```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEBRASKA
 2

 3     UNITED STATES OF AMERICA,          )    8:13CR105
                                          )
 4               Plaintiff,               )
                                          )  Omaha, Nebraska
 5          vs.                           )  July 11, 2013
                                          )  1:57 p.m.
 6     TIMOTHY DeFOGGI,                    )
                                          )
 7               Defendant.               )

 8

 9      TRANSCRIPT OF HEARING ON MOTION TO MODIFY CONDITIONS OF RELEASE

10              BEFORE THE HONORABLE THOMAS D. THALKEN

11                   UNITED STATES MAGISTRATE JUDGE

12

13     APPEARANCES:

14     For the Plaintiff:       Mr. Michael P. Norris
                                U.S. ATTORNEY'S OFFICE-OMAHA
15                              1620 Dodge Street
                                Suite 1400
16                              Omaha, Nebraska 68102

17     (telephonically)        Mr. Keith A. Becker
                                U.S. DEPARTMENT OF JUSTICE-CHILD
18                              EXPLOITATION SECTION
                                1400 New York Avenue, N.W.
19                              Sixth Floor
                                Washington, DC 20530
20

21     For the Defendant:       Mr. James M. Davis
                                DAVIS LAW OFFICES
22                              1623 Farnam Street
                                Suite 500
23                              Omaha, Nebraska 68102

24

       Proceedings transcribed from audiotape, transcript produced
25     with computer.
```

```
 1                              I-N-D-E-X

 2                    DIRECT   CROSS   REDIRECT   RECROSS

 3   DEFENDANT'S WITNESSES:

 4   1.  Timothy DeFoggi        9       34

 5   2.  Jimmy Dale Bounds      46    53,57      58,61

 6

 7

 8   EXHIBITS:                                OFFERED   RULED

 9   101.  Letter to Magistrate Judge Thalken     25      25
           from Timothy DeFoggi
10
     102.  Search warrant return                  25      25
11

12

13                                                        PAGE

14   CERTIFICATE OF TRANSCRIBER                            69

15

16

17

18

19

20

21

22

23

24

25
```

1   (On July 11, 2013, at 1:57 p.m., the following proceedings were

2   held:)

3          THE COURT:  ...Number of 8:13CR105, counsel enter

4   their appearance for the record, please.

5          MR. NORRIS:  Your Honor, for the United States I'm

6   Michael Norris in the courtroom.

7          MR. DAVIS:  Good morning, Your Honor, for the record

8   James Martin Davis appearing on behalf of Timothy DeFoggi who's

9   present in court.  Also --

10          MR. BECKER:  Keith Becker for the United States, Your

11   Honor, I'm appearing on the phone.  And thank you again for the

12   Court accommodating me by allowing me to participate via phone.

13          THE COURT:  Mr. Davis, you were interrupted.

14          MR. DAVIS:  No, I was going to say also at counsel

15   table is my legal assistant Josephine Rivera.

16          THE COURT:  Very well.  We're here on the defendant's

17   motion to modification -- to modify the conditions of release.

18      Mr. Davis.

19          MR. DAVIS:  Yes, Judge, I'd just like to make a brief

20   opening.  At the time you might recall when my client was first

21   brought into custody, Judge, we did not request really a

22   detention hearing.  I indicated to the Court that at -- first

23   of all when we -- we were going to have the detention hearing,

24   Mr. Norris wanted to proceed on a proffer.  My client wasn't

25   willing to do that.

1          Then next they provided us a number of items and documents

2     that related to the case that were more in the nature of

3     discovery.  We weren't prepared to go forward to address the

4     concerns that the government or the pretrial services officer

5     had at the time.  I needed specific information with respect to

6     my client's assets.  I needed time to put together a proposal

7     to the Court.  I've had time to do that.  I've done that in the

8     nature of our motion.

9          So what I'm suggesting, Judge, is that now there are terms

10    and conditions that will ensure my client is not a flight risk

11    and not a danger to the community.  There are certain factors

12    we're going to address that were in the PSI that just aren't --

13    aren't true.

14         My client doesn't have a mental health history, for

15    example.  You know, he -- he accidentally took an overdose of

16    drugs on an airplane because he -- he's a very poor flier.  The

17    fact that they said he has a diplomatic and a civilian or

18    tourist passport is no longer true.  Those are both expired.

19         You might recall too, Mr. Becker at the time -- it's not in

20    the PSI, but indicated to the Court that they had some

21    documents that they found relating to my client and some kid in

22    New Mexico where he was supposedly grooming him.  Well, we've

23    gone through the documents, and what Mr. Becker didn't tell you

24    and we're going to show to you is that that order was thrown

25    out.  And there's other documents that they took into custody

1   that are going to show -- and my client's going to tell about

2   it -- that he wasn't grooming any kid at all.  That they took

3   one piece of paper out of this stack of documents -- and I'm

4   not saying Mr. Becker did that -- but the agents only, you

5   know, probably gave him the one.

6       There was a court hearing down there.  My client is the one

7   that turned in the parents for child abuse down there, and they

8   turned around and filed a -- a counterclaim against him.  And

9   that was subsequently litigated and heard, you know.

10      So what we're suggesting, Judge, is that based on -- on the

11  terms and conditions we have in our -- in our motion, that --

12  that there are terms and conditions that will guarantee that he

13  will be back in court and that he will not be back in the

14  future.

15      If you look at the -- the indications in the PSI, what do

16  they say?  Assessment of non-appearance.  Possession of U.S.

17  and diplomatic passport.  Well, that we've already talked

18  about.  He doesn't have that.

19      Prior foreign travel.  Well --

20              THE COURT:  Does he have any passport now?

21              MR. DAVIS:  No, he has no passports.  They're expired.

22              THE COURT:  Both individually or diplomatic or with

23  the government?

24              MR. DAVIS:  He has none.

25              THE COURT:  All right.

```
 1            MR. DAVIS:  Prior foreign travel.  Well, that -- that
 2    hardly disqualifies somebody from being released on bond.  And
 3    he was doing that in a very limited fashion, and he'll tell you
 4    about that, only pursuant to his job.
 5        Mental health history.  He'll tell you about that too.  I
 6    mean, he was prescribed Xanax while flying and he took too
 7    many.  He never tried to kill himself.  Never admitted that.
 8            With respect to the assessment of danger, again it's the --
 9    what are the factors?  Mental health and the nature and
10    circumstance of the alleged instant offense.  Well, you know,
11    this is obviously a serious offense, but you deal with serious
12    offenses all the time.  And that doesn't mean that somebody --
13    just because somebody's charged, he's automatically a danger to
14    the community.
15        You know, the -- I'm not going to get my client -- my
16    client get into the case, but in terms of going through the
17    discovery it's a pretty much circumstantial case against my
18    client, saying that in 2006 they think it was him that used
19    this user password, and now in 2012 there's somebody else using
20    the same password and we think it's him too.  And so the two
21    must be connected.
22        I mean, and so, you know, I'm not going to get into that
23    case at all, because, I mean, you -- you've been presented with
24    some of the words and language in those texts and those
25    messages, and they were horrible.  We'll certainly admit to
```

1    that.  But -- but my client is presumed to be innocent.

2        And, you know, I think that given his absence of any kind

3    of criminal record whatsoever, the fact that he's had these

4    security clearances of all kinds, the fact that he's been

5    worthy of trust and confidence by the United States government,

6    and now you got the United States government saying he's no

7    longer worthy of trust and confidence because he's simply

8    accused.

9        And so that's where we're going.  And I'd like to put on

10   some evidence, Judge, if I might --

11           THE COURT:  You may proceed.

12           MR. DAVIS:  -- in support of my motion.  I'd call

13   Timothy DeFoggi.

14           MR. BECKER:  Your Honor, I would just request that the

15   Court admonish Mr. DeFoggi.

16           THE COURT:  I will, Mr. Becker.

17       Mr. DeFoggi.

18           THE COURTROOM DEPUTY:  Will you state your name for

19   the record, please, and spell your last name?

20           THE DEFENDANT:  Timothy DeFoggi, D-E-F-O-G-G-I.

21              TIMOTHY DEFOGGI, DEFENDANT, SWORN

22           THE DEFENDANT:  Yes.

23           THE COURTROOM DEPUTY:  Please be seated in the witness

24   chair.

25           THE COURT:  You are the defendant in this case, Mr.

1   DeFoggi?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  And under the Fifth Amendment to the

4   United States Constitution you cannot be compelled to testify

5   in this case.  Do you understand that?

6          THE DEFENDANT:  In reference to the crime charged,

7   yes, sir.  Yes, Your Honor.

8          THE COURT:  I'm sorry?

9          THE DEFENDANT:  In reference to the crime charged,

10  yes, Your Honor, I do.

11         THE COURT:  Well, your testimony can be used against

12  you.  Do you understand that?

13         THE DEFENDANT:  Yes, Your Honor, I do.

14         THE COURT:  And do you understand that when the --

15  when your counsel gets finished asking you questions, the

16  government's counsel can ask you questions?  Do you understand

17  that?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  And as long as it's within the scope of

20  the direct examination, that testimony also can be used against

21  you in these or other proceedings.  Do you understand that?

22         THE DEFENDANT:  Yes, sir, I do.

23         THE COURT:  And do you understand that if you do not

24  testify I cannot use that against you in a determination on

25  your motion to modify?  Do you understand that?

(DeFoggi - Direct)                                                          9

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  And understanding all of that, do you

 3     still wish to testify in this matter?

 4              THE DEFENDANT:  I do, Your Honor.

 5              THE COURT:  All right.  Do you have further questions

 6     I should pose to the defendant, Mr. Norris?

 7              MR. NORRIS:  No, sir.

 8              THE COURT:  Do you have further questions I should

 9     pose to the defendant, Mr. Davis?

10              MR. DAVIS:  No, Your Honor.

11              THE COURT:  All right.  Then you may inquire.

12              MR. DAVIS:  Yeah.

13                        DIRECT EXAMINATION

14     BY MR. DAVIS:

15     Q.  Mr. Witness, would you state your full name and spell your

16     last name for the record?

17     A.  Oh, Timothy DeFoggi, D-E-F-O-G-G-I.

18     Q.  Okay.  And you're the -- you understand that as the Judge

19     advised you, you're the defendant in this case?

20     A.  Correct.

21     Q.  And, you know, he's also advised you of your Fifth

22     Amendment rights against self-incrimination, right?  You

23     understand those?

24     A.  Yes, I do.

25     Q.  And you're testifying knowing, intelligently and -- and
```

(DeFoggi - Direct)                                                    10

1   voluntarily today?

2   A.   I am.

3   Q.   All right.  And with respect to the time of this

4   indictment, can you tell the Court where you were living?

5   A.   I was living in Germantown, Maryland.

6   Q.   And that's not where you're proposing to live now, is it?

7   A.   It is not.  I'm now are -- my roommate has moved to a

8   smaller place in Alexandria, Virginia.

9   Q.   All right.  How old of a gentleman are you?

10  A.   55.

11  Q.   When and where were you born?

12  A.   Dallas, Texas, January 8th, 1958.

13  Q.   And where did you attend high school?

14  A.   Piper High School in -- in Florida.

15  Q.   And when did you graduate there?

16  A.   I graduated with my GED in 1977.

17  Q.   Okay.  After you -- that, did you obtain additional

18  education?

19  A.   I did.

20  Q.   And where did you go?

21  A.   Several universities, Broward College --

22  Q.   Did you attend University of Central Florida?

23  A.   Correct.

24  Q.   Did you obtain an AA degree there?

25  A.   Well, I have two AA -- or an AA and AS from Broward College

(DeFoggi - Direct)                                              11

1   which transferred to University of Central Florida.

2   Q.   How many different degrees do you have?

3   A.   Well, I have the two, AA and AS.  And I have 16 IT

4   certifications, industry certifications, which is about four

5   years worth of college as well on top of that.

6   Q.   All right.  Now, at the time that you were indicted, where

7   were you employed?

8   A.   I was employed at the Department of Health and Human

9   Services.

10  Q.   And what did you do there?

11  A.   I was the director of cybersecurity for the office's

12  secretary.

13  Q.   And that's for the Department of Health and Human Services;

14  is that correct?

15  A.   Correct.  Correct.

16  Q.   Did you hold any kind of a clearance?

17  A.   I had a top secret clearance.

18  Q.   All right.  And prior to working for Health and Human

19  Services, where were you employed?

20  A.   I was a program director for an intelligence agency, and I

21  had a top secret SCI with acute clearance, which would be

22  nuclear weapons clearance.

23  Q.   And -- and can you tell us what agency that was?

24  A.   It was Department of Energy, Office of Intelligence and

25  Counterintelligence.  And I was the director of emerging

(DeFoggi - Direct)                                                          12

```
 1    technology, so I was a member of the CIA's counterintelligence
 2    center which is -- a monthly meeting with about five other
 3    intelligence agencies to discuss issues --
 4    Q.   And where did you work before that?
 5    A.   Pardon me?
 6    Q.   Where did you work before that?
 7    A.   Oh, where did I work before that?  I've also worked for the
 8    state department, which is where the travel came from.  I ran
 9    the terrorist name check system for the state department and
10    the immigrant visa system.  And that's why I traveled to Mexico
11    on one occasion.
12    Q.   Okay.  Is -- what -- what is the extent of your foreign
13    travel?
14    A.   I have the one trip I had to take to Ciudad Juarez to the
15    consulate office down there.  And one trip to Niagara Falls
16    quite a few years ago.  That was a personal --
17    Q.   Well, Niagara Falls is in the United States.  Or are you
18    talking about the Canada side?
19    A.   Yeah, I went over on Canada's side.
20    Q.   Is that the extent of this foreign travel --
21    A.   That is --
22    Q.   -- they've talked about that make you a --
23    A.   That is the extent of the foreign travel.
24    Q.   You have to wait until I finish.
25    A.   Oh.
```

(DeFoggi - Direct)                                                      13

1    Q.   Is that the extent of the foreign travel that you've told

2    the PSI that makes you a flight risk?

3    A.   That's my assumption.

4    Q.   Those are the only two trips you ever took?

5    A.   Those are the only two trips I've taken.

6    Q.   All right.  Never been to Europe?  Never been to Asia?

7    A.   No.

8    Q.   Never been to Russia or Bolivia?

9    A.   No.

10   Q.   Okay.  Don't know Edward Snowden?

11   A.   No.

12   Q.   All right.  All right.  And with respect to the -- do you

13   have a passport now?

14   A.   The diplomatic expired in 2008, I believe.  And I think the

15   tourist passport expired in 2012.

16   Q.   Okay.  So they're both -- both expired?

17   A.   As -- as I explained to the pretrial, they -- I told them

18   that they were both expired.

19   Q.   All right.  And you'll be willing to take those to -- even

20   though they're expired, and turn them over to pretrial service

21   officer either here or in -- or back east, true?

22   A.   Oh, absolutely.  I mean, they're of no use.  They're

23   expired.

24   Q.   Okay.  Let's talk about that.  We're suggesting that --

25   that you be released subject to house arrest and electronic

(DeFoggi - Direct)                                                                    14

1    monitoring, that's true?  Is that right?

2    A.   That is correct.

3    Q.   All right.  Now, you were -- you still live in Maryland,

4    right?  True?  When this --

5    A.   Correct.

6    Q.   When you were arrested, you were living in Maryland?

7    A.   Correct.

8    Q.   Now, can you tell the Court the address -- or do I need to

9    get that from Mr. Bounds -- where you will be living when you

10   go back this time to Virginia rather than Maryland?

11   A.   You'll probably have to get that from Mr. Bounds.  I know

12   it's Abingdon Drive, Apartment 140, in Alexandria, Virginia.

13   Q.   All right.  And Alexandria, Virginia is just right across

14   the bridge from Washington, D.C., true?

15   A.   Correct.  It's in Old Town.

16   Q.   All right.  And so what we -- when we talked about getting

17   a retired either Maryland or Washington D.C. law enforcement

18   officer to serve as your third-party custodian, you're willing

19   to do that, true?

20   A.   I am.

21   Q.   And that with respect to that person, he doesn't actually

22   have to be from Maryland, he could be from Virginia as well?

23   A.   Correct.

24   Q.   Okay.

25   A.   And it would be more convenient from Virginia probably.

(DeFoggi - Direct)                                                    15

1   Q.   Uh-huh.  Have you ever been convicted of any felonies?

2   A.   Never.

3   Q.   Ever been convicted of any misdemeanors?

4   A.   No.

5   Q.   How long have you had a -- how long have you had these

6   clearances?  When did you first get your clearance from the

7   government?

8   A.   I've probably had top secret clearances since I was a

9   federal law enforcement agent.

10  Q.   Doing what?  When were you a federal law enforcement agent?

11  A.   I was primarily counterintelligence in the last part of my

12  career with them, which is mostly when I was -- most of my

13  history is doing the counterintelligence.

14  Q.   All right.  All right.  Now, with respect to the -- do you

15  have -- do you have a roommate?

16  A.   I do.

17  Q.   And what's his name?

18  A.   Dale Bounds.

19  Q.   Does he have any kind of a -- any felony convictions?

20  A.   No felony convictions that I'm aware of.

21  Q.   I'll ask him when he testifies then.  In any event then,

22  are you going to try to get -- maintain gainful employment?

23  A.   Well, I think that --

24  Q.   Just yes or no.

25  A.   Yes, I am.

(DeFoggi - Direct)                                                         16

1    Q.   All right.  All right.  Now, you've agreed that -- that you

2    were going to pay for this third-party custodian, true?

3    A.   True.

4    Q.   And he is going to report, check on you daily, and we're

5    going to -- he's going to be a (indiscernible) professional.

6    Do you understand that?

7    A.   I do.

8    Q.   And that he will report any violations of -- of your terms

9    of pretrial release.  Do you understand that?

10   A.   I do.

11   Q.   Now, you can't have a firearm in your home.  Do you have

12   any firearms there?

13   A.   I do not.

14   Q.   You'll agree not to get any firearms, right?

15   A.   I do.

16   Q.   You're going to agree to refrain from the use of -- of --

17   excessive use -- any use of non-prescription drugs, the

18   excessive use of alcohol?

19   A.   I do.  And I'm willing to take a urine -- urine test any

20   time.

21   Q.   With the -- now, if you transfer back, if the Judge

22   releases you and allows you to go back to this new home in

23   Virginia, do you understand you'll have a pretrial services

24   officer there?

25   A.   I do.

(DeFoggi - Direct)                                                    17

1   Q.   And are you willing to report to that pretrial service --

2   pretrial release officer there and file written reports with

3   him?

4   A.   Absolutely.

5   Q.   Likewise, are you agreeable to make reports back here to

6   your pretrial services officer here?

7   A.   Whatever's required, I'm certainly willing to do.

8   Q.   And then you'll check in weekly with me and -- and once a

9   week, so we -- I know where you are, and so either you or I can

10   report back to the Court?

11   A.   Absolutely.

12   Q.   Now, do you understand that the charges here involve

13   computers?

14   A.   Correct.

15   Q.   Now, one of the things that is typical in these kind of

16   cases is that you're going to be prevented from having a

17   computer in your home.  Do you understand that?

18   A.   I do.

19   Q.   Are you willing to do that?

20   A.   I am.

21   Q.   And then you're going to have to forego access to one

22   unless you have special permission from your pretrial services

23   officer or the Court.

24   A.   Correct.

25   Q.   And that might relate to wherever you are employed.

1    A.   Correct.

2    Q.   You understand that?

3    A.   I do.

4    Q.   And that if should you have any unauthorized use of a

5    computer, that would be a violation of your terms and

6    conditions, and the Judge could revoke your pretrial release.

7    Do you understand that?

8    A.   I understand.

9    Q.   And this is all agreeable to you?

10   A.   It is.

11   Q.   All right.  Now, do you own property at 6843 Wrangell Loop

12   Northeast in Rio Rancho, New Mexico?

13   A.   I do.

14   Q.   And who's the owner of that house?

15   A.   I am.

16   Q.   Do you remember when you purchased it?

17   A.   October 13th of 2009.

18   Q.   And I have some of the documents relating to the deeds and

19   the mortgages on that property; is that true?

20   A.   That is true.

21   Q.   And you're consenting to me turning those over to the --

22   either the Court or the pretrial services officer so they

23   can -- or we can work out any documents that would be -- would

24   allow the -- the -- the Court to have a mortgage or a lien

25   against your property, true?

1    A.   I am.  True.

2    Q.   All right.  Do you know roughly what the fair market value

3    of that property is?

4    A.   Offhand, I don't know.  I know I paid 350,000 for it --

5    Q.   Uh-huh.

6    A.   -- back in 2009, and the market has fluctuated some.  So

7    offhand, I don't know what the value is currently.

8    Q.   Okay.  And do you know what -- how much equity you have in

9    there?

10   A.   Probably about 50,000.

11   Q.   Now, do you understand that without regard to your no

12   access to computers, that you can't have any -- any contact

13   with any of the persons, places or websites mentioned in this

14   indictment?

15   A.   Correct.

16   Q.   Or even in the discovery materials.  You've got some of the

17   discovery materials, right?

18   A.   I do.

19   Q.   And so you know what the websites have been identified as

20   being, true?

21   A.   I do.

22   Q.   All right.  Now, since there's a concern about your flight

23   risk are you willing -- when we have a court date set in

24   advance -- to buy and purchase your airfare and get those

25   tickets and show them to the -- to the pretrial services

(DeFoggi - Direct)                                                      20

1    officer well in advance of you -- you coming here, so they know

2    that you do intend to come back to all future court

3    appearances?

4    A.   Oh, absolutely, yeah, whatever's decided.  I think the

5    stipulation cited six weeks.  But whatever is agreed to, I'm

6    fine with.

7    Q.   Okay.  Now, the -- do you remember in court the last time,

8    Mr. Becker making -- mentioning something about a document they

9    found at your home at the time of the search?

10   A.   I do.

11   Q.   And what was it that he -- do you recall him saying that

12   they found?

13   A.   Well, they were Exhibit 3 and Exhibit 4.  One was the

14   Petition for Order of Protection, the other one was an Order of

15   Protection.  But the other six or eight documents were not

16   raised.

17   Q.   Okay.  Do you have the inventory of the items that the

18   government seized?  Do you have that with you?

19   A.   I do.

20   Q.   Okay.  Take a look at it.  You can make reference of it.

21   Can you tell the Court what you're talking about in terms of

22   what the documents were seized?

23   A.   Okay.  On page two of the A093, this is the search and

24   seizure warrant where they had listed what they had seized in

25   the search.  The last bulleted item, supplemental items, Order

(DeFoggi - Direct)

1    of Protection, papers and notes, is under the last bullet.

2    Q.   And how many -- how many items are mentioned under that

3    last bullet point?

4    A.   Well, it doesn't -- well, it just says a notebook, Order of

5    Protection with notes, and a red folder with papers.

6    Q.   All right.  So what you're saying is -- is that the

7    government only mentioned or made reference to one or two of

8    the documents that were in that group, true?

9    A.   Well, and specifically in the last hearing the government,

10   I'll quote, "it is believed that the order" -- meaning Exhibit

11   4 -- "is still in effect."

12   Q.   Okay.

13   A.   And that was obviously not true with respect to the other

14   documents, the Order to Set Aside.

15   Q.   All right.  And tell the Court just in a quick and dirty

16   fashion, what -- what that was all about.

17   A.    Well, there was a -- at the church that I attended there

18   was a family that we were friends with.  And I witnessed child

19   abuse and neglect, picking the kid up and throwing him across

20   the room, slapping him across the face so hard that it knocked

21   his head off almost, gambling to where they had no money for

22   food.

23        And so six different times I reported the child abuse and

24   neglect to the church.  And the first time I reported it, the

25   parents -- I think the pastor talked to the parents and they

1    told the pastor to tell me to mind my own business.

2         But I kept getting phone calls from the -- the child, you

3    know, crying on the phone that they had beat him again.  So

4    each time I reported it back to the church.  And then it seems

5    that the parents -- the adoptive parents that were actually his

6    great grandparents, probably in their mid 70s, and I think part

7    of it was they --

8    Q.   They did what?

9    A.   Well, anyways, they had custody of him.  And so, anyways, I

10   think that was the impetus for them filing an Order of

11   Protection so that he would not call me and I would not talk to

12   him.

13   Q.   All right.  And then ultimately they got a protection

14   order, then you got it dismissed?

15   A.   I did.  And there was actually two filings with the court

16   where I pointed out the abuse and neglect, the gambling --

17   Q.   Well, I'm not talking about that.  I'm talking about you.

18   Was that order -- protection order against you, is that set

19   aside?

20   A.   That was set aside and --

21   Q.   And was -- and was that set aside order in the documents

22   that the government seized?

23   A.   It absolutely was.  The -- the two filings that I did with

24   the court explaining the issues, all the things that they had

25   done, they had committed welfare fraud --

1    Q.   No, I'm not interested what all -- what they did.

2    A.   Okay.

3    Q.   I'm interested in -- the Court's concerned about whether or

4    not there was an active order against you.  Is there an active

5    order against you like the government said?

6    A.   There was not.

7         MR. NELSON:  Your Honor, I object, because I don't

8    know if the government ever said.  We've talked about two

9    different references and I --

10        THE COURT:  Well, overruled.  You can inquire on

11   cross.

12   Q.   (By Mr. Davis)  Well, what was it that you said Mr. Becker

13   told the -- told the Court?

14   A.   Well, in court -- well, actually it might have been Mr.

15   Norris.

16   Q.   Go -- go ahead.

17   A.   Okay.  "It is believed that the order" -- meaning Exhibit

18   4 -- "is still in effect."  And it absolutely was not, because

19   there was an Order to Set Aside which nullified that original

20   order which they said was still in effect, and it was not.

21   Q.   Okay.  And that -- that document was in the documents --

22   A.   It was absolutely in that folder that they seized.

23        MR. DAVIS:  May I approach, Judge?

24        THE COURT:  You may.

25   Q.   (By Mr. Davis)  Do you have that letter you wrote to the

1    Judge?

2    A.   I do.

3    Q.   Now, did you --

4            THE COURT:  Get to a mic there, if you --

5            MR. DAVIS:  Yeah, I --

6    Q.   (By Mr. Davis)  Did you prepare a letter you wanted to send

7    to the Judge back in June following that hearing?

8    A.   I did.

9    Q.   Okay.  And you sent it to me; is that right?

10   A.   That is true.

11   Q.   This is the -- this relates to that matter, and that's

12   something that you want the Judge to see; is that true?

13   A.   It is true.  And there's a --

14   Q.   All right.  And then -- and the --

15   A.   The last bullet --

16   Q.   The second item here is -- where it says, supplemental --

17   supplemental items, and that indicates what was seized in

18   addition to this order that they talked to the court about?

19   A.   Well, the last bullet there talks about the order.  They

20   only talked about that order, even though there was other

21   documents in that same folder.

22           THE COURT:  Have it marked 101, 102.

23   A.   I think it would've given --

24           THE COURT:  Just a -- there's nothing --

25           THE DEFENDANT:  Okay.  Sorry.

1           THE COURT:  Staple that, Mary Beth.  I don't trust

2    those clips.

3                    (Discussion off the record.)

4           MR. DAVIS:  At this time, Your Honor -- at this time,

5    Your Honor, I'd offer into evidence what's been marked for

6    evidence as Defense Exhibit No. 101.

7           THE COURT:  All right.  Any objection for the purpose

8    of this hearing, Mr. Norris?

9           MR. NORRIS:  Your Honor, I mean, it's obvious hearsay.

10   It's a letter written after the last testimony.  I understand

11   the Court's likely to accept it for what it's worth, but I do

12   object to it.

13          THE COURT:  Okay.  101 will be received.  Objection's

14   overruled.

15          MR. DAVIS:  At this time we'd offer -- the defendant

16   offers what's -- into evidence what's been marked for

17   identification as Defendant's Exhibit No. 102.

18          THE COURT:  Any objection to 102?

19          MR. NORRIS:  No, Your Honor.

20          THE COURT:  All right.  102 will be received.

21          MR. DAVIS:  If I can just have a moment, Your Honor?

22          THE COURT:  You may.

23   Q.   (By Mr. Davis)  Now, my information indicates that the --

24   the home in New Mexico is a single-family dwelling, true?

25   A.   It is.

(DeFoggi - Direct)                                                    26

1    Q.   And it's two stories; is that right?

2    A.   With a guest house out back.

3    Q.   Okay.  So it's more than just a -- a house.  It's a

4    single-family dwelling as well as a guest house that is

5    unattached, right?

6    A.   Correct.

7    Q.   All right.

8    A.   It's a casita or a guest house.

9    Q.   All right.  My information is is that the purchase price of

10   the house is 350,000, but there's a Wells Fargo mortgage to the

11   turn of -- to the tune of 298,000.  Is that consistent with

12   your recollection?

13   A.   It seems -- seems correct.

14   Q.   Okay.  That's equity of 52,000, true?

15   A.   That's correct.

16   Q.   All right.  Now, also although we don't have it in a

17   motion, do you own a boat?

18   A.   I do.

19   Q.   And what kind of boat is that?

20   A.   It's a cabin cruiser.

21   Q.   What's the fair market value of that boat?

22   A.   Probably 35, 40,000.

23   Q.   And you're willing to pledge that if the Court thinks

24   that's necessary, and use that as collateral as well as your

25   single-family dwelling --

(DeFoggi - Direct)                                               27

1   A.   Correct.

2   Q.   -- is that correct?

3   A.   Right.

4   Q.   Okay.  And you agree not to attempt to obtain any new

5   passports, true?

6   A.   Correct.  That is correct.  I'm sure they would deny it,

7   but that is correct.

8   Q.   Do you know any of the other defendants in this case?

9   A.   I do not.  With the exception of one.  I apologize.  There

10  was one that was at the jail and I found out was one of the

11  defendants.  Oh, and I had a --

12  Q.   But prior -- prior to your being arrested --

13  A.   Oh, no --

14  Q.   -- you didn't know --

15  A.   -- no, no, no.

16  Q.   -- any of these defendants.  Now, your computer was seized

17  in April, right?

18  A.   Correct.

19  Q.   But we haven't gotten any discovery back, have we yet, in

20  terms of what was on your computer, true?

21  A.   Not to my knowledge.

22  Q.   All right.  So and in terms of this case, you didn't make

23  any admissions or statements to the FBI or any law enforcement

24  officer, did you?

25  A.   No.

1    Q.   So the evidence anyway the government has against you

2    doesn't consist of any admissions that you made where you've

3    admitted guilt, right?

4    A.   No, I haven't.

5    Q.   You've entered a not guilty plea in this case, true?

6    A.   Correct.

7    Q.   You're sticking by that, true?

8    A.   Correct.

9    Q.   If the Court thinks there's any -- any other terms or

10   conditions that are necessary that you be placed under in order

11   for you to be released, will you be willing to doing -- doing

12   that?

13   A.   Absolutely.

14   Q.   All right.  Now, my -- it's my understanding that the

15   pretrial services officer might have a concern about you being

16   a danger to the community.  Are you aware of that?

17   A.   I guess, yes.

18   Q.   Okay.  Now, she bases that based on the nature of the

19   alleged offense and your mental health history.  Now, do you --

20   do you have -- have you ever been diagnosed with a mental

21   illness?

22   A.   No.  As -- as is referenced --

23   Q.   Just yes or no.

24   A.   Oh, no.

25   Q.   Let me ask the questions, Tim.

(DeFoggi - Direct)                                                    29

1    A.   No.

2    Q.   Have you -- have you ever had to repeat -- have you ever

3    been institutionalized for any mental illness?

4    A.   No.

5    Q.   Have you ever repeatedly seen treatment from a

6    psychiatrist?

7    A.   No.

8    Q.   All right.  There is a reference in here that you were

9    prescribed Xanax in 2010; is that right?

10   A.   Correct.

11   Q.   Why were you given that prescription?

12   A.   I hated flying.

13   Q.   Okay.

14   A.   Petrified of flying pretty much.

15   Q.   All right.  So it wasn't because you suffer from any mental

16   illness.

17   A.   Well --

18   Q.   Yes or no.

19   A.   No.

20   Q.   It's because you were afraid to fly?

21   A.   Correct.

22   Q.   Fear of flying as they --

23   A.   Right.

24   Q.   All right.  All right.  And then so was -- what happened

25   with respect to your use of those drugs?

(DeFoggi - Direct)                                                    30

1    A.   Well, I was flying out -- I did back-to-back trips over a

2    two-week period.  I think I went three different places around

3    the country, and I was working like 80 hours.  And I took too

4    many of the Xanax.

5    Q.   All right.  And so obviously you didn't die.

6    A.   No.

7    Q.   What did -- what did it cause?  What happened when you took

8    too many?

9    A.   Well, I -- I -- I passed out.  And when I -- and, of

10   course, got taken to University of New Mexico Hospital.  And a

11   psychiatrist did speak with me the next day and he determined

12   that it was not a result of depression or anything.

13   Q.   Stress related?

14   A.   I never saw his actual report, but he said that --

15   Q.   Well, were you released?

16   A.   I was, yeah.

17   Q.   Yeah.

18   A.   And they -- they released me without any medication, no

19   antidepressant or anything, they just released me.

20   Q.   All right.  So that's the extent of any mental health

21   history you might have, right?

22   A.   Correct.

23   Q.   And then you -- I think you -- we've indicated you --

24   you've denied the offenses in this case.  Now, do you have

25   any -- you've agreed not to have any firearms in your house.

1    Do you agree also to -- to remove any kind of weapons

2    whatsoever from your home?

3    A.   I would if I had any, but I'm not aware of any weapons in

4    my home.

5    Q.   You don't have any hunting knives, any spears, any bows and

6    arrows?

7    A.   No.

8    Q.   All right.  Do you have any -- any explosives or any items

9    that could be used to make explosives in your home?

10   A.   No.

11   Q.   Now, once again it's not in our motion, but would you be

12   willing to restrict your travel -- you're going to have house

13   arrest -- but restrict your travel within, you know, a 10-mile

14   area of -- of Washington, D.C.?

15   A.   Yeah, I -- I would.

16           MR. DAVIS:  May I have a moment, Judge?

17           THE COURT:  You may.

18   Q.   (By Mr. Davis)  And if need be, would you be willing also

19   to post -- in addition to your property, post a cash bond with

20   the Court if the Court thought that was advisable?

21   A.   I would certainly be willing to do that.

22   Q.   Uh-huh.  Now, also too, do you understand that normally --

23   and if not normally, it's going to be -- we would be suggesting

24   in this case that you waive your Fourth Amendment right to

25   search and seizure by a pretrial services officer so they can

(DeFoggi - Direct)                                                          32

1    come in and search your home to look for any weapons or look

2    for any items that might indicate that you were a danger to the

3    community?

4    A.   Oh, absolutely.  I wouldn't mind that at all.

5    Q.   All right.  So would you agree with me that if you can't

6    travel, you're on GPS, you have no firearms or weapons in your

7    house, you know, you're confined to your home, they're tracking

8    you, that you're probably not going to be much of a danger to

9    anybody?

10   A.   It would --

11              MR. NORRIS:  Objection to the form.

12              THE COURT:  Sustained.

13   A.   It would seem that --

14              THE COURT:  Just --

15              THE DEFENDANT:  Oh.

16              THE COURT:  The objection's sustained.

17              THE DEFENDANT:  Sorry, Your Honor.

18   Q.   (By Mr. Davis)  And do you understand that the third-party

19   custodian would be a retired law enforcement officer and that

20   he would report, he would check in daily or weekly or whatever,

21   with you, and he could conduct these searches, and he would be

22   bound to the -- tell the pretrial services officer or this

23   Court of any violations of your terms and conditions?

24   A.   Whatever the Court finds reasonable is fine with me.

25   Q.   All right.  Now, so what we're going to -- you're going to

1    be living with Dale Bounds, right, your roommate?

2    A.   Right.

3    Q.   Okay.  You understand that I'm going to have him testify?

4    A.   Correct.

5    Q.   And that he's going to have to take an oath that he's going

6    to have to report any and all violations of terms and

7    conditions to the Court if he observes them?

8    A.   That's fine with me.

9    Q.   All right.  So you're going to have a snitch living right

10   with you, you understand that?

11              MR. NORRIS:  Your Honor, again I object to the form of

12   the question.

13              THE COURT:  Sustained.

14   Q.   (By Mr. Davis)  All right.  Well, you're going to have

15   somebody who's going to be living with you that's going to keep

16   an eye on you, and despite your nature of relationship he's

17   going to have to tell the Court under oath that he is going to

18   watch you to make sure you don't violate any terms and

19   conditions?

20   A.   Correct.

21              MR. NORRIS:  Same objection, Your Honor.

22              THE COURT:  Overruled.

23              MR. DAVIS:  Okay.  I think that's all the questions I

24   have, Your Honor.

25              THE COURT:  All right.  Mr. Norris?

```
 1              MR. NORRIS:  Your Honor, I'd defer to Mr. Becker if
 2    the Court would allow.
 3              THE COURT:  Mr. Becker.
 4              MR. BECKER:  Thank you, Your Honor.
 5                        CROSS-EXAMINATION
 6    BY MR. BECKER:
 7    Q.  Mr. DeFoggi, your -- your attorney asked you about some
 8    matters involving your computer and items that were found on
 9    it.  I want to start there.  First, at the time that the FBI
10    searched your home in Maryland, what -- what was that -- what
11    was that address?
12    A.  It was at the Crown Ridge Court address.
13    Q.  What's the full address?
14    A.  20311 Crown Ridge Court.
15    Q.  Okay.  And you lived there at the time?
16    A.  I did.
17    Q.  With two other persons?
18    A.  Correct.
19    Q.  One of those persons is Dale Bounds?
20    A.  Correct.
21    Q.  What's the nature of your relationship?
22    A.  He is my partner.
23    Q.  Okay.  And so that -- that's a romantic relationship,
24    correct?
25    A.  Correct.
```

(DeFoggi - Cross)                                                        35

1    Q.   Okay.  There was a second individual who was living with

2    you at the time; is that right?

3    A.   Correct.

4    Q.   That individual did have a criminal record, or does have a

5    criminal record, correct?

6    A.   No, he does not.  Not that I'm aware of.

7    Q.   Okay.  At the time that FBI entered your home, you ran for

8    a computer and actually had to be physically removed from it;

9    is that correct?

10   A.   I don't believe that's an accurate portrayal.

11   Q.   Did you put your hands on a computer when the FBI

12   entered -- they entered your home?

13   A.   I was holding it when they came in.

14   Q.   It was a laptop computer?

15   A.   Correct.

16   Q.   Your laptop computer?

17   A.   Correct.

18   Q.   It was connected to the Tor network?

19   A.   Yes, I believe it was.

20   Q.   You know what the Tor network is?

21   A.   I do.

22   Q.   You're familiar with it from your expertise as a -- an IT

23   professional?

24   A.   I'm familiar with it from my intelligence positions.

25   Q.   There was Tor network software installed on that computer?

1    A.   Tor software was not installed.  The Tor browser was, but

2    that's not the application.  It's just a browser.  It's a

3    Firefox browser.

4    Q.   Got it -- you installed it on that computer?

5    A.   Correct.

6    Q.   It was running at the time?

7    A.   I believe it was.

8    Q.   It was downloading a child pornography video from a child

9    pornography website, correct?

10   A.   That, I would not characterize as accurate.  There was

11   something being downloaded, but I -- it was in the process of

12   downloading so I did not know what it was at the time.

13   Q.   What did you know about it?

14        MR. DAVIS:  Objection, outside -- that's outside the

15   scope and it's also --

16        THE COURT:  Overruled.

17   Q.   (By Mr. Becker)  Mr. DeFoggi, what do you think was being

18   downloaded?

19   A.   Well, it was from a -- in contrary to what the description

20   was of the Tor network that I -- I read, there is a directory

21   out there.  And it's not that somebody tells you that, hey,

22   there's -- this is where you go to get whatever.  There is

23   multiple Tor directories out there.  And it runs a gamut --

24   it's one of those -- it's pretty much a free speech part of the

25   internet that was actually, of course, as you know, was

1    developed by DOD for repressed countries so that they could

2    communicate with people without oversight from the government

3    and any type of retaliation by the government.

4        That is an application from the intelligence side of the

5    house that I've been very interested in because, as I mentioned

6    before, I used to develop technology for the CIA and NSA.  And

7    there were some applications in systems that I actually

8    developed that I had to go brief the National Security Council

9    of Justice to get permission to do certain things.

10       Tor is another one of those things that, from an

11   intelligence perspective, I had some thoughts and ideas on how

12   best to provide attribution --

13           MR. DAVIS:  I'm going to object to this, Judge, it's

14   irrelevant what Tor is.

15           MR. BECKER:  Judge, we're happy to let him --

16           THE COURT:  Overruled.

17           MR. BECKER:  -- answer.

18           THE COURT:  You can finish the answer.

19           MR. BECKER:  I would ask that he be allowed to answer.

20   A.   Okay.  Well, Tor is one of those things, one of those

21   applications that was developed by DOD.  But it comes back to

22   bite the U.S. government somewhat at times because it is a

23   forum of ultimately free speech.  But it is a forum where leaks

24   can be made without attribution.

25       And one of the systems that I developed for this, probably

1    in use, addressed that somewhat.  The leaks that have come out

2    in the press recently, this system that I developed addressed

3    that.  It also would track foreign intelligence officers and

4    multiple other things, but that -- the system, of course, is

5    classified so I can't discuss it in an open forum.  But that

6    is -- Tor is certainly something that the government, from my

7    perspective, is interested in.

8        And I've also kind of done some watching on that at the

9    department to try and see if that was in use at the department,

10   although the department has limited the amount of classified

11   information, they do do bioterrorism and other things of that

12   nature.  So I -- from my position at the -- in the government I

13   was certainly interested in some of the aspects of attribution

14   with Tor.

15   Q.   (By Mr. Becker)  So you've actually done development work

16   on the Tor network; is that what you're saying?

17   A.   No, that's not what I'm saying.

18   Q.   You've developed some sort of system for searching it?

19   A.   No, I have not.  I developed application, several systems

20   that are -- have been briefed to DNI and CIA and NSA, and

21   probably in use currently.  But those are not related to Tor.

22   Q.   What website was that file being downloaded from when the

23   police -- when the FBI entered your home?

24         MR. DAVIS:  Objection.  I'm going to object, may --

25   and I'd like to be heard on this.

(DeFoggi - Cross)                                                          39

1              THE COURT:  You may.

2              MR. DAVIS:  My client has a right to -- to take the

3     Fifth Amendment with respect to --

4              THE COURT:  He may do -- he may do so at any time, but

5     I'm not overruling.  I mean, if you want to -- if you have an

6     objection.  But your client can take the Fifth Amendment at any

7     time he feels that the answer he gives may incriminate himself.

8     So --

9              MR. DAVIS:  Okay.  But I -- before I do that, I was

10    going to make my motion, it's outside the scope of --

11             THE COURT:  No, it isn't.  I think it's well within

12    the motion.  You opened up this area so wide you can drive a

13    truck through, Mr. Davis.  And so, therefore, the objection is

14    overruled.  The witness will answer the question.

15    Q.  (By Mr. Becker)  Mr. DeFoggi, what website was that file

16    being downloaded from when the FBI entered your home?

17    A.   I don't recall.  There are hundreds of websites.  I don't

18    know if you've looked at the -- some of the directories that

19    you can find out there, there's --

20             MR. DAVIS:  I'm going to object it's non-responsive.

21    I mean, it just calls for a yes or no.

22             MR. NORRIS:  That's not his objection --

23             THE COURT:  The -- that objection can only be made by

24    the questioner.  So your objection is overruled.

25    Q.  (By Mr. Becker)  Mr. DeFoggi, I'm not asking you about what

(DeFoggi - Cross)                                                    40

1   websites are available on the Tor network.  I'm asking you, you

2   said that there was a file being downloaded when the FBI came

3   into your home and you put your hands on the computer.  What

4   website was up and being downloaded from?

5   A.  Well, that's --

6           MR. DAVIS:  And I'm going to -- I want to instruct him

7   to take the Fifth Amendment.  We don't have anything turned

8   over yet in terms of what --

9           THE COURT:  You just make your objection, Mr. Davis.

10          MR. DAVIS:  I'm going to instruct him to take the

11  Fifth Amendment, not answer that question.

12          THE COURT:  That's up to the defendant.

13      Mr. DeFoggi.

14          THE DEFENDANT:  Well, Your Honor, I think this does

15  go --

16          THE COURT:  Mr. DeFoggi, you can take the Fifth

17  Amendment or you can answer the question.  You can either

18  accept your attorney's advice, ignore it, or do what you wish.

19  It's your testimony, given the admonition I gave you with

20  regard to the fact that your testimony can be used against you

21  in these or other proceedings.  Now, with that in mind, you may

22  answer or not, or assert your privilege under the Fifth

23  Amendment.

24          THE DEFENDANT:  Well, I think this crosses over into

25  what would be at the trial, so I would like to exercise my

(DeFoggi - Cross)                                                            41

1    Fifth Amendment.

2             THE COURT:  All right.

3             MR. NORRIS:  Your Honor, we would move to strike his

4    testimony.

5             THE COURT:  Well, Mr. Becker's doing the examination,

6    Mr. Norris.

7             MR. NORRIS:  And I'll be quiet.

8             MR. BECKER:  I'm sorry, I would -- I would join with

9    my -- my colleague.

10            THE COURT:  I'll take that under advisement.  You may

11   further --

12            MR. BECKER:  Thank you, Your Honor.  And I guess just

13   quickly just for the record, Your Honor, part of our basis

14   would be, of course, that one, the defense has elicited

15   testimony about the computer itself; and two, of course, that

16   he made no admissions or statements to the FBI indicating his

17   guilt, which we think amongst the rest of the things brought

18   all of this to play, and that he's already taken the stand and

19   waived his Fifth regarding these sorts of matters.  And so he

20   should be actually compelled to -- to answer -- answer these

21   questions or forfeit the testimony.

22            THE COURT:  Well --

23            MR. BECKER:  I'll move -- I will move on.

24            THE COURT:  -- move on, Mr. Becker.

25            MR. BECKER:  Your Honor, just wanted to make that

1    record.  I'll move on to another area of inquiry.  Court's

2    indulgence, one moment?

3    Q.   (By Mr. Becker)  Mr. DeFoggi, it was your testimony that

4    there are no firearms currently in the home.

5    A.   That is correct.

6    Q.   There was a firearm in the home at the time the FBI

7    searched it.

8    A.   There was.  And I had a concealed weapons permit, so it was

9    registered to me.

10   Q.   Where is it now?

11   A.   I believe you guys seized it though.

12   Q.   You stated that you had a top secret clearance involving

13   your -- I want to quote you right -- being a -- at some point

14   "a federal law enforcement agent."  For what agency were you a

15   federal law enforcement agent?

16   A.   OSI.

17   Q.   Which OSI?

18   A.   The OSI.

19   Q.   Air Force?

20   A.   Correct.

21   Q.   When?

22        I'm sorry, Mr. DeFoggi, maybe that didn't -- I asked you

23   when were you an Air Force Office of Special Investigations

24   agent?

25   A.   '81 to '84.

(DeFoggi - Cross)                                                    43

1   Q.   And when did you discharge or separate from the Air Force?

2   A.   '84.

3   Q.   How were you separated?

4   A.   Honorable.

5   Q.   Do you maintain a sort of reserve status?

6   A.   I do not.  I did spend time in the Army after that in

7   military intelligence as well.

8   Q.   With respect to the -- the Order of Protection that you

9   testified about, do I have it right, your testimony is that

10  that order was set aside?

11  A.   It was set aside and there was an agreed -- the original

12  order was, I think, for six years or something.  We had -- and

13  they did a default judgment because I wasn't in court.  But

14  they -- when I did go to court after that, they did a set

15  aside, and then we agreed to 10 months that -- instead of the

16  six years.  I agreed to 10 months, because in the e-mail that I

17  sent to the church I told them that I did not want to have any

18  contact with this child any more because there was nothing I

19  could do.  I kept reporting it and nothing was being done.  But

20  anyways, the order came well after that.

21  Q.   So the order -- but the order was -- it was set aside and

22  replaced with a stipulated order between you and the other

23  party, right?

24  A.   Correct.  It went from six years to 10 months.

25  Q.   (Indiscernible) that same child, correct?

1    A.   Yeah.  Right.  So the statement that it was still in effect

2    was not true.

3              MR. BECKER:  Court's brief indulgence, Your Honor?

4              THE COURT:  You may.

5    Q.   (By Mr. Becker)  Mr. DeFoggi, you had a cell phone at

6    the -- at the time that you were still living in your

7    Germantown, Maryland home; is that right?

8    A.   Correct.

9    Q.   Phone number is 703-909-5559?

10   A.   Correct.

11   Q.   Through Verizon?

12   A.   AT&T.

13   Q.   Through AT&T.  Is that right?

14   A.   Correct.

15   Q.   You used that number for some period of time a number of

16   years?

17   A.   Some period of time.  Offhand, I don't know what the period

18   of -- that was.

19   Q.   Going back to 2006; is that fair to say?

20   A.   I would have to look at my records.  I'm -- that could be

21   true, I'm not sure.

22   Q.   Okay.  Did you previously live at an address, 8760 Mill

23   Towns Court, Alexandria, Virginia?

24   A.   I did.

25             MR. BECKER:  Your Honor, unless my colleague does, I

```
1    don't have any further questions other than I would certainly

2    have further inquiry on the topic that I was inquiring on

3    earlier when the defendant chose to -- just to taking the Fifth

4    rather than answer the questions.

5                THE COURT:  Mr. Norris?

6                MR. NORRIS:  No, Your Honor.

7                THE COURT:  Redirect?

8                MR. DAVIS:  I have no redirect, Your Honor.

9                THE COURT:  All right.  Mr. DeFoggi, you may stand

10   down.

11               THE DEFENDANT:  Thank you, sir.

12               THE COURT:  Do you have further evidence, Mr. Davis?

13               MR. DAVIS:  I do, Your Honor.  I'd call --

14               THE COURT:  You may.

15               MR. DAVIS:  -- Mr. Dale Bounds.

16               THE COURT:  All right.  Sir, come forward.

17               THE COURTROOM DEPUTY:  Will you state your name for

18   the record, please, and spell both your first name and your

19   last name?

20               THE WITNESS:  Jimmy Dale Bounds, B-O-U-N-D-S.  I go by

21   Dale.

22               JIMMY DALE BOUNDS, DEFENDANT'S WITNESS, SWORN

23               THE WITNESS:  (No audible response).

24               THE COURTROOM DEPUTY:  Please be seated in the witness

25   chair.
```

1                    THE COURT:  You may inquire.

2                    MR. DAVIS:  Thank you.

3                         DIRECT EXAMINATION

4     BY MR. DAVIS:

5     Q.   Now, Mr. Witness, would you state your full name and spell

6     your last name for the record, please?

7     A.   Jimmy Dale Bounds, B-O-U-N-D-S.

8     Q.   And, Mr. Bounds, how old of a gentleman are you?

9     A.   49.

10    Q.   And where do you live?

11    A.   1420 Abingdon Drive -- West Abingdon Drive, excuse me,

12    Apartment 140, Alexandria, Virginia 22314.

13    Q.   Okay.  Are you employed?

14    A.   Yes, sir.

15    Q.   And where are you employed?

16    A.   Calico Corners also known as Everfast, Incorporated.

17    Q.   And where is that located?

18    A.   In Old Town on King Street.

19    Q.   Old Town, Alexandria?

20    A.   Yes.

21    Q.   And in what capacity are you employed?

22    A.   I'm production management.

23    Q.   And for how long have you been so employed?

24    A.   Two years.

25    Q.   And what's the extent of your education?

1    A.    Two years of community college.

2    Q.    Where?

3    A.    In Central Florida Community College.  And also --

4    Q.    Okay.  Then when and where did you graduate from high

5    school?

6    A.    Florida -- I'm sorry.  Forest High School, Ocala, Florida.

7    Q.    Where?

8    A.    Forest High School in Ocala, Florida.

9    Q.    Oh, Ocala.  Okay.  And then you had two years of college

10   after that; that's correct?

11   A.    Right.  And then also Lake Mary Community College --

12   Q.    Oh --

13   A.    -- in Sanford, Florida.

14   Q.    And how much -- how many credits did you obtain there?

15   A.    I honestly --

16   Q.    Or how many semesters?

17   A.    -- don't know.

18   Q.    Okay.  All right.  Do you know the defendant in this case?

19   A.    Yes.

20   Q.    And how do you know Mr. DeFoggi?

21   A.    Had a relationship for 24 years.

22   Q.    All right.  Have you been living together for 24 years?

23   A.    Yes, sir.

24   Q.    All right.  Now, the -- the address of 1420 West Abingdon

25   Drive, Apartment 140, Alexandria, Virginia, that's where you

(Bounds - Direct)                                                                48

1    live right now; is that correct?

2    A.   Correct.

3    Q.   Now, prior to my client's arrest, where did you live?

4    A.   20311 Crown Ridge Court.

5    Q.   And that's in Germantown, Maryland?

6    A.   Yes, sir.

7    Q.   Okay.  And were you living with him at the time of his

8    arrest?

9    A.   Yes, sir.

10   Q.   All right.  Now, when did you move from the Germantown,

11   Maryland residence to the Alexandria residence?

12   A.   The lease was up in May, the end of May, so we ended the

13   lease.  We didn't renew the lease.

14   Q.   And was there any reason related to this case that you

15   moved to Alexandria?

16   A.   Firstly, to be closer to work.  I'm only 14 blocks from

17   work now.  And secondly, because I was traumatized by the whole

18   thing.

19   Q.   All right.  With respect to the -- if the Court releases my

20   client, he's going to -- we're asking that he release him back

21   to this address.  Do you understand that?

22   A.   Correct.

23   Q.   And that you will -- that he will be under terms and

24   conditions for pretrial release.  Do you understand that?

25   A.   Yes.

1  Q.  And do you understand that if you're living with him --

2  strike that.

3       That -- are you willing to pledge your support to pretrial

4  services officer that if Tim violates any terms and conditions

5  of his pretrial release, you will report him to PSI?

6  A.  Yes.

7  Q.  All right.  Have you ever been convicted of a felony?

8  A.  No.

9  Q.  Are you currently involved in any criminal cases now --

10 A.  No.

11 Q.  -- or -- or civil suits or anything like that?  Now, have

12 you had a chance to see the motion that we filed in this case?

13 A.  Motion?  I don't believe.

14 Q.  The motion where we are asking the Court to release Tim --

15 A.  Oh, yes.

16 Q.  -- did we show that to you?

17 A.  That one, yes.

18 Q.  And do you understand that he would be subject to house

19 arrest?

20 A.  Yes.

21 Q.  And that means that while you could come and go, he

22 couldn't?

23 A.  Correct.

24 Q.  And that he could have -- be subject to GPS tracking and

25 electronic monitoring.  Do you understand that?

1    A.   Yes.

2    Q.   Now, I'm not sure how it works in Virginia, but one of the

3    factors could be that you have to -- have a landline with

4    nothing but just straight service, no call waiting, no call

5    forwarding, no voice mail.  Would you be willing to do that?

6    A.   Yes, we could do that.

7    Q.   Now, he's agreed to hire a retired Washington, Maryland or

8    Virginia law enforcement officer, this third-party -- as a

9    third-party custodian, are you aware of that?

10   A.   Yes.

11   Q.   All right.  Now, you and I have talked about that over the

12   phone as well, have -- have we not?

13   A.   Yes.

14   Q.   And you're willing to -- if he doesn't have the money or

15   all the money he needs, to chip to help pay for this law

16   enforcement officer?

17   A.   Correct.

18   Q.   And do you understand that that -- you're going to have to

19   allow this third-party custodian access to your home?

20   A.   Correct.

21   Q.   Even though you're not subject to pretrial release, Tim is,

22   and so since it's a joint home this --

23   A.   I realize that.

24   Q.   All right.  And will you ensure that Tim reports weekly to

25   his pretrial release officer?

1   A.   Correct.

2   Q.   And make sure if he has to file written reports, they're

3   going to be filed on a regular basis?

4   A.   Yes.

5   Q.   All right.  Now, one of the things we need to talk about is

6   the fact that Tim is not going to be able to have access to a

7   computer in his home.

8   A.   Right.

9   Q.   Now, do you understand by implication that's going to mean

10  you can't have access to a computer in your home?

11  A.   Right.

12  Q.   And you're willing to do that?

13  A.   Yes, sir.

14  Q.   All right.  And that that not only means just regular

15  desktop, but that would mean laptop computers as well.

16  A.   Correct.

17  Q.   All right.  So you're willing to confine your use of any

18  computers to your work --

19  A.   Yeah, we could take them --

20  Q.   -- or other locations?

21  A.   -- out of the house.  Remove them from the house.

22  Q.   Okay.  And you'll make sure that he checks in once a week

23  with his pretrial services officer here in Omaha as well; is

24  that right?

25  A.   Yes.

1    Q.   And you -- he's pledging that he'll contact his attorney,

2    which is me, by telephone every Monday and then send proof to

3    pretrial officer.  That's okay with you, isn't it?

4    A.   That's fine.

5    Q.   In fact, you -- you have had regular contact with our

6    office almost --

7    A.   Weekly.

8    Q.   -- every other day, haven't you?

9    A.   Yes, sir.

10   Q.   Yeah, okay.  Now, you don't hold any interest in that 6843

11   Wrangell Loop property --

12   A.   No, sir.

13   Q.   -- in New Mexico, do you?

14        If there are any other terms and conditions that the Judge

15   would want to make Tim subject to, they may affect you as well.

16   Do you understand that?

17   A.   I understand, yes, sir.

18   Q.   And are you telling the Court you're giving them carte

19   blanche to fix whatever terms and conditions on Tim that will

20   allow him to be released, without regard to what it's going to

21   impact you?

22   A.   Right.  Correct.

23             MR. DAVIS:  That's all I have.

24             THE COURT:  Mr. Norris?

25             MR. NORRIS:  I'll defer again, Your Honor.

(Bounds - Cross by Mr. Becker)                                    53

1            THE COURT:  Mr. Becker?

2            MR. BECKER:  Thank you, Your Honor.

3                        CROSS-EXAMINATION

4    BY MR. BECKER:

5    Q.   Mr. Bounds, you were present at the home when the FBI

6    searched it and arrested Mr. DeFoggi; is that correct?

7    A.   Yes.

8    Q.   He was on the computer?

9    A.   I don't know.  I was asleep.

10           MR. DAVIS:  I'm going to object, that's outside the

11   scope.

12           THE COURT:  Overruled.

13   Q.   (By Mr. Becker)  Mr. DeFoggi was on the computer when the

14   FBI agents entered the home?

15   A.   I do not know.  I was asleep.

16   Q.   Okay.  So you were not on the computer when FBI agents

17   entered the home?

18   A.   No, sir.  It was 4:00 in the morning.

19   Q.   You were not downloading anything on that computer, on that

20   laptop computer when agents entered the home?

21   A.   No, sir.

22   Q.   You hadn't been using that computer in the minutes or even

23   hours before FBI agents entered the home?

24           MR. DAVIS:  Objection, outside --

25   A.   No, sir.

1           MR. DAVIS:  -- the scope, irrelevant to this hearing.

2           THE COURT:  Overruled.

3    Q.  (By Mr. Becker)  You hadn't been using that computer in the

4    minutes or hours before the FBI entered the home and arrested

5    Mr. DeFoggi?

6    A.  No.

7    Q.  He's the primary user of that computer?

8    A.  I check my e-mail on that computer.

9    Q.  Do you know what the Tor network is?

10   A.  No.  I was already questioned on this at the time.

11   Q.  That was a no, right?

12   A.  No.

13   Q.  You instore -- install any Tor software on that computer?

14   A.  No.  I wouldn't know how.

15   Q.  To your knowledge have you ever used the Tor network?

16   A.  No.

17          MR. DAVIS:  Judge, I'm going to object.  This is not a

18   trial.  It has to do --

19          THE COURT:  Overruled.  It's obvious that if the

20   defendant is going to be living with the -- with this witness

21   and the aspect of -- of computer access and knowledge of the

22   computer and so forth is very relevant with regard to the

23   conditions in this matter.  So therefore, your objection is

24   overruled and the witness will answer the question if he has

25   not already.

1      All right.  Mr. Becker, you may reestablish the question or

2  proceed to the next.

3            MR. BECKER:  Thank you, Your Honor.

4  Q.  (By Mr. Becker)  So, Mr. Bounds, have you ever used the Tor

5  network to your knowledge?

6  A.  No.

7  Q.  You ever access images or videos depicting minors, that is

8  people under the age of 18, engaging in sexually explicit

9  conduct, on the computer?

10  A.  No.

11  Q.  Have you ever used an online alias "PTasseater" that is

12  spelled, P-T-A-S-S-E-A-T-E-R?

13  A.  No.

14  Q.  Either as an e-mail account or as any other sort of online

15  account?

16  A.  No.  I don't talk like that.

17  Q.  Have you ever used the online alias -- pardon me for my

18  language -- "fuckchrist", F-U-C-K --

19  A.  Never.

20  Q.  -- C-H-R-I-S-T?

21  A.  I would never use that kind of language.

22  Q.  So you've never used that as an online alias or in

23  connection with any sort of e-mail --

24  A.  No, sir.

25  Q.  -- or other online account; is that right?

(Bounds - Cross by Mr. Becker)                                        56

1    A.   No, sir.

2              MR. BECKER:   Court's indulgence, Your Honor?

3              THE COURT:   You may.

4    Q.   (By Mr. Becker)   You've been with Mr. DeFoggi for, you

5    said, 24 years?

6    A.   Correct.

7    Q.   I assume that you don't always monitor his computer use; is

8    that right?

9    A.   Not always, no.

10   Q.   The morning the FBI came in, he was up that early morning

11   and you were still asleep; is that right?

12   A.   Correct.

13   Q.   Is that a pretty common pattern, he tends to use the

14   computer early in the morning?

15   A.   Sometimes.

16   Q.   While you're still sleeping?

17   A.   Sometimes.   It depends on who's up first and who's making

18   breakfast.

19   Q.   Does he tend to be on the computer early in the morning in

20   general, whether you're up or not?

21   A.   Different times of the day.

22   Q.   I'm just directing you to early -- early in the morning, is

23   that -- is it common for him to be on the computer early in the

24   morning?

25   A.   No.

(Bounds - Cross by Mr. Becker)                                    57

1    Q.   Is it fair to say there's times where he uses the computer

2    that you're not aware of what sites he's accessing or what he's

3    doing on it?

4    A.   Yeah.

5    Q.   You haven't monitored his computer use while the two of you

6    have lived together; is that correct?

7    A.   No.

8            MR. BECKER:  Thank you, Your Honor.  Unless my

9    colleague has additional ones, I have no further questions.

10           THE COURT:  Mr. Norris?

11           MR. NORRIS:  One inquiry, and I don't know if you want

12   me to ask Mr. Becker to ask it or if you want me to just --

13           THE COURT:  Go ahead.

14           MR. NORRIS:  All right.

15                        CROSS-EXAMINATION

16   BY MR. NORRIS:

17   Q.   Did you talk to a pretrial services officer by the name of

18   Irma Dasovic, shortly after Mr. DeFoggi's arrest?

19   A.   I'm sorry, I don't recognize the name.  No.

20   Q.   Do you remember talking to a pretrial services officer

21   immediately after his arrest while he was still in Maryland?

22   A.   I called my pretrial services officer, if you want to call

23   it that.  I was on a misdemeanor probation --

24   Q.   Okay.

25   A.   -- at the time.  And, of course, I was immediately required

(Bounds - Cross by Mr. Norris)                                        58

1    to speak to him and tell him what went on.  And that --

2    Q.  And just so you know, that's not what I'm asking.  So

3    maybe --

4    A.  Okay.

5    Q.  -- let me ask you maybe more directly and we'll get right

6    to it.  In the pretrial services report that was done out of

7    Maryland, in the Southern Division of Maryland, it reads as

8    follows, that Mr. Bounds verified the defendant's physical

9    health information.

10       Do you remember verifying physical health information to an

11   officer at some point?

12   A.  No, I don't.

13   Q.  Do you remember telling an officer that the defendant was

14   hospitalized due to an attempted suicide three years ago and

15   diagnosed with depression?

16   A.  No, I don't remember saying that.

17   Q.  You don't remember ever making that statement to anybody?

18   A.  Not that -- not in that form, no.

19   Q.  All right.  Thank you.

20           MR. NORRIS:  No further questions.

21                        REDIRECT EXAMINATION

22   BY MR. DAVIS:

23   Q.  You have a -- you say you were on a misdemeanor?

24   A.  Yes, I had a misdemeanor.

25   Q.  What was it?

1    A.   I had urinated in a federal park because the bathrooms were

2    locked.

3    Q.   Oh.

4    A.   And I was arrested --

5    Q.   Okay.  Well, you have never been -- have you ever been

6    convicted of a misdemeanor involving fraud or dishonesty?

7    A.   No.

8    Q.   This is the only -- only misdemeanor, only crime you ever

9    been charged with is urinating in public?

10   A.   Correct.

11   Q.   Okay.

12            MR. DAVIS:  That's all.

13            THE COURT:  The -- what was the charge?

14            THE WITNESS:  Lewd and lascivious.

15            THE COURT:  Okay.  And with respect to what -- you

16   said not in those words.  What words did you use with regards

17   to the mental health of the defendant about --

18            THE WITNESS:  Just that something like this could be

19   upsetting enough.

20            THE COURT:  Well, what about the occasion years ago,

21   or whatever it was, that you indicated to the -- to -- to the

22   pretrial services officer that there was an attempted suicide?

23            THE WITNESS:  I'm sorry, I don't follow you.  Could

24   you say it again?  I'm sorry.

25            THE COURT:  As I recall Mr. Norris' question, he

 1    said -- well, Mr. Norris would you please repeat what the

 2    pretrial services officer had included in the report?

 3          MR. NORRIS:  Yes, Your Honor.  It says, "Mr. Bounds

 4    verified the defendant's physical health information.  He

 5    stated the defendant was hospitalized due to an attempted

 6    suicide three years ago and diagnosed with depression."

 7          THE COURT:  All right.  Now, are you aware of that?

 8          THE WITNESS:  I think the word missing there is

 9    "suspected" at the time.

10          THE COURT:  All right.  But he was hospitalized?

11          THE WITNESS:  He was hospitalized after the incident

12    of the accidental overdose.

13          THE COURT:  And it was an overdose of --

14          THE WITNESS:  Of Xanax.

15          THE COURT:  -- of controlled substances?

16          THE WITNESS:  Yeah.

17          THE COURT:  All right.

18          THE WITNESS:  That they gave him for --

19          THE COURT:  All right.

20          THE WITNESS:  -- a flight phobia.

21          THE COURT:  Okay.  All right.  If those questions

22    (indiscernible) questions by either side, you may now inquire.

23    Mr. Davis?

24          MR. DAVIS:  No, Your Honor.

25          THE COURT:  And Mr. Norris or Mr. Becker?

1          MR. NORRIS:  Not by me, Your Honor.

2          MR. BECKER:  No, Your Honor.

3          MR. DAVIS:  Oh, wait, maybe I do.  Maybe I do.

4                    FURTHER REDIRECT EXAMINATION

5    BY MR. DAVIS:

6    Q.   Were you with him when this happened, when he took too many

7    drugs for --

8    A.   Years ago, yes.

9    Q.   And was it your understanding it was for -- because he was

10   afraid of -- afraid of flying?

11   A.   Yeah.  He had the prescription for flying because he had a

12   fear of flying, had to fly for his job.

13   Q.   Okay.  And then how long was he hospitalized?  Overnight?

14   A.   Two days.  After he had a chance to talk to somebody.  It

15   was like overnight, and then the next day he talked to someone

16   and they let him come home.

17   Q.   Did he ever have to see any -- have to see any

18   psychiatrists after that?

19   A.   No.

20   Q.   No diagnosis of any mental illness or anything like that?

21   A.   No.

22          MR. DAVIS:  That's all.

23          THE COURT:  All right.  You may stand down, sir.

24       Do you have further evidence, Mr. Davis?

25          MR. DAVIS:  No, Your Honor.  We would rest.

```
 1              THE COURT:  Any evidence by the government, Mr.

 2    Becker?

 3              MR. BECKER:  No, Your Honor, just argument.

 4              THE COURT:  All right.  I do note that the Court takes

 5    judicial notices of the previous detention hearing and the

 6    exhibits and all materials noted therein.  I'll hear you on

 7    your motion, Mr. Davis, very briefly.

 8              MR. DAVIS:  Judge, we're going to ask you to release

 9    him.  I mean, if -- if you -- if you don't release him here,

10    then anybody that's charged with a serious offense is going to

11    not be subject to release on bail.

12         I mean, the incident in this case is -- you know, the --

13    even though the charges are severe, we laid out all the terms

14    and conditions that you possibly could have to ensure that he's

15    not a flight risk and that he's not a danger to the community.

16         There's no computers in there.  There's no firearms in

17    there.  He's got an ex-cop looking after him.  He's got to

18    report to two pretrial services officers.  He can't leave his

19    house.  And there's a GPS on him.  What more can we do?

20         There isn't anything other than his pretrial detention

21    for -- for punitive purposes.  And that's what the government

22    wants to do.  I need him out so I can prepare a defense in this

23    case.

24         You know, and with respect to your motion of taking it

25    under advisement, if you strike anything you can strike the
```

1    testimony about the computer because the only testimony I

2    elicited is the fact that they went in and they say they seized

3    stuff on your computer, but we don't have it.  And that's all

4    he said is we don't have it.

5         If they're trying to argue their case through my client and

6    get him to incriminate himself, you know, if -- if -- they --

7    Mr. Becker told you at the time we had our first detention

8    hearing that he was on the computer and he was downloading

9    pornography -- child pornography or whatever.  That was the

10   implication.  They -- we don't have that.  They haven't found

11   anything on that computer, at least it hasn't been turned over

12   to us.

13        And so like the business about the -- the order that was no

14   longer in effect, that intentionally or unintentionally misled

15   the Court.  And that was the subject of the -- the first

16   hearing in terms of him being detained.  We needed time to

17   prepare and go over it.  I wanted to wait and see if we got

18   anything that they were talking about on that computer that

19   would -- might hurt our case, as well as this issue here.

20        But, Judge, he's not going to be a flight risk.  He

21   doesn't -- they told you, too, he had a passport -- two

22   passports and they were active.  And that's not true.  So there

23   are at least three falsehoods there, unintentional or

24   intentional, that were presented to you that you made your

25   first -- your -- your first decision on.

1    He didn't have -- they say he had passports.  He didn't

2    have them.  They said that -- that -- that order was in effect.

3    And it wasn't.  And they gave you the impression that there

4    was -- they nailed him red-handed and there was child

5    pornography on that computer.  And we don't have it.

6        I've asked for it.  We were supposed to get it.  We have a

7    chance to out and look.  I'm going to go out and look next week

8    to the FBI in terms of what they have.  But Mr. Tarpinian, he's

9    told me, they don't have anything there that was seized from

10   the computer.

11       Now, that is important.  Not only in his case, but it's

12   important in terms of what they're implying to you is that

13   right when they came in and he was caught red-handed.  That's

14   only an allegation.  He may have been on the computer, but

15   there isn't any evidence that it was child pornography.  At

16   least that's been turned over to us, you know.

17       So obviously, Judge, you know, the statements in the -- the

18   affidavits that were made by this fuckchrist or whatever the

19   names were, you know, those are horrible.  Whether they were

20   true and meant to be, or just fantasy, I don't know.  I don't

21   think anybody can speculate.

22       But if you read that -- that affidavit that they put in,

23   the only evidence really -- they don't have any eyewitnesses,

24   any really physical evidence.  What they're saying is that

25   these passwords they think belonged to my client in 2006 were

1    the passwords used in 2012.  And so because they think it was

2    him in 2006, and the same passwords used in 2012, it must be

3    him.  I don't know that there's anything that they've connected

4    up in the material that show that they can connect that

5    computer or anything my client did at the time in terms of

6    physical evidence with -- with what was going on and what they

7    allege.

8         But I'm not here to necessarily argue the case.  But, I

9    mean, you know -- you know, he's got a defense.  And -- and,

10   you know, he's presumed to be innocent.  And -- and -- and

11   we -- and I think that's what the government's trying to do is

12   just to make sure he stays in jail.  When they know that --

13   they have a certain legitimate right to argue and advance the

14   theories that they do, but we have an equal right, Judge.

15        And I think we've overcome that presumption, you know, he's

16   not a flight risk now.  He's not a danger.  You're going to

17   have Dale Bounds looking after him.  You're going to have two

18   pretrial services officers watching him.  You're going to have

19   an ex-cop watching him.  You know, I'm going to have him to --

20   he's going to be reporting in to me.  I mean, there's not

21   any -- anything more that we can do.

22        Because if -- if you don't release him under all those

23   conditions, then we're saying you really don't have any right

24   to pretrial release at all.  And you do under the Constitution

25   have a right to bail.  It's in our Bill of Rights.  Certainly

1    they have to show that -- I mean, if he were -- had guns in his

2    place or if -- if there were shootings, or he had a history of

3    assault, those are the usual examples of -- of history or a

4    danger to the community.  There isn't any evidence that other

5    than -- besides the tentative nature of linking it to him,

6    there isn't any evidence at all that he ever tried to contact

7    anybody, or there was any -- any kid or any adult talked --

8    assaulted or threatened.

9        What -- what we've got there is a bunch of perverts talking

10   about each other in terms of what they're fantasizing about.

11   There -- we don't have any victim that was hurt that they can

12   link to my client that said, yeah, that he's a danger to that

13   person or this person.  They're saying he's a danger to the

14   community.  What community?  He's going to be in Washington,

15   D.C. and Alexandria.

16       So, Judge, we're going to -- he's pledged to abide by all

17   those terms and conditions.  There isn't anything more that we

18   can do.  And anything -- anything -- if you don't release him,

19   Judge, I think it's just nothing but punitive as opposed to --

20   as opposed to being due process under the right to bail.

21            THE COURT:  Mr. Becker.

22            MR. BECKER:  Thank you, Your Honor.  Of course, the

23   presumption here is detention.  That is because of the

24   seriousness of the charges against the defendant.  And so it is

25   the defendant's obligation under the law to -- to rebut that.

1    And we don't believe that he can do so in this situation.

2        These are very serious charges carrying a mandatory minimum

3    penalty of 20 years (indiscernible) life.  They involve the

4    sexual exploitation of hundreds if not thousands of children

5    who are victimized and were victimized every single day that

6    these sites that drew so many like-minded offenders whose

7    desire is to exploit, sexually, children, both in -- through

8    sexual abuse and through trading images of sexual abuse.

9        And so I think the defense argument really completely

10   misunderstands and -- and minimizes the extensive harm that

11   occurs when hundreds and thousands of people like Mr. DeFoggi

12   gather intentionally so that they can collectively come

13   together to -- to exploit those children.

14       I can also state that the Court knows from evidence that it

15   received at the original hearing that Mr. DeFoggi sought to

16   meet up in person with co-conspirators on that site and was

17   communicating with at least one of those with an eye towards

18   doing so.  It is not correct that this was simply him acting in

19   some sort of fantasy -- fantasy context.  He was absolutely

20   looking to meet up with like-minded people who -- who he was

21   associated with through the site that he was operating on.

22       The -- the case here, of course, is strong and it's only

23   gotten stronger through Mr. DeFoggi's admissions today.  As the

24   Court heard at the last hearing when the FBI went through --

25   went into the house, he was at a laptop, had to be physically

1   removed from that laptop.  That laptop computer had child

2   pornography that was being downloaded from a Tor network child

3   pornography website.

4       Mr. DeFoggi's now said that it was his laptop; that he

5   installed that Tor network software.  He gave the Court a long

6   diatribe on his extensive knowledge of the Tor network itself.

7       We've, of course, heard from Mr. Bounds and he had no idea

8   about those sorts of online accounts that the defendant used

9   and is -- it is alleged to have used on -- on the site.

10      The -- the real issue here is danger to the -- to the

11  community.  Frankly, the -- you know, the majority of the

12  defense's contentions are -- are really attributable to whether

13  or not the defendant is a flight risk.  While we certainly

14  don't concede that he is not, the real issue here is danger to

15  the community.  The nature and circumstances of this offense,

16  the strength of the evidence against the defendant, all support

17  denying the defense request to -- to modify the -- the release

18  conditions here.

19      This is very much not any sort of typical case in any way.

20  And this is a -- this is a case that involves extensive and

21  serious conduct that involves a large number of conspirators,

22  and a serious amount of harm to -- to children.  It involves

23  conduct that's alleged, by the defendant, to -- that he's

24  engaged in over a long period of time.  Conduct that he's been

25  able to keep from the attention of the U.S. government, of his

1    long-term partner, we presume for -- for all this time.  That

2    only makes him more dangerous.

3        You know, his ability to have done this and engaged, as we

4    allege, in years of criminal activity while carrying security

5    clearances just means that he's really good at getting away

6    with things.  And that makes him a bigger risk and a bigger

7    danger to the community.

8        And so for all those reasons, Your Honor, we don't believe

9    that there is any sufficient reason to rebut the presumption of

10   detention here.

11            THE COURT:  Matter is taken under advisement.  A

12   transcript will be made.  Copies of these Exhibits 101 and 102

13   will be provided to both parties.  And then, Mary Beth, I'll

14   need the originals back.  Nothing further, counsel are excused,

15   and we'll be in recess.

16       (3:17 p.m., recessed.)

17       I, Vicki L. Jarchow, Transcriber, certify that the

18   foregoing is a correct transcript from the official electronic

19   sound recording of the proceedings in the above-entitled

20   matter.

21

22   Vicki L. Jarchow              July 26, 2013

23

24

25