```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEBRASKA
 2
       UNITED STATES OF AMERICA,      )
 3                                    )
                   Plaintiff,         )          8:13CR105
 4                                    )
            vs.                       )
 5                                    )      Omaha, Nebraska
       TIMOTHY DEFOGGI,               )      August 19, 2014
 6                                    )
                   Defendant.         )
 7
                                    VOLUME I
 8                      TRANSCRIPT OF TRIAL PROCEEDINGS
                     BEFORE THE HONORABLE LAURIE SMITH CAMP
 9           CHIEF UNITED STATES DISTRICT JUDGE AND A JURY

10
                         A-P-P-E-A-R-A-N-C-E-S
11
       FOR THE PLAINTIFF:          Mr. Michael P. Norris
12                                 Asst. United States Attorney
                                   1620 Dodge Street
13                                 Suite 1400
                                   Omaha, NE 68102
14
                                   Mr. Keith A. Becker
15                                 Ms. Sarah Chang
                                   DOJ Trial Attorneys
16                                 1400 New York Avenue, N.W.
                                   Sixth Floor
17                                 Washington, DC 20530

18     FOR THE DEFENDANT:          Mr. John S. Berry, Jr.
                                   Mr. Justin B. Kalemkiarian
19                                 Berry Law Firm
                                   2650 North 48th Street
20                                 Lincoln, NE 68508

21
       COURT REPORTER:             Ms. Brenda L. Fauber, RDR, CRR
22                                 111 South 18th Plaza
                                   Suite 3122
23                                 Omaha, NE 68102
                                   (402) 661-7322
24
       Proceedings recorded by mechanical stenography, transcript
25     produced with computer.
```

```
1              (At 8:45 a.m. on August 19, 2014, with counsel for the

2       parties present in chambers, the following proceedings were

3       had:)

4              (Off-the-record discussion had but no record made.)

5              (Concluded in chambers at 9:08 a.m.)

6              (At 9:57 a.m. on August 19, 2014, with counsel for the

7       parties and the defendant present, and the jury panel present,

8       the following proceedings were had:)

9              THE COURT:  We are here in the matter of the United

10      States versus Timothy DeFoggi, Case Number 8:13CR105.

11         Will counsel please enter their appearances.

12         MR. BECKER:  Good morning, your Honor; Keith Becker

13      for the United States; here with co-counsel Michael Norris and

14      Sarah Chang.

15             THE COURT:  Very good.  Good morning to you all.

16         MR. BERRY:  Good morning, your Honor; John Berry for

17      Timothy DeFoggi, along with Justin Kalemkiarian.

18             THE COURT:  And good morning to you as well.

19         At this stage, we are going to begin the voir dire

20      process.  This is a process that is used to allow the lawyers

21      to reduce the number of jurors to the number that they

22      actually need for the trial.

23         And before we begin asking questions, we need to have all

24      of the members of the jury panel stand and raise their hands

25      and take another oath.
```

1           (Jury panel sworn.)

2           (Pursuant to Local Rule, Pages 4 through 53 are filed

3       separately under seal.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              THE COURT:  Please be seated.
2         Before we take our noon break, I'm going to read you some
3    preliminary instructions.
4         Ladies and gentlemen, I'll take a few moments now to give
5    you some initial instructions about this case and about your
6    duties as jurors.  At the end of the trial, I'll give you
7    further instructions.  I may also give you instructions during
8    the trial.  Unless I specifically tell you otherwise, all such
9    instructions, both those I give you now and those I give you
10   later, are equally binding and must be followed.
11        This is a criminal case brought against the defendant by
12   the United States government.  The defendant is charged with
13   engaging in a child exploitation enterprise, conspiracy to
14   advertise child pornography, conspiracy to distribute child
15   pornography, and access with intent to view child pornography.
16        These charges are set forth in what is called an
17   indictment which I will summarize as follows:
18        The indictment alleges an Internet website, designated
19   Website A for purposes of the indictment, was established for
20   the primary purpose of the advertisement and distribution of
21   child pornography and a bulletin board for the discussion of
22   matters related to the sexual abuse of children, including the
23   facilitation of anonymous communications and prevention of
24   detention by law enforcement.  Website A is alleged to have
25   operated from March of 2012 until December of 2012.
```

1          On November 18, 2012, law enforcement seized the computer

2     server hosting Website A from a web hosting facility in

3     Bellevue, Nebraska.  While Website A remained operational from

4     November 19, 2012, through December 9, 2012, law enforcement

5     officers, armed with court-authorized orders, monitored the

6     electronic communications from Website A resulting in the

7     charges set forth.

8          Timothy DeFoggi allegedly accessed Website A during the

9     monitoring period.

10          Count I of the indictment alleges that between on or

11     about March 2, 2012, and on or about December 8, 2012, in the

12     District of Nebraska and elsewhere, Timothy DeFoggi and others

13     knowingly engaged in a child exploitation enterprise.

14          Count II of the indictment alleges that on or about March

15     2, 2012, and on or about December 8, 2012, in the District of

16     Nebraska and elsewhere, Timothy DeFoggi knowingly conspired to

17     advertise child pornography.

18          Count III of the indictment alleges that between on or

19     about March 2, 2012, and on or about December 8, 2012, in the

20     District of Nebraska and elsewhere, Timothy DeFoggi and others

21     knowingly conspired to distribute child pornography.

22          Counts IV through VII of the indictment allege that on or

23     about November 21, 2012; November 26, 2012; December 4, 2012;

24     and December 8, 2012; in the District of Nebraska and

25     elsewhere, Timothy DeFoggi knowingly accessed a means or

1    facility of interstate commerce to view child pornography.

2         You should understand that an indictment is simply an

3    accusation.  It is not evidence of anything.

4         The defendant has pleaded not guilty and is presumed to

5    be innocent unless and until proved guilty beyond a reasonable

6    doubt.

7         It will be your duty to decide from the evidence whether

8    the defendant is guilty or not guilty of the crimes charged.

9    From the evidence, you will decide what the facts are.  You

10   are entitled to consider that evidence in the light of your

11   own observations and experiences in life.

12        You may use reason and common sense to draw deductions or

13   conclusions from facts established by the evidence.  You will

14   then apply those facts to the law which I give you in these

15   and in my other instructions and in that way reach your

16   verdict.

17        You are the sole judges of the facts, but you must follow

18   my instructions on the law, whether you agree with them or

19   not.

20        Do not allow sympathy or prejudice to influence you.  The

21   law demands of you a just verdict, unaffected by anything

22   except the evidence, your common sense, and the law as I give

23   it to you.

24        You should not take anything I may say or do during the

25   trial as indicating what I think of the evidence or what I

1     think your verdict should be.

2          Finally, please remember that only this defendant, not

3     anyone else, is on trial here, and this defendant is on trial

4     only for the crimes charged, not for anything else.

5          To help you follow the evidence, I'll now give you a

6     brief summary of the elements of the crimes charged which the

7     government must prove beyond a reasonable doubt to make its

8     case.

9          With respect to Count I, the crime of knowingly engaging

10    in a child exploitation enterprise, as charged in Count I, has

11    three elements which are:  One, that between on or about March

12    2, 2012, and on or about December 8, 2012, in the District of

13    Nebraska and elsewhere, the defendant knowingly engaged in a

14    series of three or more separate felony violations of the law

15    regarding sexual exploitation or other abuse of children; two,

16    the series of violations involved more than one minor victim;

17    and three, the defendant committed those offenses in concert

18    with three or more other persons.

19         Count II:  The crime of conspiracy to advertise child

20    pornography as charged in Count II of the indictment has four

21    elements which are -- excuse me, three elements which are:

22    One, between on or about March 2, 2012, and on or about

23    December 8, 2012, in the District of Nebraska and elsewhere,

24    two or more people reached an agreement to commit the crime of

25    advertising child pornography; two, the defendant voluntarily

1    and intentionally joined in the agreement either at the time

2    it was first reached or at some later time while it was still

3    in effect; and three, at the time the defendant joined in the

4    agreement, the defendant knew the purpose of the agreement.

5         Count III:  The crime of conspiracy to distribute child

6    pornography as charged in Count III of the indictment has

7    three elements which are:  One, between on or about March 2,

8    2012, and on or about December 8, 2012, in the District of

9    Nebraska and elsewhere, two or more people reached an

10   agreement to commit the crime of distributing child

11   pornography; two, the defendant voluntarily and intentionally

12   joined in the agreement either at the time it was first

13   reached or at some later time while it was still in effect;

14   and three, at the time the defendant joined in the agreement,

15   the defendant knew the purpose of the agreement.

16        With respect to Counts IV through VII, the crime of

17   accessing child pornography with intent to view child

18   pornography as charged in these counts has three elements

19   which are:  One, in the District of Nebraska and elsewhere,

20   the defendant knowingly accessed with intent to view one or

21   more visual depictions of child pornography; two, the

22   defendant knew that the visual depiction or depictions were of

23   a minor engaging in sexually explicit conduct; and three, the

24   visual depiction or depictions were produced using materials

25   that had been mailed, shipped or transported in interstate or

1    foreign commerce, including by computer.

2         You should understand what I've given you is only a

3    preliminary outline.

4         At the end of the trial, I will give you final

5    instructions on these matters.  And those instructions will be

6    in writing, and they will be available to you in the jury

7    room.  If there is any difference between what I just told you

8    and what I tell you later at the end of the trial, what I tell

9    you at the end of the trial will govern.

10        I've mentioned the word "evidence".  Evidence includes

11   the testimony of witnesses; documents and other things

12   received as exhibits; any facts that have been stipulated,

13   that is, formally agreed to by the parties; and any facts that

14   have been judicially noticed, that is, facts which I say you

15   may but are not required to accept as true even without

16   evidence.

17        Certain things are not evidence.  I will list those

18   things for you now.  Statements, arguments, questions and

19   comments by lawyers representing the parties in the case are

20   not evidence.

21        Objections are not evidence.  Lawyers have a right to

22   object when they believe something is improper.  You should

23   not be influenced by the objection.  If I sustain an objection

24   to a question, you must ignore the question and must not try

25   to guess what the answer might have been.

1          Testimony that I strike from the record or tell you to

2    disregard is not evidence and must not be considered.

3          Anything you see or hear about this case outside the

4    courtroom is not evidence unless I specifically tell you

5    otherwise during trial.

6          Sometimes a particular item of evidence is received for a

7    limited purpose only, that is, it can be used by you for one

8    particular purpose and not for any other purpose.  I will tell

9    you when that occurs and instruct you on the purposes for

10   which the particular item can and cannot be used.

11         Finally, some of you may have heard the terms direct

12   evidence and circumstantial evidence.  You are instructed that

13   you should not be concerned with those terms.  The law makes

14   no distinction between direct and circumstantial evidence.

15   You should give all the evidence the weight and value you

16   believe it is entitled to receive.

17         In deciding what the facts are, you may have to decide

18   what testimony you believe and what testimony you do not

19   believe.  You may believe all of what a witness said, or only

20   part of it, or none of it.

21         In deciding what testimony of any witness to believe,

22   consider the witness's intelligence, the opportunity the

23   witness had to have seen or heard the things testified about,

24   the witness's memory, any motives that witness may have for

25   testifying a certain way, the manner of the witness while

1    testifying, whether that witness said something different at

2    an earlier time, the general reasonableness of the testimony,

3    and the extent to which the testimony is consistent with other

4    evidence that you believe.

5        At the end of the trial, you must make your decision

6    based on what you recall of the evidence.  You will not have a

7    written transcript to consult, and it is not practical for the

8    court reporter to read back lengthy testimony.  You must pay

9    close attention to the testimony as it is given.  If you wish,

10   you may take notes to help you remember what witnesses said.

11   If you do take notes, please keep them to yourself until you

12   and your fellow jurors go to the jury room to decide the case.

13   When you leave at night, your notes will be secured and not

14   read by anyone.

15       During the trial, it may be necessary for me to talk with

16   the lawyers out of the hearing of the jury, either by having a

17   bench conference here while the jury is present in the

18   courtroom or by calling a recess.  Please understand that

19   while you're waiting, we're working.  The purpose of these

20   conferences is to decide how certain evidence is to be treated

21   under the rules of evidence and to avoid confusion and error.

22   We will, of course, do what we can to keep the number and

23   length of these conferences to a minimum.

24       To ensure fairness, you, as jurors, must obey the

25   following rules:

1          Do not talk among yourselves about the case or about

2     anyone involved with it until the end of the case when you go

3     to the jury room to decide on your verdict.

4          Do not talk with anyone else about the case or about

5     anyone involved with it until the trial has ended and you have

6     been discharged as jurors.

7          When you are outside the courtroom, do not let anyone

8     tell you anything about the case or about anyone involved with

9     it until the trial has ended and your verdict has been

10    accepted by me.  If someone should try to talk to you about

11    the case during the trial, please report it to the courtroom

12    deputy.

13         During the trial, you should not talk with any of the

14    parties, lawyers, or witnesses involved in the case.  You

15    should not even pass the time of day with any of them.

16         If a person from one side of the lawsuit sees you talking

17    to a person from the other side, even if it is simply to pass

18    the time of day, an unwarranted and unnecessary suspicion

19    about your fairness may arise.  If any lawyer, party or

20    witness does not speak to you when you pass in the hall, ride

21    in the elevator, or the like, it is because they are not

22    supposed to talk to you.

23         It may be necessary for you to tell your family, close

24    friends, teachers, coworkers, or employer about your

25    participation in this trial.  You can explain when you are

1    required to be in court and can warn them not to ask you about

2    the case, tell you anything they know or think they know about

3    the case, or discuss the case in your presence.

4         But you must not tell anyone anything about the

5    proceedings, the evidence, or the jury's deliberations until

6    after I accept your verdict.

7         During the trial, while you are in the courthouse and

8    after you leave for the day, do not provide any information

9    about this case to anyone by any means, including electronic

10   devices.

11        Do not do any research on the Internet, in libraries, in

12   newspapers, or in any other way or make any investigation

13   about this case on your own.  Do not visit or view any place

14   discussed in this case.  And do not use Internet programs or

15   any other device to search for or to view any place discussed

16   in the testimony.

17        Also do not research any information about this case, the

18   law, the people involved, including the parties, the

19   witnesses, the lawyers or the judge.

20        Do not read any news stories or articles in print or on

21   the Internet, or in any blog about the case or about anyone

22   involved with it or listen to any radio or television reports

23   about the case or anyone involved with it.

24        Do not make up your mind during the trial about what the

25   verdict should be.  Keep an open mind until after you've gone

1    to the jury room to decide the case and you and your fellow

2    jurors have discussed the evidence.

3        The trial will proceed in the following manner:  First,

4    the government's lawyer will make an opening statement.  Next,

5    the defendant's lawyer may but does not have to make an

6    opening statement.  An opening statement is not evidence but

7    is simply a summary of what the lawyer expects the evidence to

8    be.

9        The government will then present its evidence, and

10   counsel for the defendant may cross-examine.  Following the

11   government's case, the defendant may but does not have to

12   present evidence, testify, or call other witnesses.  If the

13   defendant calls witnesses, the government's counsel may

14   cross-examine them.

15       After presentation of evidence is completed, the parties

16   will make their closing arguments to summarize and interpret

17   the evidence for you.  As with opening statements, closing

18   arguments are not evidence.

19       The Court will instruct you further on the law.  After

20   that, you will retire to deliberate on your verdict.

21       Okay.  That's a lot of information to digest.  And as I

22   mentioned, you will get instructions at the end of the trial,

23   and they will be available to you in writing in the jury room

24   for you to follow.

25       You've worked very hard this morning.  Thank you all for

```
 1      your patience and your attention.

 2           Let's take a noon break and come back at 1:15.

 3           Please reconvene in the jury room at 1:15.  At that

 4      juncture, we will hear opening statements from counsel.

 5           Thank you.  We're in recess.

 6           (Recess taken at 11:56 a.m.)

 7           (At 1:23 p.m. on August 19, 2014, with counsel for the

 8      parties and the defendant present, and the jury NOT present,

 9      the following proceedings were had:)

10           THE COURT:  Do we need to discuss anything before the

11      jury comes out to hear the opening statements?

12           MR. NORRIS:  I don't think so, your Honor.

13           MR. BERRY:  No, your Honor.

14           THE COURT:  All right.  Please bring in the jury.

15           MR. NORRIS:  Your Honor, may I check to see if this

16      is on or whether we need to move my mic for opening.

17           THE COURT:  You may.

18           (Off-the-record discussion had.)

19           (Jury in at 1:26 p.m.)

20           THE COURT:  Please be seated.

21           We are now ready for the opening statements.  And we will

22      hear first from the government.

23           Mr. Norris, will you be presenting the opening statement?

24           MR. NORRIS:  Yes, your Honor.

25           THE COURT:  You may proceed.
```

1          MR. NORRIS:  Thank you.

2          May it please the Court, counsel, ladies and gentlemen of

3     the jury.

4          Let me reintroduce myself.  It hasn't been that long, but

5     still, I'm an Assistant U.S. Attorney here in the District of

6     Nebraska.  Seated at counsel table are Sarah Chang, Keith

7     Becker with the Department of Justice.  In the back row who

8     wasn't introduced this morning through my neglect is Jeffrey

9     Tarpinian.  He's an FBI agent and he's the case agent in this

10    particular matter.

11         Together we have the privilege of representing the United

12    States in the criminal prosecution of the defendant,

13    Mr. DeFoggi.

14         The Court has gone over the charges with you.  But in a

15    nutshell, a grand jury sitting here in the District of

16    Nebraska has returned a seven-count indictment against the

17    defendant.

18         They charged various child pornography and child

19    exploitation crimes.  You heard that the first one, Count I,

20    is engaging in a child exploitation enterprise.  The statute

21    simply criminalizes offenders who work in concert with others

22    in order to exploit children.  That's what a child

23    exploitation enterprise is.

24         The Court went over the elements with you this morning,

25    so I'll just briefly touch on them.  An individual is guilty

1    if he engages in a child exploitation enterprise by engaging

2    in a series of three or more felony offenses, predicate

3    offenses, and those predicate offenses include the crime of

4    accessing with intent to view child pornography.

5        That there is more than one minor involved.  You will see

6    multiple victims in this case.  You will learn of multiple

7    victims in this case.  Those victims will range from babies to

8    prepubescents which is generally what you're going to hear

9    about.  Almost predominantly, if not all that you're going to

10   hear about, is baby to prepubescent children.  And there's

11   going to be no question when we're done here that we're

12   dealing with very, very young children.

13       Now, these series of violations involve three or more

14   people acting in concert in order to effectuate this

15   enterprise.

16       Now, Count II charges conspiracy to advertise child

17   pornography.  Conspiracy sometimes is a fancy word, a word

18   that maybe people think entails more than it is.  I anticipate

19   that you will be instructed what a conspiracy is because the

20   judge will instruct you as to the law.

21       Now, a conspiracy is really nothing more than an

22   agreement between two or more people to do a criminal act;

23   just two or more people, an agreement to do a criminal act, or

24   attempt a criminal act.  The other persons don't need to be

25   named; they don't even have to be indicted.  They don't

1     necessarily have to know each other.  As a matter of fact, on

2     a lot of Internet conspiracies or Internet-based conspiracies,

3     they know that they're dealing with somebody, they know that

4     they're acting in concert, they know that they are

5     effectuating something that's in common for them, but they

6     might not know exactly who that other person is that they're

7     working with to violate the law.

8          The agreements are seldom, if ever, in writing, which

9     makes sense, if you step back and think about that.  A drug

10    dealer, a drug conspiracy, why would we want to say that I

11    agree with you to import seven kilos of cocaine into Nebraska

12    at any given time; sign here, just to make sure you don't go

13    off and do this criminal act with somebody else.  So again, it

14    doesn't have to be in writing.  It doesn't have been formal.

15         So he's charged with conspiracy to advertise child

16    pornography.  And for advertising child pornography, that

17    means that one conspirator, some conspirator, has to publish

18    or print or post a notice and that notice either seeks to

19    offer or to receive child pornography.  Pretty simple.

20         He's charged in Count III with conspiracy to distribute

21    child pornography.  We've talked about conspiracy.  The same

22    holds for conspiracy wherever you see it in this particular

23    indictment.

24         And for distributing child pornography, that means a

25    conspiracy -- or a conspirator knowingly distributed child

1     pornography; that he knew that the visual depictions that were

2     being distributed to other co-conspirators or to other

3     individuals involved a minor engaging in sexually explicit

4     conduct; and finally, that that material was shipped or

5     affected interstate commerce by any means including by

6     computer.  Everything you see is going to be computer-based.

7          There are four counts, accessing with intent to view

8     child pornography; Counts IV, V, VI and VII.  They deal with

9     four specific dates.  And they're going to be dates that

10    occurred between November 21st and December 8th of 2012;

11    specifically November 21st and November 26th, December 4th and

12    December 8th of 2012.

13         We have to show that the defendant knowingly accessed

14    child pornography, that he knew what he was accessing was

15    child pornography, and in other words what we're going to show

16    you is that he went to a board knowing that the board had

17    child pornography on it, a board that he was a frequent

18    visitor of, and he clicked on some images.  And those images

19    would enlarge and he would be able to see the child

20    pornography.

21         And you'll see and you'll learn of the type of child

22    pornography not only available on the board, but that the

23    defendant accessed on November 21st, November 26th, December

24    4th, and December 8th.  That's the background.  That's the

25    indictment.

PLAINTIFF'S OPENING STATEMENT                    70

1          Let's talk about the evidence that you're going to hear.

2     We touched on some of it during voir dire this morning.  But

3     each of these seven charges relate to the defendant's

4     involvement in an online networking -- social networking site

5     that was found here in Nebraska.

6          The site was hosted and administered right here in the

7     Omaha and Bellevue area.  It was aptly named PedoBook, p-e-d-o

8     as in pedophilia, and book; one all word, P-e-d-o-B-o-o-k.

9          It was set up and operated very similar to Facebook, if

10    you're familiar with Facebook.  You can do various things on

11    PedoBook.  You could take polls, you could private message

12    with other individuals that shared your similar interests, you

13    could post items.  Again it was very, very similar to

14    Facebook.

15         Now, PedoBook existed and it had two primary purposes.

16    The first purpose was to advertise and distribute child

17    pornography.  It did this very effectively; very effectively.

18    You're going to hear testimony that there were more than

19    27,000 images available of child pornography and child

20    exploitation material on PedoBook.  Over 27,000 images.

21         In addition to these 27,000 images, there were over 200

22    videos that were available to members or visitors to this

23    PedoBook site.  These images involved children, prepubescent

24    minor children, engaged in sexually explicit conduct with

25    either other children or adults.

1          The second purpose with regard to PedoBook is simply to

2     promote discussions amongst individuals with like interests,

3     to foster a sense of community.

4          You're going to see the rules of PedoBook that will help

5     you see that fostering of a sense of community.  You're going

6     to see the private messages that are exchanged on PedoBook

7     that relate to what the mutual interests were.

8          But again, what you're going to learn and what you're

9     going to see are messages that foster the desire for the

10     sexual abuse of children and a sense of community that goes

11     therewith.

12          You're going to learn that PedoBook had more than 300

13     groups.  So if you had a fetish, if you had a desire, if you

14     had an interest, you probably had somewhere that you could go

15     as a member on PedoBook in order to facilitate and foster that

16     community.

17          Members could send private messages and post comments and

18     content to each of these groups.  And you'll learn that the

19     defendant was an active member of PedoBook.  You're going to

20     hear of an offensive display name and you're going to hear of

21     an offensive user name.  Know these:  These are names -- and

22     you'll have evidence that these are names that he selected

23     himself.  These are names that he typed in when he joined the

24     group.  These are names that he typed in when he joined

25     PedoBook. His user name was fuckchrist, f-u-c-k-c-h-r-i-s-t.

1      You'll see this name over and over and over again.  You'll see

2      it is associated with a myriad of images that involve the

3      sexual exploitation of children.

4          You'll see that with this membership in this group comes

5      a display name.  His display name was PTasseater.  You'll

6      learn that PT is a common phrase for "preteen".  So that was a

7      display name that he typed in when he signed on to register

8      for the board and that was used when he communicated with

9      other individuals or when he left messages or his footprint on

10     the board.  You will grow weary of hearing these names.

11         You'll see the groups that he joined.  You'll see those

12     groups and there were roughly 30, 31, 32 groups that he joined

13     on PedoBook.  Not all of them are necessary.  We don't need to

14     go into each and every one of them.

15         But some of those groups, just to get a nature and a

16     taste of some of the interests that are involved on that

17     board, some of the groups that the defendant joined included

18     Anything Goes - Hardcore Child Fucking, Babies and Toddlers,

19     Just Baby Girls, Just Baby Boys, Hard to the Core, and 0-2

20     Year Old Girls Private Sharing Group 2012.

21         You will see the private messages that were sent by the

22     defendant to other individuals.  As you may suspect, those

23     images are going to be disturbing.  Those messages will be

24     disturbing.  In messages he sent to another PedoBook member

25     who also he was able to determine lived in that Washington,

1    D.C. area, he discusses about wanting to behead a child, cut

2    off -- in other words, cut off the child's head, masturbate as

3    a result of that, and then share that with somebody else.

4         The individual he was communicating with went by the

5    display name and user name of Toddler Lover and No One Will

6    Know.  You will hear from Toddler Lover and No One Will Know.

7    You will learn that he, too, was prosecuted for his

8    involvement on this board.  And he will tell you how he

9    communicated on the board, where he communicated on the board,

10   and the repeated attempts that were made in order for him to

11   meet up with PTasseater who was trying to get him to meet in

12   the Washington, D.C. area.  It never happened.  He didn't do

13   it, and he'll tell you why.

14        You'll see private messages that were posted on the

15   board, private messages from NE14PTCH; in other words, Anyone

16   For PTCH.  PTCH, you'll learn, means preteen hard core.

17        Unknown to the defendant, this individual was an

18   undercover FBI agent who was administering to the board after

19   another individual had been arrested and while the FBI was

20   trying to determine who was trading on this board, who was

21   advertising child pornography on this particular board.

22        You'll hear from that individual.  His name is Michael

23   Gordon.  In his messages with Agent Gordon, the defendant

24   disclosed his interest in watching a young girl get beaten,

25   raped and killed.  He disclosed that he was on Pedo board

1   between the hours of 4 a.m. and 6 a.m. in the morning,

2   something that will become important later and something that

3   FBI agents were able to use to their advantage when they

4   identified and later were able to arrest the defendant.

5         You're going to learn that PedoBook operated on what is

6   known as the Tor network.  Tor is a subpart of the Internet.

7   It's designed to foster anonymity.  Users can pinpoint the

8   location of PedoBook -- I'm sorry.  Users cannot pinpoint the

9   location of PedoBook, and PedoBook cannot pinpoint the

10  location of users.

11        This is usually done through the use of IP addresses.

12  But here, through the use of the Tor network, the IP address

13  gets obfuscated.  You'll learn that on the Tor network, your

14  communication bounces around to a bunch of other relay

15  computers.  And in the process, the true identity of both the

16  website and the true identity of the user are obfuscated and

17  are not traceable by law enforcement, by the user, or by the

18  website.

19        A playground for illegal conduct.  It can be a playground

20  for illegal conduct, such as posting child pornography or

21  doing other nefarious actions.

22        How did we find PedoBook?  How did we get involved?

23        You're going to hear from Agent Tarpinian.  He's going to

24  tell you that the FBI learned of the existence of servers, a

25  website, here in the Omaha area from Dutch law enforcement.

1     The authorities determined the existence of a site hosting

2     child pornography was right here in the United States.  And

3     they also told him it's in the state of Nebraska.

4         They provided the IP address because they were able to

5     determine what the IP address was.  And that led the FBI to

6     Aaron McGrath in West Omaha, as well as his place of business

7     where he was hosting PedoBook.

8         On November 15th of 2012, agents searched Mr. McGrath's

9     West Omaha home.  It was important to catch him on his

10    computer.  It was important to catch him as he was operating

11    on the Tor network.  And it was important for them to catch

12    him as he was administering to this server, to PedoBook --

13    or -- well, to PedoBook.  You're going to learn the reason why

14    it was important to them.  And the reason why it was important

15    to them was they had a plan, not a plan just to catch one guy,

16    but a plan to catch multiple users and multiple members of

17    this group.

18        So they designed a plan in which it was planned that on

19    the 15th of November, they would execute a search warrant at

20    Mr. McGrath's residence.  You'll hear about the execution of

21    that warrant.

22        They also, not quite simultaneously but shortly

23    thereafter wanted to go into his place of business and grab

24    the board, a board that hosted PedoBook.  The intent was to

25    run the board and to identify those individuals who were both

1    members and users of that board and to attempt to locate where

2    they may be, and then ultimately to prosecute those

3    individuals.

4        They had to get authority to do this.  It's not something

5    they just decided on their own to do.  And they'll tell you

6    that they went up and got various levels of approval at high

7    management level at FBI headquarters, high management level at

8    the Department of Justice.

9        They were told:  You can do this, but you've got to

10   monitor.  And you've got to monitor closely.  You're not going

11   to put any content, you're not going to put child pornography

12   on the board.  And you're going to monitor that board 24/7; 24

13   hours a day, 7 days a week.  And you're going to look if

14   there's a child in danger, if there's anybody in peril.  And

15   if there is, you're going to do everything you can in order to

16   find local law enforcement, if it can be done, and to attempt

17   to rescue that child.

18       So this was done.  So you're going to learn about the

19   entry into Mr. McGrath's home, a no-knock warrant; a no-knock

20   warrant in which the officers entered the residence very

21   quietly and very surreptitiously.  Agent Tarpinian will tell

22   you that they were able to open the back door without knocking

23   because that's what the order -- the search warrant authorized

24   them to do; that they quietly walked into the first level

25   after they knew that Mr. McGrath was home; after they had been

1    notified through other law enforcement means that he was up on

2    his laptop, that he was communicating with a server, and that

3    he was on the Tor network.

4        Nobody's on the first floor.  They head up the steps.

5    There's a locked bedroom.  They gain access to that locked

6    bedroom and they find Mr. McGrath in his bed, covers pulled up

7    to his waist or so, laptop open.  They tell him, "Do not --

8    drop the laptop; leave the laptop open."  They give him

9    certain commands; he doesn't comply.  He goes to shut the

10   laptop, which would thus create many, many issues and problems

11   for the FBI and their plan.

12       They were able to grab the laptop from him before it went

13   completely closed, so he was not completely able to shut that

14   laptop.

15       From there, they were able to pull the laptop open and

16   you'll see what the screen -- what programs were running at

17   that particular time.  And you'll see screenshots of some of

18   those programs.

19       They then execute the warrant to grab the server at the

20   business in Bellevue, Nebraska.

21       From there, they can use that laptop, they can then take

22   command or control of PedoBook and run PedoBook for a period

23   of 19 days.  They, in fact, do so.  And in doing so, they are

24   able to identify a series and number of members who were on

25   that board that led to further prosecutions.

1        You're going to hear from Agent Gordon.  I told you a

2    little bit about Agent Gordon.  Agent Gordon is going to come

3    in and tell you that he was the individual, the FBI agent, who

4    took over for the administrator, the administrator being Aaron

5    McGrath.

6        He's going to tell you a couple of things -- he's going

7    to tell you a lot of things.  You're going to see him on the

8    stand for a while.

9        But he's basically going to be able to do a couple of

10    things for you.  He's going to be able to tell you that during

11    the 19 days that they were running that board, that the

12    defendant was very active.  He's going to tell you that they

13    were able to find PTasseater, fuckchrist, the defendant,

14    whatever name you're going to hear, that he was on that board.

15        You're going to learn that the FBI, through the course of

16    this investigation, were able to conduct open source or

17    Google-type searches, looking for anyone using the name of

18    PTasseater or fuckchrist on any other sources; not just on the

19    Tor network, but other areas.

20        These searches identified the defendant, Mr. DeFoggi, as

21    having used those terms and residing at a residence in

22    Germantown, Maryland, which is just outside of D.C.

23        It was determined that Mr. DeFoggi worked in the cyber

24    realm, that he was an acting director at one time for cyber

25    for the Department of Health & Human Services.  Hence, that's

1    why he was living in the Washington, D.C. area.

2         You're going to learn -- or they learned -- as they

3    learned, that he was dealing as an advanced computer user;

4    that he was familiar with Tor.  And so similar plans were made

5    to do an execution once he was identified at this Germantown

6    residence.

7         You're going to learn about the execution of that

8    warrant.  That warrant occurred on April 9th of 2013.  You're

9    going to learn that a number of agents from Maryland -- you're

10   going to see many of them -- assembled at his residence, at

11   the defendant's residence, on April 9th of 2013 at 5:30 in the

12   morning -- prior to 5:30 in the morning.

13        Again, remember I told you earlier that Agent Gordon is

14   going to tell you when he was communicating in private

15   messages and otherwise with the defendant, that he -- the

16   defendant shared with him that he was on the board between 4

17   and 6 in the morning.

18        So again, these officers also feared destruction of

19   evidence.  So their warrant, the warrant that authorized the

20   search in Germantown, Maryland, of the defendant's residence,

21   authorized a no-knock search warrant.

22        You're going to learn that they had a pen trap.  And a

23   pen trap basically tells you what numbers are being posted to

24   and from the residence.  Through that information, they were

25   able to determine that somebody was online in the house, and

1    somebody was on the Tor network.  So this is all prior to

2    their entry on April 9th of 2013.

3         You're going to hear from the agents who made entry into

4    the house.  It was a double entry.  There were agents at the

5    bottom, in the back of the house, and agents in the main

6    floor; so the front of the house, the back of the house.  A

7    battering ram was used.  They were able to enter the house at

8    5:25 in the morning upon being notified that somebody was

9    online and that they were connected to the Tor network.

10        You'll hear from the agents who entered from the bottom.

11   They were able to get through the sliding glass door.  There

12   were -- there was an individual who was playing video games;

13   not the defendant, but somebody else was up playing video

14   games at that time.

15        One agent will tell you, "I saw an individual, not the

16   kid playing with the game box or the gaming console, but

17   another individual run up the steps.  And I yelled, 'Up the

18   steps; up the steps.'"  The agents on the main level aren't

19   going to follow because they don't want to get caught in a

20   cross fire with the agents that are coming upstairs.

21        So then you're going to hear from the agents who came up

22   through the front door.  And they entered shortly after they

23   heard the agents on the bottom enter.  And what do they see?

24        You'll hear from Kevin Smith and you'll hear from Steven

25   Smith.  And they will tell you that they encountered none

1     other than the defendant on that main floor; that when they

2     saw the defendant, he was kneeled down on the floor, and he

3     had his fingers on a laptop and was ordered, "Get away from

4     the laptop, remove yourself from the laptop," and he did not

5     comply.

6          He had to be physically extracted or removed from the

7     laptop by Agent Smith.  I know there's two Smiths; this will

8     be Agent Steven Smith.  And he will tell you that at the time

9     that he took the defendant off that laptop, the defendant was

10    downloading from the Tor network; that they were able to

11    determine what was being downloaded from the Tor network, and

12    they were able to see that there was a file downloading from

13    the Tor network.

14         You will learn that that file came from the OnionPedo

15    Video Archive.  So in other words, it's a pedo video archive

16    downloading; it's an image of child pornography.

17         So that's where the defendant was at the time that they

18    entered from the front, having recently left from downstairs,

19    making a beeline up to the main level, kneeling at his

20    computer, attempting -- probably in all likelihood -- to

21    delete whatever images were downloading to that computer.

22         That computer was taken from him; that laptop computer is

23    taken from him.  It is taken into custody by the Federal

24    Bureau of Investigation, and it is examined.

25         You will hear from an individual by the name of Ray Hsu,

1    H-s-u.  He's a forensic examiner for the FBI.  And he can tell

2    you what was found after a forensic review on the computer,

3    the computer on the main floor of the defendant's residence,

4    the computer that the defendant had run from the downstairs

5    level to the upstairs level upon hearing people enter his

6    house, and that he physically had to be removed from as it was

7    downloading an image of child pornography.

8        You'll learn from Mr. Hsu that the laptop computer taken

9    from his hands had references to both fuckchrist and

10   PTasseater on it.  You'll learn that it had the Tor browser,

11   which is a ways or means of accessing the Tor network; and

12   that it had significant history of browsing Tor sites,

13   including PedoBook.

14       You will learn that on that computer was child

15   pornography depicting infants and toddlers, messages relating

16   to the violent sexual abuse of children consistent with the

17   messages that he was sending to Mr. MacMillan, who you'll hear

18   from; consistent with messages he was sending to NE14PTHC, the

19   undercover operative who was running the board for

20   approximately three weeks in November.

21       And as one might expect, those cybersecurity specialists,

22   you're going to learn that there was other programs, eraser

23   programs that were running on that computer.  You're going to

24   learn that CCleaner was running and Eraser was running on that

25   computer.

PLAINTIFF'S OPENING STATEMENT                                    83

1          Agent Gordon will explain to you a number of things as I

2     indicated before.  He's going to tell you -- because

3     presumably none of you are experts on this -- where do people

4     go on the Internet when they're looking for child pornography?

5     What means do they use to obtain that child pornography?  What

6     terms do they use in order to obtain child pornography?  He's

7     going to explain to you what PTHC means, as well as other

8     terms that are relevant to the investigation of these

9     individuals.

10         You will see the footprints that were left behind by the

11    defendant on the board as it was ran -- or run, I'm sorry, by

12    the FBI.  You will see when the defendant registered on the

13    computer, how he chose his user name, what he typed in as his

14    user name, how he chose his display name, what he typed in as

15    his display name.

16         You'll see that he cultivated a persona, one that took

17    pleasure in the rape and killing of very, very young children.

18    You'll see the public and the private groups that he joined --

19    we talked about those a little bit earlier -- thus acting in

20    community and concert with other individuals who shared his

21    interests or had like interests.

22         You'll see the dates and times that he accessed PedoBook.

23    You'll see where he went on PedoBook.  Agent Gordon is going

24    to be able to show you how it is he knows that it was

25    PTasseater or fuckchrist who went to a particular place on the

1    board.  And he's going to be able to show you what that place

2    looked like to anybody who was using at that time or using

3    that board at that time.  So you're going to see it from both

4    sides, where he went and what was being displayed to him.

5         You're going to see screenshots of actual private

6    messages sent by the defendant.  You're going to see -- well,

7    you're going to see a lot over the next day or so from Agent

8    Gordon.

9         You're going to see the specific images on November 21st

10   and November 26th as well as December 4th and December 8th of

11   2012 where the defendant accessed child pornography with the

12   intent to view it and what it is he would have been able to

13   view and, in fact, did view at that particular time.

14        PedoBook was -- well, I think we've covered enough as far

15   as an opening and what you're going to see over the next

16   couple of days.

17        At the conclusion of this trial, after the evidence has

18   been introduced, after you've had an opportunity to receive

19   all of the evidence, we're going to have another opportunity

20   to appear before you.  And at that time, we're going to be

21   coming back before you and asking you to return a verdict of

22   guilty.

23        Thank you very much.

24             THE COURT:  Thank you, Mr. Norris.

25        We will now hear the opening statement by defense

 1          counsel, Mr. Berry.

 2              MR. BERRY:  May it please the Court, counsel.

 3     Opening statements are the attorneys' opportunity to tell you

 4     what they believe the evidence will be.  What we say in our

 5     opening statementS is not evidence.  And I ask you to listen

 6     to the evidence and make your decision at the end of this

 7     case.

 8          I believe the evidence will show that Mr. DeFoggi worked

 9     in Washington, D.C. -- in the D.C. area for the Department of

10     Health & Human Services in the areas of network security and

11     technology.

12          He doesn't deny that he used The Onion Router or Tor.  In

13     fact, The Onion Router was used legally in the past and is

14     currently not illegal to use.  The Onion Router was developed

15     by the Department of Defense, funded by the U.S. government.

16     It has approximately 36 million users.  And Mr. DeFoggi found

17     it professionally intriguing.  He saw it as a security threat

18     and wanted to learn how to defeat it.

19          Some of the things that we all have become familiar with

20     over the last few years WikiLeaks, Edward Snowden, Internet

21     anonymity used to leak secrets and other information was

22     something that intrigued Mr. DeFoggi.  It was something that

23     he was passionate about.  He was concerned about security

24     threats.  That was part of his job; that was part of his life.

25          The government will engage [*sic*] that Mr. DeFoggie

1    engaged in some type of fantasy chat on PedoBook and used the

2    names fuckchrist or PTasseater.  The government has charged in

3    Counts IV through VII that somehow links that fuckchrist may

4    have clicked were accessing or downloading or possessing child

5    pornography.

6         However, the facts of this case will demonstrate the

7    person using the name fuckchrist did not have a role in

8    creating, operating, or administering the PedoBook website.  I

9    don't believe the evidence is going to show there's going to

10   be references to a person -- goes by the name fuckchrist or

11   PTasseater -- publishing any child pornography materials on

12   the PedoBook website.

13        At the end of the case, there will be some fantasy chat

14   and other information provided by the government, but it will

15   not be sufficient to convict on the count of a child

16   exploitation enterprise.  And the judge will instruct you on

17   the law on that and what the government has to prove.  And

18   some of that will have to do with a certain amount of persons

19   working in concert together.  And you'll get all that

20   instruction at the end.  And the law comes from the judge and

21   not from us, the attorneys.

22        But in the end, there will be not enough information to

23   show the person who used those names was guilty of any child

24   exploitation enterprise.  The government will also not prove a

25   conspiracy or agreement with this fantasy chat.

DEFENDANT'S OPENING STATEMENT                                87

1          Finally, that child pornography alleged to have been in

2     the possession of fuckchrist in Counts IV through VII you'll

3     find were not found on any device, electronic or otherwise,

4     belonging to Mr. DeFoggi.

5          At the end of this case, I will ask you to think about

6     all the evidence that the government has presented, think hard

7     about it, look at whether they have met their burden of

8     proving the case beyond a reasonable doubt.  And then at the

9     end of this case, I will ask you to find Mr. DeFoggi not

10    guilty on all counts.

11         Thank you.

12              THE COURT:  Thank you, Mr. Berry.

13         The government may call its first witness.

14              MR. NORRIS:  We will call Special Agent Jeffrey

15    Tarpinian.

16              THE COURT:  If you will please come forward to the

17    courtroom deputy, she will swear you in.

18              JEFFREY TARPINIAN, PLAINTIFF'S WITNESS, SWORN

19              COURTROOM DEPUTY:  Oh, sorry.  Please state your name

20    for the record.

21              THE WITNESS:  Jeffrey Tarpinian.

22              COURTROOM DEPUTY:  Please spell your last name.

23              THE WITNESS.  T-a-r-p-i-n-i-a-n.

24              THE COURT:  Mr. Norris, you may inquire.

25              MR. NORRIS:  Thank you, your Honor.

TARPINIAN - DIRECT                                                88

1                          DIRECT EXAMINATION

2     BY MR. NORRIS:

3     Q.   Sir, would you state your name.

4     A.   Jeff Tarpinian.

5     Q.   And how are you employed?

6     A.   I'm a special agent with the Federal Bureau of

7     Investigation.

8     Q.   And how long have you been employed as a special agent?

9     A.   Just over 26 years.

10    Q.   Where are you currently assigned?

11    A.   I'm assigned to the Omaha division of the FBI.

12    Q.   And what are your duties and responsibilities with the

13    Omaha division?

14    A.   I am part of a child exploitation task force.  And

15    specifically, I investigate crimes against children, more

16    specifically on child pornography matters.

17    Q.   How long have you worked child exploitation and child

18    pornography cases for the FBI?

19    A.   Approximately five years.

20    Q.   How many of these investigations have you participated in

21    during those -- that approximately five-year period?

22    A.   Approximately 100.

23    Q.   What other types of investigations have you been involved

24    with with the FBI both in Omaha as well as any previous

25    service with the FBI?

1    A.    For the past 26 years, I've been involved in narcotics

2    investigations, white collar matters, organized crime and

3    public corruption.

4    Q.    And have you been assigned to any other offices besides

5    Omaha?

6    A.    Yes, the Houston office.

7    Q.    Did you become involved in the investigation of a child

8    pornography board hosted here in Nebraska?

9    A.    I did.

10   Q.    And when was that?

11   A.    I became involved in March of 2012.

12   Q.    Where did the information came from or originate from?

13   A.    It originated from the Dutch National Police and

14   specifically their high technology crime unit.

15   Q.    Where did they provide that information to?

16   A.    They originally provided it to our FBI headquarters.

17   Q.    Okay.  And once it's provided to FBI headquarters, is it

18   then disseminated to the field?

19   A.    Yes, it was.

20   Q.    Okay.  As well as other agents and headquarters?

21   A.    That's correct.

22   Q.    Was a case agent designated at or about this time?

23   A.    Yes.

24   Q.    Who was the case agent?

25   A.    Myself.

1    Q.   What is a case agent?  Can you explain to the members of

2    the jury what a case agent does?

3    A.   The case agent is the individual in charge of the overall

4    scope and direction of the investigation and determines what

5    investigative evidence will take place.

6    Q.   So the lead that came from the Dutch national police, was

7    it then shared with you?

8    A.   Yes, it was.

9    Q.   And what was the nature of that lead?

10   A.   The Dutch National Police had identified hidden services

11   on the Tor network.

12   Q.   And did they indicate where they had identified that --

13   those hidden services?

14   A.   Yes.  They had identified those hidden services being

15   hosted in the Omaha, Nebraska, area.

16   Q.   I want to direct your attention to a couple of terms you

17   just used, the first one being "hidden services".  Can you

18   explain for the members of the jury what a hidden service is?

19   A.   Yes.  A hidden service is a website on the Tor network.

20   Q.   Can you analogize it to, perhaps, something that they

21   would be more familiar with?

22   A.   Yes.  It's simply just like a website on the regular

23   Internet, if you will, such as CNN or ESPN.  Hidden services

24   are just websites that you can access only on the Tor network.

25   Q.   You just used the term "Tor network".  That's the second

1    term I was going to ask of you.  Are you familiar with the Tor

2    network?

3    A.    Yes.

4    Q.    Through this investigation?

5    A.    That's correct.

6    Q.    Had you, prior to this lead that came from the Dutch

7    National Police, had any experience with the Tor network?

8    A.    No, I had not.

9    Q.    What is the Tor network?

10   A.    It is a worldwide network that enables an individual to

11   search or surf the Internet anonymously.

12   Q.    And how is that accomplished, if you know?

13   A.    That is accomplished through, number one, accessing the

14   Tor network; and then the Tor network routes your

15   communications through a series of computers or a network of

16   computers so that the site that you go to does not reveal the

17   true IP address of the user.

18   Q.    Okay.  Is the hidden service also protected from users as

19   far as the true IP?

20   A.    It is.

21   Q.    What is an IP, and why is an IP significant to law

22   enforcement?

23   A.    An IP address is an Internet Protocol address.  It's a

24   numerical number that identifies a device on a computer

25   network.

 1          It would be comparable to a telephone number as to

 2     specifically identifying a device on a network.

 3     Q.   In, I guess, short, brief terms, can you describe what

 4     problems are presented to law enforcement if an investigation

 5     involves the Tor network?

 6     A.   Yes.  The difficulty is to identify a true location of a

 7     user, in this case, of a website.  The normal investigative

 8     avenues for an investigator are not available.

 9          Typically, we can serve legal process on a website and

10     get what we call their IP logs, IP addresses that have visited

11     that site.  Using the Tor network, users obfuscate their true

12     IP address because, again, it is routed through this network

13     of voluntary computers, if you will.

14          And at the end, when that user visits that website on the

15     Tor network, his or her IP address, true IP address, is not

16     made available to that website.

17     Q.   Thank you.  Did you open an investigation in this case?

18     A.   We did.

19     Q.   Who was the initial target of the investigation?

20     A.   Aaron McGrath.

21     Q.   Why was he the target?

22     A.   Because one of the IP addresses provided by the Dutch

23     National Police resolved to a residence in West Omaha where he

24     resided.

25     Q.   What was Mr. McGrath's role with the website?

TARPINIAN - DIRECT                                           93

1    A.   We determined that he was the administrator of the

2    website.

3    Q.   You indicated that you knew that he lived West Omaha?

4    A.   Correct.

5    Q.   Were you able to determine where he worked?

6    A.   Yes, we were.

7    Q.   And how were you able to determine that?

8    A.   Two ways; number one, additional IP addresses that we

9    were provided by the Dutch resolved to data centers in

10   Bellevue, Nebraska.

11        And just through open record searches, Department of

12   Labor searches, we were able to determine McGrath resided at a

13   data center -- was employed at a data center in Bellevue.

14   Q.   Where was the data center located, other than Bellevue;

15   where in Bellevue, not a specific address?

16   A.   It was located in the old Southroads Mall in Bellevue.

17   And the name of the company he was employed with is Perigon

18   Networks.

19   Q.   You've used the term "data center".  Can you describe

20   what Mr. McGrath's job was and what a data center is?

21   A.   A data center is a business that has a series of racks of

22   servers, servers being just powerful computers.  They host

23   data on those servers for customers that either can't or don't

24   have the capability of hosting that data at their own

25   facility.

TARPINIAN - DIRECT                                    94

```
 1          So literally, a data center hosts data.  And Mr. McGrath

 2     facilitated that.

 3     Q.   Have you also heard of a data center as a server farm?

 4     A.   Yes.

 5     Q.   Did you develop a plan involving Mr. McGrath and this

 6     data center, specifically the server that would have been

 7     hosting PedoBook?

 8     A.   Yes.

 9     Q.   Tell us about the plan you had.

10     A.   We had planned to do almost simultaneous search warrants

11     at Mr. McGrath's residence in West Omaha and then execute a

12     search warrant at his place of business where we believed a

13     server was located hosting the child pornography website.

14     Q.   What did you plan to do with the server hosting the child

15     pornography website once it would have come into your

16     possession?

17     A.   We planned to monitor it for a period of time.

18     Q.   Why was it desirable for you to monitor or operate this

19     website after seizing it?

20     A.   So we could attempt to determine the true identity of the

21     users of the website who were viewing and distributing child

22     pornography.

23     Q.   Did this plan require approvals over your level?

24     A.   Yes.

25     Q.   And what levels did it require approval from?
```

TARPINIAN - DIRECT                                                    95

1    A.   It required approval of the executive management of the

2    FBI in Washington, D.C.  It required the approval of executive

3    management at the Department of Justice.

4    Q.   Okay.  Did it also require court approval?

5    A.   Yes, it did.

6    Q.   Why?

7    A.   Because we were going to be monitoring content on the

8    website.

9    Q.   And by "content," what do you mean?

10   A.   Actual information or data that was being put on --

11   uploaded onto that website and being able to monitor real-

12   time messages or conversations between users.

13   Q.   Are you familiar with the term "Title III warrant"?

14   A.   Yes.

15   Q.   Can you describe for the members of the jury what you

16   understand a Title III warrant to be?

17   A.   Yes.  A Title III warrant, if signed by a district court

18   judge, would authorize law enforcement to monitor real time --

19   well, in this case, the activity on a website, or if it was in

20   the case of a telephone, real-time content of telephone

21   conversations.

22   Q.   Did you ultimately obtain court approval through a

23   Title III in this particular investigation?

24   A.   We did.

25   Q.   Did FBI senior management or DOJ senior management place

TARPINIAN - DIRECT                                          96

1    limits on your plan?

2    A.    They did.

3    Q.    And tell us what those limits were.

4    A.    Those limits entailed us -- us, being law enforcement --

5    to monitor the website 24 hours a day, seven days a week.

6    Q.    Okay.  And why were you monitoring and what were you

7    looking for?

8    A.    We were monitoring in an attempt to identify true name --

9    or true locations of users of the website.  But just as

10   importantly, we were trying to identify individuals that we

11   thought may be ready to hurt or harm kids.  If we saw activity

12   on the website that made statements to the effect of harming

13   kids, we made an attempt to identify those individuals, either

14   by engaging them in conversation or other means.

15   Q.    How did this monitoring take place, what type of

16   manpower, how was it done?

17   A.    We had a schedule of law enforcement personnel, both FBI

18   and nonFBI law enforcement.  And we set up schedules.  And

19   from the time that we took possession of the server hosting

20   the website, we had someone physically there in front of a

21   screen monitoring that until it was shut down.

22   Q.    After you obtained approval, did you obtain search

23   warrants for Mr. McGrath's residence?

24   A.    We did.

25   Q.    And did you also seek search warrants for his home?

TARPINIAN - DIRECT                                                    97

1    A.    Yes.

2    Q.    When did you seek a search warrant for his residence?

3    A.    November 9th of 2012.

4    Q.    And who did you seek that from?

5    A.    A judge here in the District of Nebraska.

6    Q.    And when did you seek the search warrants for his place

7    of business?

8    A.    Shortly thereafter.  I don't recall the exact date.

9    Q.    Did you have both search warrants in hand when a plan was

10   made to execute them?

11   A.    Yes.

12   Q.    When was the search warrant on the residence executed?

13   A.    November 15th of 2012.

14   Q.    And when was the search warrant on the place of business

15   executed?

16   A.    The same day.

17   Q.    What concerns did you have relating to executing the

18   warrant in what specific order?

19   A.    Our concern with executing the search warrant at

20   Mr. McGrath's house was if his computer either was not on or

21   he was not logged in, because of his IT background, that there

22   may be encryption or security software on there that we

23   wouldn't be able to gain access to any of the devices in his

24   house.

25   Q.    So were you concerned about destruction of evidence?

1     A.    Yes.

2     Q.    Were you concerned about your ability to run the server

3     if the server was functionable?

4     A.    Yes.  And that was -- as stated previously, one of our

5     goals was to monitor the child pornography website.  And if we

6     didn't get access to Mr. McGrath's computers or devices, that

7     that may limit or nullify our ability to do that.

8     Q.    Is that why it was important for you to find him

9     administering on the Tor network to a board and catch him

10    while he was doing that?

11    A.    Yes.  That was our goal, and we took steps to ensure that

12    we were successful.

13    Q.    Why execute at the West Omaha household or home of

14    Mr. McGrath before executing on the server farm?

15    A.    A couple different reasons.  Number one, if we executed

16    at his place of business beforehand, he may get notified which

17    would ruin our element of surprise, if you will.

18          And then the information that we obtained initially from

19    our search of Mr. McGrath, we felt may be beneficial to the

20    execution of the search warrant at the business.

21    Q.    Given the concerns that you had with regard to possible

22    destruction of evidence and wanting to get the laptop while it

23    was open and administering, did you request a specific type of

24    warrant when you obtained the warrant for his residence?

25    A.    We did.

1    Q.    What type of warrant did you request?

2    A.    It was called a no-knock search warrant.

3    Q.    And what is a no-knock search warrant?

4    A.    It authorizes law enforcement, in this case the FBI, to

5    enter the residence without knocking and announcing our

6    presence beforehand.

7    Q.    I want to direct your attention then to the 15th of

8    November when you executed the warrant.  What time did you

9    execute on the residence?

10   A.    Approximately 4:45 p.m.

11   Q.    Was Mr. McGrath home at that time?

12   A.    He was.

13   Q.    Was it important for him to be home before you executed

14   the warrant?

15   A.    Yes.

16   Q.    And how did you know that he was home?

17   A.    Two different ways.  We had physical surveillance set up

18   at his residence so we actually saw him arrive at the

19   residence and get out of his vehicle and enter the residence.

20         And then we also became aware that he logged on as the

21   administrator to a child pornography website.

22   Q.    Was there an FBI agent who was watching that FBI -- or

23   monitoring that?

24   A.    Yes.  We had law enforcement personnel on the child

25   pornography website so we could see that the administrator,

1   who we knew was Mr. McGrath, had logged on shortly after he

2   arrived at home.

3   Q.   When you say shortly after he arrived home, approximately

4   how much time elapsed before agents saw him enter the house

5   and before other agents notified you that he was on the Tor

6   network?

7   A.   I would estimate less than ten minutes when we got that

8   notification.

9   Q.   So you and other agents decided to make an entry into the

10  residence at approximately 4:45 p.m.?

11  A.   That's correct.

12  Q.   How did you enter the home?

13  A.   We entered through an open sliding glass door at the rear

14  of the house.

15  Q.   Who entered first?

16  A.   I did.

17  Q.   As you walked through the sliding glass door at the rear

18  of the house, what level are you on?

19  A.   We were on the main level.

20  Q.   Did you see anything on the main level?

21  A.   No, we did not.

22  Q.   Where did you go after the main level?

23  A.   We walked up the stairs to the second floor.

24  Q.   And describe the second floor as far as the number and

25  nature of the rooms up there.

1    A.   It's a relatively small hallway.  There were -- I want to

2    say three rooms, plus a bathroom.  Only one of the rooms had

3    the door closed, and we checked and it was locked.

4    Q.   How would you describe your approach at this time as far

5    as the level of noise that was being made?

6    A.   Still surreptitious, if you will, so we were very

7    discreet, very quiet.  Again, our goal was to get Mr. McGrath

8    and access that laptop before he had a chance to turn it off.

9    Q.   Upon noticing that there is a bedroom door that is

10   locked, what decision is made next?

11   A.   A decision very quickly is made to forcibly enter the

12   room.

13   Q.   And was that done?

14   A.   Yes, it was.

15   Q.   How was that accomplished?

16   A.   By kicking in the door.

17   Q.   And when you kicked -- when the door was kicked in, who

18   was the first individual into the bedroom?

19   A.   I was.

20   Q.   Can you describe what you saw as the door opened and you

21   entered into the bedroom?

22   A.   I saw Aaron McGrath laying on his bed with the covers

23   pulled up to his waist.  He had a pair of headsets -- yeah, a

24   pair of headsets on, appearing to listen to music.  You could

25   hear the music coming from the headset.

1    Q.   Do you believe that assisted you in your surreptitious or

2    stealth entry into the upstairs bedroom anyway?

3    A.   Yes, absolutely.

4    Q.   Were you able to observe the laptop that you were hoping

5    to seize?

6    A.   Yes.  Mr. McGrath had a laptop on his lap, actually with

7    his hands on the keyboard at the time we entered the room.

8    Q.   So the computer was open?

9    A.   Computer was open, yes.

10   Q.   And his hands were on the keyboard?

11   A.   Correct.

12   Q.   Upon noticing this, what did you do or say?

13   A.   I ordered him to remove his hands from the laptop.  And

14   then I made steps towards him to take possession of the

15   laptop.

16   Q.   Tell us how you ordered him to remove his hands.

17   A.   I mean, it was in a loud yelling, you know, authoritative

18   voice, if you will, that there was a sense of urgency; that it

19   wasn't, "Close the laptop, do whatever."  It was now.  We

20   need, number one, to see his hands clearly from behind, the

21   part of the laptop that was obfuscating his hands, and we need

22   to do it right now.

23   Q.   He was yelled to let go of the laptop?

24   A.   Right.

25   Q.   How were you and others on the residential or home entry

1    team, how were they dressed?

2    A.   We were clearly identified in law enforcement FBI

3    personnel.  I had my FBI vest on that has a banner, if you

4    will, that says "FBI".  I believe I had a raid jacket on that

5    also said "FBI".  I would have had my badge on my belt.

6    That's clearly visible, in addition to verbal identification,

7    that we were law enforcement.

8    Q.   So what verbal identification of law enforcement was made

9    and in what sequence in ordering him to release the computer,

10   let go of the computer?

11   A.   I would have identified myself verbally as being with the

12   FBI prior to ordering him to remove his hands from the laptop.

13   Q.   Did he comply with your order to remove his hands from

14   the laptop?

15   A.   Not initially.

16   Q.   What did he do?

17   A.   He started to close the laptop.

18   Q.   How far away from him were you as he started to close the

19   laptop?

20   A.   I was probably just at the edge of the bed so I was

21   probably three to four feet from the him.

22   Q.   What did you do?

23   A.   I quickly approached him, if you will, and physically

24   removed the laptop from him.

25   Q.   When you removed the laptop from him, what was the status

1    of the laptop at that time?

2    A.    It was still on, but the screen saver had activated.

3    Q.    So it wasn't shut down?

4    A.    No, it was not shut down.

5    Q.    And what were you able to do with that particular laptop

6    after seizing it?

7    A.    We were able to gain access to it and determine what

8    sites that he was on at the time it was seized.

9    Q.    Were you able to maintain the capacity to then run the

10   server once the servers were seized?

11   A.    Yes.

12   Q.    Were you able to photograph the screens that were open on

13   that laptop at the time that you gained entry and seized it?

14   A.    Yes.  We took pictures of the screens that showed the

15   different sites he was on.

16        MR. NORRIS:  Your Honor, may I approach?

17        THE COURT:  Yes, you may.

18   BY MR. NORRIS:

19   Q.    Agent Tarpinian, I've handed you Exhibit 68.  Do you

20   recognize that?

21   A.    Yes.

22   Q.    What is it?

23   A.    That is a picture of a screen of PedoBook, the child

24   pornography website, that was on and open at the time we

25   seized the laptop from Mr. McGrath.

1    Q.   Is it a true and accurate depiction of the website,

2    PedoBook, at the time at which you were able to seize the

3    administrator's laptop from Mr. McGrath?

4    A.   Yes.  Again, for clarification, it was one of the sites

5    he was on at the time it was seized.

6        As you can tell at the bottom of that picture where it

7    shows all the different open sites that he was on; but yes,

8    this is one of those.

9            MR. NORRIS:  Your Honor, I would offer Exhibit 68.

10           MR. BERRY:  Your Honor, I would object on relevance

11   and 403.

12           THE COURT:  Overruled.  Exhibit 68 is received.

13           MR. NORRIS:  Your Honor, if I may retrieve the

14   exhibit and publish it?

15           THE COURT:  You may.

16   BY MR. NORRIS:

17   Q.   I've just now put on the monitor, Agent, Exhibit 68.  Is

18   that what you were referring to as the PedoBook that was

19   open -- the PedoBook page that was open at the time in which

20   you obtained the computer from the administrator, Mr. McGrath?

21   A.   Yes.

22   Q.   Can you read for the members of the jury the bottom line

23   of PedoBook, the last entry on that page, please?

24   A.   "Fuckchrist is now a friend with" -- and I'm going to

25   struggle with that.  I can't really see that name.  I believe

1    it's Raymer (phonetic).  I can't read that -- the name.

2    Q.   If I brought it up to you, would you be able to read it

3    clearer on the --

4    A.   Yes.

5    Q.   Okay.

6             MR. NORRIS:  May I approach?

7             THE COURT:  You may.

8    A.   "Fuckchrist is now a friend with" -- again, I'm going to

9    struggle here a little still, Ray -- Raymer (phonetic); last

10   part of that is, I believe, Himura.  And it says 3 minutes

11   ago.

12   BY MR. NORRIS:

13   Q.   All right.  After you seized the laptop, what did you do

14   next?

15   A.   After we seized the laptop, we notified the law

16   enforcement personnel that was at Mr. McGrath's place of

17   employment that they could go ahead and execute the search

18   warrant down there.

19   Q.   And where is "down there"?

20   A.   Down there is Perigon Networks, the data center we

21   discussed earlier, which is located at the old Southroads Mall

22   in Bellevue, Nebraska.

23   Q.   Did you, in fact, go to Bellevue?

24   A.   I did.

25   Q.   And you went there from the West Omaha address of

TARPINIAN - DIRECT                                           107

1    Mr. McGrath?

2    A.   Correct.

3    Q.   What did you do upon your arrival in Bellevue at Perigon?

4    A.   I oversaw the execution of the search warrant down there,

5    and then we made a determination of how to go forward after

6    the search warrant was executed.

7    Q.   Were you able to, on November 15th, serve -- I'm sorry,

8    seize the server that housed PedoBook?

9    A.   We were.  I think it was a continuation between November

10   15th into November 16th when the seizure took place.

11   Q.   But it was actually in the FBI's control and nobody else

12   could have access to it on February [*sic*] 15th, correct?

13   A.   That's correct.

14   Q.   When were you able to extract the server and bring it

15   from Perigon to an alternate location?

16   A.   It was brought to an FBI facility, I believe, on November

17   18th of 2012.

18   Q.   So when you encountered the server that housed PedoBook

19   at Perigon, did you take it offline or remove it?

20   A.   Yes.

21   Q.   What did you do after you removed it?  Where did you take

22   it?

23   A.   We took it to a secured FBI facility here in Omaha.

24   Q.   For what purpose?

25   A.   To monitor the activities on that particular site in an

TARPINIAN - DIRECT                                          108

1   attempt to identify the users who were, you know, viewing and

2   distributing child pornography.

3   Q.   Did you seek a Title III authorization from the District

4   Court -- the United States District Court to operate PedoBook

5   on November 18th then?

6   A.   We did.

7   Q.   Were you granted that authorization?

8   A.   Yes.

9   Q.   And during what period did the FBI operate and monitor

10  PedoBook?

11  A.   From November 19th of 2012 until December 8th of 2012.

12  Q.   Just shy of three weeks?

13  A.   Correct.

14  Q.   What happened on December 8th of 2012?

15  A.   We discontinued monitoring the site and shut it down.

16  Q.   When you say you shut it down, did it basically go dark?

17  A.   Yes.

18  Q.   Was there any access at that point to PedoBook by

19  anybody?

20  A.   No.

21  Q.   At any time while the FBI operated and monitored

22  PedoBook, did the FBI post any images of child pornography

23  onto PedoBook?

24  A.   No.

25  Q.   How many members were there of PedoBook as of December

```
 1    8th, 2012, when the FBI shut it down?

 2    A.   In excess of 8,000.

 3    Q.   By operating and monitoring PedoBook, was the FBI

 4    successful in identifying any other members?

 5    A.   We were.

 6    Q.   And did the identification of some of these members

 7    result in prosecutions?

 8    A.   They did.

 9    Q.   Was the administrator, Aaron McGrath, prosecuted?

10    A.   Yes, he was.

11    Q.   Did you identify some of the other PedoBook members who

12    the FBI ultimately identified resulting in their prosecution?

13    A.   Yes.

14    Q.   Was the defendant, Mr. DeFoggi, one?

15    A.   Yes, he was.

16    Q.   How about Jason Flanary?

17    A.   Yes, he was.

18    Q.   Can you describe -- I don't need you to describe what

19    Mr. Flanary was charged with or the circumstances of his

20    arrest, but can you describe for the members of the jury what

21    his display name and user name on PedoBook were?

22              MR. BERRY:  Objection, relevance, 403.

23              MR. NORRIS:  Goes to --

24              THE COURT:  Relevance?

25              MR. NORRIS:  -- concert, other members on the board.
```

```
 1              THE COURT:  Overruled.

 2    A.   Mr. Flanary's display name was iceman6791.

 3    BY MR. NORRIS:

 4    Q.   Are you familiar with an individual by the name Charles

 5    MacMillan?

 6    A.   Yes, I am.

 7    Q.   Was he on PedoBook?

 8    A.   He was.

 9    Q.   And he was identified by law enforcement and arrested?

10    A.   He was.

11    Q.   What were his display and user names?

12              MR. BERRY:  Objection, relevance, 403.

13              THE COURT:  Overruled.  He may answer.

14    A.   His user name was noonewillknow321.  And his display name

15    was toddler lover.

16    BY MR. NORRIS:

17    Q.   Can you spell toddler lover or --

18    A.   It was abbreviated.  It was t-d-l-r-l-u-v-r.

19    Q.   Was a Wesley Cameron identified on PedoBook --

20    A.   He was.

21    Q.   -- and prosecuted?

22    A.   Yes.

23    Q.   And what was his user and display name?

24              MR. BERRY:  Objection, relevance, 403.

25              THE COURT:  Overruled.  He may answer.
```

TARPINIAN - DIRECT                                           111

1    A.   Newguy689.

2    BY MR. NORRIS:

3    Q.   And did he have a display name that went with it?

4         MR. BERRY:   Same objection.

5         THE COURT:   Overruled.  He may answer.

6    A.   That's the only name I'm aware of.

7    BY MR. NORRIS:

8    Q.   How about Zachary Austin?

9    A.   Yes, I'm aware of him.

10   Q.   And was he likewise prosecuted in the District of

11   Nebraska?

12   A.   Yes.

13   Q.   And what were his display and user names?

14        MR. BERRY:   Objection, relevance, 403.

15        THE COURT:   Overruled.  He may answer.

16   A.   Slut couple.  And "couple" was abbreviated;

17   s-l-u-t-c-p-l.  And then kinky underscore couple, again couple

18   abbreviated c-p-l.

19   BY MR. NORRIS:

20   Q.   Were you able to identify members of foreign countries

21   that belonged to PedoBook?

22   A.   We were.

23   Q.   What was done with this information?

24   A.   The information was provided to federal law enforcement

25   agencies in those particular countries.

1    Q.   Were you also able to identify and prosecute individuals

2    who were not members but visited PedoBook?

3    A.   We were.

4         MR. NORRIS:  Your Honor, if I may approach again?

5         THE COURT:  You may.

6    BY MR. NORRIS:

7    Q.   I'm going to hand you what's been marked as Exhibit 74

8    and Exhibit 75.

9         Beginning with Exhibit 74, do you recognize that?

10   A.   I do.

11   Q.   What is it?

12   A.   It's the residence of Aaron McGrath back in 2012.

13   Q.   Okay.  And without telling us a specific address, can you

14   tell us the neighborhood where it was located?

15   A.   The Cottonwood neighborhood of West Omaha.

16   Q.   Which is located -- for those familiar with Omaha, would

17   be located near what schools, what area, what parks, whatever

18   is easiest for you?

19   A.   It would be on the -- it's across the street from

20   St. Wenceslaus Church on the north side of Pacific, just east

21   of 156th.

22   Q.   Is that a true and accurate depiction of the residence at

23   the time you would have executed your warrant on November 15th

24   of 2012.

25   A.   Yes.

TARPINIAN - DIRECT                                                      113

1           MR. NORRIS:  Your Honor, I would offer Exhibit -- I

2      believe I said 74.

3           MR. BERRY:  No objection.

4           THE COURT:  Exhibit 74 is received.

5      BY MR. NORRIS:

6      Q.   I'm going to ask you Exhibit 75, is that currently before

7      you?

8      A.   Yes.

9      Q.   And what is Exhibit 75?

10     A.   It's a picture of the outside of Perigon Networks, one of

11     the data centers that we discussed.

12     Q.   Associated with Mr. McGrath?

13     A.   Correct.

14     Q.   And was that where the other warrant was executed on

15     November 15th, 2012?

16     A.   Yes.

17     Q.   And is that a true and accurate depiction of the business

18     of Perigon as of November 15th of 2012?

19     A.   It is.

20     Q.   And where is it located?  Again, I don't need a specific

21     address, just the area.

22     A.    It is part of the old Southroads Mall in Bellevue,

23     Nebraska.

24     Q.   All right.

25           MR. NORRIS:  I would offer Exhibit 75, your Honor.

```
 1              MR. BERRY:  No objection.

 2              THE COURT:  Exhibit 75 is received.

 3              MR. NORRIS:  Your Honor, if I may ask the agent to

 4     write "Omaha" as well as "Bellevue" -- I'm sorry, "Omaha" on

 5     74, which is the residence, and on 75, if there are no

 6     objections to that, I'll have him write "Bellevue," just so we

 7     have the city straight.

 8              THE COURT:  Any objection?

 9              MR. BERRY:  That's fine.  You could just reoffer

10     them.

11              THE COURT:  The record will reflect that the witness

12     is writing the word "Omaha" --

13              MR. NORRIS:  On 74.

14              THE COURT:  -- on 74 --

15              MR. NORRIS:  Which is the residence.

16              THE COURT:  -- and "Bellevue" on 75.

17              MR. NORRIS:  Yes, your Honor.  Thank you.

18         Then I don't have any further questions of this witness

19     but would like to just publish 74 and 75 very briefly on the

20     ELMO before tendering the witness for cross.

21         May I approach to retrieve those?

22              THE COURT:  You may.

23              MR. NORRIS:  Your Honor, I have placed Exhibit 74 --

24     your Honor, if the record will reflect I've now published

25     Exhibit 74, and will now publish Exhibit 75.
```

1          And then I would tender him for cross.

2              THE COURT:   Thank you.   You may cross-examine,

3     Mr. Berry.

4              MR. BERRY:   Can I just have a moment, your Honor?

5          (Off-the-record discussion had.)

6                          CROSS-EXAMINATION

7     BY MR. BERRY:

8     Q.   Mr. Tarpinian, it's your understanding the FBI ran the

9     PedoBook site from November 19th to December 8th, correct?

10    A.   Yes.

11    Q.   And the FBI did not run the PedoBook website prior to

12    November 19th of 2012, correct?

13    A.   Correct.

14    Q.   You indicated that Mr. McGrath -- it was your

15    understanding Mr. McGrath was the administrator of the

16    PedoBook website prior to November 19th; is that correct?

17    A.   Yell.

18    Q.   You indicated that the Dutch police first notified you

19    about PedoBook, correct -- or first notified United States law

20    enforcement about PedoBook, correct?

21    A.   Yes.

22    Q.   Do you know how they learned about it?

23    A.   During an investigation.   The details of that

24    investigation -- I don't know all the details of their

25    investigation, no.

```
 1    Q.    Thank you.

 2              MR. BERRY:  I have no further questions of this

 3    witness at this time, your Honor.

 4              MR. NORRIS:  I have nothing else.

 5              THE COURT:  All right.

 6         Thank you, Mr. Tarpinian.  You may stand down.

 7         The government may call its next witness.

 8              MR. BECKER:  Thank you, your Honor.

 9         Your Honor, before we call our next witness, the parties

10    have reached a number of stipulations.  I would ask to tender

11    one of those and publish to the jury before the testimony of

12    the next witness.

13              THE COURT:  You may.

14              MR. BECKER:  May I approach with it first?  Does your

15    Honor wish to review it?

16              THE COURT:  Well, it's -- I guess I'll ask on the

17    record.  Why don't you show it to Mr. Berry and I'll ask him

18    if he so stipulates.

19         And is this a stipulation that you're going to want to

20    have as an exhibit that goes back to the jury or simply read

21    to the jury?

22              MR. BECKER:  We are going to mark it as an exhibit,

23    your Honor.  This will be Government's Exhibit 76.

24              THE COURT:  All right.  And Mr. Berry, you've seen

25    Government's Exhibit 76.  And do you stipulate to the contents
```

1    of that?

2              MR. BERRY:  I do, your Honor.

3              MR. BECKER:  I would note for the record it has been

4    signed by all parties.

5         May I publish it on the ELMO while I read it to the jury?

6              THE COURT:  You may.

7         Are you also offering it?  Do you want me to receive it

8    as an exhibit?

9              MR. BECKER:  Indeed.

10             THE COURT:  Exhibit 76 is received.  And you may

11   publish it and read it.

12             MR. BECKER:  Thank you, your Honor.

13        Publishing the first page of Government Exhibit 76.

14        Comes now the United States, plaintiff, and Timothy

15   DeFoggi, defendant, and stipulate that:

16        1.  On November 18, 2012, FBI agents, acting pursuant to

17   a search warrant authorized by the United States District

18   Court for the District of Nebraska, copied and seized a

19   computer server from an Internet hosting facility in Bellevue,

20   Nebraska, in the District of Nebraska.  The computer server

21   contained the data and information that formed the PedoBook

22   website.

23        2.  From November 19, 2012, until December 8, 2012, the

24   PedoBook website operated at an FBI facility in Omaha,

25   Nebraska.  During that time period, user communications on the

1    PedoBook website were monitored by the FBI pursuant to the

2    authorization of the United States District Court for the

3    District of Nebraska.

4          3.  The PedoBook website ceased to operate on December 8,

5    2012.

6          4.  Exhibits 1 through 4, 6A through 6D, 11, and 69

7    consist of fair and accurate digital copies or "screen shots"

8    of various web pages of the PedoBook website as of December 8,

9    2012, the date it ceased to operate.

10         Publishing the second page, your Honor.

11         Exhibits 5 through 5D and 7 through 9A consist of fair

12   and accurate copies of user data from the PedoBook user

13   account for PTasseater/fuckchrist as of December 8, 2012, the

14   date the PedoBook website ceased to operate.  It is not

15   alleged that the defendant, Timothy DeFoggi, had any role in

16   creating, operating, or administering the PedoBook website.

17              THE COURT:  And the jury may accept those facts as

18   true, having been stipulated between the parties.

19              MR. BECKER:  Your Honor, at this time the government

20   calls Special Agent P. Michael Gordon.

21              THE COURT:  Mr. Gordon, if you'll please come forward

22   to the courtroom deputy here on my right, she will swear you

23   in.

24              THE WITNESS:  Sure.

25              COURTROOM DEPUTY:  Please state your full name for

1    the record and spell your last.

2             THE WITNESS:  P. Michael Gordon, G-o-r-d-o-n.

3             P. MICHAEL GORDON, PLAINTIFF'S WITNESS, SWORN

4             THE COURT:  You may inquire.

5             MR. BECKER:  Thank you, your Honor.

6                          DIRECT EXAMINATION

7    BY MR. BECKER:

8    Q.   If you could please start by stating and spelling your

9    full name for the record.

10   A.   P. Michael Gordon, first initial P, middle name Michael,

11   M-i-c-h-a-e-l; last name Gordon, G-o-r-d-o-n.

12   Q.   What do you do for a living?

13   A.   I'm currently employed by the Federal Bureau of

14   Investigation.

15   Q.   How long have you been with the FBI?

16   A.   Since March of 1999.

17   Q.   What is your current position with the FBI?

18   A.   I'm currently a supervisory special agent with the

19   Violent Crimes Against Children Unit, Violent Crimes Against

20   Children Section, FBI headquarters.

21   Q.   How long have you held your current position?

22   A.   Since approximately March of this year, so five months.

23   Q.   What are the duties in that position you've recently

24   obtained?

25   A.   Currently I'm tasked with oversight of our online

1   undercover operations as well as different special projects.

2   Q.   Can you describe the unit that you work for currently.

3   A.   The Violent Crimes Against Children Unit is primarily

4   tasked with the oversight and management of all of the federal

5   criminal violations that are investigated by the FBI related

6   to crimes against children, child sex tourism, online

7   exploitation of children, production and distribution of child

8   pornography.

9            THE COURT:  Mr. Gordon, if you could just push the

10  mic back just a -- thank you.

11           MR. BECKER:  Thank you, your Honor.

12  BY MR. BECKER:

13  Q.   Special Agent Gordon, before moving to your supervisory

14  role, what was your next most recent assignment with the FBI?

15  A.   Prior to my current assignment, I was assigned to the

16  Major Case Coordination Unit, formerly known as the Innocent

17  Images Operations Unit.  It's an operational investigative

18  squad located within the Violent Crimes Against Children

19  Section.

20  Q.   For how long were you in that role?

21  A.   From 2007 until March of this year.

22  Q.   And what does that unit do?

23  A.   That unit's primary function is to serve as the primary

24  investigative element for the violent crimes against children

25  section.

1          The cases that my former unit would investigate would

2     entail highly technical or complicated or sophisticated cases

3     that may not be able to be addressed by one of our individual

4     field offices.

5          Additionally, we served as the primary point of intake

6     for international law enforcement matters, both coming from

7     other law enforcement agencies in different countries, as well

8     as referring larger cases to international partners.

9     Q.   And what was your role within that unit?

10    A.   For a period of time, I was the case agent for the

11    undercover operation that has operated out of FBI

12    headquarters, as well as being an online undercover agent

13    going online and attempting to locate individuals that were

14    attempting to sexually exploit children.

15    Q.   During your time in that unit, did you become a part of

16    the investigation that involved the PedoBook website?

17    A.   Yes, I did.

18    Q.   Can you describe your other experience with the FBI

19    before you started working with the Innocent Images and

20    Violent Crimes Against Children Unit?

21    A.   Yes.  Prior to being assigned to the FBI headquarters, I

22    was assigned to the New Orleans field office, once I completed

23    my training at the FBI academy.  That would have been in 1999.

24         My first assignment when I was at the New Orleans field

25    office was with the white-collar crime squad, which was

1    primarily tasked with investigating bank fraud, check fraud

2    and wire fraud.

3         During that period I was also the primary Internet fraud

4    liaison or investigator for the squad.

5         After the white-collar crime squad, I was assigned to the

6    computer-crime squad in New Orleans where I went online in an

7    undercover capacity and investigated individuals that would

8    steal and trade individuals' credit card and personally

9    identifying information online and sell it to other

10   individuals.

11        Once I was completed with that assignment, I then went on

12   to investigate various types of computer intrusions and

13   botnets, before I was finally assigned to the New Orleans

14   Innocent Images Undercover Operation in 2004.

15   Q.   You mentioned botnets and intrusions.  What are those?

16   A.   Botnets are basically viruses or malicious code that can

17   be used to infect another individual's computer and then be

18   utilized by individuals to conduct other types of activity.

19   Q.   So with respect to, first, just cyber or cyber-

20   facilitated crimes in general, for how long have you been

21   working as an agent in that sort of area?

22   A.   Since probably approximately 2001.

23   Q.   And with respect to crimes involving the exploitation of

24   children, for how long have you been working as an agent in

25   that area?

1    A.    2004.

2    Q.    Can you please tell the jury about your employment and

3    education prior to when you joined the FBI?

4    A.    Prior to the FBI, I graduated from the United States

5    Naval Academy with a bachelor of arts in physics.  Upon

6    graduation, I was commissioned an officer in the Marine Corps

7    where I served until March of 1999.

8    Q.    Did you have any particular technical assignments or

9    experience while working in the Marine Corps?

10   A.    My military operational specialty in the Marine Corps was

11   as a tank platoon commander for M1 Abrams tanks, pretty

12   sophisticated pieces of hardware.

13         My final assignment with the Marine Corps was with the

14   Marine Corps Warfighting Lab at Quantico, Virginia, which was

15   a testing and future concepts unit that would look at new

16   technologies, new techniques in order to address future

17   threats 10, 15 years down the line.

18   Q.    I'd like to ask you about the training you've received

19   over your time with the FBI.  Can you describe the training

20   you've received, first, with respect to the area of cyber

21   crimes and computers?

22   A.    With respect to cyber crimes and computers in general,

23   I've completed the four-stage program that the FBI set up and

24   established for cyber career path agents.  That training

25   consisted of both in-house classes developed strictly by the

1    FBI relevant to investigative matters, as well as industry-

2    certified and recognized classes, such as A+ and Net+.

3    Q.   What are A+ and Net+ classes or certifications?

4    A.   A+ certification deals primarily with computers, computer

5    hardware and operating systems and how they function.

6         Net+ primarily focuses on computer networks and how

7    different devices can be set up and configured to communicate

8    over these networks.

9    Q.   Have you received training particular to the

10   investigation of child exploitation crimes?

11   A.   I have.

12   Q.   Can you describe that, please, for the jury?

13   A.   The basic training and additional training consisted of

14   attending both the basic and the advanced Innocent Images

15   Online Undercover classes.  These classes consisted of

16   providing instruction on how individuals will trade files,

17   images, and communicate online relevant to the exploitation of

18   children.

19        In addition to that information that was provided, there

20   was also additional training on how to capture, record and

21   document various online undercover activities that I would

22   conduct in order for it to be included into a case and

23   eventual trial.

24   Q.   Have you worked as an undercover agent with the FBI?

25   A.   Yes.

GORDON - DIRECT                                                    125

1    Q.   For approximately how long or during what time period?

2    A.   As an online undercover for Innocent Images since 2004.

3    Q.   And can you estimate the number of, first, investigations

4    that you've worked on that involved you acting as an

5    undercover?

6    A.   Investigations where I've acted as an undercover,

7    probably well over a dozen.

8    Q.   And then are you familiar with the term "undercover

9    session"?

10   A.   Yes.

11   Q.   What's an undercover session?

12   A.   An undercover session is basically how -- when the FBI

13   documents an undercover activity, whether it's -- we go online

14   to chat with someone, to visit a website, or to download files

15   from somebody, each unique interaction would be considered a

16   session.

17   Q.   Can you estimate how many sessions you have engaged in

18   while UC with the FBI?

19   A.   Probably well over 200 or so.

20   Q.   You've talked about the training that you received.  Have

21   you been responsible for training others while an employee by

22   the FBI?

23   A.   Yes.  I have been a primary instructor for both the basic

24   Innocent Images Online Undercover class, as well as the FBI's

25   General Online Undercover class for other crime violations.

GORDON - DIRECT                                                    126

```
1          I've also provided instruction at Internet Crimes Against
2    Children Conferences on the use of peer-to-peer file-sharing
3    software.
4          The training I provided has been provided to both law
5    enforcements within the United States, federal, local, and
6    state, as well as various international entities.
7    Q.   When you say "international entities", what are some
8    examples of foreign law enforcement you've done training for?
9    A.   I've provided training to law enforcement officials in
10   Romania, Poland, United Arab Emirates, the Phillipines and
11   Thailand.
12   Q.   Have you testified previously during your employment with
13   the FBI regarding investigations you've participated in?
14   A.   Yes.
15   Q.   Does that include testimony regarding cases where you had
16   acted as an online undercover agent?
17   A.   Yes.
18   Q.   What other sorts of topics have you testified regarding
19   previously?
20   A.   Previously I've testified regarding investigations
21   concerning online use groups or Usenets -- basically very old
22   form of bulletin boards to some extent.  I've also testified
23   concerning websites and various types of peer-to-peer
24   investigations.
25   Q.   Does that include testimony regarding websites that were
```

1   involved in child exploitation?

2   A.   Yes.

3   Q.   With respect to your prior experience investigating child

4   exploitation over the Internet, can you describe some of the

5   technologies that offenders have used that you've

6   investigated?

7   A.   The different technologies that offenders will use to

8   communicate or trade files over the Internet are pretty much

9   the same technologies that an everyday Internet user would

10  use.

11       They'll use instant messaging, they'll use different

12  types of file-sharing programs, they'll use websites.  There

13  have been investigations that I've been involved in with --

14  including Facebook and various other types of just publicly

15  available software.

16  Q.   And in terms of your undercover work, what do those

17  multiple forums mean for you in your need to communicate with

18  them?

19  A.   It basically means that I have to be fairly familiar with

20  all the different forms of communication that could occur on

21  the Internet.  It's hard to stay -- to be masterful of all of

22  them because there's just so many.

23       But you try to make sure that you stay up-to-date and

24  current through either your own research, discussing

25  investigations with other law enforcement, or through further

1    attendance of classes and on-the-job training.

2    Q.   Based on your training and experience, Special Agent

3    Gordon, have you become familiar with the operation of

4    computers, the Internet and Internet websites?

5    A.   Yes, I have.

6    Q.   Have you become familiar with the methods, tactics and

7    operation of offenders producing and trafficking child

8    pornography over the Internet?

9    A.   I have.

10   Q.   Have you become familiar with the technologies used by

11   offenders who produce and traffic child pornography over the

12   Internet?

13   A.   Yes.

14   Q.   Have you also become familiar with the terminology used

15   by offenders who produce and traffic child pornography over

16   the Internet?

17   A.   I have.

18   Q.   Why is it important for you to be familiar with that sort

19   of terminology?

20   A.   And if I'm understanding the question right, by

21   "terminology" you're meaning abbreviations and that type?

22   Q.   Why don't you tell us.  What sort of terminology ends up

23   being pertinent to online undercover work regarding child

24   exploitation suspects?

25   A.   Individuals that will trade child pornography on the

 1    Internet will often use abbreviations or shortening of things

 2    to facilitate the trade of child pornography.

 3         For instance, in peer-to-peer investigations, one of the

 4    more common search terms that I would use when I was

 5    conducting them more frequently would be PTHC.  That, based on

 6    my experience and training, was short for "preteen hard core".

 7    That also, based on my experience with downloading files that

 8    contain that, would usually -- or could possibly contain

 9    images of an underage minor engaged in some type of sexual

10    activity, usually with some type of penetration.

11         The names themselves obviously are not 100 percent

12    indicative of what the file might contain.  But if an

13    individual file had that particular phrase in it, then it

14    would be of more interest to me than one that might say "rose"

15    or "dog" or "car".

16    Q.   When you're actually interacting with child exploitation

17    suspects as an undercover, why is it important for you to know

18    that sort of terminology?

19    A.   In order to blend in and appear to be part of their

20    community or part of their criminal activity; to blend in,

21    pretty much.

22    Q.   How are you able to stay current with your knowledge of

23    those sorts of subjects?

24    A.   At this point, it is primarily from ongoing

25    investigations that I'm a part of.

```
1              It's also from conducting research based on information

2        that we receive from our intelligence analysts, discussions

3        with other law enforcement agencies, both federal, state,

4        local and international, as well as attending classes such as

5        those that are held across the country.

6        Q.   Now, have you also become familiar with the names and

7        content of websites that are used to traffic child pornography

8        over the Internet?

9        A.   Yes.

10       Q.   And how have you obtained that sort of knowledge?

11       A.   That type of information is again obtained either through

12       investigation intelligence provided to us through our analysts

13       or most typically through the National Center for Missing and

14       Exploited Children cyber tip reports.

15       Q.   And how are you able to keep that basic knowledge

16       current?

17       A.   Going out and seeing exactly what the content of these

18       sites are, seeing if the allegations against these sites are

19       accurate, or if the site is just, for lack of a better term,

20       an innocent third party that hosts files and somebody decided

21       to put child pornography up on it.

22       Q.   So it's fair to say that as part of your occupation as an

23       online undercover, you have to actually go out and access

24       those websites that might be trafficking in child pornography?

25       A.   Yes.
```

1    Q.   Special Agent Gordon, I'd like to switch gears a little,

2    take a step back and ask you some questions more generally

3    about computers and the Internet.

4    A.   Okay.

5    Q.   Can you start just by giving us a basic explanation of

6    what the Internet is?

7    A.   The Internet is basically a system of communications or

8    communication network over which information is passed to

9    different locations around the world.  When the Internet was

10   initially established, the devices that would be used for this

11   communication were primarily computers.

12        However, in the last five to ten years, the number of

13   devices that can exchange information over the Internet has

14   increased.  Examples of this would be tablets, smartphones,

15   and in more recent years, other common household items like

16   your DVD player, your Blu-ray player, thermostats, security

17   systems, things of that nature.

18   Q.   How does an Internet user actually get access to the

19   Internet?

20   A.   The typical way an individual will get access to the

21   Internet is they'll establish a contract or request an account

22   through an Internet service provider or ISP.

23   Q.   What is an Internet service provider and what does that

24   facilitate?

25   A.   An Internet service provider or ISP is basically a

1    centralized organization.  Examples of an ISP would be

2    nationally known ones such as Verizon, Sprint, Comcast, Cox.

3    In addition to those, there are smaller regional ISPs that

4    will only provide access in certain areas.

5         The ISPs will basically -- once you establish an account

6    with them, they will -- depending on the type of service that

7    you're being provided, they'll basically run a line to your

8    house and provide you with equipment that will allow you to

9    connect your computer to their equipment.  And from there,

10   you'll be able to access the Internet.

11   Q.   What's some of that equipment called?

12   A.   The primary equipment that you will most likely find in

13   people's houses will be either modems or a combination of

14   modems and routers.

15   Q.   And what is an IP address?

16   A.   An IP address or an Internet Protocol address could be

17   thought of as a unique telephone number that devices that

18   communicate over the Internet have to have in order for the

19   communications to go through.

20   Q.   And who assigns IP addresses?

21   A.   For the most part, it is the individual Internet service

22   providers.  Individual Internet service providers will be

23   provided a specific block or section of IP addresses that

24   they're allowed to utilize and pass out to their customers as

25   they are needed.

1    Q.   Do Internet service providers keep records of what IP

2    address is assigned to what particular customer at a

3    particular time?

4    A.   Normally, yes.

5    Q.   How is that relevant or important in terms of a criminal

6    investigation?

7    A.   For purposes of investigations, the unique nature of the

8    IP address, combined with a specific date and time, would

9    allow an investigator to identify at least the account and the

10   location where some type of criminal activity could have been

11   occurring from.

12   Q.   You mentioned the unique nature of the IP address.  Can

13   you explain that?

14   A.   At any point in time, there will only be one particular

15   IP address that exists on the Internet at any given point in

16   time.  The exception to that are things such as internal

17   networks or internal computer networks that individuals have

18   set up in their house or within a business.

19        The unique nature of the IP address assigned to those

20   doesn't really apply on the normal Internet.

21   Q.   So when we're talking about a residential Internet

22   subscription, the IP address assigned to that would be a

23   unique one?

24   A.   Correct.  The IP address that would be actually

25   communicating over the Internet would be unique, but there

1    could be other IP addresses behind that.

2    Q.    In basic terms, what is a website?

3    A.    A website is essentially a set of files consisting of

4    either images, videos, music, text and a set of instructions

5    that informs a web browser or similar program on how to put

6    these files back together so that a particular website will

7    look correct.

8    Q.    Can you just give us an example of a commonly known

9    website?

10    A.    CNN.com, ESPN.com.

11    Q.    So in terms of the files, the text, all the sort of stuff

12    that makes up that site, where is all of that stuff?  Where

13    are all of those files?

14    A.    All of those files and the accompanying information that

15    lets your computer reconstruct a website once you've

16    downloaded the information to your computer is essentially

17    located on another computer located either in a company's own

18    facility or in remote data centers or other hosting providers

19    that the companies have contracted out with.

20    Q.    And what are those computers that host the stuff that

21    makes up a website called?

22    A.    They're commonly referred to in the industry parlance as

23    servers.

24    Q.    What are server logs?

25    A.    Server logs serve as a record of activity that goes into

1    or out of or actions that are performed by a server or

2    individuals that access a server.

3    Q.   How can they be useful in a criminal investigation?

4    A.   Depending on the level of logging that is actually

5    enabled by a server or a website, the logs that are maintained

6    could actually give a good representation of what a particular

7    IP address or account did when they accessed the server or

8    they accessed the website.

9    Q.   All right.  Special Agent Gordon, I'll shift gears a

10   little bit again.  Are you familiar with something called the

11   Tor network?

12   A.   Yes, I am.

13   Q.   First of all, what does "Tor" stand for?

14   A.   When it was originally created, it was -- it stood for

15   The Onion Router.

16   Q.   What is it?  What is the Tor network?

17   A.   The Tor network basically is a area of the Internet that

18   allows individuals to conduct activity, go to websites in an

19   anonymous fashion.

20   Q.   And in basic terms, how does it work?  How does it

21   accomplish that end?

22   A.   In order for an individual to use Tor, the typical method

23   or typical way to do that is they will download a software

24   package from Tor Project.  Once they download this package and

25   install it, they will then be able to access the Tor network

1    through a browser that comes with this software package.

2        Once they're using this browser, essentially their

3    communications, instead of taking the most direct route to a

4    website, will be bounced through other individuals' computers

5    that are also participating in the Tor network.  Therefore,

6    the IP address that it looks like you're actually coming from

7    will be hidden or obfuscated.

8    Q.   So if I wanted to go to CNN.com using the Tor network,

9    could I do that?

10   A.   Yes.

11   Q.   And what would the web server on the other end see in

12   terms of my IP address?

13   A.   The IP address that they would see would not be the

14   actual IP address located at your house, it would be the IP

15   address of the last computer in this chain that was relaying

16   your communication.

17   Q.   Does it cost anything to access the Tor network?

18   A.   No, it does not.

19   Q.   What about to download the Tor browser you talked about?

20   A.   It does not cost anything.

21   Q.   Is it illegal to use the Tor network, just generally?

22   A.   No, it's not.

23   Q.   Do websites exist on the Tor network?

24   A.   Yes, they do.

25   Q.   What are those websites called?

1    A.   They're typically referred to as hidden services.

2    Q.   And how does someone access a website that's on the Tor

3    network as opposed to the regular Internet?

4    A.   Tor hidden services or websites that are hosted within

5    the Tor network itself utilize a unique suffix at the end.

6    Instead of it being CNN.com, a website that would be hosted on

7    Tor would end in .onion.

8    Q.   How might someone find or find out about websites that

9    operate on the Tor network?

10   A.   Normally an individual would have to have some type of

11   previous knowledge of a website on the Tor network to get to

12   it.  Knowledge of this could come from either other

13   individuals providing them with the addresses -- you would be

14   able to Google some of them, but you would not necessarily be

15   able to access them.

16       By far the most common way though is there are

17   directories that exist on the Tor network itself that will

18   give you what the address is, what the name of the website is,

19   and generally what the content or purpose of the site is.

20   Q.   Special Agent Gordon, did you -- have you participated in

21   the investigation of the PedoBook website?

22   A.   Yes.

23   Q.   Was PedoBook a website that operated on the Tor network?

24   A.   Yes, it was.

25   Q.   So it's a hidden service?

1    A.    Yes.

2    Q.    And in what ways did you become familiar with the

3    PedoBook Tor hidden service?

4    A.    Through the investigation, I visited the website itself

5    which operated and had functions very similar to Facebook;

6    visited the site while it was up and actually active, created

7    an account on there in order to see what all functionality the

8    site had, as well as from a review of information once we

9    seized the site itself.

10   Q.    After the PedoBook website was seized, what was your role

11   with respect to that website?

12   A.    Once the website was seized, I functioned as the

13   administrator of it for a period of time, as well as

14   continuing to interact with individuals, both as the

15   administrator and as just a typical user with normal user

16   privileges and rights.

17          THE COURT:  Mr. Becker, it is getting close to break

18   time.  So let's go ahead and take our afternoon recess.

19          Please reconvene in the jury room at 3:30, and we'll

20   start again at 3:30.

21          We're in recess.

22          (Jury out and recess taken at 3:15 p.m.)

23          (At 3:35 p.m. on August 19, 2014, with counsel for the

24   parties and the defendant present, and the jury NOT present,

25   the following proceedings were had:)

```
 1          THE COURT:  Do we need to talk about anything before

 2     the jury comes out?

 3          MR. NORRIS:  Nothing of substance, just a

 4     housekeeping matter.

 5          MR. BECKER:  Just one brief housekeeping matter, your

 6     Honor, in terms of efficiently presenting the evidence that's

 7     going to start coming out now, we have all of the exhibits

 8     loaded onto our trial computer.  Special Agent Gordon's

 9     testimony for the next lengthy section is going to be the

10     exhibits that make up the screenshots and the board data that

11     the Court heard the stipulation about.

12       We would like to move those into evidence.  We'd also to

13     like to display those using the computer as opposed to having

14     to flip through the binder.  We do have a copy of all the

15     premarked exhibits in that binder that's on the witness stand.

16     It's a little tough to navigate right now because there's so

17     much in there.

18       So I wanted to see what the Court's preference was and

19     the most efficient way to go ahead and do that.

20          THE COURT:  And I don't have the stipulation here in

21     front of me, but if you can list the exhibits from the

22     stipulation, and then I'll just get on the record that there

23     is no objection -- and I anticipate none in light of the

24     stipulation -- and then we'll get them into the record.

25          MR. BERRY:  Judge, I may still object based on
```

1      relevance and 403.  So I guess I don't -- for foundational

2      purposes, I don't object.  And that was part of the

3      stipulation.

4          My concern is some of the chats in there that I

5      previously filed a motion in limine -- that was overruled --

6      arguing some of those were irrelevant and unfairly

7      prejudicial.

8                  THE COURT:  Well, let's proceed then by having the

9      offer made.  And if you'll please list the exhibits for me

10     since I don't have that stipulation in front of me.

11                 MR. BECKER:  Indeed, your Honor.  It will be --

12                 THE COURT:  Okay, I've got it in front of me.

13         Exhibits 1 through 4, 6A through 6D, 11 and 69, 5 through

14     5D so that would be 5, 5A, B, C and D.  There is a 5; there is

15     not a 6.

16                 MR. BECKER:  That's correct, your Honor.

17                 THE COURT:  Okay.  7, 9 -- oh, 7 through 9A, so we

18     have 7, 8, 9 and 9A because there is both 9 and a 9A.  And

19     that appears to be it.  Is that correct, Mr. Becker?

20                 MR. BECKER:  That's correct, your Honor.  At this

21     time that's correct.

22                 THE COURT:  All right.  So there's been an offer of

23     those exhibits listed in the stipulation.

24         And Mr. Berry, would you like to make your objections?

25                 MR. BERRY:  Yes, your Honor.  I would object based on

1    the relevance and 403, them being unfairly prejudicial, I

2    believe; that some of the photographs that were not alleged in

3    Counts IV through VII, first of all, are not relevant; number

4    two, are highly and unfairly prejudicial.

5         But next I believe that some of these exhibits also

6    contain comments that are fantasy chat, that are irrelevant

7    and unfairly prejudicial.

8              THE COURT:  Okay.

9         Response, Mr. Becker?

10             MR. BECKER:  Indeed, your Honor.

11        First of all, all of the material in the exhibits that

12   the government is currently proffering comes from the PedoBook

13   website, including the specific activity of the user

14   PTasseater and fuckchrist on that website, which is, of

15   course, the defendant's alleged alias in this case.  And so

16   all of this information consists of activity that that user

17   engaged in on the site.  That is charged activity and part of

18   the charged activity here.

19        It does consist of -- there are child pornography images

20   contained within numerous of the screenshots from the website

21   which is, of course, part of that site and part of the

22   evidence.  And so we don't believe that there's any unfair

23   prejudice here.  That is what this website was about; that is

24   what was contained on that website.

25        So while prejudicial in the sense of it being a part of

1   the evidence and incriminating, there's no unfair prejudice.

2   This is simply what was on this site and what it was about.

3        Particularly with respect to the private messages, the

4   private messages are contained -- first, just for the record

5   purpose, private messages are contained in Exhibit No. 4 and

6   Exhibits 9 and 9A.

7        The content -- the objection the defendant makes in terms

8   of the prejudicial effect of content of private messages on

9   the board was raised pretrial, ruled on by Judge Thalken, and

10  then a ruling that was sustained and upheld by Judge

11  Bataillon.

12       So it has been subject to the Court's previous ruling

13  here.  That is docket number 148 -- that is the findings and

14  recommendation of Judge Thalken; docket 169, which is Judge

15  Bataillon's order upholding those findings and

16  recommendations.

17            THE COURT:  Just so I'm clear on the relevance, with

18  respect to these exhibits, what is the government's position

19  regarding the relevance to a particular element of a

20  particular charge?

21            MR. BECKER:  Indeed.  First, your Honor, the

22  information that the defendant disclosed and articulated in

23  private messages is beyond just messages to other users about

24  the sexual exploitation of children, in particular the violent

25  sexual exploitation.  That is certainly a part of some of the

1    messages.

2        There are private messages that were exchanged where he

3    revealed his location in the D.C./Maryland/Virginia area.

4    There are private messages where the defendant solicited from

5    other users child pornography and images of child pornography,

6    conduct which constitutes a substantive violation of the

7    advertising statute which of course is crucial to our proof of

8    the conspiracy to advertise count in particular.

9        There are private messages that include content that

10   describes what times of day the user fuckchrist and PTasseater

11   was on the site.  That is, of course, key evidence of the

12   identity of the perpetrator ultimately found to be

13   Mr. DeFoggi.

14       THE COURT:  So is it fair to say that you are not

15   offering these exhibits as information about the defendant's

16   character or propensity to commit the offense?

17       MR. BECKER:  No, absolutely not, your Honor.

18       And with respect to -- particularly to messages that

19   discuss the violent sexual abuse of children, that is

20   pertinent because in part it goes to the particular groups

21   within PedoBook that the defendant was a member of, which

22   members was the defendant, in fact, conspiring with, what were

23   the defendant's interests in terms of sexual abuse which, of

24   course, translates to particular types of child pornography.

25       It is also relevant because it's one of the ways it

1        identifies Mr. DeFoggi as the perpetrator.

2            And the Court heard a bit of it in opening statement.

3        Found on Mr. DeFoggi's laptop computer, which the jury will

4        ultimately hear about, are not only references to the user

5        names PTasseater and fuckchrist, but the content of messages

6        sent between users that discusses this same theme of

7        particularly a violent sexual abuse of children.

8            So the fact that the user PTasseater/fuckchrist on

9        PedoBook expresses these particular interests is not relevant

10       just because it's salacious, just because it's nasty talk.

11       It's because we find those same sorts of messages on the

12       defendant's computer, which then helps to identify him as the

13       person behind the keyboard as PTasseater and fuckchrist.

14            THE COURT:  The objections on grounds of relevance

15       and on the grounds that the prejudicial effect would outweigh

16       the probative value are overruled.

17            I will receive into evidence Exhibits 1, 2, 3, 4, 5, 5A,

18       5B, 5C, 5D, 6A, 6B, 6C, 6D, 7, 8, 9, 9A, 11 and 69.

19            Anything else we need to address before the jury comes

20       in?

21            MR. BECKER:  Just, your Honor, I would intend to

22       publish these exhibits using the government's trial computer

23       as opposed to the ELMO or the books.  And I just wanted the

24       Court's approval for that, if that's all right.

25            THE COURT:  You may.

1            MR. BECKER:  Thank you.

2            THE COURT:  Please bring in the jury.

3       P. MICHAEL GORDON, PREVIOUSLY SWORN, RESUMED THE STAND

4           (Jury in at 3:47 p.m.)

5            THE COURT:  Please be seated.

6       Mr. Becker, you may continue with your direct

7    examination.

8            MR. BECKER:  Thank you, your Honor.

9                    DIRECT EXAMINATION (Cont'd.)

10   BY MR. BECKER:

11   Q.   Special Agent Gordon, when we broke we were starting to

12   discuss the PedoBook Tor network hidden service.  Can you just

13   tell the ladies and gentlemen of the jury what was the

14   PedoBook website?

15   A.   The PedoBook website itself was a social networking type

16   of website that functioned very similar to Facebook.

17       Based on our investigation into it, its primary purpose

18   seemed to be an area on Tor where individuals would be able to

19   meet and communicate about the sexual exploitation of children

20   through either communications such as simple text messages or

21   the exchange of various images and videos.

22   Q.   How would you go about accessing the PedoBook website?

23   A.   To access the PedoBook website, you first had to be able

24   to access Tor and then have access to the particular .onion

25   address that identified PedoBook itself.

1    Q.    For approximately how long was PedoBook active?

2    A.    I believe it was active from the early part of 2012 until

3    it was finally taken down December 8th of 2012.

4    Q.    Was a user of PedoBook required to register an account on

5    PedoBook in order to access it?

6    A.    No.  An individual could access PedoBook and be able to

7    view a number of the images and a number of the areas on the

8    site.  However, full functionality and access to the site

9    could only be accomplished if an individual actually

10   registered an account.

11        Once they registered an account, they would have a user

12   ID, a screen name, and they would be able to send and receive

13   private messages, set up groups; again very similar to

14   FaceBook.

15   Q.    Those sorts of functionality were not available to

16   someone who simply navigated to the site but didn't register?

17   A.    Correct.

18   Q.    All right.  Have you had the opportunity previously to

19   review Government Exhibits 1 through 9A, including 5A through

20   D and 6A through D?

21   A.    Yes.

22   Q.    Are they fair and accurate screenshots -- do they include

23   fair and accurate screenshots of the PedoBook website?

24   A.    Yes.

25   Q.    Can you tell us, first of all, what is a screenshot?

1    A.   A screenshot is just an image file or a picture that is

2    taken of exactly whatever is visible on a computer screen.  It

3    can be accomplished through either a function that's built

4    into the Windows operating system itself or most other

5    operating systems, or other programs that can be downloaded

6    and installed on a computer can be used to create these as

7    well, such as Camtasia or Snagit.

8    Q.   How were the screenshots of the PedoBook website created?

9    A.   These screenshots themselves that you'll be seeing were

10   created from a -- the data that existed on PedoBook when it

11   was finally taken down on December 8th.

12        The website itself was stood back up in an offline

13   capacity so that law enforcement would be able to view the

14   site as it existed without others being able to view it.

15   Q.   Was log data also obtained and extracted to make some of

16   the exhibits that we'll be seeing?

17   A.   Yes, it was.

18   Q.   And how was that -- how were those exhibits created?

19   A.   As we controlled the -- and seized the PedoBook website,

20   as individuals would visit the website, we would record the

21   various locations that they would visit.  This information was

22   then saved off and then utilized within a database file that

23   we were able to associate various actions with particular

24   users.

25        This information in these exhibits was created from that

 1   data.

 2              MR. BECKER:  Your Honor, with the Court's indulgence,

 3   if I could just shift to our computer screen?

 4              THE COURT:  You may.

 5   BY MR. BECKER:

 6   Q.   Special Agent Gordon, I'm going to start by showing you

 7   Government Exhibit 1.  Are you able to see that on your

 8   computer screen?

 9   A.   Yes.

10   Q.   So first of all, just generally if you can describe what

11   is Government Exhibit No. 1?

12   A.   Government Exhibit No. 1 is a screenshot that was taken

13   of the first page that an individual would see if they went

14   straight to the PedoBook.onion URL itself.  You can see

15   here -- whoops.

16        (Off-the-record discussion had.)

17   BY MR. BECKER:

18   Q.   Special Agent Gordon, if we zoom towards the top

19   left-hand corner of Government Exhibit 1, page 1...

20   A.   Yes, that's where I was looking.

21   Q.   Can you tell us -- sorry.  What do we see in the top

22   left-hand corner of Government Exhibit 1, page 1?

23   A.   The top left corner is the URL for PedoBook itself.

24   Q.   Can you read that URL for us?

25   A.   oqm66m6iyt6vxk7k.onion.

1    Q.   And why is there not a .com or .net or .edu at the end of

2    that URL?

3    A.   Because in this particular case, the .onion is taking the

4    place of the .com.  It indicates that this is a hidden service

5    that is located on the Tor network itself and can't be

6    accessed just by accessing the Internet.

7    Q.   And the series of characters to the left of the .onion,

8    how does that differ from what we might think of a normal

9    website URL, like CNN?

10   A.   When a hidden service is created, it's not created with a

11   people-friendly URL.  It's essentially a series of letters and

12   numbers that uniquely identify this particular hidden service

13   so that the Tor network is able to direct a person's Tor

14   browser to where the Tor hidden service is located.

15   Q.   So if a user wanted to navigate to the PedoBook website,

16   what would they have to plug into their browser?

17   A.   They would have to have a Tor browser installed, and they

18   would have to put in that URL right there.

19   Q.   And for the record, you just put a mark next to the URL

20   that you've already read to us on Government Exhibit 1.

21   A.   I did, yes.

22   Q.   All right.  Moving your attention towards the middle

23   section of Government Exhibit 1 -- first of all, in order to

24   access this particular page, would an Internet user have to be

25   logged in to the site?

1    A.    No.  As the picture's taken or the screenshot is showing

2    right now, there is nobody logged in; there's no information

3    in the user name, password; and there are none of the

4    representations at the top of the screen that would show a

5    user account is logged in.

6    Q.    So the first time someone went to a site like this, this

7    is what they would have seen?

8    A.    Yes.

9    Q.    I want to direct your attention first to the words below

10   the word "PedoBook."

11   A.    All right.

12   Q.    Starting with the far left, and let's move from left to

13   right.  If you can first explain, what does that word

14   "Activity" signify?

15        First, what are each of those words in terms of the

16   website?

17   A.    Each of those words are essentially sections or different

18   portions of the website that an individual could access just

19   by clicking on them.

20   Q.    Are you familiar with tabs?

21   A.    Yes.

22   Q.    Can you explain what tabs are?

23   A.    A tab is basically a -- like a visual representation on a

24   computer screen of regular tabs that you might see in a binder

25   or file folders.

1    Q.   And how does that relate to this page of PedoBook?

2    A.   The tabs in this case would be these words directly below

3    "PedoBook."

4    Q.   And so, if a user had clicked on the word "Activity,"

5    what happens?

6    A.   They would see the latest activity that was occurring

7    within the PedoBook site itself.

8    Q.   And is that what we see here on Government Exhibit 1?

9    A.   Yes.

10   Q.   All right.  Can you just take us through a couple of the

11   entries of -- first, as of what date would this have been the

12   latest activity on the Facebook website?

13   A.   This would have been the activity as it existed on

14   December 8, 2012.

15   Q.   And what is some of the latest activity that we see on

16   this exhibit?

17   A.   Some of the latest activity, the first entry is related

18   to user Misiek is now friend with Kleinlochgeier.

19        To the left of that particular entry is a small image.

20   Those are commonly referred to as avatars.  The PedoBook site

21   itself would allow individuals to choose different visual

22   representations for their accounts.  There was no restriction

23   on what can be used.  There were default icons that could be

24   used for the avatars, but most of the users would choose to

25   change them.  In this instance, user Misiek appeared to use

1    what appeared to be an infant laying on its back.

2         The two images that you see directly below the "Misiek is

3    now a friend with Kleinlochgeier" shows the avatar for Misiek

4    with the small arrow pointing to another avatar.  That would

5    be the avatar that represents -- that user Kleinlochgeier had

6    chosen to be a representation of his account.

7    Q.   And what does it mean to become a, quote, friend with

8    another user on PedoBook?

9    A.   Essentially the same thing that it would on Facebook.

10   You can have additional access to an individual's account,

11   depending upon the level of activity.  You could follow them,

12   things of that nature.

13   Q.   You mentioned user avatars.  Do those commonly consist of

14   -- on PedoBook, did those commonly consist of child

15   pornography images themselves?

16   A.   Child pornography, child exploitation material, or

17   demonstrated some type of sexual interest in a child, yes.

18   Q.   The words Misiek, M-i-s-i-e-k, what is that on PedoBook?

19   A.   That would be the user name.  That would be the name that

20   other individuals would see or that they would communicate

21   with.

22   Q.   Were there any particular themes of some users' user

23   names on PedoBook?

24   A.   If you look down to the third entry where you can see

25   user pedostepdad, many of the names on PedoBook related to

1    either words, phrases, or terminology associated with the

2    online exploitation or the sexual exploitation of children.

3    Q.    The term "pedo," what does that refer to?

4    A.    Pedo is usually understood to be short for pedophile or

5    pedophilia.

6    Q.    That third entry notes that the user pedostepdad

7    commented on a file.  Can you just explain that particular

8    functionality?

9    A.    Once an individual posts a file, if another user decided

10   that they wanted to put a comment on a file or congratulate a

11   user, "That was a very nice file," or something, it would be

12   registered as a comment.

13   Q.    And for each entry on the latest activity, there's an

14   entry with a number of days ago.  Can you explain what that

15   meant on the website?

16   A.    In this case, these images themselves were not created

17   when the bulletin board or when the website was taken down.

18   These images -- these screenshots were taken 461 days after

19   that activity; so approximately March, April of this year, if

20   my math is correct.

21   Q.    So this is -- the activity that's shown on here is as of

22   December 8th of 2012?

23   A.    Correct.  And this portion of the website that is doing

24   the calculation is simply using that last date and the current

25   date when these screenshots were taken.

1   Q.   Will we see other exhibits that depict the exact date of

2   particular communications on PedoBook?

3   A.   Yes, either the exact same dates or later dates,

4   depending on when the actual activity occurred.

5   Q.   Would those be in the board logs that you referenced

6   earlier?

7   A.   Yes.

8   Q.   If I can draw your attention to page 2 of Exhibit 1, and

9   what do we see, Special Agent Gordon, on page 2 of Exhibit 1?

10  A.   This first tab is the activity tab with three subtabs in

11  it, All, Mine and Friends.

12       The All tab itself is essentially the latest activity

13  that we saw on the previous exhibit.

14  Q.   And on this exhibit, are we logged in as any particular

15  user?

16  A.   Yes, we are.

17  Q.   And if I just back off, can you tell as what user are we

18  logged in as here on Government Exhibit 1, page 2?

19  A.   As of right now, this screenshot was created as if we

20  were logged in as the website administrator himself.

21  Q.   How can you tell?

22  A.   Over here on the right side, those icons right there

23  (indicating) are representative of different functions and

24  control features that an administrator would be able to

25  perform.

1          Additionally, up here in the left (indicating) is the

2     particular icon or avatar that was associated with the

3     administrator.

4     Q.   Directing your attention to that top -- the top left

5     corner of Government Exhibit 1, page 2, there are three icons

6     below the web address or URL starting on the left.  First,

7     would a user have been able to click on each of those?

8     A.   Yes.

9     Q.   Starting with the leftmost one with the picture, where

10    would that take a user?

11    A.   This first one here to the left would have taken you to

12    your own profile; in other words, the information that you had

13    entered, files that you may have uploaded, comments that you

14    may have made, things particular to that particular account.

15    Q.   And moving to the right, there's an icon that looks like

16    a couple of people.

17    A.   That particular icon was the Friends list.  You could

18    click on that and it would give you just a quick summary of

19    all of your friends.

20    Q.   And to the right of that, there is an icon of an

21    envelope.

22    A.   The envelope itself was the private message feature of

23    PedoBook.  It functions like any other type of private message

24    feature for a website.  Usually they were private messages

25    exchanged between two individuals that would only be visible

1    to those individuals.

2    Q.   Moving to page 3 of Government Exhibit 1, and if we can

3    just zoom in on the center of page 3 here, which of the tabs

4    are we looking at here?

5    A.   Currently we're looking at the tab known as the Wire.

6    Again, it is subdivided into three different subtabs, All,

7    Mine, and Friends.

8    Q.   Who would have -- what users would have had access or

9    been able to view the Wire postings?

10   A.   Pretty much anyone that accessed the sites could have

11   viewed this particular area.  You can think of the wire as

12   like a timeline or a wall.  Anyone could post on it or make

13   comments on it.  It would then be visible either in the "All"

14   area; or if you wanted to narrow it down a little bit more,

15   you could click on the "Mine" or the "Friends" just to see

16   things that you had posted or things that your friends had

17   posted.

18   Q.   So when you said you could click on -- so the words All,

19   Mine, and Friends appear in the top left of the exhibit, would

20   a user have been able to click on those?

21   A.   Yes.

22   Q.   And in terms of the activity that's commemorated here on

23   this exhibit, the second entry down has a reference to the

24   words TC.  Do you see that?

25   A.   Yes.

1    Q.   Can you explain what that and the characters next to it

2    signify?

3    A.   During the investigation, we became aware of a private

4    messaging program essentially like Microsoft Messenger, AIM,

5    Yahoo, Skype, very similar, that was referred to as Tor Chat.

6         It was basically an instant messaging program that would

7    function over the Tor network thereby hiding who different

8    individuals were and where they were located.

9         TC in this case is an abbreviation for Tor Chat.  The

10   letters and numbers that follow the colon there are

11   essentially the user name or the phone number for somebody's

12   Tor Chat program.

13   Q.   Now, is Tor Chat something that existed within PedoBook

14   or outside of it?

15   A.   No.  It was a separate program that had to be downloaded

16   individually from Tor or even without accessing PedoBook.

17   Q.   Directing your attention to again the same page, there is

18   an entry by a user 8XXXMAND.  Do you see that entry?

19   A.   Yes.

20   Q.   Can you read it, first of all, and then I'm going to ask

21   you a couple of questions about some of the terms.

22   A.   "Others bored tonight.  I love little girls, 3 to 9,

23   dislike hurt core/snuff/BDSM.  Anyone want to talk and maybe

24   trade?  TC.  n4oy6rxga7cucq4g."

25   Q.   First of all, would someone who had not registered an

1    account have been able to post a message like this?

2    A.   No.

3    Q.   I'd like to ask you to define a couple of the terms here.

4    The first one is the term "hurt core".

5    A.   Hurt core is a term that is typically associated with

6    some type of violent sexual act against an individual.

7    Typically it's some of the more extreme child exploitation

8    material that you might see.  Examples could include dunking

9    of the victim's head in a toilet, suspension by their ankles,

10   use of candles, candle wax, things of that nature.

11   Q.   There's also a term "snuff" used.  Can you define that

12   term, please?

13   A.   Snuff is a term that normally relates to the eventual

14   murder or death of someone on an image or video.

15   Q.   And the term "BDSM"?

16   A.   BDSM in an abbreviation for bondage, domination,

17   sadomasochistic.  It relates to individuals that would be

18   involved with things such as whipping, candles, bindings of

19   some type, restraints, things of that nature.

20   Q.   And that user's comment also includes a comment about

21   wanting to talk and maybe trade.  What would "maybe trade"

22   signify in this context?

23   A.   In this context, I would interpret that as meaning the

24   individual was interested in communicating with somebody and

25   then exchanging material that both of them might find

1    acceptable.

2         In this case, for user 8XXXMAND, the type of material he

3    would be looking for would be underage females between the

4    ages of 3 and 9 years old, exclusive of the types of material

5    relative to the terms I just described.

6    Q.   And by "material," what sort of material?

7    A.   The material can consist of either images or videos or

8    potentially stories.  It all depends on what they agree upon

9    within the chat itself.

10   Q.   Was the membership of PedoBook in any way limited by

11   country or language?

12   A.   No, it was not.

13   Q.   Do you see any indication of that here?

14   A.   Yes.  Right now as it's displayed, there are at least two

15   posts by individuals that appear to be in a foreign language.

16   Q.   Can you tell what language that is?

17   A.   I believe it's German or some similar variant, possibly

18   Austrian.  I'm not sure.

19   Q.   All right.  If we can move to page 4 of Government

20   Exhibit No. 1, what do we see here on page 4?

21   A.   Page 4 is a list of all of the members that currently

22   have registered accounts on PedoBook.  In other words, someone

23   that had taken the time to register an account, put in a user

24   and a screen name, create a password and fill in part of a

25   profile.

1    Q.   How many total members are listed on the members page as

2    of December 8?

3    A.   8,137.

4    Q.   If we move to the right side of Government Exhibit 1,

5    page 4, what functionality is available over on that side of

6    the page?

7    A.   Here you can either search a member by things that

8    they've been tagged with, phrases that would tend to

9    individualize what a particular person liked or was interested

10   in.  You would also be able to search by a particular user

11   name.

12   Q.   All right.  If I can direct you to Government Exhibit 1,

13   page 5, and again zooming in towards the middle section, what

14   do we see on Government Exhibit 1, page 5?

15   A.   This is a list or a partial list of all of the files that

16   would have been uploaded to the PedoBook site itself.

17        The information provided includes a small thumbnail image

18   of a larger image, the title of the post or how the individual

19   decided to upload the file, if he decided to put some type of

20   caption with it, information relevant to the individual that

21   posted it you can see by the "by" section, how long ago that

22   was posted, and then any comments that that person made.

23        Further over to the right, you can see whether that

24   particular file is visible to everybody or just visible to

25   certain groups.

1    Q.   So piggybacking on that, where the word "limited" appears

2    on this exhibit, what would that signify?

3    A.   That would signify that the access to that particular

4    file would be limited.  In other words, that particular file

5    would have to have been restricted in some way by the person

6    that uploaded it or based on the location in which it was

7    uploaded.

8    Q.   And who are we logged in as in terms of this particular

9    screenshot?

10   A.   Can you go to the upper right?  We're still logged in as

11   the administrator.

12   Q.   Would the administrator have had any limits on the

13   administrator's access to images?

14   A.   The administrator could pretty much see and do anything

15   that he wanted to.

16   Q.   And are you able to describe generally the content of the

17   images that appear on the left side of the exhibit, the

18   thumbnail images you talked about?

19   A.   The images themselves that are visible right now

20   generally depict underage children engaged in some type of

21   sexual activity.  Several of them have images of genitals and

22   anus of the underage female or the underage male as the focal

23   point of the image itself.

24        Others, I can't -- it appears that the second one down

25   might have an individual, either an adult or another child in

1    the picture -- it's kind of blurry.

2    Q.   What would happen if a user clicked on one of those

3    thumbnail size images?

4    A.   Once a user clicked on the thumbnail size image or even

5    the name out to the side right there, they would be taken to

6    the full-size image itself which, depending on how big the

7    image was, it might be just a little bit bigger than a

8    thumbnail or it might occupy half the screen.

9    Q.   Towards the top of the exhibit, we see the words All,

10   Mine, and Friends.  What would those signify?

11   A.   "All" would indicate all of the files that anyone that

12   was a member of PedoBook had uploaded to the site.  "Mine"

13   would be a filter that would just show files that I had put up

14   onto the site.  Whereas "Friends" would be files that

15   individuals that were on my friends' list would have uploaded

16   to either their profile or to different groups.

17   Q.   Is that one of the ways that the users could restrict who

18   gets to see particular images that they posted?

19   A.   Yes.  They could restrict the images to either specific

20   members that were in a particular group, or go in and say just

21   my friends can see these.

22   Q.   If I can draw your attention to the lower right side of

23   the exhibit, there is a heading called "tag cloud".  Can you

24   please explain what that means?

25   A.   A tag cloud is basically a summary of descriptive terms

1    that have been applied to different items on a site.

2         In this case, most of these tag cloud terms would have

3    been applied to images.  The way to ascertain the relative

4    popularity or prevalence of a particular tag would depend upon

5    where it's located within the cloud itself, starting at the

6    top left and reading right to left, as well as the relative

7    size of the font.

8    Q.   So a larger font size would mean that more images have

9    been tagged with that particular tag?

10   A.   Correct.

11   Q.   All right.  If we move to page 6 of Government 11 [*sic*],

12   which of the tabs do we see highlighted on this page?

13   A.   This would be the individual groups tab.

14   Q.   And what information do we see on a groups tab?

15   A.   Within this particular group tab itself, we're on the

16   groups tab and this particular subtab is titled Newest.  These

17   would have been the newest groups that had been created within

18   PedoBook.  The information that's visible here includes

19   another small avatar that's a representative of the group

20   itself, as well as the name of the group.

21        Further over to the right is an indication of whether the

22   group is either open or closed.  Open groups, pretty much

23   anybody could join, there wasn't any real restrictions.

24   Request permission to join; normally you would automatically

25   get in.

1          A closed group was a more private and restricted group

2      that could require an individual to actually confirm your

3      admittance, if not going to the extent that it needed you to

4      upload actual images of child pornography in order to prove

5      you had access to material or that you weren't law enforcement

6      or things of that nature.

7      Q.   There's a couple of terms that I'm going to ask you to

8      give an explanation of.

9          The first group that we see here is "Inna fan group".

10     What, if any, significance does the term "Inna" have to child

11     pornography?

12     A.   Inna is a well-known series of images of a victim.

13     Q.   When you say "a series of images", what does that mean?

14     A.   A series of images could be considered like a number of

15     photos or videos that are taken of a particular victim within

16     a certain setting or environment.

17     Q.   Is it common for users of these sites to have areas

18     devoted to particular victims of child pornography?

19     A.   Yes.

20     Q.   Directing your attention down to the bottom right corner,

21     there's a group called "Vicky's fans".  What is the

22     significance of Vicky to child pornography?

23     A.   Vicky is another identified victim that back when I first

24     started doing this, there were numerous images and videos of

25     her on the Internet being sexually assaulted.  And the

 1    common -- the common name associated with all of these images

 2    and videos was "Vicky".

 3    Q.   And I'm sorry, going back to -- still on the Groups page,

 4    drawing your attention to the top right-hand corner, there are

 5    four terms, All Groups, My Groups, Groups I Own and Group

 6    Invitations.  Can you describe the significance of those?

 7    A.   All Groups would just be all of the groups, it would

 8    display all of them.

 9         My Groups would be groups of which I am a member or I've

10    requested membership and been granted.

11         Groups I Own would be groups that I started or that I had

12    some type of control over.

13         And Group Invitations would be either invitations that I

14    sent out to request membership in a group or possibly

15    invitations that were sent to me to join a group.

16    Q.   So each of these boxes is one that a user could click on

17    to get to that information that you described?

18    A.   Correct.

19    Q.   Moving to page 7 of Government Exhibit 1, what section of

20    PedoBook do we see on page 7?

21    A.   This is a section entitled Polls, P-o-l-l-s.  Again this

22    section is subdivided into three subtabs, All, Mine and

23    Friends.

24    Q.   What were polls?

25    A.   Polls were basically questions or queries that individual

1    members could post and request that people provide answers to.

2    Q.    And moving your attention to the right side, some are

3    described Public and some are Limited.  What does that mean?

4    A.    Public and Limited would again roughly correspond to the

5    public or private setting.  If the indication would be public,

6    then most everybody would be able to participate in it;

7    whereas if it was limited, it might just be restricted to a

8    particular group or to a particular individual's friends.

9    Q.    On the top right of the exhibit, there is what looks like

10   a button, New Poll.  What functionality would that have?

11   A.    That would initiate the creation of a new poll as created

12   by the administrator in this case.

13   Q.    Because that's who's logged in here when the screenshot

14   was taken?

15   A.    Correct.

16   Q.    Were there rules applicable to the PedoBook website?

17   A.    Yes, there were.

18   Q.    Drawing your attention to page 8 of Government Exhibit 1,

19   what page do we see here?

20   A.    This is the Rules page.

21   Q.    Was this accessible from the main page of the website?

22   A.    Yes, it was.

23   Q.    And if you could go ahead and just read to us the rules

24   of PedoBook as posted on the site.

25   A.    The rules were last updated 519 days ago.

1          "PedoBook is a communication tool for fellow pedos to

2     discuss their interests and share content.  Here are the rules

3     for our community:

4          "1.  Be civil.  PedoBook is for the discussion of our

5     mutual pedophiliac interests in a mature and civilized

6     fashion.  Please be respectful of your fellow users, even

7     those that do not share your point of view.

8          "2.  Extreme content/topics; for example, Hurtcore, Scat,

9     etc.  Bestiality is allowed only if it involves children or

10    JB."  In this case, JB is understood to be jail bait,

11    typically images or videos depicting an individual that

12    appears to be underage.

13    Q.   And just for the record, "bestiality".

14    A.   Bestiality refers to some type of sexual interaction

15    between a human and an animal.

16    Q.   Thank you.

17         Please continue.

18    A.   "No snuff or gore."  Snuff and gore -- we previously

19    discussed snuff.  Gore, I would interpret as being just some

20    type of gory, bloody, or generally nasty representation in an

21    image.

22         "Please keep these topics private to you and your friends

23    or in groups that are private to their members out of respect

24    for those that find these distasteful.

25         3.  More to come if I think of them."

1          This last one is basically just an advisement that right

2     now these are the only rules of PedoBook; but if I think of

3     more, I'm going to put them up here.

4          The final part down there, "Note:  Adding somebody as a

5     friend gives them access to content and posts that you have

6     marked as 'Friends Only' regardless of whether or not they add

7     you as a friend, in a manner more reminiscent of Google+ and

8     Facebook (friending does not need to be mutual or approved by

9     the other party.)"

10    Q.   Were those the rules as they existed as of the date that

11    the FBI seized PedoBook?

12    A.   As of the date of the seizure and the takedown on

13    December 8th, yes.

14    Q.   Were these rules available to any user that navigated to

15    PedoBook, whether or not they had locked in or not?

16    A.   Yes.

17    Q.   So that's something a user could have accessed the first

18    time they came across the PedoBook website.

19    A.   Correct.

20    Q.   I'm going to move your attention to Government Exhibit 9

21    [*sic*].  First of all, I just want to ask you generally what

22    type of screenshot is this and does it differ from the type of

23    capture we've been looking at?

24    A.   Yes.

25    Q.   What kind of screenshot is this one?

1    A.    This one was created -- instead of the normal screenshot

2    that would just depict what is shown on the page itself or on

3    the screen itself, this one was created -- and if you notice

4    at the bottom left, down there, you can see it says page 1 of

5    3.

6    Q.    If I can zoom in...

7    A.    This was created to show the entire content of that

8    particular web page, not just what would be visible on your

9    screen, but what you might have to scroll down to look at as

10   well.

11   Q.    And just for the record, I may have misspoke.  This is

12   Government Exhibit No. 1, page 9.

13         Which page of PedoBook does this display?

14   A.    This displays the Rules area.

15   Q.    First of all, could users comment to a particular -- to

16   the particular rules posting on PedoBook?

17   A.    Yes.

18   Q.    Do we see examples of those comments on this exhibit?

19   A.    Yes, we do.

20   Q.    I want to direct you to page 10 of Exhibit 1.  I'll back

21   out just so you can see that.

22         First of all, is page 10 a continuance of the comments to

23   the Rules page?

24   A.    Yes, it is.

25   Q.    I want to direct you to a posting by the user

1    Little_Girl_Hugger.  Are you able to see the text of that

2    post?

3    A.   Yes.

4    Q.   Can you read that posting, please?

5    A.   From user Little_Girl_Hugger, the comment or the

6    suggestion is:  "Another good idea would be to recommend the

7    users of this site to not reveal too much personal information

8    about themselves and do not recommend users to set up any real

9    life meeting events.  The LEA" -- understood to be law

10   enforcement agencies -- "are definitely watching this site.

11   And the last thing anyone wants is to be revealing your real

12   identity on this site.  This site is still not a real Facebook

13   where it is safe for posting personal info like your face,

14   city of current residence, and etc."

15   Q.   Is that common advice among users of child pornography

16   websites such as this that operate on Tor?

17   A.   I'd say it's very common advice.

18   Q.   Special Agent Gordon, I'd like to move to Government

19   Exhibit No. 2.  First of all, what are we looking at generally

20   on Government Exhibit No. 2?

21   A.   Government Exhibit No. 2 is showing again just the home

22   page of the PedoBook hidden service as an individual would see

23   it once they accessed it through the .onion URL.

24        In this particular case, however, we are logging in as

25   user name fuckchrist and then the password had been entered

1    there as you can tell from the dots.

2    Q.   And page 2 of Government Exhibit No. 2?

3    A.   This would be the user profile for user name fuckchrist

4    and in this instance the screen name that was chosen was

5    PTasseater.

6    Q.   Can you explain the interplay between a user name and a

7    screen name?

8    A.   A user name is essentially the name or account name that

9    would be used to generate a log-in or to create the account

10   itself.  It's not possible to have two identical user names

11   within the same system.

12       If you've ever tried to create an e-mail account on like

13   Hot Mail or Google or something like that, and it comes back

14   and it tells you this name has already been taken, it's a very

15   similar function to this.  There would be a clash of

16   information in being able to sort things.

17       PTasseater, however, would be the name that would be

18   visible whenever an individual was making some type of posts

19   or being referred to within the site itself.

20   Q.   What are the initials PT understood to mean in the

21   context of child exploitation?

22   A.   The two letters PT, as it relates to child exploitation,

23   is generally understood or taken to mean preteen.

24   Q.   Now, who would have chosen the user name fuckchrist and

25   display name or screen name PTasseater?

1   A.   That would have been the individual who created the

2   account.   Neither of these values are automatically assigned

3   by the software on which PedoBook ran.

4   Q.   Below the word PTasseater, do you see a section that's

5   sort of a grayed section titled About Me?

6   A.   Yes.

7   Q.   First, what's the text in that section on the PTasseater

8   profile page?

9   A.   The information entered there is:  Have many perversions,

10  contact me for fantasy chat.

11  Q.   Who would have provided that information?

12  A.   That would have been the individual that created or had

13  access to the account.

14  Q.   There's also another shaded box around the word

15  Interests.   First, what's the content of that?

16  A.   Interests would be tags or again descriptive information

17  about this particular user profile, things they were

18  interested in, types of files or images or activities that

19  they would like to see or would be interested in.

20  Q.   What were the particular interests chosen by the user

21  PTasseater?

22  A.   In this case, it's exhibitionism, rimming, piss, and

23  incest.

24  Q.   Towards the right side of the page, there's a shaded box

25  with the word Friends.   What is depicted there?

1    A.   Depicted in that box are the individual avatars of

2    individuals on this particular user fuckchrist's friends list.

3    These would have been the avatars that individuals that he

4    decided to friend had chosen for their accounts.

5    Q.   What do you notice about those avatar images?

6    A.   A majority of the ones that are visible in this shot

7    definitely depict underage or minor children.  The majority of

8    them depict the children or have the minors' genitals or anus

9    as the focal point of the image itself.

10        Additionally, it appears that many of them also appear to

11   be infants or toddlers.

12   Q.   Below the Friends section there is a shaded box with the

13   text Group Membership.  What information is contained there?

14   A.   These are the different groups which this individual has

15   joined within PedoBook.

16   Q.   What are some examples of groups that the user PTasseater

17   was a member of?

18   A.   On this page, the eight groups that are visible are Hung

19   Boys, Hurt the Core, Anything Goes - Hardcore Child Fucking,

20   Babies and Toddlers, Wanna Be Balls Deep in Boys, Oh Shit,

21   BoyHole, and Aaron's Hell.

22   Q.   Below that last group name is the text More Groups.  What

23   does that indicate?

24   A.   That would indicate that in addition to the eight that

25   are visible here, there were additional groups of which this

1    account was a member.

2    Q.    When you first join PedoBook, are you automatically

3    assigned to any groups?

4    A.    No.

5    Q.    So what is the significance of these -- of the fact that

6    you see this group membership by that user?

7    A.    This would indicate that the user account fuckchrist had

8    solicited for membership in these groups or had been

9    approached to join these groups.

10   Q.    Moving to -- well, first if I could direct your attention

11   to the top left-hand section and the URL.  What do you notice

12   about the particular URL for this page?

13   A.    For this page, you can see that it has the normal

14   PedoBook URL right here (indicating).  However, additional

15   information is visible to the right of the .onion being

16   /profile/fuckchrist.  In this instance, this would indicate to

17   me that the information visible on this page related to this

18   particular user account.

19   Q.    All right.  Moving to page 3 of Government Exhibit 2,

20   which tab do we see here?

21   A.    We're on the Activity tab and the All sub tab.

22   Q.    And just backing out, what user are we logged in as when

23   this screenshot is taken?

24   A.    We're logged in as user fuckchrist.

25   Q.    And so what does that mean about the particular activity

1     that we see here on this page, Government Exhibit No. 2,

2     page 3?

3     A.   The activity that we're seeing on this page is

4     essentially all of the activity again.  However, if there

5     were -- unlike with the previous images that we were looking

6     at where we were logged in as the administrator, we wouldn't

7     necessarily see images that were in some type of limited,

8     closed, or restricted area unless this account had been

9     granted permission to view or visit those areas.

10    Q.   So what we're seeing here is the activity that the user

11    PTasseater fuckchrist would have seen on this particular page?

12    A.   That's correct.

13    Q.   If we can move to page 4 of the exhibit, first just

14    recap, what kind of screen capture are we looking at here on

15    page 4?

16    A.   Again, this is one of the scrolling type of screen

17    captures.  Again, it's a screenshot but it's not just

18    restricted to what's on the screen.  It also includes material

19    that you'd have to scroll down on the side of a website to

20    look at stuff that might be down here below the screen.

21    Q.   And what do we see depicted here on page 4?

22    A.   This would be all of the activity related to the user

23    account fuckchrist, user name or screen name PTasseater.

24    Q.   And the activity that we see at the top, would that be

25    the most recent activity?

```
 1    A.    Yes.

 2    Q.    And so as of what date?

 3    A.    456 -- this would be activity as of December 8th of 2012.

 4    Q.    Whatever -- the most recent things that had happened as

 5    of the date the board stopped --

 6    A.    Correct.

 7    Q.    -- ceased operating.

 8    A.    Correct.

 9    Q.    What were the last few things that the user PTasseater

10    did before the board shut down?

11    A.    PTasseater became friends with PushOut.  The avatar

12    chosen by the screen name PushOut appears to depict a female

13    with her genitals as the focal point of the image.

14          The next thing appeared to be that PTasseater

15    participated in a poll, which the question was:  When you have

16    your dick inside of a child's pussy, how do you like her to

17    react?  And then in parentheses, real experience only.

18          There appears to be 12 comments that were posted related

19    to that.  PTasseater's comment or participation isn't visible

20    on this.

21          The next one --

22    Q.    Let me just ask you, is there other information extracted

23    from the board that will show what the answer to this poll was

24    by the user PTasseater?

25    A.    Yes.
```

1          The next information or the next entry down is

2     participation in yet another poll:  Have you ever had a sexual

3     encounter with an underage?  Looking to see if anyones [*sic*]

4     had sex with an underage.  I know a lot of people may say so

5     because we love to fantasize and it's a turn on but looking

6     for honest answers please.

7     Q.   Drawing your attention now to the next entry, do you see

8     an entry about PTasseater joining a group Hurt the Core?

9     A.   Yes.

10    Q.   Are you familiar with that group?

11    A.   Yes.

12    Q.   What was the group Hurt the Core?

13    A.   Hurt the Core was a section of PedoBook or a closed

14    group -- I believe it was a closed group within PedoBook that

15    was primarily focused on the hurt core type of images or

16    videos of child exploitation material.

17         Hurt the Core itself was also another Tor hidden service

18    located outside of PedoBook.

19    Q.   Moving your attention to page 7 of Exhibit No. 2, and

20    what do we see depicted on page 7?

21    A.   These are all of -- well, a portion of the friends that

22    PTasseater friended while the PedoBook site was up and

23    running.

24    Q.   On the bottom of the screenshot, we see the words

25    Previous and Next and a series of numbers in between them.

1    What does that signify?

2    A.   That represents multiple pages of friends.  In this case,

3    we're on the -- it looks like we're on the second page because

4    that's what is highlighted.  This page contains ten entries.

5    So based on that, this user account could have had upwards of

6    70 friends based on the numbers that are visible.

7    Q.   And if we move to the next page, page 8?

8    A.   More than 70.  It continues on up through 25.

9    Q.   And if we move to the next page, page 9?

10   A.   Up to 30.

11   Q.   So that would indicate approximately how many friends

12   total?

13   A.   300 -- between 290 and 300 -- 291 and 300.

14   Q.   And moving to page 10 of Government Exhibit No. 2, what

15   do we see depicted here on page 10?

16   A.   These are images that would have been uploaded by

17   individuals on the username fuckchrist's friends' list.  The

18   information visible is very similar to the files page that we

19   saw previously.

20        You have a small avatar or you have a small thumbnail

21   right there (indicating), you have the name of the file

22   itself, you have who posted it.

23        Over here (indicating) you also can see whether the file

24   is available to the public or if it is simply available to

25   individuals that are actually logged in to PedoBook, meaning

1    someone that just visited the site but did not actually have

2    an account would not have been able to have seen that image.

3    Q.   Were any images on this exhibit so restricted?

4    A.   Yes.

5    Q.   Which ones?

6    A.   This one and this one (indicating).

7    Q.   Just for the record, what are the file names of those

8    two?

9    A.   The file names of those two images are -- of the first

10   one is 332410.jpg.  It appears to depict a prepubescent minor

11   nude laying on a pink sheet or some type of pink surface with

12   the genitals exposed in the primary center of the shot.

13        The second entry that is restricted to log-in users only,

14   the name of the post or wherever it's located is "who want

15   fuck this girls".  And it depicts what appears to be two

16   females, possibly minors, in bathing suits or bikini tops with

17   shorts on.

18   Q.   There are file names -- do you see the file names

19   Babyhure7 and Babyhure6 depicted on that exhibit?

20   A.   Yes.

21   Q.   What is the significance, if any, of sequentially

22   numbered file names like that?

23   A.   Normally sequentially numbered file names like that could

24   represent the number of a series or the location in a

25   particular series that this image would fall.

1    Q.   All right.  Moving to page 11 of Government Exhibit

2    No. 2, what do we see depicted there?

3    A.   These are the groups which the user fuckchrist is a

4    member of.

5    Q.   At the bottom of the screen, do we see another Previous,

6    Next, with numbers in between it?

7    A.   Yes, we do.

8    Q.   How many total pages?

9    A.   Based on this, there are four.

10   Q.   And about how many groups are listed per web page?

11   A.   There are ten.

12   Q.   If we move to page 12 of the exhibit, what do we see

13   depicted on page 12?

14   A.   We see an additional ten groups of which the user account

15   fuckchrist is a member.

16        On this page, as the previous page, you can -- you see

17   the avatars representing the site.  You see the name of the

18   group, as well as what type of group it is, in addition to the

19   number of members of the group right there (indicating).

20        On this page, there appears to be one group that has been

21   identified as a closed group, that being -- that being Boys

22   Hardcore right there (indicating).  And it appears to have 341

23   members.

24   Q.   And on page 13 of Government Exhibit No. 2 --

25   A.   We see another ten groups.  In this case you see the Hurt

 1    the Core group right there (indicating) that we saw on one of

 2    the previous exhibits.  You also see another closed group

 3    identified as 0-2 Year Little Girls Private Sharing Group

 4    2012.  That's identified as a closed group with 104 members.

 5        Another group that we've seen in a previous exhibit is

 6    also the Anything Goes - Hardcore Child Fucking.  It's an open

 7    group with 244 members.

 8    Q.  Just for the record, what do we see on the last page of

 9    that exhibit, page 14?

10    A.  We see the last two groups.  Both of those are open

11    groups.  The last one being, Wanna Be Balls Deep in Boys

12    which, if I recall correctly, we've seen in a previous

13    exhibit.

14        Based on this, the total number of groups that this user

15    was a member of as of December 8th was 32.

16    Q.  All right.  Special Agent Gordon, I'd like to direct your

17    attention to Government Exhibit No. 3.  And first zooming

18    towards the top of this particular exhibit, Government Exhibit

19    3, page 1, what do we see depicted here?

20    A.  This would be the landing page or the home page for the

21    PedoBook group Anything Goes - Hardcore Child Fucking.

22    Q.  So if you had clicked on one of those group names that we

23    saw on the prior exhibits, is this where you'd be delivered

24    to?

25    A.  Yes.  If you clicked on the Anything Goes one, this is

1    where you would have gone.  If you would have clicked on Hurt

2    the Core, you would have gone to a similar page for that.

3    Same for any of the other groups.

4    Q.   So all of this -- all of the content we're seeing here on

5    this exhibit would have been accessible or viewable to such a

6    user?

7    A.   Correct.

8    Q.   Let's go through Government Exhibit No. 3, page 1, the

9    sort of content that was on a group home page.

10   A.   All right.

11   Q.   There is a shaded box towards the middle with the word

12   Description.  What would go there?

13   A.   This would be just the general description or function

14   for this particular group.  It could include information about

15   what's acceptable there, possibly throw some rules in if they

16   wanted to.

17       The description itself is not prepopulated with anything.

18   Whoever created the group or who had administrative control of

19   the group would have been the person that entered all of this

20   text.

21   Q.   Is that description something a user would see the first

22   time a user went to this sort of group page?

23   A.   It should be, yes.

24   Q.   What was the description -- what is the description --

25   first of all, was the user PTasseater fuckchrist a member of

1    the group Anything Goes - Hardcore Child Fucking?

2    A.    Yes.

3    Q.    What is the description of this particular group?

4    A.    "A place to post anything, any kiddy fucking or naked

5    pics are welcome here, just so long as the little ones aren't

6    old enough to grow hair between their legs.  This is also a

7    place to chat hard" -- in all capital letters -- "about the

8    pics, what we like about them, what we'd like to do to the

9    little ones in the pics."

10         Next line is, "No limits."  Final line is, "Don't come

11    here if you're easily offended."

12    Q.    What does the phrase "no limits" signify?

13    A.    No limits would tend to entail that there are no

14    restrictions on the type of material, that nothing is

15    forbidden to be discussed, posted, or commented on.

16    Q.    There is an image to the left of that shaded box with the

17    description.  First, in general terms, what is it the -- what

18    is that image as it relates to a group?

19    A.    That's the avatar representation of the group.  It would

20    have been chosen by the individual that started the group.

21    It's not the -- that would not be an image that would have

22    been defaulted to once the group was created.

23    Q.    And what does the avatar of this particular group depict?

24    A.    This avatar appears to depict a possibly minor female.

25    She appears to be disrobed from at least the upper part of her

1    chest.  There appears to be a penis visible in the picture

2    with what appears to be ejaculate being directed towards her

3    face.

4    Q.   Moving down the page from that avatar section, I want to

5    ask you about some of the other group sections.

6         First, there's a gray shaded box, Group Blog.  Was there

7    any activity in that section of this group?

8    A.   No.

9    Q.   There's also a section Group Bookmarks.  Was there any

10   activity in that section of this group?

11   A.   No.

12   Q.   There's another shaded section, Group Files.  Was there

13   activity in that section of the group?

14   A.   Yes, there was.

15   Q.   And what is depicted -- what is shown below the shaded

16   box for the Group Files?

17   A.   Below this shaded box are six small thumbnails depicting

18   images or files that have been uploaded to this group.  All of

19   the images have children depicted in them in some way.

20   Several of the images depict the children engaged in some type

21   of sexual activity, either with an adult or by an adult.

22   Q.   And below the collection of thumbnails and the titles,

23   there's the words "Upload a File".  What would that allow a

24   user to do?

25   A.   That would allow an individual that desired to to -- once

1    they selected that link, they would then be able to upload a

2    file, and it would be posted into this group's particular file

3    section.

4    Q.   Under the heading Group Activity, what sort of activity

5    gets -- what sort of group activity gets commemorated there?

6    A.   In this case, all of the activity shown details

7    individual members commenting on different files.

8    Q.   Is there -- with respect to the first entry below the

9    shaded Group Activity box, is there any association with a

10   file that's also visible on that page?

11   A.   Yes.  If I recall correctly, I believe this activity

12   might have been visible on the latest activity.  Pedostepdad

13   made the comment about file 1039807.jpg.  That file itself is

14   visible directly to the left of the comment, being right here

15   (indicating).

16   Q.   What user posted that file?

17   A.   That would have been user jackspade.

18   Q.   Directing you to page 3 of Government Exhibit No. 3, for

19   which PedoBook group is this the group home page?

20   A.   This is the group home page for Boys Hardcore.

21   Q.   Was the user PTasseater fuckchrist a member of this

22   group?

23   A.   Yes, he was.

24   Q.   What is the group description?

25   A.   The description is, "A group for boys, they have sex"

 1   followed by a colon and a right parenthesis.  On the Internet,

 2   that type of combination of characters is referred to as an

 3   emoticon, and it represents a smiley face.

 4        "A group for boys.  They have sex with man's _D.  Join in

 5   and post your nice pix," and it looks like another smiley

 6   face.  "You need a avatar or a profile text.  Other I will

 7   delete.  Join in and you will see more.  Only fuck pix.  Other

 8   thinks will delete.  Have fun," and then it looks like another

 9   smiley face.

10   Q.   You mentioned earlier some groups had -- or used a

11   description in order to establish rules for that group.  Is

12   that an example of that?

13   A.   Yes.  In this case, an individual, when they join the

14   group or prior to it, they're required to have an avatar or

15   something within their profile text.  Otherwise, whoever owns

16   this board will kick them out of the group.

17        Additionally, the only type of pictures that are desired

18   are only depicting individuals engaged in some type of

19   intercourse.

20   Q.   Was Boys Hardcore an open or closed group?

21   A.   Can we go back to the previous exhibits?

22   Q.   Sure.  Let me direct you to Government Exhibit No. --

23   Court's indulgence?

24            THE COURT:  This may be a good stopping point.  It is

25   five o'clock, and the jury's put in a long day.

1          Thank you for your time and attention today.  Please

2     reconvene in the jury room before nine o'clock tomorrow

3     morning.  We'll plan to start promptly at 9:00.

4          Thank you.  We're in recess.

5

6          (Adjourned at 5:01 p.m.)

7

8

9

          I certify that the foregoing is a correct transcript from
10    the record of proceedings in the above-entitled matter.

11

12        ____/s_Brenda_L._Fauber____        _____10-7-14_____
          Brenda L. Fauber, RDR, CRR              Date
13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I-N-D-E-X

2

3    Jury Selection........................ Pages 2 through 53

4    Opening Statements................... Pages 66 through 88

5

6                           Direct  Cross  Redirect  Recross

7    WITNESSES:

8    FOR THE PLAINTIFF:

9    Jeffrey Tarpinian            88    115

10   P. Michael Gordon           119

11

12   EXHIBITS:                       Offered      Ruling

13   1.  PedoBook home page            140        144

14   2.  Fuckchrist/PTasseater PedoBook
         screenshots                    140        144
15
     3.  Fuckchrist/PTasseater PedoBook
16       group page screenshots         140        144

17   4.  Fuckchrist/PTasseater PedoBook
         private message screenshots    140        144
18
     5.  Fuckchrist/PTasseater PedoBook
19       user activity (11/19-12/8)     140        144

20   5A. Fuckchrist/PTasseater PedoBook
         user activity (11/19-12/8)     140        144
21
     5B. Fuckchrist/PTasseater PedoBook
22       user activity 11/26            140        144

23   5C. Fuckchrist/PTasseater PedoBook
         user activity 12/4             140        144
24
     5D. Fuckchrist/PTasseater PedoBook
25       user activity 12/8             140        144

| EXHIBITS: | Offered | Ruling |
|---|---|---|
| 6A.  November 21, 2012 screenshots | 140 | 144 |
| 6B.  November 26, 2012 screenshots | 140 | 144 |
| 6C.  December 4, 2012 screenshots | 140 | 144 |
| 6D.  December 8, 2012 screenshots | 140 | 144 |
| 7.  Fuckchrist/PTasseater PedoBook<br>    user information and annotations | 140 | 144 |
| 8.  Fuckchrist/PTasseater PedoBook<br>    user collections/groups | 140 | 144 |
| 9.  Fuckchrist/PTasseater PedoBook<br>    private messages (all) | 140 | 144 |
| 9A. Fuckchrist/PTasseater PedoBook<br>    private messages | 140 | 144 |
| 11. Profile page – PedoBook user<br>    noonewillknow321/TdlrLuvr | 140 | 144 |
| 68.  PedoBook screenshot | 105 | 105 |
| 69.  PedoBook stats | 140 | 144 |
| 74.  Photo - McGrath | 112 | 113 |
| 75.  Photo - Perigon | 113 | 113 |
| 76.  Stipulation | 117 | 117 |