1          THE COURT:  I will begin by asking you some

2     questions.  And then the lawyers will both have -- well, one

3     lawyer from each side will have an opportunity to ask you

4     questions as well.

5          If you have an affirmative answer to a question, please

6     raise your hand to let us know that you have an affirmative

7     answer.  Then give us an opportunity to find your name on the

8     seating chart and to identify you by name before you give your

9     response.  That way we will have a clear record about who is

10    talking at any given time.

11         Those members of the jury pool who are seated behind the

12    front bench don't need to raise their hands in response to any

13    question, but you do need to listen to all of the questions.

14    And if you are asked to replace another member of the jury

15    panel who is excused for cause, I will be asking you whether

16    you heard all of the questions and whether you had any

17    affirmative answers to any of those questions.

18         As you can see, I have a microphone, the lawyers have

19    microphones, when we have a witness on the witness stand, the

20    witness will have a microphone.  You don't have microphones.

21         So it's important when you respond to a question that you

22    speak loudly and clearly and at a reasonable pace so that we

23    can hear you and we can make a good record.

24         It's also essential that we never have two people talking

25    at the same time.  Our court reporter, Brenda Fauber, is an

1   excellent reporter, but even she can't make a clear record if

2   we have two people talking at once.

3       The lawyers have introduced themselves.  And I will ask

4   if any of you are acquainted with counsel for the government,

5   and that was Keith Becker seated in the center of the table,

6   Michael Norris on his left, and Sarah Chang on his right.  Are

7   any of you familiar with any of those lawyers?

8       The government in this case is represented by the office

9   of the United States Attorney.  And Mr. Becker and Ms. Chang

10  are with the U.S. Department of Justice.  Mr. Norris works

11  here locally with the United States Attorney, and her name is

12  Deborah Gilg.

13      Do any of you know Deborah Gilg or any other lawyer or

14  employee in the office of the United States Attorney?

15      Do any of you have any business with or have you had any

16  business with the office of the United States Attorney or the

17  Department of Justice?

18      The defendant in this case is Timothy DeFoggi, and he is

19  seated in the middle of the table here on my left [*sic*].

20  Mr. DeFoggi, would you stand so the members of the jury can

21  see you.

22      Is anyone here familiar with Mr. DeFoggi?  All right.

23  Thank you, Mr. DeFoggi.  You may be seated.

24      Mr. DeFoggi is represented by John Berry and Justin

25  Kalemkiarian of the office of Berry & Kelley in Lincoln,

1   Nebraska.  Are any of you familiar with Mr. Berry,

2   Mr. Kalemkiarian, or any lawyers or employees of the Berry

3   Kelley Law Firm in Lincoln?

4       Have any of you had any business or do you currently have

5   any business with the Berry Kelley Law Firm?

6       Do any of you know or are any of you related to any

7   prospective juror on this panel?

8       I'm going to read a list of the witnesses whom the

9   plaintiff, the government, may call to testify.  If you

10  believe that you know or may know one of these witnesses,

11  please raise your hand so we can inquire further.

12      Special Agent Jeffrey D. Tarpinian of the FBI in Omaha;

13  Special Agent Patricia J. Teakle of the FBI in Baltimore;

14  Special Agent Jacqueline Dougher of the FBI, Baltimore;

15  Special Agent Elizabeth A. Weiland of the FBI headquarters;

16  Ray C. Hsu, H-s-u, forensic examiner; Special Agent Steven A.

17  Smith Jr., FBI headquarters; Special Agent P. Michael Gordon,

18  FBI headquarters; Robert Webber, Omaha, FBI; Matthew R. Grant,

19  Omaha FBI computer scientist; Kevin Smith, Baltimore County

20  Police Department; Sergeant Dennis Cary, Washoe County

21  Sheriff's Office; Jimmy Dale Bounds, Germantown, Maryland;

22  Christopher Lee Casto, Germantown, Maryland; Special Agent

23  Alex Hernandez, Health & Human Services; Paval Stevashain;

24  Vicki L. Jarchow, court reporter; Dean Clarke.

25      In addition to the witnesses whose names I've read, the

```
 1    defendant may call the following individuals:  Dan Bright,

 2    Chris Casto, Dale Bounds, Marianne DeFoggi, Dan Meineke.  All

 3    right.  I saw no hands raised.

 4         As stated in the indictment, this case is entitled United

 5    States of America, plaintiff, versus Timothy DeFoggi,

 6    defendant.

 7         An indictment is a formal document that states the

 8    charges against a defendant and informs the defendant of the

 9    charges against him.

10         An indictment is not evidence against a defendant.  The

11    defendant entered a plea of not guilty to the charges in the

12    indictment.  Therefore, the defendant is presumed to be

13    innocent of the offenses charged.

14         The following is a summary of the charges in the

15    indictment.

16         Count I of the indictment alleges that between on or

17    about March 2, 2012, and on or about December 8, 2012, in the

18    District of Nebraska and elsewhere, Timothy DeFoggi and others

19    knowingly engaged in a child exploitation enterprise.  Count

20    II of the indictment alleges that between on or about March 2,

21    2012, and on or about December 8, 2012, in the District of

22    Nebraska and elsewhere, Timothy DeFoggi knowingly conspired to

23    advertise child pornography.  Count III of the indictment

24    alleges that between on or about March 2, 2012, and on or

25    about December 8, 2012, in the District of Nebraska and
```

 1    elsewhere, Timothy DeFoggi and others knowingly conspired to

 2    distribute child pornography.

 3        Counts IV through VII of the indictment allege that on or

 4    about November 21, 2012; November 26, 2012; December 4, 2012;

 5    and December 8, 2012, in the District of Nebraska and

 6    elsewhere, Timothy DeFoggi knowingly accessed any means or

 7    facility of interstate commerce to view child pornography.

 8        I've briefly described the nature of the case.  This

 9    particular case involves child pornography.

10        Please remember these questions are not intended to

11    embarrass you or to pry into your personal affairs.  If for

12    any reason it would cause you embarrassment to answer a

13    question in front of the other members of the jury panel, we

14    will hold a sidebar conference.  I'll meet with you here on

15    the right-hand side of the bench.  Ms. Fauber will join us and

16    one or more of the lawyers from both sides will join us.

17    Ms. Gomez will turn on some white noise, and we'll talk as

18    privately as we can over on that side of the bench.

19        Have any of you or members of your family or close

20    friends ever been involved in an arrest or prosecution related

21    to child pornography?

22        Have any of you or members of your family or close

23    friends ever been involved in an arrest or prosecution related

24    to child sex abuse?

25            PROSPECTIVE JUROR SCANLAN:  Excuse me, your Honor?

1          THE COURT:  Let me get your name first.  Hold on a

2      moment.  Mr. Scanlan?

3          PROSPECTIVE JUROR SCANLAN:  My great-niece was

4      abducted, raped and murdered in February.

5          THE COURT:  Did that take place here in Nebraska?

6          PROSPECTIVE JUROR SCANLAN:  No, St. Joseph, Missouri

7      -- excuse me, Springfield, Missouri.

8          THE COURT:  And how long ago did that incident take

9      place?

10         PROSPECTIVE JUROR SCANLAN:  February of this year.

11         THE COURT:  Has the individual responsible for this

12     been arrested?

13         PROSPECTIVE JUROR SCANLAN:  Yes.

14         THE COURT:  Are charges still pending?

15         PROSPECTIVE JUROR SCANLAN:  Yes, as far as I know.

16         THE COURT:  Well, this case involves child

17     pornography and related accusations.

18         And I often tell people when we're in a trial involving

19     any allegation of criminal activity, it's not necessary that

20     you keep an open mind about whether criminal activity is a

21     good thing or a bad thing.  The issue is going to be whether

22     the government can prove beyond a reasonable doubt each and

23     every element of each charge.

24         So for example, when we have a drug case, sometimes I

25     hear members of the jury panel say, "Well, I'm not sure I can

1     be objective because I think drugs are a bad thing," or "I

2     have a child who was addicted to drugs, and it destroyed my

3     child's life."

4         And I tell them that it's okay if you think drugs are a

5     bad thing, illegal drugs.  Congress already made that decision

6     that drugs are a bad thing.  The question is whether the

7     government has proved each element of each offense beyond a

8     reasonable doubt.

9         So -- and we'll get to your very personal and very tragic

10    issue in a moment.  If some of you are thinking, wow, I don't

11    like child pornography, it's a bad thing, it's a horrible

12    thing; that does not disqualify you from serving on a jury.

13        What we want to know is whether or not you can be fair

14    and objective in holding the government to its burden of

15    proof.  And if the government meets its burden of proof

16    showing each element beyond a reasonable doubt, then you would

17    find the defendant guilty.  If you find the government did not

18    meet its burden of proof with respect to each element, then

19    you would find the defendant not guilty.

20        So we're inquiring about any issues that might cause any

21    of you to be unable or unwilling to do your job as a juror in

22    viewing the evidence and applying the law as I give it to you

23    to the evidence.

24        So that brings me back to you, Mr. Scanlan, with this

25    tragedy in your family, and I don't know how close you were to

1    the niece or how close -- the great-niece, how close you were

2    to the parents.  But this is a personal tragedy that you and

3    your family suffered.

4         Do you believe that you could listen to the evidence in

5    this case which deals with child pornography and base your

6    decision as a juror on the evidence in the case and the law as

7    I give it to you?

8              PROSPECTIVE JUROR SCANLAN:  Yes, I can.

9              THE COURT:  Thank you, sir.

10        Is there anyone else here who has a personal experience

11   with -- either your own experience or an experience of a close

12   family member or close friend involving child sex abuse?

13        I'll broaden it a little farther into physical child

14   abuse.  All right.

15        How many of you work with minor children?  I'll start in

16   the back row.

17        Ms. Svehla, I see you are a teacher -- or you were a

18   teacher.  And what grade or grades did you teach?

19             PROSPECTIVE JUROR SVEHLA:  I did elementary school

20   and I sub on occasion now.

21             THE COURT:  Okay.  And do you believe that although

22   you have devoted your career to working directly with children

23   of a young age, that you could be fair and impartial as a

24   juror and make your decision based on the evidence in this

25   case and the law as I give it to you?

1              PROSPECTIVE JUROR SVEHLA:  Yes.

2              THE COURT:  Thank you, ma'am.

3         Any more hands in that back row?

4         All right.  Front row within the box, anybody work with

5     children?

6         I'll move to in front of the box now.  I didn't see any

7     hands within the box.

8         Ms. Beck, I see you're a registered nurse; is that right?

9              PROSPECTIVE JUROR BECK:  Uh-huh.

10             THE COURT:  Do you work exclusively with children or

11    with all --

12             PROSPECTIVE JUROR BECK:  Not exclusively with

13    children, no; all age ranges.

14             THE COURT:  All right.  But as a nurse, from time to

15    time you deal with children.

16             PROSPECTIVE JUROR BECK:  Correct.

17             THE COURT:  And has your work caused you to be in

18    contact with any children who have been victims of sex abuse?

19             PROSPECTIVE JUROR BECK:  In the past, yes.

20             THE COURT:  Okay.  Do you believe that that

21    experience would in any way prevent you from being a fair and

22    impartial juror and basing your decision on the evidence in

23    this case and the law as I give it to you?

24             PROSPECTIVE JUROR BECK:  No, I don't think so.

25             THE COURT:  Thank you, ma'am.

```
1            Any more hands in front of the box?

2            Yes, Ms. Hardesty?

3                 PROSPECTIVE JUROR HARDESTY:  Yes.

4                 THE COURT:  Go ahead.

5                 PROSPECTIVE JUROR HARDESTY:  I'm the director of the

6     UNMC Youth Learning Center.  And I also taught classes for the

7     National Safety Council for teenagers.  And I was a leader for

8     Camp Fire Kids.

9                 THE COURT:  Okay.  And in those capacities, did you

10    on occasion come across children who had been abused or

11    exploited?

12                PROSPECTIVE JUROR HARDESTY:  No.

13                THE COURT:  Is there anything about your background

14    in working with youth that you think would prevent you from

15    being a fair and impartial juror?

16                PROSPECTIVE JUROR HARDESTY:  No, Judge.

17                THE COURT:  Thank you, ma'am.

18           Any more hands in the front row?

19           I'm going to move to the bench, I saw a few hands there.

20    And Mr. Furcini?  No, I've got it wrong then, I'm sorry.

21    Ms. Forman?

22                PROSPECTIVE JUROR FORMAN:  I'm a pediatric nurse.  I

23    worked at Children's Hospital the last 16 years under their

24    umbrella, so I have come across occasional cases in the past

25    and have gone to conferences when we screen for potential
```

1    child abuse.

2           THE COURT:  Okay.  And do you believe that your

3    employment and your history of working with children,

4    including those who may have been victims of abuse, would in

5    any way prevent you from listening to the evidence and

6    weighing the evidence and applying the law as I give it to you

7    to that evidence, reaching a fair and impartial decision?

8           PROSPECTIVE JUROR PUGH:  I honestly -- I don't know,

9    to be quite honest.  My judgment's been a little bit off.  I

10   think I spoke with you about a recent death in my family, so

11   I'm not as clear on what I believe in anymore.  My father

12   passed away a couple months ago.

13          THE COURT:  And I will share that with the lawyers

14   here so that they're aware of what you told me.

15      And Ms. Forman mentioned to me downstairs that she has

16   suffered the loss of her father a few months ago and the loss

17   of another close friend, so she did express some concerns

18   about her -- perhaps her ability to concentrate during the

19   trial.  Is that fair to say, Ms. Forman?

20          PROSPECTIVE JUROR FORMAN:  Yeah.  I'm doing some

21   grief counseling right now.

22          THE COURT:  All right.  Is there any request by the

23   lawyers that I excuse Ms. Forman and bring up another member

24   of the jury panel to take her place?

25          Well, there's no request --

1      MR. BERRY:  Your Honor, I'm sorry.  I was waiting for

2   the prosecution.  The defense does request that, your Honor.

3      THE COURT:  All right.  I'm going to have you take a

4   seat behind the front bench, Ms. Forman.  And I'm going to ask

5   Ms. Gomez to choose another name, an individual who will take

6   your place.

7      COURTROOM DEPUTY:  Greg C. Pugh.

8      THE COURT:  Mr. Pugh, you've been here in the court

9   this morning as we've been proceeding with voir dire; is that

10  correct?

11     PROSPECTIVE JUROR PUGH:  Yes.

12     THE COURT:  Did you listen to all the questions?

13     PROSPECTIVE JUROR PUGH:  Yes, your Honor.

14     THE COURT:  Did you have any affirmative answers to

15  any of those questions?

16     PROSPECTIVE JUROR PUGH:  No.

17     THE COURT:  Very good.

18     I saw a hand here to my left.  And I believe, Mr. Brown,

19  you wished to be heard?

20     PROSPECTIVE JUROR BROWN:  I believe that anybody that

21  has anything to do with, like, child pornography, caught with

22  anything like that, I believe you're guilty.  I think it's a

23  waste of taxpayers' time and money to sit here and view

24  evidence and all that other kind of stuff.

25     THE COURT:  And Mr. Brown, you also indicated to me

1    downstairs that you had some concerns about your ability to --

2         PROSPECTIVE JUROR BROWN:  Yes, I --

3         THE COURT:  You said you might have some -- a

4    disability that would prevent you from being able to digest

5    the evidence in the case; is that correct?

6         PROSPECTIVE JUROR BROWN:  Correct.

7         THE COURT:  All right.  Would you like me to share

8    that with the lawyers or would you prefer I not?

9         PROSPECTIVE JUROR BROWN:  Sure.

10        THE COURT:  Okay.  Mr. Brown indicates that he has a

11   reading disability and he would not likely be able to read

12   materials if there are written materials that are presented in

13   connection with the evidence.

14      Is there a request that Mr. Brown be excused and that

15   someone else take his place?

16        MR. NORRIS:  Your Honor, we don't object to such a

17   request.  We're fine with him being excused.

18        THE COURT:  Any objection to me excusing him?

19        MR. BERRY:  No, your Honor.

20        THE COURT:  All right.  Mr. Brown, I'm going to go

21   ahead and ask you to take a seat.  And Ms. Gomez will draw

22   another name.

23        COURTROOM DEPUTY:  Tasha M. Helms.

24        THE COURT:  Ms. Helms, you were here through the voir

25   dire process in the courtroom so far?

1          PROSPECTIVE JUROR HELMS:  Yes, your Honor.

2          THE COURT:  And did you hear all the questions?

3          PROSPECTIVE JUROR HELMS:  Yes, your Honor.

4          THE COURT:  Did you have any affirmative answers to

5     any questions?

6          PROSPECTIVE JUROR HELMS:  No, your Honor.

7          THE COURT:  Very good.  We'll proceed.

8       Well, this may overlap a little bit with the questions I

9     was asking you earlier, but have any of you or any members of

10    your family or close friends ever been accused of sex abuse or

11    other abuse of a minor?

12         COURTROOM DEPUTY:  Judge, there's another person that

13    answered yes to your question about working with children.

14         THE COURT:  I'm sorry, I didn't follow through on all

15    the people who were working with children.

16       We're going back to the front bench.  And Mr. Reiff, do

17    you also have a background working with children?

18         PROSPECTIVE JUROR REIFF:  Not in my day job, but I am

19    a Cubmaster for Scouts and a Scoutmaster for Scouts.

20         THE COURT:  Very good.  Do you have any reason to

21    believe that your work with boys would in any way prevent you

22    from being a fair and impartial juror in this case?

23         PROSPECTIVE JUROR REIFF:  No.

24         THE COURT:  Thank you, sir.

25       Any other hands that I missed?

1      All right.  We'll proceed.  And I did not see any hands

2  in response to the question about whether any of you or

3  members of your family or close friends had been accused of

4  sexual abuse of a minor.  If there were any hands, please

5  raise them.

6      Do any of you believe that the criminal laws in this

7  country, whether they're federal laws or state laws, relating

8  to child pornography are either too harsh or too lenient?

9      Have any of you had special training in law, criminal

10 justice, or law enforcement?

11     Have any of you had special training in computers,

12 Internet, chat rooms, file sharing -- that's fine, I'm asking

13 a broad question about computer-savvy people here in the

14 courtroom.

15     And I'm going to start with Mr. Boldt.  And would you

16 tell us your training and expertise, please.

17          PROSPECTIVE JUROR BOLDT:  I am a network specialist

18 at the Fremont Area Medical Center, Fremont Health.  So I've

19 worked in the computer technology side of things in the health

20 industry for the last 14 years.

21          THE COURT:  Very good.  Thank you, sir.  The lawyers

22 may have more questions for you -- for all of you who have

23 computer expertise, but I'm just going to try to point you out

24 and ask you some basic questions.

25     Anybody else in that back row?

```
 1              Okay.  I'll move to the front row within the box.
 2    Ms. Ladd, I believe you have expertise.  Would you tell us
 3    what that is.
 4              PROSPECTIVE JUROR LADD:  Over nine years as a
 5    programmer and SQL to database and programming.
 6              THE COURT:  Excellent.  Thank you.
 7              Anyone else within the box?  I'll move to the row in
 8    front of the box, anyone there with computer expertise,
 9    special training?
10         And now to the bench?  Several people.
11         Mr. Reiff, would you tell us your background.
12              PROSPECTIVE JUROR REIFF:  With the company I'm with
13    the last couple -- I guess it's more on-the-job training.  I
14    take care of the IT network, printers, anything to do with the
15    computers for the last 20 years.
16              THE COURT:  Very good.  Thank you.
17         I saw Mr. Furcini.
18              PROSPECTIVE JUROR FURCINI:  I have a bachelor's
19    degree in computer science software engineering.
20              THE COURT:  Very good.  Thank you, sir.
21         Any more hands in the front bench?  Mr. Pugh?
22              PROSPECTIVE JUROR PUGH:  Networking, Internet
23    management; I have a 3D printing company, so just a lot of
24    computers in general.
25              THE COURT:  Thank you, sir.
```

```
 1            All of those who answered that question talked about

 2     special training they had or special expertise they had

 3     related to their work.  Does anyone else here engage in

 4     chats -- Internet chats on chat rooms or file-sharing

 5     activities?

 6            Again, Mr. Pugh?  Is this -- this just recreational; is

 7     that right?

 8                PROSPECTIVE JUROR PUGH:  Just blogging, and other

 9     social media websites.

10                THE COURT:  Okay.  Very good.  Anyone else?

11            Yes, Ms. Ladd again.

12                PROSPECTIVE JUROR LADD:  Just general, socializing,

13     asking questions on blogs and everything, along with the

14     typical stuff.

15                THE COURT:  Thank you, ma'am.

16            Yes, and Ms. Hardesty?

17                PROSPECTIVE JUROR HARDESTY:  I'm not sure, but is

18     Pinterest something you're interested in?

19                THE COURT:  Well, the lawyers may be interested in

20     it, so you --

21                PROSPECTIVE JUROR HARDESTY:  Okay.  Pinterest.

22                THE COURT:  You engage in the Pinterest website.

23     Okay.

24            Yes, sir, Mr. Scanlan?

25                PROSPECTIVE JUROR SCANLAN:  I use Citrix at my
```

1    employment.

2          THE COURT:  Very good.  Anyone else?

3      This is a criminal case.  Certain principles of law apply

4    in every criminal trial.  I will state some of those

5    principles and ask that if you disagree with the stated

6    principle, raise your hand to show that you do not or cannot

7    accept that principle.

8      In a prosecution of a criminal charge against a

9    defendant, the defendant is presumed innocent.

10     The government has the burden of proof which means that

11   the government must prove beyond a reasonable doubt each

12   element of the crime charged against the defendant.

13     In a criminal case, the defendant is not required to

14   prove his innocence.  A criminal case is different from a

15   civil case.  In a civil case, a plaintiff has to prove its

16   case by a preponderance or greater weight of the evidence.  In

17   a criminal case, the government must prove its case and the

18   charge against the defendant beyond a reasonable doubt.

19     As a juror, you must wait until all of the evidence has

20   been presented and you have been instructed on the law which

21   is to be applied before you make up your mind concerning any

22   fact or issue in this case.

23     As a juror, you must render a verdict solely on the

24   evidence introduced at trial, apply the law stated in the

25   instructions that will be given to you, and disregard any

1    other ideas, notions, or beliefs about the law that you may

2    have previously held, heard about, or encountered.

3        Is there anyone here who cannot accept all those basic

4    principles?

5        Have any of you had an experience with the court system,

6    either as a plaintiff, a defendant, or a witness, that you

7    believe would affect your ability to be fair and impartial in

8    this case?

9        How many of you have served on juries before today?  Very

10    good.  I don't see any hands within the box, so I'm going to

11    start with Mr. Scanlan.  How long ago were you on a jury?

12            PROSPECTIVE JUROR SCANLAN:  That I can recall, at

13    least eight years ago, maybe longer.

14            THE COURT:  Was it a civil case or a criminal case?

15            PROSPECTIVE JUROR SCANLAN:  Criminal case.

16            THE COURT:  Did the jury reach a verdict?

17            PROSPECTIVE JUROR SCANLAN:  Yes.

18            THE COURT:  Very good.

19        Any more hands here on my left?

20        Yes, Ms. Beck?

21            PROSPECTIVE JUROR BECK:  I served on a criminal case,

22    approximately 20 years ago.  And it was a -- the case involved

23    armed robbery.

24            THE COURT:  And did the jury reach a verdict?

25            PROSPECTIVE JUROR BECK:  The jury did reach a

1     verdict, yeah.

2            THE COURT:  Very good.  Any more hands on my left?

3        I'll move to the front bench.  I saw some hands over

4     there.

5        Yes, Mr. Hansen?

6            PROSPECTIVE JUROR HANSEN:  Yes.  It was probably a

7     little over ten years ago.  It was a criminal trial, and he

8     was found guilty.

9            THE COURT:  Thank you, sir.

10       Any more hands in that front bench?

11       Mr. Ellenberger?

12           PROSPECTIVE JUROR ELLENBERGER:  I served on a

13    criminal case about, oh, 20 years ago.  It was a child

14    molestation case.

15           THE COURT:  Did the jury reach a verdict?

16           PROSPECTIVE JUROR ELLENBERGER:  Yes, they did.

17           THE COURT:  All right.

18       Any other hands there in the front row?

19       Mr. DeMayo?

20           PROSPECTIVE JUROR DeMAYO:  Yeah, I served on a

21    criminal case about 20 years ago.

22           THE COURT:  Okay.  Did the jury reach a verdict?

23           PROSPECTIVE JUROR DeMAYO:  Yes.

24           THE COURT:  Very good.  Any hands I missed?

25       Has anyone here seen, read, or heard anything from any

```
 1       source, including the news media, about this case?

 2            Has anyone already made up his or her mind about how this

 3       case ought to be decided?

 4            Has anyone here been a victim of a crime or had a family

 5       member who was a victim of a crime and who believes that that

 6       experience might affect your ability to be fair and impartial

 7       in this case?

 8            As I mentioned, the plaintiff in this case is the United

 9       States of America.  Is there anyone who has specific feelings

10       about the government, either so positive or so negative, that

11       you believe it would affect your impartiality in this case?

12            How many of you have backgrounds in law enforcement or

13       have close friends or relatives who have worked in law

14       enforcement?

15            Ms. Demers?

16            PROSPECTIVE JUROR DEMERS:  My cousin's husband is a

17       U.S. Marshal.  He lives next door to my parents.

18            THE COURT:  Very good.  Thank you.

19            Yes, Ms. Svehla?

20            PROSPECTIVE JUROR SVEHLA:  My family knows the family

21       of the police chief here in Omaha.

22            THE COURT:  Very good.

23            Anyone else in the back row?

24            Front row within the box?

25            And in front of the box?  Mr. Matthews-Saunders?
```

 1            PROSPECTIVE JUROR MATTHEWS-SAUNDERS:  Yes.  My uncle

 2    is on the Omaha Police Department.  I also have a roommate who

 3    is completing training for the Omaha Police Department.

 4            THE COURT:  Very good.  Thank you, sir.

 5        Ms. Beck?

 6            PROSPECTIVE JUROR BECK:  I have a cousin who is on

 7    the police department in Lexington, Nebraska.

 8            THE COURT:  Okay.

 9        Ms. Hardesty?

10            PROSPECTIVE JUROR HARDESTY:  I worked with police

11    officers in the emergency room and at the National Safety

12    Council.

13            THE COURT:  Very good.  Thank you, ma'am.

14        Mr. Scanlan?

15            PROSPECTIVE JUROR SCANLAN:  My cousin is a sheriff in

16    Story County, Iowa.

17            THE COURT:  Thank you, sir.

18        Mr. Lausterer?

19            PROSPECTIVE JUROR LAUSTERER:  My cousin works for

20    dispatch in Wayne, Michigan.

21            THE COURT:  Very good.  Any hands in the bench?

22    Mr. Hansen?

23            PROSPECTIVE JUROR HANSEN:  My son is a deputy

24    sheriff, Dakota County, Nebraska.

25            THE COURT:  Very good.

1          Mr. Bradley, you raised your hand.

2          PROSPECTIVE JUROR BRADLEY:  I work in the Department

3    of Corrections, different levels in the department.  And my

4    brother is also chief of police in Denison.

5          THE COURT:  Very good.  Thank you, sir.

6      Mr. Furcini?

7          PROSPECTIVE JUROR FURCINI:  My father is a policeman,

8    retired about ten years ago.

9          THE COURT:  Thank you.

10      Any more hands in that front bench?

11      Is there anyone here who would give more weight or less

12    weight to the testimony of a witness simply because that

13    witness is or had been a law enforcement officer?

14      At this juncture, the lawyers have an opportunity to ask

15    you more questions.  And they may be following up on some of

16    the questions that I asked you earlier.

17      We will begin this process with the government.

18      Mr. Norris, will you voir dire?

19          MR. NORRIS:  Yes, your Honor.

20          THE COURT:  You may proceed.

21          MR. NORRIS:  May it please the Court, counsel.  I'm

22    Michael Norris.  I'm an Assistant United States Attorney here

23    in the District of Nebraska.  And as the Court has indicated,

24    both Mr. Becker and Ms. Chang are with the Department of

25    Justice.

1       There are two witness that were neglected from that long

2   list of witnesses that the Court went over.  And I'll tell you

3   now that that's a list of names that may be called, that are

4   likely to be called; but in all likelihood, there will be

5   about six, maybe seven witnesses, that the government intends

6   to actually call in this case.

7       But two that were not on that list was an individual by

8   the name of Charles MacMillan who lives in the Washington,

9   D.C. area.  And another individual by the name of Michael

10  Mizer who is an FBI agent in that Baltimore and Washington,

11  D.C. area like many of the others you heard of.

12      I think I know the answer, but does anybody know either

13  of those people?

14      This case centers on a large child pornography website

15  that was hosted here in the Omaha area.  And by hosted, it

16  means that all the communications came in and went through

17  that particular website.  And the server for that particular

18  website was located in Bellevue, Nebraska; and the

19  administrator was in Omaha, Nebraska.  So you're going to hear

20  some testimony about that.

21      I ask you now because you were asked if anybody knew

22  anything about this case, and yet you didn't have that

23  information with you at that particular time.

24      Has anybody heard anything about this case or some of the

25  cases that may have preceded this particular case?  Doesn't

 1    ring a bell for anybody?  All right.  Good.

 2        As a part of this trial, I suspect that you are going to

 3    hear testimony that the FBI took over that website -- that

 4    particular website that was hosting and trading and

 5    advertising child pornography, and they ran it.  They ran it

 6    for about a three-week period under close monitoring, under

 7    close scrutiny, with approvals of their headquarters, DOJ

 8    headquarters, and court authorization.

 9        Again, I ask you this because does that -- has anybody

10    heard anything about this, either in the news or on any other

11    type of media?

12        All right.  Has anyone -- is it Mr. Pugh?  You read

13    *Reddit*, correct?

14            PROSPECTIVE JUROR PUGH:  Yes.

15            MR. NORRIS:  Do you read anything else other than

16    *Reddit*, something like *Wired* magazine, anything like that?

17            PROSPECTIVE JUROR PUGH:  Yeah.

18            MR. NORRIS:  And have you, in your reading those

19    magazines, come across any situations like this or discussions

20    like this, that you recall?

21            PROSPECTIVE JUROR PUGH:  People talk about it,

22    there's chatter about child pornography.

23            MR. NORRIS:  Okay, child pornography in general.  I'm

24    talking about something specific and case related, not just in

25    general.

```
1              PROSPECTIVE JUROR PUGH:  No.

2              MR. NORRIS:  Thank you.

3         Can you explain perhaps what Wired is for those of us

4    that either don't read Wired or may not be aware of what Wired

5    is?

6              PROSPECTIVE JUROR PUGH:  It's just a tech magazine

7    that brings in news articles from all over the world.  It's

8    kind of like --

9              MR. NORRIS:  Mostly technology related?

10              PROSPECTIVE JUROR PUGH:  Yeah, for Wired.

11              MR. NORRIS:  Thank you.

12         Does anybody here subscribe to any magazines that are

13    similar to that?  And that's why I asked you to talk about

14    that, any IT-type magazines or websites such as Reddit or

15    Wired magazine or anything like that.  Anybody -- especially

16    some of you individuals who have a little bit more knowledge

17    about computers and software networks, etc., do any of you

18    subscribe to any of those?  All right.

19         I've told you that during the course of the trial there

20    will be testimony that the FBI took over a child porn website;

21    that they carefully monitored that website for a short period

22    of time; and during the short period of time, the reason they

23    did that was to identify those people who were advertising,

24    trading, and distributing child pornography on that particular

25    website.
```

1      I ask you, is there anything about the FBI getting

2    involved in such a fashion and doing this that bothers

3    anybody?  Is this a tactic that there's anybody that has a

4    problem with that or just outright disapproves of it?

5          PROSPECTIVE JUROR PUGH:  I don't outright disapprove

6    of it; but depending on how it's done, I don't believe the

7    neutrality...

8          MR. NORRIS:  If it's done with a court order and a

9    court authorization?

10          PROSPECTIVE JUROR PUGH:  Depends on how they got the

11    information to get that court order.

12          MR. NORRIS:  Okay.  So it relates to -- you'd want to

13    know more information before you would be able to determine

14    whether or not you would have a problem with it?

15          PROSPECTIVE JUROR PUGH:  Yeah.

16          MR. NORRIS:  If you did have a problem with it, would

17    that problem be curable by an instruction by the judge or by

18    the Court saying that if the law was followed -- and the law

19    was followed -- that you must accept the evidence for what it

20    is and not question how it was obtained, etc.?

21          PROSPECTIVE JUROR PUGH:  I agree if it's used right.

22          MR. NORRIS:  All right.  Thank you.

23      Anybody else have any problem with such a tactic, a

24    tactic that is undertaken in order to find people who are

25    trading, soliciting, advertising child pornography?

1          Is there anybody here who thinks that the FBI -- it

2     doesn't have to be the FBI, it could be any law enforcement

3     agency, so we'll just say police in general.  Is there anybody

4     here who believes that the police should not devote time or

5     resources investigating child pornography or online type

6     services, sexual exploitation services?

7          You will learn -- those of you who are selected to the

8     jury are going to learn that the name of the website was

9     called PedoBook.  So does that ring any bells?  Has anybody

10    heard any reference to a site called PedoBook, either by

11    reading it in the paper or learning about it through some

12    other means?

13         All right.  Is there anybody here who has not heard the

14    term pedophile or pedophilia?  Anybody who's never heard that?

15    I'm not going to ask you to define it, I'm just going to ask

16    is there anybody here who is not familiar with the term or has

17    never heard the term before?

18         Mr. Pugh, you've indicated that you operate a blog.  And

19    I'm not picking on you, you're just the one that has more

20    information than anybody else with regard to being a little

21    bit more technically savvy.  Do you run a website?

22              PROSPECTIVE JUROR PUGH:  Yes.

23              MR. NORRIS:  Okay.  What type of website do you run?

24    Is that part of the blog?

25              PROSPECTIVE JUROR PUGH:  It's not -- it's not

1     necessarily a blog, it's just a service website.

2            MR. NORRIS:  What's the nature of the website, if you

3     don't mind me asking?

4            PROSPECTIVE JUROR PUGH:  We do custom ceramic objects

5     for 3D printing.

6            MR. NORRIS:  Okay.  So for your work, correct?

7            PROSPECTIVE JUROR PUGH:  Uh-huh.

8            MR. NORRIS:  And that's fairly common, correct?

9            PROSPECTIVE JUROR PUGH:  Uh-huh.

10            MR. NORRIS:  I'd like to ask, does anybody else run a

11     website, either through your work -- Mr. Reiff?  You're an IT

12     specialist as well.

13            PROSPECTIVE JUROR REIFF:  One hat, yes.

14            MR. NORRIS:  On one hat.  That hat that you wear, is

15     that related to your business, and is there a website that

16     runs through the business?

17            PROSPECTIVE JUROR REIFF:  Yeah, construction work.

18     And I mostly make the pages.  I should say I coordinate with

19     who we pay to host it.  I design the pages and maintain it.

20            MR. NORRIS:  Thank you.

21        Anybody else?  Ma'am, let me make sure I get your name

22     right for the court reporter.  It's Ms. Ladd, isn't it?

23            PROSPECTIVE JUROR LADD:  For my work, I program

24     internal websites and external websites.  I help with that.

25     And we host it locally within the building.

1    MR. NORRIS:  Is it open to the outside?  When you say

2    internal websites, I take it it's accessible --

3    PROSPECTIVE JUROR LADD:  Internally.  We have

4    internet and intranet.  And we have external --

5    MR. NORRIS:  We call it internet and extranet, that

6    extranet goes outside.

7    PROSPECTIVE JUROR LADD:  Uh-huh.

8    MR. NORRIS:  Anybody else here who is familiar with

9    websites?

10       You are Mr. Boldt, correct?

11    PROSPECTIVE JUROR BOLDT:  Correct.  My previous job I

12    used to maintain our internal web page as well as the external

13    website.

14    MR. NORRIS:  Along the same things that we've just

15    heard about?

16    PROSPECTIVE JUROR BOLDT:  Yes.

17    MR. NORRIS:  Are you Ms. Harrison?

18    PROSPECTIVE JUROR HARRISON:  Yes.

19    MR. NORRIS:  Ms. Harrison, what have you done in that

20    regard?

21    PROSPECTIVE JUROR HARRISON:  I worked in advertising

22    and I maintain websites for my clients.

23    MR. NORRIS:  Okay.  Multiple websites then?

24    PROSPECTIVE JUROR HARRISON:  Uh-huh.

25    MR. NORRIS:  Did you create the website or is it

1      something that you update --

2              PROSPECTIVE JUROR HARRISON:  No.

3              MR. NORRIS:  -- and modify as the client wishes?

4              PROSPECTIVE JUROR HARRISON:  Yes, I update it.

5              MR. NORRIS:  Thank you.

6          Anybody run their own personal website, other than

7      Mr. Pugh, we've already talked about -- actually you haven't

8      said you run it.

9              PROSPECTIVE JUROR PUGH:  I do, but...

10             MR. NORRIS:  That's fine.  I'll leave you alone.

11         You are Ms. Hardesty?

12             PROSPECTIVE JUROR HARDESTY:  Yes.  I just determine

13     what goes on my website, but I don't see the computer work.

14             MR. NORRIS:  So you have input.

15             PROSPECTIVE JUROR HARDESTY:  Uh-huh.

16             MR. NORRIS:  All right.  Thank you.

17         Now, I talked a little bit -- this site that you're going

18     to hear about, it was called PedoBook.  It was here in

19     Nebraska.  It was the hub of communications for people or

20     members who were all throughout the United States, as a matter

21     of fact, all over the world.  But every communication has to

22     come in through Nebraska and go elsewhere.

23         You're going to learn through the course of this trial

24     that the defendant is a resident of Germantown, Maryland,

25     which is very close to Washington, D.C., hence why we're

1   bringing a lot of witnesses in from the Washington, D.C. area.

2        Because the board was here in Nebraska and because the

3   communications came to Nebraska, this is why he's being

4   prosecuted here in Nebraska.  Is there anybody among you who

5   thinks it's unfair to bring an individual from Maryland into

6   another jurisdiction in the United States, which is the

7   federal jurisdiction here in Nebraska, and try him for a

8   criminal offense?  All right.

9        I'm going to ask you a couple of more computer-related

10   questions.  The Court has already covered many of these.  I'm

11   going to try to avoid them as much as possible.

12        But PedoBook is set up very similar to Facebook.  And I'm

13   curious as to -- and as time goes by, and the more you do

14   this, you learn to ask the question the opposite way of what

15   you maybe did a couple years ago, especially when it comes to

16   computers.

17        So rather than asking has anybody here heard of Facebook,

18   I'm going to just ask is there anybody here who hasn't heard

19   of Facebook?  All right.  That's what I thought.

20        Is there anybody here -- and to be honest, I'd raise my

21   hand to this -- who doesn't belong to Facebook or is not on

22   Facebook?

23        All right.  Quite a few people.  I don't need to go into

24   specifics as to that.

25        But, generally those of you who are on Facebook, I want

1      to address this question to you now.  Those of you who are on

2      Facebook, how many of you participate in polls while you're on

3      Facebook?  Mr. Reiff and...

4            PROSPECTIVE JUROR HELMS:  No, just scratching.

5            MR. NORRIS:  Okay.  How many of you engage in private

6      messaging between other friends on Facebook?  Again, I'm not

7      going to get into specifics on that, I'm just curious as to

8      the number.

9         How many of you -- and this is not Facebook-related, this

10     is just with regard to questions -- are familiar with certain

11     -- I call them evidence-erasing type matters, but they're

12     actually file-erasing type matters, little operations such as

13     CCleaner or Eraser?  Mr. Pugh, Mr. Reiff.  Generally some

14     people are familiar with that.  Anybody else ever heard of

15     those?

16           PROSPECTIVE JUROR BOLDT:  Uh-huh.

17           MR. NORRIS:  Obviously, again with your IT

18     experiences.

19        All right.  I want to talk a little bit just in general

20     about child pornography.  And nobody's asking you whether you

21     condone child pornography.  And the Court did a very nice

22     explanation with regard to, you know, it's not a question of

23     whether it's illegal because Congress has already said it's

24     illegal.  It's an issue of the nature itself.

25        Is there anybody here who thinks that -- or takes issue

1    with the fact that Congress has said that child pornography is

2    against the law?  That's the basic question I'm getting at.

3    Is there anybody here who thinks, well, you know what,

4    Congress should not get into that area, or Congress should not

5    pass any laws as it relates to sexual exploitation of children

6    or child pornography?  All right.  Thank you.

7        Is there anybody here who thinks that child pornography

8    is protected by the First Amendment?  Anybody?  All right.

9        The First Amendment does not protect child pornography.

10   If you believe that it did, is there anybody here who would

11   not be able to apply the law as it's given to them, whether it

12   relates to talking about First Amendment rights or any other

13   issue as the Court gives them and substitute their own idea of

14   what the law should be?

15       That was a really awkward question, but they come out of

16   my mouth sometimes.  No?  Nobody?  All right.

17       That gets me into a different area.  I grew up watching

18   Perry Mason, LA Law, Ally McBeal.  I can pretty much trace it

19   through the decades, the TV shows that people watch that are

20   law related; big fan of Law and Order through the years.

21       But, in watching those as a lawyer, you start realizing

22   that people start talking about different presumptions of

23   doubt, presumptions of innocence, reasonable doubt.  And

24   that's all fine and dandy, but there's only one that matters

25   and that's going to be the one the Court gives you.

1    If you get an instruction about reasonable doubt or the

2    presumption of innocence, is there anybody here who is going

3    to say, well, Perry Mason used to always say this, and this is

4    the right standard for me; or on LA Law, this is the way it

5    was done, and that's the one that we're going to go with here?

6        Is there anybody who can't put that aside, whatever

7    preconceived notions they have, and apply the law as given to

8    them by the Court?

9        Your Honor, I notice my time is up.  I will pass this

10   jury for cause.

11       THE COURT:  Very good.  Thank you, Mr. Norris.

12       We will now have voir dire by counsel for the defense,

13   Mr. Berry.

14       MR. BERRY:  Good morning.  My name is John Berry.

15   Actually I work at -- the name of the firm if Berry Law Firm.

16   Problem with technology is about 11 years ago, it was entered

17   in the court system as Berry Kelley so it always shows up if

18   you pull -- if I file a document online, it says Berry Kelley.

19   But the name of the firm is Berry Law Firm, and I just wanted

20   to make sure that we don't represent any of you or haven't in

21   the past.

22       So I'll ask that question.  Berry Law Firm, have we

23   represented you or represented you in the past?

24       This is a voir dire, French, to tell the truth.  We get

25   to talk back -- this is the only time that we get to talk back

1    and forth, and we have a very limited time to do it.

2         I've been in your position before.  I sat two days on a

3    murder trial jury selection, was not selected because I knew

4    all the prosecutors, I knew the defense attorneys, and yet

5    they still kept me in there for two days.  This won't be as

6    long or as painful, but I was hesitant to ask questions.

7         I know sometimes when those questions are thrown out

8    there, you are hesitant to respond.  And so, I am going to

9    move very quickly, but I would ask that you raise your hand.

10   If in doubt, raise your hand and we'll talk about it.

11        Who here has been in a chat room?  So we still have --

12   I'll go to Mr. Pugh.  In that chat room, did you talk to other

13   individuals?

14             PROSPECTIVE JUROR PUGH:  Yes.

15             MR. BERRY:  Were there some of those individuals that

16   you didn't know their identity?

17             PROSPECTIVE JUROR PUGH:  Yes.

18             MR. BERRY:  Do you use your name or did you use an

19   alias?

20             PROSPECTIVE JUROR PUGH:  Both.

21             MR. BERRY:  Both?

22        What about you, Ms. Ladd?

23             PROSPECTIVE JUROR LADD:  Pretty much the same answer.

24             MR. BERRY:  I'm sorry, Mr. Furcini, same as well?

25             PROSPECTIVE JUROR FURCINI:  Same.

 1          MR. BERRY:  Has anybody here ever had their e-mail

 2     hacked?  A few hands.

 3        Ms. Ladd -- I'm sorry, I'll go back to Ms. Svehla.

 4          PROSPECTIVE JUROR SVEHLA:  I don't know for sure.  I

 5     did have false e-mails delivered to our e-mail address, you

 6     know, some scams and so forth.

 7          MR. BERRY:  And what about you, Ms. Ladd?

 8          PROSPECTIVE JUROR LADD:  Yes, I had to change my

 9     password and that was pretty much the end of it.

10          MR. BERRY:  Were people getting spam or messages --

11          PROSPECTIVE JUROR LADD:  Spam from me, yes.

12          MR. BERRY:  And I'm sorry, who else, Mr. -- did I see

13     Mr. -- is it Matthews-Saunders; is that correct?

14          PROSPECTIVE JUROR MATTHEWS-SAUNDERS:  Yes.

15          MR. BERRY:  You've had that experience as well?

16          PROSPECTIVE JUROR MATTHEWS-SAUNDERS:  Similar; having

17     to change the password.  There's a lot of spam e-mails sent

18     out from my account.

19          MR. BERRY:  Anyone on the other side of the room?  I

20     didn't see any hands.

21        Now, Mr. Pugh, have you ever heard of fantasy chat,

22     fantasy chat rooms?

23          PROSPECTIVE JUROR PUGH:  No.

24          MR. BERRY:  Let me give you an example.  Years ago I

25     had a case where there was a vampire/werewolves chat room and

1    people would go in there and they would take on these

2    identities as werewolves or vampires and they would chat back

3    and forth.  Have you heard about that in the tech world?

4              PROSPECTIVE JUROR PUGH:  No.

5              MR. BERRY:  Has anybody heard of that?  Ms. Ladd?

6              PROSPECTIVE JUROR LADD:  Just RP stuff.

7              MR. BERRY:  What's RP?

8              PROSPECTIVE JUROR LADD:  Sorry, role-playing.

9              MR. BERRY:  Role playing.  What is role-playing?

10             PROSPECTIVE JUROR LADD:  Like in World of Warcraft,

11   you pretend to be an elf so you say elfish things in a pretend

12   fantasy world.

13             MR. BERRY:  And when you say "say elfish things," are

14   other people responding back --

15             PROSPECTIVE JUROR LADD:  Yes.  Other --

16             MR. BERRY:  -- then they --

17             THE COURT:  Stop, stop, stop.  We have two people

18   talking at once.  We can't make a record.  So wait until the

19   question is finished, then begin the response.  And vice

20   versa, Mr. Berry.

21             MR. BERRY:  And do other people respond in character

22   as well?

23             PROSPECTIVE JUROR LADD:  Yes.

24             MR. BERRY:  Now that we've talked about that, is

25   anybody else aware of that type of role-playing online?

```
 1            Yes, ma'am.  And you are Ms. Hardesty?
 2            PROSPECTIVE JUROR HARDESTY:  Well, like in Big Bang
 3      Theory, is that what you're talking about?  Is that what --
 4      I've seen it through Big Bang Theory.
 5            MR. BERRY:  And those are like Star Trek people?
 6            PROSPECTIVE JUROR HARDESTY:  Yes.
 7            MR. BERRY:  I'm not familiar with the show.  You
 8      understand that on TV they role-play on the computer?
 9            PROSPECTIVE JUROR HARDESTY:  Uh-huh.
10            MR. BERRY:  And Ms. Ladd, how do you know who is on
11      the other end of the computer when you --
12            PROSPECTIVE JUROR LADD:  It could be anybody --
13      sorry.  It could be anybody.
14            MR. BERRY:  Do they generally stay with their names,
15      their chat names, if you will?
16            PROSPECTIVE JUROR LADD:  They either use a character
17      name or a first name.  Sometimes after awhile, they may use a
18      longer name or more about them as you get to know them.
19            MR. BERRY:  Is anyone here familiar with The Onion
20      Router or Tor?
21         Ms. Ladd and Mr. -- Mr. Ladd -- Ms. Ladd and Mr. Pugh.
22      You've both heard of that?  What's your understanding of what
23      that is?
24            PROSPECTIVE JUROR PUGH:  It's to access files.
25            MR. BERRY:  Ms. Ladd, would you agree with that?
```

```
 1              PROSPECTIVE JUROR LADD:  Yes.

 2              MR. BERRY:  Mr. Pugh, do you think -- your

 3     understanding of Tor is it allows people to search the

 4     Internet anonymously?

 5              PROSPECTIVE JUROR PUGH:  Yeah, to get stuff or --

 6              MR. BERRY:  Has anybody here heard of Silk Road?  A

 7     few hands.

 8          Mr. -- is it Lausterer?

 9              PROSPECTIVE JUROR LAUSTERER:  Yes.

10              MR. BERRY:  What have you heard about it?

11              PROSPECTIVE JUROR LAUSTERER:  Mainly that it's for

12     illegal gotten gains, drugs or anything basically that you

13     couldn't find legally online.  Someone ran that website I

14     think back -- out west.  He was arrested, but I think it's --

15     it's continuing to be taken over by somebody else.

16              MR. BERRY:  Would you agree with that, Mr. Pugh?  Or

17     do you have a different view on that.

18              PROSPECTIVE JUROR PUGH:  No, that sounds right.

19              MR. BERRY:  Has anyone ever posted anything online

20     anonymously?  Mr. Pugh, Ms. Ladd.  You don't have to give us

21     the specifics, but generally what was it about?

22              PROSPECTIVE JUROR LADD:  Just comments on blogs

23     usually.

24              MR. BERRY:  Commenting on what somebody else said?

25              PROSPECTIVE JUROR LADD:  Yes, in response, or my
```

1    personal opinion.

2            MR. BERRY:  Has anyone ever commented on a news story

3    here, on a blog, or response to, say, something on Omaha

4    World-Herald.com?

5        Mr. Pugh, you indicated you're familiar with the CCleaner

6    and Eraser?

7            PROSPECTIVE JUROR PUGH:  Uh-huh.

8            MR. BERRY:  What are those?

9            PROSPECTIVE JUROR PUGH:  Disk drive erasers.

10           MR. BERRY:  What is your understanding of the

11   purpose?

12           PROSPECTIVE JUROR PUGH:  To make sure there's no data

13   left on a drive.

14           MR. BERRY:  It's your understanding they're basically

15   used to clean hard drives?

16           PROSPECTIVE JUROR PUGH:  Uh-huh.

17           MR. BERRY:  I'm sorry, is that a yes?

18           PROSPECTIVE JUROR PUGH:  Yes.

19           MR. BERRY:  Now, Mr. Norris briefly brought up the

20   First Amendment.  And he explained there's no First Amendment

21   right to child pornography.  However, there is a First

22   Amendment right to free speech, and there is a right to

23   assemble.

24       We've talked a little bit about child pornography in this

25   case.  I suspect that there may be some evidence in this case

1    about individuals getting online in a forum, such as PedoBook,

2    to chat about child pornography and sexual fantasies.

3        Now, speech about those things is not necessarily

4    illegal.  However, is there anyone here that feels that they

5    would not be able to presume someone innocent if they engaged

6    in that type of speech?

7        Ms. Ladd?

8            PROSPECTIVE JUROR LADD:  I might be leaning more

9    towards they are guilty.

10           MR. BERRY:  And why is that?

11           PROSPECTIVE JUROR LADD:  Because it is coming from

12   their imagination, you have to at least thought about it

13   before.  Even if it hasn't occurred, it's still something in

14   your mind, which is pretty much the first step towards doing

15   something.

16           MR. BERRY:  So even if the government establishes --

17   only establishes it's fantasy chat, would you still have

18   difficulty forcing them to prove their burden of proving the

19   case beyond a reasonable doubt that a defendant broke the law?

20           PROSPECTIVE JUROR LADD:  If he actually used the

21   website, then, yes, I would have trouble with that.

22           MR. BERRY:  Okay.  And when you say "actually used

23   the website," once again there may be issues about

24   conversations.  But if it's not about the specific charges in

25   this case, such as child pornography, then can you still

1 presume that person innocent unless or until the government

2 proves the case beyond a reasonable doubt?

3    PROSPECTIVE JUROR LADD:  Yes.

4    MR. BERRY:  Does anyone have some of the similar

5 concerns that Ms. Ladd has?

6   Mr. Pugh?

7    PROSPECTIVE JUROR PUGH:  I've been on a lot of blogs,

8 and I know that people are constantly linking to other stuff.

9 And as soon as you start blogging, it's almost inevitable that

10 you would venture off to other areas outside of that blog very

11 quickly.  And if you're talking about those things, those

12 things are probably coming up, too.

13    MR. BERRY:  So you have some life experience that you

14 bring to this, correct?

15    PROSPECTIVE JUROR PUGH:  Yeah, I'm on blogs and I

16 know people are constantly posting an image if you're talking

17 about something.

18    MR. BERRY:  But if there is no evidence that the

19 defendant posted an image or downloaded an image, can you

20 still hold the government to its burden of proving the case

21 beyond a reasonable doubt?

22    PROSPECTIVE JUROR PUGH:  Depends on if there's

23 evidence of things being tampered with, things where he would

24 leave virtual trails.

25    MR. BERRY:  Who here drove on the interstate this

1    morning?  Ms. Johanek, do you drive on the interstate

2    frequently?

3              PROSPECTIVE JUROR JOHANEK:  No.

4              MR. BERRY:  Today you did.

5              PROSPECTIVE JUROR JOHANEK:  Yes, I did.

6              MR. BERRY:  Have you ever driven down the interstate

7    and seen someone pulled over and the lights are flashing?

8              PROSPECTIVE JUROR JOHANEK:  Yes.

9              MR. BERRY:  You get close, and what's the first thing

10   that pops in your mind?

11             PROSPECTIVE JUROR JOHANEK:  What did they do wrong?

12             MR. BERRY:  What did they do wrong?  What about you,

13   Ms. Demers?  Do you drive?

14             PROSPECTIVE JUROR DEMERS:  Yeah.

15             MR. BERRY:  What do you think when you see that

16   person pulled over on the side of the road and the lights

17   flashing?

18             PROSPECTIVE JUROR DEMERS:  Busted.

19             MR. BERRY:  Busted.

20        What do you think, Mr. Boldt?  Let's change the facts

21   here a little bit so that now there's a drug dog sniffing a

22   car outside.  What pops in your mind?

23             PROSPECTIVE JUROR BOLDT:  They've probably got drugs.

24             PROSPECTIVE JUROR MONSON:  What kind of drugs?

25             MR. BERRY:  I'm sorry, that's Ms. Helms -- no,

```
1    Ms. Monson.

2        So we generally presume guilt.  Would you agree with

3    that, Ms. Johanek?

4            PROSPECTIVE JUROR JOHANEK:  Yes.

5            MR. BERRY:  And the judge is going to instruct you in

6    this case that you must presume Mr. DeFoggi innocent.

7            PROSPECTIVE JUROR JOHANEK:  Yes.

8            MR. BERRY:  Do you think you will be able to do that

9    in this case, knowing this is a case about child pornography?

10           PROSPECTIVE JUROR JOHANEK:  If it's presented to me

11   the way it needs to be, yes.

12           MR. BERRY:  And Ms. Demers, even though we don't say,

13   "Why did they stop that innocent man" --

14           PROSPECTIVE JUROR DEMERS:  Yes, I mean -- I'm

15   nervous.

16           MR. BERRY:  I understand.  And that's okay.

17       But, you could presume Mr. DeFoggi innocent even though

18   when we see that car, that police car, and the police are

19   involved, we think what did they do wrong?  You think you can

20   overcome that?

21           PROSPECTIVE JUROR DEMERS:  Oh, yeah.

22           MR. BERRY:  Would you agree, Mr. Boldt, that we've

23   been taught where there is smoke, there is fire; and we tend

24   to presume things like guilt naturally, correct?

25           PROSPECTIVE JUROR BOLDT:  Yes.
```

1          MR. BERRY:  But do you think you can overcome that

2     natural presumption in this courtroom and to be able to apply

3     a different standard, which is to presume a man innocent who

4     has been arrested?

5          PROSPECTIVE JUROR BOLDT:  Yes, I do.

6          MR. BERRY:  Does anyone think they can't presume

7     Mr. DeFoggi innocent?

8        Okay.  Ms. Cramer?  Why is that?

9          PROSPECTIVE JUROR CRAMER:  Just because child

10     pornography is so despicable that I think it would just be

11     hard to -- you'd have to really prove it to me that he was

12     innocent.

13          MR. BERRY:  Okay.  And that brings me to my next

14     point.  The burden is on the government to prove the case

15     beyond a reasonable doubt.  Mr. DeFoggi has no burden.  He

16     does not have to testify.

17        That being said, if Mr. DeFoggi does not testify and the

18     government does not meet its burden, can you still find

19     Mr. DeFoggi not guilty?

20          PROSPECTIVE JUROR CRAMER:  I believe I could, but I

21     think it would be difficult.

22          MR. BERRY:  Your Honor, I see I'm out of time, but

23     I'd like to continue to inquire.

24          THE COURT:  If you wish to move to have this witness

25     removed and have --

```
 1                    MR. BERRY:  I will --

 2                    THE COURT:  -- have this juror removed and replace

 3       her, I will grant that request.

 4                    MR. BERRY:  I will make that motion.

 5                    THE COURT:  Ms. Cramer, will you please take a seat

 6       behind the front bench?

 7           And Ms. Gomez, will you please give me another name?

 8                    COURTROOM DEPUTY:  Carlene J. Byers.

 9                    THE COURT:  Ms. Byers, you've been here in the

10       courtroom throughout the voir dire process, have you not?

11                    PROSPECTIVE JUROR BYERS:  Yes.

12                    THE COURT:  Did you have some affirmative answers to

13       any of these questions?

14                    PROSPECTIVE JUROR BYERS:  No.

15                    THE COURT:  All right.  You may take another couple

16       of minutes, Mr. Berry.

17                    MR. BERRY:  Ms. Byers, are you a legal analyst; is

18       that right?

19                    PROSPECTIVE JUROR BYERS:  I am.

20                    MR. BERRY:  What's that?

21                    PROSPECTIVE JUROR BYERS:  I read contracts all day.

22                    MR. BERRY:  Okay.  Sounds fun.

23                    PROSPECTIVE JUROR BYERS:  Yeah.

24                    MR. BERRY:  You've heard the questions I've asked.

25       Do you have any concerns -- and let me restate this.
```

1          Do you think it's fair that the government bears the

2     burden of proving the case beyond a reasonable doubt?

3               PROSPECTIVE JUROR BYERS:  Yes.

4          MR. BERRY:  Do you think you can uphold that

5     standard?

6               PROSPECTIVE JUROR BYERS:  Yes.

7          MR. BERRY:  And if you hear some disturbing speech

8     about children or child pornography but the government does

9     not prove every element of the offense, can you still -- or

10    will you find Mr. DeFoggi not guilty?

11              PROSPECTIVE JUROR BYERS:  I could.

12         MR. BERRY:  Thank you.

13        No further questions.  I pass the panel for cause.

14              THE COURT:  Very good.

15        At this juncture, Ms. Gomez is going to be working with

16    the lawyers to help them as they exercise their peremptory

17    challenges to reduce the number of jurors to the number that

18    we actually need for the trial in this case.

19        And perhaps either Ms. Griess or Ms. Gomez may open that

20    door back to the jury deliberation room in case anyone needs

21    to go through there to use a restroom.  The restrooms are on

22    the left through that door.  I just ask if you do need to use

23    the restroom and you go back there, please don't talk to

24    anybody as you come to and from.

25        If you do leave the room, you will be missing a very

1    interesting presentation.  Usually this is a quiet time in the

2    trial while the lawyers do their work with the courtroom

3    deputies.

4        But because we want this to be an educational experience

5    for all of you, including those of you who are not ultimately

6    selected to serve on the jury, Ms. Fauber has agreed to give a

7    special presentation today called Everything You Wanted to

8    Know About Court Reporting But Were Afraid to Ask.

9        Now for her to do this, I have to be quiet; I have to

10   stop talking.  So without further ado, I give you Ms. Fauber.

11       (Presentation given.)

12       (Peremptory challenges exercised.)

13           THE COURT:  Ms. Gomez is now going to read the names

14   of the members of the jury panel who will not be serving on

15   this jury.  Don't get up and leave right away; please wait and

16   I'll excuse you as a group, along with the jurors seated

17   behind the front bench.

18       Ms. Gomez?

19           COURTROOM DEPUTY:  Diane Svehla, Jared Boldt, George

20   Brown, Kari E. Ladd, Tiffany Monson, Calvin J.

21   Matthews-Saunders, Marcia J. Beck, Lisa A. Hardesty, Lawrence

22   P. Scanlan, David O. Sperling, Kevin Milton Hansen, Jason W.

23   Reiff, Randy J. Bradley, Stacy A. K. Furcini, Monique D.

24   Forman, Daniel J. Ellenberger, David M. Capoun, Craig DeMayo,

25   Greg C. Pugh, Tasha M. Helms.  That's it, Judge.

1          THE COURT:  Very good.  Those of you whose names have

2     been read and those of you who are seated behind the front

3     bench are now excused.

4          And Ms. Gomez, do they need to call in after three

5     o'clock on Friday for further instructions?

6          COURTROOM DEPUTY:  Yes, ma'am.

7          THE COURT:  Please call the clerk's office on Friday

8     after three o'clock for further instruction.  And on behalf of

9     the court, thank you very much for your time and attention

10    this morning.

11         (Unselected jurors leave.)

12         THE COURT:  Ms. Gomez, if you would please seat the

13    jurors.

14         (Off-the-record discussion had.)

15         THE COURT:  Now that we have you all seated, if you

16    would please stand and raise your hand, we have one more oath

17    for you.

18         (Jury sworn.)

19

20

21

22

23

24

25