```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA
 2
     UNITED STATES OF AMERICA,      )
 3                                  )
              Plaintiff,            )         8:13CR105
 4                                  )
         vs.                        )
 5                                  )      Omaha, Nebraska
     TIMOTHY DEFOGGI,               )      August 20, 2014
 6                                  )
              Defendant.            )
 7
                              VOLUME II
 8               TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE LAURIE SMITH CAMP
 9        CHIEF UNITED STATES DISTRICT JUDGE AND A JURY

10
                      A-P-P-E-A-R-A-N-C-E-S
11
     FOR THE PLAINTIFF:           Mr. Michael P. Norris
12                                Asst. United States Attorney
                                  1620 Dodge Street
13                                Suite 1400
                                  Omaha, NE 68102
14
                                  Mr. Keith A. Becker
15                                Ms. Sarah Chang
                                  DOJ Trial Attorneys
16                                1400 New York Avenue, N.W.
                                  Sixth Floor
17                                Washington, DC 20530

18   FOR THE DEFENDANT:           Mr. John S. Berry, Jr.
                                  Mr. Justin B. Kalemkiarian
19                                Berry Law Firm
                                  2650 North 48th Street
20                                Lincoln, NE 68508

21
     COURT REPORTER:              Ms. Brenda L. Fauber, RDR, CRR
22                                111 South 18th Plaza
                                  Suite 3122
23                                Omaha, NE 68102
                                  (402) 661-7322
24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.
```

1          (At 9:13 a.m. on August 20, 2014, with counsel for the

2     parties and the defendant present, and the jury NOT present,

3     the following proceedings were had:)

4          THE COURT:  First, good morning.

5          Counsel and I had a brief meeting in chambers.  And

6     Mr. DeFoggi, I understand that you were moved from the Cass

7     County jail facility to the Douglas County jail facility, and

8     that you had some concerns about that move, in particular that

9     you had not received access to medication that you had been

10    using when at the Cass County facility, and this medication

11    helped with the prostate so that you were able to be here in

12    court for the normal periods of time.  And now you may need to

13    take more frequent breaks in order to use the restroom; is

14    that correct, Mr. DeFoggi?

15         THE DEFENDANT:  That's part of it, your Honor.  The

16    more important part of it is the fact that Douglas County

17    denied me access to my legal documents.  They told me I could

18    have one envelope, and that was it.  And I was unable to

19    prepare for cross-examination questions for today, which is

20    why I spoke to Mr. Berry about postponing the trial for one

21    day because obviously I had no access to the documents.

22         And then, of course, the other side of that is I need --

23    they didn't take us to our room until 1:30 in the morning and

24    got us up at 5.  And I haven't been able to shower.  They told

25    me I wouldn't be able to shave because they give it out after

1    I go to court.  So I will be unshaven, woolly, when I come

2    into court.  And I don't want that -- I don't want to affect

3    the jury's decision by them looking at me and I'm all

4    unshaven.

5       Cass County was far more, I guess, cooperative.  They

6    would make special arrangements.  The first day of trial, they

7    brought me a razor early to let me shave and shower.  But in

8    Douglas, they didn't care.

9       And I was also supposed to submit a medical kite this

10   morning for some additional issues, along with medication.

11   And they told me at intake they didn't have one, and they told

12   me to ask the unit.  The unit didn't have one.  So it has

13   passed now, and I won't be able to submit a request until the

14   end of court today.

15      But my other -- I mean, my really big concern, your

16   Honor, is the fact I haven't been able to prepare for

17   cross-examination of Mr. Gordon.

18           THE COURT:  Okay.  And of course, we're still in the

19   direct examination.

20      And Mr. Becker, can you tell me how long you anticipate

21   that the direct examination will take?

22           MR. BECKER:  Judge, I'd anticipate that the direct

23   will go the balance of today's morning session.  We might wrap

24   up before lunch with Special Agent Gordon, but I can't promise

25   it.

1          THE COURT:  Well, I understand your concerns,

2     Mr. DeFoggi.

3          And first, as I told counsel in chambers, we will do

4     everything to accommodate your physical need to take breaks

5     whenever that's necessary.  And we will excuse the jury

6     whenever you or your counsel asks for a break.  And that way

7     you can exit outside the presence of the jury and that won't

8     draw undue attention to the fact that you need a break.

9          On the issue of your placement at Douglas County and the

10     accommodations or lack of accommodations, I also understand

11     and appreciate those concerns.

12          What I will do is visit with the marshals during one of

13     the breaks, either the morning break or the noon break.  And I

14     am not sure that the deputies we have in the courtroom right

15     now have all of that information that I may need to decide how

16     we proceed from here.

17          But perhaps they can find out from their supervisors

18     first about why the move was made -- and I am guessing that it

19     was made simply because Douglas County is so much closer and

20     the drive to and from the court is so much shorter than in

21     Cass County.  I think it was just a matter of logistics.

22          But the marshals may also have some suggestions about

23     ways that we can accommodate some, if not all, of your

24     concerns.  And they certainly have lines of communication with

25     the Douglas County jail that may help facilitate some of

1      the -- you know, the resolution of those concerns.

2          But I won't know until I visit with the marshals.  And

3      rather than doing that here in open court, I'll probably do

4      that in chambers after they are able to gather some

5      information for me.

6          But right now we'll go ahead and we'll proceed with the

7      direct examination.  And, of course, you can take notes.  I

8      realize you may not have all of the materials that you wish to

9      have.  But we will at least make use of our time this morning

10     in proceeding with the direct examination.  And then we'll

11     address this again.

12         THE DEFENDANT:  Thank you, your Honor.

13         And just -- you know, I think Cass County jail is about

14     20 minutes from here, so it might not be as big a issue,

15     but...

16         THE COURT:  And I agree, maybe it won't be.  But the

17     marshals have more information than I have.  And so I want to

18     consult with them and see what ideas they have for resolving

19     some of the concerns.

20         THE DEFENDANT:  Okay.  Thank you, your Honor.

21         THE COURT:  Thank you.

22         All right.  Anything else before we bring in the jury?

23         MR. BECKER:  Not from the government, your Honor.

24         MR. BERRY:  No, your Honor.

25         THE COURT:  All right.  Please bring in the jury --

 1    unless they dispersed.

 2              COURTROOM DEPUTY:  I asked them not to.

 3         P. MICHAEL GORDON, PREVIOUSLY SWORN, RESUMED THE STAND

 4         (Jury in at 9:22 a.m.)

 5              THE COURT:  Good morning.  Thank you for your

 6    patience.  The lawyers and I were addressing some matters that

 7    we needed to address first before continuing with the direct

 8    examination of Special Agent Michael Gordon.

 9         And of course, Mr. Gordon, you remain under oath.

10              THE WITNESS:  Yes, ma'am.

11              THE COURT:  Mr. Becker, you may continue with your

12    direct.

13              MR. BECKER:  Thank you, your Honor.

14                     DIRECT EXAMINATION (Cont'd.)

15    BY MR. BECKER:

16    Q.   Good morning, Special Agent Gordon.

17    A.   Good morning, sir.

18    Q.   I'd like to start by directing your attention first to

19    Government Exhibit No. 69.  Just zooming in a bit on

20    Government Exhibit No. 69.  Do you recognize what this

21    particular screen depicts?

22    A.   Yes.  This is a statistics printout from the

23    administrator's log-in of -- from the administrator's log-in

24    of PedoBook.

25    Q.   So who would have had access to a page like this from the

1    PedoBook website?

2    A.   Any of the administrators.

3    Q.   How many were there?

4    A.   One.

5    Q.   And just drawing your attention -- we'll zoom in a bit to

6    the left side of the screen -- can you please identify for the

7    ladies and gentlemen of the jury some of the pertinent

8    statistics regarding the use of the PedoBook website that we

9    see here?

10   A.   Perhaps the most significant one is the files section

11   indicating that up to the point that the website was

12   functioning and taken down by us on December 8, there had been

13   28,083 files uploaded onto PedoBook.  These files could have

14   consisted of individual image files as well as possibly the

15   smaller avatars located on the site.

16   Q.   How many messages were communicated across PedoBook?

17   A.   There were 107,652 messages.  There were 165 polls, which

18   we discussed briefly yesterday.  There were 333 groups, both

19   open and closed, on PedoBook.  And there was, according to

20   this, 8,156 accounts, although from the statistic up at the

21   top, there were only 8,137 that were actually active.  So the

22   balance of those accounts could have been test accounts that

23   got closed or accounts that had gotten banned for some reason.

24   Q.   Thank you.

25        When we left off yesterday, I was asking you some

1    questions about the Boys Hardcore group.  If I can direct you

2    first just briefly to Government Exhibit No. 3, page 3.  Just

3    to refresh us, what group page is depicted on page 3 of

4    Government Exhibit No. 3?

5    A.   The Boys Hardcore page.

6    Q.   And I asked you yesterday whether or not that was an open

7    or closed group.  If I could direct you to page -- excuse me,

8    Government Exhibit No. 2 --

9    A.   Back one, I believe.

10   Q.   Sorry -- page 12, was Boys Hardcore an open or closed

11   group on PedoBook?

12   A.   It was a closed group.

13   Q.   Can you just refresh the jury on what that would signify

14   in terms of the group?

15   A.   A closed group would be one that a user would have to

16   request permission to join.  And it could be something as

17   limited as requesting permission from the administrator or

18   whoever was in charge of that group to grant them permission;

19   or it could be something as extensive as you have to prove to

20   me first that you're not law enforcement.

21   Q.   Directing you now back to Government Exhibit No. 3, page

22   4 of Government Exhibit No. 3, what group page do we see

23   depicted on page 4 of Government Exhibit No. 3?

24   A.   This is the Hurt the Core group page.

25   Q.   What is the description of the Hurt the Core group?

1    A.   "Welcome to Hurt the Core's PedoBook page.  You can find

2    the website here," followed by the letters HTC.  The letters

3    HTC themselves -- themself are a hyperlink that would lead to

4    another hidden service located on Tor at the time called Hurt

5    the Core.

6    Q.   So what -- so a user could actually click on those

7    letters HTC?

8    A.   They should be able to, yes.

9    Q.   What would that do?

10   A.   It would open -- depending on the browser, it would

11   either open up another browser tab and they would attempt to

12   connect to that website, or it would leave PedoBook and go

13   directly to the Hurt the Core site.

14   Q.   Are you familiar with that website?

15   A.   Yes, I am.

16   Q.   What was Hurt the Core?

17   A.   It was another website that was primarily involved in the

18   production and distribution of child exploitation material.

19   The site itself was, as I had mentioned and described

20   yesterday, more along the hurt core or a no-limits type site.

21   They didn't necessarily restrict the type of material that

22   their members were allowed to post or comment on.

23   Q.   Were files posted within the Hurt the Core group on

24   PedoBook?

25   A.   Yes.

1    Q.    Do you see those depicted on this view?

2    A.    Yes, I do, right here on the left side (indicating).

3    Q.    All right.  Directing your attention to page 5 of

4    Government Exhibit No. 3, this is the group page for what

5    group on PedoBook?

6    A.    0-2 Year Little Girls Private Sharing Group 2012.

7    Q.    Was the user fuckchrist PTasseater a member of this

8    particular group?

9    A.    Yes, he was.

10   Q.    Was it open or closed?

11   A.    I believe it was closed.  You can also -- in the

12   description -- the brief description right here (indicating),

13   it doesn't normally show up there.  But in this particular

14   case, the owner of the group decided to indicate that this was

15   a closed group here (indicating).

16   Q.    And you see that at the end of the text that starts with

17   the words "brief description" with the colon after it?

18   A.    Yes.

19   Q.    What was the description of this particular group on

20   PedoBook?

21   A.    "Hi my dear group fans," and then a semicolon and right

22   parenthesis signifying a wink.  "This group was created to

23   ensure scope for those who wanted a day to see a new set of

24   groups and their own private material is shared with community

25   level.  We move more and more.  Attention, everyone who has

1    shared in the group are the only members can see who are

2    present in the group.  For others, this material is

3    inaccessible as it is not publicly come out.  Those who do not

4    like the public to share their own private material, so they

5    made it to the group.  The photos just do it for access to the

6    group.  All new pictures to share with groups, attention, only

7    little girls can 4 months to 2 years.  People who can trust,

8    they call it the group.  Private material published elsewhere

9    is forbidden."  And then it provides a Tor Chat address along

10   with a user name or screen name that the individual has

11   associated with that, and name being Citydark87.

12   Q.   What is the significance of the reference to, quote,

13   private material?

14   A.   Private material in the nomenclature of individuals that

15   share and create this type of material is material that an

16   individual will produce themselves with a child that they have

17   access to or child that they've encountered, and it's not

18   necessarily something that gets shared freely over the

19   Internet.

20        This type of material is usually on a one-for-one basis;

21   in other words, I'll share my private material with you if

22   you'll share your private material with me.

23   Q.   Would that describe -- are there group files that are

24   available or located within this particular group page?

25   A.   Yes, there are.

GORDON - DIRECT                                                          201

1    Q.   Without asking you to describe all of them, are they

2    generally consistent with the age limits in the description?

3    A.   Yes.

4    Q.   Special Agent Gordon, was a private messaging feature

5    available on PedoBook?

6    A.   Yes, it was.

7    Q.   Can you briefly recap what that was to the jury?

8    A.   Private messaging on PedoBook functioned much like

9    private messaging does on Facebook or similar sites.

10   Essentially you send a message to someone and then they can

11   reply back.  It's almost like e-mail restricted just to

12   members of the site.  It doesn't leave the site.  No one but

13   the people that are exchanging the messages will actually see

14   the content.

15   Q.   Showing you Government Exhibit No. 4, do you recognize

16   this exhibit?

17   A.   Yes.

18   Q.   What do you recognize it to be?

19   A.   Could you scroll to the left a little bit more.

20   Q.   Sure.

21   A.   This is the inbox for the user fuckchrist as it existed

22   on December 8th of 2012.

23   Q.   Just drawing your attention -- we'll zoom in on the top

24   left -- how can you tell it belonged to that particular user?

25   A.   You can see it up in the address bar up here

1     (indicating), Messages, Inbox, and then the user name

2     fuckchrist.

3     Q.   And then just generally as we look to the middle of

4     Government Exhibit No. 4, what do we see on the screen?

5     What's depicted there?

6     A.   What you're seeing on the screen now is just kind of like

7     a quick summary of the messages that are sitting in the

8     fuckchrist user's inbox.

9         Most of the information here we've already talked about

10    to some extent.  You see the small avatars on the very left

11    side.  You also see the PedoBook user name or screen name that

12    actually sent the material -- or sent the message.

13        The next box shows what the subject line is of a

14    particular message.  You can also see in some of them the RE

15    indicating that that would be a reply to a message that had

16    previously been sent, probably by the user fuckchrist, to them

17    and they were just simply replying to it.

18        Here is the column that has the "days ago".  That's again

19    how many days ago this particular message would have come in.

20        You can see the X there which would have deleted a

21    message.  And then down here at the bottom, you can see the

22    1 and 2 like we've seen on some of the previous screens

23    indicating that at present, as of December 8th, this

24    particular account had at least two pages worth of messages or

25    a little bit less than two pages of messages.

1    Q.   So if a user clicked on that -- is that a hyperlink where

2    it says "RE: Interesting"?

3    A.   Yes.

4    Q.   And what happens if a user clicks on that hyperlink?

5    A.   Once a person would click on that, then they would go and

6    actually open and see a message, just like would happen with

7    Yahoo, Google or Hot Mail.

8    Q.   There are messages on this exhibit that appear to be from

9    a user ne14pthc.

10   A.   Yes.

11   Q.   Are you familiar with that user account?

12   A.   Yes, I am.

13   Q.   Who was that user?

14   A.   That was my undercover account while I was accessing

15   PedoBook as just a regular user.

16   Q.   And what's the significance of the user name?  What did

17   it convey?

18   A.   It's essentially just shorthand for anyone for preteen

19   hard core, ne14pthc.

20   Q.   Moving to page 2 of Exhibit 4, just generally what do we

21   see there?

22   A.   You see a continuation of the messages that are located

23   in this particular inbox.  All of the columns and what they

24   represent remain the same.

25   Q.   On the right side of Government Exhibit No. 4, if I can

1    just draw your attention to the two lines, Inbox and Sent

2    Messages, what would happen if you -- first of all, are those

3    hyperlinks?

4    A.   Yes.

5    Q.   What would happen if the user clicked on the Sent

6    Messages hyperlink?

7    A.   You would go and see all of the messages that this

8    particular user account had sent since the life of the account

9    unless he had deleted some of them.

10   Q.   Drawing your attention to page 3 of Government Exhibit

11   No. 4 -- let me back up and first go to the top left corner.

12   What user account is this related to?

13   A.   We're still in the user account for fuckchrist.

14   Q.   And what portion of the private message box are we in?

15   A.   Currently we're looking at the sent messages.

16   Q.   Is the structure of the sent messages box similar to what

17   you explained about the structure of the inbox?

18   A.   Yes, it's the name.

19   Q.   Briefly to -- drawing your attention, sorry, to page 4 of

20   Government Exhibit No. 4, what generally do we see there?

21   A.   We're still in the sent messages area.  And this is a

22   list of ten messages that were sent by the user fuckchrist to

23   different PedoBook members.

24   Q.   And page 5?

25   A.   The remaining four messages.

1          So all in all, it appears, according to the data that was

2     seized, that user fuckchrist had sent approximately 34

3     messages to other PedoBook user members -- or 24, I'm sorry.

4     Q.   Now, with what other -- on Government Exhibit No. 4, page

5     5, with what other user was user fuckchrist communicating

6     with?

7     A.   In this case, all of the messages seen are to PedoBook

8     member T-d-l-r-L-u-v-r, which could be interpreted to be

9     toddler lover.

10    Q.   Drawing you to page 6 of Government Exhibit No. 14 --

11    excuse me, page 6 of Government Exhibit No. 4, what's depicted

12    there?

13    A.   This would have been one of the sent messages sent by

14    fuckchrist to PedoBook member toddler lover.

15    Q.   So this is what you'd see when you actually clicked on

16    the hyperlink to -- when a user clicked on the hyperlink to

17    take you to the content of the message?

18    A.   Correct.  The sent message hyperlinks function exactly

19    the same as the received messages hyperlink.

20    Q.   Within this message, did the user fuckchrist communicate

21    any other communication medium to the user toddler lover?

22    A.   Yes.

23    Q.   And what was that?

24    A.   Secondary means of communication was identified as an

25    e-mail address, the e-mail address being

1      fuckchrist@tormail.org.

2      Q.   What is Tor mail?

3      A.   Tor mail was a web-based e-mail service that functioned

4      over the Tor network.  It essentially allowed individuals that

5      were able to access it to send and receive e-mails anonymously

6      so that they could not be traced back to the actual user.

7      Q.   Was that part of or separate from the PedoBook website?

8      A.   Like Tor Chat, it was completely separate from PedoBook.

9      You do not need either a Tor Chat or Tor mail address in order

10     to visit or create an account on PedoBook.

11     Q.   Directing your attention to page 7 of Government Exhibit

12     No. 4, to whom was this private message addressed?

13     A.   This private message was also sent to user toddler lover.

14     Q.   There is a term or abbreviation here making a reference

15     to NLF.  Are you familiar with that?

16     A.   Yes.

17     Q.   What does NLF refer to?

18     A.   In the context of PedoBook and during the time of this

19     investigation, we came to discover that the initials NLF or

20     the letters NLF were shorthand for a group of individuals

21     producing a video.  The letters themselves stood for No Limits

22     Fun.

23     Q.   And the reference to screen captures, what is that

24     referring to?

25     A.   Screen captures are -- in this case, would be referring

1    to small screen captures of a video as it was being played.

2    The screen captures themselves would be very similar to what

3    you're seeing on your monitor right now, strictly -- but it

4    would be like an individual frame from the video that was

5    being produced.

6    Q.   Drawing your attention to Government Exhibit No. 4, page

7    8, to whom is this message sent?

8    A.   Again, this is being sent to toddler lover from the user

9    account fuckchrist.

10   Q.   What location information did the user reveal in that

11   message?

12   A.   In this instance, fuckchrist seemed to indicate that he

13   was in the vicinity of the District of Columbia, Virginia, or

14   Maryland area, in that vicinity.

15   Q.   Page 9 of Government Exhibit No. 14, who sent this

16   message?

17   A.   This message was sent from user toddler lover to user

18   fuckchrist.

19   Q.   And did the user toddler lover communicate any other

20   communication medium back to user fuckchrist?

21   A.   Yes, they did.

22   Q.   What was that?

23   A.   It was another tormail.org address.  In this case, the

24   e-mail address itself was noonewillknow321@tormail.org.

25   Q.   What about information about that user's location?

1    A.   This user also seemed to indicate that he lived in the --

2    he lived on the north side of the Beltway in Maryland.

3    Q.   And did user toddler lover communicate back about the NLF

4    screenshots?

5    A.   Yes, they did.  He stated, "I have seen a few of the NLF

6    screenshots but never seen one where they snuff the child.  I

7    would love to see those."

8    Q.   And moving to page 10 of Government Exhibit No. 4, from

9    whom was this sent and to whom?

10   A.   This was from user fuckchrist to user toddler lover.

11   Q.   And the content?

12   A.   In summary, the content is user fuckchrist is informing

13   toddler lover that he just sent him an e-mail.  Based on the

14   previous communications, I would interpret that to mean that

15   the e-mail was sent via Tor mail.  And the user fuckchrist

16   apparently wanted to actually meet up with user toddler lover

17   face to face at some point.

18   Q.   Directing you to page 11 of Government Exhibit No. 4, to

19   whom was this private message sent?

20   A.   This was a message from user fuckchrist to user

21   LilGAbuser.  Interpretation of that screen name could be

22   little girl abuser.

23   Q.   There's a reference in the content of the message to

24   Daisy's Destruction.  Are you familiar with that?

25   A.   Yes, I am.

1    Q.   What does Daisy's Destruction refer to?

2    A.   That refers to a series of, if I recall correctly,

3    approximately four videos that the No Limits Fun group was in

4    the process of creating and attempting to sell via Tor and the

5    Internet.  The video itself depicted a infant toddler,

6    probably no older than 2 or 3, being sexually abused by a

7    older female.

8    Q.   Page 12 of Government Exhibit No. 4, to whom was that

9    message sent?

10   A.   This is another message from user fuckchrist to user

11   LilGAbuser.

12   Q.   Does that message also discuss the -- is there any

13   reference to the Daisy's Destruction video in that message?

14   A.   Yes.

15   Q.   Moving to page 13 of Government Exhibit No. 4, to whom

16   was this message sent?

17   A.   This message was sent to myself at the -- at my

18   undercover account that I established on PedoBook.

19   Q.   And what video was the user fuckchrist discussing with

20   you in the course of this message?

21   A.   In this instance, we were discussing -- the reference

22   here is just to the NLF video, but the NLF video in question

23   would have been the Daisy's Destruction video.

24   Q.   And page 14 of Government Exhibit No. 4, to whom was this

25   message sent?

1   A.   Again, the message was sent to my undercover account by

2   the user fuckchrist.

3   Q.   What contact information did he share with you?

4   A.   He shared the Tor mail address fuckchrist@tormail.org.

5   Q.   There's a reference -- can you just read the last

6   sentence of that message from fuckchrist to you?

7   A.   "If you do a OPVA search on Jesuz," phonetic spelling,

8   J-e-s-u-z, "there is a boy about 10 that buries a crucifix in

9   his ass."

10  Q.   What is OPVA?

11  A.   OPVA was another Tor hidden service.  It's short for

12  OnionPedo Video Archive.  Whereas some sites on the Internet

13  may host strictly images, the OPVA site you can think more as

14  the YouTube version of that.  But all of the videos and files

15  that would be uploaded there were related to the sexual

16  exploitation of children.

17  Q.   Can you turn in the exhibit book in front of you to

18  Government Exhibit No. 64?

19  A.   Yes.

20  Q.   Do you recognize Government Exhibit No. 64?

21  A.   Yes, I do.

22  Q.   What do you recognize it to be?

23  A.   This is a screenshot of the home page of OPVA or

24  OnionPedo Video Archive.

25  Q.   Is it a fair and accurate copy of what the home page of

 1    that website looked like while it was still up and operating?

 2    A.   Yes, it is.

 3    Q.   At or about the time of your communication with the user

 4    fuckchrist on PedoBook?

 5    A.   Yes, from what I recall.

 6              MR. BECKER:  Your Honor, at this time the government

 7    would move to admit Government Exhibit No. 64.

 8              MR. BERRY:  No objection.

 9              THE COURT:  Exhibit 64 is received.

10              MR. BECKER:  May I publish Exhibit 64 to the jury?

11              THE COURT:  You may.

12    BY MR. BECKER:

13    Q.   Special Agent Gordon, do you see Government Exhibit No.

14    64 on your screen?

15    A.   Yes, I do.

16    Q.   Can you just tell us, just going across the screen, what

17    were the various categories on the top of the OnionPedo Video

18    Archive?

19    A.   The tabs that you can see at the top, the different

20    categories would be Jail Bait.  Jail bait is normally

21    considered to be the late teen, early 20 range of videos.

22    Then you have the Preteen, which would be children, both boys

23    and girls that look like they were not yet teenagers.

24    Normally this would entail that they had not yet had any type

25    of mature genital area, hair growth, things of that nature.

 1          Toddlers, obviously would be considered to be infants,

 2     probably below the age of 4, 3 or lower.  And then you have

 3     broader categories of Girls and Boys.

 4     Q.   Would a user have to log in to this site in order to see

 5     this page?

 6     A.   No.  This page would be visible just once you went to the

 7     site.

 8     Q.   And the categories that we've gone through at the top,

 9     are those what you described as tabs?

10     A.   Yes.

11     Q.   Special Agent Gordon, can you turn in your exhibit book

12     at this point to Government Exhibit No. 54A?

13     A.   Yes.

14     Q.   What do you recognize Government 54A to be?

15     A.   Oh, 54A.  This is a list of Onion sites and the

16     corresponding plain text name for that site.

17     Q.   Are you familiar with each of the Onion or Tor hidden

18     services that are depicted on that exhibit?

19     A.   Yes, either through directly visiting myself or based on

20     discussions with other agents.

21     Q.   Does it fairly and accurately depict both the URL and the

22     common name of the website in each instance?

23     A.   Yes, it does.

24          MR. BECKER:  Your Honor, at this time we'd move to

25     admit Government Exhibit No. 54A.

1              MR. BERRY:  No objection.

2              THE COURT:  Exhibit 54A is received.

3              MR. BECKER:  Permission to publish Exhibit 54A, your

4      Honor.

5              THE COURT:  You may.

6      BY MR. BECKER:

7      Q.  Just so we have this for reference, Special Agent Gordon,

8      can you just go through the -- you don't need to read the

9      entire URL, but just go through the names of the sites that

10     were depicted on Government Exhibit 54A.

11     A.  The normal names of the sites depicted here are Hurt 2

12     the Core, Lolita City, Onion Pedo Video Archive, TS Chan, Cam

13     a Lot, Sciclay cams, All Natural Spanking, the number 4 then

14     pedo, Tor Mail, and PedoEmpire.

15     Q.  First, can you turn in the binder in front of you to

16     Government Exhibit 54?

17     A.  Yes.

18     Q.  Have you had an opportunity previously to review the

19     contents of Government Exhibit 54?

20     A.  Yes.

21     Q.  Are each of the URLs on Government Exhibit No. 54A

22     contained within Government Exhibit 54?

23     A.  Yes, they are.

24     Q.  Just with respect to -- back to 54A, if we can just go

25     through and just have you give a brief description of the

```
 1    content available on each of the sites.  You've already talked

 2    about Hurt the Core and the OnionPedo Video Archive.  What was

 3    Lolita City?

 4    A.   Lolita City was another Tor hidden service.  Its primary

 5    material that it would allow to be uploaded were images.  At

 6    the time or shortly after the investigation into PedoBook,

 7    Lolita City itself had approximately one million images

 8    located on it.

 9         TS Chan was just another website that focused on the

10    distribution and communications related to child exploitation

11    material.

12         Cam a Lot and Sciclay cams were both video sites.  The

13    perception that was given by the sites were that the

14    individuals that were uploading the videos were either hacking

15    into minors' computers and secretly recording them, or they

16    would get them to communicate with them through some type of

17    video chat, such as Skype or something similar, and either

18    convince them to perform sexual acts over the camera or acts

19    that could be used for sexual arousal over the camera which

20    was then recorded and then published up onto one of these two

21    sites.  Or after the initial video was created, the minors

22    could potentially be forced or extorted into producing more

23    material.

24    Q.   The All Natural Spanking?

25    A.   The All Natural Spanking, if I recall correctly, that was
```

1        one oriented more towards images of corporal punishment, such

2        as spanking of minors.

3             4 pedo itself primarily was another image-sharing site

4        with private messaging, if I recall correctly, and the ability

5        to post messages.

6             Tor mail, we already spoke about, essentially a Hot Mail

7        or Gmail that would function over the Tor network that would

8        allow individuals to communicate anonymously without IP

9        addresses being able to be tracked so they can be located.

10            PedoEmpire was a centralized URL for a series of child

11       exploitation sites operated by a single individual.

12       Q.   Thank you.

13            Special Agent Gordon, during the course in time that the

14       FBI was in control of PedoBook, was user activity monitored?

15       A.   Yes, it was.

16       Q.   And were logs created of that user activity?

17       A.   They were.

18       Q.   During that time, were communications engaged in on

19       PedoBook passing through Omaha, Nebraska?

20       A.   Yes, they were.

21       Q.   Why is that?

22       A.   The server that operated PedoBook was originally located

23       in Bellevue, Nebraska.  And then after its seizure, it was

24       eventually moved to an FBI facility in Omaha itself.

25       Q.   So private messages, image hostings, all of that would

1      travel through that server in Omaha?

2      A.   Yes.   That's ultimately where all this data resided.

3      Q.   That would also be the case for a user who is actually

4      acting or at a computer outside of the District of Omaha?

5      A.   Correct.  All of the private messages, all of the images,

6      all of the content that was uploaded to PedoBook, despite the

7      fact that a person could be seen at their computer in

8      Maryland, the actual images and everything would actually be

9      residing on the server located here in Nebraska.

10          And when we were monitoring it, it would have been in

11     Omaha, Nebraska.

12     Q.   If I could direct your attention to Government Exhibit

13     No. 7.  Now, up until this point, Special Agent Gordon, we've

14     been looking at what you described as screenshots.

15          First, starting with Government Exhibit No. 7, where is

16     the data that is located within this exhibit and the ones that

17     follow coming from?  Where was that data generated from?

18     A.   All of the data in many of the exhibits that are going to

19     be presented next are actually being derived from the data

20     that was as it existed on PedoBook on December 8th of 2012.

21          The exhibits themselves are not going to look like they

22     would have on PedoBook.  They've been put in more a summary-

23     type exhibit to show strings and identifiers and particular

24     dates and times when things might have happened.

25          We did this when we were in the process of investigating

1   PedoBook in order to speed the investigation and make it

2   easier than having to click through the website and follow

3   hyperlinks all over the place.

4   Q.   All right.  So Government Exhibit No. 7, page 1, if we

5   can zoom in towards the center of the exhibit, what do we see

6   here?

7   A.   This is a summary of the user fuckchrist's -- or the

8   account fuckchrist's profile information that we saw

9   previously.

10  Q.   Just going from top to bottom, there's a category for

11  user GUID.  What is that?

12  A.   The GUID, or global unique identifier, is a unique number

13  that was assigned by PedoBook to pretty much everything that

14  happened on PedoBook.

15       In other words, if a user created an account, they would

16  get a unique number.  If somebody uploaded a file, it would

17  get a unique number.  If a person sent a private message, it

18  would get a unique number.

19       Everything had some type of unique identifying value so

20  that the website could reassemble it and present it on the

21  browser screen correctly.

22  Q.   We see display name and user name next.

23  A.   Yes.  The display name would be the name -- the display

24  name itself would be the name that would be visible when

25  individuals were communicating or talking with this particular

1    user.

2         The user name would be what would be utilized to log in

3    to the account itself.

4    Q.   Does this exhibit tell us when that user account was

5    created?

6    A.   Yes.  The account was initially created on April 18th of

7    2012, at approximately 8:55 p.m. UTC or universal coordinated

8    time, roughly equates out to Greenwich mean time or zulu time.

9    Q.   And this is something that we'll be talking about, but

10   what is UTC as opposed to other time zones?

11   A.   UTC is for main computer applications and server setups,

12   that's the default time that everyone will use just so there's

13   a particular baseline and you're not having to adjust the

14   times all over the place.

15   Q.   How do you translate UTC time into another time zone,

16   such as central time as we are here in Omaha?

17   A.   To do that, you would have to look and see exactly how

18   many time zones are located between the location for UTC and

19   where you're actually sitting.

20        In the case of going to Omaha here, you would subtract

21   that value and then also have to adjust it for daylight

22   savings time.

23   Q.   Okay.  So wherever we see UTC, that's the particular time

24   zone that we're looking at?

25   A.   Correct.  It roughly equates out to that was the time in

 1    England.

 2    Q.    When was the fuckchrist PTasseater account last updated?

 3    A.    It was last updated on December 8, 2012, at 9:39.

 4    Q.    When was it last logged in to?

 5    A.    Last logged in to same date and time, December 8, 2012,

 6    at 9:39 p.m.

 7    Q.    When was the last action taken by that account?

 8    A.    The last action was taken on December 8, 2012, at

 9    10:20 p.m.

10    Q.    And then is there any other user-provided information

11    that we see on this exhibit?

12    A.    Yes.  The last two bits of information that were entered

13    by the user are the "About Me" and "Interests".  The About Me,

14    "have many perversions."  And then you see a capital B there.

15    That's a formatting issue with the way that PedoBook would put

16    in spaces or additional lines.  "Contact me for fantasy chat."

17    And then the Interests, "rimming, exhibitionism, piss and

18    incest."

19         These two lines of information, if I recall correctly,

20    correspond with the user information as it was presented from

21    the fuckchrist PedoBook account as we were looking at it from

22    the website itself.

23    Q.    Just remind us what's the significance of the date,

24    December 8, 2012, to the investigation?

25    A.    December 8, 2012, was the date that PedoBook was removed

 1   from being online.

 2   Q.   So this user was still active as of the time the board --

 3   the site was shut down?

 4   A.   Yes.

 5   Q.   Moving to Page 2 --

 6          MR. BERRY:  Your Honor, just -- before we have -- has

 7   this exhibit been received?  I just wanted to make sure this

 8   was received.  I didn't have that marked from yesterday.

 9          MR. BECKER:  Yes.

10          THE COURT:  Hold on, and let me verify on my list.

11   Yes.

12          MR. BERRY:  Thank you, your Honor.

13   BY MR. BECKER:

14   Q.   Special Agent Gordon, moving to page 2 of Government

15   Exhibit No. 7, what do we see depicted on page 2?

16   A.   This is a summary report for the PedoBook user

17   fuckchrist.  The title of it is Annotations.

18          All the data that is being shown here represents answers

19   that user fuckchrist would have provided to various polls or

20   questions that were placed on PedoBook.

21   Q.   And then just left to right, what information do we have

22   about each of those particular actions?

23   A.   Left to right, you see the "post date" as it was recorded

24   within the logs itself.  You see the time as it was adjusted

25   to Eastern Standard Time.  Where the particular -- you see the

1    column that says "posted to," this would be where a particular

2    annotation or comment was made.

3         "Within group," if there was a particular group or area

4    of PedoBook where this poll was posted, other than just being

5    on the wire or somebody's personal page, it would show up

6    there.

7         And finally, the "content" itself is the actual answer

8    that would have been provided to that particular poll.

9    Q.   First, how is the conversion from UTC to Eastern Standard

10   Time accomplished?

11   A.   It's a subtraction of five hours.

12   Q.   I asked you yesterday whether or not there would be an

13   exhibit that would show answers to polls that the latest

14   activity showed the user fuckchrist had responded to.  Is this

15   that exhibit?

16   A.   Yes, it is.

17   Q.   So did the user fuckchrist respond to any polls on

18   December 8th of 2012?

19   A.   Yes, he responded to two.

20   Q.   And what was the content of those responses?

21   A.   The content of the first one was "cry".  The content of

22   the second one was, "Haven't yet, but would like to."

23   Q.   If I can direct you to Government Exhibit No. 2, page 4.

24   First, just remind us what's depicted on Government Exhibit

25   No. 2, page 4.

1    A.   This is the activity section of the PedoBook user account

2    fuckchrist.  It's on the Mine tab, meaning this was the

3    activity that was recently conducted by this particular

4    account.

5    Q.   And so with respect to the most recent poll question

6    that's depicted here, what would the user's poll response have

7    been?

8    A.   To the poll, "When you have your dick inside a child's

9    pussy, how do you like her to react?"  The answer would have

10   been "cry".

11   Q.   And the answer to the next most recent poll would have

12   been what?

13        MR. BERRY:  Your Honor, I'm going to object to this

14   line of questioning.  The exhibit is already in.  I don't

15   think a witness needs to read to the jury.  I'd also argue at

16   that point it's becoming unfairly prejudicial.

17        THE COURT:  What is the purpose of having each entry

18   read?

19        MR. BECKER:  Judge, I don't think it's evident from

20   the data itself that these correspond.  That's why the

21   testimony of Special Agent Gordon is necessary in order to

22   link these two exhibits together.

23        THE COURT:  All right.  I'll overrule for now.

24        You may proceed.

25   A.   The second poll was, "Have you ever had a sexual

1  encounter with an underage?  Looking to see if anyones [*sic*]

2  had sex with an underage.  I know a lot of people may say so

3  because we love to fantasize and it's a turn on, but looking

4  for honest answers."  If you can go back to the other exhibit

5  so I can...

6  BY MR. BECKER:

7  Q.  And showing you Government Exhibit No. 7...

8  A.  That answer would have been, "Haven't yet, but would like

9  too [*sic*]."

10      MR. BERRY:  Your Honor, I'll renew my objection and

11  move to strike that answer.

12      THE COURT:  The objection's overruled.

13  BY MR. BECKER:

14  Q.  Special Agent Gordon, Government Exhibit No. 8, the first

15  page -- first, what does this generally depict?

16  A.  This depicts a list of Collections or Groups that the

17  PedoBook user fuckchrist was a member or had access to.

18  Q.  And just let's start quantitatively, how many different

19  groups do we see on the first page?

20  A.  Fourteen.

21  Q.  Page 2 of Government Exhibit No. 8?

22  A.  Thirteen.

23  Q.  And page 3 of Government Exhibit No. 8?

24  A.  Five.

25  Q.  Just for the record, do all three of these pages describe

1    groups that were associated with the user fuckchrist?

2    A.   Yes.

3    Q.   And what information -- if I can move you to the top

4    column, what sort of information is available on these

5    exhibits regarding each of these groups?

6    A.   The name of the group under group name; the total number

7    of members allowed in or provided access to the group; the

8    type of access, whether it's public, closed; the individual

9    that created the group; the time that the group was created in

10   UTC; the last time something occurred in the group -- and if

11   you could scroll to the right a little bit?

12        Finally, the group description as it would appear in the

13   previous pages that we've seen the screenshots from PedoBook.

14   Q.   We had previously looked at a screenshot for a group,

15   Anything Goes - Hardcore Child Fucking.  Is that depicted on

16   this exhibit as one of fuckchrist's groups?

17   A.   Yes, it is.

18   Q.   Same question for Boys Hardcore.

19   A.   Yes.

20   Q.   And does this exhibit designate whether Boys Hardcore was

21   public or private?

22   A.   It was a private group.

23   Q.   Moving to page 2 of Exhibit 8, were there any groups

24   denoted on this page that were private that the user

25   fuckchrist was a member of?

1    A.    Yes.

2    Q.    What group was that?

3    A.    Kids with dogs & other animals.

4    Q.    And page 3 of Exhibit 8, any private groups depicted

5    there that fuckchrist was a member of?

6    A.    There were two.

7    Q.    Which groups?

8    A.    The first group is the 0-2 Year Little Girls Private

9    Sharing Group 2012.  The second one is Toddler Girls Forced.

10   Q.    Without reading the entire description, Special Agent

11   Gordon, what was the general -- what was the general content

12   of the group Toddler Girls Forced as described?

13   A.    The general type of material desired appeared to be -- or

14   what the individuals were supposed to provide in this group

15   appear to be focused on female infants or toddlers being

16   penetrated, bound, or having other type of sadomasochistic

17   acts performed on them.

18        Additionally, in the group -- in the title, it indicates

19   that it's a sharing group, meaning that if you were a member

20   of that group, at some point you were going to be expected to

21   share material or you would get kicked out and removed from

22   the group.

23        Also, later on in the description, it appears to talk

24   about if you're able to produce your own material and would

25   like to share this type of content in a more private closer

 1    environment, then you could contact the owner of this group

 2    and he would discuss this with you.

 3    Q.    Thank you.

 4          I direct you to Government Exhibit No. 5.  Exhibit 5 is

 5    in a little different format than we've seen, Special Agent

 6    Gordon.  What is the information that is depicted in this

 7    exhibit?

 8    A.    The information depicted in this exhibit would be the

 9    activity or locations or actions of user account fuckchrist as

10    it was logged on PedoBook.  In other words, this exhibit shows

11    the different locations that user fuckchrist went to,

12    different images he may have looked at, different actions he

13    would have taken, different groups he would have went to.

14    Q.    On what date does this log begin?

15    A.    This log begins on November 19, 2012.

16    Q.    And directing your attention to the last page of the

17    exhibit, and that is page 14, on what date does this log

18    information end?

19    A.    December 8th, 2012.

20    Q.    What's the significance of those dates, November 19th and

21    December 8th?

22    A.    November 19th would have been the date that the FBI

23    started monitoring the PedoBook site.  And December 8th would

24    be the day that we ceased monitoring and removed PedoBook from

25    the Internet.

GORDON - DIRECT                                                    227

1    Q.   Was this sort of information available for activity prior

2    to November 19th?

3    A.   This type of detailed activity, no.

4    Q.   Why not?

5    A.   As part of our monitoring of the site, we wanted to be

6    able to attribute individuals that would visit the website

7    itself with the actions that they took.  So we turned on

8    additional logging that is shown here for certain areas of the

9    site itself.

10        Prior to the November 19th date, the only information

11   that we have about what someone would have done would have

12   been information that PedoBook itself would have recorded,

13   such as if the user made a comment on May 5th, we would be

14   able to go back into those records, see that particular user

15   ID and say, okay, this user account made this posting in this

16   group.

17        But as far as any information that PedoBook might not

18   have recorded, such as if a person was just going and looking

19   at images without commenting on them, or going and reading

20   private messages or things of that nature, we would not have

21   had any record of that.

22   Q.   All right.  So let's start on the top left and just go

23   left to right, if you can describe the sort of information

24   that's available on Government Exhibit No. 5.

25   A.   The first two columns correspond to the same type of

 1     information that we saw on the previous exhibit, the date and

 2     time as recorded in UTC and then the second column shows the

 3     conversion to Eastern Standard Time.

 4          The next column shows a unique session ID that was

 5     assigned to each visitor for each visit that they -- when they

 6     went to the PedoBook site.  This session ID, we utilized that

 7     to assist us in the tracking of where an individual would be

 8     going and what they would be doing.

 9     Q.   When does a session start?

10     A.   A session starts once a person first goes to the site.

11     Q.   When does a session end?

12     A.   A session ends once the browser or the tab is closed.

13     Q.   Or if a user hits the log-out button?

14     A.   Correct.

15     Q.   And the second-to-the-last column on the right?

16     A.   The second-to-the-last column on the right shows the

17     particular action or particular area of PedoBook that was

18     occurring on that date and time.

19          From looking at the URLs or from looking at the

20     information itself, reading them from left to right, you can

21     get a pretty good understanding of the exact actions that were

22     being taken by this user during this particular session.

23     Q.   And there's one more column, file name, on the right of

24     the exhibit.

25     A.   File name indicates files or images that a user would

1    actually have clicked on or viewed in its full-size capacity.

2    We previously talked about the small thumbnail images; and if

3    you clicked on them, you would see them in a larger format.

4    The only time a file name would be showing up in this

5    particular column is if a user actually clicked on a thumbnail

6    to see a larger image.

7    Q.   Let's go through this first entry here.

8         Was there a session engaged in by the user fuckchrist on

9    November 19th of 2012 starting at 5:54 p.m. Eastern Standard

10   Time?

11   A.   Yes.  And that particular session ran till 6:40 p.m.

12   eastern standard time.

13   Q.   And how do you know that that one particular session ran

14   from 5:54 p.m. until 6:40 p.m.?

15   A.   From the information recorded in the logs.

16   Q.   And can you just sort of trace along or draw us an

17   indication of that particular session?

18   A.   (The witness complies.)

19   Q.   If we move a bit to the right, can you just sort of

20   narrate for us what this exhibit tells us about what the user

21   fuckchrist did during that session between 5:54 and 6:40 p.m.?

22   A.   From looking at the information, it looks like the user

23   account fuckchrist went to the Anything Goes - Hardcore Child

24   Fucking group.  He then went to private message inbox and read

25   several e-mails or private messages.

1   Q.   There's some numbers -- on the third line down, where it

2   says messages/read/ then there's a series of numbers, what's

3   the significance of those numbers?

4   A.   Those numbers would represent the particular private

5   message that the user account fuckchrist had read.

6   Q.   As you said -- is this what you described before, that

7   the site assigns a particular number to each action?

8   A.   Yes.

9   Q.   Please continue.  Let us know, what does this show the

10  user did during the rest of that session?

11  A.   At this -- at some point while he's in his private

12  message box, it looks like he composes a message or starts to

13  compose a message.  He reads another private message.  He then

14  goes to the group's Spanking Little Girls and Boys;

15  Northeastern USA Baby Toddler Rapers Unite.

16       He then goes to Babies and Toddlers.  Then he goes and

17  looks at a file.  It's entitled Delicious Baby Pussy with a

18  file name of 20876.jpg.

19  Q.   And what does that entry in a file name column indicate?

20  A.   It indicates that he used the full-size image as opposed

21  to just the smaller thumbnail.

22       After viewing that image, it then looks like he went to

23  look at another user account, LoverBoyX.  That could

24  potentially be the individual that posted that particular

25  image that he looked at.

1          Then he goes and looks at another file called Cock in

2     Baby Mouth with a file name 1yo-g-02-03.jpg.

3          Finally he goes to another group and looks at all the

4     images that are in that group, it looks like.

5     Q.   And the series of numbers in this last entry during that

6     session you've been describing, those numbers refer to what?

7     A.   I believe those are referring to the files located in a

8     particular user's profile, kind of like their own private

9     collection.

10    Q.   And just to be clear, how do we know that that session

11    ended at 6:40 p.m.?

12    A.   Because that was the final time that was shown at the --

13    in the logs that were being monitored.

14    Q.   And the next entry down, how does the session ID compare

15    to the previous one and the entry beginning on November 20th,

16    2012?

17    A.   It's a completely different session ID.

18    Q.   Just directing your attention to page 4 of Government

19    Exhibit No. 5, was there a session engaged in by this user on

20    November 21st of 2012?

21    A.   Yes.

22    Q.   And can you just narrate the conduct that the user

23    engaged in starting at 6:20 p.m.?

24    A.   6:20?  All right.

25          At approximately 6:20 p.m. eastern standard, the

 1    individual using user account fuckchrist started looking at a

 2    series of images titled Baby Sex with a number following it.

 3    That proceeded until approximately 6:21, at which point he

 4    went back into his private messages.  Then that's when that

 5    session ended.

 6            THE COURT:  It is now approximately 10:30.

 7        Let's go ahead and take our mid-morning break.  Please

 8    reconvene in the jury room at 10:45, and we'll start again.

 9        We're now in recess.

10        (Jury out and recess taken at 10:30 a.m.)

11        (At 10:51 a.m. on August 20, 2014, with counsel for the

12    parties and the defendant present, and the jury NOT present,

13    the following proceedings were had:)

14            THE COURT:  The marshals have made a call to the

15    Douglas County jail facility and spoke to an individual who

16    has the authority to make some of the changes that you

17    requested, Mr. DeFoggi.

18        So we anticipate that the issue concerning showering,

19    shaving, access to medications, and access to your legal

20    materials will all be resolved.

21        We will revisit this tomorrow to see how things go

22    tonight.  If there continues to be difficulty in some of those

23    areas, we have other options that we can explore.

24            THE DEFENDANT:  Thank you, your Honor.

25            THE COURT:  I'm optimistic that the issue will be

1    resolved.

2         All right.  Please bring in the jury.

3         P. MICHAEL GORDON, PREVIOUSLY SWORN, RESUMED THE STAND

4         (Jury in at 10:53 a.m.)

5              THE COURT:  Mr. Becker, you may continue with your

6    direct examination.

7              MR. BECKER:  Thank you.

8                     DIRECT EXAMINATION (Cont'd.)

9    BY MR. BECKER:

10   Q.   Special Agent Gordon, we left off reviewing Government

11   Exhibit No. 5.  I'm just going to ask you to describe for us

12   the activity that the log shows the user fuckchrist engaged in

13   on PedoBook from 8:27 a.m. to 8:36 a.m. on November 23rd,

14   2012.

15   A.   I'm sorry, what were those times again?

16   Q.   Sure.  The date November 23rd, 2012.

17   A.   Okay.

18   Q.   The time beginning at 8:27 a.m. and going to 8:36 a.m.

19   A.   All right.  The user account fuckchrist first went to a

20   group profile.  The group was pedocinemaxxx-pedovids-with-no-

21   limits.  He then went to another group profile, frh-bt-sich.

22   He then visited another group, Babies and Toddlers.  And

23   then he -- if you could scroll to the right?  Thank you.

24        He then looked at a full-size image, no name for the

25   image, just the numbers of the file name.  The file name

1    itself was 135165514948.jpg.  He then looked at a second and a

2    third image, those two images being img_1803 and

3    toddlerboy1.jpg.

4         It looks like he then went back to the Babies and

5    Toddlers group looking at all the files that were visible

6    there.  And then it looks like he looked at another file,

7    61631691316227.jpg.  And then he looked at what appears to be

8    a video file, the name of that file being

9    Baby_Allison-(under1yo)-cumshot_chest+face.avi.

10   Q.   What does the .avi signify?

11   A.   The .avi signifies that it's a video file.

12   Q.   All right.  Directing your attention to Exhibit 5A, what

13   is generally depicted on Exhibit 5A?

14   A.   This shows the user activity for user fuckchrist on

15   November 21st between 5:57 a.m. and 2:04 p.m. with multiple

16   sessions being covered.

17   Q.   Is it fair to say this is a subset of the information

18   that's on Government Exhibit 5?

19   A.   Yes, it is.

20   Q.   And how many individual sessions are described on

21   Exhibit 5A?

22   A.   There are two.  There's one that starts with bd and

23   there's one that starts with kj.

24   Q.   Is there a corresponding exhibit that shows what the user

25   was seeing on each of these pages on PedoBook as of the date

1    it was seized?

2    A.   Yes, there are.

3    Q.   All right.  If you could just describe for us where the

4    user went during these two -- where the user fuckchrist went

5    during these two sessions on November 21st, 2012.

6    A.   For the session starting bd, he went to four different

7    locations.  Again this is just a summary.  He looked at a file

8    called Let Us Wank Together, It Make Fun.  The actual name of

9    the file is 3.jpg.

10        And from 5:57 to 6:05, he looked at -- if you can scroll

11   to the left a little bit -- he looked at two additional files,

12   one of them titled Open Legs, file name 13016128602 and

13   another video file titled 3month-baby1.avi, the actual file

14   name itself being 3month baby(1).avi.

15        And the last -- in the second session that's visible on

16   this page, he went to the group Babies and Toddlers and then

17   looked at an image.  The title of the image is essentially the

18   file name itself, that being 61631691316143.jpg.

19   Q.   All right.  If I could direct you to Government Exhibit

20   No. 6A, first what do we see on the first page of Government

21   Exhibit No. 6A?

22   A.   This is the group Babies and Toddlers.

23   Q.   And the second page of Exhibit 6A?

24   A.   This would be -- if you could scroll down a little bit.

25   This would be a portion of the files that were uploaded to the

1    Babies and Toddlers group.

2    Q.   The second file name from the bottom, do you recognize

3    that particular file name?

4    A.   Yes.

5    Q.   And how do you recognize it?

6    A.   That was one of the files that we recorded as user

7    account fuckchrist having not just viewed the thumbnail as

8    seen here but actually accessing the full-size image.

9    Q.   Just to take a quick step back, if we look again at

10   Government Exhibit 5A, where do we see that depicted on

11   Exhibit 5A?

12   A.   It should be right there (indicating).

13   Q.   Just for the record, you've pointed to the last entry on

14   the bottom of Exhibit 5A; is that correct?

15   A.   Correct.

16   Q.   Moving back to Government Exhibit 6A, page 3, what is

17   depicted on Government Exhibit 6A, page 3?

18   A.   It's an image -- it's an image that -- if you could

19   scroll to the left a bit?  In the address bar is the URL for

20   where this particular image is located, that URL being file/

21   view/201263/61631691316143jpg.  The file itself is the same

22   series of numbers that I read off.

23       The image on the page shows two young males, one of them

24   looks a little bit older than the second one, sitting in an

25   inflatable pool.  One of the -- appears to be the younger male

 1   is nude and is bending over in the pool with his genitalia

 2   visible to the camera.

 3   Q.   What is the -- what's at the center of the focal point of

 4   the image?

 5   A.   The focal point of the image appears to be the younger

 6   male who appears to be nude and his genitals.

 7   Q.   Moving to page 4 of Exhibit 6A.  First, let's start in

 8   the top left-hand corner.  What's the URL after the .onion in

 9   the top left?

10   A.   File/view/210835.

11   Q.   And the title of the image that's displayed?

12   A.   Let Us Wank Together It Make Fun.

13   Q.   And what's depicted in the image itself?

14   A.   The image depicts a prepubescent underage male with his

15   underwear and his pants or shorts around his ankles, touching

16   his penis, while he's looking at an adult male off to his left

17   that has his shirt pulled up and also has his penis removed

18   from his pants with his right hand holding it towards the

19   minor male.

20   Q.   What comment is located above the image itself?

21   A.   "If your little prick get stiff my sweet boy."

22   Q.   Just to go back briefly to Exhibit 5A, do we see a

23   reference to that particular image or page on Exhibit 5A?

24   A.   Yes.  It's the very first entry that occurs at 5:57.

25   Q.   And back to Exhibit 6A, page 5, first the URL for this

1    particular image after .onion?

2    A.   The URL is file/view/208041.

3    Q.   And what does the image itself depict?

4    A.   The image itself depicts a minor male prepubescent lying

5    on a bed nude.  He's using his hands to hold his knees up

6    above his waist, exposing his genitals.  The focal point of

7    the image appears to be the child's genital area.

8    Q.   Move to page 6 of Government Exhibit No. 6A, the URL

9    after .onion?

10   A.   The URL is file/group/79458.

11   Q.   And what page does that correspond to, according to the

12   web page itself?

13   A.   These are the files that were uploaded to the group Just

14   Baby Boys.

15   Q.   And page 7 of Government Exhibit 6A, first the URL?

16   A.   File/view/104681.

17   Q.   And what was available at that URL?

18   A.   This was the video file 3month baby(1).avi.

19   Q.   And going back to Exhibit 5A, how do those pages -- do

20   you see references to those pages in Exhibit 5A?

21   A.   Yes.  References to those pages appear at the 5:57 and

22   the 6:05 locations within the logs.

23   Q.   And the entry in the file name category for 3month

24   baby.avi indicates what?

25   A.   That that video was actually clicked on and viewed.

1    Q.   Moving to Exhibit No. 5B, what activity is depicted on

2    Exhibit 5B?

3    A.   This is another session that occurred for user fuckchrist

4    at 4:55 a.m.  He viewed a single file, file name 957302.jpg.

5    Q.   Showing you Government Exhibit 6B, what is depicted on

6    Government Exhibit 6B?

7    A.   In the top left is the URL, file/view/222585.  The file

8    name itself is 957302.jpg.  The image depicted at this

9    location shows a infant or toddler with their head being held

10   by what appears to be an adult or pubescent female being

11   placed between her legs forcing them to perform oral sex on

12   her.

13   Q.   At the bottom of this particular page, there's a

14   reference to NLF.  What is the significance of that?

15   A.   NLF was the three letters associated with the video

16   Daisy's Destruction and the group that was in the process of

17   making it.  This is one of the screenshots from either

18   promotional material or one of the actual videos.

19   Q.   Government Exhibit 5C, what's contained in this exhibit?

20   A.   This shows a portion of activity conducted during a

21   single session between 6:36 p.m. and 6:47 p.m.

22   Q.   On what date?

23   A.   December 4th, 2012.

24   Q.   And in terms of the pages viewed, is there any connection

25   between the pages that were viewed by user fuckchrist on

1    December 4th during this session?

2    A.   It appears that all of them related to user jackspade.

3    Q.   How can you tell?

4    A.   Up here (indicating) in the first one where it says

5    file/owner and then jackspade, that would indicate either the

6    user or the group -- in this case I believe it's a user --

7    indicating that he went to that user's profile.  And then the

8    subsequent entries showed that the individual appears to be

9    looking through images that were uploaded by jackspade to his

10   collection.

11        And if you could scroll to the left?  And then accessing

12   two of them.

13   Q.   I'm not sure that I asked you, with respect to Exhibits

14   5B and 5C, are those -- is that a subset of data extracted

15   from Exhibit No. 5?

16   A.   Yes.  Both of those are subsets of data, the same as

17   5A was.

18   Q.   Showing you Government Exhibit 6C, what does Government

19   Exhibit 6C depict?

20   A.   This depicts -- in the top left you can see the file

21   owner jackspade URL.  The page itself depicts two files that

22   were uploaded by jackspade or to jackspade's personal profile.

23   Q.   Page 2 of Government Exhibit 6C?

24   A.   These are more files.

25   Q.   And what's the -- the very last piece of the URL, what

1    does that say after the question mark?

2    A.   Offset equals 10.

3    Q.   Page -- excuse me, page -- page 3 of Government Exhibit

4    No. 6C?

5    A.   Again, these are files uploaded by jackspade.

6    Q.   And the last portion of the URL after the question mark?

7    A.   Offset equals 20.

8    Q.   Is that a comment or signifier of browsing through pages

9    of a particular section?

10   A.   Yes.  The number in the offset would roughly correspond

11   to how many images were located within that particular user's

12   profile.

13        Usually when you went to the very first page, if I recall

14   correctly, there was not an offset, but subsequent pages would

15   have an offset.

16        So in this case, the offset of 20 would mean that at this

17   point, there had been, depending on how many pages are

18   actually at the bottom, there's up to 30 images that would

19   have been uploaded.

20   Q.   So the first page of a user's file would just say the

21   user's name?

22   A.   Correct.

23   Q.   And then the second page would be offset 10?

24   A.   Third page would be offset 20.

25   Q.   Showing you page 4 of Exhibit 6C, what does that exhibit

1    depict?

2    A.    In the top left is the URL file/view/45947/my-niece-suck/

3    uneditedjpg.  The page itself depicts what appears to be a

4    minor female performing or forced to perform oral sex on an

5    adult male.

6    Q.    Going back to page 3 of Exhibit 6C, do you see that image

7    listed on the files belonging to user jackspade or uploaded by

8    user jackspade?

9    A.    I do.  It's the fourth entry down.

10   Q.    And page 5 of Government Exhibit 6C, the URL first.

11   A.    The URL is file/view/45942/lc/732jpg.  The image itself

12   depicts a minor probably prepubescent female performing oral

13   sex on either a fairly pubescent or possibly prepubescent

14   minor male.

15   Q.    And going back to page 3 of Government Exhibit 6C, is

16   that file name contained within that page of jackspade's

17   files?

18   A.    Yes, it is.  It's the seventh entry down.

19   Q.    And the last page, page 6 of Government Exhibit 6C, first

20   the URL, what's the offset on this one?

21   A.    Offset 30.

22   Q.    Indicating that's the fourth page of jackspade's --

23   A.    That would be the fourth page, yes.

24   Q.    Showing you Government Exhibit No. 5D, what is on Exhibit

25   5D?

1    A.   Again, this is a summary of information previously

2    presented complete within Exhibit 5.  It details two sessions,

3    both of which occurred on December 8th.

4         The first session detail starts with qv.  The second

5    session starts with vv.

6    Q.   During the first session, what were two of the example

7    pages that the user fuckchrist accessed?

8    A.   In the first instance, the user fuckchrist accessed a

9    file at URL file/view/254105/what-a-big-cock, file name

10   874820.jpg.

11        The second entry shows that he visited a group titled

12   Hung Boys.

13   Q.   And during the second session on December 8th?

14   A.   He accessed a single file at 4:56 p.m.  The URL for that

15   was file/view/245934/hungry-.  The file name itself was

16   thumbnail.php.jpg.

17        The final three entries show that the user account

18   visited the three groups, Anything Goes Hard Core Child

19   Fucking; the second group was Young Boys Getting Fucked; and

20   the third group was Hurt-the-Core.

21   Q.   Showing you Government Exhibit No. 6D, the first page of

22   Government Exhibit 6D, what is that?

23   A.   The URL for this particular page is file/view/254105.

24   The title of the file or the page is What a Big Cock.

25        The image itself appears to depict a pubescent or

1   possibly prepubescent minor male, nude from the waist down,

2   using a cell phone to take a picture of himself in what

3   appears to be a bathroom mirror.  The minor male's genitals

4   are visible in the picture.

5   Q.   The second page of Government Exhibit 6D?

6   A.   The URL is groups/profile/230978/hung-boys.  This is the

7   home page or the front page for the PedoBook group Hung Boys.

8   Q.   What's the avatar image for that group?

9   A.   The avatar image for that group appears to be a pubescent

10  male with his genitals exposed through the left leg of a pair

11  of shorts.

12  Q.   Page 3 of Government Exhibit 6D?

13  A.   URL is file/view/245934.  The title of the page file is

14  Hungry with a question mark.  The image itself depicts a

15  prepubescent male, possibly a toddler, lying nude in a bed or

16  some type of blanket or cushion.  His genitals are visible

17  within the image itself and appear to be the focal point.  The

18  minor itself could possibly be asleep and appears to have a

19  pacifier in his mouth.

20  Q.   Page 4 of Government Exhibit 6D?

21  A.   This is the home page -- I believe we've seen this

22  previously.  The URL is groups/profile/213149, which is the --

23  and this is the home page for Anything Goes -- Hardcore Child

24  Fucking group on pedo.

25  Q.   And you had previously described that avatar; is that

1    correct?

2    A.    Yes.

3    Q.    Page 5 of Government Exhibit 6D?

4    A.    Page 5, the URL is groups/profile/99149.  The group

5    itself is Young Boys Getting Fucked.

6    Q.    What is the avatar -- please describe the avatar image

7    for this particular group as visible on Exhibit 6D.

8    A.    The avatar itself appears to be -- depicts what appears

9    to be an adult male anally penetrating a minor male.

10   Q.    And just for the record, page 6 of 6D.

11   A.    The URL is groups/profile/223633.  This is the home page

12   for Hurt the Core.

13   Q.    And you've previously described that home page.

14   A.    Yes.

15   Q.    Special Agent Gordon, just shifting back to the board

16   logs, did that include logs of the content of private messages

17   that the users exchange on PedoBook?

18   A.    Yes, it did.

19   Q.    I'm going to show you Government Exhibit 9.  What is

20   depicted in Government Exhibit 9?

21   A.    This is -- again this is another summary chart or summary

22   exhibit that was created from the data that actually existed

23   on PedoBook.

24        This is not how the information would have appeared to

25   users when they were looking at it on the website.  But this

1    is all of the private messages that were sent and received by

2    user fuckchrist as it resided in the files when they were

3    seized on December 8th.

4    Q.   And if you could just let us know from left to right on

5    Government Exhibit 9 the information that's contained within

6    this exhibit?

7    A.   Within this exhibit, the first column is who the private

8    message is from.  The second column indicated who the message

9    was being sent to.  The next two -- whoops.  The next two

10   columns depict the time in the log and the conversion to

11   eastern standard.

12       The next column is the title of the private message

13   itself.  And the final column called Description is the actual

14   content of the private message as it was sent.

15   Q.   In that last column, the Description column, there's some

16   text that has what we might call caret marks and a P at the

17   beginning and end.  What is the significance of that, if

18   anything?

19   A.   This is just formatting so the board will be able to be

20   rendered.  It has -- it doesn't really have any relevance to

21   the actual content or context of the file or the information

22   itself.

23   Q.   So the user wouldn't have typed that caret mark P?

24   A.   No.  That caret mark P could have been -- if I recall

25   correctly, I believe that would indicate formatting relevant

1      to, like, starting a new paragraph or some type of tab or

2      other formatting.

3          If you look throughout, you can see other little small

4      formatting things in there as well.  But the user would not

5      have actually typed that.  That would have been something that

6      the program put in there so when it gets rendered by your

7      browser, it knows what to do with it.

8      Q.    Just briefly, for the record how many pages is Government

9      Exhibit No. 9?

10     A.    Twenty-eight.

11     Q.    And between what dates does it include private messaging?

12     So what's the first date on the first page of the exhibit?

13     A.    The most recent exhibit -- or the most recent private

14     message recorded was December 8th, 2012.

15     Q.    And if we shift to page 28, the last page of Government

16     Exhibit 9, what's the earliest date where private messages of

17     user fuckchrist were still retrieved?

18     A.    The earliest date was April 18th.

19     Q.    So this data does extend back past the November 19th

20     point when the FBI assumed control of the site.

21     A.    Yes, because this was information that PedoBook actually

22     kept track of itself.  The logging that we required in order

23     to attribute where people were going is not something that

24     PedoBook did by itself.

25     Q.    I want to direct you to Government Exhibit 9A.  What is

 1    Government Exhibit 9A?

 2    A.    This is a list of private messages that were strictly

 3    sent by user fuckchrist on PedoBook.

 4    Q.    Fair to say this is an extraction of data that is in

 5    Exhibit 9?

 6    A.    Yes.

 7    Q.    Is the type of data that is available on Exhibit 9A the

 8    same as the type of data available on Exhibit 9?

 9    A.    Yes.

10    Q.    I want to ask you about a couple of particular examples

11    of private messages.

12        First on page 1, can you read the content of the private

13    message on December 8th, 5:05 p.m. Eastern Standard Time?  Let

14    me start with who is it from?

15    A.    It was from user fuckchrist.

16    Q.    To whom?

17    A.    To user name ptch4u.

18    Q.    And just remind us who that was at that time.

19    A.    That was me.

20    Q.    Okay.  Without having to read it, have you previously

21    read and described the content of this message?

22    A.    Yes, previously testified about the additional contact

23    information provided by the user fuckchrist being

24    fuckchrist@tormail.org, as well as the referral to the OPVA,

25    OnionPedo Video Archive site.

```
 1    Q.   Within these private messages -- first, have you reviewed

 2    the private messages sent by the user fuckchrist?

 3    A.   Yes.

 4    Q.   Were there examples of the user requesting or soliciting

 5    child pornography from other users?

 6    A.   Yes.

 7    Q.   I direct you to page 3.  Can you read the message on

 8    November 16th, 7:37 a.m. Eastern Standard Time.  I direct your

 9    attention to that message.  First, do you see such a message?

10    A.   Yes, it's this one right here (indicating).

11    Q.   To what user was it sent?

12    A.   It was from user fuckchrist to user jamesb.

13    Q.   And the content of the message?

14    A.   The message was, "You ever share pics of your son?  My

15    e-mail is fuckchrist@tormail.org."

16    Q.   I direct you to page 5 of Exhibit 9A.  Did the user

17    fuckchrist send a message on October 30th at 4:45 p.m. --

18    excuse me, 4:45 p.m., yes.  Sorry.

19    A.   Yes.

20    Q.   To what user was it sent?

21    A.   Ukpervydad.

22    Q.   The content of the message?

23    A.   "Your gd is absolutely gorgeous naked.  You have any more

24    pics of her?"  After the question, "My e-mail is

25    fuckchrist@tormail.org.
```

1    Q.   And was there a message that was sent by fuckchrist just

2    above that message?

3    A.   Yes.

4    Q.   October 30th, 4:48 eastern standard?

5    A.   Yes.

6    Q.   What was the title of that message?

7    A.   "Son".

8    Q.   To whom was it sent?

9    A.   To user wintermute.

10   Q.   The content of the message?

11   A.   The content of the message was, "You ever take a pic of

12   him with his legs spread wide showing his beautiful cock and

13   balls and his dirty asshole?  Love when little ones don't get

14   wiped.  That's what a tongue is for."

15   Q.   Directing your attention to page 14, did the user send a

16   private message on April 26, 3:50 p.m.?

17   A.   Yes.

18   Q.   To what other user?

19   A.   It was sent to user Pervert4life.

20   Q.   The subject line?

21   A.   It was a reply to a previous message titled "Rape".

22   Q.   And the content of the message?

23   A.   Do you want me to read it or summarize it?

24   Q.   If you can read the content.

25   A.   Okay.  "I have a hard time finding pics and videos that

1   are violent enough to jack off to.  Spanking videos are okay

2   but I want to see one being brutally beaten and raped at a

3   minimum.  Lots of blood.  I would give my left nut to find a

4   real snuff video, you have no" -- in capitals -- "idea just

5   how brutal I can be with an infant or toddler if I had the

6   chance.  Have you been able to find any good videos?  God damn

7   I need to do a kill."

8   Q.   During the course of private messages, did the user

9   fuckchrist share information about his geographic location?

10  A.   Yes, he did.

11  Q.   I direct you to page 3.  Is there a private message that

12  he sent on November 16th at 5:58?

13  A.   Yes.

14  Q.   To what user?

15  A.   It was sent to user noonewillknow321.  The title was a

16  reply to a message titled "Hey".  In the content or the body

17  of the private message itself, user fuckchrist says, "In the

18  D.C. area".

19  Q.   Directing you to page 10 of Exhibit 9A, did the user send

20  a message on May 13th at 6:11 a.m.?

21  A.   Yes.

22  Q.   To what user?

23  A.   The message was sent to luvsmall.

24  Q.   What location information did he reveal in that message?

25  A.   The information he provided in this particular message

1   said, "I am south of DC."

2   Q.   Without reading the entire message, what was the rest of

3   the content between this message he exchanged with that user?

4   A.   Basically, it was a message wanting to meet and mutually

5   masturbate in a particular location, indicated he was an

6   exhibitionist.

7   Q.   Thank you.

8        Directing your attention to page 11 of Exhibit 9A, did

9   the user send a message on May 11th, 3:32 a.m.?

10  A.   May 11th at 3:32?  Yes.

11  Q.   To what other user?

12  A.   It was again sent to user name luvsmall, l-u-v-s-m-a-l-l.

13  Q.   And what location information did the user reveal in that

14  information?

15  A.   User fuckchrist indicated that they were in the Maryland/

16  DC/Virginia area.

17  Q.   In private messages, did the user fuckchrist also share

18  information about what time he was generally using PedoBook?

19  A.   Yes.

20  Q.   I direct you to page 5 of Exhibit 9A.  Did the user send

21  a message on October 27th at 2:11 p.m.?

22  A.   Yes.

23  Q.   To what other user?

24  A.   It was sent to user bill320.

25  Q.   And what type of information did the user share in that

 1    message?

 2    A.   According to user fuckchrist, he indicated that, "I am

 3    usually on around 4:30 or 5."

 4    Q.   What -- a.m. or p.m.?  Did the message indicate whether

 5    he meant morning or afternoon?

 6    A.   Based on the previous sentence, I would say it would be

 7    referring to 4:30 a.m. and 5 a.m., based on, "if you want to

 8    cam tomorrow morning."

 9    Q.   What does "cam" mean?

10    A.   Engage in a video chat.

11    Q.   Directing you also on page 5, did the user send a message

12    on October 27th at 2:05 p.m.?

13    A.   Yes.

14    Q.   To what other user?

15    A.   To bill320.

16    Q.   And what information about the time of using the site did

17    the user fuckchrist share in that message?

18    A.   He stated that he's usually on really early before his

19    roommate gets up, and clarified the time zone as being eastern

20    time.

21    Q.   Directing you to page 11, did he send a message on

22    May 10th at 3:25 a.m.?

23    A.   Yes.

24    Q.   To what other user?

25    A.   This message was again to user luvsmall.

 1    Q.   And the content of the message, did he share any time

 2    information at the end of the message?

 3    A.   Yes.  At the end of the message, he indicated he's on

 4    from between 3:30 to 6 a.m. every day.

 5    Q.   Special Agent Gordon, did you engage in undercover online

 6    communications with the user fuckchrist?

 7    A.   I did.

 8         MR. BECKER:  Court's indulgence briefly, your Honor.

 9         (Off-the-record discussion had.)

10    BY MR. BECKER:

11    Q.   Can you please turn in the exhibit book in front of you

12    to Government Exhibit 10?

13    A.   Yes.

14    Q.   Have you previously reviewed Exhibit 10?

15    A.   Yes.

16    Q.   What's the content?

17    A.   It's a combination of private messages sent via PedoBook

18    and e-mails sent via Tor mail between myself and user

19    fuckchrist on PedoBook and the Tor mail address that he

20    provided me to contact him on.

21    Q.   How did you commemorate those undercover contacts with

22    that user?

23    A.   Screenshots and PDFs.

24    Q.   Do they fairly and accurately describe the contacts you

25    had with that user?

1    A.   Yes.

2              MR. BECKER:  Your Honor, at this time the government

3    would move to admit Government Exhibit No. 10.

4              MR. BERRY:  Objection, relevance, 403.

5              THE COURT:  And the relevance, since this is a

6    communication with the agent?

7              MR. BECKER:  There's identifying information or

8    information within the content of the messages that assist to

9    identify the actual user, your Honor.

10             THE COURT:  The objection's overruled, Exhibit 10 is

11   received.

12   BY MR. BECKER:

13   Q.   Special Agent Gordon, during the course of these

14   communications, what sort of information are you trying to

15   elicit from this user you've not yet identified?

16   A.   Ideally I am trying to get the individual that I'm

17   communicating with to provide me with some type of information

18   or means of contacting him that I can use to accurately

19   identify him or at least the location where he's located.

20        Barring that, I try to establish a rapport with him and

21   try to get small pieces of information that eventually can be

22   used to provide a larger picture about who this person is

23   and/or where he is located.

24             MR. BECKER:  Your Honor, may I publish Government

25   Exhibit No. 10?

1          THE COURT:  You may.

2     BY MR. BECKER:

3     Q.   Special Agent Gordon, I'm showing you the first page of

4     Government Exhibit No. 10.  First, can you just orient us to

5     what we're seeing here?

6     A.   This is a screenshot that I created as I was composing a

7     message from my undercover account.  The message was being

8     composed to be sent to the user PTasseater.  The subject was

9     "Interesting".

10    Q.   And what did you communicate in this message?

11    A.   I indicated that I noticed the fuckchrist screen name,

12    and I inquired about his religion.  I then provided him with a

13    Tor mail and Tor Chat address for him to maintain

14    communication with me.

15         I then indicated that I could potentially be buying the

16    Daisy's Destruction video, or in this case, I called it

17    "thing".

18    Q.   Why introduce other methods of communication outside of

19    PedoBook in your interactions with this user?

20    A.   Based on the investigation, I knew that PedoBook was not

21    going to be allowed to continue to operate past a certain

22    point.

23         Therefore, I wanted to have some means of recontacting

24    him and maintaining a conversation with him if we weren't able

25    to identify him while PedoBook was up and running.

1    Q.   Moving to page 2 of Government Exhibit No. 10, what's

2    commemorated here?

3    A.   This was the response to my initial e-mail -- or my

4    initial private message.

5    Q.   And did he provide you with a Tor mail account?

6    A.   Yes.  He provided me with a Tor mail account,

7    fuckchrist@tormail.org.

8    Q.   Directing you to page 8 of Government Exhibit No. 10, so

9    what generally do we see here?  I notice this looks a little

10   different from some of the previous exhibits.

11   A.   This is a message that I sent from my undercover Tor mail

12   address to the fuckchrist@tormail.org address that was

13   previously provided to me.

14   Q.   And over -- what is -- the word "roundcube" is in the top

15   left.  What are we looking at?

16   A.   This is just the e-mail interface that Tor mail would

17   utilize.

18   Q.   Directing you to page 9 of Exhibit 10, what do we see

19   here?

20   A.   This is the response that I received from the e-mail

21   fuckchrist@tormail.org to my initial e-mail.

22   Q.   What did he tell you about when he's usually online?

23   A.   He indicated that he's usually on early in the morning

24   eastern time in the United States.

25   Q.   Showing you page 11 of Government Exhibit No. 10, first

1    can you describe, there's a number of sort of individual

2    blocks of text.  Can you just tell us generally how does that

3    work, what does that show, before we get into the content?

4    A.   This is just basically the way that this particular

5    e-mail would identify send, reply, send, reply.  It's kind of

6    an e-mail chain or thread of conversation related to this

7    particular initial e-mail that I sent.

8    Q.   And so the top line of text, who actually sent that

9    particular -- who is responsible for that content?

10   A.   The text that's visible in the white up here was sent by

11   the e-mail address fuckchrist@tormail.org to me in response to

12   a previous e-mail I had sent.

13   Q.   What was the content of the previous e-mail you sent to

14   which this user was responding?

15   A.   The content provided me with a time frame which the

16   individual was usually online.  In this case, they indicated

17   they were on usually between 4 and 6 a.m.

18   Q.   Showing you page 12 of Government Exhibit 10, first again

19   in terms of the back and forth, who is this an e-mail

20   conversation between?

21   A.   It's an e-mail conversation between my undercover address

22   and the Tor mail account fuckchrist.

23   Q.   Which user was responsible for the text at the very top?

24   A.   The text visible at the top was a response from

25   fuckchrist to myself.

1   Q.   And what's the content of that?  What was the content of

2   that communication?

3   A.   Inquiring about my marital status, if I had children;

4   again, indicated that they were on between 4 and 6 a.m.

5   eastern time in the morning.  And then additionally they could

6   be on in the evening between 4:30 and 6, although it wouldn't

7   be as private as in the morning.

8   Q.   What was the actual phrase that the user used in this

9   message?

10  A.   "Not so private time."

11  Q.   Showing you page 15 of Government Exhibit No. 10, first

12  the general content, what does it show?

13  A.   Again, this is just an e-mail conversation occurring

14  between myself and e-mail user fuckchrist.  Is there

15  something...

16  Q.   What did the user fuckchrist communicate to you in this

17  message -- the text at the top of the e-mail conversation?

18  A.   He inquired if I had located any additional video clips

19  of the NLF clips, the No Limits Fun video, Daisy's

20  Destruction, and that he could not wait until that video was

21  leaked.

22  Q.   Special Agent Gordon, I'd like to move to the next phase

23  of the investigation.

24       Despite the use of the Tor network, did you ultimately

25  develop information pertaining to who was the person behind

1    the screen name fuckchrist or PTasseater?

2    A.   We did, yes.

3    Q.   In terms of the contacts and the information on the site

4    itself, what information did you glean, just from that batch

5    of information?

6    A.   From that information, we were able to -- we were able to

7    ascertain that based on the information he provided and the

8    consistency of the information, it appeared to be that the

9    individual was located somewhere in the Virginia/DC/Maryland

10   area and that normally he would be on the Tor network early in

11   the morning between 4 and 6 a.m., as well as potentially

12   sometime in the early evening, 4:30 to 6.

13   Q.   And how did the screen names that were involved play into

14   the attempts to identify this user?

15   A.   When individuals use screen names on websites or to

16   communicate with individuals, oftentimes they will maintain

17   the same screen names or variations of the same screen name

18   between different sites or methods of communication in order

19   that individuals will be able to more readily locate or

20   identify or understand who it is that they're potentially

21   talking to.

22        In this case, for the user name PTasseater, we were able

23   to locate other locations where that screen name had been

24   used.

25   Q.   How do you go about looking for that sort of information?

1    A.   We will look through our own databases, records, and past

2    investigations to see if that particular user name or e-mail

3    address or whatever it is we're interested in has shown up

4    previously.

5         We'll also conduct searches on the Internet for that

6    particular user name to see if that's associated with another

7    website or another instant messaging or e-mail address.

8    Q.   Did you run those sorts of checks -- were those sorts of

9    checks run in this investigation?

10   A.   Yes, they were.

11   Q.   What was discovered with respect to the user name

12   PTasseater?

13   A.   We located PTasseater as being utilized as the screen

14   name or as an instant messaging account on a couple different

15   publicly accessible websites.

16   Q.   What was the first of those websites?

17   A.   The first of those websites was the website

18   DickFlash.com.

19   Q.   And what information was law enforcement able to find on

20   that site?

21   A.   From that site, we were able to locate an AIM instant

22   messaging name, PTasseater.

23   Q.   You satisfied AIM.  What is AIM?

24   A.   AOL America Online Instant Messenger.

25   Q.   What is that?

 1   A.   It's just an instant messaging program that America

 2   Online operates.

 3   Q.   What does it allow you to do?

 4   A.   Send private messages back and forth instantly.  It's an

 5   instant messenger, instant chat program.

 6   Q.   Does -- are you familiar with America Online?

 7   A.   Yes.

 8   Q.   Have you participated in serving legal process on America

 9   Online?

10   A.   I have.

11   Q.   Do they keep records pertaining to an AOL instant

12   messenger account such as that?

13   A.   Yes, they do.

14   Q.   What sorts of records do they keep that are available to

15   law enforcement through process?

16   A.   They will keep records of Internet protocol or IP

17   addresses that have been used to log in to the account.

18        Additionally, some of the information that might be

19   available would include the time that the account was created,

20   additional or secondary e-mail addresses, or other forms of

21   contact that are provided in the profile.

22        MR. BECKER:  Your Honor, at this time I'd request to

23   read and publish a stipulation reached by the parties, with

24   the Court's permission.

25        THE COURT:  You may.

```
 1          First, let me inquire as to whether you would like this

 2     one marked as an exhibit and have it go to the jury, or

 3     whether you just want to have it read.

 4          MR. BECKER:  We would like to mark it as an exhibit,

 5     your Honor.

 6          THE COURT:  Let's go ahead and do that at this time

 7     so we can identify it by number before you read it.

 8          MR. BECKER:  Currently marking the stipulation as

 9     Government Exhibit 77.

10          For the record, your Honor, it is signed by all parties.

11     I'm just going to show it to defense counsel, if I may.

12          THE COURT:  You may.

13          (Off-the-record discussion had.)

14          THE COURT:  Any objection?

15          MR. BERRY:  No, your Honor.

16          THE COURT:  Exhibit 77 is received.  And you may

17     publish it and read it.

18          MR. BECKER:  Thank you, your Honor.

19          For the record, publishing Government Exhibit No. 77.

20          Comes now the United States, plaintiff, and Timothy

21     DeFoggi, defendant, and stipulate that:

22          1.  Exhibit 14 represents a fair and accurate copy of

23     subscriber information obtained from America Online.

24          2.  Exhibits 15 through 16 represent fair and accurate

25     copies of subscriber information obtained from Verizon.
```

 1          I'll just note for the record, your Honor, there's a

 2    typographical error on the exhibit that I think the parties

 3    can fix before it's submitted.

 4               THE COURT:  Okay.

 5               MR. BECKER:  May I tender it to the Court, your

 6    Honor, or should we do that after our session?

 7               THE COURT:  Well, if you want to give that to the

 8    courtroom deputy, that's fine.

 9          Are you at this time offering the exhibits that are

10    referred to in the document, Exhibits 14, 15 and 16?

11               MR. BECKER:  At this point, we would move to admit

12    Exhibits 14, 15 and 16.

13               THE COURT:  All right.  Any objections to 14, 15 and

14    16?

15               MR. BERRY:  Just relevance, your Honor.

16               THE COURT:  14, 15 and 16 are received.  The

17    relevance objection is overruled.

18               MR. BECKER:  May I approach?

19               THE COURT:  You may.

20               MR. BECKER:  And, your Honor, may I publish Exhibit

21    14?

22               THE COURT:  You may.

23    BY MR. BECKER:

24    Q.   Special Agent Gordon, I'm showing you the first page of

25    Government Exhibit No. 14.

1           First, just generally can you tell us what is Government

2      Exhibit No. 14?

3      A.   This is a response that we received from America Online

4      pursuant to us serving them with a subpoena for information

5      related to the AOL or AIM instant messenger name PTasseater.

6      Q.   Going through Government Exhibit 14, does it include the

7      subpoena itself on pages -- on page 3 of the exhibit?

8      A.   Yes, part of the subpoena, yes.

9      Q.   Directing you to page 4 of Exhibit 14, what do we see on

10     page 4?

11     A.   We see the response to the subpoena that we served for

12     AOL relevant to the screen name PTasseater.

13     Q.   Starting at the top, does the response indicate whether

14     or not PTasseater was, in fact, registered as a user name with

15     America Online?

16     A.   It was.

17     Q.   Was there any billing information available?

18     A.   No, there was not.

19     Q.   What does it indicate about any address information that

20     is within the rest of the response?

21     A.   No real additional information is visible, except there's

22     another e-mail address provided right there (indicating),

23     luvemskinny@yahoo.com.

24     Q.   Just in the top paragraph, if you can just describe what

25     the return indicates about the registration information on a

1    subpoena return such as this.

2    A.    Are you talking about the top of the page?

3    Q.    The paragraph at the top.

4    A.    Okay.  "The email addresses/screen names that you

5    submitted for AIM were registered with the information that is

6    attached.  Be advised that AIM has no billing information on

7    this account as AIM accounts are free to the general public.

8    Registration information is recorded but not verified.

9    Fictitious names or addresses are common."

10   Q.    Now, does that sort of reservation apply to the IP

11   address information in such a return?

12   A.    Not so much, depending on what our lookups of that

13   particular IP address or IP addresses in the logs indicate.

14   Q.    So for instance, there's a zip code that's associated

15   with this account, PTasseater, AOL.  What's that zip code?

16   A.    90210.  I believe that's out in California somewhere.

17   Q.    Who would have provided that zip code upon registering an

18   account with the user name PTasseater at AOL?

19   A.    All of the user identifying information within the AIM

20   account would have been provided by the individual that signed

21   up and had access to the account.

22   Q.    Does that zip code need to be accurate?

23   A.    No.

24   Q.    Is it common or uncommon that someone registering a user

25   name like this might put in account information that might be

1    accurate or inaccurate?

2    A.   The likelihood that they would is small.  It does happen,

3    but typically individuals will put in fake information or

4    misleading information.

5    Q.   Does this particular page of the exhibit indicate for how

6    long this account had existed?

7    A.   Yes.  It looks like this account existed from

8    approximately September 11th of 2003.

9    Q.   How can you tell?

10   A.   The "Since" right there.

11   Q.   You just made a mark to the word "since" with a colon on

12   the middle of this particular page of Exhibit 14.

13   A.   I did.

14   Q.   Directing you to page 5 of Exhibit 14, what is the

15   information generally we see beginning on page 5 of

16   Exhibit 14?

17   A.   These are the IP records that America Online maintains in

18   the normal course of business.  The records indicate what

19   particular IP address was utilized to access a particular user

20   name.

21       In this case, these particular IP or Internet protocol

22   logs are associated with the AIM account PTasseater.

23   Q.   Now, IP address information like we see here, is that

24   something the user provides to AOL?

25   A.   No, it's not.  The logs that are generated at websites,

1    e-mail companies or when you log in to other locations, is not

2    provided by the user itself.  It's provided based on the

3    routing of the traffic and the communications.

4        So the IP addresses that are visible here should be able

5    to be used to locate the account and location where these

6    particular log-ins happen.

7    Q.   Starting at the top, what is the -- to be the -- the

8    first date that we see IP address information for the

9    PTasseater AOL account?

10   A.   Let's see, that would be August 28th of 2012.

11   Q.   And the IP address associated with a activity on that

12   account on that date was?

13   A.   71.178.217.239.

14   Q.   Based on your review of Exhibit 14, is that IP address

15   one that was frequently used to log in to this PTasseater AOL

16   account?

17   A.   Yes, it was.

18           THE COURT:  It's now noon.  Let's go ahead and take

19   our noon break.

20       Please reconvene in the jury room at 1:15.  We'll plan to

21   begin again at 1:15.

22       Thank you.  We're in recess.

23       (Jury out and recess taken at 12:01 p.m.)

24       (At 1:21 p.m. on August 20, 2014, with counsel for the

25   parties and the defendant present, and the jury NOT present,

1    the following proceedings were had:)

2              THE COURT:  Do we need to discuss anything before the

3    jury come in, Mr. Becker?

4              MR. BECKER:  Not from the government, your Honor.

5              THE COURT:  Mr. Berry?

6              MR. BERRY:  I don't believe so at this point, your

7    Honor.

8              THE COURT:  Very good.

9         Please bring in the jury.

10       P. MICHAEL GORDON, PREVIOUSLY SWORN, RESUMED THE STAND

11         (Jury in at 1:22 p.m.)

12             THE COURT:  Mr. Becker, you may continue with your

13   direct examination.

14             MR. BECKER:  Thank you, your Honor.

15                       DIRECT EXAMINATION (Cont'd.)

16   BY MR. BECKER:

17   Q.  Special Agent Gordon, when we broke for lunch, we were

18   discussing what's in front of you as Government Exhibit

19   No. 14.  Are you able to see that?

20   A.  Yes.

21   Q.  Just remind us to what America Online user account does

22   this exhibit pertain?

23   A.  This is a response from America Online in reference to

24   user account PTasseater.

25   Q.  And this particular page shows IP address log-ins to that

1     account for -- we're on page 5 -- for what range of dates?

2     A.   These show log-ins from approximately August 28, 2012, to

3     September 8th of the same year.

4     Q.   What IP address was most frequently used between those

5     dates?

6     A.   The most frequent IP address between -- in that time

7     frame is 71.178.217.239.

8     Q.   Move to page 6 of Government Exhibit 14, what range of

9     dates is depicted here?

10    A.   Again, from September 8 to September 16, IP address

11    71.178.217.239.

12    Q.   How many -- on this particular page during that date

13    range, how many instances was some other IP address used to

14    log in to that address?

15    A.   Only once.

16    Q.   Page 7.  The date range?

17    A.   September 17th to September 22nd.

18    Q.   How many different IP addresses?

19    A.   On this particular page, none.

20    Q.   Just that same --

21    A.   Just the same IP address we've been addressing.

22    Q.   And page 8.  The date range?

23    A.   September 23rd to October 4th.

24    Q.   What IP most predominantly used during that range?

25    A.   71.178.217.239.

 1     Q.   And moving to page 9, directing your attention -- first

 2     of all, what's the date range on page 9?

 3     A.   October 5th to November 2nd of 2012.

 4     Q.   Do we see that same 71.178 IP address on this page as

 5     well?

 6     A.   Yes.

 7     Q.   Up until what date?

 8     A.   Up until -- could you go to the next page?  Okay.  Go

 9     back.  The last time that IP address appears is October 26th.

10     Q.   And what IP address occurs in the first entry after

11     October 26th?

12     A.   173.73.10.249 on November 2nd on 2012.

13     Q.   Just to complete it, page 10 shows response for what

14     date?

15     A.   November 21st.

16     Q.   And what IP address was used on that date?

17     A.   173.73.10.249.

18     Q.   Drawing your attention now to Government Exhibit No. 15,

19     have you reviewed Government Exhibit No. 15 before?

20     A.   Yes, I have.

21     Q.   What does it depict?

22     A.   It depicts a response we received from Verizon's legal

23     department subsequent to a subpoena that we sent them for

24     information related to certain IP addresses as they were

25     assigned at a certain date and time.

1   Q.   And was this a subpoena for the IP addresses we talked

2   about that were located on that AOL return?

3   A.   Yes.

4   Q.   If I can direct you to page 10 of Exhibit 15, first of

5   all, what information did Verizon provide with respect to IP

6   address 173.73.10.249?

7   A.   They identified that this IP address was first issued to

8   this particular account on October 30th of 2012 and that that

9   particular IP address was still in service or assigned to this

10  particular account or this particular location as of the date

11  that they received our subpoena.

12  Q.   And how did that IP address correspond to what we saw on

13  the America Online IP log?

14  A.   It matched up with the time frame.

15  Q.   What information did Verizon provide about the IP address

16  71.178.217.239?

17  A.   They indicated that that particular IP address had been

18  assigned to this particular user account from approximately

19  June 30th to October 30th of 2012, a period of approximately

20  121 days.

21  Q.   And how did that time period of IP assignment correspond

22  with the last exhibit we saw, those AOL IP log?

23  A.   The time period that this IP address was assigned to this

24  account matched up with the information for the AOL logs for

25  the assignment of the IP address.

1    Q.   And according to Verizon, to what customer was that IP

2    address assigned?

3    A.   These two particular IP addresses were assigned to the

4    account of Tim DeFoggi located at --

5    Q.   I'm going to stop you for one quick second.  Without

6    actually mentioning the house name, can you tell us the street

7    and city, state, that that account was assigned to, without --

8    without stating the number of the home, can you describe the

9    street, city and state?

10   A.   It was located at Crown Ridge Court, Germantown,

11   Maryland.

12   Q.   Was there a phone number associated with that account?

13   A.   Yes, there was.

14   Q.   What was the phone number?

15   A.   703-909-5559.

16   Q.   And was there an e-mail associated with the account?

17   A.   Yes, there was.

18   Q.   What was that?

19   A.   Deparmentofstate@yahoo.com.  Department is missing the

20   middle T.

21   Q.   Special Agent Gordon, you mentioned that open source type

22   searches were run.  Was the user name PTasseater discovered on

23   any other online websites?

24   A.   Yes, it was.

25   Q.   Where else was it located?

1    A.   There was an account for that particular user name

2    located on a website known as Image Source, the URL for that

3    being IMGSRC.ru.  It's a site that's hosted in Russia that

4    allows individuals to post any type of pictures that they

5    desire up to it.  It's not strictly -- it's not a child

6    pornography site, per se, just a hosting site.

7    Q.   And so users can post any type of images using that

8    website?

9    A.   Correct.  They can put up pictures of vacations, family

10   photos, wedding photos, things of that nature.

11   Q.   Why, if at all, was that website Image Source significant

12   to the investigation?

13   A.   We located -- through the open source checks, we located

14   an account that had the screen name or the user name

15   PTasseater associated with it as the account name.

16   Q.   Can you please turn in your exhibit book to Exhibit

17   No. 70?

18   A.   (The witness complies.)  All right.

19   Q.   Is Exhibit 70 a two-page exhibit?

20   A.   Yes, it is.

21   Q.   What do you recognize it to be?

22   A.   This would be the home page and the profile or account

23   page for Image Source and the account for the user name

24   PTasseater.

25   Q.   With respect to the first page of that exhibit, is that a

1    fair and accurate depiction of the home page of the website

2    Image Source?

3    A.   Yes.  At the time it was taken, it would be.  The site

4    itself will tend to rotate photos that are visible on the

5    front for a time.

6    Q.   With respect to the second page, is that a fair and

7    accurate copy of the user page for the user PTasseater on

8    IMGSRC.ru?

9    A.   Yes, it is.

10   Q.   And as of what time are each of those two pages current?

11   A.   They were current as of last week, to the best of my

12   recollection.

13            MR. BECKER:  Your Honor, at this time, the government

14   would move to admit Exhibit 70.

15            MR. BERRY:  Objection, relevance.

16            THE COURT:  Overruled.  Exhibit 70 is received.

17            MR. BECKER:  Permission to publish Exhibit 70, your

18   Honor.

19            THE COURT:  You may.

20   BY MR. BECKER:

21   Q.   Special Agent Gordon, I'm showing you the first page of

22   Government Exhibit No. 70.  Please describe what that is for

23   the jury.

24   A.   This is the front page or the home page of IMGSRC.ru.

25   Q.   As we scroll down, what general information is available

1    on the home page of Image Source?

2    A.   There are images that you can click on on the left-hand

3    side, both a large-scale image, as well as thumbnails.

4         On the right-hand side, you can see various user comments

5    as well as individuals that have uploaded files.

6         There's also a Sections area where -- that would be

7    devoted to particular types of photos or photos of particular

8    content.  For instance, up at the very top here, there are two

9    that say Landscape and Traveling.  And then below the

10   Traveling there are various countries listed.  What should be

11   in those particular sections would be photos relevant to

12   people, of people traveling through those particular

13   countries.

14   Q.   What significance, if any, does this Image Source have to

15   the investigation of child exploitation?

16   A.   We received numerous reports and tips related to

17   individuals will use Image Source to upload child pornography

18   or child pornography images in order to share the

19   corresponding link with other individuals.

20   Q.   Does it allow users to comment on the individual images?

21   A.   Yes, it does.

22   Q.   And moving to page 2 of Government Exhibit No. 70, what

23   do we see depicted here?

24   A.   This is the user account or the user profile page for the

25   album or account of screen name or account name PTasseater.

SC-TDT  Doc # 234  Filed: 10/07/14  Page 88 of 212 - Page ID # 1331

1    Q.    And what does it indicate about that user's account?

2    A.    It indicates that at this time the account has currently

3    been banned or it was locked out for indecent comments.

4    Q.    Was the FBI able to obtain information pertaining to the

5    user account PTasseater on the website IMGSRC.ru?

6    A.    Yes, we were.

7              MR. BECKER:  Your Honor, at this time I would request

8    permission to enter, read and then mark as an exhibit a

9    stipulation reached by the parties.

10             THE COURT:  All right.  Let's mark it first as an

11   exhibit so that we can refer to it by exhibit number when you

12   read it.

13             MR. BECKER:  That will be Exhibit No. 78, your Honor.

14             THE COURT:  All right.

15             MR. BECKER:  For the record, it has been signed by

16   all parties.

17             THE COURT:  Very good.

18             MR. BECKER:  May I publish it to the jury?

19             THE COURT:  It's been marked; is that correct?

20             MR. BECKER:  Excuse me.  I'd move to admit Government

21   Exhibit No. 78.

22             THE COURT:  Any objection?

23             MR. BERRY:  No, your Honor.

24             THE COURT:  Exhibit 78 is received.  You may publish.

25             MR. BECKER:  Comes now the United States, plaintiff,

1    and Timothy DeFoggi, defendant, and stipulate that:

2         1.  On November 13, 2012, Russian law enforcement

3    authorities provided to the FBI fair and accurate copies of

4    user account data for the user name PTasseater from the

5    website www.IMGSRC.ru.  Exhibit 12 consists of fair and

6    accurate copies of that user account data.

7         2.  The defendant, Timothy DeFoggi, is not alleged to

8    have committed any crime in connection with the website

9    www.IMGSRC.ru.

10        Your Honor, at this time after that stipulation, we would

11   move to admit Government Exhibit No. 12.

12             MR. BERRY:  My objections is 403 and relevance.

13             THE COURT:  Overruled.  Exhibit 12 is received.

14             MR. BECKER:  Permission to publish Exhibit 12, your

15   Honor.

16             THE COURT:  You may.

17   BY MR. BECKER:

18   Q.   Special Agent Gordon, I'm showing you what's been marked

19   as Government Exhibit No. 12, the first page of a 27-page

20   exhibit.

21        First of all, have you had a chance to review this

22   exhibit previously?

23   A.   Yes, I have.

24   Q.   In terms of the exhibit as a whole, what does it contain?

25   A.   This is another summary exhibit created from the

 1    information that was provided to us by the Russian

 2    authorities.

 3         It contains information relevant to the Image Source user

 4    account PTasseater, both as it was entered by the individual

 5    that had access to the account, as well as information that

 6    was recorded and logged by Image Source itself.

 7    Q.   Have you reviewed information similar to this for account

 8    information on IMGSRC.ru?

 9    A.   Yes.

10    Q.   With respect to page 1, can we just go through what

11    information is contained on that page about the account,

12    starting with the user ID?

13    A.   The user ID itself is listed as PTasseater.  There are

14    two e-mail addresses also associated with this account, the

15    first one jsnparsons@yahoo.com; the second being

16    PTasseater@gmail.com.  The account itself was registered on

17    July 7th of 2007.  Currently the account is shown as locked.

18         In the About section, this would be another area where

19    the information would have been entered by the person creating

20    the account and having access to the account.

21    Q.   The Lock column, what does that mean?

22    A.   The Lock column indicates the reason for the lock, it

23    being indicated as indecent comments.  And there were 378

24    comments made by this particular account.

25    Q.   Now, who would choose a user name on the website Image

1    Source?

2    A.   The person creating the account.

3    Q.   What information is contained on the second page of this

4    exhibit?

5    A.   This contains information related to various badges or

6    small little icons associated with a particular user account.

7    Normally they would be awarded for various activities or

8    actions or administrative actions taken by the site's owners.

9    Q.   And what badges had this user attained?

10   A.   On July 22nd of 2008, he received the "New" badge awarded

11   when you post your first album of 12 or more photos.

12        There was the Early Adopter.  It's for a limited number

13   of people who joined Image Source in 2007.

14        And the final badge that was awarded to it was awarded on

15   December 18, 2011, and that was a ban badge.

16   Q.   Indicating what?

17   A.   Because -- "for those who can't read or understand our

18   house rules" and "for most of such this will be the first and

19   only badge you get."

20   Q.   Does that correspond with that insignia we saw --

21   A.   It does.

22   Q.   -- on the top right of Exhibit 70?

23   A.   Correct.

24   Q.   Drawing your attention to page 3, what is the information

25   contained from page 3 and then through to -- let's go through

1    to page 27?

2    A.   This is information that IMGSRC.ru maintained as part of

3    the information related to this account.  The columns

4    themselves -- the leftmost column is Comment ID.  It's a

5    unique identifier to represent this particular comment.

6    Similar to the user IDs that we discussed previously with

7    PedoBook.

8         The next column shows what the actual content was.  The

9    post date --

10   Q.   The content of what?

11   A.   The comment that was made on some picture in response to

12   somebody.

13   Q.   Thank you.

14   A.   The Post Date shows the date and time and UTC that this

15   particular comment was made.

16        IP address shows the IP address that was utilized to make

17   this particular comment or post particular images.

18        Album ID would identify a particular group of files.

19        And Photo ID would identify the particular file that a

20   comment is made on.

21   Q.   In terms of an association with the user name fuckchrist

22   on this, is there any content visible on page 27 that is

23   similar to or associated with that sort of user name or theme?

24   A.   Yes.

25   Q.   What is that?

1    A.    There are two occurrences where those two words occur in

2    close proximity to one another, that being for comment ID

3    4833295 and 4833297.

4    Q.    And have you reviewed the content of the comments

5    throughout Exhibit No. 12?

6    A.    Yes, I have looked over them.

7    Q.    Have you also reviewed the content of private messages

8    that were sent by the user fuckchrist PTasseater on PedoBook?

9    A.    Yes.

10   Q.    How does the theme and content of those comments compare

11   to one another?

12   A.    The context and the content appear to be -- have a very

13   similar theme, advocating violent sexual acts towards

14   children, that type of thing.

15   Q.    If I could direct you to page 17 of Exhibit 12, did the

16   user PTasseater on IMGSRC.ru associate any comments with a

17   particular e-mail account?

18   A.    Yes.  On this particular page, he identified the same

19   e-mail address four times.  The first two up here

20   (indicating), and then here (indicating), and then finally in

21   this comment you can figure out what the particular e-mail

22   address would be.

23   Q.    What is the e-mail address?

24   A.    The e-mail address itself is PTasseater@AOL.com.

25   Q.    That's the same screen name that we saw the AOL subpoena

1    return for in Exhibit 14?

2    A.   Correct.

3    Q.   Just for the record, the instances you've marked off are

4    October 8, 2011, 13:25; October 8, 2011, 13:27; October 8,

5    2011, 13:27; October 8th, 2011, 13:43; and October 8th, 2011,

6    13:43.

7    A.   Correct.

8    Q.   Was the FBI able to obtain information about the IP

9    address 96.231.186.155?

10   A.   We were.

11   Q.   Whose user account did that IP address track back to?

12   A.   It tracked back to the -- could you rephrase the

13   question?

14   Q.   Sorry.  What was the name of the subscriber associated

15   with that IP address?

16   A.   It was Tim DeFoggi.

17   Q.   Start with page 12.  When do you see the IP address

18   96.231.186.155 first appear on Exhibit 12, page 12?

19   A.   It first appeared on June 1st of 2011.

20   Q.   Just drawing your attention to the rest of the exhibit,

21   does that IP address continue to be associated with postings

22   on IMGSRC.ru?

23        For the record, we just scrolled through until page 27 of

24   the exhibit.

25   A.   Yes.  That is the IP address associated with the

 1    remainder of those entries.

 2    Q.   Did you see any other IP addresses at all?

 3    A.   None popped out at me, no.

 4    Q.   What's the last date on which that IP address appears to

 5    have been used to address the PTasseater Image Source account?

 6    A.   December 18th, 2011.

 7    Q.   Directing your attention to Government Exhibit 16, what

 8    is this exhibit generally?

 9    A.   This is another Verizon return that they provided us

10    subsequent to us issuing them a subpoena.

11    Q.   Directing your attention to page 10 of Exhibit 16, what

12    IP address does this Verizon subpoena return pertain to?

13    A.   It pertains to IP address 96.231.186.155.

14    Q.   During what date range does this Verizon return indicate

15    that IP address was assigned to one of its customers?

16    A.   From the records that were provided to us, it was

17    assigned from May 13th of 2011 to May 23rd of 2012.

18    Q.   What was the customer name associated with that account

19    and IP address?

20    A.   The customer name was Tim DeFoggi.

21    Q.   At what address -- without stating the number of home,

22    house number?

23    A.   Crown Ridge Court, Germantown, Maryland.

24    Q.   Telephone number?

25    A.   703-909-5559.

1    Q.   Special Agent Gordon, I want to ask you about some

2    further investigate steps that the FBI engaged in.

3         First of all, can you tell us what is a pen trap and

4    trace order?

5    A.   A pen trap and trace order is a court order issued by a

6    judge that allows a law enforcement agency to intercept the

7    different connections going into or out of a particular

8    residence or location.  No actual content itself is

9    intercepted, just where is this computer and where is it

10   connecting to.

11        So it would -- in the case -- in this particular case, it

12   would be for IP addresses that were being connected to from

13   this particular Verizon account.

14   Q.   Was a pen trap and trace order obtained on the Verizon

15   account -- on the Verizon Internet account that we've seen

16   described in Exhibits 15 and 16?

17   A.   Yes, it was.

18   Q.   And how does a pen trap and trace order relate, if in any

19   way, to an investigation of a Tor user?

20   A.   Based on an analysis of the different IP addresses of

21   this particular account or any particular account it can be

22   connecting to, it will be possible to see if there are IP

23   addresses associated with Tor that are being connected to from

24   that account or that residence.

25   Q.   And how does a pen trap and trace order assist, if at

1    all, with determining the time of executing a search warrant?

2    A.   In addition to recording the actual IP addresses that are

3    being connected to, the date and time is also recorded when

4    the connections are made.

5    Q.   Did you participate in the search of the address on Crown

6    Ridge Court in Germantown, Maryland, on April 9, 2012?

7    A.   I did.

8    Q.   Excuse me, was that April 9th of 2013?

9    A.   2013, yes.  I apologize.

10   Q.   How was the timing of that search warrant determined?

11   A.   The timing of the search warrant was executed earlier

12   than they normally are based on the time of day that the user

13   PTasseater had indicated he's normally online.

14        In addition, we utilized the pen register track and trace

15   to make sure that someone was connecting to Tor at the time

16   that we were going to execute the search warrant.

17        That particular timing was important because oftentimes

18   individuals will try to avoid law enforcement or destroy

19   evidence as we're entering the house or they will have

20   encryption or some other type of software program installed on

21   their computer that once they shut it down, it can impede our

22   forensic examination and retrieval of evidence.

23   Q.   Did you actually participate in the search itself?

24   A.   I was present, and I was primarily conducting an

25   interview during that search.

1    Q.   Where did you prepare -- before agents actually

2    approached the home, where did you stage or prepare for it?

3    A.   We assembled in a parking lot out of sight of the

4    residence.  I'm not exactly sure -- I don't exactly recall the

5    exact location.

6         But where we usually assemble will be outside of the

7    residence but usually within, like, a five-minute drive.

8    Q.   And what was the sort of decision factor, what did you

9    wait for until agents actually started to approach the home?

10   A.   We waited until our personnel at Quantico advised us that

11   there was Tor traffic going in and out of that residence.

12   That was an indicator that at least a computer was on within

13   the residence and that it had to be on and unencrypted at the

14   time the traffic was going in and out.

15   Q.   How many search teams were involved in this particular

16   search warrant execution?

17   A.   There was one search team.

18   Q.   And how were you divided, if at all?

19   A.   We were divided into two separate entry teams.

20   Q.   Where did -- what was the responsibility of each of those

21   two teams?

22   A.   Each of the two teams were responsible for entering and

23   securing certain areas of the residence.  The first team was

24   stationed at the front door on the main level of the house.

25        The second team made entry through the basement through

1   a -- I believe it was a sliding glass door located at the rear

2   of the residence.

3   Q.   What time of day was this search warrant executed?

4   A.   I believe it was around 5:20 or 5:30 in the morning.

5   Q.   Which of the two teams were you on?

6   A.   I was assigned to the team that was located on the main

7   level at the front door.

8   Q.   Now, had you received any particular permission from the

9   judge who authorized this warrant in terms of how the teams

10  were going to enter?

11  A.   Yes.  Due to the sensitive and fragile nature of the

12  evidence that we were trying to obtain, and the possibility

13  that if we were to conduct the entry in the normal fashion

14  which is knock on the door, announce "police," announce

15  "search warrant," someone would have time to shut down a

16  computer, therefore either encrypting the evidence or

17  destroying it, we were given permission to conduct what's

18  known as a no-knock entry.

19  Q.   Did agents make entry to that home on Crown Ridge Court

20  the morning of April 9th, 2013?

21  A.   We did.

22  Q.   And where were you in terms of the agents who entered the

23  front of the residence?

24  A.   Once the front door was breached, myself and another

25  agent proceeded up the stairs to the second level to the

1   bedrooms and other rooms up there to secure it.

2   Q.   Did you encounter anyone when you went upstairs?

3   A.   When we got to the top of the stairs, the lights were off

4   to the best of my recollection.

5        Upon entering what appeared to be the main bedroom, there

6   was a single individual that still appeared to be asleep

7   within the main -- the master bedroom itself in the bed.

8   Q.   Was there anyone else in that bedroom?

9   A.   Not that I saw, no.

10  Q.   Did you identify the person who was there and asleep?

11  A.   Yes, I did.

12  Q.   How did he identify himself?

13  A.   He identified himself as Dale Bounds and that he resided

14  at the residence.

15  Q.   Did you actually have to wake him or physically rise him?

16  How did you get his attention when you entered that bedroom?

17  A.   From what I recall, I believe I had to wake him up.  I

18  don't recall if I had to go up and shake him or if I just kept

19  announcing until he woke up, and then proceeded to search and

20  secure him at that location.

21  Q.   Later that day on April 9th during that search, were you

22  responsible for interviewing?

23  A.   Yes, I participated in that interview.

24  Q.   Who did you interview?

25  A.   I participated in the interview of Timothy DeFoggi.

```
 1              MR. BECKER:  Court's indulgence?

 2         (Off-the-record discussion had.)

 3    BY MR. BECKER:

 4    Q.   Where in the home did you interview the defendant,

 5    Mr. DeFoggi?

 6    A.   The interview was conducted in the basement of the house

 7    in a -- it appeared to be, like, a storage or a crafting area

 8    where craft supplies were stored.

 9    Q.   During the interview, did you ask him where he was

10    employed?

11    A.   Yes.

12    Q.   Do you recall what he told you?

13    A.   Yes.

14    Q.   What was that?

15    A.   He was employed by the Department of Health and Human

16    Services.

17    Q.   In what capacity, if he told you?

18    A.   Director of cyber security for the office of the

19    secretary.

20    Q.   Did he convey any information to you about his ownership

21    of a laptop computer in the residence?

22    A.   Yes.  He indicated that the laptop that we would find on

23    the main level was his.

24    Q.   Did you ask him whether he was familiar with the Tor

25    network?
```

1    A.    We did.

2    Q.    What did he tell you?

3    A.    He indicated that he was familiar with the Tor work --

4    the Tor network through his work and his own personal interest

5    in it.

6    Q.    Did he indicate whether or not there was Tor software on

7    his laptop?

8    A.    He did indicate that we would find Tor software on his

9    laptop, I believe.

10   Q.    Did you ask him about the website DickFlash.com?

11   A.    Yes.

12   Q.    Why did you ask him about that particular website?

13   A.    That particular website was one of the ones that we had

14   utilized in the search warrant application and to identify the

15   residence that we were currently in.

16   Q.    What was associated with that DickFlash.com account?

17   A.    That was the AIM screen name PTasseater as an instant

18   messenger in the profile of that site.

19   Q.    What was his response when you asked him about that

20   website?

21   A.    He claimed not to know it or he may have indicated that

22   he might have heard about it through his work or something

23   like that.

24        MR. BECKER:  Your Honor, we have one additional

25   stipulation that we'd like to mark as an exhibit.  This will

 1    be Exhibit No. 79.

 2                 THE COURT:  And do you wish to offer 79?

 3                 MR. BECKER:  We do, your Honor, and to publish.

 4                 THE COURT:  Any objection to 79?

 5                 MR. BERRY:  No, your Honor.

 6                 THE COURT:  Exhibit 79 is received, and you may

 7    publish.

 8                 MR. BECKER:  For the record, your Honor, it is signed

 9    by all parties.

10         Comes now the United States, plaintiff, and Timothy

11    DeFoggi, defendant, and stipulate that:

12         Exhibit 65 represents a fair and accurate copy of

13    electronic keycard access logs pertaining to the defendant,

14    Timothy DeFoggi, for access to the U.S. Health and Human

15    Services Parklawn Building, in Rockville, Maryland, between

16    March 18, 2012, and April 8, 2013.

17         Your Honor, we'd offer Exhibit 65 at this point.

18                 THE COURT:  Any objection to 65?

19                 MR. BERRY:  No, your Honor.

20                 THE COURT:  Exhibit 65 is received.

21                 MR. BECKER:  Permission to publish Exhibit 65, your

22    Honor?

23                 THE COURT:  You may.

24    BY MR. BECKER:

25    Q.   Special Agent Gordon, I'm showing you what has been

 1    marked as Government Exhibit No. 65.  Have you previously

 2    reviewed this exhibit?

 3    A.   Yes, I have.

 4    Q.   Please tell us what it is.

 5    A.   This is a log that was maintained by the Department of

 6    Health and Human Services for keycard entries into this

 7    particular facility.

 8         In this instance, these relate to keycard entries for the

 9    keycard assigned to their employee, Timothy DeFoggi.

10    Q.   All right.  In terms of the initial access times, have

11    you reviewed those access times?

12    A.   Yes, I have.

13    Q.   Have you compared those access times to the board logs

14    contained in Exhibit 5, which I'll show you here?

15    A.   Yes.

16    Q.   What was the result of that comparison?

17    A.   As a result of that comparison, there did not seem to be

18    any conflict between when Timothy DeFoggi had been -- had at

19    least initially entered his workspace and times that user

20    PTasseater would have been accessing PedoBook.

21         MR. BECKER:  Your Honor, no further questions of this

22    witness at this time.

23         THE COURT:  Very good.

24      Cross-examination?

25         MR. BERRY:  Thank you.

1                       CROSS-EXAMINATION

2       BY MR. BERRY:

3       Q.   We just talked about is Exhibit 65, the keycard entries.

4       Now, those do not show the exit times, correct?  Just when the

5       person goes in the building, correct?

6       A.   That is correct, yes.

7       Q.   And you were probably also aware that Mr. DeFoggi

8       additionally had applied -- through his work worked at the

9       Health and Human Services headquarters building in

10      Independence Avenue; is that correct?

11      A.   I was not provided with logs from that location.

12      Q.   Now, you indicated that you've been doing undercover

13      operations in one capacity or another since 2004, correct?

14      A.   Innocent Images sessions, yes; other types, since 2001.

15      Q.   Sometimes when doing undercover operations, you will do

16      surveillance, correct?  It's a component of the --

17      A.   Are you referring to physical world scenarios or online

18      scenarios?

19      Q.   Either way.

20      A.   In one form or fashion, yes.

21      Q.   Sometimes when doing undercover work, an agent will meet

22      with a target, correct?

23      A.   Correct.

24      Q.   And sometimes the purpose is to gain a positive

25      identification of that target, correct?

1    A.   That is correct.

2    Q.   Now, in this case, that was not done with Mr. DeFoggi,

3    correct?

4    A.   That is correct.

5    Q.   I want to move on and talk about the Tor network.  Who

6    created Tor?

7    A.   Tor was originally created by the Department of the Navy.

8    Q.   And it is not against the law to use Tor; is that

9    correct?

10   A.   No, it's not.

11   Q.   Would you agree that Tor has about 36 million users

12   currently?

13   A.   I don't have exact numbers on exactly how many people

14   utilize Tor, I'm sorry.

15   Q.   Now, you've probably heard of Tor Dir or the Tor

16   directory.

17   A.   Yes.

18   Q.   And so in a Tor directory, it wouldn't be uncommon to see

19   headings such as activism and political type headings for the

20   directory.

21   A.   That's correct.

22   Q.   Or blogs.

23   A.   Correct.

24   Q.   Hacking-related information on Tor.

25   A.   That's probably the second most popular type of sites,

1    yes.

2    Q.   There are personal pages on Tor.

3    A.   A few.

4    Q.   Security type pages on Tor.

5    A.   Yes.

6    Q.   There are also social files on Tor that are not related

7    to child pornography, correct?

8    A.   Yes.

9    Q.   And there is an entire adult section to Tor.

10   A.   Yes.  There is an adult side to Tor as well.

11   Q.   There is a business side to Tor.

12   A.   Most of the business side of Tor that I've seen have been

13   drugs and other types of contraband, so I'm not sure what

14   particular type of businesses you're referring to.

15   Q.   Bitcoin was kind of common on Tor.

16   A.   Bitcoin was a popular method on Tor.  It was actually the

17   method that the individuals for No Limits Fun were looking to

18   for people to pay them with.

19   Q.   When you say the individuals from No Limit Fun -- No

20   Limits Fun, that was a specific group from the PedoBook,

21   correct?

22   A.   It was a group on PedoBook.  And additionally they

23   created their own hidden service at one point.  It's no longer

24   functional at this time.

25   Q.   And did you determine who was trying to receive the

1    proceeds?

2    A.    That is still under investigation.

3    Q.    Were you aware that the Tor directory also has a whole

4    list of software and other computer-related things on it?

5    A.    Yes, sir.

6    Q.    Now, if I wanted to use Tor to comment anonymously on,

7    say, CNN about a news story, could that be done?

8    A.    Yes, unless CNN set up something to prevent those

9    particular IP addresses from accessing their site.

10   Q.    So one use of Tor that you found is that individuals can

11   attempt to make anonymous comments on -- in public forums that

12   are accessible to the general public.

13   A.    Yes.

14   Q.    What I mean by that is non-Tor sites.

15   A.    Non-Tor, yes, sir.

16   Q.    Like ESPN, CNN, Yahoo, that type of thing.

17   A.    Yes, sir.

18   Q.    If I could, I'd like to direct your attention to Exhibit

19   2, page 2 of 14.  I believe Mr. Becker is going to pull it up

20   on the screen really quick.

21         MR. BERRY:  I'd ask permission to republish that,

22   your Honor.

23         THE COURT:  You may.

24         MR. BECKER:  Page number?

25         MR. BERRY:  Page number 2 of 14 on Exhibit No. 2.

1    BY MR. BERRY:

2    Q.   And sir, if you could again tell us what this is, page 2

3    of 14 on Exhibit No. 2?

4    A.   This is the profile page for user name fuckchrist, screen

5    name PTasseater.

6    Q.   Now, that picture of a shadow of a person, that is called

7    an avatar, correct?

8    A.   Yes, sir.

9    Q.   Okay.  And it appears that the person described as

10   PTasseater did not upload an avatar, correct?

11   A.   That is correct.

12   Q.   Now, if we look to the right, we see Friends, correct?

13   A.   Correct.

14   Q.   And those are all -- those are all the avatars of the

15   friends of PTasseater; is that correct?

16   A.   Yes, they are.

17   Q.   And in order to upload an avatar, you must have some type

18   of an image that you upload into Tor to create that avatar,

19   correct?

20   A.   Correct.

21   Q.   Also directing your attention to the About Me, it appears

22   that there are two sentences there, correct?

23   A.   Yes.

24   Q.   I guess they're kind of fuzzy.  Could you read those real

25   quickly?

1    A.   The first one is, "Have many perversions."  The second

2    one is, "Contact me for fantasy chat."

3    Q.   Now, you did have contact with the person who went by the

4    name PTasseater during your undercover operations, right?

5    A.   Correct.

6    Q.   And during that time, PTasseater never sent you any child

7    pornography via e-mail, correct?

8    A.   That's correct.

9    Q.   And when I say PTasseater, this is the same -- basically

10   this is the same profile that we've been referring to as

11   fuckchrist, correct?

12   A.   Correct.

13   Q.   So for purposes of this discussion, PTasseater and

14   fuckchrist are interchangeable when we're talking about the

15   profile on PedoBook, correct?

16   A.   Yes, sir.

17   Q.   And you never sent any child pornography to PTasseater,

18   correct?

19   A.   That's correct.

20   Q.   Would it be fair to say that through your investigation

21   you never found any child pornography that he had uploaded

22   onto the PedoBook site?

23   A.   Not that I recall, no.

24   Q.   And while you mentioned a series that the No Limits Fun

25   was putting out that I believe you chatted with Mr. -- or with

1    PTasseater about, correct?

2    A.    Correct.

3    Q.    But PTasseater did not attempt to sell you any child

4    pornography in exchange for money, correct?

5    A.    That is correct.

6    Q.    And through your chats and e-mails with him, did

7    PTasseater ever provide you a photo of himself?

8    A.    No, he did not.

9    Q.    Did he provide you any e-mail addresses other than his

10   Tor Chat e-mail?

11   A.    Other than his Tor Chat and his Tor mail address, no.

12   Q.    And both of those addresses are on The Onion Router,

13   correct?

14   A.    Yes, sir.

15   Q.    If I could, I have a question regarding Exhibit 54.

16           MR. BERRY:  If I could publish that, your Honor?

17           THE COURT:  Just a moment.  My notes here indicate

18   that 54A is in evidence.  I don't have 54 received in

19   evidence.

20        Ms. Gomez, what do your notes show?

21           COURTROOM DEPUTY:  I do not either.

22           MR. BERRY:  Okay.

23           MR. BECKER:  We did not offer that exhibit yet, your

24   Honor.

25           THE COURT:  Well, until it's offered and received,

1    you can't publish it.

2           MR. BECKER:  Your Honor, we don't have any objection

3    to it being published right now.  And we're happy to offer

4    that if there's not an objection from the defense.

5           THE COURT:  Is there any objection to Exhibit 54?

6           MR. BERRY:  No, your Honor.

7           THE COURT:  All right.  I'll receive Exhibit 54.  And

8    you may publish.

9    BY MR. BERRY:

10   Q.   Previously you discussed Exhibit 54.  It has now been

11   offered, but you previously discussed it on the stand,

12   correct?

13   A.   54A and 54, yes.

14   Q.   And so when we look at -- you would agree the exhibit

15   is -- has 69 pages of URLs; is that correct?

16   A.   Yes, sir.

17   Q.   Is it your understanding that this document is a

18   collection of URLs that were pulled up from search terms on

19   the Tor browser?

20          MR. BECKER:  Objection, your Honor.  Just with

21   respect to the witness's personal knowledge of exactly where

22   this exhibit came from.  We don't have any objection referring

23   to it, but if there are going to be questions about exactly

24   where it came from, they may be better pointed to a different

25   witness.

1              THE COURT:  The witness may answer if he knows.  The

2     objection is overruled.

3     A.   Based on the information that was provided to me, this

4     was information that was derived from the forensic exam of the

5     laptop computer that was seized on the main level of the

6     Germantown, Maryland, residence.

7     BY MR. BERRY:

8     Q.   My question specifically is do you know whether the --

9     all of these URLs were accessed by PTasseater?

10    A.   I don't have that information, sir, I'm sorry.

11    Q.   Now, the term fuckchrist, did you research that term?

12    A.   I did not personally, no.

13    Q.   So you aren't aware as to whether there are other users

14    in the vast universe of the Internet that use that same name,

15    correct?

16    A.   I didn't research it, but I would probably guess that

17    there could be.

18    Q.   Thanks.

19              MR. BERRY:  No further questions.

20              THE COURT:  Redirect?

21              MR. BECKER:  Thank you, your Honor.

22                          REDIRECT EXAMINATION

23    BY MR. BECKER:

24    Q.   Special Agent Gordon, the defense asked you -- in

25    response to one of the questions from the defense, you

 1    mentioned that hacking was the number two most popular

 2    activity that you've seen in your training and experience on

 3    the Tor network.

 4    A.   Yes.

 5    Q.   What would be the number one?

 6    A.   The number one most common would be individuals that

 7    wanted to exchange or acquire child exploitation material.

 8              MR. BECKER:  No further questions, your Honor.

 9              THE COURT:  Very good.  Thank you, Agent.  You may

10    stand down.

11         Now, this afternoon, instead of taking one break, we're

12    going to take two 15-minute breaks.

13         And so let's take our first 15-minute break at this time

14    while the government arranges for its next witness.

15         Please reconvene in the jury room at 2:35.

16         We're in recess.

17         (Jury out and recess taken at 2:19 p.m.)

18         (At 2:37 p.m. on August 20, 2014, with counsel for the

19    parties and the defendant present, and the jury NOT present,

20    the following proceedings were had:)

21              THE COURT:  Do we need to discuss anything before the

22    jury comes out?

23              MR. NORRIS:  I don't think so, not yet.

24              MR. BERRY:  Your Honor, I guess what I'd ask for,

25    there was a motion to suppress filed in this case.  And while

1    I don't know if we'll get specifically into any of that

2    evidence obtained pursuant to that search, I know that there's

3    going to be testimony regarding it.

4         I guess what I'd ask for at this point is for a

5    continuing objection to the search based on the motion to

6    suppress filed -- I believe it's at docket 105 -- and then a

7    continuing objection based on relevance and 403.

8         I believe what the government is going to talk about

9    right now is evidence seized during the search of

10   Mr. DeFoggi's home.  The indictment talks about acts that

11   occurred up through December of '12.  This search was in April

12   of 2013.  So I would ask for a continuing objection on those

13   bases throughout the testimony of the following witnesses.

14             THE COURT:  Mr. Becker?

15             MR. BECKER:  Just for the record, Judge, filing

16   number 148 was Judge Thalken's findings and recommendations

17   denying the defendant's motion to suppress.

18        Filing number 160 should be Judge Bataillon's memorandum

19   and order adopting those findings and denying -- excuse me.

20   Filing 169 is Judge Bataillon's memorandum and order denying

21   the motion to suppress and the objections thereto.

22             THE COURT:  Well, and I appreciate the fact that the

23   defense wants to make sure that those objections are

24   preserved.  And that the right to contend that the motion to

25   suppress should have been granted is not waived.

1           I can tell you, I am happy to recognize your continuing

2    objection.  Whether the Eighth Circuit will recognize the

3    continuing objection is another matter.  So what you're really

4    wanting to do is be sure your objection is preserved for

5    purposes of appeal.

6           MR. BERRY:  Yes, your Honor.

7           THE COURT:  So I leave it to you, whether me

8    recognizing your continuing objection is satisfactory for that

9    purpose; and if you wish to interject another objection at the

10   appropriate time, you may do so.  I guess that's all I can

11   say.

12          MR. BERRY:  Yes, your Honor.  Thank you.

13          THE COURT:  All right.

14       Ms. Gomez, please bring in the jury.

15       (Jury in at 2:40 p.m.)

16          THE COURT:  Mr. Norris, the government may call its

17   next witness.

18          MR. NORRIS:  Your Honor, we're going to call Special

19   Agent Patricia Teakle.

20          THE COURT:  All right.  Agent Teakle, if you'll

21   please come forward to the courtroom deputy here on my right,

22   she'll swear you in.

23          COURTROOM DEPUTY:  Please state your full name for

24   the record and spell your last.

25          THE WITNESS:  Patricia Joan Teakle, T-e-a-k-l-e.

1          PATRICIA TEAKLE, PLAINTIFF'S WITNESS, SWORN

2              THE COURT:  You may inquire.

3              MR. NORRIS:  Thank you, your Honor.

4                        DIRECT EXAMINATION

5     BY MR. NORRIS:

6     Q.   Would you state your name, please.

7     A.   Patricia Teakle.

8     Q.   And how are you employed?

9     A.   I'm currently a special agent in the Baltimore Division

10    of the Federal Bureau of Investigation.

11    Q.   How long have you been a special agent with the FBI?

12    A.   Since January of 2010.

13    Q.   How many years would that be?

14    A.   Approximately four and a half.

15    Q.   What was your education and background before coming to

16    the FBI?

17    A.   Graduate of the United States Military Academy at West

18    Point, and then I served in the United States Army.

19    Q.   Where are you currently assigned?

20    A.   The Baltimore Division of the FBI in the Crimes Against

21    Children squad.

22    Q.   And what are your responsibilities with that division?

23    A.   We investigate issues of child exploitation, child

24    prostitution, international parental kidnapping and child

25    abduction.

1    Q.   I want to direct your attention to March of 2013.   Did

2    you receive a PedoBook-related lead from Agent Tarpinian in

3    Omaha?

4    A.   I did.

5    Q.   What did -- what were you requested to do or what did the

6    lead request?

7    A.   The leader requested that we conduct a search warrant at

8    the subject's residence.

9    Q.   And where was that residence?

10   A.   In Germantown, Maryland.

11   Q.   Where is Germantown, Maryland?

12   A.   Germantown, Maryland, is approximately 10 miles from a

13   city called Rockville, Maryland, which is approximately 12

14   miles from Washington, D.C. as if you were traveling northwest

15   from the center of Washington, D.C.

16   Q.   Okay.   Can you tell us where Germantown is in relation to

17   Rockville, Maryland, and then where -- I know that you made

18   that connection of approximately 10 miles?

19   A.   I believe it's about 10 miles to the north.

20   Q.   How far is Washington from Rockville and how far is

21   Washington from Germantown -- Washington, D.C. obviously?

22   A.   I believe Washington, D.C. is approximately 20 to 22

23   miles from Germantown.

24   Q.   Thank you.

25        Now, who was the individual whose home the lead requested

1    to be searched?

2    A.    Timothy DeFoggi.

3    Q.    And what is it that you would be searching for?

4    A.    Any material related to child exploitation and PedoBook.

5    Q.    And who was the agent responsible for planning the

6    execution of the search warrant?

7    A.    I was.

8    Q.    And in preparing to execute that warrant, did you

9    investigate or did others investigate who Mr. DeFoggi was?

10   A.    Yes.  We conducted surveillance, database checks, we were

11   in contact with the agents from the Omaha division and major

12   case unit.

13   Q.    As the planner -- is there a technical term for an

14   individual who plans the search warrants?

15   A.    We call it usually the case agent.

16   Q.    All right.  So you were the local case agent with regard

17   to this search?

18   A.    Yes.

19   Q.    As the case agent responsible for putting together this

20   plan, what was it about Mr. DeFoggi that was significant to

21   you as it related to what you were being asked to do?

22   A.    We learned that Mr. DeFoggi was the acting cyber security

23   director for the Department of Health and Human Services.

24   Q.    And why did that create issues or concerns, say, over the

25   normal warrant?

1    A.   We interpreted that to mean that Mr. DeFoggi could have

2    an advanced knowledge of the Internet.  And therefore, we had

3    a concern about the destruction of evidence.

4    Q.   Did you yourself conduct surveillance while planning the

5    execution of the warrant?

6    A.   I did.

7    Q.   Tell us just in general terms what you did.

8    A.   Went to the house early to view the house and attempt to

9    view the occupants of the house traveling to and from the

10   house.

11   Q.   Was that successful?

12   A.   Yes.

13   Q.   Are you familiar with the term pen trap?

14   A.   Yes.

15   Q.   Can you give a brief explanation of what you understand a

16   pen trap to be?

17   A.   A pen trap or pen register is a court-approved noncontent

18   technique that allows the capture of signals to allow someone

19   to determine if the target of that signal trap is connected to

20   the Internet.

21   Q.   Was a pen trap useful with regard to your plans in

22   executing the search warrant at this Germantown residence?

23   A.   Yes, it was.

24   Q.   And why would that be?

25   A.   The pen trap allowed us to determine if a user in the

1    residence was connected to the Internet and connected to Tor.

2    Q.   And why was that significant to you or of interest to

3    you?

4    A.   We only wanted to conduct the search warrant if we knew

5    prior to its execution that we had suspected Tor traffic at

6    the residence.

7    Q.   All right.  Did you obtain a search warrant for the

8    defendant's residence there in Germantown?

9    A.   I did.

10   Q.   Is that the residence at Crown Ridge Point -- I'm sorry,

11   Crown Ridge Court?

12   A.   Yes.

13   Q.   What court gave you the authority to search that

14   residence?

15   A.   The United States court in Maryland.

16   Q.   Did the court grant you any special authority -- and not

17   just you, but to law enforcement, any special authority

18   authorizing you to execute that warrant in any certain way?

19   A.   Yes.  We requested and was granted by the court an

20   anytime no-knock warrant.

21   Q.   What does that mean?

22   A.   The no-knock portion of that phrase means that we could

23   enter the residence without knocking.  And the anytime portion

24   of that warrant means that we could conduct the warrant at a

25   time outside the routine hours of 6 a.m. to 10 p.m.

1    Q.   Why were these exceptions significant to you to the point

2    where you requested them?

3    A.   Because we only wanted to execute the search warrant if

4    we had the suspected Tor traffic at the residence.

5    Q.   I want to move forward a little bit and direct your

6    attention to April 9th of 2013.  Do you recall that day?

7    A.   I do.

8    Q.   Is that the day the search warrant was executed?

9    A.   It was.

10   Q.   Did the agents meet and stage preparations or plans prior

11   to executing the warrant?

12   A.   We did.  We staged at a parking lot, and I presented an

13   operational brief of the search warrant.

14   Q.   Did you come up with the operational plan?

15   A.   I did.

16   Q.   Briefly can you describe what the plan was?

17   A.   Sure.  It entailed two separate simultaneous entries into

18   the residence.

19   Q.   Using which doors and what levels?

20   A.   The main door in the front of the residence, and there's

21   a rear door in the basement of the residence.

22   Q.   Was there any discussion as to whether it would be

23   executed on April 9th or any other time as you had this

24   staging meeting on April 9th?

25   A.   We staged early in the morning on April 9th, but we were

1    only going to conduct the search warrant that day if we had

2    been notified that there was Tor traffic at the time.

3    Q.   Did there come a point on the morning of April 9th that

4    you received that notification?

5    A.   Yes.

6    Q.   And upon receiving that notification, what did you do?

7    A.   We left the staging area en route to the residence.

8    Q.   How far from the staging area to the residence?

9    A.   I don't recall.

10   Q.   Close?  Minutes?

11   A.   Close.  Minutes.

12   Q.   What time did you arrive at the residence?

13   A.   We conducted entry at approximately 5:25 in the morning.

14   Q.   I want to direct your attention to the exhibits before

15   you.  And if I could get you to open that book to Government's

16   Exhibit 42.  Is that before you?

17   A.   Yes.

18   Q.   Do you recognize that?

19   A.   I do.  It's the front of the residence.

20   Q.   And that's the residence in Germantown, Maryland, that

21   was searched on that date?

22   A.   Yes.

23   Q.   Is it a true and accurate depiction of that residence as

24   it would have appeared on that date?

25   A.   Yes.

 1              MR. NORRIS:  Your Honor, I would offer Exhibit 42 at

 2     this time.

 3              MR. BERRY:  No objection.

 4              THE COURT:  Exhibit 42 is received.

 5              MR. NORRIS:  May I publish?

 6              THE COURT:  You may.

 7     BY MR. NORRIS:

 8     Q.   Tell us a little bit about where that residence is

 9     situated, what type of neighborhood and what kind of street?

10     A.   The neighborhood is full of similarly aged single-family

11     homes.  And I believe that this is one of maybe five or six

12     homes on a cul-de-sac.

13     Q.   What time did you arrive at the home approximately?

14     A.   It would have been shortly before 5:25 a.m.

15     Q.   And you indicated previously that there were two teams?

16     A.   Yes.

17     Q.   Can you describe where the front or main level entry team

18     was to enter?

19     A.   The front entry team would have taken available parking

20     in the neighborhood and then approached the front door this

21     way (indicating).

22     Q.   All right.  Were you a member of the front entry team or

23     the back?

24     A.   I was in the rear entry team.

25     Q.   How many agents were assigned to that team?

1    A.   There were four members of that team that included

2    myself, Special Agent Winn, Task Force Officer Tyson and

3    Supervisory Special Agent Mizer.

4    Q.   What type of entry -- we know that it's a dual entry.

5    How was it to be timed?

6    A.   We were attempting to have a simultaneous entry into the

7    residence.

8    Q.   And how was that going to being accomplished?

9    A.   Our initial plan was to have it conducted over the radio.

10   Q.   Did that work?

11   A.   No.

12   Q.   Why not?

13   A.   Our radios failed.

14   Q.   And when your radios failed, what did you do next?

15   A.   We used the audible noises of making entry in the team in

16   the rear where I was to alert the team in the front of the

17   residence to conduct the entry.

18   Q.   Was one of those audible noises starting to bang on --

19   make entry into the back door?

20   A.   Yes.

21   Q.   What time was entry made?

22   A.   At approximately 5:25 a.m.

23   Q.   Right before entry was made, was anybody able to peer

24   into the basement area where you were about to enter?

25   A.   Yes, Task Force Officer Tyson leaned down to the doors of

1    the basement which appeared to be French doors with many mini

2    blinds, and he could tell that there was an individual inside

3    the residence at the time.

4    Q.   Did he communicate that to the rest of the team?

5    A.   The entry team at the rear, yes.

6    Q.   Was a decision made to enter?

7    A.   Yes.

8    Q.   Who made that decision?

9    A.   I believe it was a collective decision.

10   Q.   What happened?

11   A.   When we made entry into the rear of the residence, I

12   remember Supervisory Special Agent Mizer and Task Force

13   Officer Tyson were in front of me and appeared to encounter a

14   male holding a gaming controller between a couch and the TV.

15   Q.   Did you make contact with that individual?

16   A.   I did not make contact with that individual because once

17   I realized it was a gaming controller, I moved left with

18   Special Agent Winn to clear the rest of the basement in a

19   safety sweep.

20   Q.   Did you make contact with that individual who was holding

21   the gaming controller at some point during that morning?

22   A.   Later, I did.

23   Q.   And were you able to later identify who he was?

24   A.   He was identified as Christopher Casto.

25   Q.   Is that somebody other than the defendant?

1    A.    Yes.

2    Q.    And how old was Mr. Casto approximately?

3    A.    I believe he's in his 20s.

4    Q.    So as you entered, there's Mr. Casto, who is on a gaming

5    device, correct?

6    A.    Holding a gaming controller.

7    Q.    Tell us what happens as you see that.  What happens next?

8    A.    Special Agent Winn and I continued to the left of the

9    basement residence to clear the area.  And then I can hear

10   Special Agent Mizer shouting, "Someone's gone up," or, "One's

11   going up," or maybe both.

12   Q.    Why was that significant to you?

13   A.    Because we were conducting a dual entry, and because

14   we're not specialized at tactically -- I gave very clear

15   instructions in the staging areas that agents responsible for

16   clearing each floor of the residence were not to cross floors.

17   Q.    What was your concern?

18   A.    Cross fire.

19   Q.    So the four agents who entered into the main level and

20   encountered Mr. Casto were not allowed to do what?

21   A.    In the basement, we're not allowed to travel up the

22   stairs.

23   Q.    What happens next?

24   A.    We finished combing the basement without incident.  And

25   to my knowledge, Task Force Officer Tyson, Special Agent Mizer

1   and Mr. Casto were also there.  After Mizer shouted, "up the

2   stairs," the rest of the teams on the other floors completed

3   their clearing of their floors and then gave an audible "all

4   clear".

5   Q.   Thank you.

6        I want to direct your attention to a couple of exhibits

7   that are going to be before you.

8        I want to start with Exhibit 25.  Do you have that before

9   you?

10  A.   I do.

11  Q.   When you -- is it currently in front of you and

12  manageable?

13  A.   It is.

14  Q.   Do you recognize Exhibit 25?

15  A.   I do.

16  Q.   What is it?

17  A.   It appears to be a picture of the basement from the area

18  of the stairs.

19  Q.   Is it a true and accurate depiction as to how that

20  basement appeared upon entry --

21  A.   Yes.

22  Q.   -- on that morning?

23  A.   Yes.

24       MR. NORRIS:  Your Honor, I would offer Exhibit 25.

25       MR. BERRY:  No objection.

1          THE COURT:  Did you say no objection?

2          MR. BERRY:  Yes, your Honor.

3          THE COURT:  Exhibit 25 is received.

4          MR. NORRIS:  Permission to publish.

5          THE COURT:  You may.

6    BY MR. NORRIS:

7    Q.   Can you explain to the members of the jury how the

8    basement was laid out at that particular time?

9    A.   Sure.  This picture appears taken with your back to the

10   stairs.  So your right shoulder would be facing the upward

11   direction of the stairway.

12        Also, if you look past this white-and-brown pillar

13   (indicating), that's where the French doors would be which is

14   our entry point into the basement.

15   Q.   We'll have another picture that will help assist with

16   that.

17        With regards to Exhibit 25 as it appears before you, can

18   you advise the members of the jury where Mr. Casto was when

19   officers made entry?

20   A.   Sure.  Mr. Casto appeared to be in this general location

21   (indicating) where the gaming controller is now.

22   Q.   As you entered, did he continue to at least hold on to

23   the gaming controller?

24   A.   Yes.

25   Q.   Was he cooperative upon --

1    A.    Yes.

2    Q.    -- your commands?

3    A.    I didn't actually give him commands, but he appeared

4    cooperative.

5    Q.    I'm going to ask you now to turn your attention to

6    Exhibit 26.  Do you have that before you?

7    A.    I do.

8    Q.    Do you recognize that?

9    A.    Yes.

10   Q.    What is it?

11   A.    A picture of the basement area with -- taken from the

12   perspective of your right shoulder towards the TV.

13   Q.    Is it a true and accurate depiction of the basement area

14   at the time that the search team entered on to the basement

15   level?

16   A.    It is.

17             MR. NORRIS:  May I offer that, your Honor.

18             THE COURT:  Any objection to 26?

19             MR. BERRY:  No, your Honor.

20             THE COURT:  Exhibit 26 is received.

21             MR. NORRIS:  May I publish?

22             THE COURT:  You may.

23   BY MR. NORRIS:

24   Q.    Now, for the members of the jury, can you explain what is

25   depicted in Exhibit No. 26.  And can you start, please, with

1   where entry was made?

2   A.   Sure.  The door's located here (indicating) which is

3   where we made entry into the residence.

4   Q.   How much distance between the door where you would have

5   made entry to the couch where you would have encountered

6   Mr. Casto?

7   A.   I would approximate that to be around ten feet.

8   Q.   Okay.  Is there anything on the door that you've now

9   circled that would indicate where one of the task force

10  officers was able to peer in before entry?

11  A.   Yes.  It would be this area of the door (indicating)

12  where the blinds are raised.

13  Q.   Using this exhibit, can you describe for the members of

14  the jury where the doors leading upstairs where Agent Mizer

15  was alerting people that somebody was heading up stairs, where

16  those would have been located -- not doors, but, I guess, the

17  stairwell?

18  A.   Sure.  The stairwell would have been out of frame towards

19  the right.

20  Q.   Approximately how many feet from where the couch is?

21  A.   I could approximate that to be five feet.

22  Q.   So in close proximity?

23  A.   Uh-huh.

24  Q.   If you could clear that screen?  Do you know how to do

25  that?

1    A.   Yes.

2    Q.   I want to direct your attention to Exhibit 27.  Is that

3    before you?

4    A.   It is.

5    Q.   And do you recognize Exhibit 27?

6    A.   I do.

7    Q.   What is it?

8    A.   It's another angle of the basement standing with your

9    left shoulder to the French doors and your right shoulder to

10   the couch.

11   Q.   Again, is it a true and accurate depiction as to how the

12   basement was situated at the time of the entry?

13   A.   It is.

14        MR. NORRIS:  Your Honor, I would offer Exhibit 27.

15        THE COURT:  Any objection?

16        MR. BERRY:  No objection.

17        THE COURT:  Exhibit 27 is received.

18        MR. NORRIS:  May I publish?

19        THE COURT:  You may.

20   BY MR. NORRIS:

21   Q.   Now, again I would ask you, using Exhibit 27 to help

22   orientate the jury as to where the stairwell was as well as

23   what is in the area that's depicted.

24   A.   Sure.  The entry doors are actually here (indicating).

25   The stairwell would be up here (indicating) on the right side

TEAKLE - DIRECT                                                        322

1    of the frame.

2    Q.   Where's the couch?

3    A.   The couch would be here (indicating).

4    Q.   There is -- in close proximity to a pillar?

5    A.   Yes.

6    Q.   As it appears that one would enter from the outside

7    through the French doors, through the walkout basement,

8    whatever you want to call it, there seems to be tile.  Is that

9    a fair and accurate --

10   A.   Yes.

11   Q.   What appears to the left of the tile?  What is that area?

12   A.   It's an area with a closet and a storage room.  And then

13   there's another room off in this direction here (indicating).

14   Q.   Thank you.

15        I'm going to now direct your attention to Exhibit No. 24.

16   And while we're looking at that, I'd also like you to take a

17   look at Exhibits 35 and 36 at the same time.  And let me know

18   when you have that chance.

19   A.   Would you like 24 first?

20   Q.   We can do all three at once, if you want to take a look

21   at all three of them.

22   A.   24, 35 and 36?

23   Q.   Yes.

24   A.   Okay.

25   Q.   Have you had a chance to view those?

1    A.   I do.

2    Q.   Can you describe in general what it is that they portray?

3    A.   Sure.  Exhibit 35 appears to be a photograph of the

4    stairs that's taken from the main floor.

5    Q.   And 36?

6    A.   36 and 24 appear to be similar-sized photographs as taken

7    from the landing of that staircase depicted in Exhibit 35.

8    Q.   Are they true and accurate depictions of the staircase

9    leading from the basement to the main floor as it was

10   encountered on the morning that the team made its entry?

11   A.   It is.

12        MR. NORRIS:  Your Honor, I would offer Exhibits 24,

13   35 and 36.

14        MR. BERRY:  No objection.

15        THE COURT:  Exhibits 24, 35 and 36 are received.

16        MR. NORRIS:  Your Honor, may I have permission to

17   publish those?

18        THE COURT:  You may.

19   BY MR. NORRIS:

20   Q.   Can you again describe for the members of the jury where

21   that stairwell goes to and where it leads from -- leads to and

22   approximately how much of a link there is in between?

23   A.   Sure.  This photograph appears to be taken from the

24   landing with your right shoulder on a poster that's been

25   hanging in the stairway.  And your left shoulder would be

 1    directed up the stairs and on to the main floor.

 2    Q.   How many steps or how many feet would be from the landing

 3    to the next set of steps?

 4    A.   From this landing to the basement, it's approximately

 5    five steps.

 6    Q.   Okay.  Then which one next would describe what is leading

 7    up to the kitchen, the kitchen area?

 8    A.   Exhibit 35.

 9    Q.   Okay.  When you make the turn on the landing, where do

10    you go?

11    A.   This picture is from the main floor looking down to the

12    stairs with the poster I mentioned.  So if you were going

13    downstairs, you would make a left turn down the stairs into

14    the basement.  Similarly --

15    Q.   How many steps are you going down in order to get to the

16    poster from the landing on the main floor?

17    A.   I don't recall.

18    Q.   Okay.  How many feet, if that's easier, just an

19    estimation?

20    A.   Three feet.

21         (Off-the-record discussion had.)

22    BY MR. NORRIS:

23    Q.   Upon entry -- I know you had a no-knock entry.  But once

24    you entered, are there commands that are issued and ordered?

25    A.   Yes.  We identify ourselves as police or as FBI, and we

1    also announce "search warrant".

2    Q.   So what was done on this particular morning as you

3    entered through the basement?  Who said what?

4    A.   I know that most of us, if not all of us, would have made

5    commands that stated, "Police.  FBI.  Search warrant."

6    Q.   And is that made upon breaching the threshold of the

7    door?

8    A.   It's made upon crossing a portal; so a hallway, an entry

9    door, an interior door.

10   Q.   So it's repeated often?

11   A.   Several times.

12   Q.   Would that command have been made upon breaching the

13   French doors as you entered the residence?

14   A.   Yes.

15   Q.   And how loud are those commands made?

16   A.   Louder than a speaking voice; usually a shout.

17   Q.   Thank you.

18        MR. NORRIS:  I have no further questions.

19        THE COURT:  Cross-examination?

20                    CROSS-EXAMINATION

21   BY MR. BERRY:

22   Q.   What techniques did you use to breach the back door of

23   the basement?

24   A.   I don't recall.

25   Q.   Did someone kick it in, do you know?

1    A.   I don't know.

2    Q.   But generally you break in, right?  On a no-knock warrant

3    you break in.

4    A.   We were armed with rams if we needed them.

5    Q.   Rams being battering rams, correct?

6    A.   Yes.

7    Q.   You don't recall whether you used those, correct?

8    A.   I'm sorry, I don't.

9    Q.   Thank you.

10        MR. BERRY:  No further questions.

11        THE COURT:  Redirect?

12                        REDIRECT EXAMINATION

13   BY MR. NORRIS:

14   Q.   What other ways are there to get in?

15   A.   You could simply open the door.

16   Q.   If it was left unlocked.

17   A.   Yes.

18   Q.   And short of a battering ram, are there other means of

19   entry that a task force or search team could use?

20   A.   Opening the door, using a key if one has one to the door,

21   using a breaching tool like a ram.  Generally in knocking

22   situations, we knock and request someone to come open the

23   door.

24   Q.   Did you see any broken glass or anything of that nature

25   in any of these photographs?

1    A.   I did not.

2    Q.   Do you recall any broken glass or anything from your

3    being present on that morning?

4    A.   No, I don't.

5    Q.   Thank you.

6              MR. NORRIS:  I have no further questions.

7              THE COURT:  Thank you, Agent Teakle.  You may stand

8    down.

9              THE WITNESS:  Thank you.

10             THE COURT:  The government may call its next witness.

11             MR. NORRIS:  Your Honor, our next witness is going to

12   be Michael Mizer, M-i-z-e-r.

13             THE COURT:  Mr. Mizer, please come forward to the

14   courtroom deputy, she will swear you in.

15             COURTROOM DEPUTY:  Please state your full name for

16   the record and spell your last.

17             THE WITNESS:  Full name is Michael Mizer, M-i-z-e-r.

18              MICHAEL MIZER, PLAINTIFF'S WITNESS, SWORN

19             THE COURT:  You may inquire.

20             MR. NORRIS:  Thank you.

21                            DIRECT EXAMINATION

22   BY MR. NORRIS:

23   Q.   State your name, please.

24   A.   Michael Mizer.

25   Q.   And how are you employed?

1    A.    I am a supervisory special agent with the FBI.

2    Q.    What is a supervisory special agent?

3    A.    Right now I supervise a squad and a task force, Crimes

4    Against Children squad, in Baltimore, Maryland.

5    Q.    How long have you been a special agent with the FBI?

6    A.    Coming up on 19 years.

7    Q.    What other duties and responsibilities other than being

8    the supervisory special agent have you held?

9    A.    Primarily as an agent, I worked drugs, gangs, and violent

10   crime in Detroit, San Juan, and Baltimore.

11   Q.    I want to direct you to a search warrant that would have

12   been executed in Germantown, Maryland.  Are you familiar with

13   Germantown, Maryland?

14   A.    Yes.

15   Q.    And specifically, I want to direct your attention to

16   April 9th of 2013.  Were you part of that search team --

17   A.    Yes.

18   Q.    -- or execution team?

19         What was your role in that?

20   A.    I was part of the entry team on the lower level of the

21   residence.

22   Q.    Do you recall other members of that entry team?

23   A.    Yes, I do.

24   Q.    And who were some of the other members?

25   A.    Detective Tyson, Special Agent Teakle.

1    Q.   Do you supervise Agent Teakle?

2    A.   Yes, I do.

3    Q.   And was Special Agent Teakle the agent who was

4    responsible for putting together the operational plan for the

5    warrant?

6    A.   Yes, she was.

7    Q.   And you would have made entry with her at the back of the

8    residence on that morning?

9    A.   That's correct.

10   Q.   Do you remember what time you executed the warrant?

11   A.   No, I'm not exactly sure.

12   Q.   Do you remember what time of day?

13   A.   It was roughly around 6 a.m.

14   Q.   So it was early in the morning?

15   A.   Yes.

16   Q.   What was your role or what did you understand your role

17   to be as far as the entry team when it was time to go in?

18   What was the plan?

19   A.   We had a two-prong plan.  We had one entry team that was

20   going to go on the upper level and my team was going to be on

21   the lower level.

22        Upon entry, we were going to secure and clear the lower

23   level and not to intermingle with the upstairs team to prevent

24   a blue-on-blue incident.

25   Q.   When you say "blue-on-blue", can you explain to those of

1   us who aren't familiar with that term what that means?

2   A.   Well, normally you don't do an entry -- usually one entry

3   point into a res- -- into a house.  On this occasion, we

4   decided two entries, which is somewhat unusual.

5        In order for us, law enforcement, not to engage each

6   other, the decision was made that the lower level and the

7   upper level, they would stay on their levels and not

8   intermingle.  This prevents someone from getting hurt or shot.

9   Q.   So blue-on-blue would be friendly fire, cross fire,

10  something along those lines that maybe we would understand

11  that easier?

12  A.   Correct.

13  Q.   So was the entry to be made simultaneously?

14  A.   Yes.

15  Q.   Was there an issue?

16  A.   I think it was a communication issue.

17  Q.   So was a decision made on the basement level where you

18  were to go on in?

19  A.   Yes, it was.

20  Q.   And where were you as far as the entry, the number of

21  agents?  Where were you in the order of people breaking the

22  threshold?

23  A.   I was the first one in.  After the breacher hit the door,

24  I was the first one into the lower level.

25  Q.   Upon the breacher hitting the door, were you saying

1    anything?  Did you hear anything?

2    A.   Yeah.  Immediately when I first ran in, everybody yelled,

3    "FBI, FBI, search warrant."

4         I immediately noticed a white male near a couch and

5    television.  I yelled at him to get his hands up.

6    Q.   Did he comply?

7    A.   Yes.

8    Q.   And once he complied, what did you do?

9    A.   I went past him and let the officer behind me secure that

10   individual.

11   Q.   Okay.  And where did you go -- first of all, let's talk

12   about the first individual that was secured.  What was he

13   doing at the time you first saw him?

14   A.   He was sitting in front of the television or in the area

15   in front of the television on a couch.

16   Q.   Okay.  Did he have anything in his hand?

17   A.   I believe he had a remote.

18   Q.   Either the TV or a gaming device?

19   A.   I'm not sure.

20   Q.   But you were able to discern that it was something that

21   you didn't have to shoot him --

22   A.   Correct.

23   Q.   -- or -- all right.

24        So you pass him off to the person behind you.

25   A.   That's correct.

1    Q.   And where do you go from there?

2    A.   Once I pass him off, I went past him.  I immediately went

3    to my left towards the stairs for the lower level.

4    Q.   What do you see there?

5    A.   At this point I see a possible white male in light-

6    colored underwear starting to go up the steps.

7    Q.   When you say "possible white male," did you see a person?

8    A.   I saw white legs and light-colored underwear; appeared to

9    be male underwear.  At that point I yelled out, "We've got

10   someone coming upstairs," to warn the upstairs team that

11   someone was coming up.

12        From there, I went towards the stairwell.  By the time I

13   got to the stairwell, I checked it.  There was no one on the

14   stairwell at that point.

15   Q.   Did you yell anything else at that point?

16   A.   No.

17   Q.   What did you do after you checked the stairwell and there

18   was no longer a body or the white underwear in the stairwell?

19   A.   I maintained my position there.  And then I helped clear

20   the rest of the residence.  I think it was a bathroom to my

21   left and proceeded to start searching after it was clear.

22   Q.   When was it safe to move from one level to -- like, the

23   basement level to the main level, or from one level to another

24   within the house?

25   A.   Both teams announced the house was clear and everyone was

MIZER - DIRECT                                                    333

1    secure in the residence.

2    Q.   When you entered the residence upon the breach in order

3    to execute the warrant, how far was the individual who had the

4    gaming device or control in his hand or remote, whatever you

5    want to call it, from you as you entered?

6    A.   About 15 feet or so, 15.

7    Q.   And how far would it have been from that particular spot

8    to the stairwell where you --

9    A.   It was approximately the same distance, about 15.

10          THE COURT:  I need to make sure -- we haven't

11   reminded you of this, but the jurors and others have heard it

12   before.

13          We're taking down every word that's being said through

14   the court reporter, so we have to make sure we never have two

15   people talking at the same time or we can't get a clear

16   record.

17          So please be sure that the question is completely done

18   before you start your answer and vice versa.

19          Thank you.

20          (Off-the-record discussion had.)

21   BY MR. NORRIS:

22   Q.   You went and checked the stairwell?

23   A.   Correct.

24   Q.   When you were still downstairs, and when you got the all-

25   clear was Mr. -- the individual who had the controller, he was

1   there the whole time, correct?

2   A.   Yes, he was.

3   Q.   Thank you.

4        MR. NORRIS:  I have nothing else, your Honor.

5        THE COURT:  Cross-examination?

6        MR. BERRY:  I don't have any questions for this

7   witness, your Honor.

8        THE COURT:  Very good.  Thank you, Mr. Mizer.  You

9   may stand down.

10       The government may call its next witness.

11       (Off-the-record discussion had.)

12       MR. NORRIS:  The next witness is going to be Kevin

13   Smith.

14       THE COURT:  Mr. Smith, if you'll please come forward

15   to the courtroom deputy here on my right, she will swear you

16   in.

17       COURTROOM DEPUTY:  Please state your full name for

18   the record and spell your last.

19       THE WITNESS:  It's Detective Kevin Smith, S-m-i-t-h.

20          KEVIN SMITH, PLAINTIFF'S WITNESS, SWORN

21       THE COURT:  Feel free to help yourself to some water

22   if you need a glass of water.

23       THE WITNESS:  Thank you, ma'am.

24       THE COURT:  You may inquire.

25       MR. NORRIS:  Thank you, your Honor.

```
 1                        DIRECT EXAMINATION

 2   BY MR. NORRIS:

 3   Q.    Would you please state your name.

 4   A.    It's Detective Kevin Smith.

 5   Q.    And how are you employed?

 6   A.    I'm with the Baltimore County Police Department Crimes

 7   Against Children unit.

 8   Q.    And where is that?

 9   A.    It's in Baltimore County, Maryland.

10   Q.    And how long have you been so employed?

11   A.    Almost 21 years.

12   Q.    And during those 21 years with Baltimore County, what

13   other positions have you held?

14   A.    I've been a detective for about 18 of those years.  I was

15   on our vice narcotics unit for several years.  And I have

16   approximately 15 years doing child sexual exploitation

17   investigations.

18   Q.    Were you a task force officer that worked with the FBI?

19   A.    Yes, I was.

20   Q.    During what time period?

21   A.    Within the last three years, up to about nine months ago.

22   Q.    And what happened nine months ago?

23   A.    Nine months ago our agency decided to rotate people from

24   our department through to give other detectives the

25   opportunity to be part of a task force.
```

 1   Q.   I want to direct your attention back to April 9th of

 2   2013.  Were you on the task force at that time?

 3   A.   Yes, I was.

 4   Q.   And did you have an assignment on April 9th?

 5   A.   Yes, I did.  I was assisting on a search warrant.

 6   Q.   Where was that search warrant?

 7   A.   It was in Montgomery County, Maryland.

 8   Q.   What town in Montgomery County, Maryland?

 9   A.   Offhand, I don't remember.  I had the address and

10   everyone on a briefing form, but...

11   Q.   Let me ask you this:  Where did you show up?

12   A.   I showed up -- we met at a school parking lot in

13   Montgomery County, Maryland; and had a briefing.

14   Q.   Approximately what time?

15   A.   We met a little bit after 5 and did the search warrant

16   approximately 5:30 in the morning.

17   Q.   Okay.  When you met up -- did you meet up for the purpose

18   of staging?

19   A.   Yes.  We were staging, making sure that the -- dividing

20   up into the teams to execute the search warrant and to go over

21   last-minute details and assignments for who was supposed to do

22   what.

23   Q.   When did you first learn that this was going to be your

24   assignment on April 9th?

25   A.   The night before I was asked if I was available.  And the

1    morning of the staging is when I learned what exactly it was I

2    was doing at the search warrant.

3    Q.   If I indicated to you that the search warrant was

4    executed at a Crown Ridge Court address in Germantown,

5    Maryland, would that refresh your recollection, or would you

6    have any reason to dispute that?

7    A.   No, I would have no reason to dispute it.

8    Q.   All right.  When you meet at the staging area, what is

9    your role?  What are you told that your role would be?

10   A.   My role and one of the reasons I was the last-minute

11   add-on was to breach the door.  Basically to "breach the door"

12   means I'm the one that knocks the door down to let the entry

13   team that.

14       Once in the location, then I was to help search and

15   secure the location until everything was settled.  And then I

16   was no longer needed.

17   Q.   Did you travel from the staging area to the residence in

18   Germantown?

19   A.   Yes, I did.

20   Q.   Was there more than one entry being staged

21   simultaneously?

22   A.   Yes, there were.  There were two entries, one being

23   around back out to the basement, and one at the main level in

24   the front.  I was assigned at the main level in the front.

25   Q.   Do you recall what time the warrant was executed?

1    A.   Again it was around 5:30 in the morning.

2    Q.   How many agents and task force officers or officers in

3    general were with you at the front of the residence prior to

4    the execution?

5    A.   Approximately six, maybe seven; I'm not sure of the exact

6    -- but it was six or seven.

7    Q.   You indicated earlier that your responsibility was part

8    breach, correct?

9    A.   That's correct.

10   Q.   Can you explain to the members of the jury what a

11   breacher does and what tool you used on the main or upstairs

12   level?

13   A.    In order to breach the door, basically it's a thing we

14   call a ram.  It's a 40-pound big piece of ram metal with two

15   handles on it.  And the whole objective is to swing it hard,

16   hit the door, and it pretty much knocks the door, the door

17   frame in so that the entry team can get in.

18        And the whole reason for doing that is they would like

19   for you to open the door, knock it open in one hit for safety

20   reasons, for time reasons.  And because I've had training and

21   have breached several doors, that's why I was asked to assist

22   on this search warrant.

23   Q.   I'm going to ask -- I'm going to put before you

24   Government Exhibit No. 42.  It's already been offered into

25   evidence.

1          Do you recognize that?

2     A.    Yes.   That looks like the location where we conducted the

3     search warrant.

4     Q.    By touching the screen with your finger, can you explain

5     where you accomplished breach that morning?

6     A.    I accomplished breach at the front door, right here

7     (indicating), going up a few steps to the front porch.

8     Q.    You can touch it a little harder, and it will make a mark

9     on the monitor.

10         Now, what does the breacher normally do after he rams a

11    door with the equipment?  What does he do next?

12    A.    He then falls into the lineup.  The lineup is basically

13    the officers or agents going in to clear the location.

14         On this particular one, I just seen there was an agent in

15    front of me that there was no one right on his heels going in.

16    So after breaching the door, I put the ram down, drew my

17    firearm from my holster, and immediately went in the door

18    behind the agent in front of me.

19         And as we entered, I've always been trained to make sure

20    the person in front of you knows that there's someone with

21    them.  As we entered the location, we went to the left.  And I

22    kept telling the agent that I was with him, so that he would

23    know that he wasn't walking into rooms by himself.

24    Q.    Do you know what agent you were accompanying?

25    A.    It was Agent Steve Smith.

 1    Q.   You indicated before making the entry or making the

 2    breach that there were a number of agents that were assembled

 3    outside the front door there.

 4         Where in the line of agents did you and Agent Smith end

 5    up coming into the residence?

 6    A.   I don't know the exact spot that we were.  All I know is

 7    whatever number he was, I was one behind him.

 8         And when I went in, I stayed with him the entire time

 9    saying, "I'm with you, I'm with you," as we went from room to

10    room.

11    Q.   Had you met Agent Smith prior to this morning -- or prior

12    to the morning that this search warrant had --

13    A.   No, I had not.

14    Q.   When you enter the residence, what direction do you go?

15    A.   We went to the left.  We thought we seen some kind of

16    movement.  So basically, go into -- it's like a living room

17    and to the left was a dining room.  And then from the dining

18    room, we went through to a kitchen.

19         And we just thought we picked up some kind of movement or

20    shadows.  As we turned to the kitchen, there was a cat.  So

21    briefly I thought maybe the cat was what we seen moving.  And

22    I heard Special Agent Smith -- he took another step and I

23    heard him, like, yell, "Stop, police.  Stop."  And he went

24    straight out through the kitchen, to another sunken family

25    room where we --

1    Q.    Were you able to see anything from your vantage point?

2    A.    Yes.  There was a subject sitting -- crouched down over a

3    computer doing something with the keyboard.

4    Q.    Okay.  When you say there was a subject crouched over a

5    computer, where was the computer at?

6    A.    The computer was on a -- I think it was like a pillow or

7    futon or something in the down part of the sunken family room.

8    Q.    When you say this individual was crouched over a

9    computer, where were his hands?

10   A.    His hands were on the keyboard.

11   Q.    Was this individual part of the search team?

12   A.    No, he was not.

13   Q.    What was this individual wearing?

14   A.    From what I remember, it was either boxers or sweatpants.

15   I don't remember the exact color.  The only reason is they

16   were loose fitting -- he had loose-fitting bottoms on because

17   I'm the one that actually, once he was secured, frisked him

18   for weapons and for our safety.  And I knew that he had very

19   loose-fitting bottoms on.

20   Q.    So where are you in the house when you notice this

21   individual with his hands on the keyboard?

22   A.    We're coming out of the kitchen.  And like I said, if you

23   go straight through the kitchen, there's, like, two or three

24   steps into a sunken family room.

25         On the top of the steps was a little welcome mat kind of

1    rug.  Agent Smith was able to make it over the little rug.  As

2    my feet hit it, I actually slid down, with the rug, the two

3    steps.

4          There was a bannister to the left.  I was able to swing

5    back, keep my gun up, my eyes focused on what was going on,

6    and as I was pulling myself up -- I didn't hit all the way to

7    the ground; but as I was pulling myself up, I holstered my

8    weapon.

9          Agent Smith had pushed the subject away from the

10   computer.  I came around immediately to the subject and

11   secured him, just basically telling him, you know, let me see

12   his hands.  And I kind of pulled him and frisked him and put

13   him up against the wall.  There's a fireplace.

14         When I put him up against the wall --

15   Q.   Well, let me ask you this --

16   A.   Yes.

17   Q.   -- when you first saw -- is the individual who you saw at

18   the computer, is he in this courtroom?

19   A.   Yes, he is.

20   Q.   Can you describe where he is or point him out?

21   A.   He's actually seated right here (indicating) at the

22   defense table.

23   Q.   Where amongst the three seated at the defense table?

24   A.   In the middle.

25   Q.   When you first saw the defendant, where -- what was

1    Mr. Smith -- Agent Smith telling him to do?

2    A.   He was saying, "Police, stop."  And I'm pretty sure he

3    was saying, "Let me see your hands."  That's just something

4    that is kind of a common practice on search warrants for our

5    safety.

6    Q.   Were you able to see the defendant as Agent Smith was

7    yelling at him, "Stop, let me see your hands"?

8    A.   Yes, he stayed crouched down at the computer.

9    Q.   And did the defendant comply with any of Special Agent

10   Smith's commands?

11   A.   No, he did not.

12   Q.   How was the defendant then removed -- his hands removed

13   from the computer?

14   A.   Agent Smith had pushed him or bumped him over, pretty

15   much knocked him off the computer.  And again at which time I

16   came around to secure the defendant.

17   Q.   Can you describe the computer that you saw the defendant

18   on?

19   A.   It was a laptop.  I could see there was something on the

20   screen, so there were active screens, but I couldn't see

21   exactly what was on the screen.

22   Q.   Was your role on this morning to collect evidence or just

23   to help secure the scene?

24   A.   I was just to help secure the scene.  Again, I was mainly

25   there just to breach.  So I did the breaching, I helped to

1    secure the actual location, meaning we searched through for

2    people to make sure that anybody in the location is secured.

3        Once the other agents got all their equipment in, I think

4    probably 20 minutes later, I had already left.  So as the

5    search warrant was going on, I left the location.

6    Q.   When you observed Agent Smith push the defendant off of

7    the computer, what was Agent Smith's responsibility at that

8    point?

9    A.   He had -- went to the computer, kind of stayed with the

10   computer.  Once he realized that I went to the defendant, he

11   stayed with the computer.  And we were pretty much within

12   arm's reach of each other.

13   Q.   Where did you take the defendant once you secured him?

14   A.   I actually put him up against a wall.  There's a

15   fireplace in the same room.  I had him face the wall and told

16   him to keep his hands up on the wall.

17   Q.   What, if anything, did you notice about the defendant's

18   movements or what he was doing as you were with him near the

19   wall?

20   A.   He continued to try to turn around to look in our

21   direction -- or look into Agent's Smith direction where the

22   computer still was.

23       So with that he wasn't being combative, but he wasn't

24   really being cooperative either.

25   Q.   All right.  How many law enforcement officers were on the

1   main level where you and Officer Smith were?

2   A.   To be exact, I don't know.  Again for the rooms I went

3   in, there was just me and Agent Smith going from room to room.

4   Once it was secured, I know they had forensics people there.

5   There were other agents, but I don't know the exact number.

6   Q.   But your obligation was to stay on the main floor,

7   correct?

8   A.   That's correct.

9   Q.   Was there anybody other than the defendant -- that wasn't

10  law enforcement -- on the main floor when you executed the

11  search?

12  A.   During the time of the search and clearing it, no.

13  Q.   So the only non-law enforcement person on that floor was

14  the defendant at the time that you encountered him?

15  A.   That is correct.

16       (Off-the-record discussion had.)

17            MR. NORRIS:  No further questions, your Honor.

18            THE COURT:  Cross-examination?

19                         CROSS-EXAMINATION

20  BY MR. BERRY:

21  Q.   When you were stacked up at the front door, do you know

22  how many people were in that stack?

23  A.   No, I do not.

24            MR. BERRY:  I don't have any additional questions.

25            MR. NORRIS:  Nothing else.

```
 1                    THE COURT:  Very good.

 2           Thank you, Officer.  You may stand down.

 3                    THE WITNESS:  Thank you.

 4                    THE COURT:  The government may call its next witness.

 5                    MR. NORRIS:  We'll call Special Agent Steven Smith.

 6                    THE COURT:  Special Agent Smith, please come forward

 7      to the courtroom deputy here on my right.  She will swear you

 8      in.

 9                    COURTROOM DEPUTY:  Will you please state your full

10      name for the record.

11                    THE WITNESS:  Steven A. Smith, Jr.

12                    COURTROOM DEPUTY:  Will you spell your last name,

13      please?

14                    THE WITNESS:  Smith, S-m-i-t-h.

15                     STEVEN SMITH, PLAINTIFF'S WITNESS, SWORN

16                    THE COURT:  You may inquire.

17                    MR. NORRIS:  Thank you, your Honor.

18                               DIRECT EXAMINATION

19      BY MR. NORRIS:

20      Q.   Would you state your name, please.

21      A.   Steven A. Smith, Jr.  Steven, S-t-e-v-e-n.

22      Q.   How are you employed?

23      A.   With the Federal Bureau of Investigation.

24      Q.   How long have you -- in what capacity, first of all?

25      A.   Special Agent.
```

1    Q.   How long have you been a special agent with the FBI?

2    A.   Almost seven years.

3    Q.   What's your education and background before coming into

4    the Bureau?

5    A.   I have a computer science degree from the University of

6    Georgia Tech in Atlanta, Georgia.

7    Q.   And what other duties and assignments have you held with

8    the Bureau prior to your current assignment?

9    A.   Prior to my current assignment, I was assigned to the

10   Cleveland Division, Toledo resident agency, working all types

11   of cyber investigations including child exploitation.

12   Q.   Tell us where you're currently assigned and what your

13   duties are.

14   A.   Currently I'm assigned to the FBI's Criminal

15   Investigative Division, Violent Crimes Against Children, Major

16   Case Coordination Unit, investigating all types of crimes

17   against children, online child exploitation; distribution,

18   receipt, production.

19   Q.   Were you involved in the investigation of PedoBook?

20   A.   I was.

21   Q.   And did you participate in that investigation while the

22   PedoBook events were occurring in Omaha, Nebraska?

23   A.   Yes.

24   Q.   What was the circumstance of that?  How is it that you

25   were brought from Washington, D.C. to Omaha early in the

1    investigation?

2    A.   I was in Omaha to assist with the search warrant at the

3    PedoBook administrator's residence, Aaron McGrath, and also

4    his placement of employment, a data center in Bellevue,

5    Nebraska.

6    Q.   What was your involvement in the search of the

7    administrator's residence in West Omaha?

8    A.   I assisted with the search and the seizure of the laptop

9    and other forensic evidence.

10   Q.   Were you with Agent Tarpinian at that time?

11   A.   Yes.

12   Q.   Did you accompany Agent Tarpinian, the case agent, as he

13   went to Bellevue, Nebraska, in order to go to the data service

14   or service farm?

15   A.   Yes.

16   Q.   What did you do at the service farm?

17   A.   At the data center, I assisted with the seizure of the

18   server and transport of the server to the off-site location, a

19   secure FBI facility, in order to place the server back online.

20   Q.   And did you assist in placing that back online?

21   A.   Yes.

22   Q.   After you assisted in placing the PedoBook server back

23   online, did you return to Washington --

24   A.   I did.

25   Q.   -- or headquarters?

1        What was your -- let me ask you a different way.

2        Did there come a time when there was another

3    PedoBook-related assignment that related to Germantown,

4    Maryland?

5    A.    Yes.

6    Q.    And what was that?

7    A.    That was a lead to the Baltimore field office to execute

8    a search warrant at a residence in Germantown, Maryland.

9    Q.    How far is the Baltimore field office in relation to

10   headquarters?

11   A.    The Baltimore field office is approximately 50, 55 miles

12   north of D.C.

13   Q.    Do you frequently work with the members of the Baltimore

14   field office?

15   A.    Yes.

16   Q.    I want to direct your attention to April 9th of 2013.

17   Where were you on that day?

18   A.    I was in Germantown, Maryland.

19   Q.    And what was your purpose for being there?

20   A.    The purpose was to assist with the execution of a search

21   warrant at the residence.

22   Q.    Was there some preplanning activity that occurred prior

23   to the execution of the warrant?

24   A.    We staged at an off-site location prior to the execution.

25   Q.    And what was going on at the off-site -- the staging

1    area?  What were you waiting to hear, what was the plan?

2    A.   At the off-site location we were waiting to hear the

3    results of a pen register trap and trace that was on the

4    Internet connection at the residence that would allow us to

5    determine whether or not there was Tor activity occurring

6    coming from the residence.

7    Q.   Why was that important to you?

8    A.   That was important so that we could increase our chances

9    of executing the search warrant at a time when the person

10   using the Tor network would be on the computer, the computer

11   would be in an unencrypted state, and avoid destruction of

12   evidence when we execute.

13   Q.   Did there come a time while you were -- while agents and

14   task force officers were present at the staging area that you

15   learned the results of that pen trap and trace?

16   A.   Yes.

17   Q.   And were plans made as a result of that?

18   A.   Yes.  Once we heard the results that there was Tor

19   activity, we then proceeded to the residence.

20   Q.   What assignment did you have at the residence?

21   A.   I was assigned to one of the entry teams, the entry team

22   entering the front of that residence.

23   Q.   And did you, in fact, enter through the front of that

24   residence?

25   A.   I did.

1    Q.   What was the original plan with regard to the execution

2    of the warrant?

3    A.   The original plan was to have two entry teams, one at the

4    front of the residence and one at the rear of the residence,

5    and to do a no-knock warrant.  That means we do not announce

6    our entry before entering the residence.

7    Q.   Was it to be done simultaneously?

8    A.   Yes.

9    Q.   Was this one done simultaneously?

10   A.   It was done semi-simultaneously.  We had issues with our

11   radio, so our entry occurred a few seconds after the entry to

12   the rear of the residence.

13   Q.   How is it that you were able to time the entry upstairs

14   on the main level from that that occurred downstairs?

15   A.   Once we heard the entry with the banging of the door

16   being breached at the rear of the residence, that ended up

17   being our cue to open the front door.

18   Q.   Do you remember approximately how many officers -- task

19   force officers and agents were assembled on the upstairs level

20   waiting to breach?

21   A.   Approximately eight.

22   Q.   I'm going to publish -- or show you Exhibit 42.  Do you

23   recognize Exhibit 42?

24   A.   I do.

25   Q.   Is that the residence in Germantown?

1    A.   Yes.

2    Q.   And did you know whose residence that was at the time the

3    warrant was being executed?

4    A.   Timothy DeFoggi.

5    Q.   He was the subject of that search warrant?

6    A.   Correct.

7    Q.   Can you -- by touching the screen, would you explain to

8    the members of the jury where you were waiting to breach?

9    A.   We were waiting at this front entrance (indicating).

10   Q.   With regard to the front entrance at the time of breach,

11   where were you in the queue or the line as far as officers

12   entering the residence?

13   A.   I was approximately fourth in line.

14   Q.   What happened to -- where did the agents ahead of you go?

15   A.   So once the door was opened, Agent Gordon and another

16   agent proceeded to the right once entering the house which led

17   to a stairway to the second floor.

18        A third agent entered the residence and went straight.

19   And then myself followed by Task Force Officer Smith entered

20   the residence.  And based off of our training, everyone went

21   to the right and straight, therefore it left us turning to the

22   left.

23   Q.   Can you describe the interior of the house to the members

24   of the jury.

25   A.   Yes.  The interior of the house, once entering the

1    residence and turning to the left, that led us into a sitting

2    room.  That was empty.

3         And then once we entered the sitting room, it then turned

4    to the right and entered into a formal dining room.  The

5    formal dining room then lead to a kitchen after you turned to

6    the right again.

7         And then once you go through the kitchen, you end up in

8    the living room with the fireplace.  So it was essentially a

9    circle.

10   Q.   What would have happened if you come to the front door

11   and head to the right?

12   A.   We would have ran into other officers.

13   Q.   I meant more along the lines of how the house was

14   situated.

15   A.   Okay.  To the right, it led to the stairwell that went to

16   the second floor.

17   Q.   You end up breaking to the left, and you go through what

18   you've described as kind of a sitting room area.

19   A.   Correct.

20   Q.   Describe for us what you see and where you go from there.

21   A.   Once we enter the sitting room, we are announcing,

22   "Police, search warrant."  As we enter, the sitting room

23   appears to be empty, but we observe a shadow coming from the

24   kitchen area.

25        And then from there, we're announcing at whatever the

1    shadow may be to identify itself as we're continuing to clear

2    the residence.

3    Q.   What did you think the shadow -- what did you determine

4    the shadow ultimately was?

5    A.   Ultimately we determined the shadow to be a cat, we

6    believe, that was roaming around the first floor.

7    Q.   Okay.  So you end up working your way through what rooms?

8    A.   Once we determined that the sitting room was clear, we

9    then proceed to the right into the dining room.  And we

10   determined that the dining room is clear as well.

11        When I then continued turning to the right again, I am

12   now looking through the house -- to the other end of the house

13   through the kitchen and to the living room.

14        Once I am looking that direction, I observed an

15   individual sitting at a laptop computer, kneeling on the

16   floor.  The laptop was down on the floor on a cushion.  And

17   someone was at the keyboard.

18   Q.   Is the individual who was at the keyboard, is he present

19   in this courtroom?

20   A.   Yes, sir.

21   Q.   Would you please identify him?

22   A.   Sitting at the defendant's table in the center chair

23   wearing a dark suit and white shirt.

24        MR. NORRIS:  Your Honor, I would ask the record to

25   reflect that he has identified the defendant.

1          THE COURT:  The record will so reflect.

2          MR. NORRIS:  Thank you.

3    BY MR. NORRIS:

4    Q.   When you observed the defendant kneeling at the laptop,

5    where are his hands?

6    A.   His hands were on the keyboard.

7    Q.   Did you make it a command or announce a command to him

8    with regard to his hands?

9    A.   Yes.  After I observed him on the laptop, I then ordered

10   him to show his hands, to step away, to stop, continually as I

11   went --

12   Q.   When you say "continually," did he comply?

13   A.   No.  I ordered him to do it, he didn't comply.  I then

14   quickly moved from the dining room to the living room while

15   continuing to order him to step away from the laptop, and he

16   continued to not comply.

17   Q.   What was the distance between where you were when you

18   first saw him kneeling and ordering him to take his hands off

19   the laptop to where he was at the laptop?

20   A.   Approximately ten large steps.

21   Q.   How were you able to cover that ground?

22   A.   By taking large steps and moving quickly through the

23   kitchen.  There were two steps that went down.  I then did a

24   single step from the kitchen level into the living room.

25   Q.   When you indicate that you gave repeated commands to the

1    defendant to take his hands off the computer, get away from

2    the computer, how loud were those commands?

3    A.   With all the other noise, plus my commands, I was having

4    to yell relatively loud to be heard.

5    Q.   What happened once you arrived at the defendant who was

6    at the computer?

7    A.   Once I reached the defendant, he had still not moved away

8    from the computer.  His hands were still on the keyboard.  So

9    as I approached him, I then used my foot and pushed on his

10   shoulder to knock him off of the computer.

11   Q.   When you were able to do this, what did you observe about

12   the computer?

13   A.   After I pushed him off and then Task Force Officer Smith

14   came around and secured Timothy DeFoggi, I then turned and

15   looked at the laptop and observed that a file was currently

16   being downloaded.

17   Q.   How were you able to tell that?

18   A.   There was a download -- browser download window on the

19   desktop, and it showed a file download in progress.

20   Q.   What do you do when you see this?

21   A.   Once I saw that, I then requested someone to bring a

22   camera so that we could take photos of the laptop screen.

23   Q.   As it was downloading?

24   A.   Yes.

25   Q.   What do you do next?

1    A.    After that, we secure -- or Task Force Officer Smith

2    secures Mr. DeFoggi, and then other officers and forensic

3    examiners enter the residence to proceed with the on-scene

4    exam.

5    Q.    Did you stay in close proximity to the laptop computer?

6    A.    Excuse me?

7    Q.    Did you stay in close proximity to the laptop computer?

8    A.    Close proximity?

9    Q.    Let me ask you a different way.  Did you leave the room

10   where the laptop computer was?

11   A.    No, I stayed with the laptop and made sure no one touched

12   the laptop while the examiners entered the residence.

13   Q.    Did there come a time when you were able to view more on

14   the laptop computer?

15   A.    Yes.  After the download completed, I was able to then

16   observe that the file was being downloaded from a Tor hidden

17   service website known as OnionPedo Video Archive.

18   Q.    What is the OnionPedo Video Archive?

19        MR. BERRY:  Your Honor, I'm going to object at this

20   point, move to strike, and object based on 403.

21        THE COURT:  Overruled.

22   You may answer.

23   A.    The OnionPedo Video Archive is a Tor hidden service

24   website that was dedicated to the distribution of child

25   exploitation material videos that allowed individuals to

1   register and upload videos as well as download the videos.

2   BY MR. NORRIS:

3   Q.   Would access to the OnionPedo Video Archive require one

4   to get on to the Tor network?

5   A.   Yes.

6   Q.   And would presence on the Tor network alert the pen

7   register that was in place?

8   A.   Yes.

9   Q.   I'm going to show you a series of pictures at this

10  particular time.  You have before you an exhibit book.

11       Can I get you to pull that exhibit book before you,

12  please?

13  A.   (The witness complies.)

14       (Off-the-record discussion had.)

15  BY MR. NORRIS:

16  Q.   I want to direct your attention, first of all, to

17  Exhibits 18 and 19 to begin with.

18       Can you take a look at those.  Let me know when you've

19  had a chance to look at those.

20  A.   I've looked at Exhibits 18 and 19.

21  Q.   Do you recognize those?

22  A.   Yes.

23  Q.   Starting with 18, what do you recognize it as?

24  A.   This is a photograph depicting the living room of the

25  residence in Germantown, Maryland.

1    Q.   And does it depict that area as of April 9th, 2013?

2    A.   Yes.

3              MR. NORRIS:  Your Honor, I would offer that exhibit.

4              MR. BERRY:  No objection.

5              THE COURT:  Exhibit 18 is received.

6    BY MR. NORRIS:

7    Q.   With regard to Exhibit 19, can you describe that?

8    A.   Yes.  That's a photograph taken from the living room of

9    the residence in Germantown, Maryland, towards the kitchen.

10   Q.   And is it a true and accurate depiction as of April 9th

11   of 2013?

12   A.   Yes.

13             MR. NORRIS:  I would offer Exhibit 19.

14             THE COURT:  Any objection?

15             MR. BERRY:  No, your Honor.

16             THE COURT:  19 is received.

17             MR. NORRIS:  Permission to publish, your Honor.

18             THE COURT:  You may.

19   BY MR. NORRIS:

20   Q.   Let's start with Exhibit 18, and we'll pull it up on the

21   monitor.

22        Can you explain to the members of the jury, please, what

23   is depicted in Exhibit 18?

24   A.   This photograph depicts a photo that was taken while

25   standing in the kitchen looking into the living room.

1   Q.   What is significant with regard to -- although you can't

2   see it in this particular picture, where would the laptop have

3   been?

4   A.   The laptop would have been somewhere in this area here

5   (indicating).

6   Q.   Exhibit 19, please, does that assist you in demonstrating

7   where the laptop was?

8   A.   Yes.  This photo shows the laptop sitting on the cushion

9   (indicating) as circled.

10  Q.   And can you -- moving backward from the laptop, can you

11  describe what the vantage point is of this photograph?

12  A.   This photograph is taken in the living with the fireplace

13  to the back of the photographer, looking into the kitchen.

14  Past the kitchen here (indicating) is a doorway that leads

15  into the formal dining room.

16  Q.   Where does the -- where is the stairwell that leads from

17  the basement to the main level where you entered?

18  A.   That would be on this wall (indicating) to the left of

19  the photo.

20  Q.   Where were you standing when you first saw the defendant

21  at the computer?

22  A.   I was standing in the dining room in the doorway

23  (indicating) where the X is, standing in that dining room,

24  looking into the living room.

25  Q.   And are the steps that you had to negotiate in order to

1    get to the defendant, are they present in that photograph?

2    A.    Yes, they are.  They are the steps that lead from the

3    kitchen into the living room.  (Indicating) That's circled.

4    Q.    What is that that the laptop of the defendant is on?

5    A.    It appears to be some type of cushion.

6    Q.    And is that an undisturbed state?  Is that how it was at

7    the time on April 9th when you encountered him?

8    A.    Yes.

9    Q.    I want to direct your attention to Exhibit 17.  Would you

10   please go there?

11   A.    (The witness complies.)

12   Q.    Have you had a chance to look at 17?

13   A.    I have.

14   Q.    There are a number of photographs that appear as 17.  As

15   a matter of fact, as I count them, there are four.

16   A.    Four photos, correct.

17   Q.    Have you had an opportunity to review each of those four?

18   A.    Yes, I have.

19   Q.    Do you recognize what's depicted in Exhibit 17?

20   A.    I do.

21   Q.    What is it?

22   A.    Exhibit 17 depicts the laptop computer and the screen

23   that's on the computer.

24         It also depicts a closer photo of the desktop and two

25   additional close-up photos of the desktop.

1          MR. NORRIS:  Your Honor, may I publish Exhibit 17?

2          THE COURT:  You haven't offered it yet.

3          MR. NORRIS:  I would offer Exhibit 17.

4          THE COURT:  Any objection?

5          MR. BERRY:  I would object based on relevance and

6     403.

7          THE COURT:  Overruled.  Exhibit 17 is received.

8      You may publish.

9          MR. NORRIS:  Thank you.

10   BY MR. NORRIS:

11   Q.   Starting with the first photograph in Exhibit 17, is that

12   the laptop still on that pad or blanket, whatever it is it was

13   sitting on?

14   A.   Yes.

15   Q.   What is showing on the display screen?

16   A.   The display is showing a completed download window and

17   the Vidalia Control Panel.

18   Q.   With regard to when you first encountered the computer

19   after you removed the defendant from it, you were able to

20   determine that there was a video downloading, correct?

21   A.   Correct.

22   Q.   Was that window present and is it depicted in this

23   photograph?

24   A.   The download window in the top left corner of the desktop

25   was present and showed a file currently being downloaded.

S. SMITH - DIRECT                                                 363

```
 1              MR. NORRIS:  Can we move on to the fourth of Exhibit

 2     17, the fourth photograph.

 3     BY MR. NORRIS:

 4     Q.   And what you just circled previously on the laptop

 5     itself, is that a copy of the same thing, the downloads?

 6     A.   Yes, it is.

 7     Q.   What is significant about the downloads, the ss.mp4, do

 8     you recognize that?

 9     A.   I do.

10     Q.   What do you recognize that as being significant?

11     A.   The file extension .mp4 indicates it's a video file.

12     Q.   I'm directing your attention above that to where it says

13     downloads and the symbol.

14     A.   Yes.  This symbol to me indicates that this is a download

15     dialogue box from the Tor Browser Bundle.  And then as stated,

16     the .mp4 indicates it's a video currently -- that was

17     downloaded.

18          Once the video completed downloading, it then shows the

19     URL of the website where the video was downloaded from.  The

20     URL begins with OPVA2, which indicates it was being downloaded

21     from the OnionPedo Video Archive.

22     Q.   I direct your attention to Exhibits 45 and 46 that are

23     currently before you.

24     A.   (The witness complies.)

25     Q.   Are those true and accurate depictions of what you
```

1    observed during the search?

2    A.    They are.

3    Q.    Are they clearer than what we have just shown?

4    A.    They are clearer.

5           MR. NORRIS:  Your Honor, I would offer Exhibits 45

6    and 46 at this time.

7           MR. BERRY:  Relevance and 403.

8           THE COURT:  The objection is overruled.  45 and 46

9    are received.

10        You may publish.

11          MR. NORRIS:  Thank you.

12   BY MR. NORRIS:

13   Q.    Again, the file that you were able to observe upon first

14   encountering the computer is where?

15   A.    It is in the top left corner of the desktop.

16   Q.    When did you first encounter the panel that is adjacent

17   to it?

18   A.    I don't recall the exact time that that panel appeared.

19   It may have been up when I first looked at it, or it may have

20   been up after the forensic examiner began reviewing the

21   laptop.

22   Q.    And do you recognize what is detailed in that panel?

23   A.    The panel in the center of the screen is the Vidalia

24   Control Panel which opens when you start the Tor Browser

25   Bundle.

1    Q.   And why would that come up on the screen at that time?

2    A.   Based off of the screen, I can look in the bottom tool

3    bar area and I can see that the main browser window had been

4    closed.  But the download window was still in the process of

5    downloading a file.  Therefore, the Vidalia Control Panel must

6    remain open for the file to continue downloading.

7    Q.   Was the main browser file open when you first encountered

8    it?

9    A.   No, it was not.

10   Q.   Do you know why?

11   A.   I do not.

12   Q.   Would it be unusual for it not to be open?

13   A.   It would be unusual for the main browser window to be

14   closed and the download to still be running.

15   Q.   If somebody had attempted to delete that file, what would

16   happen to that browser folder?

17   A.   Delete the download?

18   Q.   Yes.  Sorry.

19   A.   If someone had attempted to stop the download, then the

20   entire browser would have closed when the main browser window

21   was closed.

22   Q.   And is that the condition in which you would have

23   encountered the computer?

24   A.   Yes.

25   Q.   Even though the browser is down, would the file continue

1    to download?

2    A.   Yes.

3    Q.   Why is that?

4    A.   Based off of my experience of using the Tor Browser

5    Bundle, I've observed the same event, that if I'm downloading

6    a file and closed the main browser window, the file would

7    continue to download just because it's an active process.

8              MR. NORRIS:  Your Honor, we're going to now show

9    Exhibit 46 which has already been received into evidence as

10   well.

11   BY MR. NORRIS:

12   Q.   And what is that, Agent?

13   A.   This is a slightly clearer close-up photo of the Tor

14   Browser Bundle download window.  Again the icon on the top

15   left indicates to me that this is the Tor Browser Bundle

16   download window.  Again the file appears to be a video file,

17   and then the website appears to be the OnionPedo Video Archive

18   website.

19   Q.   Thank you.  Bear with me for just a minute.  There's

20   another exhibit that I'm looking for that --

21             THE COURT:  It is four o'clock, so I'd suggest we

22   take our second recess at this time.  We will reconvene at

23   4:15.

24        We are in recess.

25        (Jury out and recess taken at 4:00 p.m.)

 1          (At 4:19 p.m. on August 20, 2014, with counsel for the

 2     parties and the defendant present, and the jury NOT present,

 3     the following proceedings were had:)

 4          STEVEN SMITH, PREVIOUSLY SWORN, RESUMED THE STAND

 5          THE COURT:  Do we need to discuss anything before the

 6     jury comes in?

 7          MR. NORRIS:  I don't think so.

 8          MR. BERRY:  I don't believe so, your Honor.

 9          THE COURT:  All right.

10      Please bring in the jury.

11          MR. NORRIS:  I guess I will tell you I have one more

12     witness, but his lawyer is trying to get in here from West

13     Omaha, so hopefully he'll be here by 4:30.  So the

14     complicating factor is whether we have to take a five-minute

15     break before he gets here.

16          THE COURT:  Not a problem.

17          MR. NORRIS:  Thank you.

18      (Jury in at 4:20 p.m.)

19          THE COURT:  Mr. Norris, you may continue.

20          MR. NORRIS:  Thank you.

21               DIRECT EXAMINATION (Cont'd.)

22     BY MR. NORRIS:

23     Q.  Special Agent Smith, I'd like to draw your attention to

24     Government's Exhibit 31 in the book before you.  Do you have

25     that open?

 1    A.   I do.

 2    Q.   And is it to Exhibit 31?

 3    A.   31?

 4    Q.   Is it open to Exhibit 31?

 5    A.   Yes.

 6    Q.   Have you had a chance to review that then?

 7    A.   Yes.

 8    Q.   While we're talking about 31, let's look at 32 as well.

 9    Have you had a chance to look at that?

10    A.   Yes, I have.

11    Q.   Looking at Exhibits 31 and 32, how would you describe

12    those?

13    A.   These are photos depicting the sitting room in the

14    residence at Germantown, Maryland, as you enter the front door

15    and turn of the left.

16    Q.   Are they true and accurate depictions as you encountered

17    that room on the morning of the search warrant?

18    A.   They are.

19              MR. NORRIS:  I offer 31 and 32.

20              MR. BERRY:  No objection.

21              THE COURT:  31 and 32 are received.

22              MR. NORRIS:  Permission to publish 32, your Honor.

23              THE COURT:  You may.

24    BY MR. NORRIS:

25    Q.   While we're publishing 32, I would ask Agent Smith to

1    look at Exhibit 33.

2    A.   Okay.

3    Q.   What is it?

4    A.   It is a photograph depicting the formal dining room in

5    the residence of Germantown, Maryland.

6    Q.   Where is -- before I go any further, with regard to

7    Exhibit 33, is it a true and accurate depiction of the dining

8    room as it existed on April 9, 2013?

9    A.   It is.

10             MR. NORRIS:  I would offer Exhibit 33, your Honor.

11             MR. BERRY:  No objection.

12             THE COURT:  Exhibit 33 is received.

13             MR. NORRIS:  Permission to publish.

14             THE COURT:  You may.

15   BY MR. NORRIS:

16   Q.   The jury has now seen Exhibit 32, which is the sitting

17   room/living room type area and Exhibit 33, the dining room.

18        Can you describe, using Exhibit 33 before you, how that

19   dining room is oriented, where the sitting room is and where

20   the kitchen is?

21   A.   The photograph is being taken from an individual standing

22   in the sitting room, looking into the dining room.  The

23   doorway on the right side of the photo leads into the kitchen.

24   Q.   And we've seen the kitchen area before and how it extends

25   into the larger room area where the laptop was, correct?

1    A.    Correct.

2    Q.    I want to direct your attention to Exhibits 21 and 22,

3    please.  At any time were you upstairs during the warrant?

4    A.    Yes.

5    Q.    Tell us under what circumstances.

6    A.    I did enter all the rooms of that residence in order to

7    assist with seizure of electronic evidence.

8    Q.    At the time you entered the rooms upstairs, had the all-

9    clear been given?

10   A.    Yes.

11   Q.    Had all the individuals within the residence been

12   controlled or accounted for?

13   A.    Yes.

14   Q.    How many people were there in the residence that had to

15   be accounted for?

16   A.    Three.

17   Q.    And where were they at the time in which law enforcement

18   encountered them?

19   A.    One of the residents was in the basement, one resident

20   was on the main level in the living room -- the one I

21   approached -- and then there was another resident in the

22   second floor bedroom.

23   Q.    Can you identify by name the individuals that were

24   encountered by the FBI on what floors?

25   A.    The individual in the basement, I believe, was named

1    Chris Casto.  The individual in the main level was Timothy

2    DeFoggi.  And the individual on the second floor was Bounds --

3    I do not recall the first name.

4    Q.   Mr. Bounds was found on the top floor?

5    A.   Correct.

6    Q.   When you went to the top floor, the all-clear had been

7    given?

8    A.   Correct.

9    Q.   I'm going to direct your attention to Exhibits 21 and 22

10   now.  What does that depict?

11   A.   Exhibit 21 is depicting the master bedroom on the second

12   floor of the residence.

13            MR. NORRIS:  I would offer Exhibit 21, your Honor.

14            MR. BERRY:  No objection.

15            THE COURT:  Exhibit 21 is received.

16   BY MR. NORRIS:

17   Q.   Same with Exhibit 22?

18   A.   Exhibit 22 is also a photograph of the master bedroom.

19   Q.   Again, is it a true and accurate depiction as it appeared

20   on April 9th of 2013?

21   A.   Yes.

22            MR. NORRIS:  I would offer Exhibit 22 as well, your

23   Honor.

24            MR. BERRY:  No objection.

25            THE COURT:  22 is received.

 1              MR. NORRIS:  Permission to publish Exhibit 22, your

 2     Honor, and then I will have no more questions of this witness.

 3              THE COURT:  You may.

 4              MR. NORRIS:  Thank you.

 5              THE COURT:  Cross-examination?

 6                         CROSS-EXAMINATION

 7     BY MR. BERRY:

 8     Q.   You mentioned there was a Mr. Casto in the basement of

 9     the house; is that correct?

10     A.   Correct.

11     Q.   Did you interview him?

12     A.   I was involved in part of the interview.

13     Q.   Thanks.

14              MR. BERRY:  No further questions.

15              MR. NORRIS:  Nothing else.

16              THE COURT:  Thank you.  You may stand down.

17              THE WITNESS:  Thank you.

18              MR. NORRIS:  Your Honor, our next witness is in the

19     marshal's custody, and his lawyer is on his way to the

20     courthouse.

21              THE COURT:  Very good.  So we're going to be at ease.

22     How long do you wish to have the jury be at ease?

23              MR. NORRIS:  He stated at about 4:10 that he would be

24     coming down from West Omaha, and I'm assuming maybe five to

25     ten minutes he should be here.  When I see that he's here,

```
 1        I'll let the courtroom deputy know.

 2             THE COURT:  We will recess until the next witness has

 3     his lawyer available.

 4          And so please don't wander from the jury deliberation

 5     room area, but you can relax in the jury deliberation room

 6     until we are ready to proceed with the next witness.  And

 7     Ms. Gomez will let you know when that is.

 8          Thank you.

 9          (Jury out and recess taken at 4:28 p.m.)

10          (At 4:33 p.m. on August 20, 2014, with counsel for the

11     parties and the defendant present, and the jury NOT present,

12     the following proceedings were had:)

13             THE COURT:  Are we ready for the jury?

14             MR. NORRIS:  Your Honor, I think Mr. McGough has an

15     issue tomorrow morning.  I don't anticipate this witness will

16     be long; but perhaps since we've given them two breaks, we can

17     go a little longer to finish cross?  I just want to ask if

18     that's acceptable.

19             THE COURT:  I see.  Mr. McGough, you have a conflict

20     tomorrow morning?

21             MR. MCGOUGH:  I do, Judge.  I have an 8:30 hearing in

22     Lancaster County in the morning.

23             THE COURT:  We will do our best.  I will just ask

24     that counsel make the best use of the time so we don't keep

25     the jury longer than necessary.
```

```
 1              MR. MCGOUGH:  Thank you, your Honor.

 2         (Jury in at 4:35 p.m.)

 3              THE COURT:  Before we begin, I know that on first day

 4    -- yesterday I promised you we would get you out by five

 5    o'clock.  We may need to run a little bit later than that

 6    today just because we have a witness who may not be available

 7    tomorrow morning.  And for logistics purposes, it may be a few

 8    minutes after five o'clock.  Does that cause a severe

 9    inconvenience for anyone on the jury?

10         All right.  We will go ahead then, Mr. Norris.

11              MR. NORRIS:  Ms. Chang will handle this.

12              COURT REPORTER:  We haven't -- he needs to be sworn

13    in.

14              THE COURT:  Yes.  My apologies.

15              COURTROOM DEPUTY:  Please state your full name for

16    the record and spell your last.

17              THE WITNESS:  Charles Benjamin MacMillan,

18    M-a-c-M-i-l-l-a-n.

19              CHARLES MacMILLAN, PLAINTIFF'S WITNESS, SWORN

20              THE COURT:  Now you may inquire.

21                             DIRECT EXAMINATION

22    BY MS. CHANG:

23    Q.   Good afternoon.

24    A.   Good afternoon.

25    Q.   Would you please state your name and spell it for the
```

 1    record.

 2    A.   Charles Benjamin MacMillan, M-a-c-M-i-l-l-a-n.

 3    Q.   And where is your hometown?

 4    A.   I was born and raised in Richmond, Virginia, and resided

 5    in the greater metro DC area for the last six years.

 6    Q.   And how were you last employed?

 7    A.   My last employment was with Computer Sciences Corporation

 8    as a systems analyst.

 9    Q.   And how old are you currently?

10    A.   I am currently 29.

11    Q.   And could you please describe what type of schooling

12    you've received.

13    A.   I attended East Carolina University for four and a half

14    years from August 2003 until December of 2007.  My business --

15    I had a business major in business management, graduated with

16    honors.

17    Q.   Now, are you represented by an attorney?

18    A.   I am.

19    Q.   Were you represented by an attorney throughout the

20    criminal process?

21    A.   Yes, I have been.

22    Q.   And is he in the courtroom today?

23    A.   Yes, he is.

24    Q.   Now, did you recently plead guilty to conspiracy to

25    advertise child pornography?

1    A.    Yes, I did.

2    Q.    And did you enter into an agreement to cooperate and

3    testify today?

4    A.    I did.

5         MS. CHANG:  Your Honor, may I approach to retrieve an

6    exhibit?

7         THE COURT:  You may.

8    BY MS. CHANG:

9    Q.    I'm handing you what's been marked for identification as

10   Government's Exhibit 66.  Do you recognize Government's

11   Exhibit 66?

12   A.    I do.

13   Q.    And what is it?

14   A.    It is the plea agreement that I entered into a number of

15   months ago.

16   Q.    And how do you recognize it?

17   A.    It was presented to me by my attorney and by the

18   prosecution.

19   Q.    And is it a true and accurate copy of -- copy of the plea

20   agreement that you entered into?

21   A.    It appears to be.

22         MS. CHANG:  At this time, your Honor, I move

23   Government Exhibit No. 66 into evidence.

24         MR. BERRY:  No objection.

25         THE COURT:  66 is received.

1    BY MS. CHANG:

2    Q.   Mr. MacMillan, could you please just verify for us that

3    you did indeed sign that agreement on Exhibit 66?

4    A.   I did.

5    Q.   And are there other signatures on that signature page?

6    A.   Yes, there are.

7    Q.   Who else entered into that agreement with you?

8    A.   Michael P. Norris, Keith Becker, Sarah Chang, and my

9    attorney Jim McGough.

10   Q.   Now directing your attention to page 6 --

11        MS. CHANG:  Your Honor, at this time I'd like to

12   publish page 6 of the exhibit.

13        THE COURT:  You may.

14      (Off-the-record discussion had.)

15        MS. CHANG:  We're going to use the ELMO.  Permission

16   to approach?

17        THE COURT:  You may.

18   BY MS. CHANG:

19   Q.   Mr. MacMillan, do you recognize the text on page 6 of

20   this exhibit?

21   A.   Yes, I do.

22   Q.   Would you please read to us Section A all the way through

23   to about the middle of the page at 3553(e)?

24   A.   Okay.  "If, and only if, all of the following occur:

25        "1.  the United States, in its sole discretion,

1    determines that the defendant has provided "substantial

2    assistance" in the investigation and prosecution of another

3    person(s);

4        "2.  the United States files a motion pursuant to

5    U.S.S.G. 5K1.1 and Title 18 U.S. Code [*sic*] Section 3553(e) to

6    reflect the defendant's "substantial assistance"; and

7        "3.  the Court grants a motion for a departure below any

8    applicable mandatory minimum sentence;

9        "then pursuant to Rule 11(c)(1)(C) of the Federal Rules

10   of Criminal Procedure, the parties agree that the defendant's

11   sentence shall not be less than 144 months (12 years) of

12   incarceration.  Nothing in this provision is intended to

13   provide authority for the Court to depart below any mandatory

14   minimum sentence absent a motion by the government pursuant to

15   18 U.S. Code 3553(e)."

16   Q.   Mr. MacMillan, what did you understand that portion of

17   the plea agreement to mean?

18   A.   My understanding of that was that after I testify here

19   today and the government, through its sole discretion,

20   determines that my testimony is worthy of substantial

21   assistance, that I shall be granted the opportunity to be

22   considered for a departure from the mandatory minimum.

23   Q.   Now you say that you'll be considered for a departure.

24   Now who ultimately makes the decision about what sentence you

25   receive?

1    A.   My understanding is that the Court does.

2    Q.   And by "the Court", you mean --

3    A.   Mrs. Smith Camp -- in my case, Judge Bataillon.

4         MS. CHANG:  May I approach, your Honor?

5         THE COURT:  Yes, you may.

6    BY MS. CHANG:

7    Q.   Directing your attention to page 8, do you recognize page

8    8 of Exhibit 66?

9    A.   I do.

10   Q.   Would you please read for us the Breach of Agreement

11   section?

12   A.   Okay.  "Should it be concluded by the United States that

13   the defendant has committed a crime subsequent to signing the

14   plea agreement, or otherwise violated this plea agreement, the

15   defendant shall then be subject to prosecution for any

16   federal, state, or local crime(s) which this agreement

17   otherwise anticipated would be dismissed or not prosecuted.

18   Any such prosecution(s) may be premised upon any information,

19   statement, or testimony provided by the defendant.

20        "In the event the defendant commits a crime or otherwise

21   violates any term or condition of this plea agreement, the

22   defendant shall not, because of such violation of this

23   agreement, be allowed to withdraw the defendant's plea of

24   guilty, and United States will be relieved of any obligation

25   it otherwise has under this agreement, and may withdraw any

1    motions for dismissal of charges or relief of sentence [*sic*]

2    it has already filed."

3    Q.   What did you understand that portion of the plea

4    agreement to mean?

5    A.   My understanding is that if at any point after I enter my

6    plea of guilty and agree to the terms of this plea agreement,

7    if I were to commit a crime after such a time, that the plea

8    agreement would become null and void, and I would be subject

9    to prosecution for the crimes which I committed after such

10   date that I signed the plea agreement.

11   Q.   And what if you do not tell the truth today, what

12   happens?

13   A.   Then I will be prosecuted for perjury and will not be

14   considered for substantial assistance, and the charges that I

15   have been cleared of -- or that have been agreed to not be

16   prosecuted will be reinstated.

17   Q.   Now, does the truthfulness of your testimony today depend

18   on the result of this trial?

19   A.   No.

20   Q.   And has anyone made any threats or promises towards you

21   outside of this agreement that we've just moved into evidence?

22   A.   No.

23   Q.   And did you meet with the prosecution team at any time

24   before today?

25   A.   Yes.

 1    Q.   Just generally and briefly, what did you cover in those

 2    meetings?

 3    A.   I met with them briefly for an off-the-record proffer in

 4    which I gave information regarding my crimes and the crimes of

 5    those who I interacted with, and then met with them in a

 6    preparatory meeting for the trial.

 7    Q.   And has anyone told you what to say in your testimony

 8    today other than you must tell the truth?

 9    A.   No.

10    Q.   I want to move on to your knowledge of the Tor network.

11    How did you find the Tor network?

12    A.   It was shown to me by an anonymous connection online.  He

13    provided me with a link to download the Tor browser and the

14    bundle and gave me some sites that I could use -- that I could

15    access through the Tor network.

16    Q.   And what did you use the Tor network for?

17    A.   Mostly to access child pornography.

18    Q.   Now, have you heard of a website called PedoBook on the

19    Tor network?

20    A.   Yes, I have.

21    Q.   And what is PedoBook?

22    A.   It is a social networking platform for individuals who

23    share the fantasy of child pornography -- that want to access

24    child pornography.

25    Q.   So by "access", do you mean trading, distributing,

 1    receiving activity of child pornography on the website?

 2    A.   That's correct.

 3    Q.   How did you find PedoBook on the Tor network?

 4    A.   The address was provided to me by the same individual who

 5    informed me of the existence of the Tor network.

 6    Q.   And how did you go about accessing PedoBook?

 7    A.   After downloading the browser and opening it, there's a

 8    16-character alphanumeric address, random numbers and letters,

 9    followed by .onion.

10       And once you type that in to the browser and search for

11    it, the page appears.

12    Q.   Now, by "browser", did you mean the Tor browser?

13    A.   Correct.

14    Q.   And I understood you to mean that you needed the Tor

15    browser plus this .onion address to access this PedoBook.

16    A.   That's correct.

17    Q.   Now, directing your attention to Government's Exhibit 1,

18    which has already been received into evidence, I'm going to

19    draw your attention to page 8 of Exhibit 1.  Do you recognize

20    page 8 of Exhibit 1?

21    A.   I do.

22    Q.   What is it?

23    A.   It's the rules and regulations of the PedoBook website.

24    Q.   And are you familiar with the rules of behavior on

25    PedoBook?

 1    A.    Yes.

 2    Q.    And how is that?

 3    A.    I accessed this page personally in November of 2012.

 4    Q.    Now, were you a member of PedoBook?

 5    A.    I was.

 6    Q.    And what does it mean to be a member of PedoBook?

 7    A.    Essentially you provide a user name and a password, as

 8    well as an avatar name or screen name, if you would.

 9          And then just click the Join button and it presents you

10    with a profile page for you to fill out, including a picture

11    if you feel so inclined to add one, information about you,

12    whatever you feel you want to share, interests, contact

13    information if you want to provide it.

14    Q.    We'll take a look at your profile page in a minute.  But

15    all those -- the content you're describing now, your profile

16    name, your avatar, your user name, who generates that

17    information?

18    A.    All that information is generated by the user.

19    Q.    Now, would you just briefly tell us what are the benefits

20    of membership versus nonmembership of PedoBook?

21    A.    Benefit of membership is being able to connect with the

22    other members of the site who share similar interests.

23    Without a membership, you can visit the site and look around,

24    but it restricts you from sending messages or requesting

25    friends.

1    Q.   And what other functions were available to members that

2    were not available to nonmembers?

3    A.   You could also join groups, and you could upload and

4    download pictures.

5    Q.   And what was the point of these groups?

6    A.   The groups were a way to -- similar to a legitimate

7    social networking network, it was a way to group together

8    people with similar interests, in this case with age groups or

9    through fetish, groups like that.

10   Q.   Now, directing your attention to Exhibit 11, which has

11   already been received into evidence, do you recognize this

12   Exhibit 11?

13   A.   I do.

14   Q.   What is it?

15   A.   It's my profile page.

16   Q.   Could you please point out to us the display name that

17   you chose?

18   A.   Display name is toddler lover.

19   Q.   And what was the user name that you typed in to associate

20   with toddler lover?

21   A.   Noonewillknow321.

22   Q.   Now, we're going to zoom in a little bit.  What other

23   attributes of yourself did you generate on this page?  Can you

24   just point those out to us?

25   A.   The Age, Gender, About me, and Contact info.

1    Q.   Now, directing your attention to the upper right corner

2    of the page, what does that box contain?

3    A.   That contains the groups that I was a member of.

4    Q.   And do you recall approximately how many groups you were

5    a member of?

6    A.   Not the exact number, but I would have to guess somewhere

7    in the neighborhood of five to ten.

8    Q.   And were you part of open and closed groups?

9    A.   Yes, I was.

10   Q.   Would you please describe to us what the difference is

11   between those two?

12   A.   Open groups are open to anyone to join the group.  Nobody

13   has to give an okay for you to join that group.

14        Closed groups are a little different.  They require the

15   group administrator to accept you and allow you to join the

16   group.

17   Q.   Now, is there an avatar for your profile page?

18   A.   There is.

19   Q.   Zooming out of Exhibit 11, would you please point out to

20   us your avatar on the page?

21   A.   It's the picture right there (indicating).

22   Q.   And what is an avatar?

23   A.   It is a display picture, thumbnail picture, that is

24   associated with your account.  And it's displayed whenever

25   activity occurs regarding your membership.

1    Q.   And the image that you circled here, did you upload that

2    image?

3    A.   I did.

4    Q.   What does it depict?

5    A.   It depicts sexual intercourse with a young child.

6    Q.   And what was the purpose of uploading an image like this

7    on PedoBook as an avatar?

8    A.   It allowed you to be taken more seriously on the website.

9    Those members that did not upload a picture in the avatar box

10   were considered either not serious about the site or possible

11   law enforcement, and for the most part were not accepted as

12   friends and not allowed into groups.

13   Q.   Did you know -- and do you know a member on PedoBook

14   called fuckchrist?

15   A.   Yes.

16   Q.   How do you know that user?

17   A.   I corresponded with him over the course of a couple of

18   weeks in December of 2012.

19   Q.   How did you first come into contact with him?

20   A.   I don't recollect the exact way that I came in -- that I

21   first contacted him, whether he or I initiated contact; but we

22   ended up sending private messages back and forth to each other

23   for about a week and a half or two weeks.

24   Q.   And was there another name associated with that user?

25   A.   I don't know.

1    Q.   Okay.  Directing your attention to Exhibit 4, it's

2    already been received into evidence.  I'll direct your

3    attention to page 6.  Do you recognize page 6?

4    A.   Yes, I do.

5    Q.   What is it?

6    A.   That is a private message from fuckchrist to me.

7    Q.   And before we get into the substance of your private

8    messages with the user fuckchrist, can you just tell us who

9    can send and receive private messages on PedoBook?

10   A.   All members.

11   Q.   And who can see private messages that have been sent to,

12   let's say, your user name?

13   A.   The only individuals that can see those messages are the

14   sender and the receiver; and the admin, I believe.

15   Q.   Turning back to this particular message on page 6, just

16   generally -- you don't have to read it, but generally what is

17   the topic of discussion here?

18   A.   The topic of discussion is a fantasy involving

19   sadomasochistic content, sadomasochistic fantasy involving a

20   young child.

21   Q.   Now, is there a contact -- a way for you to contact user

22   fuckchrist through another medium in that message?

23   A.   There is.

24   Q.   What is that?

25   A.   E-mail address, fuckchrist@tormail.org.

1    Q.   And what is he requesting you to do?

2    A.   He is requesting me to contact him on that e-mail

3    address.

4    Q.   Why take the conversation from a private message on

5    PedoBook to Tor mail?

6    A.   Tor mail is an anonymous e-mail service that is wholly

7    provided resided -- it resides completely on the Tor network

8    and therefore is, for the most part, 100 percent anonymous.

9    Therefore, the benefit to taking it to that medium is

10   additional security.

11   Q.   Now, directing your attention to the next page, page 7,

12   do you recognize page 7?

13   A.   I do.

14   Q.   And what is it?

15   A.   It is a private message between the user fuckchrist and

16   myself.

17   Q.   Who is the sender?

18   A.   The user fuckchrist.

19   Q.   And again, what is the topic of the message?

20   A.   The topic of the message is regarding NLF screen

21   captures.

22   Q.   What does NLF stand for?

23   A.   My understanding is that it stands for No Limits Fun.

24   Q.   What does that mean to you?

25   A.   Like anything goes, whether it be sadomasochistic

1    content, all the way up to the death of a child.

2    Q.   Directing your attention to page 8, do you recognize

3    page 8?

4    A.   Yes.

5    Q.   What is it?

6    A.   A message between fuckchrist and me.

7    Q.   Who is the sender and who is the receiver?

8    A.   Fuckchrist is the sender and I am the receiver.

9    Q.   Since this is short, can you just read the message for

10   us?

11   A.   "Since not many people live in D.C., are you on the

12   Virginia or Maryland side?  Love to hook up on Wednesday."

13   Q.   Now, where did you understand fuckchrist to reside or

14   where he was located when you were discussing this with him?

15   A.   The most specific that I -- location I received from him

16   was the greater metro D.C. area.

17   Q.   Now, directing your attention to page 9, do you recognize

18   page 9?

19   A.   Yes.

20   Q.   And what is it?

21   A.   It is a message from me to the user fuckchrist.

22   Q.   Now, you don't have to read the whole thing, but if you

23   could just tell us what is the content of this message

24   briefly?

25   A.   Content of this message is regarding sadomasochistic

1    fantasies that the user fuckchrist and I shared and a desire

2    to meet up in person.

3    Q.   Now, did you tell fuckchrist in this message another way

4    to contact you?

5    A.   I did.

6    Q.   And what was that?

7    A.   To e-mail me at noonewillknow321@tormail.org.

8    Q.   And did your conversation with fuckchrist go into

9    tormail.org?

10   A.   It did.

11   Q.   Now, directing your attention to page 10, do you

12   recognize page 10?

13   A.   I do.

14   Q.   What is it?

15   A.   It is a message between the user fuckchrist and myself.

16   Q.   If you could just read it because it's so short.

17   A.   "Just sent you an e-mail.  I need to meet up with you so

18   fucking bad."

19   Q.   Outside of the messages that we reviewed just now, was

20   there continued contact with this user?

21   A.   There was.

22   Q.   On which medium?

23   A.   Through the tormail.org e-mail website.

24   Q.   For how long did you continue contact with this user?

25   A.   I'm not sure on the exact amount of time, but somewhere

1      in the neighborhood of a week or two.

2      Q.    And did you eventually stop responding to messages?

3      A.    I did.

4      Q.    Why did you do that?

5      A.    At first I was engaging in the conversation with him on

6      the PedoBook website for fantasy sake, that's all this ever

7      was to me, that's all I ever wanted it to be.  I never wanted

8      it to go to the next level to meet up in person.

9           And when it became apparent -- once we got to the Tor

10     mail network and began to exchange e-mail messages on that, it

11     became apparent that he wanted to meet up for real.

12          He continued to send messages saying that he wanted to

13     meet up with me and when was I available.  And I decided to

14     break off contact at that point.  And I think the last e-mail

15     message that I received from him was something to the effect

16     of "thanks for the fantasy," and that was pretty much it.

17     Q.    What did you think that he wanted to do?  What did he

18     communicate he wanted to do when you met in person?

19     A.    He wanted to masturbate together and talk about our

20     fantasies.

21     Q.    Masturbate to what?

22     A.    To pictures, videos, whatever we wanted to share with

23     each other.

24     Q.    What would those pictures depict?

25     A.    Child pornography and sadomasochistic content.

 1            MS. CHANG:  I have no further questions, your Honor.

 2            THE COURT:  Cross-examination?

 3                        CROSS-EXAMINATION

 4  BY MR. BERRY:

 5  Q.   Mr. MacMillan, the conversations you said you just had

 6  with fuckchrist, those were all on the Internet, correct?

 7  A.   That's correct.

 8  Q.   Specifically, they were either on PedoBook or Tor Chat

 9  e-mails, correct?

10  A.   That's correct.

11  Q.   Now, you never met the person who used the name

12  fuckchrist in person, did you?

13  A.   No, I did not.

14  Q.   And fuckchrist never sent you a photo of himself,

15  correct?

16  A.   That's correct.

17  Q.   Never sent you an e-mail address outside of the Tor

18  address, correct?

19  A.   That's correct.

20  Q.   You would agree that fuckchrist engaged in fantasy chat

21  with you?

22  A.   Yes.

23  Q.   Now, we went over some of those -- or the government did

24  -- exhibits that were communications between you and Mr. --

25  whoever he was, fuckchrist.

```
 1          During those -- I take it those were all the
 2     communications between the two of you?
 3     A.   There were others that were not presented here to me
 4     today, but we only contacted each other -- contact for a
 5     number of weeks.
 6     Q.   And you recall on fuckchrist's avatar -- there was no
 7     avatar, there was no photo; is that correct?
 8     A.   That, I cannot be sure of.
 9     Q.   Now, you never sent fuckchrist any videos, did you?
10     A.   No.
11     Q.   He never sent you any videos, correct?
12     A.   Correct.
13     Q.   You never sent him any child pornography photos, correct?
14     A.   Correct.
15     Q.   And he never sent you any child pornography photos,
16     correct?
17     A.   Correct.
18     Q.   And you would communicate with him during what times of
19     the day?
20     A.   Mostly at night, for my portion of it at least.  I worked
21     during the day so usually it was in the evenings and at night.
22          But since it was private messaging, it was similar to
23     e-mail.  And so it wasn't a chat scenario, it was trading
24     e-mails so it took upwards of a couple of days sometimes to do
25     a back-and-forth.
```

1    Q.   And just so I'm clear, with the e-mails, you had the

2    ability to send videos and pictures back and forth on the Tor

3    e-mails, correct?

4    A.   Correct.

5    Q.   But even though you had the ability, that never happened.

6    And let me clarify, DeFoggi -- or fuckchrist -- excuse me,

7    strike that.

8         PTasseater, you've never heard that name before?

9    A.   It rings a bell.

10   Q.   Okay.  But specifically you remember fuckchrist, correct?

11   A.   That's correct.

12   Q.   And you don't recall any e-mail traffic with any

13   attachments containing videos or photographs to or from

14   PTasseater, correct?

15   A.   Yeah, I don't recall those, no.

16   Q.   And you certainly don't recall any photos or videos sent

17   via e-mail traffic with fuckchrist, right?

18   A.   No.

19             MR. BERRY:  If I could, I'd like to use the ELMO to

20   publish Exhibit 66.

21   BY MR. BERRY:

22   Q.   Sir, I am publishing Exhibit 66.  We talked a little bit

23   about your plea agreement in this case on direct examination.

24        Let me ask you a couple more questions about it.  Now

25   it's your understanding that pursuant to that agreement, you

1   are to cooperate with the government, correct?

2   A.   That's correct.

3   Q.   And pursuant to that agreement, you will plead to one

4   count of conspiracy pertaining to distribution of child

5   pornography, correct?

6   A.   Conspiracy to advertise.

7   Q.   To advertise.  And the government will dismiss an

8   additional four counts, correct?

9   A.   That's correct.

10  Q.   And those four additional counts were another conspiracy

11  charge, correct?

12  A.   Yes.

13  Q.   A receipt charge, correct?

14  A.   Yes.

15  Q.   An accessing or viewing charge, correct?

16  A.   Yes.

17  Q.   And a distribution charge, correct?

18  A.   I believe so.

19  Q.   And so under that indictment that existed prior to your

20  plea agreement, would you agree that you were looking at a

21  total number of years somewhere between 40 and 100 years?

22  A.   If they were to run consecutive.

23  Q.   Yes.  And under your agreement, it's your hope that --

24  well, under your agreement, you're pleading to one count of 15

25  to 30, correct?

1    A.   Yes.

2    Q.   With the hope that if the government decides to do so,

3    the charge -- or that your sentence will be later reduced to

4    not less than 12 years, correct?

5    A.   That is correct.

6    Q.   Thank you.

7         MR. BERRY:  No further questions.

8         THE COURT:  Redirect?

9                       REDIRECT EXAMINATION

10   BY MS. CHANG:

11   Q.   Mr. MacMillan, were there other places on Tor where you

12   could go to chat with other users of Tor where there was no CP

13   or child pornography available?

14   A.   Are you asking if there are other sites that you could

15   access on Tor that didn't have to do with child pornography?

16   Q.   Yes, that had a chat function.

17   A.   Yeah, there was a -- if I recall, there was a function --

18   a program called Tor Chat.

19   Q.   And with whom would you chat with on Tor Chat?

20   A.   Anyone who had the Tor Chat program installed on their

21   computer and who had an account with the Tor Chat server could

22   access it.

23        And if you had their alphanumeric string, it functioned

24   as a user name, but it was completely random.  If you had that

25   string of characters and letters, you could have a chat with

1   them similar to AOL Instant Messenger.

2   Q.   So private messaging on PedoBook compared to Tor Chat,

3   Tor Chat was instant messaging as in real-time communications.

4   What was PedoBook private messaging like?

5   A.   That was more similar to e-mail.

6   Q.   And did I hear you correctly in your answer to Mr. Berry

7   that you did connect with and chat with user fuckchrist on Tor

8   Chat?

9   A.   I don't know if I did on Tor Chat, definitely on Tor

10  mail.

11  Q.   Now, you don't know that it was -- that this all was a

12  fantasy, your communications with fuckchrist was all a fantasy

13  for fuckchrist, do you?

14          MR. BERRY:  Objection, calls for speculation.

15          THE COURT:  Sustained.

16  BY MS. CHANG:

17  Q.   Now, could you tell us who kept urging a meeting between

18  you and fuckchrist in those communications?

19  A.   Fuckchrist, for the most part, brought up the topic more

20  often, yeah.

21  Q.   Now, even if you didn't exchange directly through e-mail

22  images of child pornography, was fuckchrist accessing your

23  profile page?

24  A.   I have to assume so, but I have no --

25          MR. BERRY:  Objection, foundation, move to strike the

 1   answer.

 2   BY MS. CHANG:

 3   Q.   What was the point --

 4        THE COURT:  Sustained.  Go ahead.

 5   BY MS. CHANG:

 6   Q.   What was the point of being a member on PedoBook?

 7   A.   The point of being a member was to access the site where

 8   you could communicate with people with similar interests.

 9   Being a member allowed you to do that much more easily than

10   just visiting the visit.

11        When you just visited the site, you didn't have access to

12   the chat -- or to the private messaging or to the groups or

13   any of that.

14   Q.   And the groups contained what kind of content?

15   A.   Child pornography.

16        (Off-the-record discussion had.)

17        MS. CHANG:  No further questions, your Honor.

18        THE COURT:  Very good.  Thank you.  The witness is

19   now excused.

20        THE WITNESS:  Thank you.

21        THE COURT:  And we will close for the day.

22        Please come back before nine o'clock tomorrow morning.

23   That's when we'll resume.

24        And I will try to remind you each evening, enjoy your

25   time with your family and friends, talk about something other

1     than this case.  Keep an open mind until all of the evidence

2     is in and you've been instructed on the law.

3         So thank you for your time and attention today, and we'll

4     see you tomorrow at nine o'clock.

5

6         (Adjourned at 5:17 p.m.)

7

8

9         I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.

10

11        _/s Brenda L. Fauber_          ____10-7-14____
          Brenda L. Fauber, RDR, CRR              Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I-N-D-E-X

 2                              Direct  Cross  Redirect  Recross
         WITNESSES:
 3       FOR THE PLAINTIFF:

 4       P. Michael Gordon        195     294     302

 5       Patricia Teakle          306     325     326

 6       Michael Mizer            327

 7       Kevin Smith              335     345

 8       Steven Smith, Jr.        346     372

 9       Charles MacMillan        374     392     396

10

11       EXHIBITS:                     Offered      Ruling

12       10.  Private Messages and E-mails
              exchanged with undercover agent   255       255
13
         12.  PTasseater user activity –
14            www.imgsrc.ru                      278       278

15       14.  Subscriber and IP information,
              Ptasseater, AOL                    264       264
16
         15.  Subscriber and IP information,
17            Verizon Internet                   264       264

18       16.  Subscriber and IP information,
              Verizon Internet                   264       264
19
         17.  Photos of laptop computer
20            at defendant's residence           362       362

21       18.  Photo living room                  359       359

22       19.  Photo living room, kitchen         359       359

23       21.  Photo master bedroom               371       371

24       22.  Photo master bedroom               371       371

25       24.  Photo stairs to basement           323       323
```

401

| | EXHIBITS: | Offered | Ruling |
|---|---|---|---|
| 1 | | | |
| 2 | 25.  Photo basement couch | 317 | 318 |
| 3 | 26.  Photo basement couch | 319 | 319 |
| 4 | 27.  Photo basement | 321 | 321 |
| 5 | 31.  Photo living room | 368 | 368 |
| 6 | 32.  Photo living room | 368 | 368 |
| 7 | 33.  Photo dining room | 369 | 369 |
| 8 | 35.  Photo basement stairs | 323 | 323 |
| 9 | 36.  Photo basement landing | 323 | 323 |
| 10 | 42.  Photo house exterior | 313 | 313 |
| 11 | 45.  Photo running laptop download | 364 | 364 |
| 12 | 46.  Photo download on laptop close-up | 364 | 364 |
| 13 | 54.  Browser activity | 301 | 301 |
| 14 | 54A. Onion Site List | 212 | 213 |
| 15 | 64.  OPVA homepage | 211 | 211 |
| 16 | 65.  Electronic keycard access records | 292 | 292 |
| 17 | 66.  MacMillan Plea Agreement | 376 | 376 |
| 18 | 70.  imgsrc.ru screenshots | 275 | 275 |
| 19 | 77.  Stipulation | 263 | 263 |
| 20 | 78.  Stipulation | 277 | 277 |
| 21 | 79.  Stipulation | 292 | 292 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |