```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEBRASKA
2

     UNITED STATES OF AMERICA,      )
3                                   )
                Plaintiff,          )           8:13CR105
4                                   )
           vs.                      )
5                                   )        Omaha, Nebraska
     TIMOTHY DEFOGGI,               )        August 21, 2014
6                                   )
                Defendant.          )
7
                              VOLUME III
8                   TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE LAURIE SMITH CAMP
9           CHIEF UNITED STATES DISTRICT JUDGE AND A JURY

10

                        A-P-P-E-A-R-A-N-C-E-S
11

     FOR THE PLAINTIFF:            Mr. Michael P. Norris
12                                 Asst. United States Attorney
                                   1620 Dodge Street
13                                 Suite 1400
                                   Omaha, NE 68102
14
                                   Mr. Keith A. Becker
15                                 Ms. Sarah Chang
                                   DOJ Trial Attorneys
16                                 1400 New York Avenue, N.W.
                                   Sixth Floor
17                                 Washington, DC 20530

18   FOR THE DEFENDANT:            Mr. John S. Berry, Jr.
                                   Mr. Justin B. Kalemkiarian
19                                 Berry Law Firm
                                   2650 North 48th Street
20                                 Lincoln, NE 68508

21

     COURT REPORTER:              Ms. Brenda L. Fauber, RDR, CRR
22                                111 South 18th Plaza
                                  Suite 3122
23                                Omaha, NE 68102
                                  (402) 661-7322
24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.
```

1              (At 9:08 a.m. on August 21, 2014, with counsel for the

2        parties and the defendant present, and the jury NOT present,

3        the following proceedings were had:)

4              THE COURT:  Good morning.

5              MR. BECKER:  Good morning.

6              MR. NORRIS:  Good morning.

7              MR. BERRY:  Good morning.

8              THE COURT:  First, let me inquire as to how things

9        are working out at the Douglas County jail.  Mr. Berry, can

10       you tell me if the concerns that were raised yesterday have

11       been alleviated?

12             MR. BERRY:  Your Honor, Mr. DeFoggi does have his

13       documents.  I believe everything has been taken care of except

14       the medication, and that is on order is my understanding.

15             THE COURT:  All right.  Well, let me know if you need

16       more frequent breaks.  What I'll plan to do is the mid-morning

17       break as we always do, and then I'll plan on two breaks in the

18       afternoon.

19             THE DEFENDANT:  Thank you, your Honor.  I appreciate

20       that.

21             THE COURT:  I understand that there are also some

22       other issues that you want to address before the jury comes

23       in.  I don't know if these are the government's or the

24       defense.

25             MR. BECKER:  I think they're the defense's issues,

1          your Honor.  It's the issue we spoke about pretrial, the

2          defense's objection to the introduction of evidence of child

3          pornography from the defendant's home.

4                And the witness who is actually going to be testifying

5          about the recovery of that evidence and presenting it would be

6          the next witness.  So I think this is the appropriate time for

7          the Court to take that up.

8                THE COURT:  All right.  Very good.

9                And I understand that in the defendant's home certain

10         child pornography was found on a flash drive and perhaps

11         another device in addition to the laptop.

12               And for the record, Mr. Berry, do you want to state your

13         objection?

14               MR. KALEMKIARIAN:  Yes, your Honor.  The prosecution

15         has indicated they intend to offer this evidence under Rule

16         414.

17               It is our belief that not only is this evidence not

18         relevant, but it is overly prejudicial.  And so we would also

19         object on Rule 403 grounds.

20               Rule 414 does not ignore, nor does it eviscerate Rule

21         403.  The indictment is limited to materials found on PedoBook

22         and PedoBook only.  It's not -- it does not extend to

23         materials found on any device, computer, thumb drive,

24         otherwise found in the defendant's home.

25               We've spent two days looking at abhorrent, deplorable

1    images.  Given the nature of these images, to allow in this

2    evidence found in the defendant's home which was not related

3    to PedoBook in any way will lead the jury to -- or could

4    mislead the jury and confuse the jury as to which images are

5    being charged in the indictment.

6         So far we've not heard any evidence of any images found

7    from PedoBook on any device seized from the defendant's home.

8         Moreover, the defense worries that those images found

9    from the home -- on the devices from the -- on the devices in

10   the home could lead the jury to convict the defendant based on

11   confusion as to the source of images.

12        Moreover, your Honor, a plain reading of Rule 414 tends

13   to suggest that the evidence that's going to be offered needs

14   to be disclosed to the defendant with more specificity than

15   simply giving it over in voluminous discovery.

16        The rule specifies -- Rule 414(b) specifies that the

17   evidence, including witnesses' statements and summaries of

18   expected test- -- or summaries of expected testimony, be given

19   at least 15 days prior to trial.

20        Yes, it's true that the defendant was given opportunity

21   to review the evidence prior -- earlier than 15 days before

22   trial.  But that also leads one to believe that the

23   prosecution then had -- also had ample time to give the

24   defense disclosure of the evidence with more specificity than

25   simply the discovery that was provided.

1           So for these reasons, we object to the evidence that is

2      going to be introduced on 403 grounds and as a result of the

3      failure to disclose with specificity under Rule 414.

4           THE COURT:  Thank you.

5      Does the government wish to respond?

6           MR. BECKER:  Yes, your Honor.

7      We also have exhibits that we'd like to present.  Your

8      Honor, in terms of the numbering of those exhibits for

9      purposes of this hearing, how would the Court like us to

10     proceed?  Should we go with a separate numbering system

11     discrete to this, we could go A, B, C, D, E or --

12          THE COURT:  I think that might be more confusing than

13     using the same numbering system that you intend to use before

14     the jury.

15          MR. BECKER:  Very well, your Honor.  I'll return to

16     that in a moment.

17     In the first instance, we're not actually necessarily

18     talking about 414 or 404(b) evidence here.  We're talking

19     about evidence that is intrinsic to this case and which, of

20     course, completes the story of the events of this case.

21     The evidence that we're going to admit through forensic

22     examiner Ray Hsu relates to child pornography images and a

23     child pornography video found on the defendant's computer

24     pursuant to the search that occurred that the jury has already

25     heard about on April 9th of 2013, a computer that as the Court

1    and the jury have heard, the defendant was seen by law

2    enforcement, had to be removed from by law enforcement while

3    he was seen with his hands on that keyboard and while that

4    computer was in the process of downloading a video from the

5    Tor network, from a child pornography site on the Tor network.

6         So this is the heart of intrinsic evidence that proves

7    the defendant's guilt, his identity as the perpetrator, the

8    person behind the alias fuckchrist and PTasseater on PedoBook.

9         And so in the first place, we don't believe there's 414,

10   404(b) analysis that will be required because we're talking

11   about intrinsic evidence.

12        We're also talking about evidence that goes to

13   consciousness of guilt.  We've heard testimony about the

14   defendant's actions, running from the basement up to the

15   computer.  And what he was trying to keep from law enforcement

16   is key and very clear and very important evidence of his

17   consciousness of guilt.  And so that's kind of the first prong

18   of this.

19        This evidence is proof also that the conduct he engaged

20   in on PedoBook as alleged, his engagement in a child

21   exploitation enterprise, his conspiracies to advertise and

22   distribute, and his access -- his knowing access with intent

23   to view was, in fact, knowing and intentional; that is, him

24   being in possession -- literally in possession when police

25   entered the home of a computer that has child pornography on

1     it, that is in the process of downloading child pornography,

2     makes it more likely that his conduct on PedoBook was, in

3     fact, knowing and intentional, both on the participation in

4     the conspiracy end as well as on the actual accessing with the

5     intent to view child pornography.  All elements that the

6     government, of course, is obligated to prove beyond a

7     reasonable doubt.

8          And so all of those factors, the use of Tor, the fact

9     that computer is on Tor, are really intrinsic to the crime

10    here to complete the story.  And so they really fall outside

11    of the 414, 403, 404(b) type analysis.

12         Now, there certainly can be a 414 analysis here.  We are

13    talking about unlawful child pornography, both the video and

14    the images.  And so we think it's appropriate to go through

15    that 414 analysis.

16         Let me start with the notice issue.  First of all,

17    there's no particular notice that's required by Rule 414.

18    What the rule says about notice is that if the prosecutor

19    intends to offer this evidence, the prosecutor must disclose

20    it to the defendant, including witnesses' statements or a

21    summary of the expected testimony.  That's an either/or, it's

22    not an "and".  It doesn't require the government to fill out

23    any particular form or piece of paper in order to disclose

24    these things to the defense.

25         The sum and substance of Examiner Hsu's testimony about

1    everything found on the laptop computer was disclosed to the

2    defense very, very long ago.  And I'll submit some exhibits to

3    that effect.

4         So what we disclosed to the defense was the examiner's

5    report; that is, a written report that describes all of his

6    findings, including everything pertinent that was found on

7    that laptop computer and on the other computers in the

8    household.  It specifies the video that's going to be

9    admitted, the particular images of child pornography that are

10   going to be admitted.

11        We also disclosed to the defense well -- way before 15

12   days before trial the actual underlying forensic reports, that

13   is, the images and videos themselves.  They were made

14   available to the defense for review.  They were made available

15   to the defendant's expert.  And in fact, a forensic image of

16   the defendant's computers were made available to the

17   defendant's expert so that expert could do his own analysis.

18   And that, in fact, was conducted in this case.  All of that

19   happened well more than 15 days before trial here.

20        So there's really just no issue here with respect to

21   whether notice of this evidence was meaningfully provided to

22   the defendant.  They've had both the written report, they've

23   had access to the actual images and videos themselves really

24   since -- for months and months ago.

25        So the first exhibit that I would ask to receive would be

```
 1    Exhibit 80.
 2         Exhibit 80, your Honor -- I'll show it to the defense --
 3    is an e-mail dated Tuesday, November 5th, 2013.  It is to
 4    James Davis, defendant's prior counsel, from my colleague,
 5    Mr. Norris.  That's just an e-mail commemorating the fact that
 6    Mr. Norris provided via e-mail a digital copy of the forensic
 7    report of Ray Hsu, who is going to testify.
 8         THE COURT:  And 80 is being offered only for the
 9    purpose of this hearing, it is not being offered to go to the
10    jury.
11         MR. BECKER:  Correct, your Honor.  All of these
12    following exhibits we would offer just for the purpose of this
13    hearing.
14         THE COURT:  Okay.  And you want to go through them
15    all and then have me rule at the end; is that convenient?
16         MR. BECKER:  Yes.
17         THE COURT:  Okay.
18         MR. BECKER:  I think that might be more efficient,
19    your Honor.
20         THE COURT:  Okay.
21         MR. BECKER:  What we're marking as Government's
22    Exhibit 81, a copy of the written forensic report of examiner
23    Ray Hsu.
24         Government's Exhibit 82 is a copy of a discovery letter
25    to prior counsel for the defendant, James Martin Davis, dated
```

1    June 17, 2013, that commemorates the disclosure of documents

2    and discovery in the case, including documents that describe

3    the items that were seized during the search of Mr. DeFoggi's

4    residence and reports that describe the circumstances of that

5    search and what occurred during that search.

6        Government's Exhibit 83 is a letter dated November 5th,

7    2013, to James Martin Davis, defendant's prior counsel, from

8    my colleague, Mr. Norris, commemorating the written disclosure

9    of the computer and forensic report of Ray Hsu.  That letter

10   also notes, "The computer and electronic media remain

11   available to you at the Federal Bureau of Investigation's

12   Digital Analysis and Research Center at Maryland.  If you

13   retain an expert, it is possible to copy the media for

14   analysis by your expert at a government facility closer to

15   your expert.  Let us know if you choose to retain an expert so

16   we can attempt to accommodate you."

17       Government Exhibit 84 is a copy of an e-mail dated March

18   20, 2014, from myself to Mr. Berry and is disclosing certain

19   additional documents to the defendant.  It includes a report

20   of the user PTasseater on the website IMGSRC.ru which the

21   Court has received -- extractions of which the Court has

22   received into evidence.  And also it attaches particular

23   documents from Mr. Hsu's forensic case report giving

24   additional disclosure of particular evidence that will be

25   admitted into evidence at trial.

1        So your Honor, I would offer for purposes of this hearing

2   Government Exhibits 80 through 84 into evidence.

3        THE COURT:  Any objections to Exhibits 80 through 84

4   for the limited purpose of this hearing?

5        MR. KALEMKIARIAN:  No objection.

6        THE COURT:  Exhibits 80 through 84 are received.

7        MR. BECKER:  May I approach to tender those exhibits?

8        THE COURT:  You may.

9        MR. BECKER:  Now, your Honor --

10       THE COURT:  Any further --

11       MR. BECKER:  I do.  I just wasn't sure whether your

12  Honor wished to review those before I continued my argument.

13       THE COURT:  Well, it appears there is no -- no one is

14  disputing that they are what you described them to be.  And so

15  I have received them into evidence, and I understand that the

16  disclosures were made.

17       MR. BECKER:  Thank you, your Honor.

18       With respect to the more substantive Rule 414 analysis

19  then, Rule 414 allows, in a criminal case, the government to

20  admit what it describes as:  When a defendant is accused of a

21  crime of, quote, child molestation, it allows the government

22  to admit evidence that the defendant committed another offense

23  of, quote, child molestation.

24       Now, child molestation is defined within Rule 414 to

25  include any violation of Chapter 110 of Title 18 of the U.S.

1       Code.  That includes basically all of the child pornography

2       statutes.

3            What that means is that all of the offenses with which

4       the defendant is charged are, quote, child molestation

5       statutes under Rule 414.

6            It also means that the offenses of possession of child

7       pornography or receipt of child pornography, which could be

8       applied to the conduct in Maryland that is uncharged; that is,

9       CP on the defendant's laptop and the video he was downloading,

10      are also Chapter 110 offenses.  And so we are within the ambit

11      of Rule 414 in terms of these being offenses of child

12      molestation.

13           Rule 414 allows that evidence to be "considered on any

14      matter to which it is relevant."  There are no limitations to

15      the use of 414 evidence as there are with the use of, for

16      example, 404(b) evidence.  And so again, no question as to

17      whether 414 allows the admission of this evidence.

18           Why is it pertinent?  We've talked about already how this

19      evidence is intrinsic to the crime here.  It is relevant to

20      the defendant's motive, his opportunity, his intent, his

21      knowledge, his consciousness of guilt, and of course his

22      identity, that this is -- the child pornography he was

23      downloading when law enforcement entered and which he

24      possessed on his computer, which existed on his computer, is

25      powerful evidence that he is, in fact, the person behind the

1    keyboard as fuckchrist and PTasseater.

2         It is particularly important, given the steps that the

3    Court will hear about, that the defendant took to wipe or

4    clean data from his computer.  And I would proffer that

5    Mr. Hsu, the forensic examiner, is going to tell the Court

6    that those two evidence elimination programs existed on this

7    computer and that they operate to delete evidence of prior

8    conduct on that computer.

9         And so the fact that he was able to find some evidence of

10   that child pornography becomes even more important in a

11   context where there will be proof that the defendant took

12   steps in order to hide his behavior and to make it more

13   difficult to find evidence of his knowledge, his intent, his

14   opportunity on that computer itself.

15        And so for all of those same reasons, even if we were

16   under a 404(b) analysis, the evidence would be admissible for

17   those purposes as well.

18        I will say 414 allows the government to request a

19   propensity inference from the jury.  We're not going to ask

20   for that.  We're not going to ask the Court to instruct the

21   jury about that.  We're not going to make an argument that the

22   defendant has a propensity to engage in this conduct; and

23   therefore, they should convict him.

24        What we will argue is that that child pornography helps

25   to identify him, it shows his knowledge, his intent, his

1    motive, all of those inferences that are entirely permissible

2    both under 414 and 404(b).

3        Now, with respect to the 403 analysis, the defense is

4    entirely correct, 414 does not eliminate 403.  This Court must

5    go through a 403 analysis.

6        I would urge the Court, in light of the case that I'll

7    talk about, to approach this issue just with some caution and

8    to make some specific findings on the record either now, or if

9    the Court does allow the evidence now, to supplement with some

10   findings at a later point to make the Court's ruling entirely

11   clear.

12       And here's why:  There is a Seventh Circuit case, *United*

13   *States vs. Loughry* that I can approach and tender the Court if

14   I may.

15           THE COURT:  You may.

16           MR. BECKER:  The citation, just for the record, is

17   660 F.3d 965.  I'm particularly familiar with *Loughry*, your

18   Honor, because I was one of the trial attorneys that retried

19   it.

20       And so *Loughry* was a child pornography conspiracy case.

21   He was charged with conspiracy to advertise in connection with

22   his membership in an online child pornography forum; and so

23   similar sorts of conspiracy charges to what the defendant

24   faces in this case.

25       In that *Loughry* case, the government admitted obviously

1    evidence of the defendant's conduct on that website and also

2    evidence of child pornography that was found within the

3    defendant's home, for some of the same reasons that we're

4    admitting that evidence here.

5        What the *Loughry* court -- what the Seventh Circuit found

6    to be problematic -- they ultimately reversed and remanded for

7    a new trial.  And there are really two prongs to the *Loughry*

8    decision.

9        On one side, the Seventh Circuit criticized the district

10   court, one, for not reviewing the actual child pornography

11   evidence that was going to be admitted, that is, the Court

12   didn't review the evidence from the home that the government

13   sought to admit before conducting a 403 analysis.

14       And second, the Seventh Circuit criticized the district

15   court for not going through its reasons for the 403 analysis

16   on the record; that is, the Court found it admissible, said it

17   was not more prejudicial than probative, but that's basically

18   all the Court said.  And the Seventh Circuit criticized on

19   that and opined that the Court should have given -- should

20   have laid out its findings in some more detail and should have

21   reviewed the images.

22       The other side of the *Loughry* case and what is entirely

23   distinguishable from this case is that the child pornography

24   site that *Loughry* was a member of permitted only what we

25   describe as lascivious images of children; that is, the board

```
 1      prohibited so-called hard core images.  It didn't have located

 2      on that board images that depicted actual sexual activity,

 3      adults engaging in sexual activity with kids or kids engaging

 4      in sexual activity with one another.

 5          At trial the government admitted, from the defendant's

 6      home, evidence of hard core sexual activity with children.

 7      And the Seventh Circuit criticized that, found that that was

 8      an element that made that evidence more prejudicial than

 9      probative because there was a disconnect between the evidence

10      from the board and the evidence that was in the defendant's

11      home in terms of how serious was the conduct and did it

12      involve just pictures of children as opposed to hard core

13      sexual acts.

14          Now, we don't have that sort of disconnect here.  The

15      Court has already seen the government's evidence and the

16      images that were available and accessed by the defendant on

17      PedoBook.  They depict minors all the way down to infants

18      engaging in sexual acts with other children and with adults,

19      hard core sexual conduct.

20          There's nothing -- in terms of the quality of the images

21      and conduct on PedoBook, there's nothing that's found in the

22      defendant's house that's any worse than everything that was

23      located and found on PedoBook.

24          And in fact, there will be an equipoise between those

25      sorts of images, which is an important probative factor.  It
```

1    does help to show the defendant's knowledge and intent, that

2    is, the images that are found in the defendant's home are of

3    infants and toddlers, they depict sexual acts with very young

4    children, just as the images on PedoBook that the Court has

5    already seen do.

6         The video itself also depicts two minor children,

7    probably about 12 or so years old -- they're pubescent age --

8    engaging in sexual acts with each other.  And so there's no

9    danger here that what the Court -- what the jury sees in terms

10   of what was on the defendant's laptop is worse than what was

11   on the board and, therefore, they decide to convict him just

12   based on those worse things there as opposed to what's on the

13   board.  There's an equipoise between them.  So that really

14   takes us out of that second *Loughry* issue.

15        So what I would urge the Court to do -- we were prepared

16   to publish them -- is for the Court to review the images that

17   we intend to present from the defendant's laptop, and to

18   review portions of the video, those portions that we intend to

19   show to the jury, before the Court goes ahead and makes its

20   finding about the probative value of this evidence and how it

21   outweighs its prejudicial effect.

22        And certainly this evidence is extremely probative,

23   particularly in this context where we have a defendant who has

24   taken such exhaustive steps to clean things from his computer.

25   So what we find there becomes very, very relevant.  And the

 1    fact that we catch him red-handed is a huge and relevant and

 2    probative factor.  We don't believe there's any danger of

 3    unfair prejudice which is, of course, all that Rule 403

 4    prohibits.

 5        The defense also argued there might be an issue of

 6    misleading or confusing the jury.  We don't believe that's the

 7    case.  The indictment very clearly charges the defendant for

 8    his activity on PedoBook and for his access with intent to

 9    view images on PedoBook.

10        The Court can and should instruct the jury that the

11    defendant is not charged with possessing or accessing the

12    images that were found in the defendant's home.  And we

13    believe that those sorts of instructions can very easily clear

14    up any sort of potential confusion of the issues that might

15    pertain.

16            THE COURT:  So a few questions.

17            MR. BECKER:  Yes, your Honor.

18            THE COURT:  What are the numbers of the exhibits that

19    represent the items found in the defendant's home?

20            MR. BECKER:  Your Honor, Government Exhibits 52 and

21    53 are both images that were located on the defendant's laptop

22    computer.  And Exhibit No. 47 is the video that was

23    downloading at the time that officers made entry into the

24    defendant's home.

25            THE COURT:  Are those the only exhibits that the

1   government is intending to introduce showing pornography that

2   was found in the defendant's home that was not on PedoBook?

3           MR. BECKER:  That's correct, your Honor, with respect

4   to our case in chief.  Now, it is possible -- I don't know how

5   the defendant's testimony, if he does testify, will go.  I

6   don't know exactly what issues the defense will bring up on

7   cross-examination of the expert.

8       There were other computers in the home.  We'll just have

9   to see how that develops.  At this point this is what we

10  intend to admit in our case in chief.

11          THE COURT:  Okay.  And at what juncture do you intend

12  to admit that?  This morning?

13          MR. BECKER:  This morning with the next witness.

14          THE COURT:  Which does not give me much time to be

15  reviewing these materials independently unless you have them

16  right here for me to do this --

17          MR. BECKER:  We do.

18          THE COURT:  -- right now.  Okay.

19      All right.  Well, then let's review Exhibits 52, 53 and

20  47 outside the presence of the jury.

21          MR. BECKER:  The first exhibit, your Honor, will be

22  images.  Showing the Court Government Exhibit 52, this is a

23  43-page exhibit depicting images that were extracted from the

24  defendant's laptop computer, that is, the computer that law

25  enforcement found him in possession of at the time of the

1    search.

2              THE COURT:  I'm looking at the paper copy that you

3    provided to me in the notebook.

4              MR. BECKER:  The exhibit -- are we not -- I'm sorry,

5    your Honor, I didn't realize we weren't hooked up here.

6              THE COURT:  Well, I can probably see what these are.

7              MR. BECKER:  We do have it on the monitor as well,

8    just fixed the technical issue.

9         The exhibit itself contains approximately three or so

10   images per page.  The images are in a small thumbnail size and

11   we left them that way and that's how we intend to present them

12   to the jury.

13             THE COURT:  All right.  I've looked at the 43 pages.

14             MR. BECKER:  The next exhibit is Government Exhibit

15   No. 53.  It's entitled Graphics - CEM - Toddler.  This is a

16   three-page exhibit depicting infant and toddler images,

17   approximately two to three -- two to four images per page.

18             THE COURT:  All right.  I've reviewed Exhibit 53.

19             MR. BECKER:  Just for the record, the testimony from

20   Examiner Hsu will be that these were found in a portion of the

21   defendant's computer called the pagefile.sys.  That will be

22   significant in the case, particularly given the defendant's

23   use of the program CCleaner and Eraser.

24        It's essentially an area of the computer where even when

25   running those sorts of counterforensic programs, you may still

1    find evidence pertinent to activity on the computer.  So

2    that's the -- the location of the images also becomes

3    significant in the overall context of the story of the case.

4         The next exhibit, your Honor, is a video.  It's the video

5    being downloaded at the time of entry.  It is entitled -- it's

6    Exhibit 47.  The exhibit itself -- the video itself is

7    approximately seven minutes in length.  We do not intend to

8    publish or to show the entire video or even a substantial

9    portion of it to the jury.

10        We have selected certain portions that we expect to

11   publish during testimony.  They are about five to ten seconds

12   each, just so the jury is able to understand and then make its

13   findings that are required that there is, in fact, sexually

14   explicit conduct that is taking place during the video.

15        The video has sound.  The sound is not the sound of the

16   children.  The only sound on the video is actually a sort of

17   sound track rock music song that's playing in the background.

18        So while playing the portions of the video, the jury is

19   not going to hear the actual sounds of the children, I think

20   another important factor, something to be considered in terms

21   of its prejudicial effect.  Sometimes those sounds can have an

22   impact on people.  They won't hear that.  I think that we may

23   play the sound track sort of quietly, but it's not really --

24   we don't think it's a point of prejudice.

25        So I'm going to open that video on the monitor.

1          THE COURT:  And what you're going to be showing me is

2    what you would be showing to the jury; is that correct?

3          MR. BECKER:  That's correct, your Honor.  We expect

4    to show these first ten seconds.  For the record, those ten

5    seconds depict two minor children, pubescent or barely

6    pubescent.  The female minor is masturbating the male minor.

7          We then intend to play a portion beginning at 54 seconds

8    into the video; start at approximately 51.  This portion of

9    the video depicts the female minor engaging in oral sex with

10   the male minor.

11         We'll then show a short section of the video at two

12   minutes -- beginning at two minutes and 17 seconds

13   approximately.  This portion of the video depicts the two

14   minor -- one minor engaging in masturbation with the other

15   minor and then active mutual masturbation.  Both of the minors

16   are nude.

17         We will then show a portion of the video at four minutes

18   at 27 seconds approximately, start with 4:24.  This portion

19   depicts again masturbation and then penetrative sex.

20         Then there's a short section at approximately five

21   minutes and 11 seconds depicting masturbation and then again

22   penetrative sex.

23         So that is what we intend to show to the jury, your

24   Honor.

25              THE COURT:  All right.  Well, I'll go ahead and make

1    a ruling so we can keep going.

2         First of all, the fact that the child pornography was

3    indeed found in the defendant's home is relevant and is

4    probative of a material issue other than the defendant's

5    character.  It is very relevant to identity.

6         And much of the evidence that we've heard so far has been

7    an effort by the government to demonstrate to the jury how the

8    government went about linking up the person known as

9    fuckchrist and PTasseater to the defendant in this case.  And

10   that's a very key evidentiary issue in this case.

11        And the fact that once they traced those user names to

12   the defendant's home, the defendant was found there with child

13   pornography that matches very closely to the kind of child

14   pornography that was being used and described by fuckchrist

15   a/k/a PTasseater is important.

16        So it is relevant, it is probative.  It also goes to

17   issues of motive, opportunity, knowledge and intent.

18        Which leaves me, then, with the 403 analysis about what

19   is unduly prejudicial.  And I have to balance there with the

20   probative value of the material and what's unduly prejudicial.

21        It is certainly fair for the government to show some of

22   the images to the jury that appear in Exhibits 52 and 53

23   because it does link very closely with the exhibits that we

24   saw on PedoBook linked to fuckchrist a/k/a PTasseater.

25        I find that all of the images in 53 are admissible

 1    because I don't think that while -- while they're awful images

 2    and they're inflammatory, I think that the probative value

 3    outweighs the prejudicial impact.

 4         With regard to Exhibit 52, frankly I just don't think

 5    that we need 45 pages or 43 pages of the child pornography

 6    photos in order to make the point that the government wants to

 7    make, that these images closely link to or resemble the images

 8    that were being viewed or shared by fuckchrist PTasseater.

 9         I think that if four pages of the images are shown and

10    the witness simply testifies that many more pages existed in

11    the defendant's possession at his home, that is sufficient to

12    make the point that the government is entitled to make.

13         With regard to the video, the video can be described by

14    the witness, and I don't think it is necessary for the jury to

15    watch the video.  I think that its prejudicial impact

16    outweighs its probative value as far as being actually shown

17    to the jury.  But I certainly will allow the witness to

18    describe the nature of the video.

19         So that's my ruling.  At the time that the exhibits are

20    offered, I will allow the government to introduce 53 in its

21    entirety.  I'll allow the government to introduce four pages

22    from Exhibit 52.

23         And Mr. Becker, you can select four pages if you wish, if

24    you have a choice as to which four pages come in, but I think

25    four pages is enough.

```
1              MR. BECKER:  Very well, your Honor.

2         Would your Honor consider -- understanding the Court's

3    ruling on the video, would your Honor consider us admitting

4    still shots from that video, perhaps just -- maybe three or

5    four still shots from it just so that the jurors understand

6    the quality of it.  That's something we can create relatively

7    easily.  We might need a little bit of time, but just so they

8    can visually understand the content without having to see any

9    video conduct.

10             THE COURT:  All right.  I will permit you to do that.

11             MR. BECKER:  Thank you, your Honor.

12             MR. NORRIS:  Your Honor, may I ask a question with

13   regard to the redacted exhibit is what I'll call it where

14   we're using four pages.

15             THE COURT:  It's Exhibit 52.

16             MR. NORRIS:  Exhibit 52, thank you.

17        If we were to remove the screens whatsoever and left the

18   rest of it, would that be fine; in other words, not display

19   the pornography itself?

20             THE COURT:  Yes, you can do that.

21             MR. NORRIS:  All right.  Thank you.

22             THE COURT:  Okay.  Anything else before the jury

23   comes in?

24             MR. BECKER:  I think just -- may we have a moment

25   just to -- may we just have a moment to instruct our witness
```

1    about the kind of change in what he's going to be testifying

2    about.

3             THE COURT:  Yes.  Let's just start at ten o'clock.

4    That way Mr. DeFoggi can also perhaps take his bathroom break.

5    That will give us a little longer to go; otherwise, we'd have

6    to stop at 10:30.  This way perhaps we can go longer.

7       All right.  We'll see you out here at ten o'clock.

8       (Recess taken at 9:48 a.m.)

9       (At 10:08 a.m. on August 21, 2014, with counsel for the

10   parties and the defendant present, and the jury NOT present,

11   the following proceedings were had:)

12            THE COURT:  Is there anything else we need to discuss

13   before the jury comes in?

14       MR. BECKER:  I don't believe so, your Honor.

15      We have taken the screenshots that we will ultimately

16   publish, and we'll only publish at this point selected pages

17   of the exhibit that your Honor limited.  We will then create

18   hard copies later today that we can put in the jury binder.

19            THE COURT:  And have you shown the selected portions

20   to defense counsel?

21       MR. BECKER:  I have not, but we can do that right

22   now, your Honor.

23            THE COURT:  All right.

24            MR. BECKER:  First, your Honor, with respect to

25   Exhibit No. 52, we will publish only page 1, which is on the

1    screen; page 6, which is now on the screen, page 15, which is

2    now on the screen; and page 41.

3         And then for the paper copy that will ultimately go back

4    to the jury, we will redact all of the remaining images from

5    that exhibit.

6         With respect to the video, your Honor, we are going to

7    show first this first page, which is the title of the video

8    which does not depict any children or minors; this second

9    page, which depicts a still image of masturbation conduct; the

10   third page, which depicts oral sex; a fourth page, depicting

11   mutual masturbation conduct; fifth page, depicting mutual

12   masturbation conduct; and the last page, depicting penetrative

13   sexual conduct.

14        THE COURT:  All right.

15        MR. KALEMKIARIAN:  Your Honor, I know we've already

16   objected.  I would object further to the title screenshot

17   being in there, the fact that it indicates the depiction of

18   incest.  I think it goes beyond the scope that's necessary --

19   beyond the scope or purpose for offering the exhibit.  I think

20   it's overly prejudicial.

21        THE COURT:  That objection is overruled.  In some of

22   the postings made by the individual using the screen name

23   fuckchrist PTasseater, he expressed a particular interest in

24   incest.  And so I think that the title of the film showing

25   that it was specifically incest-related goes to the issue of

1    identity.

2        Okay.  Let's bring in the jury.

3        (Jury in at 10:12 a.m.)

4        THE COURT:  Good morning.  Thank you for your

5    patience.

6        The lawyers and I were working out some matters that in

7    the long run will end up saving you time, we believe.  So we

8    are now prepared to begin.  The government may call its next

9    witness.

10       MS. CHANG:  Your Honor, the government calls Mr. Ray

11   Hsu.

12       THE COURT:  Mr. Hsu, if you'll please come forward to

13   the courtroom deputy here on my right, she will swear you in,

14   right up here.  Thank you.

15       COURTROOM DEPUTY:  Please state your full name for

16   the record and spell your last.

17       THE WITNESS:  Ray Hsu, H-s-u.

18           RAY HSU, PLAINTIFF'S WITNESS, SWORN

19       THE COURT:  You may inquire.

20                    DIRECT EXAMINATION

21   BY MS. CHANG:

22   Q.   Good morning.

23   A.   Good morning.

24   Q.   Could you please state and spell your name for the

25   record, please?

1   A.    Good morning.  My name is Ray Hsu, R-a-y H-s-u.

2   Q.    How are you employed?

3   A.    I'm employed by the FBI.

4   Q.    And for how long?

5   A.    Nine years.

6   Q.    And specifically what are your duties with the FBI?

7   A.    I'm a forensic examiner.

8   Q.    Now, before you became a forensic examiner with the FBI,

9   could you please describe what schooling you received?

10  A.    Yes.  I received bachelor of science degree from Purdue

11  University in computer information systems.  And I receive

12  master of science degree from University of Illinois,

13  Springfield campus, in the area of management information

14  systems.

15  Q.    Now, specifically about your forensic examiner training,

16  what kind of training have you received?

17  A.    I received a lot of forensic training in the past nine

18  years, and most of them were working toward a specific

19  forensic certification.

20        And currently I hold four forensic certifications; first

21  one is FBI certified examiner; second one is IACIS certified

22  examiner.  IACIS stands for International Association of

23  Computer Investigative Specialists.  Third one is ACE, which

24  stands for AccessData Certified Examiner; and finally ENCE,

25  Encase Certified Examiner.

1    Q.   And during your nine years at the FBI as a forensic

2    examiner, approximately how many cases were you assigned?

3    A.   Approximately 50 cases.

4    Q.   And of those 50, how many were child pornography-related?

5    A.   About 30.

6    Q.   And in those cases, approximately how many pieces of

7    evidence did you examine?

8    A.   Thousands.  Just recently, I had a case I completed.

9    That one case alone had over 1300 pieces of items.

10   Q.   And can you just describe for us briefly, what is your

11   role as a forensic examiner at the FBI?

12   A.   I help investigators to find evidence in a computer.

13   Q.   And do you ever accompany special agents of the FBI to

14   search warrant scenes?

15   A.   Yes.

16   Q.   And what is your role at those search warrant scenes?

17   A.   I conduct preview of the computers.

18   Q.   And what is a preview of a computer?

19   A.   Preview of computer is conduct a preliminary examination

20   of the computer on scene.

21   Q.   And were you present on April 9th, 2013, at Crown Ridge

22   Court, Germantown, Maryland, to execute a search warrant at

23   the defendant's residence?

24   A.   Yes, I was.

25   Q.   Do you remember approximately what time the search began?

1    A.   Approximately 5:25 in the morning.

2    Q.   And did the residence have to be cleared for security

3    purposes before you entered?

4    A.   Yes.

5    Q.   Now, once it was cleared and you had entered the house,

6    can you please describe to us, what was your role on scene?

7    A.   My role as a forensic examiner is to conduct preliminary

8    review or preview of computer, computers in house.

9    Q.   What was your first investigative task on scene?

10   A.   I was told to take a look at a laptop computer.

11   Q.   And where was this laptop computer that was pointed out

12   to you?

13   A.   It was in the living room area of the main floor.

14   Q.   And what was it specifically on?  Can you describe where

15   it was located within the room?

16   A.   It's in the center of the room, next to a coffee table.

17        MS. CHANG:  Court's indulgence?

18   BY MS. CHANG:

19   Q.   Showing you what's already been received in evidence as

20   Exhibit 19, do you recognize Exhibit 19?

21   A.   Yes.

22   Q.   And what is it?

23   A.   That's the living room of the main floor of the

24   defendant's house.

25   Q.   And was this what you saw upon entering and being pointed

1    out -- pointed to the laptop?

2    A.   Yes.

3         MS. CHANG:  I'm sorry, is this already published to

4    the jury?

5         MR. BECKER:  Yes.

6    BY MS. CHANG:

7    Q.   Now, when you first approached the laptop, what did you

8    see?  What did you encounter?

9    A.   I saw the laptop was on, and I saw a program Eraser was

10   running.

11        MS. CHANG:  Permission to approach.

12        THE COURT:  You may.

13   BY MS. CHANG:

14   Q.   Showing you what's been marked as Government Exhibit 71,

15   do you recognize it?

16   A.   Yes.

17   Q.   What is it?

18   A.   This is the same laptop in the picture.

19   Q.   And is that the same laptop you encountered at the

20   defendant's residence?

21   A.   Yes.

22   Q.   And how do you know that?

23   A.   I know that because I took notes of the laptop, make,

24   model and serial number.  And three days ago, I was told to

25   review this laptop again.  And I compared my notes with the

1    make, model and serial number of this laptop, and they

2    matched.

3                MS. CHANG:  At this time, your Honor, we would move

4    to admit Government's Exhibit 71.

5                MR. BERRY:  Objection, relevance.

6                THE COURT:  Overruled.  Exhibit 71 is received.

7                MS. CHANG:  Permission to approach.

8                THE COURT:  You may.

9         (Off-the-record discussion had.)

10   BY MS. CHANG:

11   Q.   Now, you said that the computer was powered on.

12   A.   Yes.

13   Q.   And on the screen, you saw -- would you please describe

14   to us what you saw on the screen.

15   A.   Well, I saw two programs running on the desktop of the

16   computer.

17   Q.   Showing you what's been marked as Government Exhibit

18   No. 45, already received into evidence, do you recognize

19   Exhibit 45?

20   A.   Yes.

21   Q.   And is this what you saw on the laptop when you first

22   encountered it?

23   A.   Yes.

24   Q.   Would you please describe to us -- and feel free to point

25   to the monitor -- what we're seeing.

1    A.   We're seeing two windows.  The first one in the middle,

2    here, the Vidalia Control Panel is indicating that the

3    computer at the time was connected to Tor network.  And this

4    window (indicating) is a Firefox download window, indicating a

5    file at the time was actively download a file.

6    Q.   And approximately what time was that when you observed

7    this happening on the laptop?

8    A.   Approximately 5:40 in the morning.

9    Q.   And how do you know that?

10   A.   I know that because at the bottom right corner of the

11   screen, if you zoom in to this area (indicating), there's the

12   time and it shows 5:40.

13   Q.   You said it was actively downloading.  Did you let the

14   download continue?

15   A.   Yes.

16   Q.   Did you do anything to the laptop while it was

17   downloading this file?

18   A.   I checked other running processes of the computer, and I

19   noticed the program Eraser was also running.

20   Q.   What is Eraser?

21   A.   Eraser is a application capable of erasing files of a

22   computer in a way that is difficult or even impossible for

23   forensic tools to recover.

24   Q.   So what did you do once you realized that Eraser was

25   running?

1    A.    I closed it.

2    Q.    Now, how long did it take the download to compete,

3    approximately?

4    A.    Four minutes.

5    Q.    And how do you know that?

6    A.    On the screen here (indicating) indicating four minutes

7    remaining.

8    Q.    Now, directing your attention to Exhibit 46, which has

9    already been received into evidence, do you recognize

10   Exhibit 46?

11   A.    Yes.

12   Q.    And what is it?

13   A.    This is a photo that I took of the laptop screen showing

14   the completion of download.

15   Q.    And how do you know it's been completed?

16   A.    I know it's completed because the status bar was not

17   there anymore and you see the complete file size of the file.

18   Q.    Now, does this box also indicate where this file came

19   from?

20   A.    Yes.

21   Q.    Where did it come from?

22   A.    It come from OPVA.onion site.

23   Q.    And what is OPVA?

24   A.    OnionPedo Video Archive.

25   Q.    Now, what's to the left of the download box, directly to

1    the left?

2    A.   We're seeing a thumbnail image of that file.

3    Q.   How do you know that's the file that you saw actively

4    downloading?

5    A.   Because the file name SS matched SS (indicating).

6    Q.   Now, the fact that we're seeing it on the screen means

7    that the file downloaded to where?

8    A.   To the desktop of the user's computer.

9    Q.   Did you review this file on scene?

10   A.   Yes.

11   Q.   How much of it did you review?

12   A.   Approximately the first ten seconds.

13   Q.   What did you observe?

14   A.   I observed two prepubescent child -- children performing

15   sexual acts.

16   Q.   At a later time, did you get a chance to review the

17   entire file?

18   A.   Yes.

19   Q.   Where were you at the time?

20   A.   I was in my office.

21   Q.   Directing your attention to Exhibit 47, which has not yet

22   been admitted --

23        MS. CHANG:  Your Honor, this is the video file that

24   we've now taken screenshots of.  Would you -- should I move it

25   into evidence or shall I --

1            THE COURT:  Well, I'll give the jury an instruction

2    on this.  And then if you wish to make an offer of Exhibit 47

3    in its redacted form, you may make the offer, I'll hear

4    objections on the record -- in fact, why don't you make the

5    offer first, I'll hear objections and then we'll proceed.

6         (Off-the-record discussion had.)

7            MS. CHANG:  Permission to approach.

8            THE COURT:  Yes.

9    BY MS. CHANG:

10   Q.   Showing you what's been marked as Government's Exhibit

11   47, do you recognize it?

12   A.   Yes.

13   Q.   And what is it?

14   A.   This is a CD containing the video file that was actively

15   downloaded at the house.

16   Q.   How do you know that?

17   A.   I know that because I created this.

18   Q.   And what -- did you make any markings on it?  Does that

19   help you recognize it?

20   A.   Yes.  It has my initials on the CD.

21           MS. CHANG:  At this time, your Honor, we would move

22   to admit Government's Exhibit 47 into evidence and publish

23   select still shots from Exhibit 47.

24           MR. BERRY:  Objection, relevance and 403.

25           THE COURT:  Well, the objection is overruled with the

1     limitation that only the still shots will go to the jury, that

2     the remainder of the video will not go to the jury.

3          And I'll just take this opportunity to give an

4     instruction, which I'll also give perhaps in a little

5     different wording at the time I give you the final

6     instructions.

7          You're about to see some evidence that the defendant

8     possessed certain child pornography in his home.  The

9     defendant has not been charged with that offense.  You can

10    consider this evidence if you find it's more likely true than

11    not true.

12         If you find the evidence has been proved, then you may

13    consider it to help you decide the following issues:  The

14    defendant's identity, his motive, his intent, his knowledge,

15    and the absence of mistake or lack of accident in connection

16    with the offenses actually charged.

17         You may proceed.

18    BY MS. CHANG:

19    Q.   Now, Mr. Hsu, before I show you the still shots from the

20    video, can you tell us approximately how long the entire video

21    lasted?

22    A.   Seven minutes.

23    Q.   Showing you what's been selected from Exhibit 47 -- we'll

24    call that 47A, do you recognize 47A?

25    A.   Yes.

1   Q.   What is it?

2   A.   It's the title of the video, Susie and her Little

3   Brother.

4   Q.   And it's the title of the video that you saw downloading

5   on scene?

6   A.   Yes.

7   Q.   Showing you what's marked as Government's Exhibit

8   No. 47B, do you recognize 47B?

9   A.   Yes.

10  Q.   What is it?

11  A.   This is two prepubescent children performing a sexual

12  act.  The young girl is kissing the boy, at the same time

13  masturbating the young boy.

14  Q.   Just for the record, showing 47B at time marker nine

15  seconds.  Can you see on the bottom where the time marker is

16  shown?

17  A.   Yes.

18  Q.   And what time marker is it at?

19  A.   Nine seconds.

20  Q.   Thank you.

21       Moving on to 47C, do you recognize 47C?

22  A.   Yes.

23  Q.   And what does this depict?

24  A.   It depict the young girl performing oral sex on the young

25  boy.

1    Q.   What is the time marker on this still shot?

2    A.   Marker 54 seconds.

3    Q.   Moving on to 47D, what does 47D depict?

4    A.   It depict the young boy masturbating the young girl.

5    Q.   And what time marker is this still shot?

6    A.   Two minute, 16 second.

7    Q.   Showing you what's 47E, what does 47E depict?

8    A.   It depict the young boy and the young girl performing

9    mutual masturbation.

10   Q.   And what is the time marker on this image?

11   A.   Four minute, 26 second.

12   Q.   47F is on your screen now.  What does 47F depict?

13   A.   It depict the young boy and young girl performing sexual

14   intercourse.

15   Q.   And what is the time marker on this still shot?

16   A.   Five minute, 22 second.

17   Q.   And at this point, could you point out to us where you

18   can see the approximate length of the full video?

19   A.   To the right -- bottom right, it shows six minute,

20   57 second.

21   Q.   Now, this file that you found on the laptop and that you

22   saw downloading on scene, where did you find it in the laptop

23   and during your later examination?

24   A.   I found it on the desktop area of the user account

25   ToonaBug.

1    Q.   Now, did you find any other child pornography on the

2    laptop during your later examination?

3    A.   Yes.

4    Q.   Showing you what's been marked as Exhibit 52, I will show

5    you first page 1.

6           MS. CHANG:  Your Honor, at this time we would like to

7    present four separate pages of Exhibit 52 to the witness for

8    admission into evidence and then publication to the jury.

9           THE COURT:  So you are offering the four selected

10   pages of Exhibit 52 at this time?

11          MS. CHANG:  Correct.  And at a later time we will

12   publish the remaining pages in a redacted form.

13          THE COURT:  All right.

14          MR. BERRY:  Objection, relevance and 403.

15          THE COURT:  Overruled.  The Exhibit 52 as redacted is

16   received.

17   BY MS. CHANG:

18   Q.   Mr. Hsu, first I'm going to show you page 1 of Exhibit

19   No. 52.

20          MS. CHANG:  Permission to publish, your Honor.

21          THE COURT:  You may.

22   BY MS. CHANG:

23   Q.   Do you recognize page 1?

24   A.   Yes.

25   Q.   And what is it?

1    A.    These are three pictures that contain child pornography.

2    Q.    And where were these found?

3    A.    They are found on the pagefile.sys file.

4    Q.    And was the pagefile.sys extracted from the laptop?

5    A.    Yes.

6    Q.    What is pagefile.sys?

7    A.    Pagefile.sys is a system file that stores temporary data

8    for the computer's memory.

9    Q.    Now, the remaining pictures that I'm going to show you,

10   where did you find those?

11   A.    They're all from pagefile.sys.

12   Q.    Showing you page 6 of Exhibit 52, do you recognize

13   page 6?

14   A.    Yes.

15   Q.    What does page 6 depict?

16   A.    It depict graphics of child pornography.

17   Q.    Showing you page 15 of Exhibit 52, what does Exhibit

18   15 -- I'm sorry, Exhibit 52, page 15 depict?

19   A.    Graphics of child pornography.

20   Q.    And lastly, Exhibit 52, page 41.  What does page 41

21   depict?

22   A.    Graphics of child pornography.

23   Q.    And approximately how many of these graphics of child

24   pornography did you find on pagefile.sys on the laptop?

25   A.    In total, I found 141 pictures.

1    Q.   I'm going to show you Exhibit 53.

2         THE COURT:  This is not yet in evidence.  I just want

3    to make sure that it doesn't get shown to the jury

4    inadvertently.  So we need to take the jurors' monitors down.

5         MS. CHANG:  Yes, can we take the jurors' monitors

6    down, please?

7         THE COURT:  Thank you.

8    BY MS. CHANG:

9    Q.   Do you recognize Exhibit 53?

10   A.   Yes.

11   Q.   And what is it?

12   A.   These are child pornography depicting toddlers.

13   Q.   And where did you find these images?

14   A.   These images were extracted from the pagefile.sys file.

15   Q.   And on what device?

16   A.   On the laptop computer.

17   Q.   And how do you know that these are the images extracted?

18   A.   I extract them myself.

19        MS. CHANG:  At this time, your Honor, we would move

20   to admit Exhibit 53 into evidence.

21        MR. BERRY:  Objection, relevance and 403.

22        THE COURT:  Exhibit 53 is received.  The objection's

23   overruled.

24        MS. CHANG:  Permission to publish, your Honor.

25        THE COURT:  You may.

1    BY MS. CHANG:

2    Q.   First, I'm showing you page 1.  On page 1, Mr. Hsu, would

3    you please describe to us what is depicted?

4    A.   The first picture depict an adult male sexually

5    penetrating a toddler boy.

6    Q.   Moving on to page 2, just generally, you don't have to go

7    through each picture, but what does page 2 show you?

8    A.   It shows a toddler female and a toddler male posing nude

9    showing the genital area.

10   Q.   Moving to page 3, what does page 3 depict?

11   A.   It depict toddler boy and then adult male specifically

12   focus on the genital area.

13   Q.   And in total, if you can just let us know how many images

14   are contained in Exhibit 53?

15   A.   Nine.

16   Q.   Now, this is just a portion of what you found during your

17   exam; is that right?

18   A.   Yes.

19   Q.   And let's just talk some more about your exam findings.

20   First, did you work off of an original?

21   A.   No.

22   Q.   What did you work off of?

23   A.   Image copy.

24   Q.   And what is an image copy?

25   A.   Image copy is a exact duplicate of the original.

1   Q.   And can you just clarify to us what you mean by

2   original -- original copy of what?

3   A.   Original copy of the laptop computer's hard drive.

4   Q.   Showing you what's been marked as Exhibit 48 --

5        MS. CHANG:  Permission to approach?

6        THE COURT:  You may.

7   BY MS. CHANG:

8   Q.   Mr. Hsu, do you recognize Exhibit 48?

9   A.   Yes.

10  Q.   And what is it?

11  A.   This is hard drive containing the forensic copy of the

12  original hard drive.

13  Q.   And how do you know that?

14  A.   I know that because I created this hard drive myself in

15  my office.  And I wrote down the make, model and serial number

16  of the hard drive.

17       And three days ago I was asked to verify this hard drive.

18  And I look at the make, model and serial number and compare to

19  my notes.  They matched.  And I put a sticker and initials on

20  this hard drive.

21  Q.   Now, you said that this is an image copy of the original

22  hard drive from the laptop.  How do you know that's the exact

23  same copy?

24  A.   I know that because the hash value matched.

25  Q.   What is a hash value?

HSU - DIRECT

1   A.   Hashing is a process of taking a mathematical algorithm

2   and apply it to certain string of data.  It can be a picture,

3   a video, or a document or entire hard drive.

4        At the end of the calculation is hash value, which

5   uniquely identified that certain set of data.

6        Analogy would be taking a fingerprint of a person.

7   Q.   So why work off of an exact duplicate as opposed to the

8   original laptop?

9   A.   For two main reasons:  First one is we want to preserve

10  the original evidence.  So by producing an exact duplicate of

11  the original, we accomplish the preservation.  At that time,

12  we can package the original evidence and safely put it away.

13       And the second reason is to minimize the risk of damaging

14  the original or accidentally change the integrity of the

15  original data because we are focusing our examination on the

16  exact duplicate copy.

17  Q.   Now, when you first started your examination, did you

18  verify that the hash value of the image copy matched the

19  original laptop hard drive?

20  A.   Yes.

21  Q.   And after you completed your forensic examination, did

22  you check the hash values again?

23  A.   Yes.

24  Q.   And did they match?

25  A.   Yes, they matched.

1    Q.   Does Exhibit 48 appear to be in the same or substantially

2    the same condition as when you conducted and completed your

3    analysis?

4    A.   Yes.

5              MS. CHANG:  At this time, your Honor, we would move

6    to admit Exhibit 48 into evidence.

7              MR. BERRY:  Relevance, 403, duplicative.

8              THE COURT:  Overruled.  Exhibit 48 is received.

9    BY MS. CHANG:

10   Q.   Before we get into the specifics of your findings, let's

11   just discuss a couple of general concepts and terms.

12        First, what is the point or purpose of a forensic

13   examination?

14   A.   The purpose of forensic examination is to extract

15   meaningful and relevant data out of a computer evidence.

16   Q.   And do you use certain tools to help you in that

17   examination?

18   A.   Yes.

19   Q.   In this particular examination of the laptop found in

20   defendant's residence, what tools did you use?

21   A.   I use FTK, which stands for Forensic Toolkit, and Encase.

22   Q.   And what is Forensic Toolkit, FTK?

23   A.   FTK is forensic software and designed to help me extract

24   meaningful and relevant data from computer evidence.

25   Q.   And what is Encase?

1   A.    Encase is similar to FTK.  It's the same extracting and

2   reporting relevant information found in computer evidence.

3   Q.    And are FTK and Encase pretty standard in the field of

4   forensic examination?

5   A.    Yes.

6   Q.    And are those two approved and validated by the FBI?

7   A.    Yes.

8   Q.    Do those two tools change, alter, or delete data in any

9   way?

10  A.    No.

11  Q.    Now, we already talked about where on the laptop computer

12  you found the video that was downloading on scene.

13        Which user account was the video located on?

14  A.    User account ToonaBug.

15  Q.    And what is a user account?  First, for the record, could

16  you spell ToonaBug?

17  A.    Sure.  T-o-o-n-a-B-u-g.

18  Q.    And again, what is a user account?

19  A.    User account is Microsoft Windows operating system's way

20  to make a user more personalized and unique experience when a

21  user log on to their computer.

22        For example, in my house I have a computer that I use it

23  and my wife uses it.  So I have account, my wife has her own

24  account.

25        When I log into the computer, I have my own desktop

1   graphic.  In my case, I like Baltimore Ravens.  So I have a

2   Ravens picture on the desktop.  I have my own download folder,

3   my own music folder, my own picture folder and my own video

4   folder.

5       Now, when my wife logs on to the same computer, she has

6   her own settings.  In her case, she likes flowers.  So she's

7   got a flower picture as a background picture.  She has her own

8   download folder, music folder, picture folder and movie

9   folder.

10      So in other words, a user account is to let a user have

11  more of a personalized -- and so that when the user logs in to

12  his or her own account, he or she is entering an environment

13  that is familiar with.

14  Q.   Now, this environment composed of all those settings you

15  talked about, who creates those settings?

16  A.   The user himself or herself.

17  Q.   And how many user accounts did you find on the laptop?

18  A.   One.

19  Q.   What was the name of that laptop -- I'm sorry, the user

20  account?

21  A.   ToonaBug.

22  Q.   Just a minute ago we determined that the video file you

23  could visually see on the desktop.

24  A.   Yes.

25  Q.   And you just told us that you found it in the user

 1    account ToonaBug.  Let's just drill down a little further into

 2    the forensic evidence of that.

 3         Showing you what's been marked as Exhibit 57, do you

 4    recognize Exhibit 57?

 5    A.   Yes.

 6    Q.   And what is it?

 7    A.   This is web browser activity specifically on OnionPedo

 8    Video Archive that I extracted from pagefile.sys.

 9         MS. CHANG:  At this time, we would move to admit

10    Exhibit 57 into evidence.

11         MR. BERRY:  Objection, relevance, 403.

12         THE COURT:  Overruled.  Exhibit 57 is received.

13         MS. CHANG:  Permission to publish.

14         THE COURT:  You may.

15    BY MS. CHANG:

16    Q.   Directing your attention to page 2, line 6, do you see

17    line 6 on that page?

18    A.   Yes.

19    Q.   Could you just mark next to that line so we can refer to

20    it more easily?

21    A.   (Witness complies.)

22    Q.   Do you recognize that file name?

23    A.   Yes.

24    Q.   And how do you recognize it?

25    A.   This is the same file name that was actively downloaded

1    at the scene.

2    Q.   What is the file name?

3    A.   ss.mp4.

4    Q.   And the fact that it appears in this exhibit tells us

5    what?  What's the significance of seeing this file name again

6    here?

7    A.   It indicate that ss.mp4 was at the desktop of user

8    ToonaBug.

9    Q.   And what kind of file is this, this record, what kind of

10   file does this record show us?

11   A.   It's a video file.

12   Q.   And in terms of the record itself, pagefile.sys, what

13   does that indicate to us?

14   A.   Would you repeat that question, please?

15   Q.   The fact that this shows up next to what is shown on the

16   screen as pagefile.sys, what does that mean?

17   A.   That means ss.mp4 was downloaded to the desktop of

18   ToonaBug.

19   Q.   Could you remind us what a pagefile.sys is again?

20   A.   It's a system file that stores temporary data for the

21   computer's memory.

22   Q.   Now, how come -- you said that there was a deletion

23   program running when you first encountered the laptop,

24   correct?

25   A.   Yes.

1   Q.   And what was that deletion program again?

2   A.   Eraser.

3   Q.   Can you just explain to us how is it that ss.mp4, the

4   video file you saw downloading, was not erased?

5   A.   Because the program Eraser relies on the computer's

6   memory to function.  And at the time when we enter -- when I

7   saw the computer, this ss.mp4 was actively download, which

8   means that the data was still stored in a memory or even part

9   of the data may be -- it resides in pagefile.sys.  Therefore,

10  Eraser may not be able to even erase this ss.mp4 file.

11  Q.   Now, what -- let's just talk more about the Eraser

12  program.  Showing you what's been marked as Exhibit 51 --

13       I think it's a little awkward to have the button pushed

14  every time to publish to the jury.  So I'll just direct you to

15  -- do you have an exhibit book in front of you?

16            COURTROOM DEPUTY:  The jurors' monitors are on.

17            MS. CHANG:  I'm just going to refer you to the binder

18  first and then when we publish, we'll have the exhibits show

19  up on the jurors' monitors.

20            COURTROOM DEPUTY:  The binder is over there.

21       (Off-the-record discussion had.)

22  BY MS. CHANG:

23  Q.   Could you please flip to Exhibit 51, please?

24  A.   (The witness complies.)  Yes.

25  Q.   Do you recognize Exhibit 51?

1    A.    Yes.

2    Q.    What is it?

3    A.    It's a registry report for register file NTUSER.

4    Q.    What is a registry report?

5    A.    It's a registry report produced by my forensic tool.

6    Q.    What is a registry?

7    A.    Registry is database for Windows operating system to

8    track configuration settings.

9    Q.    Configuration settings of what?

10   A.    For instance, for this report, it's NTUSER.  This is

11   specifically for user software settings for ToonaBug account.

12          MS. CHANG:  At this time, your Honor, we would move

13   to admit Exhibit 51 into evidence.

14          MR. BERRY:  Relevance, 403.

15          THE COURT:  Overruled.  Exhibit 51 is received.

16          MS. CHANG:  Permission to publish.

17          THE COURT:  You may.

18   BY MS. CHANG:

19   Q.    Directing your attention to page 4 of Exhibit 51, what is

20   on page 4 of Exhibit 51?

21   A.    It shows registry key for the software Eraser.

22   Q.    Now, the fact that this Eraser program created a registry

23   report, what does that tell us?

24   A.    It tells us that the program Eraser existed on the

25   computer, and it was -- it existed as far back as June 10th,

1    2012.

2    Q.   Now, what is the significance of that date November 10th,

3    2012?

4    A.   It was also the date that Windows operating system was

5    installed.

6    Q.   Showing you what's been marked as Exhibit 49 -- actually,

7    could you please flip to it in your book, first?

8    A.   (The witness complies.)  Yes.

9    Q.   Do you recognize Exhibit 49?

10   A.   Yes.

11   Q.   And what is it?

12   A.   It is a registry report showing software registry

13   information.

14   Q.   You just talked about an NT registry.  What is a software

15   registry?

16   A.   Software registry tracks information such as the version

17   number of installed operating system, the install date and the

18   registered owner information.

19   Q.   And did you create Exhibit 49?

20   A.   Yes.

21           MS. CHANG:  At this time, your Honor, we'd move to

22   admit Exhibit 49 into evidence.

23           MR. BERRY:  Relevance, 403.

24           THE COURT:  Overruled, Exhibit 49 is received.

25           MS. CHANG:  Permission to publish.

1              THE COURT:  You may.

2      BY MS. CHANG:

3      Q.   Now, you just said that it would show us a couple of

4      things about the user of this laptop.  Could you please point

5      out to us that information?

6      A.   Okay.  Down in the bottom, Product Name, it shows Window

7      Home Premium indicating that the laptop computer was -- had

8      Windows 7 Home Premium operating system installed and the

9      install date.  The OS install date you can see, which is

10     coordinated universal time.  And the date was June 10, 2012.

11          And we know the registered owner is ToonaBug.  What it

12     means is that during the Windows operating system install

13     process, the user registered this operating system under the

14     name ToonaBug.

15     Q.   Now, that date, June 10, 2012, that was the date that you

16     said you could determine that Eraser, the deletion program,

17     existed on the laptop; is that right?

18     A.   Right.

19     Q.   Now, were there other deletion programs on the laptop?

20     A.   Yes.

21     Q.   Directing your attention to page 6 of Exhibit 51, what is

22     on page 6 of Exhibit 51?

23     A.   This is a registry key for the program CCleaner.

24     Q.   What is CCleaner?

25     A.   CCleaner is a software that is capable of deleting files

1    and records from the computer in a way that is difficult, even

2    impossible, for forensic tools to recover.

3    Q.   Now, does the existence of a registry record of CCleaner

4    tell us that CCleaner was installed on this laptop?

5    A.   Yes.

6    Q.   Now, we see all this text in the box below your mark --

7    the mark you just made.  What are all -- what does all that

8    text mean?  What information does that give you about

9    CCleaner's settings?

10   A.   Okay.  The company that creates CCleaner is called

11   Piriform.

12        So this Last Written Time of December 2, 2012, indicates

13   that CCleaner exists on the computer as far back as December

14   2, 2012.  And it was last updated on April 7, 2013.

15   Q.   And is April 7, 2013, two days before the day of your

16   search of Mr. DeFoggi's residence?

17   A.   Yes.

18   Q.   Now, what does this tell us about how CCleaner was set up

19   on the laptop?

20   A.   Well, the bottom portion, from here (indicating) -- by

21   the way, there's more pages after that.

22   Q.   We can scroll through them, just one second.  Is that the

23   end of the session you're referring to?

24   A.   Yes.

25   Q.   Now, to go back to page 6, there's a line in that section

1    towards the bottom of the page that indicates "Recent

2    Documents, True".  Can you tell the jury what that line tells

3    you?

4    A.   It's indicating that the user had set the program

5    CCleaner to delete records in Recent Documents.

6    Q.   And what are Recent Documents?  How would we encounter

7    Recent Documents as a user of a laptop?

8    A.   Let's say a user opens a picture, a Excel spreadsheet, a

9    Word document, or a video clip.  Those recently opened files

10   are being tracked by Windows operating system.  And Windows

11   operating system keep those records in a place called Recent

12   Documents.

13        So when the user sets CCleaner, "True", it's indicating

14   that the user is telling CCleaner to clear all the records in

15   recent documents.

16   Q.   So from the perspective of a forensic examiner, what

17   problem does this create for you?

18   A.   I wouldn't know what recent document the user had used.

19   Q.   Now, directing your attention to page 7 of Exhibit 51, do

20   you see where it indicates "Temporary Internet Files, True"?

21   A.   Yes.

22   Q.   What does this line tell us about CCleaner's settings by

23   the user?

24   A.   The user had set the CCleaner to delete temporary

25   Internet files.

1    Q.   And what are temporary Internet files?

2    A.   Let's say a user opens up a browser and visits ESPN.com.

3    The front page may show last night's sports game, an article

4    about it, maybe a couple pictures of famous athletes.  All

5    that information, including the picture, is being temporarily

6    stored in the folder called Temporary Internet Folder.

7         So when a user click away from the main ESPN.com web page

8    and later decide to go back to the main page again, instead of

9    going to ESPN.com and download the same information, the

10   browser just simply take the data that's available in the

11   Temporary Internet Folder and display it to the user.

12   Q.   So from the perspective of a forensic examiner, why is

13   this important to know?

14   A.   Well, this is important to know because Temporary

15   Internet Files would indicate recent Internet activity by the

16   user.

17   Q.   Not only activity, but it would also show some of the

18   content that the user accessed, correct?

19   A.   Definitely.

20   Q.   Now, directing your attention to page 8 of Exhibit 51, do

21   you see a line that indicates Index.dat set to True?

22   Directing your attention to the bottom of the page, what does

23   this line tell us?

24   A.   It tells us that the user had set CCleaner to delete

25   Index.dat files.

1    Q.    And what are Index.Dat files?

2    A.    It's basically a journal of Internet activity.  It

3    contains the browsing history of the user, the frequency --

4    I'm sorry, the exact website that a user had been to, and the

5    frequency of their visits, and the date and time of the

6    visits.

7          So it contains a lot of valuable Internet activity for

8    forensic investigation.

9    Q.    Now, directing your attention to page 7 of Exhibit 51, do

10   you see a line that says "Run At Startup, True"?

11   A.    Yes.

12   Q.    What does this record tell us?

13   A.    The user had set CCleaner to run as soon as the computer

14   starts; not only telling the CCleaner to run automatically, it

15   is also automatically to run all the functions that is set to

16   True.

17   Q.    In other words, every time the computer started, CCleaner

18   would delete or wipe all of these files set to True?

19   A.    Yes.

20   Q.    Now, outside of the startup when you boot your computer

21   up again, can the user still run CCleaner manually at any time

22   by clicking on the program?

23   A.    Yes.

24   Q.    Were you able to tell when CCleaner was last run manually

25   by the user?

 1    A.   Yes.

 2    Q.   And what would tell you that?

 3    A.   From Windows Prefetch file.

 4    Q.   Now, could you flip to -- your page in the binder to

 5    Exhibit No. 63.  Do you recognize Exhibit 63?

 6    A.   Yes.

 7    Q.   What is it?

 8    A.   It's the Windows Prefetch file information that I

 9    created.

10         MS. CHANG:  At this time, your Honor, we would move

11    to admit Exhibit 63 into evidence.

12         MR. BERRY:  Objection, 403, relevance.

13         THE COURT:  Overruled.  Exhibit 63 is received.

14         MS. CHANG:  Permission to publish.

15         THE COURT:  You may.

16    BY MS. CHANG:

17    Q.   Now, you said that a prefetch file would tell you when

18    CCleaner was last run by the user.  Could you please explain

19    to us what is a prefetch file?

20    A.   Prefetching is a feature of Windows operating system to

21    learn the user's habit of using a computer.

22         Let's say you're a graduate student at UN Omaha.  You've

23    been working on your thesis all year long.  And the program

24    you use to write your thesis paper is Microsoft Word.  So the

25    computer knows that you often use Microsoft Word, and it

1    learns that.  It actually take a record of how many times you

2    use Microsoft Word.

3         So next time when you turn on the computer, the operating

4    system is expecting you to click on Microsoft Word, so it's

5    working in the background to retrieve data and files necessary

6    to run that program for you.

7         Once you click on Microsoft Word, it shows up

8    immediately.

9    Q.   It's a way for the computer to efficiently --

10   A.   Efficiently, yeah, use resources.

11   Q.   And also learn your most commonly used programs?

12   A.   Yes.

13   Q.   Now, could you please tell us on Exhibit 63 what that

14   first entry tells you?

15   A.   It tells me that CCleaner was last run on April 8, 2013.

16   Q.   And at approximately what time was it run on April 8,

17   2013?

18   A.   10:36:12 p.m. UTC time.

19   Q.   What is that converted to Eastern Standard Time in

20   Daylight Savings Time?

21   A.   6:36:12.

22   Q.   In the evening?

23   A.   In the evening.

24   Q.   And at the time of April 8, 2013, were we on Daylight

25   Savings Time?

1    A.   Yes.

2    Q.   Now, how many times does this tell us that CCleaner was

3    run?

4    A.   Twenty-five times.

5    Q.   Was April 8, 2013, the day before the search of

6    Mr. DeFoggi's residence?

7    A.   Yes.

8    Q.   Now, the second entry on this page tells us what?

9    A.   It tells us that the program Eraser was run on April 9,

10   2013, at 9:24 a.m. UTC time.

11   Q.   And what is that in Eastern Standard Time during daylight

12   savings?

13   A.   5:24 a.m.

14   Q.   And is April 9th, 2013, the day of the search of

15   Mr. DeFoggi's home?

16   A.   Yes.

17   Q.   And approximately what time did the search begin?

18   A.   5:25 a.m.

19   Q.   Is that approximately the same time as when this prefetch

20   file on Eraser was run?

21   A.   Yes.

22   Q.   So what does this indicate that the user did at the time?

23   A.   It indicate that the user had started the program Eraser

24   at or about the same time of the law enforcement entry.

25   Q.   Now, going down to the third entry on the page, what does

1    this entry tell us?

2    A.   It tells us that the user started Tor browser on April 9,

3    2013, at 8:51 a.m. UTC.

4    Q.   What is that Eastern Standard Time during daylight

5    savings?

6    A.   4:51 a.m.

7    Q.   Is that approximately 30 minutes before the search team

8    entered?

9    A.   Yes.

10   Q.   So if Eraser, as we just discussed, was run at the time

11   of the search warrant team's entry into Mr. DeFoggi's

12   residence, how come -- could you please review with us how

13   come ss.mp4, the video file, was not deleted?

14   A.   It may not be available at the time.

15   Q.   And could you please review for us when -- around what

16   time you saw the download proceeding.  When was the download

17   happening?

18   A.   I saw the download was actively downloading at

19   approximately 5:40 in the morning.

20   Q.   Now, despite the user's attempts to delete data from his

21   laptop, were you able to find any activity of Tor activity or

22   child pornography activity on the laptop?

23   A.   Yes.

24   Q.   For example, the child pornography images and video that

25   we reviewed earlier in your testimony, you found that in

1    pagefile.sys, correct?

2    A.   Yes.

3    Q.   So how come pagefile.sys records were not deleted by

4    CCleaner or Eraser?

5    A.   Pagefile.sys is a system file.  And it's -- due to the

6    nature of -- that is a virtual memory which stores temporary

7    data from the memory.

8         And we know that the Eraser program or CCleaner also

9    relies on the resource of the memory to function.  It wouldn't

10   be -- Eraser and CCleaner, we wouldn't be able to erase data

11   in the pagefile.sys.

12   Q.   Is that because of the temporary nature of pagefile.sys?

13   A.   The temporary nature, yes.

14   Q.   Now, outside of the pagefile.sys record of ss.mp4 we just

15   discussed, did you visually observe ss.mp4 on the laptop?

16   A.   No.

17   Q.   Where did you observe it?

18   A.   I observed it using my forensic machine after I had turn

19   off the computer and taken out the hard drive afterwards.

20   Q.   But when you first approached the laptop, when you first

21   encountered the laptop, and you saw the file had completed

22   downloading, did you see ss.mp4?

23   A.   Yes.

24   Q.   Where did you see it?

25   A.   On the desktop.

1    Q.   And did you actually see the file itself on the desktop?

2    A.   Yes.

3    Q.   And did you click on that file?

4    A.   No, I did not.

5    Q.   How did you view it on scene?  You said you saw about ten

6    seconds of it?

7    A.   Yes, I did.  I later removed the hard drive from the

8    laptop shell and connected with my examine machine to perform

9    a preview of the hard drive.

10   Q.   And why did you do that as opposed to just clicking on

11   it?

12   A.   If I simply click on it on the ASUS laptop itself, I may

13   be adding more data into the original state of the computer.

14   Q.   So you were trying to protect the data --

15   A.   Part of the preservation process.

16   Q.   -- that you found as is?

17   A.   Yes.

18   Q.   So despite all this Eraser and CCleaner activity, let's

19   talk about what you could find.

20        What you did find on the laptop?  Could you please flip

21   to Exhibit 54 in the binder?

22   A.   Yes.

23   Q.   Do you recognize Exhibit 54?

24   A.   Yes.

25   Q.   And what is Exhibit 54?

1    A.   It's browser activity that I extracted from pagefile.sys.

2              MS. CHANG:  Your Honor, Exhibit 54 has already been

3    received into evidence.  Permission to publish.

4              THE COURT:  Yes, you may.

5    BY MS. CHANG:

6    Q.   Directing your attention to page 3 of Exhibit 54, what

7    are we looking at on this page?

8    A.   The top portion of this page indicates that the user

9    visited the OPVA.onion site and possibly access these web

10   links that point to pictures.

11   Q.   How do you know they were pictures?

12   A.   Because the file extension is .jpg.

13   Q.   Did the user -- is there evidence of video files in

14   addition to picture files on page 3?

15   A.   Yes, the .mp4 is the picture file -- I'm sorry, the video

16   file here (indicating), .avi, .wmv, .wmv, .mp4 and .avi.

17   These are all video files.

18   Q.   Now, did you create -- I'm sorry, you reviewed the

19   entirety of Exhibit 54 at some point?

20   A.   Yes.

21   Q.   How many pages is Exhibit 54?

22   A.   Sixty-nine pages.

23   Q.   And just generally, what does Exhibit 54 contain?

24   A.   It contain a lot of Internet activity on .onion sites.

25   Q.   Now, directing your attention to Exhibit 56 -- actually

 1    could you just flip to Exhibit 56 in your binder?

 2    A.    Yes.

 3    Q.    Do you recognize Exhibit 56?

 4    A.    Yes.

 5    Q.    And what is it?

 6    A.    It's a PedoBook web browsing activity that I extracted

 7    out of pagefile.sys.

 8          MS. CHANG:  Permission -- at this time, we move to

 9    admit Exhibit 56 into evidence, Your Honor.

10          MR. BERRY:  Objection, relevance, 403.

11          THE COURT:  Overruled.  Exhibit 56 is received.

12          MS. CHANG:  Permission to publish.

13          THE COURT:  You may.

14    BY MS. CHANG:

15    Q.    Now, this is a relatively short record, so if you could

16    just tell us exactly what we're looking at.  Feel free to go

17    line by line.

18    A.    We're looking at web browsing records for PedoBook.  And

19    these are the web records.  We have the common link is

20    oqm6.onion.  This link indicates that the user had visited

21    PedoBook site.

22    Q.    Did you also find evidence of Web search queries on the

23    laptop?

24    A.    Yes.

25    Q.    Would you please flip to Exhibit 59 in your binder?

1    A.    Yes.

2    Q.    Do you recognize Exhibit 59?

3    A.    Yes.

4    Q.    What is it?

5    A.    These are web search queries that I extracted from

6    pagefile.sys.

7    Q.    And what are web search queries?

8    A.    Web search terms, similar to you can go to Google and you

9    search for "stamps".

10   Q.    And you created this -- or you saw this exhibit before?

11   A.    Yes.

12        MS. CHANG:  At this time, we move Exhibit 59 into

13   evidence.

14        MR. BERRY:  Objection, relevance, 403.

15        THE COURT:  Overruled.  Exhibit 59 is received.

16        MS. CHANG:  Permission to publish.

17        THE COURT:  You may.

18   BY MS. CHANG:

19   Q.    Now, if you could just walk us through what we're looking

20   at.  Directing your attention to page 1, lines 1 and 2, what

21   does this tell us about what the user did with search engines?

22   A.    For instance, the first line, the user search -- used

23   Google search engine to search for term "tor irc".

24   Q.    What is "tor irc"?

25   A.    Tor Internet relay chat.

1   Q.   What is that?

2   A.   Internet relay chat is just an Internet chat program.

3   Q.   On line 2, what does that tell us about the user's search

4   engine?

5   A.   On line 2, the user search for a term "OPVA" using

6   pastebin.com search.

7   Q.   And what is OPVA again?

8   A.   OnionPedo Video Archive.

9   Q.   Now, the rest of the page shows us that the user searched

10  for what term?

11  A.   Tor hidden service irc server.

12  Q.   What is pastebin.com?

13  A.   It's just an easier way for a user to locate the complete

14  link of a site.

15  Q.   So if I knew the name of the site but didn't know the

16  actual address, I would use pastebin.com?

17  A.   Correct.

18  Q.   Why would one do that for OPVA?

19  A.   Because it's easier to remember OPVA; easier to remember,

20  say, Google or ESPN, instead of Google.com, ESPN.com.  They

21  are more lengthy web addresses.

22  Q.   And is OPVA one of those lengthy web addresses?

23  A.   Yes.

24  Q.   Now, could you flip to Exhibit 59 in your book -- I'm

25  sorry, Exhibit 60.

1    A.   Yes.

2    Q.   Now, before we move on to Exhibit 60, if I could just

3    direct your attention to the bottom of Exhibit 59, so page 3,

4    I believe -- yes, page 3.  We're seeing a lot of Tor hidden

5    service irc servers.  But at the bottom of the page, what

6    search are we seeing?

7    A.   We're seeing a term that contain "baby rape".

8    Q.   And what kind of website was that linked to or associated

9    with?

10   A.   It's an Onion site associated with Lolita City.

11   Q.   And based on your training and experience, what is Lolita

12   City?

13   A.   It's a website that contains child pornography material.

14   Q.   Now, directing your attention to page Exhibit 60 that you

15   flipped to in your book, do you recognize Exhibit 60?

16   A.   Yes.

17   Q.   And what is it?

18   A.   It's search results for the term "fuckchrist".

19   Q.   And who conducted that search?

20   A.   I did.

21        MS. CHANG:  At this time, your Honor, we would move

22   to admit Exhibit 60 into evidence.

23        MR. BERRY:  Objection, relevance, 403, also

24   foundation when the date of the search was done.

25        THE COURT:  All right.  Do you wish to inquire?  Voir

1    the witness?

2            MR. BERRY:  Yes, your Honor.

3            THE COURT:  All right.

4    (FOUNDATIONAL EXAMINATION)

5    BY MR. BERRY:

6    Q.   Sir, Exhibit 60, what was -- what was the date of this --

7    you said you did a search.  What was the date of this search?

8    A.   I don't remember.  You mean the search for the keyword?

9    Q.   Yes.

10   A.   I do not remember.  I have to look in my notes.

11       (Off-the-record discussion had.)

12           MR. BERRY:  No additional questions, your Honor.

13   I'll renew my objection.

14           THE COURT:  The objections, other than foundation,

15   are overruled.

16       I will ask counsel to lay more foundation regarding the

17   time frame in which this was conducted.

18   (DIRECT EXAMINATION RESUMED)

19   BY MS. CHANG:

20   Q.   Mr. Hsu, could you just clarify for us, when you say

21   search -- keyword searches, who conducted that search in --

22   what did you do with the laptop when you're describing a

23   keyword search?

24   A.   As I perform my forensic analysis, there are requests

25   that I was told to perform.  And the term "fuckchrist" was one

1    of the keyword search that I would search against the hard

2    drive.

3         And Exhibit 60 contains all the search results of the

4    term "fuckchrist".

5    Q.   Did you use a forensic tool to assist you in that search?

6    A.   Yes.

7    Q.   And does this exhibit fairly and accurately represent the

8    result of your examination?

9    A.   Yes.

10        MS. CHANG:  At this time, we would move to admit

11   Exhibit 60 into evidence.

12        THE COURT:  Just with respect to time frame, would

13   you please ask the witness -- I understand he doesn't know the

14   exact date he performed this function.  But would you give us

15   a time frame by inquiring of him, please?

16        MS. CHANG:  Yes, your Honor.

17   BY MS. CHANG:

18   Q.   Mr. Hsu, do you recall approximately when, what time of

19   month, time of year that you conducted this part of your

20   examination?

21   A.   Approximately October of 2013.

22        THE COURT:  All right.  The objections are overruled.

23   Exhibit 60 is received.

24   BY MS. CHANG:

25   Q.   Now again, can I just clarify with you that when -- this

 1   data reflects accurately the state of the data at the time it

 2   was seized, correct?

 3   A.   Yes.

 4   Q.   And when you finished your forensic examination, you

 5   verified that the hash value of the copy you were working with

 6   matched the original hard drive of the laptop, correct?

 7   A.   Correct.

 8           MS. CHANG:  Permission to publish Exhibit 60.

 9           THE COURT:  You may.

10   BY MS. CHANG:

11   Q.   Now, does this exhibit show you the results of the search

12   you conducted for the user name fuckchrist on the laptop?

13   A.   Yes.

14   Q.   Now, just directing your attention to page 1, line 3,

15   what do we see there?

16   A.   We see a message, "appreciate that fuckchrist, I just

17   wish more of us pedosadists would feel free to let..."

18   Q.   And what are we actually seeing?  Is this a message, is

19   this an e-mail?  What is this that we're seeing?

20   A.   We are seeing a fraction of a online message.

21   Q.   Now, directing your attention to line 12 of page 1 --

22   A.   Yes.

23   Q.   -- what does this line indicate to us?

24   A.   This line indicates that user fuckchrist of Lolita City

25   accessed his or her inbox and engaged in private messaging.

1    Q.   And how do you know it's private messaging and not a blog

2    entry or web forum message?

3    A.   Because of pms.

4    Q.   And how does one access private message?

5    A.   Private messages are sent specifically for a user, not

6    for everybody.

7    Q.   Now, directing your attention to page 1, line 10, just

8    two above that, what does that line indicate to us?

9    A.   I'm sorry, can you repeat that, please?

10   Q.   Directing your attention to page 1, line 10, two lines

11   above what you just looked at, what does that line indicate to

12   us?

13   A.   I just want to confirm that this (indicating) is the

14   line, right?

15   Q.   Correct.

16   A.   It confirmed that user fuckchrist viewed Lolita City.

17   Q.   This doesn't look like a complete URL or web address, and

18   the message that you read to us on line 3 was also, you said,

19   a fragment.  How come we're seeing fragments and just pieces

20   of data?

21   A.   Because data on pagefile.sys doesn't really have a

22   structure.  So at times you will get fragments of data, and

23   it's not complete information.  But it does indicate that

24   fuckchrist is a member of Lolita City.

25   Q.   So despite that you're seeing fragments, what fragments

1    you do see give you valuable information, correct?

2    A.   Yes.

3    Q.   Now, did you find more full, lengthier messages on the

4    laptop?

5    A.   Yes.

6    Q.   Would you please flip to Exhibit 61 in your book?

7    A.   Yes.

8    Q.   Do you recognize Exhibit 61?

9    A.   Yes.

10   Q.   And what is it?

11   A.   These are messages that I extracted from pagefile.sys.

12   Q.   And how do you recognize it?

13   A.   I created it.

14        MS. CHANG:  At this time, your Honor, we would move

15   to admit Exhibit 61 into evidence.

16        MR. BERRY:  Objection, relevance, 403.

17        THE COURT:  Exhibit 61 is received.  The objections

18   are overruled.

19        MS. CHANG:  Permission to publish.

20        THE COURT:  You may.

21   BY MS. CHANG:

22   Q.   Now, since this is a six-page exhibit, we won't go

23   through the whole thing, but generally could you please tell

24   us what the content of these messages reflect?

25   A.   They reflect sexual torture and abusing babies and

1    toddlers.

2    Q.   Directing your attention to page 3 of Exhibit 61, do you

3    see the user name fuckchrist towards the top of the page?

4    A.   Yes.

5    Q.   Could you please read that message for us?

6    A.   "Appreciate that fuckchrist, I just wish more of us

7    pedosadists would feel free to let our feelings be known

8    without all those fuckwad moralistic pedos having to chime in

9    on their bullshit."

10   Q.   Is that message familiar to you?

11   A.   Yes.

12   Q.   How so?

13   A.   The first portion of the message matches the previous

14   exhibit.

15   Q.   And what does that verify for you?

16   A.   It verified that fuckchrist was a member of Lolita City,

17   and this message was intended for fuckchrist.

18   Q.   Now, did you find any evidence of bookmarks on the

19   laptop?

20   A.   Yes.

21   Q.   What are bookmarks?

22   A.   Bookmarks are just an easier way for a user to access a

23   website.

24   Q.   And just visually, physically, where would we see it in a

25   browser window?

 1    A.   At a bookmark section.

 2    Q.   Could you please flip to Exhibit 62 in your book?

 3    A.   (The witness complies.)  Yes.

 4    Q.   Do you recognize Exhibit 62?

 5    A.   Yes.

 6    Q.   What is it?

 7    A.   It's Firefox browser bookmarks that I extracted.

 8    Q.   How do you recognize it?

 9    A.   I created this.

10         MS. CHANG:  At this time, we would move to admit

11    Exhibit 62 into evidence, your Honor.

12         MR. BERRY:  Objection, relevance, 403.

13         THE COURT:  Overruled.  Exhibit 62 is received.

14         MS. CHANG:  Permission to publish.

15         THE COURT:  You may.

16    BY MS. CHANG:

17    Q.   Now, you said you found evidence of bookmarks.  Which

18    bookmarks did you find that are reflected in this exhibit?

19    A.   That's the Tor directory and Tor mail.

20    Q.   And which browser were these bookmarks associated with?

21    A.   Firefox.

22    Q.   Where else during your examination did you see evidence

23    of Firefox Tor browser?

24    A.   Can you repeat the question?

25    Q.   Where else during your examination did you find evidence

1    of Firefox Tor browser being run or existing on the laptop?

2    A.   The Firefox associated with Tor Browser Bundle.

3    Q.   Correct.

4    A.   Where else?

5    Q.   Correct.

6    A.   I did not find anything else.

7    Q.   Now, are you saying that what we discussed earlier was

8    duplicative of what we're seeing here or something else?

9    A.   Can you replace -- repeat the question?

10   Q.   Actually, let me ask it this way.

11        Why don't I direct your attention to an exhibit that we

12   discussed earlier, Exhibit 63.  At the bottom of the page of

13   Exhibit 63, page 1, what record do you see there?

14   A.   Windows prefetch file records.

15   Q.   And the prefetch file record tells you about what

16   program.

17   A.   The programs that are commonly used by the user.

18   Q.   Now, directing your attention to page 2 of Exhibit 63,

19   what does -- what do these records tell you?

20   A.   It tells me that the Firefox associated with Tor Browser

21   Bundle was last run on April 9, 2013, at 8:51 a.m. UTC time.

22   Q.   And what is that in Eastern Standard Time during daylight

23   saving?

24   A.   4:51 a.m.

25   Q.   And is that approximately 30 minutes before the search

1    began of Mr. DeFoggi's residence?

2    A.   Yes.

3    Q.   So is this the same -- or is this evidence of Firefox

4    browser associated with Tor Browser Bundle existing on the

5    laptop?

6    A.   Yes.

7    Q.   Now, what else does this page tell you, just so we can

8    complete a review of this exhibit?

9    A.   It tells me that Tor was run April 9, 2013, at 8:51 a.m.

10   UTC time or 4:51 a.m. eastern daylight time; and also Vidalia

11   was run April 9, 2013, at 8:51 UTC time or 4:51 eastern

12   daylight time.

13   Q.   And on April 9th, 2013, when you entered the scene to

14   conduct the preview of the laptop, did you see Vidalia and Tor

15   and Firefox Tor Browser Bundle on the laptop?

16   A.   Yes.

17   Q.   Did you find any Wikipedia type pages that tell you more

18   about the user of this laptop?

19   A.   Yes.

20   Q.   Could you please flip to Exhibit 58 in your book?

21   A.   Yes.

22   Q.   Do you recognize Exhibit 58?

23   A.   Yes.

24   Q.   And what is it?

25   A.   This is a Hidden Wiki page.

1    Q.    And what is a Hidden Wiki page?

2    A.    Wiki page is information about websites.

3    Q.    Is it similar to Wikipedia that we would --

4    A.    Similar to a Wikipedia page, yes.

5    Q.    And what's the significance of it being a Hidden Wiki?

6    A.    It's suggesting that it's not meant to be published.

7    Q.    Published where?

8    A.    To the open Internet.

9    Q.    And how do you recognize Exhibit 58?

10   A.    I extracted it and I produced it.

11         MS. CHANG:  At this time, we would move to admit

12   Exhibit 58 into evidence, your Honor.

13         MR. BERRY:  Objection, relevance, 403.

14         THE COURT:  Overruled.  Exhibit 58 is received.

15         MS. CHANG:  Permission to publish.

16         THE COURT:  You may.

17   BY MS. CHANG:

18   Q.    Now, directing your attention to page 3 of Exhibit 58,

19   what is this Hidden Wiki page providing -- what kind of

20   information is it providing?

21   A.    It provides web links, appear to be child pornography

22   sources.

23   Q.    And web links to what kind of websites?

24   A.    .onion sites.

25   Q.    And where can one find .onion sites on the Web?

1    A.    On Tor network.

2    Q.    Now, why is this pagefile.sys file useful for the user of

3    this laptop?

4    A.    To make a Wiki page.

5    Q.    And what can one do with the list of websites on this

6    page?

7    A.    It may serve as a reference as to where to locate a

8    specific website.

9    Q.    Now, let's talk about just lastly what you could tell us

10   about the user of the laptop, any more information you found

11   about the user account.

12         Could you please flip to Exhibit 50 in your book?

13   A.    Yes.

14   Q.    Do you recognize Exhibit 50?

15   A.    Yes.

16   Q.    And what is it?

17   A.    It's a registry report for user account information.

18   Q.    Just remind us again since it's been a while since we

19   talked about registry reports what a registry is.

20   A.    A registry is a database that Windows operating system

21   use to keep track of user settings.

22   Q.    So what is a user account registry?

23   A.    It tells the user account information.

24   Q.    And how do you recognize Exhibit 50?

25   A.    I extracted it and I create the exhibit.

1          MS. CHANG:  At this time, we would move Exhibit 50

2    into evidence, your Honor.

3          MR. BERRY:  Objection, relevance, 403.

4          THE COURT:  Overruled.  Exhibit 50 is received.

5          MS. CHANG:  Permission to publish.

6          THE COURT:  You may.

7    BY MS. CHANG:

8    Q.   Now, we're seeing here on page 1 -- what kind of user

9    account does this tell us about?

10   A.   It's user account, administrator.

11   Q.   And what is an administrator account?

12   A.   This is a built-in account for administering the computer

13   or domain, which means this is a default account that came

14   with the Microsoft operating system.

15   Q.   Does that mean a user did not create this account?

16   A.   No, the user did not create this account.

17   Q.   Now, which user account was created by the user on this

18   laptop?  Would you remind us?

19   A.   ToonaBug.

20   Q.   If I could direct your attention to page 4 of this

21   exhibit -- actually page 3 through 4, what does this record

22   tell us?

23   A.   It tell us that the user name is ToonaBug, and the user

24   ToonaBug log in to the computer 1380 times.  The last time

25   ToonaBug log in was April 9, 2013, 8:50:50 UTC time.

1    Q.    What is that Eastern Standard Time?

2    A.    4:50 a.m.

3    Q.    Is April 9th, 2013, the day of the search of

4    Mr. DeFoggi's home?

5    A.    Yes.

6    Q.    Now, was there a password on this account?

7    A.    No.

8    Q.    And did you find any other user names or screen names

9    found within the user account ToonaBug?

10   A.    Yes.

11   Q.    Directing your attention back to Exhibit 51, what was

12   that user name or screen name that you found associated with

13   ToonaBug?

14   A.    PTasseater6969.

15   Q.    And what program had that user name?

16   A.    Yahoo.

17   Q.    And what is a Yahoo user name?  What is it for?

18   A.    Well, Yahoo is a Internet company that provide Internet

19   communication services.

20        When the user wish to use Yahoo Internet services, he or

21   she would have to create a user profile within Yahoo.  And

22   the -- in the user profile creation process, the user had to

23   put in a unique user name; in this case, PTasseater6969.

24   Q.    If the user name is created on a Yahoo page, how come

25   it's showing up here?  What does this tell us?

1    A.   It tell us that the user -- it tells us that the Yahoo

2    profile PTasseater6969 was used on this computer as far back

3    as November 21, 2012.

4    Q.   And based on your training and experience, what does PT

5    stand for?

6    A.   Preteen.

7         MS. CHANG:  Court's indulgence.

8         THE COURT:  Sure.

9    (Off-the-record discussion had.)

10        MS. CHANG:  No further questions, your Honor.

11        THE COURT:  We'll wait until after the noon break for

12   the cross-examination.

13        Please reconvene in the jury room at 1:15.  We'll start

14   again at 1:15.

15        Thank you.  We are in recess.

16   (Jury out and recess taken at 11:57 a.m.)

17   (At 1:17 p.m. on August 21, 2014, with counsel for the

18   parties and the defendant present, and the jury NOT present,

19   the following proceedings were had:)

20        THE COURT:  Do we need to discuss anything before the

21   jury comes in?

22        MR. BECKER:  No.

23        MR. BERRY:  I don't believe so, your Honor.

24        THE COURT:  All right.

25        Please bring in the jury.

1              RAY HSU, PREVIOUSLY SWORN, RESUMED THE STAND

2         (Jury in at 1:19 p.m.)

3              THE COURT:  Please be seated.

4         Cross-examination?

5                         CROSS-EXAMINATION

6    BY MR. BERRY:

7    Q.   Mr. Hsu, the laptop that you spoke about, that was not

8    password protected, correct?

9    A.   That's right.

10   Q.   And there was an eraser application known as CCleaner on

11   that, correct?

12   A.   Yes.

13   Q.   And CCleaner is something you can get -- you can purchase

14   online for your computer, correct?

15   A.   It's -- you can actually download it free.

16   Q.   Free?  Okay.  Same with Eraser?

17   A.   Yes.

18   Q.   When you say download it for free, that means you can

19   search for it on the Internet and click onto a link and then

20   give permission to download and it will download onto your

21   computer, correct?

22   A.   Yes.

23   Q.   And do those things like Eraser and CCleaner, do they

24   also make your computer run faster when they delete a bunch of

25   files?

1    A.    Possibly.

2    Q.    Now, there was no encryption software on that computer,

3    correct?

4    A.    No.

5    Q.    Can you tell the jury what encryption software is?

6    A.    Encryption software is used for security purposes.  For

7    example, if you have sensitive documents such as tax forms,

8    medical history, you can use encryption software to encrypt

9    those files that other users would not be able to access.

10   Q.    I know you talked about a few things pertaining to the

11   laptop.  I just want to make sure -- the only thing we've

12   talked about on direct examination at this point is the laptop

13   device that you examined, correct?

14   A.    Yes.

15   Q.    No other computers or storage devices have been discussed

16   yet, correct?

17   A.    Yes.

18              MS. CHANG:  Objection, outside the scope of direct.

19              THE COURT:  Overruled.  The answer will remain.

20   BY MR. BERRY:

21   Q.    Now, in looking at some of the files, we saw that even

22   though the CCleaner had run, there was a pagefile.sys or dot

23   s-y-s.  Do you remember talking about that?

24   A.    Yes.

25   Q.    And you indicated that either CCleaner or Eraser does not

1    erase those pagefile.sys files; is that correct?

2    A.   Correct.

3    Q.   One reason is because they are not available; is that

4    correct?

5    A.   Yes.

6    Q.   And so what that means is that's just a temporary

7    footprint, if you will, or a marking of a file, but it's not

8    accessible at that point to the user of the computer?

9    A.   It is not accessible to the user, but it is accessible to

10   the computer.

11   Q.   And you also talked about Exhibit No. 58.

12          MR. BERRY:  Keith, do you have that?

13          MR. BECKER:  Sure.

14   BY MR. BERRY:

15   Q.   And Exhibit No. 58, you indicated there were some links

16   to child pornography pages, correct?

17   A.   Yes.

18   Q.   There are also links to a variety of other sites,

19   correct?

20   A.   Yes.

21   Q.   You also discussed doing a forensic examination in this

22   case; is that right?

23   A.   Yes.

24   Q.   And you did a forensic examination of several devices,

25   correct?

1    A.   Yes.

2    Q.   One of those was an eMachines computer, correct?

3         MS. CHANG:  Objection, your Honor, outside the scope

4    of direct.

5         THE COURT:  Shall we have a sidebar?

6         (Bench conference on the record.)

7         THE COURT:  I understand on direct you were talking

8    about the laptop, what was on the laptop.  You didn't get into

9    other devices.  Why are we going into the other devices at

10   this point in time?

11        MR. BERRY:  Your Honor, there were other devices that

12   were found, including an eMachines computer in the basement

13   that contained child pornography which raises issues because

14   there were two additional occupants of the household.

15        And so now we have another device with child pornography

16   which suggests that there may have been -- that there may have

17   been a user in the household other than Mr. DeFoggi who could

18   have been found at that same IP address.

19        MS. CHANG:  This is part of their case.  We've got

20   some affirmative defenses to part of the defense's case; and

21   at the time of their case, they can present that information.

22   But at this time, because it is outside the scope of direct, I

23   would object to it.

24        THE COURT:  And while I recognize the government

25   didn't get into the other devices at the time of the direct,

1    it appears to me that it's linked because of the logic that

2    defense counsel has presented that somebody else could have

3    put this information on the laptop since there were other

4    occupants of the house.

5         I'll let you go ahead and pursue that line of

6    questioning.

7         Oftentimes, too, rather than calling somebody back on the

8    presentation of the defendant's case, sometimes just for

9    judicial economy, it's better to get the information in at one

10   time and it's more convenient for the witness to do it that

11   way.

12        That's not the basis for my ruling, but it's something

13   I'm also considering.

14        Go ahead.

15        (End of bench conference.)

16   BY MR. BERRY:

17   Q.   One of the other pieces of evidence you examined was an

18   eMachines computer, correct?

19   A.   Yes.

20   Q.   And the registered user of that computer was a Scooter,

21   correct?

22   A.   Yes.

23   Q.   And that machine was password protected, correct?

24   A.   No.

25   Q.   The eMachine computer was not password protected?

1    A.    No.

2    Q.    During your examination of that computer, did you find

3    child pornography?

4    A.    Yes.

5    Q.    Thank you.

6           MR. BERRY:  No further questions.

7           THE COURT:  Redirect?

8                       REDIRECT EXAMINATION

9    BY MS. CHANG:

10   Q.    Mr. Hsu, you said that there was no encryption software

11   on the laptop, correct?

12   A.    Yes.

13   Q.    Is that because there was nothing left to encrypt because

14   CCleaner and Eraser had erased most of the files?

15          MR. BERRY:  Objection, form of the question.

16          THE COURT:  Overruled.  He may answer.

17   A.    It's possible.

18   BY MS. CHANG:

19   Q.    Now, you answered a few questions about what pagefile.sys

20   is.  Is pagefile.sys evidence of user activity?

21   A.    Yes.

22   Q.    So it tells you what the user did with the laptop,

23   correct?

24   A.    Yes.

25   Q.    Now, you mentioned that child pornography was found on

1    the eMachines computer --

2    A.    Yes.

3    Q.    -- which was not password protected.

4    A.    Yes, it was not.

5    Q.    What was the nature of the images found on the eMachines

6    computer?

7    A.    There were some child exploitation material; but the

8    majority of the files were young children performing modeling,

9    swimsuits, underwear.

10   Q.    And by "young children", about -- around what age would

11   you approximate?

12   A.    I would say around 10 to 12.

13   Q.    And by "modeling", do you mean that they were not nude,

14   they were clothed?

15   A.    They were not nude, they were in bikinis, underwear.

16         MS. CHANG:   Court's indulgence.

17         (Off-the-record discussion had.)

18   BY MS. CHANG:

19   Q.    So how do those images that you just described as

20   modeling, swimsuit type pictures of children, compare to the

21   ones you found on the laptop?

22   A.    The ones I found on the laptop are child exploitation

23   material depicting children in nude, explicitly showing

24   genital area or performing sexual acts.

25   Q.    Now, what about age -- was there a difference in the age

1   shown on the images you found on the laptop versus the

2   eMachines computer?

3   A.   Yes.

4   Q.   In what way?

5   A.   On the laptop, there was more of younger children,

6   infants and toddlers.

7   Q.   On the eMachines computer, did you find any evidence of

8   Tor activity?

9   A.   Yes.

10   Q.   And what was that?

11   A.   I saw the entire Tor Browser Bundle software in the

12   folder, and I found bookmarks of two .onion sites.

13   Q.   Now, what was the extent of the Tor browser activity on

14   the eMachine computer?

15   A.   There was not much of Tor browsing activity.

16   Q.   And please compare the extent of that activity on the

17   eMachines computer on Tor to the Tor activity found on the

18   laptop.

19   A.   It was minimal compared to the laptop.

20          MS. CHANG:  No further questions, your Honor.

21          MR. BERRY:  Your Honor, I would ask for just a little

22   bit of recross about some of the images the prosecutor brought

23   up.

24          THE COURT:  You may.

25                       RECROSS-EXAMINATION

1    BY MR. BERRY:

2    Q.   Mr. Hsu, you indicated that most of the materials here

3    were child modeling type pictures, correct?

4    A.   On the eMachine, yes.

5    Q.   But there were also definitely other child pornography

6    videos, correct?

7    A.   I have to --

8    Q.   Would you like --

9    A.   I have to look at my notes to confirm that.

10   Q.   Do you have your notes in front of you?

11   A.   I wouldn't know which exhibit to --

12   Q.   I'm sorry, do you have your report in front of you?

13   Would that refresh your recollection?

14   A.   I don't have the -- my forensic report in front of me.

15   Q.   Well, I have a copy of your report.  If I let you look at

16   it, would that refresh your recollection?

17   A.   Yes, please.

18            MR. BERRY:  Your Honor, may I approach?

19            THE COURT:  You may.

20            MR. BERRY:  Does the Court prefer I have it marked?

21            THE COURT:  Is it marked -- is it listed as one of

22   the numbered exhibits?

23            MR. BERRY:  It is not.

24            THE COURT:  Since you're showing it to him for

25   identification purposes, we should have it marked.

 1              MR. BERRY:  Yes, your Honor.

 2         (Off-the-record discussion had.)

 3              MR. BERRY:  Your Honor, may I approach the witness?

 4              THE COURT:  You may.

 5    BY MR. BERRY:

 6    Q.   Mr. Hsu, I'm showing you what's been marked for

 7    identification purposes as Exhibit No. 307.  Does this appear

 8    to be a copy of your report?

 9    A.   Yes.

10    Q.   I'm going to direct your attention to page 4 of 9.  And I

11    just want to direct your attention to some of the -- well,

12    take the opportunity to review it.

13    A.   Okay.

14    Q.   Does that refresh your recollection about your report?

15    A.   Yes.

16    Q.   And about your investigation of the eMachines computer in

17    this case?

18    A.   Yes.

19    Q.   May I retrieve the exhibit from you?

20    A.   Okay.

21    Q.   And would -- and so you would agree that some of the

22    files accessed on the eMachines were a Daphne and Irena video,

23    does that ring a bell?

24    A.   Yes, it does.

25    Q.   And is that a child pornography video?

1    A.    I don't know.

2    Q.    Do you know if that's a child pornography series, the

3    Daphne and Irena?

4    A.    Yes.

5    Q.    So Daphne and Irena is a child pornography series that is

6    common that you've seen before in your work as a forensic

7    examiner?

8    A.    Yes.

9    Q.    And does that involve young girls engaged in sexual

10   activity?

11   A.    Yes.

12   Q.    Similarly, Baby Shy Rape Anal Collection, is that

13   consistent with child pornography as well?

14   A.    Yes.

15   Q.    That was found on the eMachines computer?

16   A.    Let me clarify.  Daphne and Irena, this file was -- this

17   file was accessed by the eMachine computer.  It does not mean

18   that Daphne and Irena is located in the eMachine computer.

19   The same with -- the same goes with the rest of the list.

20   Q.    So you found child pornography that had been accessed by

21   the eMachines computer but which was not necessarily on the

22   eMachines computer when you examined it, correct?

23   A.    That's correct.

24   Q.    Thank you.

25        MR. BERRY:  No further questions.

1          THE COURT:  Thank you, Mr. Hsu.  You may stand down.

2          MS. CHANG:  Your Honor, may we ask a few follow-up

3    questions?

4          THE COURT:  You may.

5                    FURTHER REDIRECT EXAMINATION

6    BY MS. CHANG:

7    Q.   Now, on the page of your report that Mr. Berry just

8    showed you, do you recall around how many files you identified

9    as naturalist lifestyle, child modeling, swimsuit and

10   underwear photos?

11   A.   On the eMachines?

12   Q.   Yes.

13   A.   About 16,000 files.

14   Q.   And approximately how many graphic child pornography

15   videos did you find?

16   A.   Less than 20.

17   Q.   Does that include the images of child pornography you

18   found?

19   A.   Yes.

20         MS. CHANG:  No further questions.

21         THE COURT:  Thank you, sir.  You may stand down.

22   The government may call its next witness.

23         MR. BECKER:  Your Honor, at this time the government

24   would recall Special Agent Steven Smith.

25         THE COURT:  Very good.

```
 1        Special Agent Smith, you remain under oath.  You may take

 2     the stand.

 3           STEVEN SMITH, PREVIOUSLY SWORN, RESUMED THE STAND

 4                        DIRECT EXAMINATION

 5     BY MR. BECKER:

 6     Q.   Good afternoon, Special Agent Smith.

 7     A.   Good afternoon.

 8     Q.   Welcome back.

 9     A.   Thank you.

10     Q.   When you last testified, we asked you some questions

11     about your background and training and experience.  I'm going

12     to ask you some additional questions relative to your

13     testimony today.  Is that all right?

14     A.   Yes.

15     Q.   All right.  Can you first start by letting the ladies and

16     gentlemen of the jury know your educational background?

17     A.   Yes.  I have a bachelor's of science degree in computer

18     science from Georgia Tech in Atlanta, Georgia.

19     Q.   What did you do after you completed that degree in

20     computer science?

21     A.   After I completed that degree and for a period of time

22     before I completed the degree, I did a -- multiple things

23     including independent contractor/consultant for private

24     companies.  I started a business as well that I developed

25     websites for corporations that needed websites, including
```

1    websites that involved e-commerce, database back-ends for

2    managing users or data sets that they wanted to have on

3    websites for their customers.

4    Q.   And for how long did you work in that capacity after

5    school?

6    A.   It was actually while I was in school I did that.  And

7    after completing school, I started a full-time job as an IT

8    manager, information technology manager, for a corporation in

9    the Atlanta area.  I also continued doing some independent

10   consulting on the side as well for private corporations.

11   Q.   And so before we get to your consulting, what was your --

12   what were your responsibilities in your primary job?

13   A.   My primary job as information technology manager was to

14   get the direction and guidance for the technology for the

15   company; including part of that job entailed developing and

16   building a data center, a server room, rebuilding the entire

17   network from beginning to end, selecting the servers,

18   installing the servers, administering the servers,

19   troubleshooting the desktops, troubleshooting the

20   applications, developing custom solutions.

21        For example, there was a recall on a product, and we had

22   a lot of data -- a lot of products coming back.  So I

23   developed databases and applications to help manage those

24   types of situations that occurred in the company.

25   Q.   How big a company was this?

S. SMITH - DIRECT                                                500

1   A.   It was a small company, approximately 20 employees,

2   distribution company.

3   Q.   Sounds like a lot of responsibilities.  Were you the

4   primary IT guy for that place?

5   A.   I was the one-man show IT shop for the company.  So I did

6   everything for the company involving the technology.

7   Q.   And for how long did you do that job?

8   A.   I did that job for approximately five years.

9   Q.   What did you do after you left employment there?

10  A.   After I left employment with that company, I began

11  employment with the Federal Bureau of Investigation.

12  Q.   Where were you first assigned?

13  A.   My first assignment was to the Cleveland Division Toledo

14  Resident Agency in Toledo, Ohio.

15  Q.   What were your responsibilities?

16  A.   At the Toledo Resident Agency, I was responsible for all

17  types of cyber investigations.  I investigated Internet fraud,

18  botnets, distributed denial of service attacks, also website

19  intrusions, as well as a large number of child exploitation --

20  online child exploitation investigations involving the

21  distribution, receipt and production of child pornography.

22  Q.   Some technical terms I'd ask you to define.  One of them

23  was distributed denial of service attacks.  What's that mean?

24  A.   A distributed denial of service attack is when an

25  individual utilizes multiple computers, or thousands of

1    individuals together will attack a single server.  And because

2    of the volume of traffic going to that server, it blocks

3    legitimate customers or users of the server from using the

4    services, denying service.

5    Q.   Botnet?

6    A.   A botnet is a network of computers that have been taken

7    over.  So your computers at home could have someone that is

8    able to hack into your computer or give you some type of

9    e-mail that you click a link and it installs a bot, a piece of

10   code on your computer that allows the botnet controller to

11   give commands.

12        And then your computer, unbeknownst to you, is then going

13   and doing things on behalf of this botnet herder.  And they

14   can take thousands and hundreds of thousands of computers that

15   have been compromised and they can also use those computers to

16   initiate a distributed denial of service attack.

17   Q.   What sort of training did the -- have you attained in

18   working in investigations regarding those sorts of

19   cybercrimes?

20   A.   I've obtained investigation -- I'm sorry, I've obtained

21   training both external from the FBI and internal FBI training.

22   Specifically for online child exploitation training, I've

23   taken the basic -- Innocent Images basic training for online

24   undercover investigations for website investigations, chat,

25   instant messaging, Internet relay chat, e-mail investigations.

1          I've also attended the Dallas Crimes Against Children

2     conference which is an annual conference dedicated for

3     investigators of crimes against children where I've attended

4     lectures, talks, as well as labs and specific technical

5     training for online child exploitation investigations.

6     Q.   I wanted to route us back to your FBI experience.

7          You had last told us that you had an assignment at the

8     Toledo Resident Agency.  What was your next assignment with

9     the FBI?

10    A.   After I transferred from the Toledo Resident Agency, I

11    started working at the headquarters operational unit known as

12    the Major Case Coordination Unit.  It's underneath the Violent

13    Crimes Against Children section.  Our unit is dedicated to the

14    investigation of online crimes against children, as well as

15    physical crimes against children for production of child

16    exploitation material or child -- domestic child prostitution

17    or child sex tourism.  Those are individuals who travel

18    internationally to engage in sex with children.

19    Q.   When did you begin working in that unit?

20    A.   I began working in that unit at the beginning of October

21    2011.

22    Q.   And just so we have it for the record, when did you start

23    to work for the FBI?

24    A.   I started working for the FBI in November of 2007.

25    Q.   What are your particular responsibilities within your

S. SMITH - DIRECT                                                    503

1    current role?

2    A.   My current role in the Major Case Coordination Unit is to

3    investigate again online child exploitation matters.   I

4    primarily focus on large websites, bulletin boards.   These

5    websites will have millions of posts, hundreds of thousands of

6    images, thousands of users.   Over the last two and a half

7    years, it's been focused on websites that are being hosted as

8    Tor hidden services on the Tor network.

9    Q.   For the last two years or two and a half years, how much

10   of your time have you spent working on Tor hidden service

11   investigations?

12   A.   100 percent of my time.

13   Q.   And what sort of functions do you -- what sort of things

14   do you do within those investigations?

15   A.   In those investigations, I spend time as a user would be

16   using the websites.  So I go online in an undercover capacity

17   as law enforcement, view the sites, I gain membership into the

18   sites, learn how they work.  So from a user perspective, I'm

19   very familiar with how a user would use the site, how the site

20   would look as a user uses the site.

21       In addition to that, we will seize these websites at

22   times.  And then I'm very familiar, because of the seizure of

23   the site, how the site works behind the scenes, what the user

24   doesn't see, right?  The photo structure of how the files are

25   stored on the file system, the database, how all the posts and

 1      the user profile information is stored in the database.

 2           I take that data, I analyze it, review it, triage it.

 3      And I put it in a format that allows other investigators to

 4      more efficiently review the data as well.

 5           So because of the number of sites, which today is

 6      approximately 20, 25 of these large websites I've reviewed and

 7      analyzed, I'm very familiar with how they operate and how all

 8      the pieces work together to present what the user sees as

 9      they're using the website.

10      Q.   And did you participate in this sort of role in the

11      investigation of the PedoBook Tor network website?

12      A.   Yes.

13      Q.   Special Agent Smith, I'd like to first direct you to

14      Government Exhibit No. 54.  I'll bring that up on the screen.

15      If you don't mind also having that available in front of you

16      in the binder.

17      A.   Okay.  I have it.

18      Q.   First of all, have you previously reviewed the content of

19      Government Exhibit No. 54?

20      A.   I have.

21      Q.   Can I also ask you just during your testimony to remove

22      Exhibit 54A from the binder and just keep it in front of you.

23      A.   All right.  I have Exhibit 54A and Exhibit 54.

24      Q.   Special Agent Smith, I'd like to ask you to help us

25      navigate the sort of data that's reflected in Exhibit 54 and

1    its significance.

2         Can you first just tell us, what is the sort of data that

3    we're seeing on each line of each page of Government Exhibit

4    No. 54?

5    A.   Exhibit 54, each line is showing a link to a website URL,

6    universal resource locator, the web address that a user would

7    type in to access a website.

8         Every line is a link to either a web page that would have

9    text as well as possibly images.  Other lines -- a lot of the

10   lines also are links, web addresses specifically to an image

11   or a video from a website.

12   Q.   And just to remind us, what's the common thread between

13   every single URL on this particular Exhibit 54?

14   A.   These URL all end -- the website portion of the URL,

15   which is the beginning of the URL, they end with .onion, which

16   .onion URLs refer to Tor hidden service websites.

17   Q.   What can a URL like this tell us about particular

18   activity that a user engaged on a website?

19   A.   It can tell us which websites they went to, which page on

20   the website.  It can tell us the specific post ID, the number

21   or the post that they looked at.

22        We can then take that post, look in the database and find

23   the exact content they were reviewing.  It would tell us which

24   image.  We can go to the website and look at the exact image

25   they were looking at with this link.

1          It can also tell us if they were looking at their private

2     messages which private message they may have been looking at.

3          It can tell us their unique session ID, so when a user

4     logs in, they're assigned a unique session ID.  And all of

5     their activity is under that session ID.

6     Q.   If I can direct you to page 6 of Government Exhibit

7     No. 54?

8     A.   Okay.

9     Q.   First, do you recognize the .onion URL of this particular

10    Tor hidden service?

11    A.   All of the .onion URLs on this page are -- the URL that

12    begins with 4i2a is the URL for Hurt the Core.

13    Q.   Do you see that depicted on Exhibit 54A?

14    A.   I do.

15    Q.   Remind us what Hurt to the Core is.

16    A.   Hurt to the Core is a bulletin board Tor hidden service

17    website dedicated to the distribution of child exploitation

18    material.

19         It was a website that was focused on hurt core material,

20    the rape, torture, bondage, mutilation of children, infants,

21    toddlers.

22    Q.   Can you give us some examples of the sort of particular

23    activity that we can pull off of this exhibit to make some

24    sense out of what it tells us?

25    A.   Yes.  This page would actually indicate that a user --

1       the first -- let's see, the first one, two, three, four, five

2       lines, keeping -- continuing from the top has an entry that

3       says action=pm, f=inbox.  It has a sort date, the start --

4       which message that he's starting at, either sorting by name or

5       subject.

6            All of that indicates that a user is logged in to Hurt to

7       the Core because, in order to read private messages -- they're

8       private, right?  So there's a log-in that is required to your

9       account to be able to read your messages.

10           So it first indicates that someone has logged in to Hurt

11      to the Core.  It then indicates that they are reading their

12      private messages because the action=pm -- and based off my

13      experience and knowledge of how these websites operate and how

14      they function, I know they're looking at their private message

15      inbox.

16           It also tells us that it's not a link that was found on a

17      website or document somewhere on the computer because it's

18      actually indicating an action that the user took to click a

19      column or a drop-down box and sort their messages in a

20      particular method; for example, sort by date, or sort by name

21      or subject.

22      Q.   So this wouldn't indicate that if, for example, a user

23      went to some directory and there were a bunch of Tor hidden

24      service URLs on that directory and one of them just happened

25      to be 4i2aiir, etc., this sort of entry would mean that is not

1    what was happening on this computer?

2    A.   Correct.  Based off my experience, and I myself have gone

3    to these directories and used these directories to find

4    websites, you do not see a link such as this.  It would not

5    have any relevance or value to users.  If you tried to click

6    the link, you would be directed to a log-in page on the Hurt

7    to the Core website in this instance.  The only way it would

8    be of value is as a user who is actually logging in and

9    clicking the website.

10   Q.   If I can direct you to page 11 of Government Exhibit

11   No. 54 --

12   A.   Okay.

13   Q.   -- can you just explain some activity that this depicts

14   and what it tells us about what the user of the computer was

15   doing?

16   A.   So this exhibit page shows us again the Hurt to the Core

17   URL.  It also shows us specific topics.  So where it says

18   topic=227, message=1619, so that's the topic or thread in the

19   specific post that that user is viewing.  They click the link

20   and they're viewing that content.

21   Q.   Let's pause there for a quick second.

22        Topics and threads, what do those mean in the context of

23   a bulletin board website?

24   A.   A bulletin website, the content is organized into a

25   forum.  And then inside of a forum, you could have a forum

 1       that talks about nature.  And then the forum has threads.  And

 2       in the thread, each thread could be about a different part of

 3       nature.

 4            And then if you're interested in trees, you could go to

 5       the thread about trees.  And then in that thread, users would

 6       make posts specifically about trees.

 7            So it's a hierarchy of how to organize all the content on

 8       the website to make it easier for users to find what they're

 9       interested in.

10  Q.   All right.  Please continue in your explanation of that

11       exhibit.

12  A.   So this exhibit, again it shows specific URLs to specific

13       threads and messages or posts on Hurt to the Core.  It also

14       shows a link action=search where a user is clicking to search

15       for some type of content.

16            We also see where someone clicked and they said

17       action=unread board children.  So this is someone clicking the

18       site looking for any of the unread posts on that particular

19       board involving the term "children".

20            And then it just continues there, the different boards

21       that are being viewed.  And normally a user would click to

22       look at the unread content because they regularly visit the

23       board, they are up to date on the content, and they just want

24       to see what's been posted since their last visit.

25            And once you log into a bulletin board, it knows what

1    you've looked at.  And it will only show you the new posts.

2    Q.   All right.  If we move to page 12 of the exhibit,

3    anything you see on page 12 that tells us about a different

4    type of user activity?

5    A.   On this page, we can see near the bottom of the list

6    there's a php session ID and a long string.

7         That is one of those unique identifiers that you're

8    assigned when you visit a site in order to keep track of your

9    session.  And if you did not have a unique session ID, every

10   page you'd go to you'd have to re-log in.  So it helps once

11   you've logged in as well to keep track of you so you don't

12   have to repeat the log-in.

13        So this is not something you would normally see on a

14   directory, a Tor hidden service directory website, or a search

15   engine.  You would just see the beginning URL without the php

16   session ID because that session ID is specific to the user

17   session at the time the page is being viewed.

18   Q.   So the existence of an entry like this found on a

19   particular computer tells us what?

20   A.   This tells us that more than likely this URL is here

21   because a user using the laptop computer was accessing the

22   site.

23   Q.   Showing you page 13 of Government Exhibit 54 --

24   A.   Yes.

25   Q.   -- what sort of website activity do these sorts of URLs

1    tell us was going on?

2    A.   These are more of the URLs indicating a user action.

3         So a user is, for example, reviewing this topic=227.0, is

4    then sorting -- or rather clicking through the pages.  They

5    view the topic, and then they click prev_next=next.  So

6    they're clicking to go to the next page or the previous page.

7         So this is a user clicking to view the topic and then

8    clicking to page through the topic.

9    Q.   Just showing you page 14, any other types of user

10   activity that you can translate for us here?

11   A.   It's more of the same type of activity where a user is

12   viewing a topic and a specific message.  He's also again

13   clicking "previous" or "next" to page through the topics,

14   viewing specific messages in a topic, again looking at the new

15   content because typically if you regularly visit the board,

16   again you're interested in what's new since you last visited.

17   Q.   First, we've been looking at examples of activity from

18   this one particular Tor hidden service.  Have you seen this

19   sort of active user engagement with respect to other Tor

20   hidden services within Exhibit 54?

21   A.   Yes.

22   Q.   If I can direct you to page 16, towards the bottom

23   section, there are different kinds of URLs than what we've

24   seen in examples so far.  Any significance to that, and can

25   you explain it?

1    A.   So the URLs that are very long (indicating) as marked,

2    those URLs are associated with the OnionPedo Video Archive Tor

3    hidden service website.

4        The OnionPedo Video Archive website URL begins with

5    OPVA2.  The way the website operates is after you log in to

6    the website, and you observe a video that you're interested in

7    downloading, you click the link.  The link actually is

8    downloading the video from a different URL.

9        And there were over 10 different URLs that the videos

10   were distributed between.  The reason for doing that was so

11   the website would operate more efficiently.  Because the

12   videos are large, the downloads would be more efficient if you

13   distribute the downloads across multiple websites or URLs.

14       I know that this is a OPVA, OnionPedo Video Archive, URL

15   but -- because of the URL .onion itself, but also because of

16   the format of the URL.  The /download followed by a long

17   string of characters, and then at the very end we see "Monica

18   13yo".  So the percent 20 is not part of the file name, it's a

19   special encoded character.  The file number would be Monica

20   13yo.

21   Q.   Can you just hit clear on your screen so the jury can see

22   that?

23   A.   Sure.  The file name is underlined, .avi, which indicates

24   a video.  With my experience using the OnionPedo Video

25   website, this URL is used when you're downloading a video.

S. SMITH - DIRECT                                                513

1        And part of this string that -- of random characters

2   includes your session ID.  If you take this link and post it

3   onto a directory site or somewhere else, the user, once they

4   click, they would have to go back and log in.  It would not

5   actually work to download the video directly from this link.

6        So this indicates that a user obviously is logged in to

7   the website to -- for this download to occur.

8   Q.   If I can direct you to page 45?

9   A.   Okay.

10  Q.   First, do you recognize that Tor URL?

11  A.   Yes.  The URL on this page -- the URL is for Lolita City.

12  Q.   And what do the particular entries on this page, page 45

13  of Exhibit 54, tell us about the computer user's activity?

14  A.   So this shows us that a user is visiting the upload page,

15  for example, for the specific user session.  They're visiting

16  the upload set where you can upload a group of images called a

17  set.  They were all maybe of the same child, a series of

18  images that go together.

19       It also shows us that the user is viewing the profiles of

20  other users.

21       For Lolita City, if you see the tilde -- for example,

22  ~5hukran, that's the profile page of a specific user on that

23  website.

24       We can also see that a specific user is viewing their

25  inbox, their private message inbox.  Near the bottom is a user

1    ~fuckchrist, and the tab they're on is the inbox.  And then

2    they're showing their private messages.  And then we see the

3    specific user session for that user that's logged in.

4         So here is a user (indicating).  Again, they had to log

5    in in order to view their private messages.

6    Q.   If I can direct you to Exhibit 57.

7    A.   Okay.

8    Q.   First, do you recognize the Tor URL?

9    A.   Yes.  This Tor URL that begins with OPVA2 is the URL for

10   the OnionPedo Video Archive website.

11   Q.   In the first, sort of quarter, of the top of the exhibit,

12   do you see the words "connection keep alive"?

13   A.   Yes.

14   Q.   What do those entries and those that are like them tell

15   us about what the user of this computer was doing?

16   A.   These entries are from the pagefile.sys which, as

17   discussed earlier, is a cache for the memory of the computer.

18        Here we can see this entire line is actually showing us a

19   request or response that was made to the OPVA website.  The

20   "connection keep alive" is a common request header.  The

21   "referer:" tells us the page that the user is on when they

22   made the request.

23        So this user was on the index.php page of OPVA.  We also

24   have a cookie which contains the session ID.  A cookie is a

25   small file that is put into -- on your computer as part of the

1    browser that allows the website to store information so that

2    as you visit each page of the website, it can keep track of

3    maybe who you are, what your user ID is, what your user name

4    is, whatever they want to keep track of, to -- while you're

5    visiting the website.  And one of those common things would be

6    the session ID.

7         The next line down shows us that a file, tn_5.jpg, was

8    being downloaded from host OPVA2.  And then it also gives us a

9    piece of the unique browser that was downloading that file.

10        So these actually are showing pieces of request or

11   response that was made while the user was browsing the

12   website.

13   Q.   Is there a reference on this page to a base64?  And does

14   that tell us anything pertinent?

15   A.   Yes, there is (indicating).

16        So where I have underlined the OnionPedo Video Archive

17   URL and then "&data:" is telling us what type of data is being

18   downloaded.  In this case, it's an image; png is the file

19   extension, the type of image.  And then the base64 is the

20   encoding that the image is being sent in.  So it's -- and then

21   as you can see, there's a lot of random characters that

22   follow, which is the actual image being downloaded.

23        The computer will download all of the bits of the image

24   and then is told it's stored in base64 so it will use that

25   information to then put it back together so a user can then

1    view the image.

2    Q.   And directing you to page 2, any information on this page

3    about request headers?

4    A.   The second line of the page shows "HTTP:domain=".  Again

5    this is part of the request header.  It gives us the full link

6    to the .jpg, the image file, that's being downloaded.  So

7    again this is part of the request header requesting download

8    of that specific file.

9    Q.   All right.  So Special Agent Smith, then what is your

10   review of Exhibits 54 and 57 in your training and experience

11   telling us about the meaning of these entries being within a

12   pagefile.sys file on a particular computer?

13   A.   This tells me that a user of the computer was viewing

14   these websites and creating these entries in the pagefile.sys.

15   It's not something that I would observe on again a Tor

16   directory website or a search engine.  These are URL specific

17   to a user of the website.  And because we can see part of the

18   request header in the page file as well, again that reinforces

19   the fact that this is occurring from this computer.

20   Q.   Now, Exhibit 57 here, fair to say pertains only to the

21   OPVA.onion site; is that right?

22   A.   Correct.

23   Q.   And it's 195 pages?

24   A.   Correct.

25   Q.   Does that indicate a lot of activity or not much activity

1    or something else?

2    A.   That would indicate to me a lot of activity on that

3    website.

4    Q.   Now, was OPVA still active as of April 9th of 2013?

5    A.   Yes, it was.

6    Q.   I want to direct you to Exhibit 56.

7    A.   Okay.

8    Q.   All right.  What do we see on Exhibit 56?

9    A.   Exhibit 56 shows us the URL that begins with oqm for

10   PedoBook which is a Tor hidden service website.

11   Q.   Now, fair to say we see fewer entries regarding the

12   PedoBook URL on this exhibit; is that right?

13   A.   Yes.

14   Q.   Is that unusual, surprising; what is your reaction to

15   that?

16   A.   This limited number of URLs for PedoBook does not

17   surprise me.  PedoBook was taken offline on December 8th of

18   2012.  Because of the amount of time that lapsed between when

19   the website was taken offline and the date of the seizure of

20   the laptop, it would make sense that there would be very few

21   entries.

22        As the computer's continuingly used, old data that is

23   cached in the page file would be pushed out and overwritten

24   while the new activity is replacing it.

25        So if this computer was continually used for months and

1    months, you know, continuing forward after it was seized in

2    April of 2013, these eventually would completely be gone from

3    the page file.

4    Q.   All right.  Special Agent Smith, showing you briefly

5    Government Exhibit No. 63, first page and second page, have

6    you had an opportunity to review that exhibit?

7    A.   Yes.

8    Q.   Had you reviewed it prior to taking the stand this

9    afternoon?

10   A.   Yes.

11   Q.   Showing you Government Exhibit No. -- excuse me, sorry.

12   Just remind us what is Government Exhibit No. 63?

13   A.   Exhibit 63 is showing a report of the Windows prefetch

14   file, which shows us recent applications that have been run on

15   the computer and how often the applications were ran.

16   Q.   Showing you Government Exhibit 50, have you had an

17   opportunity to review this exhibit previously?

18   A.   Yes.

19   Q.   Can you just remind us what it is?

20   A.   This is a FTK registry report for the laptop computer

21   seized from Germantown, Maryland.

22   Q.   Based on your review of Exhibits 50 and 63, as well as

23   the other exhibits you've reviewed with us today, your

24   training and experience, as well as your personal

25   participation in the events of April 9 of 2013, can you

1      construct for us a timeline of activities that occurred on the

2      laptop computer for about an hour before FBI entered until you

3      actually personally took hold of it?

4      A.    Yes.   Based off of my participation in the search warrant

5      entry into the house and removal of Timothy DeFoggi from the

6      laptop computer, as well as observing his hands on the

7      keyboard, and reviewing the exhibits presented here, it

8      appears that at approximately 4:50 a.m. on April 9, 2013, the

9      user of the laptop under the user name ToonaBug logged in to

10     the computer.

11         Approximately one minute later at 4:51 a.m., the Tor

12     Browser Bundle was opened and a browsing session started.   A

13     short time later a file was started downloading from the

14     website OnionPedo Video Archive.

15         About 5:25 a.m. the search warrant was executed.

16         Prior to the search warrant being executed, agents were

17     staging at an offsite location and observing the pen trap and

18     trace data.   When the Tor Browser Bundle was started at 4:51

19     a.m., we were able to observe the Tor connections occurring

20     from the residence.   And that led us to begin execution of the

21     search warrant.

22         At 5:25 a.m. agents approximately -- approximately 5:25

23     a.m. agents entered the residence and executed the search

24     warrant.   At approximately the same time, approximately 5:24

25     a.m., the Eraser application on the computer was executed,

1      which began erasing whatever it was configured to erase.

2           When I entered the residence, I was proceeding through

3      the residence, through the sitting room, through the dining

4      room, and after entering the dining room, I observed an

5      individual on the other side of the house with his hands on

6      the keyboard kneeling on the floor at a laptop computer.

7           As I approached the individual and continually ordered

8      him to move away from the laptop and he did not comply, as I

9      reached the individual, I used my foot and removed him from

10     the laptop.  Later that individual was identified by agents as

11     Timothy DeFoggi.

12          Once he was removed from the laptop, I secured the

13     laptop.  I viewed what was on the laptop screen and observed a

14     file being downloaded from the OnionPedo Video Archive, which

15     matches up with what we see on these exhibits.

16     Q.   With respect to this start-up of Eraser, was that

17     something that had to be initiated by the user or would have

18     happened automatically?

19     A.   Based off the evidence we have, it appears it would have

20     been initiated by the user.

21          (Off-the-record discussion had.)

22          MR. BECKER:  Your Honor, we have no further questions

23     at this time.

24          THE COURT:  Cross-examination?

25          MR. BERRY:  Yes.

S. SMITH - CROSS                                                   521

```
 1                          CROSS-EXAMINATION

 2     BY MR. BERRY:

 3     Q.   You indicated that the Eraser program was initiated by

 4     the user, correct?

 5     A.   Correct.

 6     Q.   Okay.  And you base that off what?

 7     A.   The lack of a scheduled task that would execute the

 8     Eraser application at that specific date and time.

 9     Q.   And so where is the evidence that it was run at that

10     time -- that it was running at that time?

11     A.   The evidence that the Eraser application was run was in

12     the prefetch file.

13     Q.   And it was running in the background as a service,

14     correct?

15     A.   The Eraser application?

16     Q.   Yes.

17     A.   Yes.  It can run in the background as an application.

18     Q.   But was it running as a service at that time?

19     A.   Not to my knowledge from the exhibits I have here.

20          (Off-the-record discussion had.)

21     BY MR. BERRY:

22     Q.   And do you know who stopped the Eraser program?

23     A.   To my knowledge, no one stopped the Eraser application.

24     When I viewed the laptop computer, there was no signs of the

25     Eraser application running visibly.
```

1           The download, there's a visible indication.  The Eraser

2     application, there is no visible indication that it was

3     running when I observed the screen.

4     Q.   You talked a little bit about images on web pages.  Now

5     once a web page is accessed, those images -- all the images on

6     the page are automatically uploaded, correct?

7           Let me ask you a simpler question.  If I go to ESPN.com

8     and I pull up a page and Johnny Man- -- there's a picture of

9     Johnny Manziel on there, whether I like it or not, that

10    picture of Johnny Manziel is coming up on my computer,

11    correct?

12    A.   Correct.  When you browse a website, the images on the

13    page that you're looking at would be downloaded into the

14    temporary Internet files' location for the computer.

15    Q.   Thanks.

16           MR. BERRY:  I have no further questions.

17           THE COURT:  Redirect?

18           MR. BECKER:  One quick question on redirect, your

19    Honor.

20                    REDIRECT EXAMINATION

21    BY MR. BECKER:

22    Q.   Special Agent Smith, what were the settings on CCleaner

23    on the laptop set to do to temporary Internet files?

24    A.   The settings on CCleaner were set to delete temporary

25    Internet files.

 1          MR. BECKER:  No further questions.

 2          THE COURT:  Thank you, Special Agent Smith.  You may

 3    stand down.

 4        The government may call its next witness, or we can do

 5    our first break.

 6          MR. NORRIS:  That might be more appropriate.

 7          MR. BECKER:  That would be great, your Honor.

 8          THE COURT:  Let's take our first break.  We're going

 9    to have two breaks this afternoon as well, as we did

10    yesterday.

11        Let's take the first break.  Please reconvene in the jury

12    room at 2:40, and we'll start again then.

13        (Jury out and recess taken at 2:25 p.m.)

14        (At 2:44 p.m. on August 21, 2014, with counsel for the

15    parties and the defendant present, and the jury NOT present,

16    the following proceedings were had:)

17          MR. NORRIS:  Your Honor, if I may?

18          THE COURT:  You may.

19          MR. NORRIS:  I just want to give you a little roadmap

20    of what we plan on doing, and then ask for permission to

21    excuse Keith while I have the next witness.

22        And the reason for that is we have a witness we were

23    hoping to have here Monday, but we had to go through the

24    Russian embassy and through all sorts of delays and everything

25    else.

1          He arrived about -- oh, a half hour ago.  So we're going

2     to have Keith talk to him before he's presented, so we're

3     going out of order.

4          And what I plan on doing next is put Agent Tarpinian on.

5     I'm going to ask the Court, first of all, to take judicial

6     notice of the hearing on July 11th of 2013 in this particular

7     matter.  It was a motion to modify conditions of release.

8          And what I had planned on doing was -- it's Exhibit 44.

9     I'm just going to ask and identify the questions and have

10    Agent Tarpinian respond as Mr. DeFoggi did in the hearing

11    below, if that's okay.

12         THE COURT:  You're just asking me to take judicial

13    notice of the fact that the hearing took place or take

14    judicial notice of the transcript?

15         MR. NORRIS:  I'm going to ask the Court to take

16    judicial notice of the transcript.  And I do so just to lay

17    foundation for it, Exhibit 44 itself.

18         Under 201, I believe you can do it because it happened

19    within at least the United States District Court for the

20    District of Nebraska.  There is a transcript.  And that

21    transcript could be compared to the ECF recording in order to

22    verify its accuracy.  So rather than bringing in the court

23    reporter [*sic*], I think this is a clearer, easier way to go.

24         THE COURT:  All right.  Now I have before me the

25    transcript and the redacted transcript.

1          So Mr. Norris, basically the audio is available online,

2     but the transcript itself is not a part of the docket; is that

3     correct?

4          MR. NORRIS:  The audio would be available online as

5     just part of our ECF, but not the redacted version obviously.

6          And what's been redacted, just so the Court knows is he

7     did raise his Fifth at some point in the middle of the

8     proceedings.  And there were some other matters that were

9     redacted as well.  So that's -- the major redaction towards

10    the end is his refusal to answer any more questions.

11         THE COURT:  And I guess part of my question, the

12    written transcript is not a part of the record, it's not in

13    the docket, it's not a filing.

14         MR. NORRIS:  I think it should be.

15         THE COURT:  Ms. Fauber is nodding that it is.

16         MR. NORRIS:  Okay.

17         THE COURT:  I just didn't see any CM/ECF filing

18    number on it.

19         Well, I can certainly take notice of the proceedings that

20    have taken place in this case thus far.  And filing number 55

21    is a part of those official proceedings of the court.  I take

22    judicial notice of filing number 55.  And that may be all I

23    need to do at this point.

24         MR. NORRIS:  I think that is.  And then I'll offer it

25    when the jury comes back in.  And once it's received, I'll ask

1    permission to publish and we'll go in the process that I just

2    explained.

3            THE COURT:  One other question before we bring in the

4    jury, again just a housekeeping/roadmap type question, in

5    light of the fact that we have other cases lined up waiting to

6    be tried.

7        I understand that the government may finish its case at

8    the end of the day; is that right?

9            MR. NORRIS:  I think will is probably -- and probably

10   with some time to spare.

11           THE COURT:  Okay.  And does the defense anticipate

12   closing tomorrow in time that we would be able to have the

13   closing arguments and jury instructions?

14           MR. BERRY:  Yes, your Honor.

15           THE COURT:  Okay.  That's good.  That helps us to

16   know what I'm doing next week and helps us to notify the

17   lawyers, who are waiting to try their case, know what they're

18   going to be doing next week.  So I appreciate that.

19           MR. BERRY:  Your Honor, before the jury comes, I

20   would like to be heard on this Exhibit No. 44, which is the

21   testimony of Mr. DeFoggi at his detention hearing.

22       I suppose that -- well, it doesn't matter to me, but it

23   might make more sense to address one of my concerns outside

24   the presence of the jury.

25           THE COURT:  Okay.

1          MR. BERRY:  Your Honor, and my concern is this was a

2     detention hearing.  And obviously the defendant has a right to

3     have a detention hearing, he has a Fifth Amendment right to

4     remain silent, he has a right to have a trial.

5          Mr. DeFoggi chose to testify at the hearing.  Most of

6     what you'll see here -- or most of what I'm concerned about is

7     the cross-examination by Mr. Becker starting on page 34 of

8     this exhibit.

9          And essentially my argument is that -- and I believe

10    Mr. Davis, who was Mr. DeFoggi's attorney at the time,

11    objected to some of this questioning, which was that it was --

12    you know, it was outside the scope of the hearing, it had very

13    very little to do with the detention hearing.  Mr. DeFoggi

14    answered some of it and he later asserted his Fifth Amendment

15    right.

16         My point is I don't believe it's relevant, I believe it's

17    unfairly prejudicial to Mr. DeFoggi, and I believe it should

18    not have been allowed in the first place by the magistrate

19    during the detention hearing.

20         THE COURT:  I'm looking at the transcript starting at

21    what is labeled page 34.  Bear with me a moment.  And I'm

22    looking at the redacted copy.  I don't see the objections that

23    you're making reference to, Mr. Berry.

24         MR. BERRY:  They may have been redacted, your Honor.

25    Let me just see if I can find it --

1          THE COURT:  And also I note there's no reference in

2     the redacted copy to him raising the Fifth Amendment.

3          MR. NORRIS:  Correct.  We redacted that out.  And I

4     don't plan on calling it a motion for release or anything like

5     that.  I'm just going to call it a prior hearing.

6          THE COURT:  Okay.

7          MR. NORRIS:  And to that extent, maybe we need to --

8     on page 44, we should change -- strike "conditions of

9     release," or at least it says modify so that doesn't

10    necessarily mean that he's been detained.

11         THE COURT:  On page 44 I don't even see a reference.

12         MR. NORRIS:  I'm talking about page 1 of Exhibit 44.

13    That was me misspeaking.

14         THE COURT:  Okay.  Let's do redact the words that say

15    "on motion to modify conditions of release," so that that does

16    not appear on page 1 of Exhibit 44.

17         And Mr. Berry, if there are places in the redacted

18    version here of Exhibit 44 where objections were made and

19    redacted, and obviously overruled and there was a response,

20    you can point that out to me if you want me to look at it.

21         MR. BERRY:  Yes, your Honor.

22         On page 36, if you look right after line 13, it is

23    redacted.  On the nonredacted version, Mr. Davis objects that

24    this is outside the scope.  And he says, "It is also" -- and

25    the magistrate cut him off and said, "Overruled."

1           So that was on page -- halfway through 36, which you

2      should see on your redacted version of Exhibit 44.

3           And then also Mr. Davis again made the same objection

4      halfway down page 37, which has also been redacted.

5           THE COURT:  But those objections weren't in

6      connection with raising a Fifth Amendment issue.

7           MR. BERRY:  No, they were not.  They were just toward

8      the propriety of the question for the purpose of the hearing.

9      And Mr. DeFoggi's argument is they shouldn't have been allowed

10     then and, therefore, they shouldn't be allowed now.

11          THE COURT:  Well, I understand that the statements

12     that he made here in the redacted version of Exhibit 44 were

13     statements that he made when he had counsel with him; he knew

14     that he had a right not to testify; and once he invoked his

15     Fifth Amendment privilege, he wasn't questioned further.

16          So the concerns that you're raising now I appreciate your

17     raising outside the presence of the jury so I have an

18     understanding of the nature of the objections, but I

19     anticipate I will overrule those objections.

20          And when the exhibit is offered, I'll rule on the

21     admissibility of the exhibit.

22          Okay.  Are we ready for the jury?

23          MR. NORRIS:  Yes, your Honor.  So the Court knows, I

24     plan on just starting with the -- if the Court prefers, I can

25     do a quick explanation as to a prior hearing starting with the

1    direct examination of Mr. DeFoggi and not get into the

2    preliminary where the Court went through the Fifth Amendment

3    rights.  Or if the Court prefers, I can go through that as

4    well.  He was advised by Judge Thalken of his Fifth Amendment

5    right prior to --

6            THE COURT:  Frankly, I think it's helpful to have

7    that additional information included for purposes of the jury

8    unless the defendant for some reason objects to that.

9        (Off-the-record discussion had.)

10           MR. BERRY:  Your Honor, I would object to that.

11           THE COURT:  All right.  Then I'll ask that you start

12   with the questioning after he's been advised of his rights.

13   And if counsel wants that prior part redacted as it goes back

14   to the jury...

15           MR. NORRIS:  Well, I have no problem with just

16   starting here.  But if we redact it on the way back to the

17   jury and there's some sort of consideration that this was an

18   involuntary statement or there's some sort of argument or

19   suggestion, then I think it probably needs to stay in there.

20       And this was done -- I mean, there's nothing improper,

21   3501-wise or voluntariness-wise so I think it should stay.

22   I'm just willing to go -- start with the direct instead of

23   going through the admonishment from the Court.

24           THE COURT:  I understand that there is no question

25   that he was advised of his rights, and that's a part of the

```
1    record.  And this appears in the record in its full and

2    unredacted state.  So there's going to be no question in front

3    of any Court of Appeals that the rights of the defendant were

4    in any way violated.

5       But whatever we're reading in front of the jury I think

6    ought to be the same thing that ultimately goes back to the

7    jury, unless you simply want to read it and not have the

8    document go back to the jury, which is okay, too.

9            MR. NORRIS:  I want the document to go back to the

10   jury, so if we need to redact that portion out, if that's what

11   the request is, we'll do that.  And we can do it that way.

12           THE COURT:  All right.  Thank you.

13      Let's bring in the jury.

14           MR. NORRIS:  And Mr. Becker does have permission to

15   remain outside for this...

16           THE COURT:  Sure.

17           MR. NORRIS:  Thank you.

18      (Jury in at 2:59 p.m.)

19           THE COURT:  Please be seated.

20      Mr. Norris, you may proceed.

21           MR. NORRIS:  Your Honor, at this point I'm going to

22   offer Exhibit 44.

23           THE COURT:  Any objection to Exhibit 44?

24           MR. BERRY:  Yes, your Honor.  The defense would

25   object based on relevance and also objections as to the scope
```

1    of the questioning made during the time of the hearing.

2            THE COURT:  The objections are overruled.  Exhibit 44

3    is received.

4            MR. NORRIS:  Your Honor, toward that end, with regard

5    to Exhibit 44, I would like to publish it to the jury.

6        And I would advise the Court and advise the jury that

7    this is a prior motion hearing under which the defendant

8    testified.

9        I would like to call Special Agent Jeffrey Tarpinian back

10    to the stand solely for the purpose so that I can read the

11    questions that were asked at that hearing by the individuals

12    who asked the questions, and have Agent Tarpinian give the

13    verbatim responses of the defendant at that hearing.

14            THE COURT:  You may.

15        Agent Tarpinian, you may take the stand.

16      JEFFREY TARPINIAN, PREVIOUSLY SWORN, RESUMED THE STAND

17            MR. NORRIS:  May I inquire?

18            THE COURT:  You may proceed.

19                        DIRECT EXAMINATION

20    BY MR. NORRIS:

21    Q.   Agent Tarpinian, I'm going to ask you to read the answers

22    that the defendant provided at a hearing that occurred on July

23    11th of 2013 before the magistrate judge here in the District

24    of Nebraska.

25        Toward that end, I'm going to ask you to turn to page 9

1   of Exhibit 44.

2   A.   Okay, I'm there.

3   Q.   And do you see where it says "direct examination"?

4   A.   Yes.

5   Q.   This direct examination was done by a Mr. Davis?

6   A.   I see that.

7   Q.   And do you know who Mr. Davis is, first of all?

8   A.   I do.

9   Q.   And who is he?

10   A.   He is a defense counsel here in Omaha and previously

11   represented the defendant.

12   Q.   All right.  So question by Mr. Davis:

13       Question:  Mr. Witness, would you state your full name

14   and spell your last name for the record?

15       Answer:  Oh, Timothy DeFoggi, D-e-F-o-g-g-i.

16       Question:  Okay.  And you're the -- you understand that

17   as the judge advised you, you're the defendant in this case?

18       Answer:  Correct.

19       Question:  And you know he's also advised you of your

20   Fifth Amendment rights against self-incrimination, right?  You

21   understand those?

22       Answer:  Yes, I do.

23       Question:  And you're testifying knowing, intelligently

24   and voluntarily today.

25       Answer:  I am.

1       Question:  All right.  And with respect to the time of

2    this indictment, can you tell the Court where you were living?

3       Answer:  I was living in Germantown, Maryland.

4    BY MR. NORRIS:

5    Q.   I want to forward to page 34.  Are you there?

6    A.   Yes.

7    Q.   I want to start the cross-examination by Mr. Becker, the

8    government's attorney.

9    A.   Okay.

10   Q.   I will read the parts of Mr. Becker and you will provide

11   the answers of the defendant, okay?

12   A.   Yes.

13      Question:  Mr. DeFoggi, your attorney asked you about

14   some matters involving your computer and items that were found

15   on it.  I want to start there.

16      First, at the time that the FBI searched your home in

17   Maryland, what -- what was that -- what was that address?

18      Answer:  It was at the Crown Ridge Court address.

19      Question:  What was the full address?

20   BY MR. NORRIS:

21   Q.   And Agent, I know that it's redacted in there, but would

22   you please just respond as it's written.

23      Answer:  Crown Ridge Court.

24      Question:  Okay.  And you lived there at the time?

25      Answer:  I did.

1        Question:  With two other persons?

2        Answer:  Correct.

3        Question:  One of those persons is Dale Bounds?

4        Answer:  Correct.

5        Question:  What's the nature of your relationship?

6        Answer:  He is my partner.

7        Question:  Okay.  And so that -- that's a romantic

8    relationship, correct?

9        Answer:  Correct.

10       Question:  Okay.  There was a second individual who was

11   living with you at the time; is that right?

12       Answer:  Correct.

13       Question:  Okay.  At the time that FBI entered your home,

14   you ran for a computer and actually had to be physically

15   removed from it; is that correct?

16       Answer:  I don't believe that's an accurate portrayal.

17       Question:  Did you put your hands on a computer when the

18   FBI entered -- they entered your home?

19       Answer:  I was holding it when they came in.

20       Question:  It was a laptop computer?

21       Answer:  Correct.

22       Question:  Your laptop computer?

23       Answer:  Correct.

24       Question:  It was connected to the Tor network?

25       Answer:  Yes, I believe it was.

1        Question:  You know what the Tor network is?

2        Answer:  I do.

3        Question:  You're familiar with it from your experience

4    as a -- an IT professional?

5        Answer:  I'm familiar with it from my intelligence

6    positions.

7        Question:  There was Tor network software installed on

8    that computer.

9        Answer:  Tor software was not installed.  The Tor browser

10    was, but that's not the application.  It's just a browser.

11    It's a Firefox browser.

12        Question:  Got it.  You installed it on that computer.

13        Answer:  Correct.

14        Question:  It was running at that time.

15        Answer:  I believe it was.

16        Question:  It was downloading a child pornography video

17    from a child pornography website, correct?

18        Answer:  That I would not characterize as accurate.

19    There was something being downloaded, but I -- it was in the

20    process of downloading so I did not know what it was at the

21    time.

22        Question:  What did you know about it?

23        MR. NORRIS:  Next question.

24        Question:  Mr. DeFoggi, what do you think was being

25    downloaded?

1          Answer:  Well, it was from a -- in contrary to what the

2     description was of the Tor network that I -- I read, there's a

3     directory out there.  And it's not that somebody tells you

4     that, "Hey, there's -- this is where you go to get that -- to

5     get whatever."  There is multiple Tor directories out there,

6     and it runs a gamut.  It's one of those -- it's pretty much a

7     free speech part of the Internet that was actually -- of

8     course, as you know, was developed by DOD for repressed

9     countries so that they could communicate with people without

10    oversight from the government and any type of retaliation by

11    the government.

12    BY MR. NORRIS:

13    Q.   If I could get you to turn to page 39, please.

14    A.   I'm there.

15    Q.   Question by Mr. Becker:

16         Question:  Mr. DeFoggi, what website was that file being

17    downloaded from when the FBI entered your home?

18         Answer:  I don't recall.  There are hundreds of websites.

19    I don't know if you've looked at the -- some of the

20    directories that you can find out there, there's...

21         Question:  Mr. DeFoggi, you had a cell phone at the time

22    that you were still living in your Germantown, Maryland, home;

23    is that right?

24         Answer:  Correct.

25         Question:  That phone number is 703-909-5559.

```
 1          Answer:  Correct.

 2          Question:  Through Verizon?

 3          Answer:  AT&T.

 4          Question:  Through AT&T; is that right?

 5          Answer:  Correct.

 6          Question:  You used that number for some period of time,

 7     a number of years?

 8          Answer:  Some period of time.  Offhand, I don't know what

 9     the period of -- that was.

10          Question:  Going back to 2006; is that fair to say?

11          Answer:  I would have to look at my records.  I'm -- that

12     could be true.  I'm not sure.

13          Question:  Okay.  Did you previously live at an address

14     8760 Mill Towns Court, Alexandria, Virginia?

15          Answer:  I did.

16          MR. NORRIS:  Your Honor, that concludes the published

17     portion of this testimony.

18          THE COURT:  Very good.  Thank you.  You may stand

19     down.

20     The government may call its next witness.

21          MR. BECKER:  Thank you, your Honor.  United States

22     calls Paval Stevashain.

23     Your Honor, just for the Court's benefit, your Honor, we

24     do also have a translator available for this witness.

25          THE COURT:  Very good.
```

1    I will ask the courtroom deputy first to -- well, I think

2    first I should swear in the interpreter if you are going to be

3    using an interpreter during this testimony.  Is that what you

4    anticipate doing, Mr. Becker?

5         MR. BECKER:  It is, your Honor.

6         THE COURT:  All right.  I'll ask that the interpreter

7    come forward.  And first state his name to the courtroom

8    deputy and spell the name, please.

9         INTERPRETER:  My name is Nick Nersesian, N-i-c-k,

10   N-e-r-s-e-s-i-a-n.

11        THE COURT:  Okay.  And are you an interpreter in the

12   Russian language?

13        INTERPRETER:  Russian and Ukrainian.

14        THE COURT:  And can you tell us what certifications

15   or other authority you have that recognizes you as an

16   interpreter in these language?

17        INTERPRETER:  I'm a registered court interpreter for

18   State of Nebraska.

19        THE COURT:  Very good.  Then I'll ask that you raise

20   your right hand, please.

21      And do you swear to faithfully and accurately interpret

22   the statements of this witness in this case?

23        INTERPRETER:  I do.

24        THE COURT:  Very good.

25      I'll now ask that the courtroom deputy swear in the

1     witness after she has him state his name and spell his name

2     for the record.

3               COURTROOM DEPUTY:  Please state your name for the

4     record and spell it.

5               THE WITNESS:  (In English) My name is Paval Vorsovich

6     Stevashain, P-a-v-a-l V-o-r-s-o-v-i-c-h S-t-e-v-a-s-h-a-i-n.

7               THE COURT:  I'm going to interrupt for just a moment.

8     We will need to choose either English or Russian or Ukrainian,

9     depending on what the witness prefers.

10        And if you're going to interpret for us during the

11    hearing, that's fine.  Then the witness will need to speak in

12    the other language throughout the proceedings.  If you're here

13    simply to assist if he doesn't understand a particular

14    question, then I need to know that.

15              INTERPRETER:  Yes, your Honor.  We were advised by

16    the counselor before the hearing here that he -- he's capable

17    of just stating his name and spelling it and then rest of his

18    testimony I will interpreter from English to Russian and back.

19              THE COURT:  Excellent.  Then from here on out, I will

20    ask that the witness please speak in Russian.

21              PAVAL STEVASHAIN, PLAINTIFF'S WITNESS, SWORN

22              THE COURT:  Very good.  Please take a seat at the

23    witness stand.  And the interpreter will stand next to you by

24    the microphone.  The interpreter will have the microphone.

25              (Off-the-record discussion had.)

```
 1                    THE COURT:  You may inquire.

 2                    MR. BECKER:  Thank you, your Honor.

 3                             DIRECT EXAMINATION

 4    BY MR. BECKER:

 5    Q.   Good afternoon, Mr. Stevashain.

 6    A.   Good afternoon.

 7    Q.   First of all, do you speak and understand English?

 8    A.   Yes, I do.

 9    Q.   Is it your preference to testify today through a Russian

10    interpreter?

11    A.   Yes.

12    Q.   Is Russian your native language?

13    A.   Yes, Russian is my native language.

14    Q.   Thank you.

15         Please tell us how you are employed.

16    A.   I work at law enforcement agency of the Moscow police.

17    Q.   What is your assignment?

18    A.   I am the head of a department that deals with the

19    pedophiles and promote sexual crimes in connection with

20    underage children.

21    Q.   How long have you been a police officer?

22    A.   Fourteen years.

23    Q.   How long have you been head of the pedophile unit of your

24    police agency?

25    A.   Five years.
```

1   Q.   Are you familiar with the website Image Source or

2   IMGSRC.ru?

3   A.   Yes, I'm familiar with it.

4   Q.   How are you familiar with that website?

5   A.   During my work I discovered that website.

6   Q.   Please describe it for us.

7   A.   This website is a social network where users can post and

8   exchange pictures and comments.

9   Q.   On the screen in front of you is Government Exhibit

10  No. 70.  Do you recognize that?

11  A.   Yes, I recognize it.

12  Q.   What is it?

13  A.   This is the home page of the site Image Source.

14  Q.   On the screen in front of you is the second page of

15  Exhibit 70.  What is that?

16  A.   This is page of one of the users of this site,

17  PTasseater.

18  Q.   I've circled a portion of the site in the top right

19  corner.  What does that symbol mean?

20  A.   This symbol means that this particular user was banned

21  from using this website.

22  Q.   In 2012, did you obtain user information from the website

23  Image Source?

24  A.   Yes, I obtain this information.

25  Q.   Did that include user registration information?

1    A.    Yes, included.

2    Q.    Did that include user comments?

3    A.    Yes, included.

4    Q.    Did that include IP logs?

5    A.    Yes, included.

6    Q.    Were those logs created directly by the website?

7    A.    All logs are saved automatically on this website of all

8    users that ever used it.

9    Q.    Did you obtain that information directly from the site

10   administration?

11   A.    Yes, from administration of the site.

12   Q.    In 2012, did you provide that information to an agent of

13   the FBI?

14   A.    Yes, I provided it to the FBI agent.

15           MR. BECKER:  Your Honor, we have no further questions

16   of this witness.

17           THE COURT:  Cross-examination?

18       (Off-the-record discussion had.)

19                          CROSS-EXAMINATION

20   BY MR. KALEMKIARIAN:

21   Q.    Mr. Stevashain, I'm sitting here at the defense table.

22   Do you recognize any of the people at the defense table, the

23   three of us?

24   A.    Can I ask a question about --

25   Q.    Let me rephrase the question.  Have you ever met the

1   defendant sitting here to my right in the gray suit and red

2   tie?

3   A.   No, I'm seeing him first.

4   Q.   This is the first time you've seen him, is that what

5   you're saying?

6   A.   Yes.

7   Q.   You just made reference to the user name on Image Source

8   Russia of PTasseater.  Did you ever meet the user that used

9   that name?

10  A.   Met in real life or how?

11  Q.   Have you ever met him in real life?

12  A.   I think not, but I may -- I may have not known that I've

13  seen him before.

14  Q.   Did you ever communicate with that user on the Internet?

15  A.   No, never.

16  Q.   Were you ever made aware of his identification or ID

17  before today's hearing?

18          MR. BECKER:  Objection as to relevance and scope,

19  your Honor.

20          MR. KALEMKIARIAN:  The relevance and scope, your

21  Honor, the -- during the direct line of questioning, the

22  Assistant U.S. Attorney asked about a specific user

23  PTasseater, as well as indicating that that user was

24  identified with specific -- or indicated that user was

25  identified with a certain IP address.  So whether or not the

1    witness knows or has identified the defendant is well within

2    the scope of cross-examination.

3         THE COURT:  I'll overrule the objection.  I'll allow

4    the witness to answer.

5         The question is, "Were you ever made aware of his

6    identification or ID before today's hearing?"

7    A.   Well, I wasn't aware of him, you know, all the time, but

8    I did forward the information about this user to the FBI

9    agents and, of course, I was aware of him by then.

10        And I always pay attention to all -- to information of

11   all users that I provide information to other agents, I mean,

12   names of the users.

13   BY MR. KALEMKIARIAN:

14   Q.   Were you an administrator of IMGSRC.ru?

15   A.   No, never.

16   Q.   And during your -- during the investigation of the user

17   name PTasseater, was that led by -- was that led at the

18   direction of U.S. officials?

19        MR. BECKER:  Objection, relevance and scope.

20        THE COURT:  Overruled.  I'll allow the answer.

21        Go ahead.

22        INTERPRETER:  Interpreter asks to repeat the

23   question, please.

24        THE COURT:  Sure.  The question is:  During the

25   investigation of the user name PTasseater, was that led by --

1   was that led at the direction of U.S. officials?

2   A.   I didn't quite understand the question.

3        THE COURT:  Okay.  I'll allow counsel to rephrase.

4   BY MR. KALEMKIARIAN:

5   Q.   Did any -- did the FBI or any other American law

6   enforcement agency ask you to investigate user PTasseater on

7   Image -- on IMGSRC.ru?

8   A.   No, nobody asked me to investigate.  I investigated by

9   myself.  And because those IP addresses were American, that's

10  why I forward this information to American law enforcement.

11  Q.   Thank you.

12       MR. KALEMKIARIAN:  No further questions at this time.

13       THE COURT:  Redirect?

14       MR. BECKER:  No redirect, your Honor.

15       THE COURT:  Very good.  Thank you, Mr. Stevashain.

16  And thanks to our interpreter.  You are now both excused.

17      The government may call its next witness.

18       MR. BECKER:  Your Honor, we just have a request for

19  judicial notice and regarding an exhibit that would support

20  that request for judicial notice.  We're happy to make this

21  outside the presence of the jury or within, however the Court

22  would like us to proceed.

23       THE COURT:  Do you anticipate --

24       MR. BECKER:  Or just a sidebar, it's strictly related

25  to --

1           THE COURT:  Do you anticipate resting after this?

2           MR. BECKER:  We do, your Honor.

3           THE COURT:  Then I'm going to allow the jury to take

4    their second and final break because I need to talk to the

5    lawyers about a few other things in any event.

6        Please reconvene in the jury room at 3:40, and we'll

7    continue at that time.

8           (Jury out at 3:25 p.m.)

9           THE COURT:  Please be seated.

10          MR. BECKER:  First, thank you for allowing me to be

11   absent to prep that witness, your Honor.  He traveled 20 hours

12   to get here and literally just arrived.

13       The judicial notice request that we have just relates to

14   the universal coordinated time and the conversion to Eastern

15   Standard Time.

16       I would ask the Court to receive one exhibit, and that is

17   Exhibit No. 43, which I'll -- it's in the binder, also on the

18   screen.

19       It's just a printout from the website of the National

20   Institute of Science and Technology which we would proffer to

21   be a reasonable government source that is, I think, not

22   capable of being contradicted in support of such a request.

23       The exhibit itself is a three-page exhibit, just

24   explaining time zones, as well as the conversion of universal

25   coordinated time to eastern standard and eastern daylight time

1  and at what times of the year that would take place.

2       And so we would request that the Court receive this

3  exhibit as from a reliable source, the NIST.gov, and then to

4  take judicial notice of the fact that Eastern Standard Time is

5  UTC minus five and eastern daylight time is UTC minus four.

6            THE COURT:  Any objection to Exhibit 43?

7            MR. BERRY:  No, your Honor.

8            THE COURT:  Exhibit 43 is received.

9       And I will take judicial notice of the information in

10  Exhibit 43, including the conversion of eastern daylight time

11  as set out in the chart that appears on the third page of the

12  exhibit.

13       I guess that refers -- well, eastern standard and eastern

14  daylight.

15            MR. BECKER:  Yes, your Honor.

16            THE COURT:  Okay.  Then if -- and I understand that

17  you will be resting now.

18       Would you make your rest at this point in time and then

19  redo it in front of the jury so that I can hear motions?

20            MR. BECKER:  Sure.  That's fine, your Honor.  Upon

21  the admission of this and with the understanding the Court

22  would take judicial notice of it in front of the jury, the

23  government would rest its case in chief.

24            THE COURT:  Very good.

25       Motions from the defense?

```
 1            MR. BERRY:  Your Honor, at this time the defense

 2    would move for a directed verdict.  The government has not

 3    made a prima facie case for the -- for all seven counts.

 4            I think Count I, specifically three individuals act -- or

 5    more acting in concert for this -- to make a prima facie case.

 6    This is a child exploitation enterprise.  I believe that that

 7    has not been met.

 8            As far as Counts II and III, the conspiracy counts, there

 9    is no evidence that Mr. DeFoggi was part of any agreement to

10    either advertise or distribute child pornography.

11            And Counts IV through VII, the images that Mr. DeFoggi

12    allegedly accessed were not -- well, there was no evidence

13    that they were found on any computer devices belonging to

14    Mr. DeFoggi, and I would argue on those bases.

15            The government has failed to prove a prima facie case on

16    all counts and ask the Court to dismiss.

17            THE COURT:  And I find that the government has

18    presented sufficient evidence from which a reasonable jury

19    could conclude that the government has met its burden with

20    respect to the elements of each of the charges.  So the motion

21    is denied.

22            We will proceed with the presentation of the defendant's

23    case at 3:40.

24            (Recess taken at 3:30 p.m.)

25            (At 3:44 p.m. on August 21, 2014, with counsel for the
```

1    parties and the defendant present, and the jury NOT present,

2    the following proceedings were had:)

3            THE COURT:  Do we need to discuss anything before the

4    jury enters?

5            MR. NORRIS:  I think so.

6            MR. BERRY:  Your Honor, the defense -- we have two

7    witnesses now.  We have an additional witness, a Mr. Bright

8    who is to appear via video teleconference.  My understanding

9    is we're setting up from his location and this location so

10   it's better he goes tomorrow.

11       I anticipate that Mr. DeFoggi will testify as well.  But

12   what I would like to do probably is after we've finished these

13   two witnesses, if the Court would allow, if we have time to

14   start the jury instruction conference or start discussing

15   that, and then begin with Mr. Bright tomorrow and then finish

16   with Mr. DeFoggi.

17           THE COURT:  How long do you anticipate that those two

18   witnesses will take?

19           MR. BERRY:  I think we would be done by noon

20   tomorrow, your Honor, at the latest.

21           THE COURT:  Okay.  I just want to make sure we have

22   time for closing and jury instructions.  It's fine if the jury

23   comes back and continues deliberating on Tuesday -- although I

24   might have to move them a different quarters.

25       And I had told them that they would not be working

1    on Monday so they may have plans for Monday.  If they don't

2    have plans for Monday, I could have them come back and start

3    deliberating on Monday.

4            COURTROOM DEPUTY:  Your Honor, they did ask me today

5    if they would have to come on Monday and I told them I didn't

6    think they would have to.

7            THE COURT:  Well, I won't make them come if anyone

8    has a conflict or other plans because I told them they

9    wouldn't have to work on Monday.

10       All right.  Well, we will have draft jury instructions

11   available for you before you leave today.  I don't want to

12   have a jury instruction conference until the trial is closed.

13       So we'll have an informal conference when the trial is

14   closed, and then we'll have an on-the-record opportunity for

15   objections once the instructions are in final form.  But we

16   will do that tomorrow.

17       Mr. Norris?

18           MR. NORRIS:  I anticipate one issue that may come up,

19   and that is I understand they're planning on calling a

20   Christopher Casto who testified before a grand jury in

21   Maryland about related matters, specifically about the matters

22   of the stuff that was found in the basement.

23       He asked for a lawyer at that time and was given a

24   lawyer.  I don't know at what level or at what point somebody

25   needs to apprise him of his Fifth Amendment right as he

1    testifies today, whether that's something the defense counsel

2    is planning on doing, or whether it's something that's going

3    to come up in the middle of his testimony when he realizes

4    that he may be one of one or one of two people that are

5    fingered as other possible suspects in this matter.

6            THE COURT:  And Mr. Berry, do you know if this

7    witness has a lawyer currently?

8            MR. BERRY:  Your Honor, this witness -- there was a

9    grand jury testimony.  I believe he had an attorney for that a

10   few months back.

11       I would note that he was actually subpoenaed by the

12   government to be one of their witnesses.  We also subpoenaed

13   him.  So I suppose if anybody knows whether he is in any

14   jeopardy of being prosecuted, it would be the government.  So

15   I don't know.

16           MR. NORRIS:  That's not the issue.

17           THE COURT:  I think I have to assume he's in

18   jeopardy, at a minimum --

19           MR. KALEMKIARIAN:  Your Honor, Mr. Casto is currently

20   in the courtroom.  I would ask that he leave at this point.

21           THE COURT:  Okay.  Thank you.

22       Well, we know what the issue is.  And when he is called,

23   I may ask him a few questions about whether he's represented

24   by counsel and whether he's been advised of his Fifth

25   Amendment rights, and then we'll proceed.

1          Okay.  Let's bring in the jury.

2               MR. BECKER:  Judge, just to be clear, he did assert

3      those rights previously.  So when he was represented, he

4      asserted a Fifth Amendment right and refused to testify before

5      a grand jury without immunity, just so the record is clear on

6      that.

7               THE COURT:  Okay.

8          (Jury in at 3:50 p.m.)

9               THE COURT:  Please be seated.

10         Any further evidence from the government?

11              MR. BECKER:  No, your Honor.  Just with the admission

12     of Government Exhibit -- I apologize.

13              THE COURT:  43?

14              MR. BECKER:  Government Exhibit 43 and request that

15     the Court take judicial notice.

16         The government would rest at that point.

17              THE COURT:  Exhibit 43 is received.

18         This is one of the matters that we had discussed outside

19     of your presence, and there was no objection to Exhibit 43.

20     It makes reference to certain conversions of time, such as

21     Eastern Standard Time or eastern daylight time into universal

22     time.  And I take judicial notice of Exhibit 43 and the

23     conversion specifically laid out on page 3 in the chart on

24     Exhibit 43.

25         Does the government rest?

```
 1              MR. BECKER:  We do, your Honor.

 2              THE COURT:  Very good.

 3         The defense may proceed with its presentation of

 4     evidence.

 5              MR. KALEMKIARIAN:  The defense would call Dale

 6     Bounds, your Honor.

 7              THE COURT:  Very good.

 8         Mr. Bounds, if you'll please come forward to the

 9     courtroom deputy, she will swear you in.

10              COURTROOM DEPUTY:  Please state your full name for

11     the record and spell your last.

12              THE WITNESS:  Jimmy Dale Bounds, B-o-u-n-d-s.

13              JIMMY DALE BOUNDS, DEFENDANT'S WITNESS, SWORN

14                       DIRECT EXAMINATION

15     BY MR. KALEMKIARIAN:

16     Q.   Good afternoon, Mr. Bounds.  Can you hear me all right?

17     A.   Yes.

18     Q.   Do you recognize Tim DeFoggi in the courtroom?

19     A.   Yes.

20     Q.   And how long -- approximately how long have you known

21     Mr. DeFoggi?

22     A.   Twenty-five years.

23     Q.   Twenty-five years.  And how would you characterize that

24     relationship, as friends or romantic or --

25     A.   Romantic, my life partner.
```

1    Q.   And you -- have you lived together most of that time?

2    A.   The entire time.

3    Q.   The entire time, all 25 years?

4    A.   (Witness nods in the affirmative.)

5         THE COURT:   You have to answer audibly.

6    A.   Sorry.  The entire time, the whole -- well, except for

7    the time that he's been away in --

8    BY MR. KALEMKIARIAN:

9    Q.   That's right.  Any yes or no answers --

10   A.   Yes.

11   Q.   You have to -- they have to be spoken.

12        So you would say you've lived together -- as a matter --

13   you would know -- you would say -- would you say --

14        COURT REPORTER:   Sir...

15        MR. KALEMKIARIAN:   Sorry.

16   BY MR. KALEMKIARIAN:

17   Q.   Would you say that you know Tim pretty well.

18   A.   Yes.

19   Q.   And are you aware of the allegations that are -- that

20   Mr. DeFoggi is facing?

21   A.   Yes.

22   Q.   In all of those 25 years and as well as you know him, did

23   you ever see or hear or were made aware of any indication that

24   Mr. DeFoggi might have been involved with the types of

25   allegations with which he's being charged?

1   A.    No.

2   Q.    And why is that?

3   A.    I know him as well as I know myself.  I know him probably

4   better than he knows himself.

5   Q.    And are you -- have you ever -- have you ever been faced

6   with a situation in which Mr. DeFoggi expressed an attitude

7   towards child abuse or child sexual abuse?

8   A.    Yes.

9   Q.    Can you describe how he reacted or how he has reacted?

10  A.    He was outraged that someone would hurt someone -- that

11  someone would hurt a child.

12  Q.    And did that come up -- was that a sentiment that was

13  repeated over time?

14  A.    There was an incident in West Virginia where a family

15  friend was -- a younger person was beaten by an older boy and

16  put in the hospital.  And the Child Protective Services did

17  nothing because this young man was on the football team, they

18  didn't want to ruin his record.

19        And then in New Mexico, he witnessed --

20              MS. CHANG:  Your Honor, his response is hearsay.

21              MR. KALEMKIARIAN:  I will withdraw the question.

22              THE COURT:  All right.  Sustained -- withdrawn,

23  doesn't matter.

24  BY MR. KALEMKIARIAN:

25  Q.    Now, I will switch gears a little bit.

1          During the -- in April of 2012, you were working

2     full-time, were you not?

3     A.   Correct, yes.

4     Q.   And do you recall for whom you were working?

5     A.   Calico.

6     Q.   And in what capacity were you with Calico?

7     A.   At that time I was the labor coordinator.

8     Q.   And that was a full-time position?

9     A.   Yes.

10    Q.   Can you describe -- does that mean -- can you describe

11    the hours that you worked, including travel time?

12    A.   With my hour-and-a-half commute, probably about 12 or 13

13    hours a day.

14    Q.   So you would leave approximately what time in the

15    morning?

16    A.   By 7:30.

17    Q.   And then you would -- you would arrive 7:30 at --

18    A.   7:30 to 8 o'clock at night I would get home.

19    Q.   All right.  And at the time, Tim was working full-time as

20    well, correct?

21    A.   Yes.

22    Q.   Now, there was also a third person living with you; is

23    that correct?

24    A.   Yes.

25    Q.   And who was that person?

1    A.    Chris Casto.

2    Q.    And how would you characterize his relationship with you

3    and Tim?

4    A.    Child.

5    Q.    A child.

6    A.    Our son.

7    Q.    During approximately April 2012, was Mr. Casto working?

8    A.    No.

9    Q.    No part-time jobs or -- he just wasn't working at all?

10   A.    No, he was not.

11   Q.    So he was -- was he at home most of the day?

12   A.    Yes.

13   Q.    He wasn't in school?

14   A.    No.

15   Q.    Okay.  Now, let's talk about the -- you know, one of the

16   subjects in this case are the computers in the home.  There

17   were at least two in the home, were there not?

18   A.    Yes.

19         (Off-the-record discussion had.)

20   BY MR. KALEMKIARIAN:

21   Q.    And one of those -- excuse me.

22         If one of those computers malfunctioned or needed to be

23   serviced in such a way, would you have been comfortable or

24   would you have asked Chris -- well, would you have repaired

25   those or maintained those yourself?

1   A.   No.

2   Q.   Would you have asked Mr. DeFoggi to do it possibly?

3   A.   Either Tim or Chris, one of the two.

4   Q.   So you would -- that was going to be my next question.

5   You would ask Chris to maintain those computers as well

6   possibly.

7   A.   Sometimes.

8   Q.   Was he -- would you describe him then as -- describe

9   Chris as at least computer literate?

10   A.   Yes, to a point.

11   Q.   Not an expert, but at least you'd be comfortable in

12   saying, "There's a problem, can you look into this?"

13   A.   Yes.

14   Q.   So if there was a laptop that was upstairs on the morning

15   when the house was -- when the FBI agents came into the

16   house --

17        MS. CHANG:  Objection, your Honor, the questions

18   continue to be leading in fashion.

19        THE COURT:  I'll just ask that the questions be

20   phrased as a question.  And counsel may finish the question

21   before the objection is posed.  I can't tell at this junction

22   whether it's leading or not.

23        MR. KALEMKIARIAN:  I can rephrase the question.

24        THE COURT:  All right.

25   BY MR. KALEMKIARIAN:

 1    Q.    When the FBI agents came into the home, was there a

 2    computer up -- in the living area on the main level, a laptop?

 3    A.    I don't know.

 4    Q.    There was -- are you aware of a laptop by -- an ASUS

 5    brand that Mr. DeFoggi and Mr. Casto might have used?

 6    A.    Yes.

 7    Q.    Did you also use that computer, Mr. Bounds?

 8    A.    Yes.

 9    Q.    What did you use that computer for?

10    A.    E-mail and social -- a little bit of social stuff I did.

11    Q.    Did you spend a lot of time on that computer?

12    A.    Mostly reading.

13    Q.    Okay.  Now, there was a second computer -- are you

14    familiar with -- if I use the term desktop computer, are you

15    familiar with that term?

16    A.    Meaning laptop or --

17    Q.    I'm sorry.  You would have, you know, like maybe a tower,

18    maybe two feet tall, you know, sits on the ground, not --

19    A.    Oh, yes.

20    Q.    -- portable?

21          Okay.  Are you aware of a desktop computer that was in

22    the home as well at the same time?

23    A.    Yes.

24    Q.    And where was that computer located?

25    A.    In the basement.

1    Q.   Was that -- was there anybody living in the basement at

2    that time?

3    A.   It was a family room, yes.

4    Q.   Did anybody sleep in the basement?

5    A.   Chris did once in a while, yes.

6    Q.   Okay.  Did you ever see -- did you ever see anybody use

7    the eMachines desktop in the basement?

8    A.   No.

9    Q.   Did you ever see Tim use that desktop in the basement?

10   A.   No.

11          MR. KALEMKIARIAN:  I don't have any other questions

12   at this time.

13          THE COURT:  Cross-examination?

14                         CROSS-EXAMINATION

15   BY MS. CHANG:

16   Q.   Now, Mr. Bounds, you said that you'd been in a romantic

17   relationship with the defendant for 25 years, correct?

18   A.   Yes.

19   Q.   And you care about his well-being, don't you?

20   A.   Yes.

21   Q.   You don't want him to be convicted, do you?

22   A.   No.

23   Q.   Now, in the 25 years that you were living with the

24   defendant and in a relationship with him, did you have a cat?

25   A.   A what?

1    Q.   A cat.

2    A.   Yes.

3    Q.   What was the name of the cat?

4    A.   Toona.

5    Q.   Now, on direct examination you were asked about an

6    instance of child abuse now -- that Mr. DeFoggi would feel

7    outraged towards.  Now, was that physical child abuse?

8    A.   Yes.

9    Q.   Now, the nature of that abuse was of an older adolescent

10   being beaten up by another older adolescent, correct?

11   A.   Correct, one of them.

12   Q.   You also said that you worked 12 to 13 hours a day,

13   correct?

14   A.   Yes.

15   Q.   And you would leave the house around 7:30 a.m., correct?

16   A.   Yes.

17   Q.   And so what time would you usually wake up?

18   A.   Around 6:30, 7.

19   Q.   And on the day of April 9, 2013, you were asleep when the

20   FBI entered your home, correct?

21   A.   Yes.

22   Q.   They entered your home and you were woken up by a

23   flashlight in your face, correct?

24   A.   Yes; loud noises, crashing and banging.

25   Q.   You don't know what was going on downstairs at the time

1    you woke up, do you?

2    A.   No.

3    Q.   The laptop we were talking about was primarily used by

4    Mr. DeFoggi, correct?

5              MR. KALEMKIARIAN:  Objection, speculation.

6              THE COURT:  Overruled.  He may answer.

7    A.   I don't know.  We all used it equally.

8    BY MS. CHANG:

9    Q.   Now, you've previously --

10              MS. CHANG:  Court's indulgence.

11    BY MS. CHANG:

12    Q.   Now, did you previously testify in a grand jury in the

13    state of Maryland under oath?

14    A.   Yes.

15    Q.   And was that around March of this -- actually, I'm sorry,

16    February of this year?

17    A.   I think so, yes.

18    Q.   You were under a legal obligation to testify truthfully,

19    correct?

20    A.   Yes.

21    Q.   Now, when you were asked how often Mr. DeFoggi used the

22    laptop, you answered that he usually used it daily, on a daily

23    basis, correct?

24    A.   Yes.

25    Q.   You also testified that you only used it on occasion to

1    check your e-mail, correct?

2    A.    Usually each evening.

3    Q.    Now, on that date of your grand jury testimony, you said,

4    quote, I check my e-mail and just keep up with friends on

5    Facebook-type things once in a while, when you were asked

6    about your use of the laptop, correct?

7    A.    Yes, when I had time.

8    Q.    You also testified that -- when you were asked about

9    Christopher Casto's use of the laptop, you also testified that

10   you never observed him using that laptop, correct?

11   A.    Not to my knowledge -- not that I know of, but...

12   Q.    Now, your e-mail -- just to go back to your e-mail --

13   just to clarify for the jury, Mr. Bounds, in your grand jury

14   testimony, you said that you used the laptop to check your

15   e-mail on occasion; but just now, you testified that you use

16   it as equally, as frequently, as daily as Mr. DeFoggi did,

17   correct?

18   A.    When I had time, correct.

19   Q.    Now, to continue on the e-mail question, your e-mail is

20   bounds_jd@hotmail.com?

21   A.    Correct.

22   Q.    And you have no other user names or e-mail addresses

23   other than that, right?

24   A.    No.

25   Q.    And you knew nothing about Tor before the FBI agents

1    arrived at your home that day, correct?

2    A.   No, I didn't.

3    Q.   Did you ever use Tor?

4    A.   No.

5    Q.   Now, you said that you come home around 7:30 p.m. in the

6    evening, correct?

7    A.   Correct.

8    Q.   So you wouldn't know what's happening in the house before

9    you arrive at the house; is that right?

10   A.   Correct.

11   Q.   Mr. Bounds, you don't ever -- you have never used the

12   user name fuckchrist, correct?

13   A.   No.

14   Q.   And you haven't used the user name PTasseater?

15   A.   No.

16   Q.   And you don't have a Yahoo profile, do you?

17   A.   No, I don't.

18   Q.   And you have no knowledge of whether Chris Casto has any

19   of these user names as well, do you?

20        MR. KALEMKIARIAN:  Objection, beyond the scope of

21   direct examination.  I -- at never point -- at no point did I

22   ask about specific user names or specific -- or any specific

23   e-mail addresses that Mr. Bounds might have used.

24        THE COURT:  Overruled.  You may answer.

25   A.   What was the question again?

1          THE COURT:  The question is:  And you have no

2     knowledge of whether Chris Casto has any of these user names

3     as well, do you?

4     A.   No, I don't.

5     BY MS. CHANG:

6     Q.   And you have no knowledge or experience with a website

7     called PedoBook, do you?

8     A.   No.

9     Q.   Do you have any knowledge or experience with the website

10    OPVA, otherwise known as OnionPedo Video Archive?

11    A.   No.

12    Q.   Do you have any knowledge or experience of a website

13    called Lolita City?

14    A.   No.

15    Q.   You don't even know what a Tor directory is, do you?

16    A.   I do now because I've looked it up; but before, no.

17    Q.   Before when?

18    A.   Before all this proceeding started.

19    Q.   And do you mean when the FBI arrived at your house on

20    April 9, 2013?

21    A.   Correct, yes.

22    Q.   Now, you said that you use the laptop on occasion and you

23    know of a desktop computer in the basement, correct?

24    A.   Yes.

25    Q.   Have you ever heard of the program CCleaner?

1    A.    No.

2    Q.    What about the program Eraser?

3    A.    Yes, I've heard of that.

4    Q.    And how have you heard of that?

5    A.    Just advertising and general knowledge.

6    Q.    So at no point did you yourself install CCleaner or

7    Eraser onto any of the computers in your home, correct?

8    A.    No.

9    Q.    Now, just to go back to the details of April 9, 2013, you

10   were woken up by the FBI agents, correct?

11   A.    Uh-huh, correct.

12   Q.    And that's the first thing that happened that morning for

13   you, correct?

14   A.    Yes.

15   Q.    At no point were you downloading a video on the laptop,

16   were you?

17   A.    No.

18   Q.    At no point were you ever on the Tor browser that day,

19   were you?

20   A.    I'm sorry?

21   Q.    At no point were you on the Tor browser that day?

22   A.    No.

23   Q.    Have you ever been on the Tor browser?

24   A.    No.

25          MS. CHANG:  Court's indulgence.

```
 1              (Off-the-record discussion had.)

 2      BY MS. CHANG:

 3      Q.   Now, Mr. Bounds, when you were home, did you monitor the

 4      computer use of Chris Casto or Tim DeFoggi?

 5      A.   No.

 6      Q.   At any point did you monitor or look over the shoulder of

 7      Mr. DeFoggi while he was on the computer?

 8      A.   No.

 9      Q.   Now, during direct examination you said that if there was

10      a malfunction on the computer, you would usually hand it off

11      to Mr. DeFoggi; is that right?

12      A.   Either that or Geek Squad.

13      Q.   And Geek Squad is what?

14      A.   The people that work for Best Buy that fix viruses and

15      things like that.

16      Q.   You would describe your proficiency in computers as

17      minimal; is that right?

18      A.   Yeah -- yes.

19      Q.   Have you ever heard of the website called IMGSRC.ru?

20      A.   Not before this, no.

21      Q.   And by before all this, you mean when the FBI arrived at

22      your house on April 9th?

23      A.   Correct.

24      Q.   Do you even know whether Tor browser was installed on

25      your laptop?
```

1    A.   Say again?

2    Q.   Do you even know if Tor browser was installed on the

3    computer?

4    A.   No, I do not.

5    Q.   Now, you just said if there is a malfunction, you usually

6    go to Geek Squad or Mr. DeFoggi.  Were you responsible for any

7    of the programs installed on the laptop?

8    A.   Only games, PC games.

9    Q.   What kind of games?

10   A.   Like city building and things like that.

11   Q.   Now, let me just move to the desktop downstairs.  Timothy

12   DeFoggi had access to that desk computer, correct?

13   A.   Yes.

14   Q.   Now, did you ever use the computers in the home to access

15   child pornography?

16   A.   No.

17   Q.   Have you ever accessed child pornography?

18   A.   No.

19   Q.   Now, can I ask you about the wireless network in your

20   home?  Was it secured, as in password protected?

21   A.   I don't know.

22   Q.   So let me just ask you about Mr. DeFoggi's usual schedule

23   since you've lived with him for 25 years and were in a

24   relationship with him.

25        You said that you usually leave for work around 7:30; is

1    that right?

2    A.   Correct.

3    Q.   When would Mr. DeFoggi leave for work?

4    A.   Probably about half an hour before that.

5    Q.   And that would make it seven o'clock a.m.?

6    A.   About 6:30, seven o'clock, somewhere in there.

7    Q.   So before that time, he would be home, correct?

8    A.   Yes.

9    Q.   With access to the computers?

10   A.   Yes.

11   Q.   Just a few questions about Mr. Casto.  You say Mr. Casto

12   is your son?

13   A.   Yes.

14   Q.   And is he your adopted son?

15   A.   Tim's adopted son.

16   Q.   And how long have you known Christopher Casto?

17   A.   Fifteen years.

18   Q.   And for how long has he lived with you during that time?

19   A.   Probably about seven years.

20   Q.   And how old is Mr. Casto right now?

21   A.   Twenty-five.

22   Q.   And to your knowledge, does he have any learning

23   disabilities?

24   A.   I would have to say yes, in a way.

25   Q.   And what do you mean?

 1          MR. KALEMKIARIAN:  Objection, relevance.

 2          THE COURT:  Overruled.  He may answer.

 3   A.   He's not what a person would consider a book learner.

 4   BY MS. CHANG:

 5   Q.   Does that mean he has trouble reading?

 6   A.   No.  It's just that he's not one to sit in a classroom

 7   and learn things.

 8   Q.   Does that mean he has trouble focusing?

 9   A.   No.

10   Q.   What about writing, is he very proficient at writing?

11   A.   Yes.  His writing is quite tiny, but yes.

12   Q.   I'm sorry, say that --

13   A.   His writing is quite tiny.

14   Q.   Is it difficult for him to write?

15   A.   No.

16   Q.   So what do you mean exactly by learning disability?

17   A.   He would probably benefit better in a university

18   situation where it's oratory instead of in a situation with

19   books and learning something on your own with homework.

20   Q.   When you say "oratory", is it fair to say he has a better

21   time hearing conversations rather than writing them down?

22   A.   Yeah, I'd have to say that, yeah.

23   Q.   And it wouldn't be fair to say that chatting online,

24   writing long messages and exchanging them with people online

25   would be difficult for Mr. Casto?

```
 1              MR. KALEMKIARIAN:   Objection, speculation.

 2              THE COURT:   Overruled.

 3   A.    No.

 4   BY MS. CHANG:

 5   Q.    But you just testified that he would have trouble with

 6   writing things out as opposed to hearing them, correct?

 7   A.    Not that he would have trouble, it's just the

 8   willingness -- the willingness to do so.

 9   Q.    And does that mean that he -- he wouldn't take steps to

10   do -- writing out conversations as much as he would in

11   engaging in them audibly?

12   A.    I'm not following you on that one.

13   Q.    Oh, I'm sorry.  I'll rephrase.

14         Now, does that mean that you think that he would more

15   likely engage in audible conversations as opposed to written

16   conversations, correct?

17   A.    Yes, I think he would prefer that, yes.

18   Q.    Now, do you ever e-mail with Chris Casto?

19   A.    No.

20   Q.    So do you know of any of his user names?

21   A.    No, I don't.

22   Q.    What about any of his aliases on his gaming systems?

23   A.    Not really, no.

24   Q.    So you don't know of any user names, screen names that he

25   uses outside of his actual name, Chris Casto, correct?
```

1    A.    No.  The only one I've ever seen is, like, a character

2    name that he uses on a game as a doctor.

3    Q.    Okay.  What's the name of that character?

4    A.    Dr. Retner.

5    Q.    Repner?

6    A.    Retner.

7    Q.    You've never associated PTasseater or fuckchrist with

8    Chris Casto, correct?

9    A.    No.

10   Q.    You've never even heard him mention those names to you --

11   A.    No.

12   Q.    -- is that right?

13         Now, did you have any -- did you ever look at the

14   Internet browsing history on your computers in the household?

15   A.    No, I wouldn't know how.

16   Q.    Were there any websites that you bookmarked on any of the

17   computers in the house?

18   A.    I had some on miniatures and stuff I had done to

19   Favorites.

20   Q.    What do you mean by "miniatures"?

21   A.    Dollhouse miniatures and miniature buildings and things

22   like that, architecture.

23   Q.    You were bookmarking websites that --

24   A.    Footnotes, star thing.

25   Q.    So you were bookmarking websites that would take you to

 1    content relating to dollhouses, right?

 2    A.   Uh-huh.

 3    Q.   Did you have any other kind of bookmarks?

 4    A.   No.

 5    Q.   Now, did you and Mr. DeFoggi ever share an e-mail

 6    account?

 7    A.   No.

 8    Q.   Ever share any other online accounts?

 9    A.   No.

10    Q.   Did you ever share any passwords?

11    A.   No.

12              MS. CHANG:   Court's indulgence.

13         (Off-the-record discussion had.)

14    BY MS. CHANG:

15    Q.   Just a few more questions, Mr. Bounds.

16         What was Christopher Casto's schedule like?

17    A.   Meaning -- I'm sorry.

18    Q.   Was he home during the day?

19    A.   Yes, he was.

20    Q.   Was he usually home all day long?

21    A.   He slept most of the day, yes.  He's a night owl.

22    Q.   And you were the one that would leave the house for work,

23    correct, outside of Mr. DeFoggi?

24    A.   Yes.

25    Q.   And again, you would leave around 7:30 in the morning and

1    return at 7:30 at night, correct?

2    A.   About then, yes.

3    Q.   And what time would Mr. DeFoggi usually get home?

4    A.   Depending on work, anywhere between 3 and 5.

5    Q.   So you weren't at the home between the hours of 3 and 5

6    when Mr. DeFoggi was home with access to the computers,

7    correct?

8    A.   No.

9    Q.   So you don't know what he was doing at that time, right?

10   A.   No.

11            MS. CHANG:  No further questions, your Honor.

12            THE COURT:  Redirect?

13            MR. KALEMKIARIAN:  Just a few, your Honor.

14                      REDIRECT EXAMINATION

15   BY MR. KALEMKIARIAN:

16   Q.   Did Chris have a nickname that you knew of?

17   A.   Scooter.

18   Q.   Scooter?  Did you or Mr. DeFoggi or others call him

19   Scooter?

20   A.   It was a self-styled nickname.  He called himself

21   Scooter.

22   Q.   Does the name Scooter_fucktheworld mean anything to you?

23   A.   I think that has something to do with one of his gaming

24   things.

25   Q.   You're familiar with that term?

1     A.   Yes.

2     Q.   And would it be fair to say that you would ascribe that

3     term to Mr. Casto himself?

4     A.   Yes.

5     Q.   Okay.  Now, just to clarify something I thought I -- you

6     described -- did you also describe during the

7     cross-examination of -- describe Chris as a night owl?

8     A.   Yes.

9     Q.   Meaning that he stayed up at night?

10    A.   Correct.

11    Q.   And was he playing video games or -- I guess you don't

12    know what he was doing, I assume.  You were asleep.

13    A.   Yeah.  I usually went to bed and whatever he was doing...

14    Q.   Okay.  Now I want to ask you about that laptop computer

15    that we discussed earlier, the ASUS.  You're familiar with

16    that?

17    A.   Yes.

18    Q.   When you sat down and opened it up, in order to use it,

19    did you have to put in a password?

20    A.   No.

21    Q.   Do you know if Chris had to put in a password to use it?

22    A.   No, he wouldn't have.

23    Q.   What about Mr. DeFoggi?

24    A.   No.

25    Q.   If I went over there and tried to use it, would I have to

1    put in a password?

2    A.    No.

3              MR. KALEMKIARIAN:  No further questions.

4              THE COURT:  All right.  Thank you, Mr. Bounds.  You

5    may stand down.

6         Defense may call its next witness.

7              MR. KALEMKIARIAN:  We'll call Chris Casto.  He's

8    outside so --

9              MR. BECKER:  Your Honor, may we have a sidebar?

10             THE COURT:  Yes.

11        (Bench conference on the record.)

12             THE COURT:  Just to let you know, what I plan to do

13   is allow him to be sworn in, have him state his name.  I'll

14   excuse the jury and I'll ask him a few questions about whether

15   he's represented by counsel, if he's been advised of his Fifth

16   Amendment rights.  And if you have some questions for him

17   outside the presence of the jury on that subject, you know,

18   you'll have an opportunity to ask him those, all right?

19             MR. NORRIS:  Thank you.

20        (End of bench conference.)

21             THE COURT:  Mr. Casto, if you'll please come forward

22   to the courtroom deputy here on my right, she'll swear you in.

23             COURTROOM DEPUTY:  Please state your full name for

24   the record and spell your last.

25             THE WITNESS:  Christopher L. Casto, C-a-s-t-o.

1            CHRISTOPHER CASTO, DEFENDANT'S WITNESS, SWORN

2          THE COURT:  At this juncture, I'm going to ask the

3 jury to leave the courtroom and go back in the jury

4 deliberation room for a few minutes.  The lawyers and I have a

5 few questions that we need to ask Mr. Casto while you're not

6 in the room.

7       (Jury out at 4:30 p.m.)

8          THE COURT:  Mr. Casto, are you here under a subpoena?

9          THE WITNESS:  Yeah.

10          THE COURT:  Okay.  Are you represented by a lawyer?

11          THE WITNESS:  No.

12          THE COURT:  Were you represented by a lawyer earlier

13 in connection with the investigation of this case?

14          THE WITNESS:  Yeah.

15          THE COURT:  Who was your lawyer earlier?

16          THE WITNESS:  Michael -- I can't pronounce his last

17 name.

18          THE COURT:  All right.  Was that lawyer appointed for

19 you by the Court?

20          THE WITNESS:  Yeah.

21          THE COURT:  Did you testify in connection with a

22 grand jury proceeding?

23          THE WITNESS:  Yeah.

24          THE COURT:  And at that point in time, did your

25 lawyer advise you about your right not to incriminate

1    yourself; in other words, your right to invoke your Fifth

2    Amendment privilege against self-incrimination?

3              THE WITNESS:  Yeah.

4              THE COURT:  And did you decline to answer some

5    questions at the grand jury investigation after you got that

6    advice?

7              THE WITNESS:  No.

8              THE COURT:  You went ahead and answered the

9    questions?

10             THE WITNESS:  Yeah.

11             THE COURT:  During this proceeding, if lawyers on

12   either side ask you a question and you think that by answering

13   the question you might be admitting to some criminal activity,

14   you do have the right to invoke the Fifth Amendment privilege

15   and to tell me that and to indicate to me that you don't want

16   to answer the question because it might incriminate you.  Do

17   you understand that?

18             THE WITNESS:  Yeah.

19             THE COURT:  A few other questions, just to give me a

20   better understanding of your understanding of this right.

21        Can you tell me what level of education you have?

22             THE WITNESS:  High school.

23             THE COURT:  Okay.  So you graduated high school?

24             THE WITNESS:  Yeah.

25             THE COURT:  All right.  And were you in any special

1      education classes?

2              THE WITNESS:  Yeah.

3              THE COURT:  All right.  When did the special

4      education classes begin?

5              THE WITNESS:  First grade.

6              THE COURT:  Okay.  So from the time you began school,

7      you were in special ed classes; is that right?

8              THE WITNESS:  Yeah.

9              THE COURT:  Have you ever been told what your reading

10     level is, like what grade level you can read at?

11             THE WITNESS:  They never told me.

12             THE COURT:  Okay.  Do you remember ever getting an

13     IQ test or being told what the IQ level is?

14             THE WITNESS:  I have no idea.

15             THE COURT:  Okay.  Can you read?

16             THE WITNESS:  Yeah.

17             THE COURT:  Okay.  And can you write?

18             THE WITNESS:  Yeah.

19             THE COURT:  All right.  Do you understand what I've

20     just told you about your right not to answer questions that

21     you think might cause you to confess to some criminal

22     activity?

23             THE WITNESS:  Yeah.

24             THE COURT:  Okay.  I'm going to ask the lawyers if

25     they have any further questions for Mr. Casto.

1            MR. NORRIS:  Just very briefly, your Honor.  And it

2       relates to this, Mr. Casto.  Do you understand the nature of

3       the charges that have been brought against the defendant?

4            THE WITNESS:  Sort of.

5            MR. NORRIS:  Sort of?  I'm more interested in whether

6       you understand the penalties that he faces as a result of

7       conviction on one or more of those.

8            THE WITNESS:  Not really.

9            MR. NORRIS:  Thank you.  That's all I have.

10           THE COURT:  Any questions from the defense outside

11      the presence of the jury?

12           MR. KALEMKIARIAN:  I don't have anything.

13           THE COURT:  All right.

14      Ms. Gomez, please bring in the jury.

15           MR. NORRIS:  Your Honor, there is an issue that's

16      come up.

17           THE COURT:  All right.  We'll wait.

18           MR. NORRIS:  I mean, I guess the question is if he

19      raises the Fifth at any time during this proceeding, then we

20      have certain things that we can do and say.  But if he plans

21      on raising the Fifth, that's the only thing that hasn't been

22      asked.  And I didn't ask it because I thought it would be --

23      well, I didn't think of it, so --

24           THE COURT:  Let me inquire a little bit further then.

25      Mr. Casto, do you understand the general nature of the

1   charges that were brought against Mr. DeFoggi?

2            THE WITNESS:  No, I haven't heard any of it, really.

3            THE COURT:  Okay.  Among other things, he's been

4   accused of having access to certain materials described as

5   child pornography and doing certain things in connection with

6   those materials.

7        When you are asked questions, do you anticipate that you

8   may need to -- well, I'm trying to think of how to phrase this

9   without --

10           MR. NORRIS:  Perhaps "require the assistance" --

11           THE COURT:  Do you anticipate that you will invoke

12  the right against self-incrimination, the Fifth Amendment

13  right?  Do you anticipate that you will decline to answer some

14  questions that might cause you to acknowledge access to child

15  pornography?

16           THE WITNESS:  What, you're saying if I had access?

17           THE COURT:  I'm asking -- I'm not going to ask you

18  directly if you had access.

19       But I'm going to ask you if you might invoke your

20  right of -- your Fifth Amendment right and decline to answer

21  certain questions about access to child pornography.  Do you

22  think you're going to need to do that?

23           THE WITNESS:  I have no idea.

24           THE COURT:  Okay.  I don't know how to explore it any

25  further, Mr. Norris.  If you wish to ask any other questions,

1    you may.  We just have to see how it goes.

2              MR. NORRIS:  Thank you.  That's all.

3              THE COURT:  Let's go ahead and bring in the jury.

4         (Jury in at 4:39 p.m.)

5              THE COURT:  You may inquire.

6                        DIRECT EXAMINATION

7    BY MR. KALEMKIARIAN:

8    Q.   Mr. Casto, can you understand me if I speak at this

9    volume?

10   A.   Yeah.

11   Q.   Mr. Casto, how long -- well, do you recognize the

12   gentleman sitting to my right?

13   A.   I'm sorry?

14   Q.   Do you recognize the gentleman sitting to my right?

15   A.   Yeah, it's my dad.

16   Q.   Okay.  And he's an adoptive dad, the adoptive dad?

17   A.   Yeah.

18   Q.   How long -- approximately how long have you known

19   Mr. DeFoggi?

20   A.   Fifteen years, something like that.

21   Q.   Fifteen years?  And how old are you now?

22   A.   Twenty-five.

23   Q.   And you currently live with Mr. Bounds, correct?

24   A.   Yeah.

25   Q.   Were you also -- how long have you lived with Mr. Bounds

1      and Mr. DeFoggi?

2      A.    Since I was 18.

3      Q.    So approximately -- since approximately 2006 or 2007?

4      A.    Yeah.

5      Q.    How did you meet Mr. DeFoggi?

6      A.    I used to live near him.

7      Q.    What level of education do you have?

8      A.    High school.

9      Q.    After high school, did you take any computer classes --

10     excuse me, any college classes?

11     A.    Yeah.

12     Q.    What type of classes did you take?

13     A.    Network.

14     Q.    Can you be a little bit more specific?  I'm sorry,

15     computer networking?

16     A.    Yeah.

17     Q.    Now, is that limited to just intranet or did it also

18     include Internet networking?

19     A.    It was Internet.

20     Q.    Okay.  Are you currently employed, Mr. Casto?

21     A.    Yeah.

22     Q.    And how so?

23     A.    At Calico.

24     Q.    Is that where Mr. Bounds works as well?

25     A.    Yeah.

1   Q.   Approximately how long have you worked at Calico?

2   A.   About a year, a little over a year.

3   Q.   Okay.  Now during April of 2012, were you employed with

4   Calico?

5   A.   No.

6   Q.   Were you employed at all at that time?

7   A.   No.

8   Q.   Okay.  Did Tim and Dale have employment at that time

9   during April of 2012?

10  A.   Yeah.

11  Q.   Was that full-time employment?

12  A.   Yeah.

13  Q.   So they were both gone most of the day?

14  A.   Yeah.

15  Q.   Approximately when did they leave in the morning and when

16  did they come back?

17  A.   Tim left bright and early, I'm not sure.  Dale was, I

18  guess, 8, 9:00 in the morning.

19  Q.   Okay.  And do you know when they returned home?

20  A.   Tim about 4 or 5, and Dale was about 6.

21  Q.   Okay.  So you were essentially alone during the day then.

22  There wasn't anybody in the home.

23  A.   Yeah.

24  Q.   What do you enjoy doing for fun, Mr. Casto?

25  A.   Playing video games.

1   Q.   Now, do you play those video games over the Internet?

2   A.   Yeah.

3   Q.   While you're playing those video games, do you interact

4   with other players?

5   A.   Yeah.

6   Q.   Do you interact with them via voice act -- you know,

7   microphone?

8   A.   Yeah.

9   Q.   And have you ever used -- do you use -- what gaming

10  system do you use?

11  A.   PlayStation.

12  Q.   Does it have a network that you use to play those games

13  on the Internet?

14  A.   Yeah, it's Sony Online Entertainment Network.

15  Q.   Does it have a messaging function on it?

16  A.   Yeah.

17  Q.   Did you ever use that to interact with other players?

18  A.   Yeah.

19  Q.   What type of video games were your favorite?

20  A.   D.C. Universal.

21  Q.   By D.C. Universal, do you mean the comic book characters?

22  A.   Yeah.

23  Q.   Did you -- when you -- you played these video games

24  interactive with other players, did you use your real name?

25  A.   Yes and no.  I mean, they know my real name, but it was a

1    different name shown.

2    Q.   What name did you use that was shown?

3    A.   Like character-wise or my ID?

4    Q.   Both.

5    A.   My ID was Scooter.  And my character's name at the time,

6    I think it was, like, Doctor or something.

7    Q.   If I said Dr. Rekner or something like that, does that --

8    A.   Retner.

9    Q.   Was Scooter a name that you used as a nickname for

10   yourself?

11   A.   Yeah.

12   Q.   Does the name Scooter_ftw mean anything to you?

13   A.   Yeah, that's my PSN.

14   Q.   Excuse me?

15   A.   PlayStation Network ID.

16   Q.   Is that the same name that would show up if you were

17   playing the video game?

18   A.   Depending on what game, yeah.

19   Q.   So say I was in the game and you killed me.  Would it say

20   Scooter_ftw killed whatever my name was?

21        MR. NORRIS:  Object to the form and leading

22   questions.

23        THE COURT:  Sustained.

24        MR. KALEMKIARIAN:  Okay.

25   BY MR. KALEMKIARIAN:

```
 1    Q.   How did that name Scooter_ftw show up in the game?

 2              MR. NORRIS:  Your Honor, I object --

 3    A.   Above my character's name.

 4              MR. NORRIS:  I object on relevance.

 5              THE COURT:  Overruled.  He may answer.

 6    A.   Above my character's name.

 7    BY MR. KALEMKIARIAN:

 8    Q.   And the _ftw, does that stand for anything or are those

 9    just random --

10    A.   For the world.

11    Q.   Excuse me?

12    A.   For the world.

13    Q.   For the world?  Oh, okay.

14         Now, on April 9, 2012 [sic], is that when FBI agents came

15    into the home, approximately, that date?

16    A.   Yeah, I guess.

17    Q.   Were you awake when they came in to the home?

18    A.   Yeah.

19              MR. NORRIS:  Your Honor, just for purposes of the

20    record, I believe it's actually '13, just so the record's

21    clear.

22              MR. KALEMKIARIAN:  Excuse me?

23              MR. NORRIS:  April 9th of 2013.

24              MR. KALEMKIARIAN:  Oh, I'm sorry.  I'm sorry.  That's

25    my fault.
```

1      BY MR. KALEMKIARIAN:

2      Q.    So on the day the FBI agents came in, you were awake,

3      correct?

4      A.    Yeah.

5      Q.    What were you doing when they came in?

6      A.    Playing video games.

7      Q.    Do you remember how long you had been playing video games

8      prior to them entering the home?

9      A.    All day.

10     Q.    Would that include the night prior -- let me rephrase

11     that.

12           Would that include the hours -- were you up the hours

13     prior to the FBI agents coming into the home?

14     A.    Yeah.  I was playing a video game, yeah.

15     Q.    Okay.  Was that common for you to be up at night playing

16     video games?

17     A.    Yeah.

18     Q.    Was there a desktop computer in the basement?

19     A.    Yeah.

20     Q.    Was that -- had you used that previously?

21     A.    Yeah.

22     Q.    Would you -- do you know the registered owner name that

23     would have been associated with that computer?

24     A.    I have no idea.

25     Q.    If you had set up that computer when it was first

 1    purchased, do you have any idea what that name -- what you

 2    might have used?

 3              MR. NORRIS:  Your Honor, calls for speculation.

 4              THE COURT:  Please rephrase.

 5              MR. KALEMKIARIAN:  I'll strike the question.

 6    BY MR. KALEMKIARIAN:

 7    Q.   Was that computer -- that desktop computer password

 8    protected?

 9    A.   I don't remember.

10    Q.   And that computer was located in the basement, correct?

11    A.   Yeah.

12    Q.   Do you know the make of the computer, what type it was?

13    A.   I don't remember.

14    Q.   Does the name eMachines mean anything to you?

15    A.   Yeah, I've heard of them before.

16    Q.   Is it possible that was the computer that was downstairs,

17    the model -- or make of the computer downstairs?

18    A.   Yeah.

19    Q.   Now, there was also a laptop upstairs, right?  Excuse me,

20    was there a laptop upstairs?

21    A.   Yeah.

22    Q.   Do you know the make or model of that computer?

23    A.   No.

24    Q.   Did Mr. Bounds ever use that laptop computer?

25    A.   I have no idea.

CASTO - DIRECT                                                      591

1    Q.   Did you ever use that laptop computer?

2    A.   Yeah.

3    Q.   What did you use that computer for?

4    A.   Surfing games at Best Buy, websites like that.

5    Q.   Okay.  Did you ever use that eMachines -- excuse me, the

6    desktop computer in the basement?

7    A.   Yeah.

8    Q.   And what did you use that for?

9    A.   Flight Simulator.

10   Q.   Excuse me?

11   A.   Flight Simulator.

12   Q.   Like an airplane simulator?

13   A.   Yeah.

14   Q.   Did anybody else use that computer?

15   A.   Yeah.

16   Q.   Do you remember talking to the FBI on approximately April

17   9, 2013, about that desk computer?

18        MR. NORRIS:  Objection.

19   A.   Yeah.

20        MR. NORRIS:  I withdraw it.

21   BY MR. KALEMKIARIAN:

22   Q.   Do you remember what you told them about who used that

23   computer?

24   A.   I'm sorry?

25   Q.   Do you remember what you told the FBI about who used that

1    desktop computer in the basement?

2    A.   I don't remember.

3    Q.   If I showed you -- if I showed you a report that

4    discussed what you told the FBI, would that maybe help you

5    remember?

6    A.   I mean, before or after I felt threatened?

7    Q.   I don't know at what time they interviewed you, but I --

8    A.   I was interviewed in the basement.  And I felt very

9    threatened if I didn't say something intimidating against my

10   dad --

11           MR. NORRIS:  Your Honor, I object --

12   A.   -- that I would --

13           MR. NORRIS:  This is a narrative.

14   A.   -- I would be locked up.

15           MR. NORRIS:  It's nonresponsive to the question.

16           THE COURT:  We're going to stop there.

17           MR. NORRIS:  I also object to improper impeachment

18   with the line of questioning at this point.

19           THE COURT:  Sustained.

20   BY MR. KALEMKIARIAN:

21   Q.   Did your brother or sister ever use that computer?

22   A.   My brother.

23   Q.   Where did your brother live?

24   A.   West Virginia.

25   Q.   Did you ever see anybody else using that computer?

1          MR. NORRIS:  By "that computer," your Honor, may I

2     have some -- to be sure that --

3          MR. KALEMKIARIAN:  I'm sorry.

4     BY MR. KALEMKIARIAN:

5     Q.   Did you ever see anybody else using that desktop in the

6     basement?

7     A.   No.

8     Q.   Would it be fair to --

9          (Off-the-record discussion had.)

10         MR. KALEMKIARIAN:  No further questions.

11         THE COURT:  Cross-examination?

12         MR. NORRIS:  Yes, your Honor.  Thank you.

13                       CROSS-EXAMINATION

14    BY MR. NORRIS:

15    Q.   Mr. Casto, I think you've already said this, but you

16    consider the defendant to be your father, correct?

17    A.   Yeah.

18    Q.   As a matter of fact, he is your father because he's

19    adopted you, correct?

20    A.   Yeah.

21    Q.   How old were you when he adopted you?

22    A.   Eighteen.

23    Q.   Why was it necessary to wait until you were 18 to be

24    adopted?

25    A.   'Cause it was legal.

1   Q.   I'm sorry?

2   A.   It was legal.

3   Q.   Okay.  So it was legal at 18 for him to adopt you.  Is

4   that because your mother did not consent to the adoption

5   before you turned 18?

6   A.   Well, because I could get on healthcare, that was one.

7   Q.   Well, did your mother object to your being adopted by

8   somebody else?

9   A.   No, I was adopted beforehand, too.

10  Q.   How old were you when you met the defendant?

11  A.   How old was I when I met him?

12  Q.   Yes.

13  A.   Ten.

14  Q.   Where were you living when you met him?

15  A.   Parkersburg, West Virginia.

16  Q.   Parkersburg, West Virginia?  Who were you living with

17  when you met him?

18  A.   My mother.

19  Q.   And did you know the defendant at any time before meeting

20  him?  Were you related to him or anything?

21  A.   We were neighbors.

22  Q.   How close of neighbors?

23  A.   Next door.

24  Q.   Do you have brothers and sisters -- I think you indicated

25  you do, right?

1    A.    Yeah.

2    Q.    Do you have a mother and a father?

3    A.    A mother.

4    Q.    How long did he continue to be a neighbor of yours when

5    you were 10 back in Parkersburg, West Virginia?

6    A.    Years.

7    Q.    All the years or did he move?

8    A.    He moved around a little bit.

9    Q.    Okay.  And when he moved around a little bit, would you

10   follow him?

11   A.    I'd visit, yeah.

12   Q.    What places would you visit with him at?  Where would you

13   go?

14   A.    Movies, restaurants.

15   Q.    In other cities after he moved?

16   A.    Yeah.  We went to Disneyland.  My brother and sister

17   went, too.

18   Q.    When was that?  How old were you?

19   A.    Fifteen, something like that.

20   Q.    And the defendant brought you?

21   A.    I'm sorry?

22   Q.    And the defendant took you on that trip?

23   A.    Yeah.

24   Q.    With your brother and your sister?

25   A.    Yeah, and my uncle.

1    Q.    Any other trips?

2    A.    Canada.

3    Q.    With your brother and your sister and your uncle, or just

4    with the defendant and Mr. Bounds?

5    A.    I don't remember.

6    Q.    Do you remember how old you were?

7    A.    No.

8    Q.    Were you a minor though?

9    A.    Yeah.

10   Q.    Still in school?

11   A.    Yeah.

12   Q.    And your mother didn't accompany?

13   A.    No.

14   Q.    Any other trips that you recall?

15   A.    No.

16   Q.    Okay.  He would move through his business or through his

17   job from place to place, correct?

18   A.    I'm sorry?

19   Q.    He would move -- after you met him in Parkersburg,

20   Virginia [*sic*], he continued to move for his job --

21   A.    Yeah.

22   Q.    -- so he didn't stay there for long, right?

23   A.    Yeah.

24   Q.    So if you met him at 10, he might have moved away when

25   you were 12, but you continued to see him, right?

CASTO - CROSS

1    A.   Yeah.

2    Q.   What other cities did you go to visit he and Mr. Bounds

3    at?

4    A.   Virginia.

5    Q.   Where in Virginia?

6    A.   Alexandria.

7    Q.   How far is Alexandria, Virginia, from Parkersburg, West

8    Virginia?

9    A.   About 300 miles.

10   Q.   So would those be overnight stays as well?

11   A.   Yeah.

12   Q.   And would those be -- how would you get there?

13   A.   Be brought there by a friend, family friend.

14   Q.   And then dropped off?

15   A.   Yeah.

16   Q.   And how did you get back to Parkersburg, West Virginia?

17   A.   They'd come back and pick me up.

18   Q.   And how long would you stay with him?

19   A.   Couple weeks.

20   Q.   How old do you think you were when you were visiting them

21   for a couple weeks when they were living in Alexandria?

22   A.   How old was I?

23   Q.   Yeah, approximately how old were you?

24   A.   Sixteen, 17.

25        THE COURT:  Mr. Norris, I'll just note that I had

1    promised the jury that today we will stop at 5.  So you can

2    continue going, but you have five more minutes before we're

3    going to stop.

4               MR. NORRIS:  Okay.  That's fine.  Thank you.

5    BY MR. NORRIS:

6    Q.   You were asked how much schooling, and you indicated that

7    you've got a -- that you finished high school, correct?

8    A.   Yeah.

9    Q.   Did you go straight through high school?

10   A.   No.  I quit.  And then when I was 18, I went back to

11   school and got it.

12   Q.   What grade did you quit before going back?

13   A.   Like 17.

14   Q.   What grade would that have been?

15   A.   10th.

16   Q.   Did you have some learning disabilities?

17   A.   Yeah.  We've already covered this.

18   Q.   Well, when were you first aware of the fact that you had

19   a learning disability?

20   A.   Through school.

21   Q.   Where in school, what grade?

22   A.   Probably first grade.

23   Q.   All right.  And how would you describe the nature of your

24   learning disability?  Are there some things that come easy to

25   you and some things that are more difficult for you?

1    A.    Yeah.

2    Q.    Let's start with the things that are easy to you.  What

3    do you feel come easy to you, either in a school setting or

4    otherwise?

5    A.    Gym's easy, playing video games is easy; difficult is

6    reading, writing, comprehension.

7    Q.    Okay.

8          MR. NORRIS:  Your Honor, I'm about to move forward to

9    the date of the warrant, and there's only about a minute.  So

10   if this is a natural breaking spot for you...

11         THE COURT:  This is a natural breaking spot.  We'll

12   start again tomorrow morning at nine o'clock.

13       Enjoy your evening with your family and friends.  Keep an

14   open mind until all the evidence is in.  Talk about something

15   other than the case.

16       We'll see you tomorrow at 9.  We're in recess.

17         THE WITNESS:  I can step down?

18         THE COURT:  You can go ahead and get up now, and go

19   wherever you need to go.  But you need to come back here

20   tomorrow before nine.

21         THE WITNESS:  Come here at, like, 8:30?

22         THE COURT:  If you'd come back here at 8:30, that

23   would be great.

24         THE WITNESS:  Okay.

25         MR. NORRIS:  Your Honor, perhaps he's been -- because

1    of the sequestration order, he's not to talk to other

2    witnesses, etc., about this.

3              THE COURT:  Yes.  I'll do it on the record here.

4    Please be seated.

5              THE WITNESS:  Do you want me to sit?

6              THE COURT:  Yes, you can go ahead and sit down.

7         You know you're witness in this case.  That's why people

8    are asking you questions.  And there are other witnesses in

9    this case, including Mr. Bounds, Dale Bounds.

10             THE WITNESS:  Uh-huh.

11             THE COURT:  And the lawyers have asked and I've

12   ordered that the witnesses can't talk to each other while this

13   case is pending.  So until the case is completely done, you

14   can't talk to any of the other witnesses, including

15   Mr. Bounds.

16        So I'm not sure where you're staying, who you're staying

17   with.  But you should not have contact with Mr. Bounds until

18   the trial is over.  Do you understand that?

19             MR. NORRIS:  I believe they're staying together.  So

20   as long as they don't talk about this case, that's all I'm

21   concerned about.

22             THE COURT:  All right.  Would you promise me that you

23   won't talk to Mr. Bounds about the case?

24             THE WITNESS:  I won't.

25             THE COURT:  Okay.  I appreciate that.  Thank you.

1          THE WITNESS:  Yeah, I promise.

2          THE COURT:  We'll see you here tomorrow before 9:00.

3    You have a good evening.

4          THE WITNESS:  You, too.

5          MR. BECKER:  Judge --

6          THE COURT:  I keep thinking we're done and we're not

7    done.

8          MR. BECKER:  I don't think we need to bring him back

9    in to do this.  I would normally request that Mr. Bounds also

10   be so admonished.  I think it's fine if the defense wants to

11   let Mr. Bounds know that your Honor wishes that to be the

12   case, that's good for us.  I just wanted to make that request.

13         THE COURT:  All right.  I'll ask that defense counsel

14   please remind Mr. Bounds that he's not to talk to any of the

15   other witnesses, including this witness, about the case until

16   it's all finished.

17         MR. BERRY:  Yes, your Honor.

18         THE COURT:  Thank you very much.

19      And if you'd like to come back into chambers, I think

20   I've got draft jury instructions available back there.

21      Thank you.

22      (Adjourned at 5:01 p.m.)
         I certify that the foregoing is a correct transcript from
23   the record of proceedings in the above-entitled matter.

24

25      _/s Brenda L. Fauber_          ___10-7-14_____
        Brenda L. Fauber, RDR, CRR           Date

```
1                         I-N-D-E-X

2

3                         Direct Cross Redirect Recross

4    WITNESSES:

5    FOR THE PLAINTIFF:

6    Ray Hsu                429    486  491,497    494

7    Steven Smith, Jr.      498    521    522

8    Jeffrey Tarpinian      532

9    Paval Stevashain       541    543

10

11   WITNESSES:

12   FOR THE DEFENDANT:

13   Jimmy Dale Bounds       554    561    575

14   Christopher Casto       583    593

15

16   MOTIONS                        Made        Ruling

17   Defense motion for directed verdict   549          549

18

19   EXHIBITS:                      Offered      Ruling

20   43.   NIST time conversion chart   547,553   548,553

21   44.   7-11-13 Transcript         531          532

22   47.   Video                      438          438

23   47A.  Photographs                438          438

24   47B.  Photographs                438          438

25   47C.  Photographs                438          438
```

| EXHIBITS: | | Offered | Ruling |
|---|---|---|---|
| 47D. | Photographs | 438 | 438 |
| 47E. | Photographs | 438 | 438 |
| 47F. | Photographs | 438 | 438 |
| 48. | Image of laptop hard drive | 448 | 448 |
| 49. | Registry report - software | 455 | 455 |
| 50. | Registry report -<br>User account info | 483 | 483 |
| 51. | Registry report-NTUSER | 454 | 454 |
| 52. | Graphics-CEM-laptop | 442 | 442 |
| 53. | Graphics-CEM-toddler-laptop | 444 | 444 |
| 56. | PedoBook-browser activity URLs | 468 | 468 |
| 57. | OPVA – browser activity URLs | 451 | 451 |
| 58. | Hidden Wiki | 481 | 481 |
| 59. | Parsed search queries | 469 | 469 |
| 60. | Fuckchrist string search | 471,473 | 472,473 |
| 61. | Messages in pagefile | 476 | 476 |
| 62. | Firefox bookmarks | 478 | 478 |
| 63. | Prefetch | 461 | 461 |
| 71. | ASUS Laptop | 434 | 434 |
| 80. | E-mail from Michael Norris | 412 | 412 |
| 81. | Report of Examination | 412 | 412 |
| 82. | Letter to Davis from Norris | 412 | 412 |
| 83. | Letter to Davis from Norris | 412 | 412 |
| 84. | E-mail from Becker to Berry | 412 | 412 |