```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF NEBRASKA
 2
     UNITED STATES OF AMERICA,        )
 3                                     )
                    Plaintiff,         )           8:13CR105
 4                                     )
              vs.                      )
 5                                     )       Omaha, Nebraska
     TIMOTHY DEFOGGI,                  )       August 22, 2014
 6                                     )
                    Defendant.         )
 7
                              VOLUME IV
 8                   TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE LAURIE SMITH CAMP
 9          CHIEF UNITED STATES DISTRICT JUDGE AND A JURY

10

                         A-P-P-E-A-R-A-N-C-E-S
11
     FOR THE PLAINTIFF:           Mr. Michael P. Norris
12                                Asst. United States Attorney
                                  1620 Dodge Street
13                                Suite 1400
                                  Omaha, NE 68102
14
                                  Mr. Keith A. Becker
15                                Ms. Sarah Chang
                                  DOJ Trial Attorneys
16                                1400 New York Avenue, N.W.
                                  Sixth Floor
17                                Washington, DC 20530

18   FOR THE DEFENDANT:           Mr. John S. Berry, Jr.
                                  Mr. Justin B. Kalemkiarian
19                                Berry Law Firm
                                  2650 North 48th Street
20                                Lincoln, NE 68508

21
     COURT REPORTER:              Ms. Brenda L. Fauber, RDR, CRR
22                                111 South 18th Plaza
                                  Suite 3122
23                                Omaha, NE 68102
                                  (402) 661-7322
24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.
```

1            (At 9:04 a.m. on August 22, 2014, with counsel for the

2     parties and the defendant present, and the jury NOT present,

3     the following proceedings were had:)

4                THE COURT:  Good morning.

5                MR. BECKER:  Good morning.

6                MR. NORRIS:  Good morning, your Honor.

7                THE COURT:  I think you all got copies of the draft

8     jury instructions last night.  And Rachel and I made a couple

9     of very minor changes, so we'll go through those after all of

10    the testimony is in.

11         And I understand that there may be some matters that we

12    need to discuss this morning before the jury comes in.

13                MR. BERRY:  Your Honor, in terms of the defense, we

14    have a witness who may be appearing via video teleconference.

15    We subpoenaed him.  We then later -- due to some travel

16    difficulties on his side, we agreed with the prosecution that

17    either side could use video teleconference for specific

18    witnesses.

19         The last few days we've been attempting to contact this

20    witness, have not been able to get ahold of him via telephone

21    or e-mail.

22         It's my understanding that if he testifies, the VTC will

23    take place out of -- the location from which he will be

24    broadcasting is Baltimore.  My concern is that I don't know

25    that we will have him set up and/or contacted prior to that

1    time.  I don't know, maybe he'll -- he hasn't been getting our

2    messages and he'll just show up.  But we have not been able to

3    reach him in the past two days.  He was subpoenaed to be here.

4        So I anticipate -- I suppose my contingency plan then if

5    he is not here after Mr. Casto is done testifying, that I will

6    then likely call Mr. DeFoggi to testify.

7        I do not know whether the Court likes to inquire as to

8    the defendant's Fifth Amendment right or whether they like to

9    have counsel do that or like to have that on the record.

10       I guess I'd ask for your guidance or preference at this

11   time, your Honor.

12           THE COURT:  I think it is a very good idea to have

13   that done on the record.  Generally that is simply done with

14   counsel and the defendant and the court reporter.  And I don't

15   know that I have a preference; but on occasion, lawyers have

16   asked that I do that myself.

17       Usually I'm not even in the room when it's done because

18   oftentimes counsel prefer to say things to their clients that

19   they may not even want me to hear.

20       So it can be done on the record outside the presence of

21   everybody else except you, your client, and the court

22   reporter.

23       I think it is important that the defendant, of course, be

24   advised of his right to testify; his right not to testify; the

25   fact that if he does testify, of course, he will be under

1    oath, and he will be subject to cross-examination.  And if it

2    is determined that he has not been truthful under oath, there

3    are a number of consequences, including prosecution for

4    perjury, including a potential finding of obstruction of

5    justice which can enhance a sentencing guideline.

6        So those are the types of things that I would anticipate

7    you would advise him on the record.  And of course, he's heard

8    me say those things right now.

9        But if that is agreeable to you, that can all be done

10   outside of the presence of the government and of me.  And if

11   there are other things that you want to say to him for the

12   record, you may do that.

13        MR. BERRY:  And your Honor, normally I would do that

14   after the other witnesses have testified.  But due to my

15   concern about contacting Mr. Bright, I guess I would prefer to

16   do that now -- well, logistically speaking, I think that

17   Mr. Casto is not going to be much longer on the stand.  So it

18   might make sense to do that now as opposed to later.

19        THE COURT:  All right.  And that's perfectly fine.

20        Let's take ten minutes.  And I will come back when that

21   the process has been completed.

22        I think it's best that the government exits as well so

23   that counsel can be very frank with his client.

24        MR. NORRIS:  Courtroom as well?

25        THE COURT:  Yes, let's clear the courtroom.  Thank

1    you.

2         (Courtroom cleared.)

3         (Defendant sworn.)

4         MR. BERRY:  Mr. DeFoggi, as you know, you have the

5    absolute right to testify in this case and the absolute right

6    not to testify.  Are you aware of both those rights?

7         THE DEFENDANT:  Right.

8         MR. BERRY:  And if you do not testify, there can be

9    no inference used against you.  In fact, the judge will give a

10   jury instruction that you not testifying cannot be used as

11   evidence against you at trial, and the jury may not consider

12   your decision not to testify if you decided not to testify.

13        THE DEFENDANT:  But given -- given the circumstantial

14   evidence, which is basically all they have, they could easily

15   convict me on circumstantial evidence.

16        MR. BERRY:  Right.  And that is -- that's one of the

17   risks you run is that they could convict without you

18   testifying.  They could convict with you testifying.  And the

19   reason I bring that up is because you will be subject to

20   cross-examination.

21        Now, as you know, at this point the government has,

22   you're right, put on a lot of circumstantial evidence.  Some

23   of that evidence includes linking an IP address to your

24   residence.  And of course --

25        THE DEFENDANT:  Where no crime was committed.

1          COURT REPORTER:  I'm sorry, I didn't hear you.

2          THE DEFENDANT:  Oh.  Where no crime was committed.

3          MR. BERRY:  Right.  But, to that specific residence

4     where three people lived.  Obviously one of the issues that

5     comes up is whether the government can prove beyond a

6     reasonable doubt who was behind that computer screen.

7          Obviously, even if you don't testify, that is still a

8     defense that can be asserted based on the evidence now.

9          If you do testify, you will be subject to

10    cross-examination.  And while I will do my best to object or

11    limit questions that are outside the scope of -- that I

12    believe are outside the scope of cross-examination [*sic*], the

13    judge makes that ultimate determination.  And that is one of

14    the risks you run if you --

15         THE DEFENDANT:  Yeah.  That occurred in a pretrial

16    where in my opinion, it was -- the cross-examination was

17    completely out of scope, but it was sustained and they were

18    allowed to.

19         And that's why at that point my attorney told me to take

20    the Fifth because they were going into the actual case which

21    would have been really things you would cover at trial.

22         MR. BERRY:  And just so you're aware, the same thing

23    can happen here.  There are disputes always when it comes to

24    objections and evidence regarding what is proper.  And in the

25    end the judge gets to make that decision.

1    I just want to make sure you're familiar with the risk

2  and comfortable with it.

3          THE DEFENDANT:  And at that point, I would take the

4  Fifth perhaps?

5          MR. BERRY:  Well, keep in mind that you have

6  waived -- once you take the stand, you do waive that right.

7  Of course, you can always --

8          THE DEFENDANT:  Reinvoke my right.

9          MR. BERRY:  You can always reinvoke your right.  To

10  the extent to which, though, it has been waived at one point

11  or another as to how you ask [*sic*] the question -- I guess my

12  point is this:  I don't think it would look very good on the

13  stand if you did invoke your Fifth halfway through the

14  questioning.  Certainly, this is a different situation than

15  the pretrial -- well, the detention hearing in which you

16  testified.

17      So I just want to be clear that there is risk there.

18  And, of course, if the judge feels that somehow that that has

19  been waived, she may attempt to order you to answer a

20  question.  I certainly am a little bit concerned if we get

21  partway through the cross-examination -- or make it into their

22  cross-examination and you assert that right, I don't think

23  that looks very good for the jury.  I'm not sure how the judge

24  will treat it.  So it is a very difficult decision to make.

25          But, as you know, the decision belongs to you and not to

1     me.  And one concern that I have is that I cannot control

2     cross-examination.

3              THE DEFENDANT:  Right.

4              MR. BERRY:  I will do my best on direct examination

5     to keep you within the boundaries in which you wanted to

6     testify.

7          But as I said, the government may make arguments to some

8     of your testimony or answers, open the door to other

9     questioning, and that is the risk you run.

10             THE DEFENDANT:  Which is what happened at the

11    pretrial.  And the question is -- well, in my opinion, it was

12    completely out of bounds, but the ruling was that it was

13    allowed.

14             MR. BERRY:  Right.

15             THE DEFENDANT:  But aren't the -- the testimony would

16    be regarding the subject matter that we previously discussed,

17    correct?

18             MR. BERRY:  That is correct.

19             THE WITNESS:  All right.

20             MR. BERRY:  All right.  And you still wish to

21    testify?

22             THE WITNESS:  Yeah.

23             MR. BERRY:  Thank you.

24          (Conclusion of record.)

25          (At 9:19 a.m. on August 22, 2014, with counsel for the

```
1    parties and the defendant present, and the jury NOT present,

2    the following proceedings were had:)

3            THE COURT:  So, Mr. Berry, you've had an opportunity

4    now to advise your client of his right to testify and his

5    right not to testify and the respective consequences?

6            MR. BERRY:  Yes, your Honor.

7            THE COURT:  Very good.

8        Is there anything else we need to discuss before the jury

9    comes in?

10           MR. NORRIS:  No, your Honor.

11           MR. BERRY:  No, your Honor.

12           THE COURT:  Please bring in the jury.

13       CHRISTOPHER CASTO, PREVIOUSLY SWORN, RESUMED THE STAND

14           (Jury in at 9:21 a.m.)

15           THE COURT:  Please be seated.  Good morning.

16       As you'll recall, when we stopped yesterday afternoon,

17   Mr. Casto was on the stand here.

18       And Mr. Casto, I remind you that you do remain under

19   oath.  Do you understand that?

20           THE WITNESS:  Yeah.

21           THE COURT:  All right.  You may proceed with the

22   direct examination.

23           MR. NORRIS:  Thank you.

24           THE COURT:  Excuse me, I guess this is

25   cross-examination.
```

```
 1            Thank you.

 2                        CROSS-EXAMINATION (Cont'd.)

 3       BY MR. NORRIS:

 4       Q.    Good morning.

 5       A.    Good morning.

 6       Q.    Now, during your direct examination yesterday, it was

 7       suggested that you had taken some computer networking classes

 8       in college.  Did you take more than one class in college?

 9       A.    No, just that one.

10       Q.    So you took one class in college?

11       A.    Yeah.

12       Q.    Where was that college located?

13       A.    Montgomery College.

14       Q.    And is that in Maryland or Virginia?

15       A.    Maryland.

16       Q.    And did you complete that class?

17       A.    Yeah.

18       Q.    And when I say complete the class, did you go all the way

19       through to the final, get a grade?

20       A.    Yeah.

21       Q.    Do you remember in earlier testimony that you would have

22       provided under oath in Greenbelt, Maryland, before a federal

23       grand jury?

24       A.    What was the question?

25       Q.    Do you remember testifying before a federal grand jury in
```

1   Maryland in --

2   A.   Oh, yeah.

3   Q.   And that was earlier this year, right?

4   A.   Yeah.

5   Q.   Specifically, it would have been on March 26th of 2014?

6   A.   I don't remember.

7   Q.   Okay.  But you were represented by counsel, correct?

8   A.   Yeah.

9   Q.   Do you remember being asked at that time whether you went

10  to college or community college?  Do you remember that, yes or

11  no, being asked that question?

12  A.   No, I don't remember.

13          MR. NORRIS:  Your Honor, may I approach the witness

14  and allow him to look at his grand jury testimony?

15          THE COURT:  Yes, you may.

16  BY MR. NORRIS:

17  Q.   I'd ask you to open to page 21.  Here, I can open it for

18  you.

19          MR. NORRIS:  Would you like me to return to my seat?

20  I've got a copy.  It might be easier that way.

21          THE COURT:  Okay.

22  BY MR. NORRIS:

23  Q.   I've asked you to look at page 21.  And specifically, I

24  want you to look in the middle of that page; and frankly, line

25  14 would be your answer.

1   A.   Yeah.

2   Q.   Do you remember being asked, "Did you go to any college

3   or community college?"  And what was your answer?

4   A.   "Yeah, one college class, but I didn't finish it."

5   Q.   Okay.

6   A.   But that -- in a way, I didn't finish it because it was a

7   series of classes.

8   Q.   Okay.  All right.

9        So your college class work on networking was one class,

10  and that was -- that's all you've taken in college?

11  A.   Yeah, it was an introductory.

12  Q.   And was it only the introductory class that you were

13  taking?

14  A.   Yeah.

15  Q.   I want to move forward to the early morning hours of

16  April 9th of 2013.

17       And to put this in context for you, April 9th of 2013 is

18  when the FBI served a warrant at the house in Maryland, okay?

19  A.   Yeah.

20  Q.   Do you remember that day?

21  A.   Vaguely.

22  Q.   Well, you were in the basement when the FBI came in,

23  correct?

24  A.   Yeah.

25  Q.   You were playing a video game?

```
1      A.    Yeah.

2      Q.    Had been playing a video game for some time?

3      A.    Yeah.

4      Q.    And after the FBI came in, you remained in the basement

5      for a while, correct?

6      A.    After the FBI came in?

7      Q.    Right.

8      A.    No.

9      Q.    Once they came into the house, they kept you in the

10     basement for a little while, didn't they?

11     A.    No.

12     Q.    Well now, did they allow you to go upstairs right away?

13     A.    They brought you upstairs.

14     Q.    But I'm talking before they brought you upstairs, they

15     made you stay downstairs with the agents and officers who were

16     downstairs, didn't they?

17     A.    No.

18     Q.    You were allowed to walk around freely?

19     A.    No.  They handcuffed me and brought me upstairs.

20     Q.    At that time you'd been up all night gaming?

21     A.    Yeah.

22     Q.    Was that your usual pattern at that time, to stay up at

23     night and game and sleep during the day?

24     A.    Yeah.

25     Q.    Now when the FBI came in and they grabbed you and took
```

1    control of you, you were down in that basement, right?

2    A.   Yeah.

3    Q.   And when they came in, you were playing a game and had a

4    controller in your hand, right?

5    A.   Yeah.

6    Q.   The laptop computer that was discussed yesterday was not

7    downstairs with you, was it?

8    A.   No.

9    Q.   And it hadn't been down with you at all during that

10   night, had it?

11   A.   No.

12   Q.   And you hadn't been using that computer -- that laptop

13   computer?

14   A.   Huh-uh.

15   Q.   Huh-uh means no, you had not been using that laptop

16   computer?

17   A.   Correct.

18   Q.   You weren't the person with his hands on the keyboard of

19   the laptop when the FBI came into the house and grabbed the

20   laptop, correct?

21   A.   Correct.

22   Q.   When the FBI came into the house, you didn't try to

23   upstairs [*sic*] when you heard the agents enter, did you?

24   A.   I'm sorry?

25   Q.   When the FBI came into the house, when they broke into

1    the house when they executed the warrant at 5:25 in the

2    morning, you didn't try to run upstairs when they came in the

3    house, did you?

4    A.   No.

5    Q.   You stayed downstairs?

6    A.   Yeah.  Surrendered and put my hands up.

7    Q.   You still had the controller in your hand?

8    A.   Yeah.

9    Q.   And you did exactly what they asked you to.  When they

10   asked you to put your hands up, you put your hands up, right?

11   A.   Yeah.

12   Q.   And you absolutely complied with every single thing that

13   they told you to do at that time, correct?

14   A.   Correct.

15   Q.   Did you buy that laptop computer that was found upstairs?

16   A.   No.

17   Q.   In fact, it was Mr. DeFoggi, the defendant, who bought

18   that laptop computer, correct?

19   A.   Yeah.

20   Q.   And it was his computer.  He was the one who used it,

21   right?

22   A.   Yeah.

23   Q.   Did you ever put any elimination or evidence elimination

24   files onto that computer, onto the laptop computer?

25   A.   I don't understand the question.

CASTO - CROSS

1    Q.   All right.  Did you ever put any software or any programs

2    on the laptop computer at all?

3    A.   No.

4    Q.   Do you know what Eraser or CCleaner are?

5    A.   No.

6    Q.   So you're not the individual who loaded Eraser and

7    CCleaner onto the laptop computer that the FBI found on the

8    main floor of the house, correct?

9    A.   Correct.

10   Q.   Would you even know how to obtain the programs

11   CCleaner --

12   A.   No.

13   Q.   -- or Eraser?

14   A.   No.

15   Q.   Did you ever use that laptop computer to send private

16   messages on the Internet?

17   A.   No.

18   Q.   Did you ever at any time use that laptop computer to

19   access child pornography?

20   A.   No.

21   Q.   In fact, you've been asked on three different occasions,

22   twice by the FBI and once before the grand jury, that

23   question.  And each and every time you've said no, you've

24   never accessed or downloaded child pornography off of that

25   computer, correct?

1    A.    Correct.

2    Q.    Did you ever use that laptop computer to access the Tor

3    network?

4    A.    No.

5    Q.    Did you ever at any time access Tor?

6    A.    No.

7    Q.    Did you ever at any time access Tor through any other

8    means, any other computer?

9    A.    No.

10   Q.    Would you have known how to access Tor or find a hidden

11   service as of April 9th of 2013?

12   A.    No.

13   Q.    Do you know how to do it today?

14   A.    Well, now, yeah, I've been told by you guys.

15   Q.    Told how to do it or told about it?

16   A.    Well, told about it.

17   Q.    So your understanding of Tor came through the

18   investigation?

19   A.    Yeah.

20   Q.    Did you ever use the terms "fuckchrist" or "PTasseater"?

21   A.    No.

22   Q.    Ever at any time?

23   A.    No.

24   Q.    On any type of device or computer?

25   A.    No.

1    Q.   Did you ever access a website known as PedoBook?

2    A.   No.

3    Q.   Had you heard of PedoBook before April 9th of 2013?

4    A.   No.

5    Q.   Are you familiar with the site known as OPVA?

6    A.   No.

7    Q.   Are you familiar with the term "OnionPedo Video Archive"?

8    A.   No.

9         MR. KALEMKIARIAN:   Objection to this line of

10   questioning, your Honor, beyond the scope of direct

11   examination.   The witness was not asked about these websites

12   or familiarity with other websites during direct examination.

13        THE COURT:   Overruled.

14   BY MR. NORRIS:

15   Q.   Now, we've learned through forensic testimony that the

16   computer downstairs was not password protected.

17        Is it true that anyone could have used that computer that

18   was downstairs?

19   A.   Yeah, I guess.

20   Q.   Others have used it, correct?

21   A.   Yeah.

22   Q.   Did you ever see Mr. Bounds use it?

23   A.   No.

24   Q.   If Mr. Bounds had indicated or testified that he may use

25   that to play a game -- a city building game on the computer,

CASTO - REDIRECT                                                        622

1      would you have any reason to disagree with that?

2      A.   If he said he did, he did, I guess.

3      Q.   And it's possible that anybody in the house could have

4      used and operated that computer, correct?

5      A.   Yeah.

6      Q.   Did you at any time download or view child pornography

7      from the computer downstairs?

8      A.   No.

9      Q.   Did you ever at any time download or view child

10     pornography from any computer anywhere?

11     A.   No.

12          MR. NORRIS:  I have no further questions.

13          THE COURT:  Redirect?

14          MR. KALEMKIARIAN:  Yes.  Indulgence of the Court for

15     a minute.  One question.

16                          REDIRECT EXAMINATION

17     BY MR. KALEMKIARIAN:

18     Q.   Chris, was that laptop that was upstairs, the ASUS

19     laptop, password protected?

20     A.   I'm sorry, I'm having trouble hearing you.

21     Q.   I'm sorry.  Was that ASUS laptop that was upstairs that

22     was seized by the FBI password protected?

23     A.   I don't think so.

24          MR. KALEMKIARIAN:  No further questions.

25          MR. NORRIS:  Nothing else.

1           THE COURT:  All right.  Thank you, Mr. Casto.  You

2      may stand down, and you're now excused.

3           THE WITNESS:  Oh, I can leave?

4           THE COURT:  You can leave.

5           THE WITNESS:  Thank you.

6           THE COURT:  The defense may call its next witness.

7      (Off-the-record discussion had.)

8           MR. BERRY:  Your Honor, the defense is going to

9      request a brief recess at this time, of five minutes, just to

10     ensure -- to see whether Mr. Bright is, in fact, available.

11          THE COURT:  All right.  The jury is at ease until

12     9:45.  Please be ready to begin again at 9:45.

13          Thank you.

14          (Jury out and recess taken at 9:35 a.m.)

15          (At 9:56 a.m. on August 22, 2014, with counsel for the

16     parties and the defendant present, and the jury NOT present,

17     the following proceedings were had:)

18          THE COURT:  Mr. Berry, did you make a determination

19     as to whether or not the witness is available?

20          MR. BERRY:  Your Honor, we still cannot get ahold of

21     him, so I intend to call Mr. DeFoggi to the stand next.

22          THE COURT:  All right.  Very good.

23          Anything else we need to talk about?

24          Please bring in the jury.

25          (Jury in at 9:57 a.m.)

DeFOGGI - DIRECT                                                      624

1              THE COURT:  Please be seated.

2          Mr. Berry, you may call your next witness.

3              MR. BERRY:  Your Honor, the defense calls Timothy

4      DeFoggi.

5              THE COURT:  Mr. DeFoggi, if you'll please come

6      forward to the courtroom deputy, she will swear you in.

7              COURTROOM DEPUTY:  State your name for the record and

8      spell your last name.

9              THE WITNESS:  Timothy DeFoggi, D-e-F-o-g-g-i.

10             TIMOTHY DeFOGGI, DEFENDANT'S WITNESS, SWORN

11             THE COURT:  You may inquire.

12                          DIRECT EXAMINATION

13     BY MR. BERRY:

14     Q.   Mr. DeFoggi, what's your last residence of record?

15     A.   That would be in Maryland, Germantown.

16     Q.   Prior to your involvement in this case, what did you do

17     for a living?

18     A.   For much of my career it was cybersecurity or positions

19     within the U.S. intelligence community.

20     Q.   What is your most recent position?

21     A.   Most recent position was the Director of Cybersecurity

22     Operations for the Health & Human Services.

23     Q.   How long have you worked in the cybersecurity or security

24     field?

25     A.   Well, cybersecurity is probably overlapping with -- I was

DeFOGGI - DIRECT                                                    625

1     the Director of Emerging Programs for an office of

2     intelligence and counterintelligence.  That was also

3     cybersecurity, so I would say cybersecurity for maybe ten

4     years.

5     Q.   You should have an exhibit in front of you marked 201.

6     Do you see that exhibit?

7     A.   The CV?

8     Q.   Yes.

9     A.   I do.

10    Q.   And who created that document?

11    A.   I did.

12    Q.   Does that CV that you referred to fairly and accurately

13    depict your recollection of your qualifications --

14    A.   It does.

15    Q.   -- and accomplishments?

16         MR. BERRY:  Your Honor, I'd offer Exhibit 201.

17         MR. BECKER:  We don't have any objections, but I

18    don't think the witness answered the question.

19         THE COURT:  No, he did not.  I'll reread the last

20    question.  Does that CV that you referred to fairly and

21    accurately depict your recollection of your qualifications and

22    accomplishments?

23         THE WITNESS:  Yes, it does.

24         THE COURT:  All right.  No objection to Exhibit 201?

25    Exhibit 201 is received.

1    BY MR. BERRY:

2    Q.   Mr. DeFoggi, if you could please tell us a little bit

3    about your post-high school education.

4    A.   Post-high school I have approximately four -- well, four

5    years of college, much of -- well, some of -- well, much of

6    that, I guess, would be the University of Central Florida.

7        And then with the IT courses that I took, that's probably

8    about another five years of college equivalent.  They're the

9    same courses covered in college, I just took the accelerated

10   courses and tested out on those.

11            MR. NORRIS:  Your Honor, may I be excused for just a

12   moment?  We can keep going, I just --

13            THE COURT:  Yes, you may.

14            MR. BERRY:  Your Honor, may I approach the witness?

15            THE COURT:  You may.

16       (Off-the-record discussion had.)

17   BY MR. BERRY:

18   Q.   Mr. DeFoggi, I'm now showing you Exhibits 222 through

19   239.  Do you recognize these documents?

20   A.   I do.

21   Q.   What are those?

22   A.   These are IT certifications, 16 of them, which was the

23   result of, I believe, 46 written and oral exams.

24   Q.   What is Exhibit 222?

25   A.   That is a Security Plus certification.

1    Q.    What's Security Plus?

2    A.    That is a -- it's a course -- kind of a lengthy course, I

3    would say, on securing networks and computers and that sort of

4    thing.

5          And then, of course, when you take -- I believe this was

6    a four-hour test, maybe.  And once you pass the exam, you

7    get your -- you receive a certification.

8    Q.    In order to make this go a little faster, Mr. DeFoggi,

9    I'm going to ask you, now that you've reviewed all those

10   exhibits, do they fairly and accurately depict certificates

11   you've received pertaining to your professional training?

12   A.    They do.

13         Can I comment that these cover Microsoft --

14   Q.    I will go over some of those with you.

15   A.    Okay.

16   Q.    I just want to be able to offer them at this point.

17   A.    Okay.

18             MR. BERRY:  So at this point --

19   BY MR. BERRY:

20   Q.    You indicated they do?

21   A.    Uh-huh.

22             MR. BERRY:  Your Honor, I'd offer Exhibits 222

23   through 239.

24             THE COURT:  222 through 239?

25             MR. BERRY:  Yes, your Honor.

DeFOGGI - DIRECT                                                          628

```
 1                    THE COURT:  All right.  Any objection to Exhibits 222

 2        through 239?

 3                    MR. BECKER:  We have an objection to 237, your Honor.

 4        No objection to the balance of those.

 5                    THE COURT:  And the nature of the objection to 237?

 6                    MR. BECKER:  Relevance, your Honor.  It's actually

 7        not an IT certification document, but a contracting

 8        certification.  We don't believe it's relevant.

 9                    THE COURT:  The objection to 237 is overruled.  I

10        will receive Exhibits 222 through 239.

11                    MR. BERRY:  Your Honor, may I approach the exhibits

12        -- to retrieve the exhibits and post them on the ELMO?

13                    THE COURT:  You may.

14        BY MR. BERRY:

15        Q.   All right.  Mr. DeFoggi, I'm showing you Exhibit 222, you

16        indicated this is for what?

17        A.   It's for IT security, securing networks in general.

18        Q.   Now, showing you Exhibit 223, what is this certificate

19        for?

20        A.   That's a Microsoft Certified Trainer, so I was able to

21        teach Microsoft courses.

22        Q.   Now, I direct your attention to Exhibit 224, what's this?

23        A.   That is a Microsoft Certified Systems Engineer.

24        Q.   What's a systems engineer?

25        A.   If you could move it to the left slightly?  That's in
```

DeFOGGI - DIRECT                                                 629

1    Windows 2003, certification for that system.

2    Q.   Now, showing you what's been marked as Exhibit No.

3    235 [*sic*], what is this?

4    A.   That is the Microsoft Certified Systems Administrator.

5    Q.   I'm now showing you Exhibit No. 226, what is this?

6    A.   That is another Microsoft Certified Systems Engineer.

7    This is in Windows 2000.

8    Q.   What is Windows 2000?

9    A.   That is servers, desktops, being able to administer and

10   engineer, which was multiple exams.  Each one of these was

11   probably five or six exams.

12   Q.   I'm now showing you Exhibit No. 227, what is this?

13   A.   That is another Microsoft Systems Engineer.  This one is

14   in NT4, although it doesn't state it.  That was the system

15   that this is certified in.

16   Q.   What is NT4?

17   A.   That's the earlier version.  So I had MCSE or a systems

18   engineer in NT4, Windows 2000 and Windows 2003.

19   Q.   I'm now showing you Exhibit No. 228.

20   A.   That's a Microsoft Certified Professional.

21   Q.   I'm now showing you Exhibit No. 229, what's that?

22   A.   That's Cisco Certified Network Professional.  This is

23   more Cisco products, and this in particular, is more for

24   routing traffic, Internet traffic across the globe.

25   Q.   What's Cisco?

DeFOGGI - DIRECT                                                    630

1    A.    Pardon me?

2    Q.    What is Cisco?

3    A.    Cisco is the -- probably the largest vendor of Internet

4    equipment, routers, switches, and that sort of thing.

5    Q.    Now, showing you Exhibit No. 230, what is this?

6    A.    That's a Cisco Certified Network Associate.

7    Q.    What's that?

8    A.    That is the first certification you get.  It's like the

9    Microsoft Certified Professional versus the Engineer.  The

10   previous one was an engineer equivalent, and this would be

11   more of an administrator.

12   Q.    Now, showing you Exhibit No. 231, what is this?

13   A.    That is a -- I was also an instructor for Novell.  Novell

14   was previously the big operating system before Microsoft.

15   This is a Certified Instructor, so I was able to teach those

16   courses as well.

17   Q.    I'm now showing you Exhibit No. 232...

18   A.    That is another Certified Netware Engineer.  This is in

19   Version 4.

20   Q.    Now, showing you Exhibit 233, what is this?

21   A.    This is a Certified Network Administrator for

22   Intranetware, which was another version of the product.

23   Q.    I'm now showing you Exhibit No. 234, what is this?

24   A.    Another certified Novell or Netware Administrator.  This

25   is for Version 4.

DeFOGGI - DIRECT                                                       631

1    Q.    Now, showing you Exhibit No. 235, what is this?

2    A.    This is a Certified Network Engineer for -- it looks like

3    probably Version 3X of the software.

4    Q.    Now, showing you Exhibit No. 236, what is this?

5    A.    A Certified Novell Administrator for Netware 3.

6    Q.    Now, showing you Exhibit No. 237, what is this?

7    A.    That is another course where you have to be certified to

8    be a federal contracting representative.

9    Q.    Now, showing you Exhibit No. 238, what's this?

10   A.    This is a course I went through for the Director of

11   National Intelligence University.  This was a course that

12   trained you in how to develop technology for the CIA, NSA and

13   other intelligence agencies.

14   Q.    Now, showing you Exhibit No. 239, what is this?

15   A.    This is -- since I was a counterintelligence officer, I

16   was sent to Y12 down at Oakridge to learn how to make nuclear

17   weapons.

18   Q.    We talked briefly about your education and some of your

19   training qualifications.

20         If you could, tell us about the positions you have held

21   in the area of network security and network administration.

22   A.    Do you want to -- okay.  I guess I could just start from

23   the earlier part.

24         Do you want me just to go through my work?  Most of this

25   did touch on IT security in one form or another.

DeFOGGI - DIRECT                                                    632

1    Q.   Well, if you want, we can work backwards.  What is your

2    most current position?

3    A.   Well, my most current position was the Director of

4    Cybersecurity Operations for Health & Human Services Office of

5    Secretary.

6    Q.   And what does that position entail?

7    A.   That position entailed oversight and decisions on

8    protecting the entire network for HHS.  And Health & Human

9    Services is made up of CDC, FDA, NIH, Indian Health Service

10   and a couple of other agencies underneath.

11        So this would be a position that would be making

12   decisions on cybersecurity that affected the whole department,

13   to include the subagencies.

14   Q.   What position -- and what were the years -- when did you

15   first obtain that position?

16   A.   Well, I was originally the Director of Cybersecurity for

17   the Indian Health Service, which is all lumped in here into

18   the same -- same position description.

19        In that position, we -- IHS is actually the second

20   largest agency under Health & Human Services.  They're

21   actually larger than CDC and FDA.

22        In that position, I was in charge of 660 locations across

23   the U.S. and protecting them from cyberattacks.  We -- when I

24   first started there, we had an intrusion by China, which I had

25   to remediate.

DeFOGGI - DIRECT

```
 1          Then there was an incident at CDC, which I don't think
 2     was made public in the news, but all of the senior
 3     leadership's e-mail was stolen from a -- well, I believe the
 4     attribution was China on that.
 5          And so when that occurred, I looked at how it took place
 6     at CDC.  And I went back and reviewed our network and made a
 7     significant number of changes to make sure that we were
 8     protected from a similar incident.
 9          And then after, we were -- there was an incident where
10     our public web server was hacked and used by Russia to access
11     the Department of Homeland Security.  They hacked in using our
12     public web server.
13     Q.   And you used the term "cyberattack", what does
14     cyberattack mean?
15     A.   Well, it can mean several things.  Any unauthorized
16     access to a network, which could even include scanning,
17     looking for open ports, or looking for ways to get into a
18     network can be interpreted as an attack.
19          And I don't know if you've entered this one, but just to
20     give you an idea, at IHS we had -- I had to block four
21     countries because I looked at the threats around the world and
22     determined that there were four countries that were the worst.
23     So I completely blocked them.
24          But just from those four countries, we had about --
25     almost 15 million attacks in one week.  And that's quite
```

 1    typical across the government to have that much activity.

 2    Q.   Now, prior to your work at Health & Human Services and

 3    dealing with the networks and the cyberattacks, did you --

 4    where did you work prior to that time?

 5    A.   Prior to that I was the Director of Emerging Products and

 6    Counterintelligence Officer for the Office of Intelligence and

 7    Counterintelligence at Department of Energy.

 8    Q.   Okay.  And what did you do in that capacity?

 9    A.   In that capacity -- before I answer that, just a little

10    background, which would be relative here.

11        The Department of Energy -- most people don't know

12    Department of Energy actually builds all of the nuclear

13    weapons.  And most of the weapons research is conducted by the

14    Department of Energy.

15        But, in that role at DOE, I was the Director of Emerging

16    Programs and a counterintelligence officer.  And I was put

17    into that position because of my ability to innovate.  There

18    were different threats.  I would come up with technologies to

19    prevent the attacks or innovate technology that would benefit

20    CIA, NSA, or different agencies.

21    Q.   Was it part of your job to be creative?

22    A.   Absolutely.  That's why I was put into that position.

23    And I think we're going to talk about Second Sight shortly.

24    That was a project that had failed previously by another

25    individual.  And I was able to get that passed.  And because

1    of that, they created a new department --

2             MR. BECKER:  Objection, your Honor, relevance and

3    narrative at this point.

4             THE COURT:  Sustained.

5    BY MR. BERRY:

6    Q.   And so you brought up this program Second Sight.  What is

7    Second Sight?

8    A.   Second Sight is a classified program.  It was --

9             MR. BECKER:  Objection to relevance, your Honor.

10            THE COURT:  And the relevance, Mr. Berry?

11            MR. BERRY:  Well, he brought it up in explaining what

12   he did as the Department of Energy counterintelligence

13   officer.

14   A.   Well, I --

15            THE COURT:  I understand that his general knowledge

16   of the Internet and the workings of computers and computer

17   security is relevant.  But I think that we're running kind of

18   far afield here in the detail.

19            MR. BERRY:  Yes, your Honor.

20   A.   Well, I think it was more related to --

21            MR. BECKER:  Your Honor --

22            THE COURT:  You have to wait for a question.

23            THE WITNESS:  Okay.

24   BY MR. BERRY:

25   Q.   Let's move on to what you did prior to being the --

DeFOGGI - DIRECT                                                      636

1     working at the U.S. Department of Energy in the Office of

2     Counterintelligence.  Where did you work prior to that time?

3     A.    I worked at the State Department.

4     Q.    What did you do for the State Department?

5     A.    I ran their terrorist name check system and actually

6     migrated -- it was on a mainframe at one point, and it was

7     costing $9 million a year.  And so I migrated it from a

8     mainframe system to a server farm, which saved the State

9     Department probably close to $8 million a year.

10    Q.    And what did you do before working at the State

11    Department?

12    A.    Prior to that, I worked at the U.S. Treasury.  And I was

13    a network administrator with them, and that involved

14    installation of systems and some cybersecurity.

15    Q.    And what did you do before that?

16    A.    Well, prior to that -- skipping back some, I was an

17    intelligence analyst, breaking codes for military

18    intelligence.

19    Q.    What branch?

20    A.    U.S. Army.

21    Q.    And we've talked a little bit about your positions over

22    time.  How far back does this -- do these positions -- all

23    these positions we've discussed, how far back does it go?

24    A.    And the one before that, right before that, was as a

25    federal law enforcement agent with OSI.

DeFOGGI - DIRECT                                           637

1    Q.   And OSI means what?

2    A.   Office of Special Investigations.  That's the

3    investigative branch of the Air Force.  And I was a special

4    agent with them.

5    Q.   And when was that?

6    A.   That was '81 to '84, and military intelligence analyst

7    was '88 to '89.

8    Q.   And so from the time that you worked as an OSI officer,

9    all through the time of your position at Health & Human

10   Services, did you work in any other fields other than

11   security, intelligence, networks, that type of stuff?

12   A.   For the most part, that's probably accurate that I was in

13   IT or intelligence in some form or another or federal law

14   enforcement.

15   Q.   In your latest position with Health & Human Services, did

16   you have to be familiar with the Internet?

17   A.   Oh, absolutely.

18   Q.   How so?

19   A.   Well, people don't realize that really only 5 percent of

20   the threat is internal.  So really most people are going to

21   work every day doing what they do.

22        The -- 95 percent of the threat is external.  And I've

23   talked about that a little bit, the hacking that we had from

24   China, Russia, and that sort of thing.

25        So, you know, a lot of time is spent trying to secure the

DeFOGGI - DIRECT                                                          638

1    network from outside; whereas classified systems, it's the

2    reverse.  They're not connected to the outside world.  So

3    you're really worried about the people inside the network.

4    Q.   And when you say "people inside the network," are we

5    talking about a network that can be accessed through the

6    Internet?

7    A.   Correct.

8    Q.   Now, are you familiar with the term "Tor"?

9    A.   I am.

10   Q.   What is Tor?

11   A.   Tor has somewhat been explained, but there is more

12   complexity to it, I would say, than what might have been

13   presented so far.

14        The Tor is an anonymous network.  It was developed by

15   DOD, which has been mentioned before.  It's 80 percent funded

16   by the federal government, State Department and other

17   agencies.

18        And it's been used in a lot of -- by a lot of citizens of

19   other governments when there's been some sort of unrest to be

20   able to get out to CNN and post comments or read what's going

21   on around the world.

22        What makes Tor such a challenge is every hop in the

23   network -- when you log in to the Tor network, every hop it

24   goes through -- I think it's been mentioned before, there's

25   several hops.  It's encrypted between each one.  So it's very,

1    very difficult to sniff the network or try and be a man in the

2    middle of that because everything is encrypted.  And it's all

3    anonymous.

4         And as many of you have probably heard, Edward Snowden,

5    he used Tor to --

6              MR. BECKER:  Objection, narrative and relevance, your

7    Honor.

8              THE COURT:  Sustained.

9    BY MR. BERRY:

10   Q.   Let me ask you, in becoming knowledgeable about Tor, did

11   you be -- did you become concerned about how it could affect

12   your professional mission with HHS?

13             MR. BECKER:  Objection to leading.

14             THE COURT:  Overruled.  He may answer.

15   A.   Well, certainly from U.S. intelligence communities'

16   perspective, it's a serious issue.  And I think from the

17   cybersecurity world, it's also an issue, maybe not as much as

18   it would be in the intelligence community, based on this

19   Snowden.  But it would certainly be something high priority on

20   my list to break.

21   BY MR. BERRY:

22   Q.   What do you mean "to break"?

23   A.   To find ways of bypassing the system.  And I was looking

24   at methods to do that.

25   Q.   How do you bypass a system?

DeFOGGI - DIRECT                                                    640

1    A.   Well, when -- and if you look to people in this intel or

2    law enforcement, it's certainly a tough cookie.  But in this

3    case, there's things you could do.  One, you could map the

4    hidden services to try and determine where are -- where's data

5    being uploaded and identify those servers.

6         Problem with Tor is on the regular Internet, when you

7    type "Google" in on your browser, it goes out to a domain name

8    server.  And that domain name service says, oh, you're trying

9    to get to Google, here's the IP address.  And then your

10   computer goes to it.

11        On the hidden services, not so.  They don't -- there is

12   no DNS server.  There's a directory server, which is referred

13   to in Tor.  And there is no list of these hidden servers that

14   you can just grab, like you can on the regular Internet on

15   DNS.

16        So it's really tough to find these hidden servers.  And

17   of course, those are the ones that people in the intelligence

18   community and cyber world want to kind of find.  So it was

19   certainly a high priority my list.

20        And I was in the process of trying to get a

21   man-in-the-middle system set up at work to facilitate that.

22   Q.   Let's back up for just one second.

23        So you mentioned that there are hidden services.  How do

24   you -- and you mentioned mapping hidden services.  How do you

25   map hidden services?

1    A.   Well, for instance, you can -- if you're downloading

2    something from any website -- a web server -- let me explain

3    how a web server works so you can better understand this,

4    perhaps.

5         If you think of you're going to a restaurant, and there's

6    a -- you have a waiter.  The waiter comes to you with a tray

7    and gives you your food.  But he's just really like the front

8    end.  All of the food is really in the kitchen.  So he's just

9    the front end handing it to you.  None of the food is, like,

10   in his pockets; it's all in the kitchen.

11        So similarly, with a web server, it is merely the front

12   end.  You make a request of the web server.  The web server is

13   usually in a semiprotected area.  And then it reaches into

14   your network to grab the data.

15        Same thing happens on Tor.  You'll find that on a lot of

16   these websites, they may have pictures, but the actual

17   content, the larger content is stored somewhere else.

18        Those are the ones that I'm interested in primarily

19   because that's where the data is stored.  That's where the

20   Snowden stuff could be.  That's where other items of interest

21   could be or items of concern.

22   Q.   And so when you say "map hidden services", are you

23   specifically talking about services or -- meaning things that

24   are provided or specific physical servers?

25   A.   Physical servers.  And that's where I would be most

1    interested, in mapping the hidden services to find all of

2    those services out there in the Tor network.

3    Q.   Earlier I cut you off, and you talked about a technique

4    and you used a term, man-in-the-middle.  What is that?

5    A.   Man-in-the-middle is used probably primarily in

6    government.  What that is is if you're trying to -- when you

7    communicate with your bank, for instance, and you use your web

8    browser to do that, you'll see an HTTPS up in the left corner.

9    That means it's encrypted.  And what that is is your PC is

10   exchanging encryption certificates with the bank, a public/

11   private key.  And that's how it secures its communications.

12        And what a man-in-the-middle does is it will sit there in

13   the middle.  And when you go to your bank, you're really not

14   talking to your bank.  You're talking to this other computer

15   in the middle.  And that computer will tell you, hey, I'm your

16   bank, John, go ahead and send me your data.

17        And then that box will talk to the bank, and say, hey,

18   I'm John, I'm trying to check my bank account.  So everything

19   at that server is in the clear because it's in the middle of

20   that encrypted communication.

21        And that would be one technique to explore with Tor.

22   Since everything is encrypted, if you could build a

23   man-in-the-middle and at least see that first layer and

24   perhaps from that determine where the hidden services are kept

25   so you could identify them.  That's a huge thing, I think, is

DeFOGGI - DIRECT

1    to identify where these hidden services are because they're

2    anywhere in the world.

3    Q.   Now, have you used this man-in-the-middle technique?

4    A.   I was in the process of implementing something like that

5    at HHS.  The problem was we had two products.  One was

6    probably heavily influenced by a foreign intelligence agency

7    and the other one couldn't get their act together to get the

8    code fixed.

9         So it was kind of, okay, really don't want to use that

10   one product because their -- this foreign government would be

11   possibly capturing all of our traffic.  Or wait and hope that

12   this other vendor gets their act together, so that the

13   man-in-the-middle can be implemented in your network.

14   Q.   How is this man-in-the-middle technique significant to

15   the Tor network?

16   A.   Well, as I mentioned earlier, I think that would be --

17   there's two ways that I could attack Tor.

18        One would be just mapping, seeing where the storage

19   devices are and mapping as many of those because those are the

20   ones from intel -- intelligence community perspective or cyber

21   I would be interested in, is Snowden's story and stuff here?

22   You know, I want to see where the stuff is being stored.

23        The other is to put a man-in-the-middle in, which was my

24   intention also, once a vendor was selected, to break down that

25   first layer of encryption and do some intelligence, I guess,

1    on it to see, okay, now that I've got this broken down and I

2    can see the first layer of encryption and what's transpiring,

3    maybe from that I can identify the directory server because

4    that's the box I want is the directory server.

5          And I was also planning to perhaps use a system -- a

6    classified system called Nicodemus that I had developed and

7    use certain technologies from that in defeating Tor.  And the

8    Nicodemus has been briefed at the Justice Department, FBI,

9    and --

10              MR. BECKER:  Objection, relevance.

11   A.    Okay.  They're aware of that.

12              THE COURT:  Sustained.

13   BY MR. BERRY:

14   Q.    Why would you want to attack Tor?

15   A.    Well, it's -- for me, I guess, once you're in federal --

16   you're once a federal enforcement agent or in the U.S.

17   intelligence community, it's always kind of in your blood.

18         And while there are certain cyber interests in Tor, for

19   me it's more of intelligence interests, from an intelligence

20   agent perspective.

21         And I -- based on some of the projects that I've created

22   in the past, I think I -- given time, I could have probably

23   defeated Tor and at least gotten a solid mapping of the hidden

24   servers.

25   Q.    What makes you believe that you are capable of defeating

 1    Tor?

 2            MR. BECKER:  Objection, relevance.

 3            THE COURT:  Overruled.  He may answer.

 4    A.    Well, as I mentioned, the Nicodemus problem, that system

 5    I'll obfuscate as much as -- I mean, I can obfuscate this.

 6    But just to give you an example, the largest threat in the

 7    intelligence community was people stealing classified

 8    information from a network.  Because as I stated before, on a

 9    classified network, your biggest threat are insiders.  Because

10    it's not connected to the public Internet, you don't have to

11    worry about people hacking in.

12        So I developed some technology that would not only track

13    the data and identify foreign intelligence officers, but I

14    worked with the IOC, which is the Intelligence Operations

15    Center at the CIA, to add some additional features to the

16    system that would be more beneficial to the agency.

17        And because of that, Justice Department had to weigh in

18    on whether it was legal.  And of course, it turned out it was,

19    but they had to weigh in on it.

20        But, that was resolving a problem that's been the largest

21    problem in the U.S. intelligence community for years, people

22    taking classified data.  You have Snowden, you have the

23    WikiLeaks, people just walking out with data.  And so --

24            MR. BECKER:  Objection as to narrative at this point,

25    your Honor.

DeFOGGI - DIRECT                                                    646

```
 1              THE COURT:  Sustained.

 2    BY MR. BERRY:

 3    Q.   Let me go into some more specific questions.

 4         Mr. DeFoggi, do you know how a web server works?

 5    A.   I do.

 6    Q.   How does a web server work?

 7    A.   I --

 8              MR. BECKER:  Objection, asked and answered, your

 9    Honor.

10              THE COURT:  I'll let him explain again.

11         Go ahead.

12    A.   Okay.  Thank you.

13         As I was mentioning before, it's like in a restaurant.

14    You have the waiter come and he may take an order from you,

15    but he really doesn't have the food, just like a web server

16    does not.

17         And web servers are really just front ends.  And they

18    generally hold little data of interest basically.

19    BY MR. BERRY:

20    Q.   Where is that data generally held?

21    A.   In a -- do you want me to draw it out, or do you want me

22    to just explain it?

23    Q.   If you can explain it, that would probably be best.

24    A.   Typically in any company, especially in the government

25    because there are certain federal requirements, but normally a
```

1    web server is placed in a -- what's called a demilitarized

2    zone.  It's not in your inside network because you don't want

3    people on the Internet getting into your network.  So it's put

4    it in a demilitarized zone where people from the Internet can

5    get to your web server and nothing else.

6         And then when your web server has to answer and send data

7    to somebody, the web server and the web server only is allowed

8    inside your network to extract the data that's needed.  So

9    there's a firewall there that says, okay, the only person

10   coming into the network is the web server.  So that protects

11   the data.  Data is generally never stored on a web server.

12        And as I mentioned before, our web server at IHS was used

13   by Russia to hack into DHS.

14   Q.   So where is the data stored?

15   A.   Inside the -- it's stored somewhere else.  And in most

16   cases, it's inside a protected network.

17   Q.   What is an IP address?

18   A.   IP address -- I did see how this was explained in some

19   other testimony.  And it wasn't really completely accurate,

20   and it was kind of misleading.  But IP address is a unique

21   address for a network or a device.

22        But let me give an example of a home network.  Now I did

23   see some testimony where somebody said that --

24              MR. BECKER:  Objection, your Honor, that's commenting

25   on testimony.

DeFOGGI - DIRECT                                                648

 1    A.    Okay.

 2              THE COURT:   Sustained.

 3    BY MR. BERRY:

 4    Q.    Okay.  Let's talk about what is an IP address in relation

 5    to a home network?

 6    A.    Okay.  An IP address is not necessarily unique across the

 7    Internet.

 8    Q.    Okay.  What do you mean it's not unique across the

 9    Internet?

10    A.    Okay.  The reason why I say that, I've seen references to

11    where it's like a telephone number.  It is not.

12          And the reason why I say that is the -- when you have

13    Internet service at your house, that -- there you have a

14    unique IP address that's unique across the globe.

15          But once you hit the house, or a company even, everything

16    inside the house, it could be a TV, it could be an iPad, it

17    could be an Xbox, a PlayStation, a computer, a tablet, all of

18    those things are using a private address space.

19          And most of you guys, if you have a home computer or a

20    home network, you'll see that the address is usually 198 -- or

21    198 -- let's see -- 168194.  But, it's a private address space

22    that's not used on the Internet.

23          So the problem is that while that entrance to your house

24    is unique, everything inside is just an address that you're

25    handing out locally.  Those same local addresses are handed

DeFOGGI - DIRECT                                                    649

```
 1    out everywhere.

 2         So if you want to know who in a particular house, whether

 3    it was a tablet or something did something, you have to have

 4    some way of doing logs because --

 5    Q.   Okay.  Let me stop you.  What are logs?  What do you mean

 6    by "you have to have some way of doing logs"?

 7    A.   Well, in the government, you're required to produce logs.

 8    When I had a hack, we had 150,000 --

 9         MR. BECKER:  Objection, and move to strike, your

10    Honor.  I think that's nonresponsive.

11         THE COURT:  Sustained.

12         Next question.

13    BY MR. BERRY:

14    Q.   So let me go back to you indicated that you needed to

15    have logs.  What are the logs?

16    A.   Okay.  So in the --

17         MR. BECKER:  I'd object to that question and move to

18    strike it, your Honor.  I think counsel has co-opted the

19    portion that the Court has agreed would be struck.

20         MR. BERRY:  I don't believe so.

21         THE COURT:  No, overruled.  He may answer.

22    A.   Okay.  For instance, HHS had maybe, I don't know, 150,000

23    employees.  And we had an entrance to their -- exit to the

24    Internet.  So everything inside -- a lot of our IP addresses

25    were private addresses.  That's 19816 -- or the -- either a
```

1    ten-dot network which is not used on the Internet.  It's all

2    private.

3         So when traffic went out and traffic came in, we had to

4    keep track and log that traffic.  So we would know John Berry

5    at 3:05 p.m. went out to CNN.com.  And we would have that log.

6    So if something happened to where your computer got infected,

7    for instance, from CNN.com, we'd go, oh, okay, John's computer

8    got infected.  He went to CNN at 3:05.  Okay, let's look and

9    see who else went to that website because they're probably

10   infected also.  So you need all those logs to go back for

11   forensic analysis, like I said.

12   BY MR. BERRY:

13   Q.   The logs that you mentioned, just so I understand, are

14   you talking about logs of specific devices located at that IP

15   address?

16   A.   Correct.  And at homes, you generally -- 99 percent of

17   the time, no home user has set up logging.  So what goes in

18   and out of your house, there's really not much of a record of

19   that.  The ISP will know what came from your house; but what

20   happened inside your house, no clue.

21   Q.   I wanted to direct your -- I want to shift gears for just

22   a second and go back to your work at Health & Human Services.

23   And I want to specifically ask about the months of December

24   2012 to April 2013.

25        What buildings did you work at at the Department of

DeFOGGI - DIRECT                                                    651

1    Health & Human Services?

2    A.   I worked at the -- my primary office was in Rockville,

3    and I had another office in Washington, D.C.

4    Q.   Did you -- how did you get to your -- get into your

5    office?

6    A.   Well, I drove to the office if I was in Rockville because

7    I lived in Germantown, of course.  But if I was going into the

8    D.C. office, I would usually go into Rockville and take the

9    Metro or subway into D.C.

10   Q.   I'm sorry.  How do you get into the buildings?

11   A.   Oh, with a PIV card.

12   Q.   What's a PIV card?

13   A.   It's a government ID card that all government people

14   have.  It has a computer chip in it and an antenna.

15   Q.   And what buildings require your PIV card to access?

16   A.   Well, both -- there was a little difference in the two

17   buildings, but Rockville only required you to badge going in.

18   So when you were done and you're leaving, you don't have to

19   swipe, so there's no record.

20        However, the Washington, D.C. office, you have to swipe

21   going in and swipe going out.

22   Q.   During the months of December 2012 through April 2013,

23   did you go to both buildings regularly?

24             MR. BECKER:  Objection, leading.

25             THE COURT:  Overruled.  He may answer.

1    A.    Typically -- my normal routine was either one day a week

2    because there was a meeting downtown D.C. that I'd have to go

3    to.  So usually one day a week I'd be in downtown D.C.,

4    sometimes two or three times that week I'd be in D.C., just

5    depending on what happened.  But generally one day a week I

6    would spend downtown.

7    BY MR. BERRY:

8    Q.    Are you familiar with the program CCleaner?

9    A.    I am.

10   Q.    What is CCleaner?

11   A.    Could you put on the overhead so we could -- I think it

12   was one of the exhibits that hasn't been submitted.

13   Q.    I'm just asking you right now what is CCleaner?

14   A.    Oh, all right.

15         It's really a -- it's not exactly what's been portrayed

16   so far.

17              MR. BECKER:  Objection, your Honor, as to the

18   comments of testimony.

19              THE WITNESS:  Okay.

20              THE COURT:  Sustained.

21   BY MR. BERRY:

22   Q.    Just what is the program?

23   A.    Okay.  It's generally -- and I gave you a printout from

24   the Internet from the vendor, but it's really a program that

25   -- whenever you uninstall a program on your computer, it

DeFOGGI - DIRECT                                                    653

1    leaves trash in your registry.  So it will get rid of that for

2    you.  It can --

3    Q.    What's the benefit of having CCleaner?

4    A.    Well, it can make your PC run more efficient.

5    Q.    Do you know whether or not it provides security?

6    A.    It does provide a level of security because by cleaning

7    out the Internet cache, which was referred to earlier as the

8    index.dat and --

9          MR. BECKER:  Objection, relevance.

10   A.    Okay.

11   BY MR. BERRY:

12   Q.    What does it do if --

13         MR. BECKER:  Your Honor, may we approach?

14         THE COURT:  All right.  We'll have a sidebar.

15         (Bench conference on the record.)

16         MR. BECKER:  Your Honor, at this point we've had

17   several instances where the defendant has commented on other

18   testimony in the case and referred to documents that are not

19   yet in evidence.

20        At this point, we'd ask the Court to instruct the witness

21   that he should not do either of those things, respond to the

22   questions, without commenting on evidence or exhibits that

23   haven't yet been offered or received.

24         THE COURT:  All right.  I'll so advise him.

25         And I'll just ask counsel to tailor questions as best you

DeFOGGI - DIRECT                                                    654

1    can to avoid that.  But I know it's not your fault.

2              MR. BERRY:  If I can ask leading questions, I think

3    that will make it easier.

4              MR. BECKER:  I'm not asking you to lead, and I

5    understand it's not Mr. Berry's fault.  But we do think the

6    instruction is appropriate at this time.

7              THE COURT:  Okay.  Thank you.

8         (End of bench conference.)

9         (Off-the-record discussion had.)

10             THE COURT:  All right.

11        The defendant has requested that he have an opportunity

12   to visit for a moment with his lawyer.  I am going to allow

13   that.

14        Before we do that, I'll just mention, Mr. DeFoggi, that

15   during your testimony, please don't comment on prior testimony

16   in the case or refer to exhibits that aren't yet in evidence,

17   okay?

18             THE WITNESS:  Yes, your Honor.

19             THE COURT:  And at this time, you may step down from

20   the witness chair and you may visit with your lawyer.

21        (Off-the-record discussion had.)

22             THE DEFENDANT:  Thank you, your Honor.

23             THE COURT:  Mr. Berry, you may continue.

24   BY MR. BERRY:

25   Q.   Mr. DeFoggi, we were talking about a program known as

1    CCleaner.  Before your testimony stopped, you indicated that

2    it helped speed up the computer system.  Were there any other

3    benefits to CCleaner?

4    A.   Yeah.  In the Internet cache, you -- a lot of times

5    viruses will reside there that you're downloading from the

6    Internet either -- because every time you go out to the

7    Internet, there's cache files, thumbnails, all kinds of stuff

8    gets dumped into your cache.  And that's a great spot, a lot

9    of times, for viruses to appear.  And so CCleaner cleans that

10   out so you don't have to worry about it.

11   Q.   Can you just explain what you mean by -- when you say

12   viruses are in cache, what is cache?

13   A.   That's the temporary storage for Internet files.  And a

14   lot of times, it's been found that there can be viruses in

15   there from the Internet and that's where they get stored.

16        Also, my computer had some issues in -- it does a

17   cleanup.  It's like getting a tune-up on your car.  It does a

18   lot of little things.  I had, like, everything, true, true,

19   true, true, true, just to make sure my laptop kind of kept

20   cleaned up.

21   Q.   And in the CCleaner program, "true" means it's running,

22   correct?

23   A.   Yeah.  And I think I had "true" for everything, just keep

24   it clean or -- because I was having problems with it shutting

25   down properly.

1   Q.   What about the program Eraser, did you load that program?

2   A.   I did.  Eraser is -- you know, with people worried about

3   privacy and identity theft and that sort of thing, it's just

4   good practice.

5        And a lot of times, I didn't bring home my laptop from

6   work, so I would do work on my home PC.  And so -- and then I

7   might e-mail it in to work so when I got to work, I'd have it

8   the next morning.

9        But it's -- much bad things that happen on the Internet

10  and stuff.  It's actually, I think, a good idea if you have

11  financial records or whatever, if you don't need them anymore,

12  download the free Eraser application and delete it so when you

13  take your laptop to get fixed at Best Buy or you give it away

14  or whatever, your data's not on there.

15       And that's part of my job to be security, you know...

16  Q.   Does the Eraser program run automatically, or do you have

17  to make settings on it?

18  A.   You have to initiate it.  And it takes time to run.  It's

19  not like I can click on "erase a file" and one second later,

20  it's gone.

21       What Eraser does -- and you can change the settings.  But

22  what it does is it goes out and overwrites, like, 35 times

23  with random characters.

24       In government, for instance, that's a requirement.  Any

25  time you get rid of a hard drive, you have to degauss it,

DeFOGGI - DIRECT                                                    657

1    which is a way of erasing with magnetic -- or Eraser in some

2    agencies can be used to delete data.  That's just a

3    requirement, and I'm used to that requirement.

4    Q.  Mr. DeFoggi, I want to go back several years to when you

5    worked with the Department of the Air Force.

6        Did you work in technology programs not much different

7    than here we are 30 years --

8    A.  Well --

9    Q.  -- later today?

10       MR. BECKER:  Objection, leading.

11       THE COURT:  Overruled.  He may answer.

12   A.  So the last year in that position was strictly

13   counterintelligence.  And as you might have seen, one of the

14   projects was Seven Rockets.

15   BY MR. BERRY:

16   Q.  Let me ask you, what is Seven Rockets?

17       MR. BECKER:  Objection to relevance, your Honor.

18       THE COURT:  Overruled.  He may answer.

19   A.  Seven Rockets, myself and one other agent, we were

20   assigned -- they brought in ground-launched cruise missiles

21   into McChord Air Force Base in Washington state to do testing

22   on the usability and whatnot of ground-launched cruise

23   missiles.

24       So what I did is I recruited somebody to see how much

25   access he could get to the cruise missiles.  These are actual

DeFOGGI - DIRECT                                                      658

1   nuclear weapons.  And I was able to get him in far enough

2   where he could lay his hands on a -- nuclear weapons without

3   having legitimate access at all.

4        So from a counterintelligence --

5            MR. BECKER:  Objection.  This is entirely irrelevant.

6            THE COURT:  It is becoming narrative.  So I will

7   sustain at this juncture.

8   BY MR. BERRY:

9   Q.   Were you recognized for your success in the Seven Rockets

10  program?

11           MR. BECKER:  Objection, relevance.

12  A.   By the general BA, yes.

13           THE COURT:  I understand that his expertise in

14  computers is relevant.  But again, we're getting pretty far

15  afield, both in time and in the nature of the expertise.

16       So I'll just ask counsel to focus on the issues relevant

17  to the case.

18  BY MR. BERRY:

19  Q.   In those 30 or more years that you've worked in these

20  type of challenges, how important is an ability to innovate?

21           MR. BECKER:  Objection, relevance.

22           THE COURT:  Overruled.  He may answer.

23  A.   Extremely important.  In fact, that's why I went to that

24  National Intelligence course is to train CIA and NSA and folks

25  like that to innovate for the intelligence community.  It's

1    extremely important.

2          There are so many difficult problems in government, Tor

3    being one, people walking out with classified information --

4    that's killed us twice, WikiLeaks and Snowden.  It's very

5    important to be able to --

6              MR. BECKER:  Objection, narrative, your Honor.

7              THE COURT:  Sustained.

8    BY MR. BERRY:

9    Q.   Specifically, why is innovation important to defeating

10   the Tor network?

11             MR. BECKER:  Objection, relevancy and asked and

12   answered.

13             THE COURT:  Sustained.

14   BY MR. BERRY:

15   Q.   Mr. DeFoggi, when you worked on these -- some of these

16   programs, did you have a security clearance?

17   A.   I did, top secret, sensitive compartment of information

18   with a Q clearance, which means access to weapons data.

19   Q.   Thank you.

20             MR. BERRY:  No additional questions.

21             THE COURT:  Cross-examination?

22             MR. BECKER:  Thank you, your Honor.

23                          CROSS-EXAMINATION

24   BY MR. BECKER:

25   Q.   Good morning, Mr. DeFoggi.

1    A.    Good morning, Mr. Becker.

2    Q.    Sorry.  Is it DeFojee or DeFogee (phonetic)?

3    A.    Either way, DeFogee.

4    Q.    Very good.

5          I want to ask you first just a bit about some of your

6    technical experience and education.  Fair to say you're

7    educated in the field of computer networking?

8    A.    I am.

9    Q.    Well educated.

10   A.    Probably.

11   Q.    Would you agree?

12   A.    I would agree.

13   Q.    Both in terms of your academic education?

14   A.    Correct.

15   Q.    And then your many years of experience working in jobs

16   related to computer networking?

17   A.    Well, academics was mathematics, but...

18   Q.    Okay.  So in terms of your experience then, we'll say

19   you're well educated with respect to computer networking?

20   A.    I am.

21   Q.    Information technology management?

22   A.    Uh-huh, I am.

23   Q.    We'll need you to say yes or no.

24   A.    Yes.

25   Q.    Operating systems?

DeFOGGI - CROSS                                                    661

1    A.    Yes.

2    Q.    The routing of Internet traffic?

3    A.    Correct.

4    Q.    Network engineering?

5    A.    Correct.

6    Q.    These are all topics that we've seen many of your

7    certifications admitted into evidence on; is that correct?

8    A.    That's correct.  I think there was 16 of them.

9    Q.    Certificates you've obtained over a career working in

10   those sorts of fields.

11   A.    Uh-huh, correct.

12   Q.    And working in those fields primarily on behalf of the

13   government.

14   A.    Primarily with the government.

15   Q.    And your work experience also has given you knowledge in

16   those sorts of areas.  Is that fair to say?

17   A.    True.

18   Q.    You work with computers -- when you were working in these

19   positions, you were working with computers pretty much every

20   day.

21   A.    Except -- well, probably somewhat fair to say.

22   Q.    That includes personal computers, such as laptops and

23   desktops.

24   A.    Not so much.  I was more -- for the last six years,

25   probably more -- well, like the Director of Emerging Programs,

DeFOGGI - CROSS                                                      662

1    I was looking at -- I was down to the desktop level, let's

2    say.

3    Q.   All right.

4    A.   And neither was I at HHS or IHS, I wasn't at the desktop

5    level.  I was making decisions at a much higher level.

6    Q.   So you'd say you're proficient in working with what I'll

7    call client computers.

8    A.   Correct.

9    Q.   A client computer might be a desktop.

10   A.   Correct.

11   Q.   Might be a laptop.

12   A.   They're pretty much the same.

13   Q.   It's a computer that someone is using, right?

14   A.   Right.

15   Q.   And it's a client computer when it's attached to a

16   network.

17   A.   Correct, I'd say.

18   Q.   And that network has computer servers.

19   A.   Not necessarily true.

20   Q.   Most networks would have some kind of computer server, is

21   that fair to say?

22   A.   Are you talking about at home, at work, a government

23   network or a business network?

24   Q.   Any computer network's got a collection.  It's a

25   collection of computers.  Is that fair to say?

```
 1    A.   Well, it's a collection of computers, but no, sir, you

 2    wouldn't have servers at home, in other words.

 3    Q.   Well, you might.

 4    A.   Normally you wouldn't, but...

 5    Q.   You didn't.

 6    A.   Most people don't.

 7    Q.   You didn't at home.

 8    A.   Okay.

 9    Q.   I'm asking you.

10    A.   Oh, no, I didn't.

11    Q.   You had personal computers at home.

12    A.   I had -- yes, I had personal computers at home.

13    Q.   Okay.  What I want to get at is you've also got

14    experience working with computer servers.

15    A.   I do.

16    Q.   Working on them, helping to configure them, training

17    people to --

18    A.   Correct.

19    Q.   -- use and configure them?

20    A.   I do.

21    Q.   Substantial experience.

22    A.   Substantial training; but again, not as much hands-on.

23    Q.   You talked quite a bit on direct about your experience in

24    intelligence and counterintelligence.  Is that fair?

25    A.   That's fair.
```

DeFOGGI - CROSS                                                        664

1   Q.   You mentioned that you had a security clearance.

2   A.   I do.

3   Q.   You had a top secret --

4   A.   Used to.

5   Q.   You had a top secret security clearance.

6   A.   I did.

7   Q.   And that requires an approval process in order to get; is

8   that right?

9   A.   That's correct.

10  Q.   And you were trained on the methods of understanding what

11  information is classified, right?

12  A.   I also had a polygraph.

13  Q.   You have to have a polygraph?

14  A.   Right.

15  Q.   But you've got to be trained on identifying what's

16  classified information.

17  A.   Correct.

18  Q.   And the different levels of classified information.

19  A.   Correct.

20  Q.   And how it's supposed to be kept.

21  A.   Correct.

22  Q.   How it can be stored.

23  A.   True.

24  Q.   What persons are allowed to have access to it.

25  A.   Uh-huh, yes.

1    Q.    What persons are allowed not to have access to it.

2    A.    True.

3    Q.    Who you can share classified information with.

4    A.    True.

5    Q.    And who you cannot share classified information with.

6    A.    True.

7    Q.    And you kept that security clearance all the way until

8    last April.  Is that fair to say?

9    A.    That is fair to say.

10   Q.    So you abided by those rules --

11   A.    I believe so.

12   Q.    -- that required you to keep some information available

13   to some people and other information available to others.

14   A.    True.

15   Q.    You've also -- you talked about the field of information

16   security, right?

17   A.    I did.

18   Q.    And particularly with respect to the government.

19   A.    True.

20   Q.    And fair to say that part of your job has been to ensure

21   the security of government information?

22   A.    Correct.

23   Q.    And part of your job has been to ensure the security of

24   government devices.  When I say devices, I mean things like

25   computers or storage drives, those sorts of things.

1      A.   To keep them secure?

2      Q.   Yeah.

3      A.   True.

4      Q.   Okay.  And in connection with your job at HHS, your most

5      recent job, for example, you were issued a laptop computer.

6      A.   I was.

7      Q.   It's your work computer.

8      A.   True.

9      Q.   It belongs to the government.

10     A.   Right.

11     Q.   And you use it on behalf of the government.

12     A.   Right.

13     Q.   And you use that for your work.

14     A.   Most of the time.

15     Q.   You're not supposed to use your government [*sic*] for

16     other than -- what do we call it in the government, de minimis

17     personal use, right?

18     A.   Yeah.  I just mean I use my personal laptop.  If I didn't

19     bring my work [*sic*] home, I'd just use my personal laptop and

20     e-mail it to my work address or put it on a thumb drive and

21     take it to work or something.

22     Q.   Okay.  So you also trained people on security policies,

23     right?

24     A.   Not so much.

25     Q.   Is it part of -- was it part of your most recent job to

1    make sure that those security policies were adhered to by

2    employees?

3    A.   That's probably fair to say.

4    Q.   Okay.  Do you agree with me when I say that using your

5    personal laptop for government business is actually a

6    violation of a security policy, right?

7    A.   No, I wouldn't -- I wouldn't agree to that.

8    Q.   You're saying that as a security director with HHS, it

9    was allowable for your employees to use their personal

10   computer to do work for the government?

11   A.   Do you people not use your smart devices to check the

12   government e-mail?

13   Q.   Do I?

14   A.   Well, most people do.  And in fact --

15   Q.   Did you have a government-assigned device, laptop

16   computer?

17   A.   I did.

18   Q.   Okay.  So your testimony is it's okay at HHS to use your

19   personal computer for government work.

20   A.   Actually we even had a policy allowing for your smart

21   device to connect to the corporate or HHS e-mail.

22   Q.   Sure.  That's accomplished by using an app that allows

23   those communications to be secure, right?

24   A.   It depends on how secure they are.  It depends on how the

25   exchange server is set up, what policy is pushed into the

 1    smart device, and whether you're using a personally owned

 2    device or a government-owned device.  We allowed people to

 3    bring their own devices.  In fact, we were the first agency to

 4    develop a white paper on it according to Verizon.

 5    Q.   By "smart device", you mean something like a smartphone

 6    like the iPhone I've got in my hand, right?

 7    A.   Uh-huh, right.

 8    Q.   Okay.  You don't mean laptops.

 9    A.   No.

10    Q.   You wouldn't consider a laptop to be a smart device as

11    you're characterizing it.

12    A.   No.  A tablet would be though.

13    Q.   Okay.  So tablet, smartphone, not a laptop.

14    A.   Right.

15    Q.   When you say you e-mailed work from home to work, did you

16    use personal e-mail to do that?

17    A.   No.

18    Q.   That would be a security violation.

19    A.   Not necessarily.

20    Q.   Not at HHS?

21    A.   Not at HHS, and I don't know that I've heard that as a

22    violation in many agencies at all.

23    Q.   All right.

24    A.   Maybe Justice does it that way.

25    Q.   If you had your laptop, your work laptop with you, would

1    you use that rather than your personal device?

2    A.   Probably.

3    Q.   You've also received some training in law enforcement; is

4    that correct?

5    A.   Correct.

6    Q.   So of your 30-year career, about three of those were with

7    the Air Force Office of Special Investigations?

8    A.   Correct.

9    Q.   You received training at -- did you go to the Federal Law

10   Enforcement Training Academy?

11   A.   What happened, OSI is now part of the --

12   Q.   Let me just ask you to say yes or no.  Did you go to that

13   academy?

14   A.   The one down in Glynco?  No.

15   Q.   Okay.  Is that because it wasn't set up at that point?

16   A.   Yeah, it wasn't combined at that time.

17   Q.   Okay.  Did you receive law enforcement training before

18   you started that job at AFOSI?

19   A.   No.

20   Q.   You did not?

21   A.   No.

22   Q.   You weren't trained at all as a law enforcement officer?

23   A.   Oh, I did through the academy.

24   Q.   Okay.

25   A.   Is that your question?

1    Q.   Sorry.  I wasn't asking -- we can set aside the Federal

2    Law Enforcement Academy.  Did you receive training before you

3    started your job with AFOSI?

4    A.   I did.

5    Q.   Law enforcement training?

6    A.   Yes.

7    Q.   Training on things like how to use weapons?

8    A.   Correct.

9    Q.   How to assist with search warrants?

10   A.   Correct.

11   Q.   How did clear homes?

12   A.   I don't think we -- I don't recall that.

13   Q.   All right.  You do recall being trained on the method of

14   executing search warrants?

15   A.   Right.

16   Q.   I'd like to ask you a bit about your knowledge and

17   experience with respect to Tor.

18        As you've told us, you certainly know what Tor is.

19   A.   Is that a question?

20   Q.   It is.

21   A.   Yes, I know what Tor is.

22   Q.   And you've used Tor.

23   A.   I have.

24   Q.   You've accessed it.

25   A.   I have.

DeFOGGI - CROSS                                                        671

1     Q.   You've used the Tor Browser Bundle to do so.

2     A.   Correct.

3     Q.   You've accessed hidden services on Tor.

4     A.   I have.

5     Q.   You understand what they are.

6     A.   Absolutely.

7     Q.   How they work.

8     A.   For the most part.

9     Q.   How to find them -- when I say "find them", I don't mean

10    the actual location, I mean how to actually navigate to them.

11    A.   Well, there's several methods to try and locate servers.

12    One is the directory that Mr. Berry showed yesterday.  There's

13    different published -- and that there are very partial, but I

14    mean, there's various published categories of hidden servers.

15    Q.   And you're familiar with those.

16    A.   Yeah.

17    Q.   You know where to go to find lists of the actual URLs of

18    Tor hidden services.

19    A.   Very partial lists, very partial.

20    Q.   Very partial?  Okay.  But you know how to get there.

21    A.   Yeah, I know where to get the directory and a few other

22    ones.

23    Q.   One of the places that you can go, you mentioned the Tor

24    directory.  You're also familiar with pastebin?

25    A.   Correct.

1    Q.   Pastebin is actually on the regular Internet -- what I'll

2    call the regular Internet, not Tor, right?

3    A.   Right.

4    Q.   Pastebin is actually sort of a repository where people

5    can literally paste information.

6    A.   That's probably fair.

7    Q.   So I mean, just literally cut and paste textual

8    information that other people can come and use or search?

9    A.   Okay.  I don't use it very often, but...

10   Q.   But you know what it is.

11   A.   Right.

12   Q.   Okay.  You're familiar that that's one way that you can

13   find the URLs to Tor hidden services.

14   A.   Yeah.

15   Q.   And it's useful because it's -- as I think you've said,

16   it's difficult to find or find out the actual .onion URL of

17   particular Tor hidden services.

18   A.   It's nearly impossible at this point.

19   Q.   Well, let me make sure we're clear on what we're saying.

20        Again, I'm not asking about actually finding the computer

21   server that's hosting the data for a hidden service.  I mean

22   if I want to go to a particular Tor site, I've got to know

23   that 16-digit alphanumeric series of characters plus the

24   .onion to get there, right?

25   A.   Right, and --

1    Q.   And it's not like -- sorry.  It's not like -- well, when

2    I am on the regular Internet, I can just Google the name of

3    the website, and it will probably come up as the first

4    response, right?

5    A.   Well, you can probably Google the name of -- you can

6    probably do a Google search for "onions" and get some.  I

7    don't know how many.

8    Q.   But it works differently, doesn't it?

9    A.   I don't know what you mean by that.

10   Q.   So when I go to Google, and I plug in the name of a

11   website, Google is searching and crawling the entire open

12   Internet to try to find that actual place, right?

13   A.   It is, but --

14   Q.   Now, if I type in the name of an onion site, somebody

15   else might have put on the regular Internet a reference to it,

16   right?

17   A.   Correct.

18   Q.   And that might come up in Google.

19   A.   Yeah.  Any mention of that -- that site or anything

20   related to it.  There's no telling what you might get on a

21   Google search.  You could search whatever .onion and come up

22   with maybe 50 responses.  Who knows.

23   Q.   You mentioned that you've been working on some projects

24   related to Tor for your work; is that right?

25   A.   True.

1    Q.   All right.  And that is -- you talked about

2    man-in-the-middle type strategies for attribution on Tor,

3    right?

4    A.   Correct.

5    Q.   Trying to map the network, correct?

6    A.   Right.

7    Q.   And you agree that all of that is in connection with your

8    work at the Department of Health & Human Services?

9    A.   Well, I think it's in connection with that and connected

10   with my general -- I guess I would say once you've worked in

11   the intelligence community, it's kind of a part of you.

12        So if I was able to defeat Tor, I would share that with

13   NSA or somebody.

14   Q.   All right.  So this is a professional interest that

15   you're telling us about.

16   A.   Yeah.

17   Q.   And that's why you're working on these strategies?

18   A.   It was also work.  We were getting ready to put in the

19   man-in-the-middle, though they were doing it for a different

20   reason.  It's a man-in-the-middle, nonetheless.  So I was

21   planning on using it to capture some Tor traffic.

22   Q.   All right.  Your most recent job, you're not -- you

23   weren't working as a federal law enforcement agent; is that

24   right?

25   A.   No.

1    Q.   And you're no longer a federal law enforcement agent.

2    A.   Correct.

3    Q.   You haven't been for about 27 or so years.

4    A.   Yeah, that's true.

5    Q.   Fair to say HHS doesn't have any responsibility in the

6    world of investigating child pornography?

7    A.   They do.

8    Q.   The Department of Health & Human Services investigates --

9    A.   OIG, yes.

10   Q.   So the Department of HHS -- you said OIG.  That is the

11   Office of the Inspector General --

12   A.   Yes.

13   Q.   -- for the Department of Health & Human Services.

14   A.   Right.

15   Q.   And if an employee of the Department of Health & Human

16   Services were to be found or suspected of accessing child

17   pornography, an agent of the Office of the Inspector General

18   for HHS might investigate that employee.

19   A.   That's correct.

20   Q.   So when you say HHS does investigate child pornography,

21   that's what you mean.

22   A.   Yeah, the Office of the Inspector General.

23   Q.   HHS doesn't have some general responsibility to

24   investigate child pornography that's not occurring regarding

25   HHS employees.

1    A.    It's not under -- it's not part of their mandate.

2    Q.    Thank you.

3          You owned a laptop computer; is that right?

4    A.    That's right.

5    Q.    You saw it entered into evidence?

6    A.    Here or at the house?

7    Q.    You saw that laptop entered into evidence here in this

8    trial.

9    A.    Digitally, I guess.  I mean, I didn't see there was a

10   laptop being entered.

11   Q.    Okay.  I'm going to direct your attention to the month of

12   April before April 9th of 2013; is that all right?

13   A.    Okay.

14   Q.    Okay.  You owned an ASUS brand laptop computer.

15   A.    Correct.

16   Q.    It's your laptop.

17   A.    It is.

18   Q.    You purchased it.

19   A.    I did.

20   Q.    You installed the -- you decided how to set it up.

21   A.    Yeah.

22   Q.    You configured it.

23   A.    Yeah.

24   Q.    You installed programs on it.

25   A.    True.

DeFOGGI - CROSS

1    Q.    You created a user account.

2    A.    True.

3    Q.    That user account is ToonaBug.

4    A.    ToonaBug.

5    Q.    Toona is your cat, right?

6    A.    It is.

7    Q.    So you named your user account on that laptop after the

8    cat.

9    A.    Right.

10   Q.    Some of the software that you installed on your laptop

11   computer included CCleaner.

12   A.    True.

13   Q.    Again, you installed it.

14   A.    More than likely, yes.

15   Q.    Well, let's be clear about it.  You're the one that

16   installed CCleaner on that laptop.

17   A.    Probably.  My son used it a lot, too, so -- I probably

18   was the one that installed it.

19   Q.    You configured CCleaner on that laptop.

20   A.    I did, yeah.  I did because it makes -- I think I checked

21   "true" to everything.

22   Q.    So you're the one who chose what the settings of CCleaner

23   was on that laptop.

24   A.    I'd say that was fair to say.

25   Q.    When you say you checked "true", CCleaner offers a user

DeFOGGI - CROSS                                                                678

1    sort of a menu of options on what a user wants CCleaner to do.

2    A.   Yes.

3    Q.   And you checked those boxes in order to determine what

4    you wanted CCleaner to do on your laptop.

5    A.   Right.  I think I said "true" to everything.

6    Q.   By setting "true", that means that action is going to

7    happen.

8    A.   Yeah.

9    Q.   You installed Eraser on that laptop.

10   A.   Probably.  Well, Eraser is not really installed.  It's

11   present, but it's not physically -- I mean, it's not really

12   installed.

13   Q.   Eraser is a program that existed on that laptop as of

14   April 9th of 2013.

15   A.   Oh, it was, yes.

16   Q.   All right.  You're saying you're not sure if you put it

17   there?

18   A.   No, no, I put it there probably -- more than likely

19   because I download stuff.  My son does, too, but more than

20   likely I probably did.  I don't know but...

21   Q.   You testified on direct that you knew how to configure

22   Eraser.

23   A.   Yeah.

24   Q.   You chose the settings.

25   A.   I don't know if it was on default settings or -- it might

1    have just been on default settings, I'm not sure.

2    Q.   You agree that's a choice.  You can leave it to default

3    settings or you can set it elsewhere.

4    A.   Oh, yeah.

5    Q.   And Eraser is also a program that you can -- I'll say

6    more actively use.

7    A.   More actively use?  What do you mean?

8    Q.   Let me be clear with what I'm saying.  There are default

9    settings for Eraser, right?

10   A.   There are.

11   Q.   Okay.  You can then also, as a user, while your

12   computer's up and running, you can then click on a button and

13   actually make Eraser work to do something.

14   A.   True.

15   Q.   Okay.  One of the things Eraser allows you to do is to

16   securely delete a file off of your computer, right?

17   A.   It does.

18   Q.   Because you know, as an IT professional, when you just,

19   let's say, right-click a file and select delete, it just goes

20   to your recycle bin, right?

21   A.   True.

22   Q.   And even if you go to your recycle bin and you hit "empty

23   recycle bin", that file is not really gone from your computer,

24   right?

25   A.   True.

1    Q.    When you use Eraser and you click on a file and tell it

2    to erase, it actually securely deletes it, right?

3    A.    Yeah, depending -- to varying degrees.

4    Q.    That's what it's intended to do.

5    A.    It is.

6    Q.    And it overwrites the section of the computer where that

7    file was otherwise being stored.

8    A.    And that's what I'm trained to do in my job.

9    Q.    Absolutely.  And that's a way that you securely erase --

10   A.    Right.

11   Q.    -- let's say, a hard drive?

12   A.    Yeah.

13   Q.    Or a portion of a hard drive.

14   A.    Right.

15   Q.    Or a file.

16   A.    Correct.

17   Q.    A file that might be sensitive.

18   A.    It runs pretty slow, but, yeah.

19   Q.    You can erase a file that might be sensitive.

20   A.    Yeah, you might --

21   Q.    A file that might be classified.

22   A.    Better not be on your laptop, but, yeah.

23   Q.    Because that would be a security violation, right?

24   A.    That would be a security violation.

25   Q.    Classified file on your personal laptop.

1    A.    Yeah, that would not be good, or on a government laptop

2    that's not designated for classified information.

3    Q.    All right.  You said on direct that Eraser did not run

4    automatically; is that correct?

5    A.    No, you have to -- you can set it up as a schedule to run

6    at morning, afternoon, or whatever.

7    Q.    Okay.  What you testified to on direct is that it does

8    not run automatically; is that correct?

9    A.    Did I testify to that?

10   Q.    Yes.

11   A.    Yeah, I'm just explaining my answer is that normally you

12   do, but you can set it up as a schedule.  And it will run

13   automatically if you set it up that way.

14   Q.    Now, even if it's running automatically, you can still

15   open up Eraser and then tell it to do something, right?

16   A.    You can, yeah.

17   Q.    I'd like to ask you a bit about your work schedule.

18         At your most recent job, you said that you primarily

19   worked out of the Rockville Office of Health & Human Services;

20   is that right?

21   A.    Correct.

22   Q.    That is -- that's the Parklawn Building?

23   A.    Right.

24   Q.    The address of that building is 5600 Fishers Lane in

25   Rockville, Maryland?

DeFOGGI - CROSS                                                                    682

1    A.    Indeed.

2    Q.    And you told us on direct examination that around April

3    of 2013 you were working generally about one day a week in

4    D.C.

5    A.    True.

6    Q.    And so the rest of the days when you were at work, you'd

7    be at that Parklawn Building in Rockville.

8    A.    Again, I think I said one day is pretty consistent, but

9    there's some times there were two or three days.  It depended.

10   Q.    All right.  Your testimony was that it was usually one

11   day per week in D.C.; fair to say?

12   A.    Usually, but then I caveated that sometimes it was two or

13   three days.

14   Q.    Your home at the time was in Germantown, Maryland?

15   A.    Correct.

16   Q.    Crown Ridge Court?

17   A.    Correct.

18   Q.    Fair to say about a 20-minute drive from your home to

19   your workplace at the Parklawn Building in Rockville?

20   A.    Not fair to say.  Again, it would depend --

21   Q.    Would you agree that it's 15 miles?

22   A.    Somewhere around there, but it was on a street that had a

23   lot of traffic lights and heavy traffic; so depending on what

24   time you leave.  You know, you live in the D.C. area, traffic

25   is horrible.

DeFOGGI - CROSS                                                          683

1    Q.   So --

2    A.   What should take you --

3    Q.   It also depends on the time of day; fair to say --

4    A.   Right.

5    Q.   -- fair to say?

6    A.   But even --

7    Q.   But early morning --

8         COURT REPORTER:  You guys may not do this.  One at a

9    time, please.

10   BY MR. BECKER:

11   Q.   Your drive goes down so you would drive south from

12   Germantown on Interstate 270 to get down to the --

13   A.   No, I took -- whatever that main -- I didn't take

14   interstate into work.  I took the regular road that had

15   traffic lights on it.  Because you had to go way east -- way

16   west to get to the interstate, so I would just take whatever

17   that road was, the main road that goes down.

18   Q.   Fair enough.  We're in agreement though about 15 miles?

19   A.   Right.

20   Q.   Do you ever use Google Maps to map out directions from

21   one place to another?

22   A.   Yeah.

23   Q.   Something you found to be a reliable indicator of

24   distance?

25   A.   Yeah.

1    Q.   You find that to be a reliable indicator of time, travel

2    time?

3    A.   In the D.C. area?  Not really.

4    Q.   What are you saying your commute time was?  And let me

5    ask you to direct it to days where you were getting to work by

6    7 a.m.

7    A.   Well again, the laws there reflect somewhat the holiday

8    season, too, so that kind of affected it a little bit.

9    Q.   I didn't ask you about that, Mr. DeFoggi.

10   A.   Okay.

11   Q.   I asked you to estimate your commute time when you were

12   getting to work by 7 a.m.

13   A.   Well, if I left at 5 in the morning, it would take me 25

14   minutes maybe, 20 minutes -- yeah, 20 minutes if I left at 5

15   in the morning.

16   Q.   Okay.  Thank you.  So if --

17   A.   Do you want to know at 7 o'clock what it took?

18   Q.   You answered my question.

19   A.   Well, you asked about 7, I answered on 5.

20        If I left at 7, it would probably take me 40 or 45

21   minutes.

22   Q.   What about if you arrived at 7?

23   A.   To arrive at 7?

24   Q.   Probably somewhere in between those two estimates?

25   A.   Yeah, maybe -- well, maybe 30 minutes.  I don't know.

1    Q.    Thank you.

2          And you generally left for work after your partner, Dale

3    Bounds, right?

4    A.    No.  That's not what he testified, and that's not -- I

5    don't think he said that.

6    Q.    Dale went to work before you?

7    A.    No.

8    Q.    Sorry.  Other way around.  All right.  You would get home

9    before Dale.

10   A.    True, because I think at that time, he was getting home

11   at 7:30 or something, something like that.

12   Q.    He worked out -- was he working out in Alexandria,

13   Virginia, at the time?

14   A.    Yeah.

15   Q.    A much longer commute there.

16         MR. BERRY:  I'm going to object as outside the scope

17   of direct.  Dale's commute time was not mentioned on direct

18   examination.

19         THE COURT:  Sustained.

20   Mr. DeFoggi, so that we don't have two people talking at

21   the same time, please wait until you're sure --

22         THE WITNESS:  Okay, your Honor.

23         THE COURT:  -- that the question is finished --

24         THE WITNESS:  Okay.

25         THE COURT:  -- before you start.

1    BY MR. BECKER:

2    Q.   Just to make sure that we're clear, you would get home

3    from work before Dale Bounds would.

4         MR. BERRY:  Objection, outside the scope of direct

5    examination.  Did not talk about Mr. DeFoggi's return time

6    home, did not talk about Dale Bounds' travel time.

7         THE COURT:  Sustained.

8         MR. BECKER:  Your Honor, this is cross-examination.

9         THE COURT:  I understand, but you still need to stay

10   within the scope of the direct.

11   BY MR. BECKER:

12   Q.   Mr. DeFoggi, you were what we call a GS15 in your last

13   job; is that right?

14   A.   That's correct.

15   Q.   I imagine you accrued quite a bit amount of leave time in

16   that position; is that right?

17   A.   Mainly because -- depending on -- when I was a cyber

18   director, I couldn't take leave a lot of times because I

19   always had too much work.

20   Q.   You still take it.

21   A.   So I did have a lot of leave accumulated.

22   Q.   You would take leave occasionally?

23   A.   Oh, yeah, yeah.

24   Q.   Particularly around holidays.

25   A.   Well, that's the time where there's use or lose a lot of

DeFOGGI - CROSS                                                      687

1    time so you try and use what you can.

2    Q.   Just for the ladies and gentlemen of the jury, the

3    concept of use or lose for a federal employee, you're only

4    allowed to carry over a certain amount of vacation hours,

5    right?

6    A.   Right.

7    Q.   So there's often a run kind of towards the end of the

8    year, around Thanksgiving and Christmas, to use up your leave

9    hours, right?

10   A.   Right.

11   Q.   Otherwise, they're going to go away and be forfeited.

12   A.   Right.

13   Q.   Do you recall that in November of 2012, Thanksgiving

14   being on a Thursday, November 22?

15   A.   Was that on a Thursday?  Is that your question?

16   Q.   Do you recall whether Thanksgiving was on Thursday,

17   November 22nd?

18           MR. BERRY:  I would object, it's irrelevant.  And

19   this question is outside the scope of direct.

20           MR. BECKER:  Your Honor, this is well within the

21   defendant's testimony as to why he was conducting activities

22   he was conducting.

23           THE COURT:  Well, let's have a sidebar because I want

24   an explanation of how it's inside the scope of direct.

25           (Bench conference on the record.)

1           THE COURT:  The defendant obviously gave very limited

2     testimony about his substantial expertise, his training, and

3     employment regarding computers and then stopped.

4        How is the inquiry that you're getting into now within

5     the scope of the direct examination?

6           MR. BECKER:  It's certainly within the scope of his

7     extensive testimony about his work responsibilities, his work

8     actions, where he worked and what he did.

9        At least these questions are still within that ambit,

10    your Honor.  It's the timing -- the line of questioning I'll

11    get to more directly, it's just that he took leave during

12    November of -- during November of 2013.  And one -- excuse me,

13    November 2012.  And it's going to correspond with other

14    exhibits, including access records.  That's really the point.

15    He was asked about the access log record that's in evidence.

16    This is going to pertain to that and why he was absent on

17    certain days.

18           THE COURT:  I understand your interest in going

19    there, I understand the relevance of it.

20        My problem is the scope of direct, which appeared to be

21    just computer expertise and his work history, but there was no

22    inquiry regarding this particular period of time or his

23    vacation or what he did during that time.

24           MR. BECKER:  He did testify about his PIV card and

25    how it's used to log access into the building.  This is

 1    directly pertinent to that.  I can go to the exhibit, if you'd

 2    like.

 3        The exhibit is in evidence.  And he referenced that he

 4    used a PIV card to enter his government building, the Parklawn

 5    Building.  And he said it only tracks entry and does not track

 6    egress.

 7        So the absence of entry logs in the explanation of that

 8    which is going to be that he was on vacation, it's extremely

 9    relevant and pertinent to the testimony he gives.

10            THE COURT:  If I'm going to err, it's going to be on

11    the side of restricting the cross specifically to the scope of

12    the direct.  And I find that you're getting afield of that.

13    So sustained.

14            MR. NORRIS:  May I ask a question?  Is he done?  Are

15    you going to take him off and put him back on?  Because that

16    makes a big difference, I would think, as far as what the

17    scope is.

18            THE COURT:  My understanding is he's done.

19            MR. BERRY:  I'm done with him.

20            MR. NORRIS:  I don't see how you're going --

21            MR. BERRY:  Unless I have another witness and I

22    recall him.

23            THE COURT:  You're going to have redirect, but that's

24    got to be within the scope of what you do.

25            MR. NORRIS:  I was just wondering if this was a

1    tactical thing, and I didn't think it was; but at the same

2    time, if it was, then I think that would have expanded the

3    scope, but we don't have to hear that argument.

4              THE COURT:  Okay.

5         (End of bench conference.)

6              THE COURT:  Next question.

7    BY MR. BECKER:

8    Q.   Mr. DeFoggi, you testified on direct examination about

9    something called a PIV card; is that right?

10   A.   Yes.

11   Q.   A Personal Identification Verification card?

12   A.   Uh-huh.

13   Q.   You need to say yes or no for the record.

14   A.   Yes.

15   Q.   You were issued one in connection with your employment

16   with HHS.

17   A.   I was.

18   Q.   You've testified that you used it to access the Parklawn

19   Building, for example, that you told us about.

20   A.   Correct.

21   Q.   And that would log times that you entered that Parklawn

22   Building.

23   A.   Correct.

24   Q.   But not times that you exited it?

25   A.   No.

1   Q.   And you agree that at a time where you were on vacation,

2   you wouldn't be going to the Parklawn Building?

3   A.   If I was on vacation, not necessarily, but sometimes I

4   would go if I was off because I had stuff to do.  I would take

5   vacation to burn it but maybe only go into work for a few

6   hours.

7   Q.   All right.  You had resided at the Crown Ridge Court

8   address in Germantown since 2010, right?

9   A.   I don't recall when we moved in there.

10  Q.   I'm sorry, Mr. DeFoggi?

11  A.   I don't recall when we -- I think we signed -- we were

12  probably living there a year and a half, so that would have

13  been '11 maybe.

14  Q.   Early 2011?

15  A.   I think.  I'm not sure.

16  Q.   Certainly by -- you'd been living there by May of 2011.

17  Is that fair to say?

18  A.   Probably.

19  Q.   When you got there, you'd have turned on Internet

20  service?

21  A.   Oh, we did, yeah.

22  Q.   And you had that Internet service through Verizon.

23  A.   I think so.

24  Q.   You provided the subscriber information for that Internet

25  service.

1    A.    Probably not.  I think Dale probably set it up in my name

2    because it was on a credit card and it was my credit card, but

3    I think he set it up.

4    Q.    You certainly used that Verizon Internet.

5    A.    Did I use it?

6    Q.    Yeah.

7    A.    Yeah.

8    Q.    You used it at home with your laptop computer.

9    A.    I did.

10         MR. BECKER:  Sorry, Court's indulgence briefly, your

11   Honor.

12        (Off-the-record discussion had.)

13   BY MR. BECKER:

14   Q.    Mr. DeFoggi, you testified on direct about the difference

15   between outward-facing IP addresses and internal IP addresses.

16   A.    Correct.

17   Q.    Fair to say when I go to a website, let's say ESPN, ESPN

18   is going to see my outward-facing IP address, right?

19   A.    That is correct.  That is true.

20   Q.    And that's going to be the IP address my Internet service

21   provider has assigned to me.

22   A.    Correct.

23   Q.    What ESPN sees, what the web server sees, is not one of

24   those internal network IP addresses that you were talking

25   about.

1    A.   Well, I would retract my -- or change my answer basic --

2    in essence, not necessarily so.

3         If you had your browser set up to go through a proxy,

4    then the CNN or whatever you referenced would actually see the

5    proxy's address and not your address.

6    Q.   Exactly.  So if I was using the Tor browser to access

7    ESPN, ESPN would see the IP address of a Tor node instead of

8    the IP address my ISP had provided to me.

9    A.   Tor is one form of anonymity.  Yeah, there's other

10   proxies you can use, but Tor is one.

11   Q.   So the answer to my question is yes?

12   A.   Right, yes.

13   Q.   And you talked about the concept of logging internal IPs.

14   You didn't set up logging on your internal computer network at

15   your home.

16   A.   Most people don't.

17   Q.   You didn't do that.

18   A.   No, I didn't.

19   Q.   You had the expertise to do so if you wished.

20   A.   Yeah, I could have.  If there's a router, I could have

21   set up logging.  I don't think I did.

22   Q.   You'd agree that -- you mentioned that that's the -- let

23   me make sure I've got you right here.

24        You said on direct that logging those internal home IPs

25   would be the only way to know who in the house is doing

1   something, right?

2   A.   That's probably the best way to do it.  And it may be the

3   only way, I'd have to give it some thought.  But yeah, without

4   logging you really can't trace internal traffic anywhere.

5   Q.   Okay.  So you're saying the only way to know which user

6   in a home is doing certain activities is to have logs of it?

7   A.   Or do a full packet capture, maybe have a laptop using

8   Wireshark or something to capture all the traffic.  You could

9   do it that way.

10  Q.   Got it.  Or you could just see them doing it, right?

11  A.   Yeah.

12  Q.   So if you were standing next to someone and watching them

13  type on a computer, you'd know that that person was the person

14  engaging in activity on that computer?

15  A.   Obviously, yes, that's true.

16           MR. BECKER:  Your Honor, may we approach?

17           THE COURT:  You may.

18           MR. NORRIS:  Sidebar.

19           THE COURT:  Oh, sidebar?  All right.

20       (Bench conference on the record.)

21           MR. BECKER:  Your Honor, the defendant testified on

22   direct about the concept of logging internal home IP

23   addresses.  He submitted that's the only way you can track

24   users.  He's admitted there's other ways to do that now,

25   including observing someone on a computer.

1          I think it's fair for the government to ask at this point

2     about the events that occurred at the time of the search and

3     observing him on that computer, whether he agrees that's a way

4     of attributing that as a true statement.

5          MR. BERRY:  And I would argue that is outside the

6     scope of direct.  He was asked a question, academic or

7     hypothetical, not a specific situation or question.

8          And now it's my understanding the government wants to use

9     that answer to get into the specifics of the case and the

10    search of the home.  I believe that's way outside the scope of

11    direct examination.

12         THE COURT:  And I will sustain an objection --

13         MR. NORRIS:  Can I --

14         THE COURT:  Only one person gets to talk at sidebar.

15         MR. BECKER:  Your Honor, may we --

16     (Off-the-record discussion had.)

17         MR. BECKER:  I'm just going to ask if it's possible

18    we can take our lunch break early.  I'd like to research the

19    issue whether the defendant can testify in this regard and if

20    so completely limit the government's ability to confront him

21    with the other evidence in the case once he's taken the stand.

22         I understand the ruling thus far.  I'm asking for the

23    opportunity over the lunch break to see if we can find

24    something that will be on point that will allow us to confront

25    him with the evidence in this case now that he's taken the

DeFOGGI - CROSS                                                    696

1    stand.

2              THE COURT:  Unfortunately, he's taken the stand and

3    all he talked about was his computer expertise and his work

4    history, and you've cross-examined him on that.  He has not

5    addressed any of the issues regarding the actual allegations

6    against him or the evidence against him.  He didn't talk about

7    that.

8         And so the objection to your proposed line of questioning

9    is sustained.  Please wrap up with this witness.  And I think

10   that we may be done with the evidence before the noon hour.

11   Over the noon hour, we will work on the jury instructions.

12             MR. BECKER:  I do have further witnesses, your Honor.

13             THE COURT:  I said go ahead and wrap it up.

14        (End of bench conference.)

15   BY MR. BECKER:

16   Q.   Mr. DeFoggi, in your testimony on direct examination, you

17   twice described your -- the title of your position at Health &

18   Human Services as the Director of Cybersecurity; is that

19   correct?

20   A.   Director of Cybersecurity Operations.

21   Q.   You were actually the Acting Director, is that --

22   A.   I think that was made final before I left.  My resume was

23   never updated.

24   Q.   So your resume says Acting Director?

25   A.   Right.  I just never updated it.  This is a little bit

 1    old.

 2    Q.    You are not the Director now?

 3    A.    No, not anymore.

 4    Q.    You testified on direct also that with respect to an

 5    incident where there were some -- some e-mail that was stolen

 6    at the Center for Disease Control; is that fair?

 7    A.    Right.

 8    Q.    And you actually -- you said you took some actions to

 9    alter that network in order to protect against intrusions?

10    A.    Well, not against intrusions.  They used Pass the Hash to

11    get the e-mail of the senior leadership and to gain access.

12          So I looked at our network to see if there were any

13    vulnerabilities with regard to Pass the Hash and some other

14    vulnerabilities that we needed to clean up.  And we went

15    through and cleaned it all up and published a report to our

16    director.

17    Q.    Was the objective to keep that network more protected

18    against intrusions?

19    A.    Yeah.  It was -- we looked at what happened at CDC and

20    said we don't want that to happen here.  That's not good for

21    the director's e-mail to get stolen.

22    Q.    All right.  So that's a, you say, capability that you

23    possess, the ability to ensure that a network is better

24    protected from outside intrusions, right?

25    A.    Yeah, that's the biggest threat is the outside intrusion.

DeFOGGI - CROSS                                                    698

1    Q.   And you'd say that's knowledge that's applicable to your

2    home computer and Internet use as well?

3    A.   Yeah, I mean, it could.  I never really gave it much

4    thought at home because I didn't really have anything worth --

5    I mean, my home computer, it's not like I had much on it,

6    but...

7    Q.   Right.  Because you used CCleaner to clean out your

8    computer pretty much every day, right?

9    A.   I don't know if I cleaned it out every day.  But, I mean,

10   periodically -- I don't know what that would be, but

11   periodically I did run it to clean out old files and stuff

12   like that.

13   Q.   It was set to run at Start Up, correct?

14   A.   Yeah, I think it was.

15   Q.   So it would run -- CCleaner would run all of its settings

16   every time your computer --

17   A.   Yeah --

18   Q.   -- started up.

19   A.   -- so I didn't have to do anything.

20   Q.   All right.

21   A.   So really, I guess it was out of sight, out of mind.

22   Q.   You had to start -- I mean, you had to start up the

23   computer.

24   A.   Well, yeah.  But I mean, what happens as it's booting I

25   don't really think about, I guess.

DeFOGGI - CROSS                                                          699

```
1    Q.   Because you'd preset it to work.

2    A.   Yeah.

3    Q.   And so that was -- that was wiping out, as you said, your

4    Internet cache.

5    A.   Well, let's see, the Internet cache, yeah -- well, I

6    don't know if that's specific to Internet Explorer.  I used

7    Firefox generally.  I never used Internet Explorer so I

8    think --

9    Q.   I'm sorry, I didn't ask -- I didn't say Internet

10   Explorer.  I said your Internet cache.

11   A.   Well, that's what I'm trying to qualify.  I don't know

12   that it would have cleaned out the Firefox cache.  That

13   setting, I think, was for Internet Explorer cache.

14        I just went through and clicked "true" on everything just

15   to -- general principle, I just clicked "true" on everything.

16   Q.   All right.  So you agree "true on everything" would mean

17   clear out everything that program is capable of cleaning out.

18   A.   Yeah.  And certainly, as I mentioned before, viruses.  If

19   there is a virus somewhere that's been downloaded, then, yeah,

20   it would probably get rid of that as well.

21   Q.   All right.  So it would get rid of the potential

22   viruses --

23   A.   Yeah.

24   Q.   -- that are malicious, right?

25   A.   Yeah.
```

1    Q.   So CCleaner would knock that malicious activity off of

2    your computer.

3    A.   For the most part.  I mean, it would help, certainly.

4    Q.   Fair to say that CCleaner would clean out things like

5    browsing history?

6    A.   Again, I don't know if it would get rid of the Firefox

7    browsing history because I'm not sure that was a setting.

8    Typically people use Internet Explorer, so -- I never used

9    Internet Explorer, so you're right, it would have cleaned out

10   Internet Explorer, but I don't know if it would have cleaned

11   out Firefox.  That was a whole separate cache directory.  And

12   I don't know that it would have.  I couldn't answer.  I don't

13   know that answer.

14   Q.   All right.  You saw the registry entries for your

15   CCleaner program for your laptop entered into evidence, right?

16   A.   Right.

17   Q.   Do you have any reason to doubt that those are the

18   accurate settings for the CCleaner you installed on that

19   laptop?

20   A.   Again I -- I can't say it was or I can't say it wasn't.

21   I mean, it could be an accurate representation.  I didn't

22   really go in and look at it setting by setting.

23        So, as I said before, I generally just went through and

24   checked "true" for everything so it would keep my PC cleaner,

25   knowing that it may not get rid of Firefox because that's what

DeFOGGI - REDIRECT                                                        701

1    I used, where it would with Internet Explorer, but I never

2    used Internet Explorer.

3    Q.   Firefox being one particular type of web browser, right?

4    A.   Correct.  And that's what I used.

5    Q.   And that's the same -- the Tor browser is actually a

6    version of the Firefox browser, right?

7    A.   It is.

8    Q.   It's kind of a souped-up version --

9    A.   Right.

10   Q.   -- that's preconfigured to work on the Tor network,

11   right?

12   A.   Yeah.

13        (Off-the-record discussion had.)

14        MR. BECKER:  Your Honor, we have no further questions

15   at this time.

16        THE COURT:  Redirect?

17        MR. BERRY:  Just briefly.

18                      REDIRECT EXAMINATION

19   BY MR. BERRY:

20   Q.   Mr. DeFoggi, Mr. Becker asked you a question about your

21   knowledge of Tor hidden services.  Did you ever find out how

22   many hidden services were on Tor?

23   A.   Unfortunately, our witness didn't show up.  But Dan

24   Bright and I have talked about --

25        MR. BECKER:  Objection to hearsay.

1              THE COURT:  Sustained.

2      BY MR. BERRY:

3      Q.   Well, let me ask a better question.  Does the number of

4      hidden services on Tor change?

5      A.   Absolutely.

6      Q.   How regularly does it change?

7      A.   That's probably hard to answer.  But what we know exists

8      out there is probably a fraction of what's out there.

9      Q.   Thanks.

10             MR. BERRY:  No further questions.

11             THE COURT:  Thank you, Mr. DeFoggi.  You may stand

12     down.

13          Any further evidence on the part of the defendant?

14          (Off-the-record discussion had.)

15             MR. BERRY:  Your Honor, if I could just verify

16     whether we were able to get ahold of Mr. Bright?

17             THE COURT:  We're not taking a break.  You can verify

18     right now, and that's all.

19          (Off-the-record discussion had.)

20             MR. BERRY:  Your Honor, defense rests.

21             THE COURT:  Rebuttal?

22             MR. NORRIS:  We'd like to approach and talk to the

23     Court about whether that's appropriate.

24          (Bench conference on the record.)

25             MR. BECKER:  Your Honor, we would expect to call just

1    one witness on rebuttal for brief testimony on three issues

2    the defendant addressed during his direct examination.

3         One would be to make it clear that the images on PedoBook

4    were actually stored on that computer server.  The defendant

5    testified a lot about images and data isn't actually stored on

6    the server hosting the website.  I want to make it clear for

7    the jury that is the case with respect to this particular

8    website.

9         Also just to clarify that the vast majority of the

10   browser -- the Tor browser activity on the defendant's laptop

11   related to child pornography, Tor hidden services.  He's

12   testified he was interested in Tor for professional reasons,

13   that's why he was accessing it.  We want to make it clear that

14   the quantitative analysis shows otherwise.

15        And finally, just to clarify the point that the defendant

16   made about internal home IP addresses versus external IP

17   addresses from one of our experts.  One witness, we think it

18   would just be a few minutes of testimony.

19             MR. NORRIS:  And we can go now.

20             MR. BERRY:  Your Honor, I would argue that the first

21   two points -- number one has already been addressed.  And

22   number two, I don't think that based on the direct examination

23   they are within the scope -- or outside the scope of the

24   direct.  So they do not become -- there's no rebuttal purpose

25   for them.  They weren't mentioned.  They are in evidence.  I

1    don't see there's any rebuttal value of those two.

2         The third thing, I guess I'm not completely clear on, but

3    it appears to have to do with the technical aspects

4    Mr. DeFoggi was discussing and not that other.  I think that

5    would probably be appropriate.  But the first two, I do not

6    believe are appropriate for rebuttal.

7              THE COURT:  I'm going to allow briefly inquiry into

8    these three areas and the reason I'm going to allow that is I

9    think the only purpose of the defendant's testimony and the

10   only inference that the jury might draw in the defendant's

11   favor from the defendant's testimony is that he was a

12   professional who had access to the Tor network for the purpose

13   of national security and security of HHS and that what he was

14   doing on that Tor network was business-related or related to

15   his personal professional innovation to use the network for

16   the purpose of good and not evil.

17        So I think it is fair for the rebuttal to address those

18   issues.

19             MR. BECKER:  Thank you, your Honor.

20        (End of bench conference.)

21             MR. BECKER:  Your Honor, in its rebuttal case, the

22   government calls Special Agent Steven Smith.

23             THE COURT:  Agent Smith, you may come forward.  You

24   remain under oath.

25        And I will just assure the jury that counsel has told me

 1    that this testimony is going to be very brief, so it will not

 2    take you too long into the lunch hour.

 3         Go ahead.

 4              STEVEN SMITH, PREVIOUSLY SWORN, RESUMED THE STAND

 5                          DIRECT EXAMINATION

 6    BY MR. BECKER:

 7    Q.   Good almost afternoon, Special Agent.

 8    A.   Good afternoon.

 9    Q.   First, with respect to the -- are you familiar with where

10    the images that existed on the PedoBook computer server were

11    stored?

12    A.   I am.

13    Q.   Where were they stored?

14    A.   The images on the PedoBook server were stored on the same

15    server as the actual website files.

16    Q.   And that's the server that was located and seized from

17    Bellevue, Nebraska.

18    A.   That's correct.  There was one server that contained all

19    the pieces of the website.  And all of those pieces were

20    delivered from that one server.

21    Q.   Did you have an opportunity to review -- just to recap --

22    showing you Government Exhibit 54, can you see that on your

23    screen?

24    A.   Yes, I can.

25    Q.   For the record this is a 69-page exhibit.  Have you

S. SMITH - DIRECT                                                706

1    previously reviewed Government Exhibit 54?

2    A.   I have.

3    Q.   What type of Tor hidden service websites represent the

4    majority of the activity that we see in Government Exhibit

5    No. 54?

6    A.   Over 50 percent of the page, starting at the top going

7    down, is the Tor hidden service Hurt to the Core.

8    Q.   And with respect to the exhibit as a whole, have you

9    reviewed the exhibit as a whole?

10   A.   Yes.

11   Q.   What types of Tor hidden services represent the majority

12   of the activity reflected in this exhibit?

13   A.   After reviewing the entire 69 pages, the majority of the

14   Tor hidden service activity is related to child exploitation

15   websites.

16   Q.   What federal law enforcement agencies investigate the

17   exploitation of children online?

18   A.   The FBI, ICE or Immigration and Customs Enforcement, also

19   the U.S. Postal Inspector.

20   Q.   Were you in court for testimony regarding internal home

21   network IP addresses versus external IP addresses?

22   A.   I was.

23   Q.   Can you please explain for the jury the -- well, let me

24   start here.

25        When a user in a home visits an internal website, what IP

S. SMITH - DIRECT                                                    707

1      address would be reflected in the log, if any, of that

2      Internet website?

3      A.   The IP address in the log on the website server would be

4      either the IP address of the user's home router, the public IP

5      address assigned by their Internet service provider, or as was

6      discussed, an IP address of a proxy server, an in-between

7      server that the user routes their traffic through before

8      reaching the final destination website.

9      Q.   Would the web server for any reason capture an IP of the

10     sort of internal 198 series IP addresses?

11     A.   No.  The 192.168?  No.

12     Q.   Sorry.  Go ahead and please correct me.

13     A.   Right.  The internal private IP address would be 192.168

14     dot something.  And that IP address would not be an IP address

15     that would appear in the web server's log files.

16     Q.   How are those sorts of IP addresses used by an internal

17     network?

18     A.   There are certain blocks of IP addresses, such as the 192

19     address or the 10.0 address that are used as nonroutable IP

20     addresses only meant for an internal network.

21          If you equate it to the telephone analogy, you have

22     public telephone numbers so you can call other businesses or

23     residences.

24          Inside of a business you might have a telephone system

25     with four-digit extensions.  Those extensions are only

1    accessible inside of that business.

2              MR. BECKER:  No further questions, your Honor.

3              THE COURT:  Cross?

4         (Off-the-record discussion had.)

5                          CROSS-EXAMINATION

6    BY MR. BERRY:

7    Q.   Mr. Smith, on the exhibit currently on the screen --

8              MR. BERRY:  If we could go to page 3?

9    BY MR. BERRY:

10   Q.   -- would it be fair to say that not all of the OPVA

11   videos are found on a single server, but on multiple servers

12   on this exhibit which you've just referenced?

13   A.    That's not something I can currently answer.  The OPVA

14   server is not a server that the FBI has had privy to review

15   the back end of how it's structured.

16        Based off of our investigations, we have determined that

17   there are the multiple .onion URLs that help distribute the

18   download work required for the individuals to download the

19   videos.  But we don't have information indicating exactly

20   which servers those are coming from.

21   Q.    Thank you.

22             MR. BERRY:  No further questions.

23             THE COURT:  Redirect?

24             MR. BECKER:  No, your Honor.

25             THE COURT:  All right.

```
1              Thank you, Agent Smith, you may stand down.

2              Any further rebuttal?

3                   MR. BECKER:  No, your Honor.

4                   THE COURT:  So the government arrests?

5                   MR. BECKER:  We do, your Honor.

6                   THE COURT:  Very good.  Both sides have now rested.

7              You are going to get a lunch break that will last until

8       1:30.  That's because the lawyers and I have some work to do

9       in connection with the preparation of the jury instructions.

10             When you return at 1:30, you will hear jury instructions

11      and then you will hear closing arguments by counsel, and then

12      you will begin your deliberations.

13             We'll see you at 1:30.  Thank you.

14             (Jury out at 12:07 a.m.)

15                  THE COURT:  Please be seated.

16             I'll ask counsel to come into chambers for an informal

17      jury instruction meeting at 12:45.  That will give you an

18      opportunity to get a quick bite to eat, and then we will go

19      through the proposed instructions that I provided to you.  You

20      can make your informal objections at that time.

21             Then we will come -- we'll make copies of the final

22      instructions.  And we'll plan to come into the court at 1:20

23      so that we can go on the record for formal objections to the

24      instructions before the jury comes in at 1:30.

25             So I will see you in chambers at 12:45.
```

1          MR. NORRIS:  May I ask one question?

2          THE COURT:  Yes.

3          MR. NORRIS:  Mr. Becker will be doing the closing.

4    He asked me the other day, and I couldn't recall.  Do you

5    instruct first or do you instruct on the back end?  And I know

6    it changes sometimes.

7          THE COURT:  Well, actually, I had always -- I have

8    always deferred to lawyers on that issue.  And the lawyers

9    have always wanted me to instruct first so that the lawyers

10   can refer to the instructions if they wish during the closing

11   arguments.

12        These instructions are going to be rather lengthy, so

13   when I'm done instructing, if people want to take a ten-minute

14   break before the closing arguments begin, that will be fine.

15   That way the jury will be somewhat refreshed when the closing

16   arguments start.

17        I do save the very last instruction to give to the jury

18   after the closing arguments, just because it tells them what

19   they're supposed to do when they enter the jury room.  And

20   it's good for them to have that fresh in their mind when they

21   go into the jury room.

22        So that's the plan, but we can talk about that more in

23   chambers.

24         MR. NORRIS:  No, we just wanted to know your

25   preference.

1                   MR. BECKER:  Thank you, your Honor.

2                   THE COURT:  All right.  Thank you.

3             (Recess taken at 12:10 p.m.)

4             (At 1:20 p.m. on August 22, 2014, with counsel for the

5       parties and the defendant present, and the jury NOT present,

6       the following proceedings were had:)

7                   THE COURT:  For the record, we had an informal jury

8       instruction conference in chambers.  The lawyers made a number

9       of suggestions which I adopted, a few that I did not.  The

10      revisions are being made back in chambers as we speak.

11          So we will now go on the record for the formal objections

12      to the final draft of the instructions.

13          Mr. Becker?

14                  MR. BECKER:  Your Honor, the government has no

15      objections to the instructions as the Court intends to issue

16      them.

17                  THE COURT:  Thank you.

18          And Mr. Kalemkiarian?

19                  MR. KALEMKIARIAN:  Your Honor, do you want to go page

20      by page, your Honor, or object to individual instructions?

21                  THE COURT:  Well, of course, we don't have them

22      numbered yet because of the fact that they're being numbered

23      as we speak.

24          So if you wish to refer to page number or -- in fact,

25      some of the page numbers are likely to change because of the

1    fact that there is a substantial addition requested by

2    defendants, which is being included.

3        So I would say refer to them as the instruction on a

4    particular topic, and that should suffice.  And then later I

5    will certainly give you leave to make an additional record

6    with respect to the numbered instructions if you wish.

7        MR. KALEMKIARIAN:  Okay.  Thank you, your Honor.

8        First, in the instruction for engaging in a child

9    exploitation enterprise -- I believe it's the first

10   instruction for the child exploitation enterprise, the dates

11   as they are written in the proposed instructions are March 2,

12   2012, and December 8.

13       I would argue that the date should be amended to November

14   21st, 2012, through December 8th, 2012, because in the --

15   further in the instruction, it indicates -- the instruction

16   indicates that the first element of the child exploitation

17   enterprise may be satisfied by finding the defendant guilty of

18   any three or all of Counts IV through VII as defined in the

19   instructions.  And that refers to the counts in the

20   indictment.

21       Those counts are limited to certain dates beginning on

22   November 21st and ending on December 12th.  So the defense

23   argues that the dates in the instruction for the child

24   exploitation enterprise should be similarly limited to those

25   dates, simply to reflect the indictment; and secondly, because

1       there has been extensive evidence regarding other noncharged

2       possession of child pornography.  And defense believes it

3       might be prejudicial if the date scope is enlarged to include

4       -- potentially include other offenses that are not charged.

5              THE COURT:  And for the record, the government's

6       response, Mr. Becker?

7              MR. BECKER:  Your Honor, we oppose any modification.

8       We believe the instructions as currently recited correctly

9       recite the dates as charged in the indictment.

10         We also believe that both the Court's instructions, as

11      well as the verdict form, make it abundantly clear regarding

12      which particular predicate offenses are charged and applicable

13      to the child exploitation enterprise charge in Count I.

14             THE COURT:  The objection is overruled.

15             MR. KALEMKIARIAN:  Continuing on in the child

16      exploitation enterprise instructions, on the page that

17      discusses the second element of that charge, the government

18      has asked for dates to be added in in consistency with

19      previous dates for this instruction regarding child

20      exploitation enterprise.  Similar to the first objection, the

21      defense would argue if dates are added, it would be those

22      dates limited in scope.

23             THE COURT:  And government's response?

24             MR. BECKER:  Your Honor, we oppose the defendant's

25      proposed modification of that instruction.

1          THE COURT:  The objection's overruled.

2          MR. KALEMKIARIAN:  Pertaining to instructions for

3     Counts II and III, the conspiracy to distribute child

4     pornography -- excuse me, conspiracy to advertise child

5     pornography and conspiracy to distribute pornography -- child

6     pornography, the defense argues that there should be an

7     instruction in both as to -- as requiring overt act by one of

8     the co-conspirators.

9          That instruction was included originally in the proposed

10    instructions for Count -- I believe it's III.  The defense

11    argues that that should be kept in and added to Count II as

12    well.

13         There is precedent in the Eighth Circuit from other types

14    of conspiracy charges that an overt act is required.  And

15    given such precedent, the defense argues that such an

16    instruction should be included today.

17         THE COURT:  Response, Mr. Becker?

18         MR. BECKER:  We oppose, your Honor.  The statute

19    charged includes conspiracy as a part of the statute itself.

20    This is not a 371 conspiracy charge.

21         We have previously provided authority to the Court that

22    in such a situation, the requirement -- there is no overt act

23    requirement either to be alleged or proven; that that example

24    comes from drug prosecution context.  We've also provided some

25    authority from child exploitation cases as well.

1           THE COURT:  And this is an issue that we researched

2      fairly extensively in chambers and concluded that the fourth

3      element was not necessary under the case law.  So the

4      objection's overruled.

5           MR. KALEMKIARIAN:  An instruction was included as to

6      venue.  The defense argues that the jury verdict form should

7      be kept as it was in relation to this instruction.  It's the

8      defense's understanding that that instruction on the jury

9      verdict form will be taken out.  The defense argues that it

10     should not be, and it is proper, and it properly instructs the

11     jury.

12          THE COURT:  Just to clarify, we had a number of

13     drafts that existed back in chambers for purposes of

14     discussion and preparation.  We added the venue instruction

15     because it was proposed by the government and because there

16     was not a stipulation on the issue of venue.

17          The instruction itself makes it clear to the jury that if

18     they do not find that the government has met its burden of

19     establishing venue by a preponderance of the evidence, then

20     their verdict must be in favor of the defense.  The

21     objection's overruled.

22          MR. KALEMKIARIAN:  And finally, going back to the

23     child exploitation enterprise, the defendant argues that the

24     instruction regarding "in concert with co-conspirators on the

25     predicate offenses" require the jury to find the defendant

1    acted in concert with the requisite number of people for each

2    predicate offense, not the predicate offenses when combined

3    together.

4         Counsel is aware that there is precedent in other

5    circuits, but the Eighth Circuit has not -- to counsel's --

6    defense counsel's knowledge, the Eighth Circuit has not ruled

7    on whether or not "in concert" applies to each predicate

8    offense or the predicate offenses as a series.

9         Defendant argues that under the -- under a plain reading

10   of the statute, it is clear that the statute requires a -- the

11   in concert with three or more people to be found for each

12   predicate offense, not the predicate as -- not the predicate

13   offense as a series.

14        THE COURT:  Response, Mr. Becker?

15        MR. BECKER:  Your Honor, we oppose that modification.

16        There is authority to the contrary of the defense premise

17   in *United States v. Daniels* in the Sixth Circuit and *United*

18   *States v. Wayerski* in the Eleventh Circuit.  There is no

19   authority known to the government for the premise -- the

20   opposite premise which the defendant argues, nor would it be

21   appropriate given the statutory language.

22        THE COURT:  The objection is overruled.

23        Any further objections to either the instructions or the

24   verdict form, Mr. Kalemkiarian?

25        MR. KALEMKIARIAN:  No, your Honor.

1           THE COURT:  All right.

2       Any objections to the verdict form, Mr. Becker?  I don't

3    think I asked you about that.

4           MR. BECKER:  No, your Honor.

5           THE COURT:  All right.  It is going to take us a

6    little while longer to get the changes made in chambers.

7       So take another 15 minutes.  And I'll ask Ms. Griess to

8    advise the jury that they are at liberty for another 15

9    minutes.  We will aim for 1:45.

10      At that point in time, we should have copies for one

11   lawyer on each side and a copy for the court reporter and me.

12   And I will read all of the instructions, except the final one.

13   Then I will probably allow the jury to take another short

14   break before we do the closing arguments.

15          MR. BECKER:  Judge, just one issue before closing.

16      I have prepared a PowerPoint presentation to assist me

17   with my presentation in closing argument.  I provided a copy

18   to the defense.  I'm not aware that they have any objection to

19   it, but I certainly wanted to make sure that would be

20   appropriate with your Honor before I were to do that.

21      There are portions of exhibits, nonchild pornography

22   exhibits that are excerpted within that presentation.  I've

23   footnoted it so that it's clear what particular exhibits they

24   refer to.

25      And I do have some notes in there just generally about

1    some of the elements of the charges.  I just wanted to clear

2    that with the Court before I did that.

3             THE COURT:  Well, it is a common practice for lawyers

4    to use PowerPoint in connection with closing arguments.  As

5    long as the excerpts are from exhibits that are in evidence,

6    that's perfectly fine.

7         Sometimes lawyers will even take excerpts from the final

8    instructions that are in -- that are done, that are final.  I

9    don't know if you have any demonstrative exhibits in

10   connection with the PowerPoint and if there are any objection

11   to those.

12            MR. BECKER:  There's no demonstratives in there, your

13   Honor.  The only pictures would be portions of actual

14   exhibits.

15            THE COURT:  Okay.

16            MR. BERRY:  Your Honor, on the defense side, I just

17   have one demonstrative exhibit which is a photograph which I

18   have shown to the prosecution.  And I don't believe they

19   object.

20            MR. BECKER:  We don't.

21            THE COURT:  And again, I very much appreciate the

22   cooperation between counsel and the communication that you've

23   had.  That's been good for me to have counsel getting along

24   and cooperating.

25        We will see you back here at 1:45, assuming that we can

1     have the changes done by then.

2          Thank you.

3          (Recess taken at 1:33 p.m.)

4          (At 1:45 p.m. on August 22, 2014, the following record

5     was made with counsel for the parties:)

6               COURTROOM DEPUTY:  We'll do plaintiff's exhibits

7     first.

8          Exhibits 1 through 5 are offered and received.  5A

9     through 5D are offered and received.  6A through 6D are

10    offered and received.

11              MS. CHANG:  Correct.

12              COURTROOM DEPUTY:  7 through 9, offered and received.

13              MS. CHANG:  Correct.

14              COURTROOM DEPUTY:  9A is offered and received.

15              MS. CHANG:  Correct.

16              COURTROOM DEPUTY:  10, 11, and 12, offered and

17    received.

18              MS. CHANG:  Correct.

19              COURTROOM DEPUTY:  14 through 19, offered and

20    received.

21              MS. CHANG:  Correct.

22              COURTROOM DEPUTY:  21 and 22, offered and received.

23              MS. CHANG:  Correct.

24              COURTROOM DEPUTY:  24 through 27, offered and

25    received.

```
 1              MS. CHANG:  Correct.

 2              COURTROOM DEPUTY:  31, 32, 33, offered and received.

 3              MS. CHANG:  Correct.

 4              COURTROOM DEPUTY:  35 and 36, offered and received.

 5              MS. CHANG:  Correct.

 6              COURTROOM DEPUTY:  42 through 46, offered and

 7      received.

 8              MS. CHANG:  Correct.

 9              COURTROOM DEPUTY:  47 and 47A through F, which are

10      photographs, are offered and received.

11              MS. CHANG:  Correct.

12              COURTROOM DEPUTY:  48 through 54, offered and

13      received.

14              MS. CHANG:  Correct.

15              COURTROOM DEPUTY:  54A offered and received.

16              MS. CHANG:  Correct.

17              COURTROOM DEPUTY:  56 through 66, offered and

18      received.

19              MS. CHANG:  Correct.

20              COURTROOM DEPUTY:  68 through 71, offered and

21      received.

22              MS. CHANG:  Correct.

23              COURTROOM DEPUTY:  74 through 79, offered and

24      received.

25              MS. CHANG:  Correct.
```

 1            COURTROOM DEPUTY:  And 80 through 84 are offered and

 2     received, but those do not go to the jury.

 3            MS. CHANG:  Correct.

 4            COURTROOM DEPUTY:  On defendant's side, Exhibit 201

 5     is offered and received.

 6            MS. CHANG:  Correct.

 7            COURTROOM DEPUTY:  And Exhibits 222 through 239 are

 8     offered and received.

 9            MR. KALEMKIARIAN:  Correct.

10            MS. CHANG:  222 through --

11            COURTROOM DEPUTY:  239.

12            MS. CHANG:  Correct.

13            COURTROOM DEPUTY:  Thank you.

14         (End of record at 1:46 p.m.)

15         (At 2:30 p.m. on August 22, 2014, with counsel for the

16     parties and the defendant present, and the jury NOT present,

17     the following proceedings were had:)

18            THE COURT:  We have made the changes.  I have a copy

19     of the final instructions in front of me.  And each side has

20     one copy and the court reporter has one copy.

21         We will be making copies in chambers for the jury.  They

22     will not have them in front of them at the time that I'm

23     reading, but they will have them when they go in to deliberate

24     after the closing arguments.

25         Anything we need to discuss before the jury comes in?

1          MR. BECKER:  Not from the government, your Honor.

2          MR. BERRY:  No, your Honor.

3          THE COURT:  Please bring in the jury.

4      (Jury in at 2:31 p.m.)

5          THE COURT:  Thank you very much for your patience.

6   It's sometimes difficult to know just how long it will take to

7   put together instructions.  And the lawyers and I have been

8   working on those.

9          We now have the final instructions prepared.  I have not

10  yet had copies printed off for you because we wanted to go

11  ahead and continue with the proceedings.  But you will all

12  have your own copy of these jury instructions in writing

13  before you go into the jury room to begin your deliberations.

14         So don't be concerned about memorizing what I am reading

15  to you.  Do listen, but be assured that you will have your own

16  copy available to you when you start your deliberations.

17      (Instructions 1 through 39 read.)

18         THE COURT:  Now, I am going to wait to read the last

19  instruction until after the closing arguments because it gives

20  you more specific instruction about what you're supposed to do

21  when you actually enter the jury room to begin your

22  deliberations.

23         To give the lawyers an opportunity for just a brief break

24  before they start their closing arguments, and to make sure

25  that you're prepared to listen to the closing arguments after

1    having listened to these very lengthy instructions, we're

2    going to take just a ten-minute break.

3        Please be in the jury room, and we will start at 3:20.

4    And the lawyers should be back here at 3:20 to begin closing

5    arguments.  Thank you.  We're in recess.

6        (Jury out and recess taken at 3:10 a.m.)

7        (At 3:23 p.m. on August 22, 2014, with counsel for the

8    parties and the defendant present, and the jury NOT present,

9    the following proceedings were had:)

10       THE COURT:  I am going to point out to the jury that

11   in their copy of the jury instructions, there will be two

12   corrections of minor typos.  One on page 13, first line, the

13   word "of" will be inserted after the word "element".

14       And then on instruction number 25, the word "where" will

15   be inserted in the second line after the word "conduct".  And

16   I will reread that instruction just so it's heard in context.

17   And then we'll proceed with the closing arguments.  Is there

18   anything else that we need to discuss?

19       Oh, we have a misspelling on page 6.  The word "counts"

20   is misspelled on line 4.  So I will point that out to them.  I

21   don't think that's going to cause any confusion.  I'm not

22   worried about that, but I appreciate Ms. Fauber and her eagle

23   eye.

24       Anything further before we bring in the jury?  No?

25       Please bring in the jury.

 1              (Jury in at 3:36 p.m.)

 2                 THE COURT:  Please be seated.

 3         Well, it's rarely possible to issue jury instructions,

 4    especially ones that are this long, without having a few

 5    typographical errors creep in.  So I'm going to point those

 6    out to you, just to make a clear record.

 7         On page 6, instruction number 5, the fourth line down

 8    over to the right, the word "counts" is missing the letter

 9    "n".  I don't think that will confuse anyone.

10         On page 13, instruction number 11, your copy has been

11    corrected by interlineation.  And as you can see at the very

12    first line, the word "of" has been inserted between "element"

13    and "conspiracy".  And that is the way that I read it to you.

14         On page 32, instruction number 25, again by

15    interlineation we have inserted the word "where" after the

16    word "conduct".  And I'm going to reread this just to make

17    sure that everyone has the proper context.

18         Instruction No. 25:  "The phrase 'child pornography' as

19    used in these instructions means any visual depiction of a

20    minor engaging in sexually explicit conduct where the

21    production of the depiction involved the use of a minor

22    engaged in sexually explicit conduct.  The term 'minor' as

23    used in these instructions means any person under the age of

24    18 years."

25         Those are the only corrections.

1          And at this time, we are going to hear closing arguments

2     by counsel.

3          And we will begin with counsel for the government.

4     Mr. Becker?

5              MR. BECKER:  Thank you, your Honor, and may it please

6     the Court, counsel.

7          Ladies and gentlemen, good afternoon.  Just a few days

8     ago, my colleague, Mr. Norris, stood before you in our opening

9     statement and told you all that we have the privilege of

10    representing the United States in this prosecution.

11         With that privilege comes the responsibility, the

12    responsibility to prove to you each and every element of each

13    and every charge in this case beyond a reasonable doubt.

14         Well, ladies and gentlemen, you've now seen and heard all

15    of the evidence and testimony in this case.  And I submit to

16    you that you have seen that proof; and that at this point,

17    we've shown that the defendant, Timothy DeFoggi, is, in fact,

18    guilty of each and every one of those charges, that he is

19    guilty of using the PedoBook website to conspire with others

20    and to access child pornography.

21         So let's talk about why.  And the first thing we're going

22    to talk about is PedoBook itself.  What was it?  What do you

23    now know about it?

24         You now know, after hearing all the evidence in this

25    case, that it was a social networking website for pedophiles

1    and child pornographers.  But it wasn't social networking in

2    the sort of conventional way you may think of social

3    networking sites, like Facebook, that are broad based, widely

4    focused and diffuse in the interests that they allow people to

5    express.

6         PedoBook was much narrower than that.  PedoBook had a

7    particular purpose, an aim, a goal that all of its registered

8    users and members shared.  PedoBook was oriented towards

9    criminal activity, criminal activity involving child

10   pornography of infants and toddlers, other minors being

11   sexually abused or posed lasciviously.  Its structure, its

12   function, the way users interacted with it and with each other

13   was all designed to facilitate those criminal ends, those

14   criminal goals and purposes on that website.

15        And it used social networking as a platform.  It used the

16   technology of a social networking site as a platform, as a way

17   to facilitate that criminal conduct that its users engaged in;

18   users like the defendant, Mr. DeFoggi.

19        And unfortunately it worked very well.  You've seen the

20   evidence of over 100,000 messages exchanged over PedoBook by

21   its registered users.  You've heard about the 28,000 files

22   available on PedoBook to its users.  And you've had to see

23   many of those files, images and portions of video depicting

24   young children being sexually abused and exploited.

25        I know that you see me in front of a computer, and that

PLAINTIFF'S CLOSING ARGUMENT                                727

1    may worry you.  But we're not going to look at them again.

2    They're in evidence.  You've seen them.  You have the

3    instructions from her Honor about what it means to be child

4    pornography and how that's defined.

5         You all, as judges of the facts, have reviewed those

6    exhibits and will make that decision.  And I submit to you

7    there's no question that any of the exhibits that have been

8    received into evidence do, in fact, depict unlawful child

9    pornography.

10        But you know again that PedoBook was prolific, not only

11   in its number of users, but in the groups that it allowed its

12   users and members to create, over 300 of those groups; groups

13   which in and of themselves functioned as ways for its users to

14   subcategorize child pornography, to make it more efficient for

15   their fellow members to find and solicit and receive and

16   access the type of child pornography that they wished to

17   consume.

18        You know that PedoBook had rules, rules which tell you

19   much about what the purpose of this site was and what the

20   registered users of that site would have understood it to be;

21   rules which talked about civility in the context of a website

22   that made such terrible things available to its users; rules

23   which talked about extreme content and rather than prohibit,

24   encouraged its users to subcategorize and to organize around

25   that content so that it would be easier for those members to

1    find others who could provide it, to find others from whom

2    they could solicit it, so that they too could access those

3    sorts of illegal materials.

4        And rules that were important in the context of where

5    this site existed; not on the open Internet, but on the Tor

6    network.  Because part of the deal here, part of the agreement

7    was that this website was designed to be anonymous.  This

8    website was designed to be safe; not for the children who were

9    exploited on this site, but for the users who wished to engage

10   in that criminal conduct without getting caught.

11       And so you see this posting that you'll see on the rules

12   -- exhibits that have been received into evidence, where users

13   are talking about the infiltration of LEA, law enforcement

14   authorities; advising each other about tactics and techniques

15   to be able to ply their trade without being caught by law

16   enforcement.  And that's a part of it.  And the fact that this

17   site existed on the Tor network is an important piece.

18       And of course, the use of the site was anonymous, but

19   only to a degree.  Why do I say that?  Its registered users

20   created accounts, they created user names.  They displayed

21   interests, they displayed particular tags.

22       And so they wanted to be anonymous to the rest of the

23   world in terms of not being found.  But there was great

24   incentive not to be anonymous to one another, to create and

25   cultivate those personas to establish credibility amongst each

1   other about the extent of their interest in the exploitation

2   of children, about their knowledge of it and about their

3   ability to obtain and ultimately distribute it to one another.

4       So let's talk about the ways in which you've seen the

5   PedoBook website and how the exhibits that you'll have with

6   you help you to understand and help you explain how this site

7   works.

8       You've seen the PedoBook site from a number of different

9   perspectives.  And when you look over the exhibits and what

10  have been admitted, you have screenshots, first of all.  So

11  you have a user's perspective of what this website looked like

12  to those who actually navigated their Tor browser to that

13  .onion URL.

14      You have screenshots that describe the structure of the

15  site, that show you what its home page looked like, and what

16  each of those individual sections contained, sections like the

17  activity page, showing every user what was going on with its

18  users at that exact moment.  You've seen some of the

19  defendant's conduct reflected on that page.

20      The Groups page, showing you all of the individual

21  subcategorized groups, where users could interact with one

22  another about a common interest in a subcategory of child

23  pornography, so they could network in with those people to

24  solicit, to exchange, to distribute and to access that

25  submaterial that they were so interested in.  And so you have

1    those screenshots in evidence that will show you what this

2    website looked like generally.

3         But you don't just have that perspective on PedoBook.

4    You've also got the behind-the-scene perspective.  When you

5    look at Exhibit 5 and the subexhibits to Exhibit 5, the board

6    data, what we call the server side data, the information that

7    came directly from that computer server on which the Tor

8    website operated.

9         You've seen how the Federal Bureau of Investigation was

10   able to log users' activity while they were in control of that

11   website so that you can see a journal of everything a user

12   like the defendant did for that period of time that law

13   enforcement had control of the board.

14        And keep in mind, that period of time as you heard from

15   Special Agent Gordon started on November 19th and went until

16   December 8th when that site came down.  And perhaps

17   unsurprisingly, before November 19th, that sort of data wasn't

18   available because of the choice made by the administrator of

19   the site not to record it.  So you'll see in that Exhibit 5

20   that records the defendant's conduct on PedoBook that it

21   begins on November 19th.

22        And we'll talk a little bit more later about how to view

23   those individual entries and go through and recall exactly

24   what they mean and how they document the defendant's activity

25   on PedoBook.

1          And you don't just have those two perspective, ladies and

2     gentlemen, because you've seen PedoBook from the defendant's

3     perspective, from the perspective of the user PTasseater and

4     fuckchrist on the PedoBook website.

5          You've seen all of the particular choices that were made

6     by the defendant about how he would interact with this site

7     and about the users -- and with the users of it.

8          So what do we know?  We know that he registered.  That's

9     a choice, because you heard from the testimony of Special

10    Agent Gordon that a user could go to the PedoBook site and see

11    it, observe what it was, and access some of the child

12    pornography accessible there, without ever registering as a

13    user.

14         But without doing that, without registering, you don't

15    get access to that greater functionality.  You don't get

16    access to that ability to interact with the others from whom

17    you can solicit and receive that child pornography material.

18         So the defendant made the choice to register.  And he

19    picked a user name and a display name.  The user name,

20    fuckchrist; the display name, PTasseater; preteen, as you've

21    learned those two letters mean.

22         He decided that he was going to put out some more

23    information about him; that he was going to fill out that

24    profile with information about his particular interests, many

25    perversions; that he was going to write in that profile,

PLAINTIFF'S CLOSING ARGUMENT                                           732

1           solicit other users to contact him; and that he was going to

2           tell users about his particular interests, using these tags,

3           those hyperlinks that he put there, exhibition and so on, so

4           that other users would know what he was into and what they

5           could contact him about.

6                He went further.  He joined both public and private

7           groups on PedoBook.

8                Now remember, within each group that users created, there

9           were images that those particular group members had posted,

10          categorized according to the rules and description and titles

11          of those groups, easy to search, easy for users to determine

12          whether that sort of material was going to be material they

13          wished not only to access but to solicit from other users who

14          could provide it.

15               And so what groups did the defendant choose to join?

16          Groups like Anything Goes, Hard Core Child Fucking; and

17          private groups like Toddler Girls Forced, 0-2 Year Little

18          Girls Private Sharing 2012, Kids With Dogs and Other Animals.

19               Private groups.  And remember, what does that mean?  You

20          know that that means that a solicitation goes out from the

21          user asking to be included, asking the member who set up that

22          group to allow him to participate, and that that invitation is

23          accepted.

24               And that at that point, the defendant gets access to the

25          images provided by the members within that private group that

PLAINTIFF'S CLOSING ARGUMENT                              733

1    are not available to members elsewhere on the site who haven't

2    been accepted.

3         The defendant responds to polls.  You'll see, ladies and

4    gentlemen, in Exhibit 7 the sort of responses that the

5    defendant gives to these polls that are openly available to

6    everyone on the site.

7         Again, part of this active participation.  You might

8    remember you heard from one of the other PedoBook members,

9    Charles MacMillan, Toddler Lover, during the course of this

10   trial.

11        And remember, he talked about the reason why he uploaded

12   an avatar, one of those images that goes next to your user

13   name on the site, was for credibility purposes.  He wanted to

14   be taken seriously among other users, among other members, so

15   that he could get access to what they could provide to him.

16        Well, that's what we see here.  The responding to polls,

17   the publishing interests in a profile, were the defendant's

18   way of establishing that credibility, establishing that he was

19   an active user and someone who when he sent a message to a

20   private group administrator saying, "Let me in, I can

21   contribute," that administrator would say yes.  That's the

22   purpose when you look through these exhibits and you see these

23   sorts of comments being posted by the defendant.

24        The defendant reached out to friends.  You know that.

25   You'll see in the exhibits the list of those friends.  You've

PLAINTIFF'S CLOSING ARGUMENT                               734

1      seen the screenshots, screen after screen after screen of

2      users the defendant reached out to individually; screens of

3      those users' avatars, avatars that frequently consisted of

4      sexually explicit images of children.

5          And you've seen and heard about his private messages.

6      Private messages that not only discussed violence and sexual

7      abuse of children, but private messages that made his

8      knowledge and intent of the purpose of this site, messages

9      that made his intention to solicit child pornography from and

10     through other members very, very clear; messages where he

11     discussed child pornography, videos and images and where to

12     get them and which ones he liked and which ones he just

13     couldn't find enough of.

14         And you'll see that all through Government's Exhibit 9A,

15     every message that the defendant sent to another user on the

16     PedoBook website.

17         So ladies and gentlemen, that's the site.  You know the

18     structure; you know how it was set up.  You've seen the

19     exhibits documenting the way that it facilitated these sorts

20     of interactions among its users.

21         I want to step aside for a moment and talk a little bit

22     about the charges in this case and their elements and talk

23     through how the evidence that you've seen and heard is going

24     to fit in these elements.

25         So the first count is engaging in a child exploitation

1    enterprise.  And the judge has instructed you on the law.  You

2    have your jury instructions in front of you.  If anything that

3    I say, ladies and gentlemen, in any way conflicts with

4    anything the judge has told you or that is in your

5    instructions, please, those instructions and what the judge

6    tells you are the law, not what I say.

7         What I would like to do here is recap in basic terms some

8    of the elements and how you can consider them, how you can

9    think about them when you're deliberating.

10        So what are the basic building blocks of the enterprise

11   count?

12        First, it's that the defendant accessed child pornography

13   with the intent to view three or more times; that he did so in

14   concert with -- and the judge has told you that means the same

15   as being in a conspiracy with -- three or more other persons,

16   and he did this -- and that this conduct involved more than

17   one minor child.

18        Now, with respect to the first portion of this, and that

19   is the access with intent to view child pornography, keep in

20   mind that what we're talking about are the counts charged in

21   Counts IV through VII, that is, on four individual dates, the

22   defendant is charged with having access with intent to view

23   child pornography.  Those are the three or more times that

24   we're talking about that pertain to Count I.

25        What does access with intent to view child pornography

1    mean?

2         The judge has instructed you.  It's knowingly accessing

3    with intent to view a computer disk or other material.  What

4    do we mean in this context?  We mean the PedoBook web server.

5    That server that was located here in Omaha.  That server that

6    had on it all of the child pornography images that were

7    available on the PedoBook website.  That's the computer disk

8    or other material.

9         And that the defendant knew that it contained child

10   pornography.  Well, how do you know that?  Well, you've seen

11   the records of the defendant's conduct.  You've seen the

12   screenshots of the site and what it looked like to its users

13   and its members.  And you've seen what the defendant saw each

14   day that he went and accessed these particular materials.

15        Now, again on the access with intent count, ladies and

16   gentlemen, you've got a guide.  And your guide to these counts

17   is Exhibits 5A through D and 6A through D.

18        And what you're seeing on the screen is an excerpt from

19   Exhibit 5A.  And how do these fit together?  5A through D are

20   portions of that board data, the logs, that exist for the

21   defendant's conduct for November 19th until December 8th.

22        5A corresponds to November 21st, 5B to November 26th, 5C

23   to December 4th, and 5D to December 8th.

24        And we've organized 6A through D in a particular way to

25   make it easy to follow.  6A goes with 5A, 6B goes with 5B and

PLAINTIFF'S CLOSING ARGUMENT                                    737

1    so on.  6A through D are those screenshots that you saw of

2    what the defendant would have seen up on his computer screen

3    as he navigated through these sessions.

4         So let's go through what we're seeing on the screen, what

5    it means, to hopefully make your deliberations a bit easier.

6         We've got a portion of Exhibit 5A broken up on the screen

7    here.  On the top part, we see the date and time.  We've heard

8    a lot about UTC, Universal Coordinated Time.  It means the

9    user took an action and that's the time that website recorded

10   it.  It's converted into Eastern Standard Time, the

11   defendant's time zone, in Germantown, Maryland, the eastern

12   time zone.

13        We see that session identifier.  Now remember the

14   testimony from Special Agent Gordon, Special Agent Smith.  A

15   session ID is an individual, unique identifier for one

16   particular session on the board.

17        What's a session?  Log-on to log-off.  One session, one

18   unique series of characters just like you see on that screen.

19        Page view, what does that tell us?  Just what it says.

20   That is the page on the PedoBook website that the user viewed

21   at that date and time on that same entry.

22        It's the same sort of thing that you'll see in that URL,

23   that web box that starts with oqm and then all of those

24   characters, and then .onion.  And then you'll see this slash

25   and the rest of it.  That's what the user sees on the screen.

1    And this is what tells you where the user was on that site.

2         And then finally, where you see that entry, it means the

3    user took one more active step.  Didn't just navigate to the

4    particular web page, but then took another step to click on

5    that image.  And clicking on that image means you expanded

6    from a smaller image to a larger image.

7         So you'll see these entries again for each of the dates

8    of access with intent that are charged.

9         The second part of child exploitation enterprise is that

10   it's done in concert with three or more other persons.

11        COURTROOM DEPUTY:  Mr. Becker, 23 minutes.

12        MR. BECKER:  Thank you.

13        You'll see on each one of those exhibits, 6A through 6D,

14   which user actually posted the image that the defendant

15   accessed.  You'll see -- and you'll see those three or more

16   other users and their user names depicted right next to the

17   image that they posted.

18        But of course, that's not all -- that's not the only

19   person -- those aren't the only persons that the defendant

20   interacted with.  And those aren't the only other persons that

21   the defendant conspired with.

22        Because you know -- you'll know from the private messages

23   that he interacted with dozens and dozens of other users, from

24   his friends, that he interacted with dozens and dozens of

25   other users.

PLAINTIFF'S CLOSING ARGUMENT                                    739

1        So Count II, conspiracy to advertise child pornography.

2   I want to stop and talk to you a little bit about what

3   "advertising" means before we get to conspiracy.

4        Advertising child pornography has been defined for you by

5   the Court.  The key concept that we'll ask you to focus in on

6   is this making, printing or publishing of a notice or

7   advertisement, seeking or offering to receive, exchange, buy,

8   produce, display or distribute.

9        Now, how does this make sense in the context of the facts

10  here?

11       What we're talking about in terms of advertising behavior

12  is this seeking behavior.  It's the seeking -- seeking or

13  offering, it's a two-sided sort of concept.

14       And so what do we see in terms of the defendant's conduct

15  that tells us that he was seeking child pornography?

16       Again, Exhibit 9A.  Example after example of him

17  soliciting others about particular child pornography, of him

18  soliciting other users to send him child pornography.  "You

19  ever share pics of your son?"  "Do have any more pics of her?"

20  And then talking about that particular and brutal interest

21  that he had in very violent videos that he was seeking to

22  obtain.

23       I want to talk to you for a moment about what makes

24  PedoBook a conspiracy.  I was talking with my colleagues,

25  Mr. Norris and Ms. Chang, last night in trying to brainstorm

1      about how to articulate why PedoBook in particular is a

2      conspiracy to you all today.

3          And the concept that came to me was actually one that

4      you've seen on PedoBook, and that's the tag cloud.  Now, the

5      tag cloud, as you may recall, was a series of terms that users

6      of PedoBook had used to describe particular images that were

7      posted and a way for users to subcategorize to make it easier

8      to find.

9          I hope that this cloud is less offensive than the one

10     that you saw on the PedoBook website.  But these are the sorts

11     of words that we're talking about and thinking about when we

12     talk about a conspiracy as it existed in this context on

13     PedoBook.  It's the structure of the interaction, the way this

14     site was organized and categorized, the incentives it created

15     to reach out to other users in order to solicit material,

16     particular material for particular interests.

17         And it was crucial that this be done anonymously.  And

18     the fact that it was on Tor and a hidden service was a key

19     component of that.

20         Some quick points about what conspiracy does not require.

21     It does not require, as the judge instructed you, a formal

22     agreement.  It doesn't require that everyone join at the same

23     time.  It doesn't require that you know in real life all of

24     the other people in the agreement.  Nor does it require any

25     major role.  And we've talked about how the defendant

1      personally participated in this conspiracy.

2          And the last thing I want to speak to you about is the

3      evidence that shows the defendant, Timothy DeFoggi, to be the

4      user fuckchrist and PTasseater on the PedoBook website.

5          Well, first, you know that he gave investigators clues in

6      the private messages he exchanged with other users.

7          He pinpointed himself as someone who lived in the D.C.,

8      Maryland, Virginia area.  You've seen those messages.  And

9      you'll see them again in Government Exhibit 9A.

10         You've seen the crucial clues that he gave to other users

11     and to Special Agent Gordon in their undercover interactions

12     about when he was on this website, when he was on Tor.  "I'm

13     on from 3:30 to 6 a.m. every day; really early before my

14     roommate gets up, around 4:30 or 5 in the morning."

15         And then telling users -- and this will be important --

16     "I'm off this week if you want to hook up."  What week was

17     that?  November 20th.  It's the week of Thanksgiving.  Take a

18     look at the defendant's work access logs and see whether or

19     not it looks like he went to work that week.  That was the

20     first clue.

21         The defendant's reuse of this user name PTasseater was

22     ultimately part of his undoing.  You've seen Exhibit 14.  And

23     remember, an America Online instant messaging profile,

24     PTasseater.  A direct connection between the defendant and

25     that account.  How?  IP address log-ins from the AOL account

1    tracing directly to the defendant's Verizon Internet account

2    in Germantown, Maryland.

3        The reuse of the user name PTasseater on the Russian

4    image hosting website Image Source.  Take a look at Exhibit

5    70, Exhibits 12 and 16.  You will see this IP address dozens

6    and dozens and dozens of times from June to December of 2011

7    through the entirety of that time assigned to the defendant's

8    residence, his Verizon Internet account, in Germantown,

9    Maryland.

10       And then, of course, ladies and gentlemen, you know that

11   he was just caught red-handed; that when law enforcement

12   carefully and with great deliberation and after creating a

13   very well-considered operational plan, going in at exactly the

14   right time when they knew they could catch the user they were

15   looking into on the Tor network, they go through his door and

16   what is he doing?  They find him with his hands on the

17   keyboard of his laptop computer in the process of downloading

18   a child pornography video from a Tor child pornography

19   website.

20       That computer tells you the rest of the story.  Messages

21   in there, not only talking about the same sorts of topics as

22   fuckchrist on PedoBook discussed with his other users, but

23   references to his user name, fuckchrist; references to his

24   other user name, PTasseater; all within that laptop computer

25   that he bought, that he configured, that he used and was in

DEFENDANT'S CLOSING ARGUMENT                                    743

1    his hands when law enforcement went into his house at 5:30 in

2    the morning on April 9th, 2013.

3        And that's not all. You know from the rest of the

4    examination of that laptop that not only was there the user

5    names, but there was evidence of the Tor browser which you

6    know was there; a voluminous amount of Tor hidden service

7    browsing activity that you know from Examiner Hsu and Special

8    Agent Smith consisted of access to Tor hidden services; that

9    the majority of the Tor hidden services accessed by that

10   computer were those involving child exploitation.

11       So ladies and gentlemen, I'm going to come before you

12   again in a few moments after the defense has their opportunity

13   to talk to you.

14       When I do, I'm going to ask you to return the only

15   verdict that will be consistent with all of the evidence in

16   this case. That will be a verdict of guilty.

17       Thank you.

18           THE COURT: Thank you, Mr. Becker.

19       We'll now hear from Mr. Berry, counsel for the defense.

20           MR. BERRY: Good afternoon.

21       It's been a long, long week, and you've been subjected to

22   some fairly disgusting images. You're probably tired of being

23   here. But it's very important that you're here. You're the

24   standard bearer. You're the one -- the ones that are

25   responsible for holding the government to its standard of

1    proving a case beyond a reasonable doubt.

2         And while some of these images and pictures may be

3    emotionally disturbing, emotionally charged, and have invaded

4    your mind and disturbed your thoughts, your duty is to go

5    beyond those thoughts and feelings and to look at the facts of

6    the case and determine whether the government has, in fact,

7    proven its case beyond a reasonable doubt.

8         And this is closing argument.  Mr. Becker and I have the

9    opportunity to talk about the things that we think are

10   important in the case.  We'll talk about the facts, we'll talk

11   about the law.  But at the end of the day, the judge instructs

12   you on the law and you decide the facts.

13        We get to talk about our interpretation, our arguments.

14   But in the end, much of the decision pertaining -- to bring

15   the law and the facts together is up to you.  The judge will

16   tell you in the end what you must do.  And it's your duty to

17   follow that, regardless of personal feelings.

18        And so we talk about the government's burden, there's

19   really two parts to this.  First, whether the person known as

20   fuckchrist PTasseater committed the crimes alleged by the

21   government.

22        Now, you've seen horrific pictures, you've seen a lot of

23   stuff.  It doesn't necessarily have to do with the specific

24   counts charged in the indictment.

25        And the judge is going to instruct you on all seven of

1     those counts.  But the first thing you have to decide is

2     whether the actions of this fuckchrist PTasseater actually

3     violated the law based on the facts you've heard at trial and

4     the instructions given you by the judge.

5          Second, if you find that those actions violated the law,

6     then you have to decide the identity piece.  Was this person

7     who goes by the name fuckchrist PTasseater, was this proven

8     beyond a reasonable doubt that it's Mr. DeFoggi?

9          So you heard in the beginning, Mr. DeFoggi is presumed

10    innocent.  By law, you have to presume him innocent.  And

11    that's difficult because that's not something we do in our

12    everyday lives.  We typically presume guilt, like when we see

13    the police officer pulling the person over to the side of the

14    road, we just assume they did something wrong.

15         We can't do that here.  And so that presumption stays

16    with Mr. DeFoggi unless or until the government can prove

17    every element of the offense beyond a reasonable doubt.

18         And in this case reasonable doubt as to the specific

19    allegations remains.

20         Count I:  Child exploitation enterprise.  The judge will

21    give you copies of those instructions to take back to the jury

22    room with you.  The way I see it, there's three things:  The

23    violations must have involved three or more persons with whom

24    the defendant acted in concert, and he committed the offenses

25    three or more times.

1         Acted in concert with these other people.  PedoBook;

2    foreign concept to us but Facebook probably isn't.

3         Speaking on Facebook, putting in messages, seems to be an

4    individual act, not acting in concert.  And to some degree,

5    whether a group exercises its First Amendment right to

6    assemble, there's nothing wrong with that, even if they're

7    pedophiles.

8         Certainly child pornography is illegal.  And there is no

9    right to break the law.  But for a group of people to discuss

10   their thoughts, views, and fantasies, that's not illegal.

11   That's protected by the First Amendment.

12        There's a stipulation entered into evidence.  This is

13   what it said:  Fuckchrist had no role in creating, operating

14   or administering the PedoBook website.

15        As I said, this was fantasy chat.  Do you remember what

16   his profile said?  Contact me for fantasy chat.

17        So Count II, conspiracy to advertise.  This is my attempt

18   to break it down into something a little simpler:  That there

19   was an agreement to advertise child pornography, and that the

20   defendant joined in the agreement.

21        Chatting about what you want to do isn't advertising.  A

22   group of people aim to discuss their fantasies with each other

23   are not advertising anything other than discussing fantasies.

24        Count III, conspiracy to distribute.  The same thing.

25   And is fantasy chat an agreement?  Telling somebody about your

1    deepest thoughts and fantasies, is that an agreement?  An

2    agreement to do what?  There is no agreement.

3        We know that fuckchrist did not post or upload any

4    pictures, images or videos.  Don't have any evidence that he

5    didn't receive from other PedoBook users.  We don't have any

6    evidence that he purchased any.

7        Possession itself.  We saw a lot of child pornography

8    that was taken from PedoBook and other places certainly.  But

9    the counts in the indictment are specific to specific dates;

10   November 21, Count IV; November 26, Count V; December 4, Count

11   VI; December 8, Count XI.  Those are the images that are

12   alleged here.  I know you saw a lot more than four images.

13       Mr. DeFoggi isn't charged with a crime specific to those

14   images or for possessing those other images that you saw on

15   the PedoBook.  And are -- it is these four images on these

16   dates that the government must prove beyond a reasonable

17   doubt.  And none of these images were found on any device

18   located in Mr. DeFoggi's home.

19       So those are the -- that's the first half.  The person

20   who is -- goes by the name the fuckchrist, did that person

21   commit those crimes?  If not, you stop there.

22       If it doesn't look like a child exploitation enterprise

23   based on your review of the jury instructions and the facts,

24   then you stop there.  If it's not a conspiracy, you stop

25   there.  If it's not possession or, as I say, accessing, you

1    stop there.

2        If you move past that, you still have -- the government

3    still has the burden of proving identity.

4        So who is behind the computer?  Well, we know no one's

5    ever met up with fuckchrist, right?  We had an undercover

6    agent who was talking with him, chatting with him; meetings

7    were mentioned, they wanted to meet to masturbate and I guess

8    have additional fantasy chat, but that never happened.

9        We heard from Mr. MacMillan, the snitch, the guy in the

10   yellow jumpsuit.  He comes out here and says, yeah, we talked

11   about it but I really didn't want to.  We have no positive

12   identification as to who the person is that was or went by the

13   name fuckchrist or PTasseater.

14       We also know that there were other occupants of the

15   house.  We heard this from Mr. DeFoggi.  And I think I heard

16   the same thing from -- from one of the agents that you have an

17   IP address, it will tell you the source, maybe the household

18   where that service is going; but if there's no logs, you don't

19   know specifically which devices are plugged in and who is

20   behind the device at that time.

21       So, we are -- we have to presume innocent.  We can't just

22   assume identity.

23       So what do we know about the identity of fuckchrist?

24   Well, there's no avatar.  We saw that page where it was blank.

25   There's no -- fuckchrist didn't upload a picture of himself,

1    he didn't upload child pornography like a lot of other users

2    of PedoBook, didn't upload any photos in that avatar space.

3    And there's no photos uploaded in any other space of PedoBook

4    by fuckchrist.  And once again, no in-person meetings.

5        The one thing we do know about the identity:  Contact me

6    for fantasy chat.  In the end, even if we have an identity,

7    what does it show?  That someone engaged in fantasy chat?

8        We heard testimony that if we go to a website -- again,

9    we go to ESPN, and maybe I don't want to see Johnny Manziel

10   pop up.  But if I click on that home page, I'm going to get

11   those pictures anyway.

12       And if someone wants to chat with other persons who have

13   similar interests, don't necessarily control the avatars that

14   they post or what's going to be on the page; but if someone

15   wants to chat, they go to chat.  The purpose of PedoBook was

16   for fantasy chat.

17       Certainly people in the PedoBook broke the law.  And

18   certainly there was child pornography all over the place.  The

19   question is whether the person identified as fuckchrist or

20   PTasseater violated the specific laws that the government has

21   alleged in this case, and that's Counts I through VII.

22       The reasonable doubt remains; number one, as to whether

23   the person going by the name of fuckchrist PTasseater actually

24   violated the law, if they -- was part of a child exploitation

25   enterprise, whether they were part of a couple of

1    conspiracies, whether they actually accessed those four images

2    that we never found on a physical hard drive or other physical

3    piece of evidence.

4        The other reasonable doubt is who was fuckchrist?  We

5    have no positive identification.  This case has not been

6    proven beyond a reasonable doubt.

7        And for these reasons, I'm asking you to find Mr. DeFoggi

8    not guilty on all counts.

9        Thank you for your time and your service.

10       THE COURT:  Thank you, Mr. Berry.

11   We'll hear rebuttal from Mr. Becker.

12       MR. BECKER:  Thank you, your Honor.

13       Ladies and gentlemen, first of all, thoughts and views

14   and fantasies, we're not prosecuting anyone for words but for

15   actions, actions that were taken on the PedoBook website.

16       You may have a First Amendment right to say that you

17   robbed a bank, but those words are going to come back and hurt

18   you if you've actually done that.

19       You've got to think about what those words mean in terms

20   of judging the defendant's knowledge and intent with respect

21   to the crimes that are charged.

22       What do those words mean?  How do they amplify the

23   actions that were taken by the defendant?

24       Because the user PTasseater and fuckchrist, the defendant

25   it's been proven to be, didn't just chat with other users on

```
1    PedoBook.  There's not even a chat function on PedoBook.

2    There's no instant messaging service available there.  That's

3    not what the site's all about.  The defense would love if it

4    were because it makes their fantasy of an argument a lot more

5    probable, but it's not.

6         The fact is, you've seen the evidence that the defendant

7    didn't just chat with others, that he did, in fact, access the

8    illegal child pornography that is there on that website on

9    those dates that are charged here.

10        The child pornography is not fantasy.  You have seen the

11   children depicted in those images.  You know, ladies and

12   gentlemen, that that exploitation that occurs in those images

13   is not fantasy.  It is real.

14        The straw man.  The defendant points the finger at other

15   people in the household.  Ladies and gentlemen, you know

16   everybody else in that household.  You've heard from them.

17   They took the witness stand.  And they had every incentive and

18   interest to do whatever they could to exculpate the defendant,

19   right?  Dale Bounds, his partner of 25 years; Chris Casto, the

20   defendant's adoptive son.  Surely they'd say anything they

21   could to help exculpate Tim DeFoggi.

22        Could they?  No.  You know why?  Because all they could

23   do, all they were allowed to do was get up there and tell the

24   truth.  And what was the truth?

25        Dale Bounds:  I'm not PTasseater.  I'm not fuckchrist.  I
```

1   don't use Tor.  Tim gets home before me every single day from

2   work.

3        Chris Casto:  I've never used any of the computers in the

4   household to surf child pornography.  I've never used Tor to

5   surf child pornography.  I'm not PTasseater.  I'm not

6   fuckchrist.

7        That's what the evidence is, ladies and gentlemen.

8   You've heard from everyone in that house.

9        Why isn't there images from the PedoBook website on the

10  defendant's laptop?  You all know the answer to that.  We've

11  talked about that ad nauseam; CCleaner and Eraser.  It runs

12  every time the defendant turns that computer on, and it wipes

13  out all that data we'd expect to find and be able to use for a

14  forensic examination.  That is exactly why there are not

15  images from the PedoBook website that were found on that

16  laptop.

17       On straw man, on the prospect of there being some

18  possibility of some other user out there, ladies and

19  gentlemen, you've seen the self-contained world of the people

20  in that house who had access to that computer.

21       You know from the defendant's own words.  He took the

22  stand.  He told you, "I bought that laptop.  I used that

23  laptop.  I put CCleaner on it.  I put Tor on it.  I used the

24  Tor network with that laptop."

25       He talked to you for maybe an hour about his experience

1   and his knowledge of the Tor network.  Did you see any of that

2   or hear any of that from Mr. Bounds or Mr. Casto?  Of course

3   not.

4        The defendant took the stand.  He gave you that

5   testimony.  You should evaluate that testimony as you do the

6   testimony of all the other witnesses.

7        I'll just leave you with this, ladies and gentlemen:  Did

8   anything the defendant told you give you any reason to doubt

9   that he's the person responsible?

10       He acknowledges his computer, his network, his expertise.

11  He's the one who did this and you know this from all of the

12  evidence submitted by the government and by the defense.

13       For that reason, ladies and gentlemen, we ask you to find

14  the only verdict that's consistent with everything you've

15  heard and seen in this case.

16       We ask you to hold the defendant accountable to the

17  evidence that you've seen and heard and do that by finding him

18  guilty.

19       Thank you.

20            THE COURT:  Thank you, Mr. Becker.

21       I'm now going to read the final instruction, No. 40.

22       (Instruction 40 read.)

23            THE COURT:  No doubt you have noticed that there are

24  13 of you here.

25       And Mr. Marshall, you are the alternate in this case.  It

 1    was very important for you to be here because if any of the

 2    other jurors had become ill or gotten in an accident or been

 3    unable to attend, we would have needed you.

 4        But at this point, you have completed your service to the

 5    court.  So thank you for your time and attention.  You don't

 6    need to call in to the clerk's office for any further

 7    instructions.  You have finished your duty.

 8        The remaining 12 of you have a little bit of time this

 9    afternoon to start on your deliberations.

10        And one of the things that I had mentioned to you when I

11    was downstairs on the first day of trial, on Tuesday morning,

12    was that we would not be in trial on Monday.  And that was

13    because I was unsure that the lawyers would finish at the end

14    of this week.

15        You do not need to deliberate on Monday.  If some of you

16    have made plans for Monday, that's fine.  But I'm going to

17    leave it in your hands whether you choose unanimously to

18    deliberate on Monday.  If you wish to, you may.

19        If anyone is not -- if any one of you is not available on

20    Monday, then you should start your deliberations no later than

21    nine o'clock in the morning on Tuesday.

22        With that, you may retire to the jury deliberation room

23    to begin your deliberations.

24        Thank you.

25        (Jury out at 4:24 p.m.)

```
 1            THE COURT:  Are there any other matters that we need
 2     to address at this time?
 3         Mr. Becker?
 4            MR. BECKER:  No, I don't believe so, your Honor.
 5            THE COURT:  Mr. Berry?
 6            MR. BERRY:  No, your Honor.
 7            THE COURT:  All right.
 8         I will note that we will be happy to let you know if the
 9     jury does decide to deliberate on Monday so that you can be on
10     call.
11         We do ask that one person from either side, one lawyer
12     from either side, remains within a 10-minute radius of the
13     courthouse while the jury is deliberating; and that way, if
14     the jury reaches a verdict, there won't be any substantial
15     delay in getting the lawyers here for the purpose of receiving
16     the verdict.
17         If there's a question by the jury, we will reach you by
18     cell phone.
19         So please be sure you let Ms. Griess know a cell phone
20     number where one lawyer from either side can be reached at all
21     times that the jury is deliberating.
22         I want to thank the lawyers for their thorough
23     preparation and professionalism and courtesy to each other and
24     to the court staff.
25         It was a pleasure to have all of you here.
```

1           Some of you I see regularly and some I don't see so

2    often, so anyway it was my pleasure to have you here this

3    week.  Thank you.

4           MR. BECKER:  Judge, until what time does the jury

5    deliberate, your Honor?

6           THE COURT:  We will excuse them at 5.  We won't keep

7    them past 5 today.

8        And by five o'clock, Ms. Griess, when you excuse them,

9    would you please inquire as to whether they plan to deliberate

10   on Monday?  That way we can let the lawyers know.

11       Thank you.

12          MR. BECKER:  Thank you, your Honor.

13          MR. NORRIS:  Thank you.

14          MS. CHANG:  Thank you, your Honor.

15

16       (Adjourned at 4:26 p.m.)

17

18

19

20       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

21

22       _/s Brenda L. Fauber_              10-7-14
         Brenda L. Fauber, RDR, CRR                Date
23

24

25

```
1                          I-N-D-E-X

2

3    Jury Instruction Conference......... Page 711 through 717

4    Closing Arguments.................. Page 725 through 753

5

6                          Direct Cross Redirect Recross

7    WITNESSES:

8    FOR THE DEFENDANT:

9    Christopher Casto                    613    622

10   Timothy DeFoggi              624     659    701

11

12   REBUTTAL WITNESSES:

13   FOR THE PLAINTIFF:

14   Steven A. Smith, Jr.          705    708

15

16   EXHIBITS:                           Offered      Ruling

17   201.  Defendant's CV                  625         625

18   222.  Certification-Security Plus     627         628

19   223.  Certification-Microsoft         627         628

20   224.  Certification-Microsoft         627         628

21   225.  Certification-Microsoft         627         628

22   226.  Certification-MCSE 2000         627         628

23   227.  Certification-MCSE NT4          627         628

24   228.  Certification-Microsoft         627         628

25   229.  Certification-Cisco             627         628
```

| | EXHIBITS: | Offered | Ruling |
|---|---|---|---|
| 230. | Certification-Cisco | 627 | 628 |
| 231. | Certification-Novell | 627 | 628 |
| 232. | Certification-Novell | 627 | 628 |
| 233. | Certification-Novell | 627 | 628 |
| 234. | Certification-CNA, Netware 4 | 627 | 628 |
| 235. | Certification-CNE, Netware 3x | 627 | 628 |
| 236. | Certification-CNA, Netware 3x | 627 | 628 |
| 237. | Certification-Federal Contracting Officer Representative | 627 | 628 |
| 238. | Course-National Intelligence University, Research, Development, and Architecture | 627 | 628 |
| 239. | Course-Counterintelligence Directorate, Nuclear Technology For Counterintelligence | 627 | 628 |